## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AHMED ZAID SALEM ZUHAIR,
     Detainee (ISN 669),
     United States Naval Station
     Guantánamo Bay, Cuba,

     *Petitioner/Plaintiff,*

     v.

GEORGE W. BUSH,
     President of the United States
     The White House
     1600 Pennsylvania Ave., N.W.
     Washington, D.C. 20500;

ROBERT GATES,
     United States Secretary of Defense
     Department of Defense
     1000 Defense Pentagon
     Washington, D.C. 20301-1000;

REAR ADMIRAL MARK H. BUZBY,
     Commander, Joint Task Force—
     Guantánamo
     JTF—GTMO
     APO AE 09360; and

ARMY COL. BRUCE VARGO,
     Commander, Joint Detention
     Operations Group, JTF—GTMO
     JTF—GTMO
     APO AE 09360,

     *Respondents/Defendants.*

**PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Ahmed Zaid Salem Zuhair (hereinafter "Petitioner," "Plaintiff," or "Mr. Zaid"[1]) seeks the Great Writ. Mr. Zaid is a citizen of Saudi Arabia. He is a civilian who has never participated in armed activities against the United States or its allies. In late 2001, Mr. Zaid was kidnapped and tortured by authorities in Pakistan and subsequently rendered to U.S. custody in Afghanistan, where he was tortured and subjected to cruel, inhuman, and degrading treatment. Mr. Zaid was then transferred to the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo") in mid-2002 and has been held virtually *incommunicado* since, without access to a neutral magistrate to test the legality of his detention. Mr. Zaid has been abused and beaten by guards at Guantánamo and is subjected to humiliating body searches several times per day.

In June 2005, after nearly three years in arbitrary detention based on vague and unsubstantiated allegations, Mr. Zaid and one other detainee went on hunger strike in protest. They have remained on hunger strike for nearly three years, far longer than any other detainees at Guantánamo. Mr. Zaid's jailers have sought to punish Mr. Zaid for his hunger strike and attempted to break his will. They have subjected him to unnecessarily brutal forms of force-feeding, including a four-hour daily regimen of painfully strapping him to a chair and forcibly inserting a feeding tube into his stomach through his nose. In a bid to break his hunger strike, Mr. Zaid's jailers have denied him badly needed medical care, including refusing him treatment for inflamed nerves in his spinal cord. They have repeatedly inflicted needless pain upon him, stitching without anesthesia facial wounds sustained as a result of their beatings, for instance, or spraying mace in his face while he

---

[1] Petitioner's family name is actually Zuhair; Zaid is his middle name. A Petition for Review under the Detainee Treatment Act, filed before counsel was allowed to meet with Petitioner and confirm his proper name, was filed under the name Zaid. *See Zaid v. Gates*, 07-1221 (D.C. Cir. 2007). For the sake of consistency, this petition will continue to refer to him as "Mr. Zaid."

was strapped into a restraint chair and incapable of harming anyone. They have repeatedly denied him and his counsel access to medical records needed for an independent assessment of his deteriorating health. Yet despite all of this, Mr. Zaid has advised counsel that "this injustice will only end when I leave this island and only then will I end my [hunger] strike."

Petitioner is detained without lawful basis, without charge, and without any fair process by which he might challenge his detention. Mr. Zaid is being held under color of law, and in violation of the Constitution, laws and treaties of the United States as well as in contravention of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner or to establish in this Court a lawful basis for his detention. This Court should also order injunctive and declaratory relief, including telephonic access to his family, with whom he has not spoken for more than six years.

Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, or under the November 13, 2001 Executive Order, Respondents/Defendants (hereinafter "Respondents") George W. Bush, President of the United States; Robert Gates, U.S. Secretary of Defense; Rear Admiral Mark H. Buzby, Commander of Joint Task Force—Guantánamo (JTF—GTMO); and Army Colonel Bruce Vargo, Commander, Joint Detention Operations Group, JTF—GTMO, are either ultimately responsible for, or have been charged with the responsibility of maintaining, the custody and control of the detained Petitioner at Guantánamo.

## I.    JURISDICTION

1.    Petitioner brings this action pursuant to 28 U.S.C. §§ 2241(a), (c)(l) and (c)(3) and 2242, and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, and Articles I(9)(2) and III(2) of the United States Constitution.

2.    This Court is empowered under 28 U.S.C. § 2241 and the Constitution to grant this Writ of Habeas Corpus and to entertain the instant Petition under 28 U.S.C. § 2242. This Court is further empowered to entertain the Petition pursuant to the United States Supreme Court's ruling in *Rasul v. Bush*, 542 U.S. 466 (2004). This Court is empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, in accordance with Fed. R. Civ. P. 57; to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

3.    The Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ("MCA"), does not strip the Court of jurisdiction to entertain this Petition. The Supreme Court is currently considering the effect of that legislation. *Boumediene v. Bush*, 127 S.Ct. 3078 (June 29, 2007) (No. 06-1195); *Al Odah v. United States*, 127 S.Ct. 3067 (June 29, 2007) (No. 06-1196). This Court has repeatedly demonstrated its reluctance to dismiss habeas petitions pending resolution of the issues presently before the Supreme Court.[2]

---

[2] *See, e.g., Al Darby v. Bush*, No. 05-2371 (RCL) (D.D.C. Mar. 31, 2008) (order denying Motion to Dismiss without prejudice); *Taher v. Bush*, No. 06-1684 (GK), Docket 26 (D.D.C. Mar. 21, 2008) (minute order denying without prejudice respondents' motion until the Supreme Court has ruled definitively on the issue of the District Court's jurisdiction); *Almurbati v. Bush*, No. 04-1227 (RBW) (D.D.C. Mar. 7, 2008) (minute order denying without prejudice respondents' motion to dismiss pending the Supreme Court's decision in *Boumediene v. Bush*); *Al Shimrani v. Bush*, No. 05-2249 (RMC) (D.D.C. Jan. 1, 2008) (order staying case pending decision in *Boumediene v. Bush*); *Errachidi v. Bush*, No. 05-0640 (EGS) (D.D.C. Aug. 17, 2007) (minute order denying without prejudice respondents' motion to dismiss pending the Supreme Court's decision in *Boumediene v. Bush*); *Khalid v. Bush*, No. 04-1142 (RJL) (D.D.C. Aug. 6,

4.    The Court of Appeals for the District of Columbia Circuit ("Court of Appeals") has also held that the MCA does not preclude this Court from exercising its jurisdiction to issue preliminary injunctions barring transfer of detainees to countries where they face risk of torture. *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. Mar. 14, 2008). The preservation of jurisdiction over transfers is crucial given the serious risk of torture faced by some former detainees after transfer from Guantánamo. *See* Jennifer Daskal and Eric Goldstein, Human Rights Watch, *Ill-fated Homecomings: A Tunisian Case Study of Guantanamo Repatriations* (2007).

## II.    PARTIES

5.    Petitioner is a citizen of Saudi Arabia who is presently incarcerated and held in Respondents' unlawful custody and control at Guantánamo. Petitioner acts on his own behalf through counsel.

6.    Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States military. Mr. Zaid is being detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (November 13, 2001) ("Executive Order"). President Bush is responsible for Mr. Zaid's unlawful detention and is sued in his official capacity.

---

2007) (order staying case pending resolution of *Boumediene v. Bush* and *In Re Guantanamo Bay Detainee Cases*); *Al Qosi v. Bush*, No. 04-1937 (PLF) (D.D.C. July 27, 2007) (order denying without prejudice respondents' motion to dismiss pending the Supreme Court's decision in *Boumediene v. Bush*); *Al Maqaleh v. Gates*, No. 06-1669 (JDB), 2007 WL 2059128 (D.D.C. July 18, 2007) (minute order denying without prejudice respondents' motion to dismiss for lack of subject-matter jurisdiction); *Abdessalam v. Bush*, No. 05-0313 (CKK) (D.D.C. July 5, 2007) (minute order denying without prejudice respondents' motion to dismiss pending the Supreme Court's decision in *Boumediene v. Bush*); *Said v. Bush*, No. 05-2384 (RWR) (D.D.C. July 2, 2007) (minute order continuing stay in lieu of dismissing case); *Yaakoobi v. Bush*, No. 06-1683 (RWR) (D.D.C. July 2, 2007) (same).

7.    Respondent Robert Gates is the United States Secretary of Defense. Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war or, alternatively, pursuant to the Executive Order, Respondent Gates has been charged with maintaining the custody and control of Mr. Zaid. He is sued in his official capacity.

8.    Respondent Rear Admiral Mark H. Buzby is the Commander of Joint Task Force—Guantánamo ("JTF—GTMO"), the task force running the detention operation at Guantánamo Bay. He has supervisory responsibility for Mr. Zaid and is sued in his official capacity.

9.    Respondent Army Colonel Bruce Vargo is the Commander of the Joint Detention Operations Group, which manages JTF—GTMO's detention camps, including the facility where Petitioner is presently held. He is the immediate custodian responsible for Petitioner's detention and is sued in his official capacity.

10.    Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf, or agents or employees of private contractors ("contractor employees") with whom any agency under Respondents' authority or supervision has contracted for the provision of services at Guantánamo. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, other government agents, employees or contractor employees.

### III.    STATEMENT OF FACTS

11.    Ahmed Zaid is a citizen of Saudi Arabia who was swept up with no valid justification in the present Administration's "Global War on Terror" and, for the past six

years, has been wrongfully imprisoned virtually *incommunicado* by Respondents at the United States Naval Station at Guantánamo Bay, Cuba. During this time, he has not seen, spoken to, or heard from his family.

12.    In the fall of 2001, Mr. Zaid traveled from Saudi Arabia to Lahore, Pakistan to visit his wife's family and to purchase spare motorcycle parts for his import-export business.

13.    In late December 2001, Mr. Zaid was seized at a market in Lahore by a dozen men in civilian clothes who blindfolded him and took him to an unmarked house.

14.    At this time, Arab travelers in Pakistan were targeted for abduction and arbitrary detention by those who hoped to sell them to U.S. authorities for bounties. An analysis of publicly available Defense Department data indicates that at least 66% of detainees in Guantánamo were captured in Pakistan or by Pakistani authorities. Mark Denbeaux et al., *Report on Guantanamo Detainees: A Profile of 517 Detainees Through Analysis of Department of Defense Data* 14 (Seton Hall Law Sch. 2006), *available at*: http://law.shu.edu/aaafinal.pdf. Amnesty International has documented in Pakistan a "routine practice of offering large rewards for unidentified terror suspects [that] has facilitated arbitrary arrests, detention and enforced disappearance," aimed mostly at foreign Muslims, especially Arabs. Amnesty International, *Pakistan: Human Rights Ignored in the "War on Terror"* 18-20 (2006), *available at* http://asiapacific.amnesty.org/library/pdf/ASA330362006ENGLISH/$File/ASA3303606. pdf. Pakistani President Pervez Musharraf boasted of this practice in his memoirs: "We have captured 689 [individuals] and handed over 369 to the United States. We have earned bounties totaling millions of dollars. Those who habitually accuse us of 'not doing

enough' in the war on terror should simply ask the CIA how much prize money it has paid to the government of Pakistan." Pervez Musharraf, *In the Line of Fire* 237 (2006).

15.    Mr. Zaid is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind under any definition adopted by the United States Government in any civil or military proceeding. Mr. Zaid has never engaged in combat against the United States or its allies in Afghanistan or anywhere else, nor has he provided material support for acts of terrorism.

16.    Because Mr. Zaid did not participate in any armed conflict against the United States or its allies at any point in time or in the attacks of September 11, 2001 in any way, he is not properly detained pursuant to President Bush's authority as Commander-in-Chief under the laws and usages of war, or the Authorization for the Use of Military Force. Joint Resolution 23, Authorization for Use of Military Force, Publ. L. 107-40, 115 Stat. 224 (Sept. 18, 2001) ("AUMF").

17.    On information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Mr. Zaid is subject to the Executive Order of November 13, 2001. Even if he was being detained pursuant to the Executive Order, Mr. Zaid is not properly subject to it because he has never been a member of al-Qa'ida, has never been involved in acts of international terrorism against the United States, and has never knowingly harbored anyone who has. Moreover, the Executive Order is unjust, *ultra vires*, and violates the laws, treaties, and Constitution of the United States insofar as it authorizes indefinite detention without charge. The United States Supreme Court in *Rasul v. Bush*, 542 U.S. 466 (2004), has invalidated the

Executive Order's provision barring judicial review of the legality of the detainees' imprisonment.

18.    Further, petitioner is not, nor has he ever been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who were engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld,* 542 U.S. 507, 516 (2004).

### Detention and Torture in Pakistan and Afghanistan

19.    Immediately after his initial abduction, Mr. Zaid was taken to a house in what he later saw was an affluent residential area of Lahore, Pakistan. There, Pakistani agents tied Mr. Zaid to a wall and beat him with sticks so severely that they broke several sticks in the process. He was fed only once a day. The torture was so severe that Mr. Zaid was willing to lie to the interrogators, hoping that this would make the torture stop.

20.    After six days of this mistreatment, Mr. Zaid unsuccessfully attempted to escape. To punish him, his captors brutally beat him for an entire evening, including with an AK-47 rifle, and threatened to shoot and kill him.

21.    In early January 2002, Mr. Zaid was transferred to an underground military prison in Islamabad, Pakistan. He was held for 2½ months in the facility *incommunicado* and without charge, and for much of this time, Mr. Zaid was unable to lie on his back due to the injuries sustained during his torture. The prison director told Mr. Zaid that the information he had provided prison officials about his identity and the purpose of his trip to Pakistan had been confirmed by Pakistani investigators and that he "should not have been arrested." The official said that Mr. Zaid would be handed over to U.S. authorities for a brief interrogation and would then be released.

22.    Mr. Zaid was instead transferred to Bagram Collection Point ("Bagram"), a U.S. detention center (now called Bagram Theater Internment Facility) near Kabul, Afghanistan in or around the middle of March 2002, probably in exchange for a bounty.

23.    At Bagram, U.S. interrogators stripped Mr. Zaid naked and photographed him during his daily interrogations. Mr. Zaid was questioned by shifts of 10 interrogators who repeatedly asked him about the October 2000 attack on the U.S.S. Cole in Yemen and insisted on calling him "Mullah Bilal." One interrogator threatened to send Mr. Zaid to a place where he would be raped and subjected to other abuses.

24.    In June 2002, Mr. Zaid was transferred to a facility in Qandahar, Afghanistan. During his daily interrogations, he was forced to remain on his knees with his hands on his head for two hours.

25.    Two weeks later, Mr. Zaid was transferred to the U.S. detention facility at Guantánamo Bay Naval Station, Cuba.

**Arbitrary Detention and Denial of Due Process at Guantánamo**

26.    In mid to late June 2002, Mr. Zaid arrived at Guantánamo. His Internment Serial Number ("ISN") is 669; it is unclear if he was assigned this ISN at Guantánamo or at an earlier point.

27.    Mr. Zaid was placed in absolute isolation for over two weeks and was forced to sleep on a cold steel floor.

28.    After his arrival at Guantánamo, Mr. Zaid was not immediately interrogated. He eventually had to ask for a meeting with an interrogator, who brought a virtually empty file to the meeting. In subsequent meetings, interrogators expressed befuddlement at the near-complete lack of information in his file.

29.    In 2003, an interrogator from the FBI told Mr. Zaid that he had tracked down his family, searched his family's home and interrogated his family. The interrogator said he did not tell Mr. Zaid's family where Mr. Zaid was.

30.    On October 26, 2004—nearly three years after his initial abduction in Pakistan—the government revealed the basis for its labeling of Mr. Zaid as an "enemy combatant," in a memorandum summarizing the claims presented for his Combatant Status Review Tribunal ("CSRT") hearing.

31.    A CSRT is a non-adversarial hearing conducted pursuant to rules and procedures that are unfair in design and biased in practice. Detainees are denied access to counsel as well as the right to see evidence against them, confront or even know the identity of accusers, call witnesses, present evidence, or know how the evidence against them was collected. CSRT rules and procedures further allow for the consideration of hearsay evidence and evidence obtained by torture or coercion. These rules and procedures in practice and effect virtually compel the CSRT conclusion that the detainee is an "enemy combatant." *See also* Decl. of Stephen Abraham, Lieutenant Colonel, United States Army Reserve, *Al Odah v. United States*, No. 06-1196 (U.S. June 22, 2007) ("Abraham Decl. I"). Moreover, CSRT allegations are prepared by personnel who themselves have virtually no access to sensitive intelligence information and little or no training or experience in intelligence analysis or criminal prosecution. *See* Decl. Of Stephen Abraham, *Hamad v. Gates*, 07-1098 (D.C. Cir. Nov. 13, 2007) ("Abraham Decl. II"). The CSRT process is inconsistent with the Constitution and laws of the United States and is not a substitute for habeas corpus.

32.    Mr. Zaid declined to participate in his CSRT hearing because he believes it is fundamentally unfair for the reasons outlined above, among others. On November 6, 2004, the CSRT predictably declared him an "enemy combatant."

33.    The government made a number of allegations before the CSRT against Mr. Zaid. The two most specific and serious allegations were that Mr. Zaid was involved in the bombing of the U.S.S. Cole and the murder of William Arnold Jefferson, an American employee of the United Nations, near Tuzla, Bosnia-Herzegovina, in November 1995. The government also cited Mr. Zaid's conviction *in absentia* by a court in Bosnia-Herzegovina for alleged involvement in a bombing in the city of Mostar on September 18, 1997.

34.    Mr. Zaid was not involved in the attack on the U.S.S. Cole in any way.

35.    In November 2002, U.S. forces captured 'Abd al-Rahim al-Nashiri, who was alleged to have been the al-Qa'ida operative behind the Cole bombing. National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* 153 (2004). One of Mr. al-Nashiri's aliases is "Mullah Bilal," the name that Mr. Zaid's U.S. interrogators in Afghanistan used to address him. Office of the Dir. of Nat'l Intelligence, *Biographies of High Value Terrorist Detainees Transferred to the U.S. Naval Base at Guantanamo Bay* 7 (2006). On February 5, 2008, CIA director General Michael Hayden announced in a hearing of the Senate Select Committee on Intelligence that Mr. al-Nashiri had been subjected to the form of torture known as "waterboarding." *See* Greg Miller, *CIA Chief Confirms Use of Waterboarding*, L.A. Times, Feb. 6, 2008, at A1.

36.     The apparent confusion between Mr. Zaid and Mr. al-Nashiri may stem from the similarity between two other aliases attributed to Mr. al-Nashiri—Abu Bilal al-Makki (Abu Bilal the Meccan) and 'Amm Ahmed (Uncle Ahmed)—and Mr. Zaid's nickname, Ahmed al-Makki (Ahmed the Meccan). Using place-based adjectives such as "al-Makki" as nicknames is very common in the Arabic language. Sharing such modifiers in combination with a very common first name is a poor basis for identification or for presuming family ties.

37.     Abu Bakr—an Egyptian detainee at Guantánamo who had also been transferred from Afghanistan—recognized Mr. Zaid from pictures shown to him by U.S. interrogators while in Afghanistan. He told interrogators that he knew Bilal al-Makki and that Mr. Zaid was not Bilal. Although Mr. Zaid's interrogators appear to have reached the same conclusion, the accusation of involvement in the Cole bombing remains on the list of government allegations against Mr. Zaid, without any serious possibility for review.

38.     Mr. Zaid played no part whatsoever in the 1995 murder of William Jefferson and has never been to Tuzla, where the murder occurred. Moreover, there is no evidence to suggest that the killing was part of an armed conflict with the United States, perpetrated by al-Qa'ida or its allies, or was politically motivated in any way.

39.     The 1995 murder of Mr. Jefferson has been extensively investigated by the FBI, the United Nations, and Bosnian authorities. Mr. Zaid has never been charged in connection with the murder of Mr. Jefferson.

40.     In 1998, Interpol issued a "red notice"—a request for arrest with a view to extradition—at the behest of Bosnian authorities for Fa'iz al-Shanbari, a Saudi national, for the murder of Mr. Jefferson.

41.     Mr. Zaid did not participate in the September 1997 Mostar bombing in any way. Moreover, the bombing is not alleged to have targeted or harmed any U.S. persons or property.

42.     The Mostar bombing investigation that led to Mr. Zaid's trial *in absentia* was tainted with impropriety from its early stages. Shortly after the bombing, the UN International Police Task Force (IPTF) in Bosnia-Herzegovina agreed to supervise the investigation. Despite this, local authorities in Mostar refused IPTF's requests for access to the forensic evidence and also barred IPTF's access to the site of the bombing. At a press conference in Sarajevo on October 10, 1997, an IPTF spokesman said: "the UN IPTF is not in a position to certify the results of this investigation since it was denied the opportunity to supervise it, as was agreed with the Federation [of Bosnia-Herzegovina] authorities. Whatever the results of the cantonal investigation into the Mostar bombing, they will not receive the UN IPTF's 'seal of approval.'"

43.     Mr. Zaid's conviction *in absentia* was largely based on statements given by one of his co-defendants, a Bahraini national living in Bosnia-Herzegovina who was already serving a prison sentence for robbery. The co-defendant, Ali Hamad, later recanted the statements incriminating both himself and Mr. Zaid during the trial, claiming that he had been coerced by police who had earlier promised him a quick trial followed by release in exchange for his testimony implicating Mr. Zaid.

44.     Mr. Hamad's unreliability and willingness to fabricate claims in order to obtain leniency is already notorious. After the 9/11 attacks—and after being incarcerated for four years—he suddenly declared himself a former member of al-Qa'ida and became a principal source of information to the U.S. government in its decision to seize Lakhdar

Boumediene and five other men of Algerian origin in Bosnia and transfer them to Guantánamo in 2002. *See* Brief for the *Boumediene* Petitioners at 29, *Boumediene v. Bush*, No. 06-1195 (U.S. filed Aug. 24, 2007).

45.     Subsequent exhaustive investigations by Bosnian authorities cleared the Boumediene group of any wrongdoing. *See* Craig Whitlock, *At Guantanamo, Caught in a Legal Trap: 6 Algerians Languish Despite Foreign Rulings, Dropped Charges*, Wash. Post, Aug. 21, 2006, at A1 ("In 2004, Bosnian prosecutors and police formally exonerated the six men after a lengthy criminal investigation. Last year, the Bosnian prime minister asked the Bush administration to release them, calling the case a miscarriage of justice."). The U.S. government itself seems to have long ago discounted Mr. Hamad's self-serving claims.[3]

46.     Despite the facts outlined above, the government nevertheless reiterated its allegations in different forms for Mr. Zaid's Administrative Review Board ("ARB") proceedings in 2005, 2006, and 2008. In these proceedings, the government has also added vague and unsubstantiated allegations relating to activities in Afghanistan and Kuwait and "connections to" the Algerian Armed Islamic Group (Groupe Islamique Armé or al-Jamaaʿa al-Islaamiyya al-Musallaha) and the Egyptian Islamic Group (al-Jamaaʿa al-Islaamiyya). Mr. Zaid has never traveled to these countries—other than when he was brought to and held in Afghanistan by U.S. authorities—let alone engaged in

---

[3] In a letter written from prison addressed directly to U.S. Maj. Gen. Virgil Packett, head of the NATO-led peacekeeping force in Bosnia, Mr. Hamad wrote: "I know that you do not trust what I have publicly stated about Al Qaeda and its engagement in [the] Federation of [Bosnia-Herzegovina] … you think that I do not talk the truth." Apparently unsatisfied with Maj. Gen. Packett's non-response, Mr. Hamad later penned an open letter to a Bosnian Serb newspaper complaining more generally about the refusal of western officials in Bosnia to take his claims seriously.

belligerent or armed actions there, nor has he ever been a member of or supported these groups.

47.    After more than six years of detention, Respondents have yet to provide any reliable evidence supporting any of the allegations against Mr. Zaid outlined in the CSRT or ARB proceedings.

48.    Respondents have yet to provide any reliable evidence that Mr. Zaid is, or has ever been, a part of the Taliban or Al Qa'ida, has ever supported those groups, has ever committed any violent act against the United States or any U.S. person or property, or has provided material support for acts of terrorism. Moreover, Respondents have failed to offer any proof that Mr. Zaid had any involvement, direct or indirect, in the attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qa'ida or any other terrorist group.

**Hunger Strike and Denials of Medical Treatment**

49.    In June 2005—after 3½ years in detention—Mr. Zaid went on hunger strike to protest both the government's refusal to allow him access to a court of law and the conditions of his confinement.

50.    Mr. Zaid continues his hunger strike to this day. He considers it an act of protest against his prolonged detention without charge. Mr. Zaid has told undersigned counsel that "the hunger strike is [his] only way to speak out."

51.    Mr. Zaid informed counsel that he will continue his hunger strike until he sets foot in the Kingdom of Saudi Arabia, his home country.

52.    Mr. Zaid accepts no solid food. He started drinking water only after the fourth month of his hunger strike, when he began urinating blood.

53.    Mr. Zaid is force-fed twice a day. Medics utilize six-point restraints to strap Mr. Zaid to a chair. He is held in this position for four hours a day. GTMO personnel force a feeding tube through a nostril into his stomach. During each force-feeding, Mr. Zaid's nose bleeds. The pain from each force-feeding is so excruciating that Mr. Zaid is unable to sleep at night because of the pain in his throat.

54.    In the first weeks of Mr. Zaid's hunger strike, he was force-fed on a bed in the medical clinic. Being force-fed while lying on a bed caused Mr. Zaid far less pain and discomfort than being force-fed while being forcibly restrained in a sitting position.

55.    The decision to change Mr. Zaid's force-feeding regimen to the more painful and degrading form he currently experiences was a deliberate decision by officials calculated to punish Mr. Zaid for his hunger strike, to cause him discomfort, and to "break" his hunger strike. *See also* Eric Schmitt and Tim Golden, *Force-feeding at Guantánamo is now acknowledged*, N.Y. Times, Feb. 22, 2006, at A6 (describing official acknowledgment of the use of isolation and extended time in "restraint chairs" to break hunger strikes).

56.    Medics take several tries to insert the feeding tube down Mr. Zaid's throat. Each reinsertion and removal causes him increasing discomfort and pain.

57.    The Journal of the American Medical Association has stated that the "rapid insertion of the feeding tube for force-feeding purpose . . . can lead to mechanical complications, such as malposition of the tube, nasopharyngeal or esophageal trauma, and rarely, esophageal perforation." Sondra S. Crosby et al., *Hunger Strikes, Force-feeding, and Physicians' Responsibilities*, 298 JAMA 563 at 564 (2007).

58.     After almost every force-feeding, Mr. Zaid vomits up the nutrients given to him.

59.     Mr. Zaid's initial force-feeding regimen, using a bed rather than a restraint chair, was less painful and inhumane.

60.     Guantánamo personnel at all levels of the chain of command have employed tactics designed to break Mr. Zaid's hunger strike. These tactics include the permanent placement of Mr. Zaid on punishment status, physical abuse, and the withholding of medical treatment.

61.     Mr. Zaid has been placed on punishment status since beginning his hunger strike. Punishment status means that a detainee must wear an orange jumpsuit and has only a 1cm thick "ISO mat" in his cell and a Quran. He is allowed a blanket only from 10 PM to 5 AM (as opposed to detainees not on punishment status, who get blankets from 9 PM to 6 AM). His undergarments and socks have been confiscated. The temperature is set extremely low in his cell. Under these conditions, Mr. Zaid's steel cell has become unbearably cold. This is a strategy commonly used by Guantánamo officials to cause discomfort to hunger-strikers.

62.     On several occasions, Guantánamo personnel—including members of the medical staff and the Initial Reaction Force ("IRF")—have physically abused him on account of his hunger strike.

63.     On one occasion, an IRF team slammed Mr. Zaid's face into the floor, splitting open the skin on his face. His wound required stitches. A medic gave him three stitches, but denied him anesthesia. The medic told Mr. Zaid that this denial was because

of his hunger strike. There is no medical justification for denying Mr. Zaid anesthesia under those circumstances.

64.     Medics often cause Mr. Zaid pain when force-feeding him or introducing IVs into his muscles instead of his vein. On one occasion, a medic inserted the feeding tube in Mr. Zaid incorrectly down the wrong passage. In extreme pain, Mr. Zaid called the medic "stupid" for this mistake. As punishment, authorities sprayed mace in Mr. Zaid's face. Mr. Zaid's head and the rest of his body were strapped to the feeding chair so he could not avoid or block the spray nor could he have constituted a threat to the medic or anyone else.

65.     Medical personnel have repeatedly denied Mr. Zaid treatment for severe medical conditions in a bid to break his hunger strike.

66.     Mr. Zaid suffers from severe neck pain caused by inflammation of nerves in the spinal cord. This was confirmed by a CAT scan.

67.     A doctor told Mr. Zaid that he would not administer medication to Mr. Zaid unless he suspended his hunger strike. There is no medical basis for denying Mr. Zaid medication for the inflammation of the nerves in his spinal cord.

68.     Mr. Zaid suffers from intense kidney pain. He feels a burning sensation when he urinates. He further suffers from a swollen knee, as well as constant pain in his stomach and joints. He has informed medical staff about his ailments. Medical personnel have denied Mr. Zaid treatment because of his decision to continue his hunger strike. There is no medical basis for refusing Mr. Zaid treatment for these ailments.

69.     Medics have withheld lozenges from Mr. Zaid when force-feeding him. These lozenges, usually Vicks or Robitussin, would help lubricate and soothe the throat

to ease the pain felt when forcing in feeding tubes. The medics have withheld the lozenges to break Mr. Zaid's hunger strike. There is no medical basis for not using lubricants to ease the process of entubation.

70.    Mr. Zaid's allegations of retaliation from Guantánamo staff seeking to break his hunger strike are corroborated by other detainees' experiences. *See, e.g.*, Eric Schmitt and Tim Golden, *Force Feeding at Guantanamo is Now Acknowledged*, N.Y. Times, Feb. 22, 2006, at A6 (describing use of six point restraints and physical abuse to break hunger strikes); Amnesty International, *Further Information on Legal Concern / Health      Concern      /      Torture      (2006),      available      at* http://www.amnesty.org/en/library/asset/AMR51/028/2006/en/xRq7RbsC7HQJ (describing tactics used by Guantánamo staff to break hunger strike by four detainees, including isolation, deliberate over-feeding, and the deliberate misuse of medical instruments to cause pain); Amnesty International, *Cruel and Inhuman: Conditions of isolation   for   detainees   at   Guantánamo   Bay   (2007),   available   at* http://www.amnesty.org/en/library/asset/AMR51/051/2007/en/UR4i7iJ8J_sJ  (describing guards as subjecting hunger-striking detainees to "further punitive treatment, such as pepper spraying them").

71.    Government officials have acknowledged the use of the punitive tactics described by Mr. Zaid as part of a concerted plan to break hunger strikes at Guantánamo. Eric Schmitt and Tim Golden, *Force-feeding at Guantánamo is now acknowledged*, N.Y. Times, Feb. 22, 2006, at A6 (describing official acknowledgment of the use of isolation and extended time in "restraint chairs" to break hunger strikes).

72.     Physicians in the United States and the United Kingdom have stated that the force-feeding regimen in Guantánamo violates medical ethics as well as domestic and international law. "[F]orcefeeding should not be used as punishment." The use of 6-point restraints to "immobilize competent prisoners for nasogastric tube insertion or [for] force-feeding … violates the Geneva Conventions, international human rights law, and medical ethics." Sondra S. Crosby et al., *Hunger Strikes, Force-feeding, and Physicians' Responsibilities*, 298 JAMA 563 at 565 (2007).

73.     Respondent Gates has repeatedly refused to release Mr. Zaid's medical records. Counsel filed a Motion to Compel Production of the Record on Review and Medical Records, and for the Entry of a Scheduling Order ("Motion to Compel") on October 29, 2007, under Mr. Zaid's Detainee Treatment Act petition (see below at ¶ 77) before the Court of Appeals. Briefing on the motion was completed on November 21.

74.     The Court of Appeals has not ruled on the Motion to Compel, and Respondents have reiterated their refusal to disclose any information about Mr. Zaid's medical condition. Without Mr. Zaid's medical records, an independent evaluation of his medical condition is impossible. In the more than five months that have passed since briefing was completed on the Motion to Compel, Mr. Zaid has remained on hunger strike and continued to endure unabated abuse and mistreatment in Guantánamo Bay in addition to his unlawful and arbitrary detention.

75.     Mr. Zaid is one of the two longest-term hunger-strikers at Guantánamo and also one of the last remaining hunger-strikers there. Between 2003 and 2007, nearly 165 detainees mounted hunger strikes. Officials have attributed the end of most hunger

strikes to the use of coercive and unethical techniques. Tim Golden, *Tough U.S. Steps in Hunger Strike at Camp in Cuba*, N.Y. Times, Feb. 9, 2006, at A1.

76.    Counsel last saw Mr. Zaid on May 6, 2008. Mr. Zaid's physical appearance had deteriorated precipitously since a previous meeting on October 26, 2007. Three years of hunger-striking, retaliation by U.S. authorities and denial of adequate medical care have taken their toll on Mr. Zaid's body. But his determination remains unshaken. He has advised counsel that "this injustice will only end when I leave this island and only then will I end my strike."

**Mr. Zaid's Petition Under the Detainee Treatment Act**

77.    On June 19, 2007, around the fifth anniversary of his imprisonment at Guantánamo, Mr. Zaid filed a Petition for Immediate Release and Other Relief under the Detainee Treatment Act ("DTA Petition") with the Court of Appeals to challenge his CSRT determination and the legality of his detention.

78.    Under Section 1005(e)(2)(A) of the DTA, the Court of Appeals has "exclusive jurisdiction" to determine the validity of CSRT determinations. Section 1005(e)(2)(C) limited the applicable "scope of review" by the Court of Appeals to determining whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and whether the use of the standards and procedures was "consistent with the Constitution and the laws of the United States," "to the extent the Constitution and laws of the United States are applicable."

79.    On August 16, 2007, Mr. Zaid met with a lawyer—undersigned counsel— for the first time in his 5½ years of detention. Counsel's access to Mr. Zaid, however, continues to be conditioned on acceptance of an extraordinarily restrictive set of

procedures imposed by Respondents that goes far beyond the Protective Order entered by the Court of Appeals.

80.     Ten months after it was filed, the DTA Petition has not resulted in prompt and meaningful judicial review of Mr. Zaid's detention. Respondents have stalled an already profoundly flawed procedure by refusing to either produce all Government Information[4] for the Court of Appeals' review or, in the alternative, to convene a new CSRT, which, of course, would feature the same structural deficiencies and denial of basic fair hearing rights.

81.     There are currently no judicially imposed deadlines for the Government to decide whether it will convene a new CSRT. If the Government decides to convene new CSRTs, there are no binding timeframes for such re-hearings. Thus, if the Government announces a decision to convene a new CSRT for Mr. Zaid, judicial review under the DTA could be deferred indefinitely and Mr. Zaid would continue to be deprived of his right to challenge the legality of his detention.

82.     Consequently, Petitioner's "relief" under the DTA constitutes either limited judicial review of a fundamentally unfair CSRT process, or the convening of yet another flawed CSRT hearing, followed by the same limited judicial review, only at a much later time. Given the Government's persistence in producing only a truncated

---

[4] For the purposes of the CSRT, Government Information comprises "such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings." Memorandum for Distribution from Sec'y of the Navy Gordon England, Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants detained at Guantanamo Naval Base, Cuba, encl. 1 at 3 (July 29, 2004), *available at* http://www.defenselink.mil/news/jul2004/d20040730comb.pdf. The Court of Appeals has repeatedly confirmed that the record on review of CSRT proceedings includes *all* Government Information. *Bismullah v. Gates*, 501 F.3d 178, 180 (D.C. Cir. 2007), *rehearing denied Bismullah v. Gates*, 503 F.3d 378 (D.C. Cir. 2007), *rehearing denied en-banc Bismullah v. Gates*, 514 F.3d 1291 (D.C. Cir. 2008).

record, the prospect of timely or meaningful relief for Petitioner under the DTA is dim.

Judicial review under the DTA is merely illusory and is no substitute for the writ of

habeas corpus. Section 1005(e) of the DTA fails to provide the full measure of process,

rights and remedies required by the Suspension Clause of the United States Constitution,

Art. I, § 9, cl. 2. It therefore violates the Suspension Clause, exceeding Congress' power

to suspend the writ of habeas corpus in the absence of a narrowly defined "Rebellion" or

"Invasion."

83.     Entertaining a petition for the Great Writ is not only necessary due to the

irremediable flaws of the DTA system, it is also appropriate so as to place Mr. Zaid on

equal footing with other similarly situated detainees in Guantánamo whose habeas

petitions have been stayed pending the Supreme Court's decision in *Boumediene v. Bush*,

127 S.Ct. 3078 (June 29, 2007) (No. 06-1195) and *Al Odah v. United States*, 127 S.Ct.

3067 (June 29, 2007) (No. 06-1196). *See* cases cited above at footnote 2, especially those

with concurrent DTA petitions.[5] Entertaining this habeas petition will also avoid

prejudice by enabling counsel to prepare for habeas litigation so that once *Boumediene* is

decided, Petitioner will be ready to proceed immediately on the issues along with the

other Guantánamo petitioners.

---

[5] *See, especially, e.g., Al Darby v. Bush*, 05-2371 (RCL) (D.D.C. Mar. 31, 2008) (order denying motion to dismiss notwithstanding pending DTA petition); *Taher v. Bush*, No. 06-1684 (GK), Docket 26 (D.D.C. Mar. 21, 2008) (minute order denying motion to dismiss notwithstanding pending DTA petition); *Al Shimrani v. Bush*, 05-2249 (RMC) (D.D.C. Jan. 1, 2008) (order staying case pending decision in *Boumediene v. Bush* notwithstanding DTA petition); *Abdessalam v. Bush*, No. 05-0313 (CKK) (D.D.C. July 5, 2007) (minute order denying motion to dismiss pending decision in *Boumediene* notwithstanding DTA petition); *Said v. Bush*, No. 05-2384 (RWR) (D.D.C. July 2, 2007) (minute order continuing stay notwithstanding DTA petition).

### IV.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(ARTICLE I OF THE UNITED STATES CONSTITUTION —
VIOLATION OF THE SUSPENSION CLAUSE)**

84.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

85.    Respondents' arrest and continued detention of Petitioner violate the United States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension Clause guarantees Petitioner the right to be charged criminally or released. Petitioner has been and continues to be detained without charge.

86.    Respondents' arrest and continued detention of Petitioner violate the United States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension Clause guarantees Petitioner the right to an adequate and meaningful judicial process. Petitioner has been and continues to be detained without such process.

87.    Respondents have seized and continue to detain Petitioner without affording him fundamental due process.

88.    To the extent that the DTA and the MCA purport to remove this Court's jurisdiction over Petitioner's habeas petition challenging the legality of his detention, Respondents' actions constitute an unlawful Suspension of the Writ of Habeas Corpus, in violation of Article I, § 9, cl. 2 of the United States Constitution.

89.    Accordingly, this Court should grant Mr. Zaid's petition for writ of habeas corpus, order his immediate release from custody, and enter declaratory, injunctive, and any other relief the court may deem appropriate.

**SECOND CLAIM FOR RELIEF**

**(ARTICLE II OF THE UNITED STATES
CONSTITUTION — UNLAWFUL DETENTION)**

90.     Petitioner incorporates by reference all preceding paragraphs as if set forth
fully herein.

91.     Petitioner is not, nor has he ever been, an enemy alien, lawful or unlawful
belligerent, or combatant of any kind. The Executive lacks the authority to order or direct
military officials to detain civilians who are seized far from the theater of war or
occupied territory or who were not "carrying a weapon against American troops on a
foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522n.1 (2004).

92.     By the actions described above, President Bush has exceeded and
continues to exceed the Executive's authority under Article II of the United States
Constitution by authorizing, ordering and directing that military officials seize Petitioner
and transfer him to military detention, and by authorizing and ordering his continued
military detention at Guantánamo. All of the Respondents acted and continue to act
without lawful authority by directing, ordering, and/or supervising the seizure and
military detention of Petitioner.

93.     The military seizure and detention of Petitioner by the Respondents is
*ultra vires* and illegal because it is in violation of Article II of the United States
Constitution. To the extent that the Executive asserts that Petitioner's detention is
authorized by the Executive Order, that Order exceeds the Executive's authority under
Article II and is *ultra vires* and void on its face and as applied to Petitioner.

94.     To the extent that Respondents assert that their authority to detain
Petitioner derives from a source other than the Executive Order, including the

Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law. Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

### THIRD CLAIM FOR RELIEF

**(COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE
OF THE FIFTH AMENDMENT TO THE UNITED STATES
CONSTITUTION — UNLAWFUL DEPRIVATION OF LIBERTY)**

95.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

96.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

97.     President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals including Petitioner, without due process of law, and the remaining Respondents have implemented those orders. Respondents' actions deny Petitioner the process accorded to persons seized and detained by the United States military, to the extent that there is an armed conflict, as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

98.     To the extent that Petitioner's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

99.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, and any other relief the court may deem appropriate.

### FOURTH CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION — UNLAWFUL CONDITIONS OF CONFINEMENT)

100.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

101.     By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioner to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

102.     Accordingly, Petitioner is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

### FIFTH CLAIM FOR RELIEF

### (FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION — PROLONGED DENIAL OF TELEPHONIC COMMUNICATION WITH FAMILY)

103.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

104.     By the actions described above, Respondents, acting under color of law, have prevented any telephonic communication between Petitioner and his family for

more than six years, unreasonably restricting his First Amendment rights in a manner not reasonably related to any legitimate penological interests.

105.    Accordingly, Petitioner is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

### SIXTH CLAIM FOR RELIEF

### (FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION — VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

106.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

107.    Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner's right to consult with counsel by conditioning counsel's access to Petitioner on unreasonable and overly restrictive terms and procedures, all in violation of Petitioner's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

108.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

### SEVENTH CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES — RENDITION)

109.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

110.    On information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country other than his own. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected

to torture constitutes a violation of Petitioner's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

111.   Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## EIGHTH CLAIM FOR RELIEF
### (GENEVA CONVENTIONS — UNLAWFUL DETENTION)

112.   Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

113.   By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military, to the extent that there is an armed conflict, as established by specific provisions of the Third and Fourth Geneva Conventions.

114.   Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241(c)(3).

115.   Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

116.   Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

**NINTH CLAIM FOR RELIEF**
**(CONVENTION AGAINST TORTURE AND CONVENTION**
**RELATING TO THE STATUS OF REFUGEES — RENDITION)**

117.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

118.    On information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country other than his own. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a direct violation of Petitioner's rights under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture") and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 *entered into force* Apr. 22, 1954.

119.    Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

**TENTH CLAIM FOR RELIEF**
**(ALIEN TORT STATUTE — TORTURE)**

120.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

121.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon Petitioner in order to obtain coerced information or confessions from him, punish or intimidate Petitioner or for other purposes.

122.    Among other abuses, Petitioner has been: held in and surrounded by conditions of isolation; subjected to repeated interrogation and severe beatings; kept in

cages with no privacy; shackled with heavy chains and irons; placed in absolute isolation and solitary confinement; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and subjected to repeated psychological abuse.

123.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violate customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

124.    Respondents are liable for said conduct because they directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against Petitioner.

125.    Petitioner was forced to suffer severe physical and psychological abuse and agony and is entitled to declaratory and injunctive relief and other relief to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE — WAR CRIMES)

126.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

127.    By the actions described above, Respondents' acts directing, ordering, confirming, ratifying, and/or conspiring to bring about the torture and other inhumane treatment of Petitioner constitute war crimes in violation of the law of nations under the

Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting war crimes as reflected, expressed, and defined in other multilateral treaties and international instruments, international and domestic judicial decision, and other authorities, including the Fourth Geneva Convention, Common Article III of the Geneva Conventions and Additional Protocols I and II of the Geneva Conventions as well as customary international law.

128.    As a result of Respondents' unlawful conduct, Petitioner has been and is forced to suffer severe physical and psychological abuse and agony, and is therefore entitled to declaratory and injunctive relief and such other relief as the court may deem appropriate.

### TWELFTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE —
### CRUEL, INHUMAN OR DEGRADING TREATMENT)

129.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

130.    The acts described herein had the intent and the effect of grossly humiliating and debasing Petitioner, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical or moral resistance.

131.    The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

132.    Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhuman or degrading treatment of Petitioner.

133.    Petitioner was forced to suffer severe physical and psychological abuse and agony and is entitled to declaratory and injunctive relief as well as other relief to be determined at trial.

### THIRTEENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE — ARBITRARY ARREST AND PROLONGED ARBITRARY DETENTION)

134.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

135.    The acts described herein constitute arbitrary arrest and detention of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

136.    Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

137.   As a result of Respondents' unlawful conduct, Petitioner has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to declaratory and injunctive relief and such other relief as the court may deem appropriate.

### FOURTEENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE — ENFORCED DISAPPEARANCE)

138.   Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

139.   By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about the enforced disappearance of Petitioner in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

140.   As a result of Respondents' unlawful conduct, Petitioner has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to declaratory and injunctive relief and such other relief as the court may deem appropriate.

### FIFTEENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE — RENDITION)

141.   Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

142.   On information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country other than his own. The transfer of the

Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under customary international law, which may be vindicated under the Alien Tort Statute.

143.    Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### SIXTEENTH CLAIM FOR RELIEF
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT — ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION)

144.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

145.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See, e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

146.    By arbitrarily and capriciously detaining Petitioner in military custody for over six years in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

147.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

### SEVENTEENTH CLAIM FOR RELIEF
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT —

ARBITRARY AND CAPRICIOUS DENIAL OF DUE PROCESS)

148.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

149.     By the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military, to the extent that there is an armed conflict, as established by Army Regulation 190-8 in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

150.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

**EIGHTEENTH CLAIM FOR RELIEF**
**(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT —**
**TORTURE AND CRUEL, INHUMAN OR DEGRADING TREATMENT)**

151.     Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

152.     By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Petitioner to torture and/or cruel, inhuman or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedure Act, 5 U.S.C. § 706(2).

153.     Accordingly, Petitioner is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## V.   PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for relief as follows:

1.     Grant the Writ of Habeas Corpus and order Respondents to release Petitioner from his current unlawful detention;

2.     Order that Petitioner be brought before the Court or before a Magistrate Judge assigned by the Court at a convenient facility to conduct proceedings under the supervision of the Court to vindicate his rights;

3.     Order that Petitioner cannot be transferred to a country other than his own without the specific, written agreement of Petitioner and Petitioner's counsel while this action is pending;

4.     Order that Petitioner cannot be delivered, returned, or rendered to a country other than his own where there is a foreseeable and imminent risk that Petitioner will be subject to torture;

5.     Order Respondents to allow counsel immediately to meet and confer with Petitioner, in private and unmonitored attorney-client conversations;

6.     Order Respondents to allow Petitioner to contact his family by telephone;

7.     Order Respondents to cease all interrogations of Petitioner, direct or indirect, while this litigation is pending;

8.     Order Respondents to cease all acts of torture; cruel, inhuman and degrading treatment; and outrages upon the personal dignity of Petitioner;

9.     Order Respondents to use humane and less harmful and painful methods of forced sustenance;

10.    Order Respondents to cease withholding medical care as punishment for Petitioner's hunger strike;

11.    Order and declare that Section 1005(e) of the DTA violates the Habeas Corpus Suspension Clause of the United States Constitution;

12.    Order and declare the Executive Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the United States Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, federal common law, the treaties of the United States and customary international law;

13.    Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international human rights and humanitarian law; and

14.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutes, and international law.

Dated: May 12, 2008

Respectfully submitted,

_____

Ramzi Kassem, Esq.
Michael J. Wishnie, Esq.
Anand Balakrishnan (law student intern)
Jessica Chen (law student intern)
Darryl Li (law student intern)

Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
Phone: (203) 432-0138
Fax: (203) 432-1222

*Counsel for Petitioner Ahmed Zaid, ISN 669*

## **CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION**

Counsel for Petitioner hereby certify, pursuant to L. Cv. R. 83.2(g), that they are representing Petitioner without compensation.

Dated: May 12, 2008

Ramzi Kassem, Esq.
Michael J. Wishnie, Esq.
Anand Balakrishnan (law student intern)
Jessica Chen (law student intern)
Darryl Li (law student intern)

Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
Phone: (203) 432-0138
Fax: (203) 432-1222

*Counsel for Petitioner Ahmed Zaid, ISN 669*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

instrument to be served by Certified Mail, Return Receipt Requested, this 12th day of

_May_____, 2008, on the following persons:

**Kenneth L. Wainstein**
U.S. ATTORNEY
District of Columbia District
Judiciary Center
555 4th Street, NW
Washington, D.C. 20530

**George W. Bush**
PRESIDENT, UNITED STATES OF AMERICA
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20301-1000

**Rear Admiral Mark H. Buzby**
COMMANDER, JOINT TASK FORCE-GTMO
JTF-GTMO
APO AE 09360

**Army Col. Bruce Vargo**
COMMANDER, JDG
JTF-GTMO
APO AE 09360

**Michael Mukasey**
ATTORNEY GENERAL OF THE UNITED STATES
U.S. Department of Justice
Robert F. Kennedy Building
Tenth Street & Constitution Ave., NW
Room 5111
Washington, D.C. 20530

**Robert Gates**
SECRETARY, U.S. DEP'T. OF DEFENSE
1000 Defense Pentagon
Washington, D.C. 20301-1000

**Rear Admiral Mark H. Buzby**
UNITED STATES NAVY
Pentagon
Washington, D.C. 20310-0200

**Army Col. Bruce Vargo**
UNITED STATES ARMY
Pentagon
Washington, D.C. 20310-0200

Anand Balakrishnan
Law Student Intern

Allard K. Lowenstein International
Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
Phone: (203) 432-0138
Fax: (203) 432-1222

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Ahmed Zaid Salem Zuhair | George W. Bush; Robert Gates; Rear Admiral Mark H. Buzby; Army Col. Bruce Vargo |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Ramzi Kassem<br>Yale Law School<br>127 Wall St<br>New Haven, CT 06511<br>203 432 0138 | |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ⊙ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| [X] **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)**<br><br>*\*(If pro se, select this deck)\** | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions (if Privacy Act)**<br><br>*\*(If pro se, select this deck)\** | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. 2241 (Habeas); 28 U.S.C. 1350 (ATS); 5 U.S.C. 702 (APA); Amends I, V, VI to U.S. Const. (freedom of speech; due process; right to counsel)

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND: YES ☐  NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐  NO [X]  If yes, please complete related case form.

DATE  May 12, 2008    SIGNATURE OF ATTORNEY OF RECORD  _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.