## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AHMED ZAID SALEM ZUHAIR,

     *Petitioner*,

v.

     Civil Action No. 08-864 (EGS)

GEORGE W. BUSH, ROBERT GATES,
REAR ADM. MARK H. BUZBY, and
ARMY COL. BRUCE VARGO,

     *Respondents*.

## MOTION TO COMPEL PRODUCTION OF COMPLETE MEDICAL RECORDS AND FOR ORDER PERMITTING INDEPENDENT MEDICAL EXAMINATION

Petitioner Ahmed Zaid Salem Zuhair respectfully moves this Court to compel Respondents to produce immediately his complete medical records and to order Respondents to permit a physical examination of Petitioner by an independent medical expert.[1]  Mr. Zuhair has been on hunger strike for three years, longer than any other detainee held at Guantánamo Bay. During that time, both as a form of punishment and a means to break his hunger strike, Respondents have refused to treat or even properly diagnose Mr. Zuhair's numerous ailments, jeopardizing his ability to participate meaningfully in his habeas proceedings.  An independent medical assessment of Mr. Zuhair's condition is urgently necessary to preserve this Court's jurisdiction, and requires both production of his complete medical and mental health records as well as a physical examination by a reliable outside physician trusted by Petitioner and his counsel.

---

[1] Pursuant to Local Civ. R. 7(m), undersigned counsel contacted Respondents' counsel to seek their consent to the relief sought herein, informing them that this motion would be filed should they decline to consent or fail to respond ahead of the Court's August 12 deadline.  No response was received.  During the July 29, 2008 status conference, Respondents stated they did not agree to part of the relief sought here, the production of medical records.

## BACKGROUND

After his first three years in Guantánamo, in June 2005, Mr. Zuhair went on hunger strike to protest his indefinite detention without charge, the abuse and humiliation he experiences daily at the hands of guards and interrogators, and Respondents' refusal to allow him any direct communication with family. Since that time, Mr. Zuhair has been subjected to an increasingly brutal force-feeding regimen that involves personnel painfully strapping him into a six-point restraint chair for four hours per day and shoving a feeding tube into his nostril and down into his stomach. Declaration of Ramzi Kassem in Support of Petitioner's Motion to Compel Production of Complete Medical Records and for Order Permitting Independent Medical Examination ("Kassem Decl.") ¶9, attached as Ex. 1. Moreover, Guantánamo medical personnel refuse to use any lubricant, anesthesia, or even soothing lozenges when shoving the tube into his nose during his twice-daily feeding sessions, damaging and inflaming the inner lining of his nose and throat and causing his left nostril to swell up and close off completely. Kassem Decl. ¶¶9, 14, 23; Affidavit of Dr. Robert Cohen ("Cohen Aff.") ¶¶16, 31, 33, attached as Ex. 2. These force-feeding procedures are unnecessarily brutal and do not serve any legitimate medical purpose. Cohen Aff. ¶¶19, 29.

Separate from the force-feeding regimen, Guantánamo medical personnel have deliberately subjected Mr. Zuhair to other practices that are painful, harmful to his health, and devoid of any medical justification. Guantánamo medical personnel have repeatedly refused to properly diagnose or treat Mr. Zuhair for a number of chronic, serious ailments, including severe kidney pain, a burning sensation during urination, inflammation of nerves in his spinal cord, a swollen knee and ankle, and a painful hemorrhoidal condition that leaves blood in his feces. Kassem Decl. ¶¶11-13, 16, 21, 24. In particular, Mr. Zuhair's kidney symptoms are consistent

with chronic gout, which could ultimately lead to life-threatening kidney failure.  Cohen Aff. ¶¶20, 22.  On one occasion, medics refused to use anesthesia while stitching a wound on Mr. Zuhair's face incurred during a beating by guards at Guantánamo.  Kassem Decl. ¶12.  On another occasion, guards confiscated an ankle brace that Mr. Zuhair had managed to borrow from another detainee despite the near-absolute isolation in which they are held to relieve his own severe ankle pain after medical personnel refused to provide him with one.  Kassem Decl. ¶16.

In violation of professional ethics and standards, Guantánamo personnel, from orderlies to physicians, have conditioned provision of medical care on Mr. Zuhair's discontinuing his hunger strike.  Kassem Decl. ¶¶11-14, 21, 26.  Guantánamo medical staff have even refused to carry out simple diagnostic procedures—such as urinalysis and kidney ultrasounds—that would ordinarily be urgently required to determine the cause and severity of his ailments and the best course of treatment.  Cohen Aff. ¶¶21, 24, 37.  There is no medical justification for denial of proper diagnosis or treatment to a hunger striker complaining of such symptoms.  Cohen Aff. ¶¶11, 19.  Standard medical practice would be to diagnose and treat such ailments.  Cohen Aff. ¶11.  Guantánamo staff's denial of proper medical care under these circumstances can only be an effort to break Mr. Zuhair's will.

While the duration and severity of these abuses is undoubtedly linked to Mr. Zuhair's special status as one of the two longest-running hunger strikers in Guantánamo, they are also part of a pattern that calls into question the conduct of medical personnel at the detention facility.  At the request of the Senate, the Department of Defense (DoD) Inspector General's Office is currently conducting an investigation into medical abuse during interrogations or detention at Guantánamo.  *See* Department of Defense Inspector General Letters to Center for Constitutional

Rights, attached as Ex. 3. The relief sought herein is needed to ensure that Petitioner is receiving appropriate and humane medical treatment, that undersigned counsel can discharge their obligations, and that this Court can proceed apace with its adjudication of this matter.

## ARGUMENT

This Court should compel Respondents to provide to undersigned counsel all medical records pertaining to Mr. Zuhair compiled during his detention at Guantánamo within fourteen days from a grant of this motion, updating those records on a regular basis thereafter. Respondents should also be ordered to permit a physician to accompany Petitioner's counsel in order to conduct a physical examination of Mr. Zuhair. Respondents' actions have endangered Mr. Zuhair's health to the point of threatening this Court's ability to conduct these proceedings. The extraordinary duration of Mr. Zuhair's hunger strike has led to an unusually prolonged and concerted set of measures designed to break his will, most disturbingly by conditioning provision of medical care on the cessation of his hunger strike. Indeed, medical personnel employed by Respondents continue to violate their professional oaths and ethical obligations by systematically withholding needed medical care and employing unnecessarily brutal force-feeding procedures crafted to deter hunger strikers. Petitioner's precarious health—including symptoms that could indicate gradual kidney failure—jeopardizes his ability to participate meaningfully in his own habeas proceedings and potentially undermines his ability to inform, consult, or instruct counsel.

This Court's jurisdiction over Mr. Zuhair's habeas corpus petition was recently reaffirmed in the Supreme Court's landmark ruling in *Boumediene*, striking down a jurisdiction-stripping statute pertaining to foreign nationals held as "enemy combatants." *Boumediene v. Bush*, 128 S.Ct. 2229, 2275 (2008) (holding that the "law we identify as unconstitutional is MCA §7, 28 U. S. C. A. §2241(e)"). This Court should exercise its inherent authority to protect its

hold on this case by compelling Respondents to produce Petitioner's medical records and granting permission for a physical examination by an independent expert. The narrow relief sought here is crucial to preserving this Court's jurisdiction.

**I.    The Relief Sought by Petitioner Is Necessary and Appropriate to Protect this Court's Jurisdiction Over this Case**

This Court has the authority to protect its jurisdiction over this case pursuant to the All Writs Act, 28 U.S.C. §1651(a), which enables courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."[2] The Act, which originated in the Judiciary Act of 1789, "empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C. Cir. 1996). Orders under the All Writs Act protect the jurisdiction of *courts* and are therefore distinct from preliminary injunctive relief under Fed. R. Civ. P. 65, which is aimed primarily at preventing immediate harms to *parties*. A court may grant a writ under the All Writs Act whenever necessary "to achieve the ends of justice entrusted to it." *Adams v. United States*, 3177 U.S. 269, 273 (1942); s*ee also, Klay v. United Healthgroup, Inc*., 376 F.3d 1092, 1100-01 (11th Cir. 2004) ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.").

Even before *Boumediene* confirmed the importance of federal court jurisdiction over habeas claims by Guantánamo detainees, the D.C. Circuit held that district courts retain the equitable power to issue injunctions to protect their jurisdiction over such matters. *Belbacha v. Bush*, 520 F.3d 452, 426 (D.C. Cir. 2008) (district court has jurisdiction, pursuant to All Writs

---

[2] Courts have interpreted the "necessary of aid of jurisdiction" language "liberally." *See, e.g., Cutler v. 65 Sec. Plan*, 831 F. Supp. 1008, 1013 (E.D.N.Y. 1993) (holding that All Writs Act empowers federal courts to fashion broad remedies).

Act, to issue injunction preventing transfer of detainee where transfer would strip court of jurisdiction to reach merits of habeas petition).

Respondents' deliberate denials of medical care and even basic medical information undermine Mr. Zuhair's ability to participate in his habeas proceedings. They also interfere with Mr. Zuhair's ability to interact with counsel and with counsel's ability to properly advise him. Both harms, against Mr. Zuhair directly and against his privileged relationship with counsel, threaten this Court's hold on the case. Courts are empowered to "require[e] additional measures to assure meaningful access by habeas petitioners to present their own cases." *Bounds v. Smith*, 430 U.S. 817, 824 (1977). Such measures include setting forth affirmative obligations to assure all prisoners meaningful access to the courts. *Id.*

## II. Petitioner Is Also Entitled to the Relief Sought in the Form of a Preliminary Injunction

Respondents' refusal to properly treat Mr. Zuhair's ailments or release information about his condition does more than threaten this Court's jurisdiction; it also harms Mr. Zuhair directly and therefore the relief he seeks would be justified under Fed. R. Civ. P. 65, should this Court deem it a more appropriate way to proceed. This Court may issue a preliminary injunction pursuant to Rule 65 ordering Respondents to produce Mr. Zuhair's medical records and to permit an independent physician to accompany his counsel in order to perform an examination.

In deciding whether to issue preliminary injunctive relief, four factors are considered: (1) whether Petitioner would suffer irreparable harm absent the preliminary injunction; (2) whether Petitioner has a substantial likelihood of success on the merits; (3) whether the injunction would substantially injure the opposing party; and (4) whether the injunction furthers public policy. *See Al-Joudi v. Bush*, 406 F.Supp. 2d 13, 19 (D.D.C. 2005). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs v. Shalala*, 158 F.3d 1313, 1318

(D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.*

All four factors here weigh in Mr. Zuhair's favor:

(1) Respondents' repeated denial of access to medical records, deliberate denial of needed medical care and numerous other abuses over the years undoubtedly threaten Mr. Zuhair with substantial, irreparable injury. As detailed earlier, Mr. Zuhair suffers from a number of chronic ailments, including severe kidney pain, a burning sensation during urination, inflammation of nerves in his spinal cord, swollen joints, and a painful hemorrhoidal condition that leaves blood in his feces. Respondents have shown deliberate indifference to Mr. Zuhair's ailments in a bid to break his hunger strike. As the *Al-Joudi* court found, "where the health of a ... vulnerable person is at stake, irreparable harm can be established." *Al-Joudi v. Bush*, 406 F.Supp.2d 13, 20 (D.D.C. 2005).

(2) Mr. Zuhair is more than likely to prevail on the merits of his claim because it is rooted in a well-established right to participate in his habeas proceedings and to enjoy meaningful access to counsel. In other Guantánamo habeas cases, judges have recognized their duty and authority to develop mechanisms for vindicating these rights. "[P]rocedures must be fashioned, as necessary and appropriate, to facilitate Petitioners' access to their counsel and the Court, as well as counsel's access to their clients, so that Petitioners have the tools to 'present their own cases.'" *Al-Joudi v. Bush*, 406 F.Supp.2d at 21. This power should be construed broadly to address any issue that could undermine a Petitioner's ability to present his case.

As described above, Mr. Zuhair's ability to participate in his own habeas proceedings and to enjoy adequate access to counsel are threatened here and are central to the proper conduct of these proceedings. As the court in *Al-Joudi* articulated, "access to counsel by Petitioners is

illusory unless counsel have sufficient access to their clients to be informed about their physical condition." *Al-Joudi*, 406 F. Supp. 2d at 22. Provision of medical records is an essential first step to obtaining accurate information about Mr. Zuhair's condition. An examination by an independent physician is also crucial where, as here, there are disturbing indications of blatant medical misconduct by Mr. Zuhair's custodians. The right to counsel encompasses not only an attorney, but interpreters and other expert support to enable meaningful representation, as reflected in the Criminal Justice Act's provision for defendants to retain nonlawyer professionals in habeas matters.[3] 18 U.S.C. § 3006A(e)(1).

(3) Providing a copy of Mr. Zuhair's medical records and allowing a physician to accompany counsel to perform a physical examination would not pose any significant logistical or other burdens on Respondents and is certainly outweighed by the past and imminent harm inflicted on Mr. Zuhair. First, as the court in *Al-Joudi* notes, any logistical burden of providing medical reports is "simply not substantial when weighed against the irreparable injury Petitioners face." *Id.* Similarly, allowing a physician to accompany counsel would be no more burdensome on the Government than allowing interpreters to attend meetings with the Petitioner and as crucial to the proper functioning of a defense team. Petitioner is not demanding any affirmative action other than transmission of information and allowing a physician to accompany counsel on a visit to their client.

(4) The public interest in the proper functioning of the courts, especially in the context of such sensitive litigation, would be served by allowing Mr. Zuhair to obtain an independent assessment of his health. Such basic and narrowly-tailored relief would also promote transparency on an issue of great public import.

---

[3] Courts have discretion to apply the CJA when a prisoner files a habeas petition under 28 U.S.C. § 2241. *See* 18 U.S.C. § 3006A(a)(2)(B).

III.    **Petitioner is Entitled to Medical Records and an Independent Medical Assessment**

Regardless of the procedural vehicle employed by this Court, Mr. Zuhair is entitled to an independent assessment of his health based on access to his complete medical records and a medical examination by a physician provided by counsel.

A.    **This Court Should Order Respondents to Produce Petitioner's Complete Medical Records Immediately**

For the reasons outlined above, Petitioner is entitled to immediate access to his complete medical and mental health records[4] as a necessary first step in undertaking an independent assessment of his health.  Respondents should be ordered to provide updated records on a regular, continuing basis.  For more than nine months, Mr. Zuhair has sought access to his medical records through three separate channels:

1.  Petitioner filed a Motion to Compel Production of the Record on Review and Medical Records, and for the Entry of a Scheduling Order on October 30, 2007 before the United States Court of Appeals for the District of Columbia Circuit pursuant to his Detainee Treatment Act Petition.  *See* Mot. to Compel Produc. of the R. on Review and Medical Records, and for the Entry of a Scheduling Order in *Zaid v. Gates*, No. 07-1221 (D.C. Cir.).  Briefing on the Motion to Compel was completed on November 23, 2007 and the parties filed supplements on April 18, 2008 and April 30, 2008, respectively.  That motion is still pending before the Court of Appeals with no indication that a ruling is likely to issue in the near future.

2.  Petitioner filed a request with the DoD for expedited production of medical records pursuant to the Freedom of Information Act on February 28, 2008 and has since met with

---

[4] Petitioner notes that access to medical records is available as of right to detainees incarcerated by the Federal Bureau of Prisons. 28 C.F.R. § 513.42.

a combination of denials and delay. On April 2, DoD denied the request for expedited processing and failed to make a determination on the request within the statutory deadline. On May 29, Petitioner appealed these denials and submitted a copy of a medical records authorization form signed by Petitioner. Nonetheless, on June 11, DoD sent a letter claiming not to have received the authorization form and halting all processing of the request. Petitioner submitted a copy of the signed authorization form a second time on July 28. *See* Correspondence between Lowenstein National Litigation Project and DoD Office of Freedom of Information, attached as Ex. 4.

3. Petitioner has renewed his request for production of medical records before this Court. *See* Pet'r's Status Report in *Zuhair v. Bush*, No. 08-864, Dkt. No. 21 (D.D.C. July 15, 2008); Pet'r's Status Rep. in Resp. to July 24, 2008 Order in *Zuhair v. Bush*, No. 08-864, Dkt. No. 26 (D.D.C. July 28, 2008). As recently as the July 29, 2008 status conference, Respondents reiterated their refusal to release any medical information.

There are no practical obstacles to prompt production of Petitioner's complete medical and mental health records. As indicated above, Mr. Zuhair has authorized counsel to obtain these records on his behalf. Moreover, such records should be readily accessible to Respondents in light of DoD's obligation to monitor the health of persons held in their custody.

**B.     This Court Should Order Respondents to Permit Petitioner's Examination by an Independent Medical Expert**

Immediate production of Mr. Zuhair's complete medical records is a first step towards an independent assessment of his health, but it is not sufficient in itself. Guantánamo medical personnel have deliberately and repeatedly endangered Mr. Zuhair's health, violating their own professional ethical standards in addition to Petitioner's rights. Such serious misconduct raises questions about the accuracy and completeness of any medical records pertaining to Mr. Zuhair

compiled by Respondents and further underscores the necessity of a physical examination by an outside independent expert. Moreover, Mr. Zuhair questions whether his medical records are accurate and believes that they have been doctored by Guantánamo medical personnel to conceal their actions towards him. Kassem Decl ¶25.

The Senate-ordered DoD Inspector General's ongoing investigation into medical abuse at Guantánamo is belated acknowledgement of concerns raised for years by detainees, their attorneys, human rights organizations and journalists. Although the Government has operated the detention facility at Guantánamo under much secrecy, publicly available information detailing other detainees' experiences corroborates Mr. Zuhair's account of retaliation by Guantánamo staff seeking to break his hunger strike.[5] *See, e.g.,* Eric Schmitt and Tim Golden, *Tough U.S. Steps in Hunger Strike Camp in Cuba*, N.Y. Times, Feb. 9, 2006, attached as Ex. 8; *See also* Physicians for Human Rights, *Broken Laws, Broken Lives: Medical Evidence of Torture by U.S. Personnel and its Impact* (2008), attached as Ex. 9. At Guantánamo, "medical personnel played a role in facilitating torture and ill-treatment in … through the monitoring of abuse during interrogations, providing medical information to interrogators, denying medical care, and failing to take action to stop and/or document detainee abuse." Physicians for Human Rights, *Broken Laws, Broken Lives*, at 7. Moreover, the report describes how "[o]ne detainee stated that during his detention at Guantánamo, he suffered pains in his ears, and despite his requests he did not have an examination nor was he given any medication. Another reported that despite his 'many many' requests for medical attention for persistent stomach pain, as well as swelling in his wrists, he never received medical care." *Id.* at 85. Both Petitioner's experience of willful

---

[5] Reports of other detainees' experiences and force feeding techniques corroborating Mr. Zuhair's account can be found in several declarations filed with the D.C. Federal District Court. *See* Marc D. Falkoff Declaration, Dkt. No. 62, attached as Ex. 5; Stewart Eisenberg Declaration, Dkt. 62, attached as Ex. 6; and Andrea J. Prasow Declaration, Dkt. No. 47, attached as Ex. 7, in *Al Joudi v. Bush*, No. 05-00301 (D.D.C. Oct. 14, 2005).

medical neglect and a growing body of public reporting suggest that the accuracy and completeness of his medical records cannot be presumed.

## CONCLUSION

For the foregoing reasons, this Court should grant the relief sought in this Motion, ordering Respondents (1) to produce immediately Petitioner's medical and mental health records, updating them on a regular and continuing basis, and (2) to permit Petitioner to be examined by an independent and reliable medical expert of undersigned counsel's choice.

Dated: August 12, 2008

Respectfully submitted,

_____/s/_____
Ramzi Kassem
Michael J. Wishnie
*Supervising Attorneys*

Anand Balakrishnan
Madhuri Kumar
Darryl Li
*Law Student Interns*

Allard K. Lowenstein International Human Rights
    Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138
ramzi.kassem@yale.edu
*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | |
| *Petitioner*, | |
| v. | Civil Action No. 08-864 (EGS) |
| GEORGE W. BUSH, ROBERT GATES, REAR ADM. MARK H. BUZBY, and ARMY COL. BRUCE VARGO, | |
| *Respondents*. | |

**[PROPOSED] ORDER TO PRODUCE COMPLETE MEDICAL RECORDS AND PERMIT AN INDEPENDENT MEDICAL EXAMINATION**

**IT IS HEREBY ORDERED THAT** Respondents shall immediately provide Petitioner's counsel with all medical and mental health records relating to Petitioner and created during his detention at the U.S. Naval Station Guantánamo Bay, providing updated records on a continuing basis; and

**IT IS FURTHER ORDERED THAT** Respondents shall permit a physical examination of Petitioner to be conducted by an independent medical expert retained by Petitioner's counsel.

Date: _____

_____
EMMET G. SULLIVAN
United States District Judge

13

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2008, I caused a true and accurate copy of Petitioner's Motion to Compel Production of Complete Medical Records and for Order Permitting Independent Medical Examination to be served upon the following counsel for Respondents by electronic filing via the Court's ECF system:

Arlene Groner, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530


\_\_\_\_\_/s/_____
MADHURI KUMAR
Allard K. Lowenstein International Human Rights
     Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AHMED ZAID SALEM ZUHAIR,

    *Petitioner*,

v.                                                                Civil Action No. 08-864 (EGS)

GEORGE W. BUSH, ROBERT GATES,
REAR ADM. MARK H. BUZBY, and
ARMY COL. BRUCE VARGO,

    *Respondents*.

---

## DECLARATION OF RAMZI KASSEM IN SUPPORT OF PETITIONER'S MOTION TO COMPEL PRODUCTION OF MEDICAL RECORDS AND FOR ORDER PERMITTING INDEPENDENT MEDICAL EXAMINATION

Pursuant to 28 U.S.C. § 1746, I certify that the following is true and correct to the best of my knowledge:

1. My name is Ramzi Kassem.

2. I am a Robert M. Cover Fellow and Clinical Lecturer in Law at Yale Law School and counsel to Ahmed Zaid Salem Zuhair.

3. Mr. Zuhair is a Saudi national who has been imprisoned at the U.S. Naval Station Guantánamo Bay, Cuba ("Guantánamo") without charge or legally-recognized status for over six years. The U.S. military has assigned Internment Serial Number (ISN 669) to Mr. Zuhair.

4. I traveled to Guantánamo and met with my client on August 16, 2007, October 25, 2007, January 29, 2008, May 6, 2008, and August 5-6, 2008. Information obtained during the latest client meeting remains presumptively classified pending processing by the Privilege Review Team.

5. I met with my client in a shack at the Camp Iguana section of the detention facilities on the base on all of the aforementioned dates.

6. I receive hand-written legal mail on occasion from Mr. Zuhair, which is also subject to review by the government's Privilege Review Team.

7.    At our first meeting on August 16, Mr. Zuhair directly authorized me to represent him.

8.    During that first meeting, Mr. Zuhair stated that he understood that his authorization allows me, among other things, to meet with him at Guantánamo Bay and to gain access to records concerning him that are presently in the custody of the United States government.

9.    During that meeting, Mr. Zuhair explained to me that he had been on hunger strike since June 2005. He described how, twice a day, Guantánamo staff restrain him to a chair, forcibly insert a tube into his stomach via his nose, and feed him without consent.

10.    During that meeting, Mr. Zuhair explained that he has been suffering from severe back pain, kidney pain, and pain in the knees, ankles, and other joints. He fears that he is experiencing kidney failure.

11.    During that meeting, Mr. Zuhair explained that he has asked for medical treatment for his various ailments. In an attempt to break his hunger strike, he was told by medical personnel that he would not receive treatment unless he stopped his hunger strike.

12.    During that meeting, Mr. Zuhair showed me a scar on his chin that he said was from an incident in which guards had slammed his face into the floor, splitting open the skin. Mr. Zuhair added that Guantánamo medical personnel refused to use anesthesia while stitching the wound and that they explained that this refusal was because of his hunger strike.

13.    During that meeting, Mr. Zuhair complained of severe neck pains from his force-feeding regimen. He explained that Guantánamo medical personnel had used a CAT-scan to diagnose him with inflammation of nerves in his spinal cord but that a doctor refused to give him medication because of his hunger strike.

14.    During that meeting, Mr. Zuhair told me that he cannot sleep at night because of the throat pain caused by the force feeding. He said that the staff has not been giving him adequate medications to quell the swelling in his nose and the pain in his throat in an attempt to break his hunger strike.

15.    During that meeting, Mr. Zuhair described how Guantánamo medical personnel frequently jab intravenous needles into his muscles instead of his veins, causing severe pain.

16.    During that meeting, Mr. Zuhair described how Guantánamo medical personnel had refused to give him an ankle brace for his joint pain, but that he had managed to borrow one from another detainee not on hunger strike.

17.    At our October 25, 2007 meeting, Mr. Zuhair told me he was continuing his hunger strike. He stated that the conditions and treatment he had previously reported continued unabated.

18.    During that meeting, Mr. Zuhair reported that guards had confiscated the ankle brace that he had managed to borrow from another detainee.

19.    During that meeting, Mr. Zuhair added that one of the nurses who administers his force-feeding regimen harshly and painfully inserts and extracts the feeding tubes in order to force him to end his strike. Mr. Zuhair emphasized that this behavior was not necessary or inherent to the entubation process, as other personnel perform it much more gently and humanely.

20.    On January 29, 2008, I met with Mr. Zuhair at Guantánamo Bay for a third time, again in a shack at Camp Iguana. Mr. Zuhair was still on hunger strike, and I observed that his physical health had declined dramatically since the last meeting. Most of my notes from that meeting—fourteen of seventeen pages—were deemed classified by the Privilege Review Team.

21.    On April 26, 2008, Mr. Zuhair addressed a letter to me, in which he reiterated that hunger strikers at Guantánamo such as himself continue to be subject to "deliberate medical neglect."

22.    On May 6, 2008, I met with Mr. Zuhair at Guantánamo Bay for the fourth time, again in a shack at Camp Iguana. Mr. Zuhair told me that he was continuing his hunger strike. The staff continues to force feed Mr. Zuhair by restraining him to a chair and inserting a tube in his nose.

23.    Mr. Zuhair explained to me that the staff does not use lubricants, anesthetics or lozenges during the force feeding. He also explained that his left nostril is now so swollen due to the force feeding that they can only force feed through his right nostril, which causes him great pain. Further, he said that during one out of every ten occasions, Guantánamo medical personnel mistakenly insert the feeding tube down his windpipe, causing him to cough violently so the tube comes out of his mouth.

24.    During that meeting, Mr. Zuhair explained that he has been suffering from severe back pain, neck pain, pain in the knees, and other joints. He regularly feels sharp pain in his kidneys. He also suffers from a burning sensation when he urinates and has lower back pain and a hemorrhoidal condition that leaves blood in his feces. He told me that guards in an "Initial Reaction Force" (IRF) team broke his left index finger when they pulled it all the way back. IRF is a small scale riot squad at Guantánamo deployed to intimidate detainees.

25.    During that meeting, Mr. Zuhair told me he is convinced that his medical records are altered or falsified by Guantánamo personnel in order to conceal their actions towards him.

26.     On May 28, 2008, Mr. Zuhair addressed a letter to me in which he described how Guantánamo personnel tightened the wrist, leg, and torso restraints on his feeding chair to the point of causing him severe pain and bruising.  When Mr. Zuhair asked why this was done, some Guantánamo personnel informed him that this was ordered by nurses, while others explained that it was punishment for his hunger strike.

Executed on this 12th day of August, 2008.

RAMZI KASSEM
Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
Phone: (203) 432-0138
Fax: (203) 432-1222
*Counsel for Petitioner Ahmed Zuhair, ISN 669*

# Exhibit 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AHMED ZAID SALEM ZUHAIR,

    *Petitioner,*

v.                                                                Civil Action No. 08-864 (EGS)

GEORGE W. BUSH, ROBERT GATES,
REAR ADM. MARK H. BUZBY, and
ARMY COL. BRUCE VARGO,

    *Respondents.*

## AFFIDAVIT OF DR. ROBERT COHEN

1)     I am a Board-certified physician and have over two decades of experience monitoring health care delivery in federal correctional facilities as a court-appointed expert. My curriculum vitae is attached.

2)     I was contacted by Attorney Ramzi Kassem in April 2008 to provide an independent medical assessment of Ahmed Zaid Zuhair's (hereinafter "Mr. Zuhair") health, medical treatment, and the propriety of the force-feeding regimen on which he has been placed.

3)     I am providing these services on a *pro bono* basis.

4)     Attorney Kassem has provided me with his unclassified observations and his declassified meeting notes from his first four meetings with Mr. Zuhair. In addition, I have read the Affidavit of Navy Captain Dr. Stephen G. Hooker, formerly the Officer in Charge, Detention Hospital, Joint Task Force-Guantanamo, submitted in the case of *Al-Adahi v. Bush*, 05-2890, D.C. Dist. Ct. and dated March 1, 2006 ("Hooker affidavit").

5)     Because prisons are closed institutions it is essential that medical care provided in prisons be evaluated by agencies outside of the control of the prison. The National Commission for Correctional Health Care, a national organization composed of representatives of correctional and health organizations accredits prisons and jails throughout the United States based on published standards. The need for outside accreditation through quality review is also recognized by the Federal government's requirement for Joint Commission for Accreditation of Healthcare Organizations (JCAHO) accreditation of all institutions which receive Medicare funds. JCAHO also reviews and accredits medical care programs in US prisons and jails.

6) As I understand it, the government has repeatedly refused to release Mr. Zuhair's medical records, making a conclusive evaluation of his health impossible.

7) Nevertheless, from my review of the available materials, I can make the following preliminary conclusions.

8) First, Mr. Zuhair's complaints are consistent with the presence of serious treatable medical problems, which may include urinary tract infections, urethral strictures, bladder injury, kidney failure, gout, cervical radiculopathy, and trauma to the nasal passageways, trachea and esophagus.

9) I understand that Mr. Zuhair has been denied both diagnosis and treatment of his complaints. It is impossible to determine the gravity of these ailments until a proper diagnostic work-up is performed. This diagnostic work is non-intrusive and should have been done long ago.

10) If these symptoms do represent undiagnosed serious medical conditions, and if continue to go untreated, the underlying problems will in all likelihood cause severe and irreversible medical complications. They may have already done so.

11) If the failure to provide Mr. Zuhair with medical care and to evaluate his medical condition stems from an attempt to break his hunger strike, this is extremely dangerous, troubling, and inconsistent with fundamental principles of medical ethics. There is no legitimate medical reason why Mr. Zuhair would be denied basic medical care and why simple diagnostic techniques have not been used to determine the cause of his ailments.

12) Given Mr. Zuhair's symptoms, his allegations of denial of medical care, and his hunger strike, it is necessary to have access to his medical records to ensure that his health conditions remain stable through the course of his judicial proceedings. Without his medical records, there is no guarantee as to the state of his health or the quality of the health care he is provided.

13) Second, Mr. Zuhair's complaints about the manner in which Guantánamo medical staff are force feeding constitute a breach in the protocols described in the Hooker Affidavit.

14) Mr. Zuhair is force-fed by entubation twice a day. When he is force-fed, Mr. Zuhair is strapped to a chair with six-point restraints. He spends four hours a day in this chair. He is fed four boxes of nutritional supplements a day through a tube inserted through his nose and esophagus into his stomach. He is given serums and saline solution via an intravenous needle inserted into his arm.

15) The failure to provide Mr. Zuhair with topical anesthesia or proper lubricant during force feeding constitutes deliberate indifference to a known medical need.

16) Furthermore, Mr. Zuhair's constant nosebleeds and throat pain signify the existence of a host of other possible complications of force-feeding, including nasal trauma, and trauma to the trachea and esophagus.

17) The proper response to constant nose-bleeds is either to end the force feeding or to modify the force-feeding technique.

18) Given the apparent lack of medical attention paid to Mr. Zuhair, it is necessary to have access to his medical records to ensure that the force feeding regime is neither designed nor implemented in such a way as to cause Mr. Zuhair pain.

## Denial of Medical Care

19) There is no reason why Mr. Zuhair should be denied medical care because of his hunger strike or the exigencies of force-feeding.

20) Mr. Zuhair suffers from burning pain when he urinates. This pain may be secondary to urinary tract infection, urethral stricture, urinary stones, or bladder injury, and requires immediate evaluation. Untreated, these syndromes can cause permanent damage to the urethra, as well as permanent damage to the kidneys, including loss of renal function due to irreversible destruction of the kidneys.

21) Diagnosing the causes of Mr. Zuhair's urinary pain is necessary. The first diagnostic evaluation, urinalysis, will look for evidence of white and red blood cells in the urine, bacteria, casts, and crystals, which would signify the presence of kidney stones. The second diagnostic test is a urine culture. Urinalysis and urine culture are non-invasive tests. If these tests are not conclusive, further radiologic evaluation, including an ultrasound, intravenous pyelogram (IVP), or CT scan may be necessary. Urologic consultation may also be necessary based on the results of the evaluation. The consultant urologist may recommend additional tests, including cystoscopy. The observation notes describe Mr. Zuhair suffering from pain in the region of his kidneys. Kidney pain may be caused by infection, trauma, cancer, or kidney stones. Urologic evaluation as described above would also be part of the evaluation of his pain located in the region of the kidney.

22) Particularly concerning is the possibility that Mr. Zuhair's pain is caused by the presence of uric acid stones, or gout. Gout is consistent with the presence of pain in the kidney secondary to the development of uric acid stones, arthritic symptoms, and the swelling of joints and extremities. Gout is diagnosed by blood tests, urinalysis, and examination of joint fluid from an inflamed joint.

23) The observation notes describe Mr. Zuhair suffering from persistent neck pain. The description is consistent with Cervical Radiculopathy, or injury and inflammation of the roots of the C7 and C8 nerves.

24) Further evaluation by either a neurologist or a Physical Medicine and Rehabilitation Specialist is necessary to determine the existence and extent of the neuropathy. Diagnostic procedures would include x-rays, CT scan, MRI, and electromyography (EMG). Treatment of cervical radiculopathy could include medications, physical therapy, supportive devices, and, in intractable cases, surgery. The symptoms of cervical radiculopathy and the degree of injury may be secondary to the restraint chair to which Mr. Zuhair is attached twice daily. Untreated severe cervical radiculopathy can cause increasing and intractable pain, as well as loss of motor function in the upper extremities.

## Force-Feeding Techniques

25) In his Affidavit, Dr. Hooker represents that standard protocol force-feeding at Guantánamo requires lubrication of feeding tubes and use of topical anesthesia for the pharynx.

26) Topical anesthesia can be provided by lozenge, spray, or gargling with a lidocaine suspension. Robitussin or Vicks lozenges are likely inadequate topical anesthesia.

27) The procedure is less painful if adequate topical anesthesia is used.

28) Mr. Zuhair complains that the feeding tubes are not being lubricated and that topical anesthesia is not administered.

29) There is no medical reason to avoid the use of lubricants. The failure to do so is dangerous to Mr. Zuhair and deliberately indifferent to the preventable medical complications of repeated tube insertions.

30) The intubation of patients for the purposes of enteral feeding may result in a number of complications if the tube is not inserted correctly. In hospital settings, it is standard protocol to check the location of the tube radiologically to ensure the tube is introduced into the stomach or small intestine, and not into the trachea.

31) Given the extraordinary number of intubations Mr. Zuhair has experienced, and his description of the manner of intubation—without proper anesthetic, lubrication, or monitoring—it is likely that he has suffered injury to his nose, pharynx, larynx, or esophagus.

32) An Ear Nose and Throat (ENT) specialist should evaluate the possibility of injury to Mr. Zuhair's upper airway using a fiber-optic laryngoscope. The esophagus and first portion of the small intestine should be visualized via a procedure called esophago-gastro-duodenoscopy (EGD).

33) The observation notes describe Mr. Zuhair as experiencing recurrent nose bleeds. Most likely, these are a consequence of the repeated insertions of the feeding tube. Recurrent nosebleeds can have other causes as well, including aberrant blood vessels in the nose, coagulation problems, infections, and non-infectious lesions. ENT evaluation, including fibre-optic laryngoscopy, should be sought for this serious problem.

34) The notes indicate that Mr. Zuhair was once sprayed with mace in his face while strapped into a restraining chair.

35) There is no possible justification for using mace on a detainee while in a restraining chair. A prisoner strapped to a six point restraining chair is not at risk of harming himself or others. The use of a noxious chemical agent would be only for the purpose of causing pain.

## Recommendations

36) An independent physician must be allowed to review Mr. Zuhair's medical records as soon as possible.

37) Physicians caring for Mr. Zuhair should provide the above recommended diagnostic procedures, specialty consultations, laboratory evaluations, and, based on the outside evaluation of the medical records, provide necessary treatment of any identified medical problems.

38) Physicians caring for Mr. Zuhair should assure that the protocols referenced by Dr. Hooker specifically designed to minimize trauma from repetitive entubation are followed.

39) If physicians caring for Mr. Zuhair are unable to provide the above recommended diagnostic procedures, specialty consultations, laboratory evaluations, and provide necessary treatment of any identified medical problems, an independent evaluation of Mr. Zuhair should be conducted by a physician who will be able to interview and examine Mr. Zuhair.

I swear upon penalty of perjury that the above is true and correct to the best of my knowledge and information,

Dr. Robert L. Cohen, MD

Subscribed and sworn to before me, a notary public, on this _11th_ day of August, 2008.

Notary Public

New York County
Commi Exp:
11/08

# Exhibit 3



**INSPECTOR GENERAL**
DEPARTMENT OF DEFENSE
400 ARMY NAVY DRIVE
ARLINGTON, VIRGINIA 22202-4704

Center for Constitutional Rights                                        July 10, 2008
666 Broadway 7th floor
New York, NY 10012

To the Center for Constitutional Rights:

     On July 7, 2008 we received your response to our request for information regarding allegations made in the Washington Post article of April 23, 2008, "Detainees Allege Being Drugged, Questioned."

     We appreciate any information that you can provide to us about the experiences of prisoners at Guantanamo who allege that they were subjected to medical abuse at Guantanamo during interrogations or detention. Additionally, we concur with your request that we notify counsel prior to any interviews of prisoners and see no issue with allowing counsel to be present during interviews of their clients. A security-cleared interpreter would be appreciated as well.

     Finally, we request a list of all current and former detainees-clients and any biographical information that you could provide about them so that we can better focus our research and possible interview list.

     Your assistance in this matter is greatly appreciated. If you have any questions or concerns, please feel free any time to contact Ms. Julie Lund (Project Manager) at (703) 604-8839, DSN 664-8839, julie.lund@dodig.mil.

                          Sincerely,

                          William Rainey
                Deputy Assistant Inspector General
                   for Intelligence Evaluators



**INSPECTOR GENERAL**
**DEPARTMENT OF DEFENSE**
**400 ARMY NAVY DRIVE**
**ARLINGTON, VIRGINIA 22202-4704**

JUN 1 8 2008

Center for Constitutional Rights
666 Broadway 7th floor
New York, NY 10012

To the Center for Constitutional Rights:

The Senate requested the Department of Defense Inspector General investigate allegations raised in the April 23, 2008, Washington Post article, "Detainees Allege Being Drugged, Questioned." In order to support our overall preparation for the investigation, we request that you provide us with any information that will assist us in reviewing the allegations made in the Washington Post. When providing this information, please include the names of the individuals who allege they were drugged as well as the dates, locations and detailed accounts of the alleged incidents.

Your timely response in this matter is greatly appreciated. For further information, please feel free any time to contact Ms. Julie Lund (Project Manager) at (703) 604-8839, DSN 664-8839, julie.lund@dodig.mil.

Sincerely,

Shelton R. Young
Deputy Inspector General
for Intelligence

Attachment(s)
Washington Post Article, "Detainees Allege Being Drugged, Questioned"

# Exhibit 4



Yale Law School
Allard K. Lowenstein International Human Rights Clinic
National Litigation Project

February 28, 2008

Department of the Navy
Chief of Naval Operations
DNS-36
2000 Navy Pentagon
Washington, DC 20350-2000

## FREEDOM OF INFORMATION ACT REQUEST

Dear FOIA Officer,

This letter constitutes a request for records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., and corresponding regulations. This request is submitted on behalf of Ahmed Zaid (ISN 669), also known as "Ahmed Zeid Salem Zohair," "Ahmad Zayid Salim Zuhayri," or "Ahmed Zaid Salim Zuhair." Mr. Zaid is presently detained at the Guantánamo Bay Naval Base, Cuba ("Guantánamo"). The Yale Law School's Lowenstein International Human Rights Clinic, National Litigation Project ("NLP") is legal counsel for Ahmed Zaid, and has been authorized by him to act on his behalf. *See Zaid v. Gates*, No. 07-1221 (D.C. Cir.).

## I.    Records Sought

Ahmed Zaid seeks access to and copies of all records held by the U.S. Department of the Navy concerning any and all medical evaluations, procedures, treatments, assessments, diagnoses, prognoses, or prescriptions administered or prescribed by employees or agents of the United States Government, including any such records generated during his ongoing detention in Guantánamo. This request seeks any information or records in any form, including electronic media, that in any way concern or mention Mr. Zaid's medical conditions and/or treatment, including, but not limited to:

a)    Records concerning the physical or mental health conditions of Mr. Zaid;

b)    Records concerning medical illnesses, ailments or conditions experienced by Mr. Zaid, including emergency and non-emergency conditions;

c)    Records concerning medical and/or psychiatric evaluations, procedures, treatment or prescriptions provided to, requested by, or denied to Mr. Zaid while in U.S. custody, including any Detainee Medical Request forms;

d)    Records concerning any mental health or psychological assessments, evaluations or diagnoses of Mr. Zaid;

e)      Records concerning the identities of every person who has or did have any
        responsibility to observe, record, address, cure, modulate, monitor, or in any
        way reflect upon the physical or mental health conditions of Mr. Zaid;

f)      Records concerning any procedures, instructions, orders, or guidance provided
        to medical personnel with respect to their duties at Guantánamo, including
        evaluations, performance assessments, and disciplinary records;

g)      Records concerning any prescriptions or drugs, including any injections, given
        to Mr. Zaid, including any Medication Administration Records;

h)      Records concerning any procedures, instructions, orders, or guidelines
        regarding management of hunger strikes and force-feeding or enteral tube
        feeding, including any documents related to the Hunger Strike Protocol;

i)      Records concerning Mr. Zaid's participation in a past or current hunger strike,
        including any records of meal refusals, any documents regarding placing Mr.
        Zaid on the Hunger Strike Protocol, and any records tracking or reflecting Mr.
        Zaid's weight;

j)      Records reflecting legal opinions, by the Judge Advocate or any other official,
        regarding the initiation and continuation of force-feeding or enteral tube
        feeding on Mr. Zaid;

k)      Records concerning the initiation and continuation of the force-feeding or
        enteral tube feeding of Mr. Zaid,

l)      Records concerning any medical illness, ailments, or conditions, mental or
        physical, related to Mr. Zaid's hunger strike or to force-feeding and enteral
        tube feeding techniques.

## II.    Ahmed Zaid is Entitled to Expedited Processing

Mr. Zaid is entitled to, and demonstrates a compelling need for, expedited processing of
his FOIA request. Expedited processing of a FOIA request is warranted when there is an
"imminent loss of substantial due process rights and humanitarian need." 32 C.F.R. §
286.4(d)(3)(iv). Here, the denial of Mr. Zaid's substantial due process rights is not only
imminent, but is also present and ongoing. Mr. Zaid has been detained by the U.S.
Military for over five years with only recent and heavily restricted access to a lawyer and
no legitimate legal process.

To protest his indefinite and extrajudicial detention, Mr. Zaid has been on a hunger strike
since June 2005. His family, his counsel, and the public have not been provided with
information concerning Mr. Zaid's medical health or treatment, and, given repeated
accounts of abuse of detainees by the military's Initial Response Force and the ongoing

hunger strike, there is reason to believe that Mr. Zaid is facing serious and imminent threats to his safety and well-being. *See Kassem Affidavit.*

It is our understanding that the requested information is maintained in a manner readily accessible to the Department. Secretary Gordon England has represented that the Department regularly reviews the files of each Guantánamo detainee in order to justify their continued detention; further, the Department is obligated to monitor the health of persons held in their custody. Mr. Zaid's medical records should be readily accessible to the Department. If this information is not available in succinct format, we request the opportunity to view the records in your offices.

FOIA and DoD implementing regulations provide that if some parts of records containing the requested information are exempt from mandatory disclosure, then non-exempt materials shall be disclosed after deletion of the exempt material. *See* 5 U.S.C. § 552(b); 32 C.F.R. § 286.23(d). Therefore, if some portion of a record that is responsive to this request is determined to be exempt from disclosure, please provide a copy of the remainder of the record. Additionally, if some or all of the requested records are determined to be exempt from disclosure, please provide a list or index of the records withheld, the exemption invoked, an estimation of the volume of records denied, and the reasons why a discretionary release of the records would not be appropriate under DoD implementing regulations and the agency's FOIA policy. *See* 32 C.F.R. § 286.23(e).

## III.    Ahmed Zaid Is Entitled to a Fee Waiver

Mr. Zaid is entitled to a fee waiver because the disclosure of the requested information is in the public interest and is not made for commercial use. A requester is entitled to a fee waiver if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii). Mr. Zaid's counsel is a noncommercial pro bono clinic at the Yale Law School. Moreover, the records released are likely to contribute significantly to public understanding of the operations of the DoD and are not in any way in the commercial interest of Mr. Zaid or undersigned counsel.

If a fee waiver is denied, Requester will pay applicable fees, but requests notification if fees exceed $100. We reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

Please find attached the Affidavit of Ramzi Kassem, which notes, inter alia, Mr. Zaid's authorization of his counsel to view the requested information.

Thank you for your consideration of this request. Please direct all future responses to my attention at the address, email or telephone number provided below.

Sincerely,

Ramzi Kassem
Robert M. Cover Teaching Fellow

Anand Balakrishnan
Law Student Intern

Jessica Chen
Law Student Intern

Darryl Li
Law Student Intern

Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School

Encl.



**DEPARTMENT OF DEFENSE**
OFFICE OF FREEDOM OF INFORMATION
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

0 2 APR 2008
Ref: 08-F-0911

Mr. Ramzi Kassem
Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511

Dear Mr. Kassem:

This is an interim response to your February 28, 2008, Freedom of Information Act
(FOIA) request submitted to the Department of the Navy on behalf of Ahmed Zaid
(ISN 669), also known as "Ahmed Zeid Salem Zohair," "Ahmad Zayid Salim Zuhayri,"
or Ahmed Zaid Salim Zuhair." You state that the Yale Law School's Lowenstein
International Human Rights Clinic, National Litigation Project ("NLP") is legal counsel
for Ahmed Zaid, and has been authorized by him to act on his behalf and that you are
counsel to Ahmed Zaid. You have requested expedited processing, a fee waiver and have
agreed to pay applicable fees if a fee waiver is denied up to $100 but wish to be notified
should the amount exceed $100. The Department of the Navy referred your request to
this Office on March 24, 2008, and we received it on the same day. Your request was
assigned FOIA case number 08-F-0911.

You have requested "copies of all records held by the U.S. Department of the
Navy concerning any and all medical evaluations, procedures, treatments, assessments,
diagnoses, prognoses, or prescriptions administered or prescribed by employees or agents
of the United States Government, including any such records generated during his
ongoing detention in Guantanamo". You seek records in any form that concern or
mention Mr. Zaid's medical conditions and/or treatment, including but not limited to
twelve specifically described items. As the Navy has referred your request to this Office,
we are interpreting your request as it applies to the Department of Defense.

You have requested expedited processing pursuant to 32 C.F.R. § 286.4(d)(3)(iv),
based on an "imminent loss of substantial due process rights and humanitarian need".
You state that "the denial of Mr. Zaid's substantial due process rights is not only
imminent, but is also present and ongoing." "That Mr. Zaid has been detained by the U.S.
Military for over five years with only recent and heavily restricted access to a lawyer and
no legitimate legal process". That "Mr. Zaid has been on a hunger strike since June
2005" and that "His family, his counsel, and the public have not been provided with

information concerning his medical health or treatment, and, given repeated accounts of abuse of detainees by the military's Initial Response Force and the ongoing hunger strike, there is reason to believe that Mr. Zaid is facing serious and imminent threat to this safety and well-being". After carefully considering your request for expedited processing, I have determined that your request does not meet the criteria of the above mentioned DoD standards for expedited processing; therefore, this request is denied.

Based on the information in your request, I have determined that you should be placed in the "other" category for fee purposes. The "other" fee category affords your client two hours of search time and 100 pages of duplication free of charge. Subsequent processing will be assessed at the established DoD fee rates of: clerical search time--$20 per hour; professional search time--$44 per hour; executive search time--$75 per hour; and document reproduction at $0.15 per page.

You have additionally requested a fee waiver "because the disclosure of the requested information is in the public interest and is not made for commercial use." A fee waiver is appropriate when "furnishing the information is likely to contribute significantly to public understanding of the operations or activities of the Department of Defense and is not primarily in the commercial interest of the requester". 32 C.F.R. § 286.28(d). Factors contributing to a determination of a fee waiver are the requester's ability to disseminate the information to the general public and the significance or impact of the disclosure against the current level of public knowledge. A decision on a fee waiver can only be made after a search for responsive documents is conducted and the volume and nature of the records is determined.

I will make a decision on your request for a fee waiver after a search for responsive documents is conducted and the volume and nature of the records is determined. As you have agreed to pay $100 in fees, that decision will be based on the results of two hours of search time provided free of charge plus $100.

You have also requested that, in the event that any responsive information is determined to be exempt from disclosure, that this Office provide a list or index of the records withheld, the exemption invoked, an estimation of the volume of records denied, and the reasons why a discretionary release of the records would not be appropriate under DoD implementing regulations and the agency's FOIA policy. I have interpreted as a request for a *Vaughn* index pursuant to Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). It is well settled that a requester is not entitled to receive a *Vaughn* index during the administrative process. See Schwarz v. United States Dep't of Treasury, 131 F. Supp.2d 142, 147 (D.D.C. 2000). Accordingly, this request is denied.

As the preponderance of your request is for medical records; we will need a completed and signed "Authorization for Disclosure of Information," DA Form 5006 (copy enclosed), from your client. The DA Form 5006 must be received by this Office before we will process those portions of this FOIA request pertaining to medical records. You may also wish to check our website at: http://defenselink.dtic.mil/pubs/foi/detainees/GITMO_MedicalSOPs.pdf for documents concerning medical procedures and re-feeding. We will initiate a search for records responsive to the other portions of your client's request, but not for any medical records until we receive a signed DA 5006 from your client. As we have previously received versions of the DA Form 5006 translated into the Arabic language, you should be aware that we require that the DA Form 5006 or a similar document to be written in English.

Your request is a complex request that may involve a large volume of material, some of which may be classified, that may be located in numerous offices, and will require multiple levels of review. Accordingly, this Office will be unable to make a release determination on your request within the twenty-day statutory time period. This Office processes requests on a first-in, first-out basis, therefore, this request has been placed in the complex case processing queue. I apologize for the anticipated delay in responding to your request, but due to the complexity of the request this Office is unable to estimate when the processing of this request will be completed.

If you are not satisfied with the denial of expedited processing, you may submit an administrative appeal to James Hogan, Chief, Policy, Appeals and Litigation Branch at the above address. Your appeal should be postmarked within 60 days of the date of this letter, should cite to case number 08-F-0911 and should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

for Will Kammer
Chief

Enclosure:
As stated

| MEDICAL RECORD | AUTHORIZATION FOR DISCLOSURE OF INFORMATION |
|---|---|
| | For use of this form, see AR 40-66; the proponent agency is Office of The Surgeon General. |

This form will not be used for authorization to disclose alcohol or drug abuse patient information from medical records or for authorization to disclose information from records of an alcohol or drug abuse treatment program.  For authorization to disclose alcohol or drug abuse patient information, see 42 USC section 290dd, 42 CFR part 2, AR 40-66, and AR 600-85.

**(Pursuant to the Privacy Act of 1974, 5 USC section 552a)**

| PHYSICIAN OR MEDICAL TREATMENT FACILITY AUTHORIZED TO RELEASE INFORMATION | It is understood that this authorization may be revoked at any time, if requested in writing, except to the extent that action will have already been taken. |
|---|---|

**PATIENT DATA**

| NAME  (Last, First, MI) | DATE OF BIRTH (YYYYMMDD) | SOCIAL SECURITY/IDENTIFICATION NUMBER |
|---|---|---|

| PERIOD OF TREATMENT  (YYYYMMDD to YYYYMMDD)  TO | TYPE OF TREATMENT   ☐ OUTPATIENT    ☐ INPATIENT    ☐ BOTH |
|---|---|

RESTRICTIONS ON INFORMATION  (Specify)

USE OF MEDICAL INFORMATION

☐ FURTHER MEDICAL CARE   ☐ INSURANCE CLAIM(S)   ☐ ATTORNEY   ☐ DISABILITY DETERMINATION
☐ OTHER  (Specify)

**INFORMATION DESTINATION**

INDIVIDUAL OR ORGANIZATION TO WHOM INFORMATION SHOULD BE RELEASED  (Name and Address)

*(ANY DISCLOSURE OF MEDICAL RECORD INFORMATION BY THE RECIPIENT(S) IS PROHIBITED EXCEPT WHEN IMPLICIT IN THE PURPOSES OF THIS DISCLOSURE)*

**RELEASE AUTHORIZATION**

| I hereby request and authorize the named physician/medical treatment facility to release the medical information described above to the named individual/organization indicated. | DATE (YYYYMMDD) |
|---|---|
| SIGNATURE OF PATIENT/PARENT/GUARDIAN | RELATIONSHIP TO PATIENT |

IMPRINT OF PATIENT IDENTIFICATION PLATE WHEN AVAILABLE

DA FORM 5006, FEB 2003      DA FORM 5006-R, NOV 1996, IS OBSOLETE.                    USAPA  V1.00



# Yale Law School
## Allard K. Lowenstein International Human Rights Clinic
### National Litigation Project

May 29, 2008

**VIA FEDERAL EXPRESS**

James Hogan, Chief
Policy, Appeals and Litigation Branch
Department of Defense
Office of Freedom of Information
1155 Defense Pentagon
Washington, D.C. 20301-1155

Re:    **FREEDOM OF INFORMATION ACT APPEAL**
**(FOIA Case No. 08-F-0911)**
**Expedited Processing Requested**

Dear Mr. Hogan,

This is an appeal regarding FOIA Case No. 08-F-0911, under the Freedom of Information Act, 5 U.S.C. § 552(a)(6).

On February 28, 2008, we filed a FOIA request ("Request") on behalf of Requester Ahmed Zaid with the Department of the Navy ("DoN") for medical records concerning or mentioning Ahmed Zaid. The Request included a request for expedited processing. The Department of Defense received the Request through the DoN's referral on March 24, 2008.

On April 2, 2008, the DoD sent an "interim response" letter, signed by Will Kammer, FOIA Chief for the DoD's Directorate for Freedom of Information and Security Review, 1) denying the request for expedited processing, 2) declining to make a determination on the Request within the statutory deadline, and 3) declining to process the Request until a medical authorization form signed by Mr. Zaid is provided. *See* DoD FOIA Denial Letter from Will Kammer to Ramzi Kassem (Apr. 2, 2008). Copies of the Request and the denial letter are attached for your reference.

We appeal all the above denials in the April 2 letter, for reasons detailed below.

## I.    The DoD Improperly Denied Zaid's Request for Expedited Processing.

We appeal the denial of Mr. Zaid's request for expedited processing of his medical records. Under FOIA, expedited processing of a request is granted where the requester

"demonstrates a compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). The requester demonstrates a compelling need when "a failure to obtain expedited records on an expedited basis . . . could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(v)(I). Under DoD regulations, expedited processing of a FOIA request is additionally warranted when there is an "imminent loss of substantial due process rights and humanitarian need." 32 C.F.R. § 286.4(d)(3)(iv).

Mr. Zaid clearly demonstrates a "compelling need" for expedited processing under FOIA, since denial of expedited access to medical records would pose a threat to Mr. Zaid's life or physical safety. Moreover, denial of Mr. Zaid's "substantial due process rights" under DoD regulations is not only imminent, but is also present and ongoing.

A. *Failure to Process Mr. Zaid's Request on an Expedited Basis Poses an Imminent Threat to his Life and Physical Safety*

Mr. Zaid has been on hunger strike longer than any other detainee in Guantánamo. Now in the seventh year of his detention, Mr. Zaid has been on continuous hunger strike for nearly three years to protest the illegality of his detention. He has not accepted any solid food since commencing the hunger strike in June 2005.

Mr. Zaid is force-fed by entubation twice a day, while strapped to a chair with six point restraints.[1] He is held in this position for four hours a day. The force-feeding process involves shoving feeding tubes up his nose and down into his stomach, causing nosebleeds each time. The procedure is not only excruciatingly painful, but is also almost certain to result in medical complications.[2]

Guantánamo staff intentionally engage in excessively coercive tactics while administering force-feeding. In the first weeks of Mr. Zaid's hunger-strike, he was force-fed on a bed, which caused Mr. Zaid far less pain and discomfort than being force-fed in a restraint chair. The decision to change Mr. Zaid's force-feeding regimen to the more painful and degrading form he currently experiences was a deliberate decision by officials calculated to punish Mr. Zaid for his hunger strike, to cause him discomfort, and to "break" his hunger strike.[3] Moreover, medics often cause Mr. Zaid pain when force-feeding him or introducing IVs into his arm.

---

[1] A diagram of the chair is available here: http://humanrights.ucdavis.edu/projects/the-guantanamo-testimonials-project/testimonies/testimony-of-military-physicians/index.
[2] The Journal of the American Medical Association has stated that the "rapid insertion of the feeding tube for force-feeding purpose . . . can lead to mechanical complications, such as malposition of the tube, nasopharyngeal or esophageal trauma, and rarely, esophageal perforation." Sondra S. Crosby, Caroline M. Apovian, Michael A Grodin, "Hunger Strikes, Force-feeding, and Physicians' Responsibilities," Journal of the American Medical Association (August 1, 2007), vol 298, No. 5. at 564.
[3] See also Eric Schmitt and Tim Golden, *Force-feeding at Guantánamo is now acknowledged*, N.Y. Times, Feb. 22, 2006, at A6 (describing official acknowledgment of the use of isolation and extended time in "restraint chairs" to break hunger strikes).

P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • TELEPHONE 203.432.0138 • FACSIMILE 203.432.1222

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511 • EMAIL RAMZI.KASSEM@YALE.EDU

Guantánamo personnel at all levels of the chain of command have employed tactics designed to break Mr. Zaid's hunger strike. These tactics include the withholding of medical treatment, physical abuse, and the permanent placement of Mr. Zaid on punishment status.

These tactics, along with the already harsh conditions at Guantánamo, endanger Mr. Zaid's health and well-being. Mr. Zaid has been beaten by guards at Guantánamo and is subject to humiliating body searches several times per day. Mr. Zaid also suffers from numerous ailments, including a swollen rib and cuts resulting from brutal and unprovoked attacks by the Initial Response Force, a special squad at Guantánamo known for extreme disciplinary tactics and physical abuse. He suffers from severe neck pain caused by inflammation of cervical nerves, intense kidney pain, and stomach, back, and joint problems. Medical staff have refused to treat his ailments in an effort to break his hunger strike.

Mr. Zaid's allegations of retaliation from Guantánamo staff seeking to break his hunger strike have been corroborated by other detainees' experiences.[4] Moreover, government officials have acknowledged the use of the punitive tactics described by Mr. Zaid as part of a concerted plan to break the wills of hunger strikes at Guantánamo.[5]

The seven years of detention under brutal conditions, compounded by the denial of medical care and intentional maltreatment meted out by Guantánamo staff in a bid to force Mr. Zaid to end his hunger strike, have taken their toll on him. During one of counsel's last visits to Guantánamo on January 29, 2008, Mr. Zaid's health seemed to have deteriorated severely, and he seemed on the brink of a physical and emotional breakdown. *See Kassem Affidavit.*

Given the gravity of Mr. Zaid's medical condition and Guantánamo personnel's efforts to directly undermine Mr. Zaid's health, there is a compelling need for counsel to have speedy access to Mr. Zaid's medical records. Access to these records is essential for obtaining an independent and reliable evaluation of his health. An independent medical evaluation is imperative to assess whether Mr. Zaid currently suffers from any illnesses or conditions that seriously jeopardize his health and that would require immediate

---

[4] *See, e.g.*, Eric Schmitt and Tim Golden, *Force Feeding at Guantanamo is Now Acknowledged*, N.Y. Times, Feb. 22, 2006, at A6 (describing use of six point restraints and physical abuse to break hunger strikes); Amnesty International, *Further Information on Legal Concern / Health Concern / Torture* (14 February 2006), *available at* http://www.amnesty.org/en/library/asset/AMR51/028/2006/en/xRq7RbsC7HQJ (describing tactics used by Guantánamo staff to break hunger strike by four detainees, including isolation, deliberate over-feeding, and the deliberate misuse of medical instruments to cause pain); Amnesty International, *Cruel and Inhuman: Conditions of isolation for detainees at Guantánamo Bay* (April 5, 2007), *available at* http://www.amnesty.org/en/library/asset/AMR51/051/2007/en/UR4i7iJ8J_sJ (describing guards as subjecting hunger-striking detainees to "further punitive treatment, such as pepper spraying them").

[5] Eric Schmitt and Tim Golden, *Force-feeding at Guantanamo is Now Acknowledged*, N.Y. Times, February 22, 2006, at A6 (describing official acknowledgment of the use of isolation and extended time in "restraint chairs" to break hunger strikes).

treatment. Moreover, counsel has no alternative access to Mr. Zaid's medical records.[6] Thus, the DoD's failure to produce the requested medical records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of" Mr. Zaid. 5 U.S.C. § 552(a)(6)(v)(I).

B. *Mr. Zaid's Request Qualifies for Expedited Processing Because He Has Suffered Loss of Substantial Due Process Rights and Will Continue to Do So Without Access to the Requested Records*

Expedited processing of FOIA is required where there is an "imminent loss of substantial due process rights." 32 C.F.R. § 286.4(d)(3)(iv). Mr. Zaid faces a loss of substantial due process rights that is not only imminent but present and continuous. The conditions of detention at Guantánamo as well as the repeated denials of medical care and needlessly coercive treatment violate Mr. Zaid's due process rights and mandate expedited processing of this request for medical records. Expedited processing is additionally required because of the threat of prosecution facing Mr. Zaid and the integral role access to medical records will have to his defense if this threat materializes.

Conditions of Mr. Zaid's detention at Guantánamo are exceptionally restrictive and constitute an unlawful deprivation of his liberty: he is held virtually incommunicado, is constantly subject to abuse, and suffers twice daily a force-feeding regimen that physicians in the United States and the United Kingdom have specifically criticized as a violation of medical ethics as well as domestic and international law.[7] *See supra* at I(A). These conditions impose on the inmate "atypical and significant hardship" beyond ordinary prison life, and the Supreme Court has held that such conditions implicate special liberty interests for that reason. *Wilkinson v. Austin,* 545 U.S. 209, 223-224 (2005) (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). In fact, the *Wilkinson* court described conditions comparable those superior to those at Guantánamo: "almost all human contact is prohibited . . . the light, though it may be dimmed, is on for 24 hours . . . [p]lacement at [the Ohio State Penitentiary's supermax facility] is indefinite and, after an initial 30-day review, is reviewed just annually." *Id.* at 223-224 (holding that the atypical confinement conditions give rise to a liberty interest in their avoidance). Here, due process concerns for Guantánamo detainees like Mr. Zaid are exceptionally weighty, since individuals in Guantánamo suffer indefinite detention with none of the procedural safeguards offered in the criminal justice system.

Additionally, Mr. Zaid has suffered from the repeated denials of medical treatment and from the needlessly coercive implementation of his daily force-feeding regimen. *See*

---

[6] Counsel filed a motion to compel production of medical records on October 29, 2007, under Mr. Zaid's Detainee Treatment Act petition in the U.S. Court of Appeals for the District of Columbia Circuit. Briefing on the motion was completed on November 21, 2007. The Court of Appeals has not ruled on the motion, and Respondent Gates has reiterated his refusal to disclose any information about Mr. Zaid's medical condition.

[7] The use of 6-point restraints to "immobilize competent prisoners for nasogastric tube insertion or forced feedings [for] force-feeding … violates the Geneva Conventions, international human rights law, and medical ethics." Journal of the American Medical Association (August 1, 2007), vol 298, No. 5. at 565.

*supra* at I(A). Courts have held that "fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *United States v. Fitzgerald*, 466 F.2d 377, 380 n.6 (D.C. Cir. 1972). Failure to provide medical treatment or the provision of inadequate medical services violates the due process clause, as the failure to treat "could well result in the deprivation of life itself." *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972) (internal citations and quotations omitted).

Excessively coercive treatment implicates similar concerns.  Prisoners are entitled to relief upon demonstration that medical staff "intended to inflict pain without any medical justification" or chose treatment known to be "painful, ineffective, or imposed substantial risk of harm." *White v. Napoleon*, 897 F.2d 103 (3rd Cir. 1990) (holding that allegations of doctor's infliction of pain sufficed to state a violation of the Eighth Amendment).  The Supreme Court has noted that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990) (holding that there is a liberty interest in not being subjected to involuntary administration of antipsychotic drugs except with an overriding justification for their use and a determination of medical appropriateness).

The harsh conditions of detention, the refusals of medical treatment, and the employment of excessively coercive treatment constitute due process violations so severe as to endanger Mr. Zaid's life and liberty. Again, given the gravity of Mr. Zaid's medical condition and Guantánamo medical staff's unethical treatment toward Mr. Zaid, counsel's speedy access to Mr. Zaid's medical records is essential for obtaining an independent and reliable evaluation of his health.  An independent medical evaluation is necessary to assess whether Mr. Zaid currently suffers from any illnesses or conditions that jeopardize his health and that would require immediate treatment.  Medical records are also needed to evaluate the extent of the coerciveness and propriety of Guantánamo staff's treatment of Mr. Zaid.

Expedited processing of FOIA requests is also required where the requester faces criminal prosecution, because of the substantial due process and liberty interests involved.  *See, e.g., Aguilera v. F.B.I.*, 941 F. Supp. 144 (D.D.C. 1996); *Ferguson v. F.B.I.*, 722 F. Supp. 1137 (S.D.N.Y. 1989); *Cleaver v. Kelley*, 427 F. Supp. 80 (D.D.C. 1976).  A FOIA requester facing criminal prosecution that could result in "his loss of freedom or life" is "confronted with an exceptional and urgent need" to obtain potentially exculpatory information.  *Cleaver*, 427 F. Supp. at 81-2.    Mr. Zaid is held without charge.  However, he faces the threat of being charged by the Military Commissions established by Congress to try detainees at Guantanamo.

Courts have articulated that expedited processing is warranted for due process concerns in FOIA cases involving criminal prosecution when the plaintiff demonstrates that 1) his request is limited in scope; 2) the criminal discovery process is unavailable; 3) he faces "grave punishment"; and 4) "his reason to believe the documents may assist in his

P.O. BOX 209090, NEW HAVEN, CONNECTICUT  06520-9090 • TELEPHONE 203.432.0138 • FACSIMILE 203.432.1222

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT  06511 • EMAIL RAMZI.KASSEM@YALE.EDU

defense" is corroborated with "objective proof." *Aguilera*, 941 F.Supp. at 149-150 (setting aside the FBI's decision to deny expeditious processing).

Mr. Zaid has clearly demonstrated substantial loss of due process rights requisite for a grant of expedited processing. Firstly, his request is largely limited to his own medical records, which should be readily accessible to the Department, such that expeditious processing would not be overly burdensome. Former Secretary of the Navy Gordon England has represented that the Department regularly reviews the files of each Guantánamo detainee in order to justify their continued detention; further, the Department is obligated to monitor the health of persons held in their custody.[8]

Additionally, Mr. Zaid has no alternative discovery process for medical records. As a rule, prisoners have the right to review their medical records. *See* 28 C.F.R. § 513.42(a), counsel has been denied access to Mr. Zaid's medical records despite the gravity of the health and due process concerns involved. *See supra* note 5.

Mr. Zaid does not merely face potential loss of freedom, but has suffered "grave punishment" at Guantánamo for six years. As a result of his detention, he has been subject to numerous due process violations, including denial of legal process, harsh conditions of confinement, refusals of medical treatment, and excessively coercive medical treatment. Expeditious processing of medical records is necessary for Mr. Zaid to obtain relief from the significant harms and deprivations he has suffered.

Medical records will assist in Mr. Zaid's defense. Mr. Zaid has been detained on the basis of vague and unsubstantiated allegations and without any meaningful judicial review. Mr. Zaid's declining health condition caused by conditions of confinement, the hunger strike and the maltreatment by Guantánamo staff, endangers Mr. Zaid's meaningful access to counsel and jeopardizes his ability to participate in legal proceedings to contest the legality of his detention. Given the gravity of Mr. Zaid's medical problems and the fact that the medical personnel employed by his custodians have withheld basic medical care in a bid to break his strike, expeditious provision of Mr. Zaid's medical records to counsel is necessary so that counsel may monitor Mr. Zaid's continued ability to participate meaningfully in legal proceedings. Additionally, medical records will help establish whether any statements made by Mr. Zaid to interrogators or custodians were involuntary, made under physical duress, or improperly facilitated by medical personnel.[9]

C. *Mr. Zaid's Request Qualifies for Expedited Processing Because Release of the Information is Compelled by Humanitarian Need Under 32 C.F.R. § 286.4(d)(3)(iv)*

---

[8] Secretary England, speaking to the BBC on August 5, 2004, said that the status of each detainee had been reviewed eight times before, *available at:*
http://www.bbc.co.uk/radio4/today/listenagain/ram/today4_terrorism_20040805.ram.
[9] *See Aguilera*, 941 F. Supp. at 150 (FOIA requester's defense of mental incompetency at the time incriminating statements were made to the police constitutes "objective proof to support his reason to believe that the FBI documents may assist in this defense").

P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • TELEPHONE 203.432.0138 • FACSIMILE 203.432.1222
COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511 • EMAIL RAMZI.KASSEM@YALE.EDU

"Humanitarian need" mandates expedited processing by DoD Components. 32 C.F.R. § 286.4(d)(3)(iv). "Humanitarian need means that disclosing the information will promote the welfare and interest of mankind." *Id.*

Disclosure of Mr. Zaid's medical records will promote his individual welfare. *See supra.* Additionally, records of Mr. Zaid's treatment and medical conditions during his detention at Guantánamo will "promote the welfare and interests of mankind." The instant request clearly meets this standard.    Domestic and international observers have closely scrutinized the conditions of confinement at Guantánamo in general and the medical treatment of hunger strikers more specifically, with medical professionals taking public stands on the moral, ethical, and medical implications of detainee allegations. *See, e.g.,* Joby Warrick, *Detainees Alleged Being Drugged, Questioned*, WASH. POST, Apr. 22, 2008, at A1; Omar El Akkad, *A Place Rife with Paradox, Guantanamo Bay Draws Global Outrage*, GLOBE AND MAIL (Canada), April 19, 2008, at F1; John Chandler & Currey Hitchens, *A Cancer on Body Politic; Gitmo a Medical, Legal Limbo*, ATLANTA JOURNAL-CONSTITUTION, March 9, 2008, at 3B; M. Gregg Bloche, *Military Medicine's Toxic Silence*, L.A. TIMES, March 11, 2007, at 2; Verity Edwards, *Hicks's Medical Care Panned*, THE AUSTRALIAN, February 2, 2007 at 8; Dr. Scott Allen and Stephen Xenakis, *Our Duty To War Detainees*, BOST. GLOBE, January 22, 2007, at A15; Carol J. Williams, *Details on Detainee Suicides Emerging*, L.A. TIMES, June 12, 2006, at A1; Eric Schmitt and Tim Golden, *Force Feeding at Guantanamo is Now Acknowledged*, N.Y. TIMES, Feb. 22, 2006, at A6; Suzzane Goldberg, *UN Calls for Closure of Guantanamo: Violent Force-feeding of Hunger Strikers Criticized*, THE GUARDIAN (London), Feb. 14, 2006, at 17.

## II.    The DoD Improperly Declined to Process the Request Within the Twenty-Day Statutory Time Period.

We appeal the refusal to process the Request within the twenty-day statutory time period. FOIA requires an agency to make a determination on any FOIA request within 20 working days of receipt. § 552(a)(6)(A)(i). Again, Mr. Zaid's Request is largely limited to a request for his medical records, and such records should be readily available to the Department.

Though agencies can extend the statutory deadline by ten working days in "unusual circumstances,"[10] the DoD did not set forth the "unusual circumstances" or the "date on which a determination is expected to be dispatched," as is required under FOIA. § 552(a)(6)(B)(i). Instead, the DoD simply stated that it could not make the deadline and that it could not provide an estimate of when processing would be completed due to the "complexity of the request." The DoD also did not provide Mr. Zaid opportunities "to

---

[10] Under FOIA, a large backlog of requests and inadequate resources to complete the request does not constitute "exceptional circumstances." *See, e.g., Exner v. FBI*, 542 F.2d 1121 (9th Cir. 1976); *Donham v. Dep't of Energy*, 192 F. Supp. 2d 877 (S.D. Ill. 2002); *Ray v. Department of Justice*, 770 F.Supp. 1544, 1549 (S.D. Fla.1990); *Mayock v. INS*, 714 F.Supp. 1558, 1566 (N.D. Cal.1989); *Caifano v. Wampler*, 588 F.Supp. 1392 (N.D. Ill.1984).

limit the scope of the request" or "to arrange with the agency an alternative time frame for processing the request or a modified request," as is required under FOIA. 5 U.S.C. § 552(a)(6)(B)(ii).

**III.    Though the DoD Improperly Denied Processing Mr. Zaid's Request for Medical Records Pending Provision of a Medical Authorization Form, We Attach Here a Signed "Authorization for Disclosure of Information" (DA Form 5006)**

We attach to this appeal the "Authorization for Disclosure of Information" (DA Form 5006), signed by Mr. Zaid.

However, this is without conceding the propriety of DoD's denial as the provision of such authorization is not required under either FOIA or the DoD's implementing regulations. FOIA does not require the provision of a medical authorization form personally signed by requester when the requester seeks medical records. The DoD's FOIA regulations require only a notarized request "certifying under penalty of perjury that their identity is true and correct" from the requester or requester's attorney when the request involves "personally identifiable information." 32 C.F.R. § 286.22 (a)(iii). In the initial request letter, counsel provided exactly what is required under DoD's FOIA regulations: a notarized affidavit by counsel attesting that he is authorized to represent Mr. Zaid and to obtain all records pertaining to Mr. Zaid that are in United States custody.

- - - - -

Pursuant to 5 U.S.C. § 552 (a)(6)(E)(ii)(II), we expect "expeditious consideration" of this appeal. We will contemplate judicial review as is our right under 5 U.S.C. § 552 (a)(6)(E)(iii).

Please direct all future responses to my attention at the address, email or telephone number provided below.

Sincerely,

Ramzi Kassem
Supervising Attorney
Allard    K.    Lowenstein    International
Human Rights Clinic
National Litigation Project
Yale Law School

Anand Balakrishnan
Jessica Chen
Darryl Li
Law Student Interns

Encl.

Table of Attachments

(1)  Authorization for Disclosure of Information (DA Form 5006), signed by Mr. Zaid
(2)  Affidavit of Ramzi Kassem, February 28, 2008
(3)  DoD Interim Response in re: 08-F-0911, April 2, 2008
(4)  Request Letter in re: 08-F-0911, February 28, 2008

| MEDICAL RECORD | AUTHORIZATION FOR DISCLOSURE OF INFORMATION |
|---|---|
| | For use of this form, see AR 40-66; the proponent agency is Office of The Surgeon General. |

**This form will not be used for authorization to disclose alcohol or drug abuse patient information from medical records or for authorization to disclose information from records of an alcohol or drug abuse treatment program.  For authorization to disclose alcohol or drug abuse patient information, see 42 USC section 290dd, 42 CFR part 2, AR 40-66, and AR 600-85.**

(Pursuant to the Privacy Act of 1974, 5 USC section 552a)

| PHYSICIAN OR MEDICAL TREATMENT FACILITY AUTHORIZED TO RELEASE INFORMATION | |
|---|---|
| *Dept. of Defense ; BAGRAM MEDICAL FACILITIES*<br>*JTF-GTMO ;*<br>*GUANTANAMO BASE MEDICAL FACILITIES* | It is understood that this authorization may be revoked at any time, if requested in writing, except to the extent that action will have already been taken. |

**PATIENT DATA**

| NAME *(Last, First, MI)*<br>*ZAID, AHMED* | DATE OF BIRTH *(YYYYMMDD)* | SOCIAL SECURITY/IDENTIFICATION NUMBER<br>*N/A* |
|---|---|---|
| PERIOD OF TREATMENT *(YYYYMMDD to YYYYMMDD)*<br>*2002* TO *PRESENT* | TYPE OF TREATMENT<br>☐ OUTPATIENT    ☐ INPATIENT    ☑ BOTH | |

**RESTRICTIONS ON INFORMATION** *(Specify)*

*NONE. ALL INFORMATION ON FILE.*

**USE OF MEDICAL INFORMATION**

☐ FURTHER MEDICAL CARE    ☐ INSURANCE CLAIM(S)    ☑ ATTORNEY    ☐ DISABILITY DETERMINATION
☐ OTHER *(Specify)*

**INFORMATION DESTINATION**

INDIVIDUAL OR ORGANIZATION TO WHOM INFORMATION SHOULD BE RELEASED *(Name and Address)*

*RAMZI KASSEM, ESQ.*
*P.O. BOX 209090*
*NEW HAVEN, CT 06520 - 9090*

*(ANY DISCLOSURE OF MEDICAL RECORD INFORMATION BY THE RECIPIENT(S) IS PROHIBITED EXCEPT WHEN IMPLICIT IN THE PURPOSES OF THIS DISCLOSURE)*

**RELEASE AUTHORIZATION**

| I hereby request and authorize the named physician/medical treatment facility to release the medical information described above to the named individual/organization indicated. | DATE *(YYYYMMDD)*<br>*2008/05/06* |
|---|---|
| SIGNATURE OF PATIENT/PARENT/GUARDIAN<br>*AHMed ZAID* | RELATIONSHIP TO PATIENT<br>*SELF* |

IMPRINT OF PATIENT IDENTIFICATION PLATE WHEN AVAILABLE

احمد زيد زكي الشيبة

DA FORM 5006, FEB 2003        DA FORM 5006-R, NOV 1996, IS OBSOLETE.        USAPA V1.00

**AFFIDAVIT OF RAMZI KASSEM IN SUPPORT**
**OF AHMED ZAID'S REQUEST FOR RECORDS PURSUANT TO FREEDOM**
**OF INFORMATION ACT**

Pursuant to 28 U.S.C. § 1746 and 32 C.F.R. § 286.4(d)(3)(iv), I certify that the following is true and correct to the best of my knowledge:

1.  My name is Ramzi Kassem.

2.  I am a Robert M. Cover Clinical Teaching Fellow at Yale Law School and counsel to Ahmed Zaid.

3.  Mr. Zaid, to whom the U.S. military has assigned Internment Serial Number ("ISN") 669, is a Saudi Arabian national who has been imprisoned at Guantánamo Bay without charge or legally-recognized status for over five years.

4.  On August 12, 2007, I traveled to the U.S. Naval Station at Guantánamo Bay, Cuba, and on August 16, 2007, I met with my client in a shack at the Camp Iguana section of the detention facilities on the base.

5.  On October 25, 2007, I met with my client at Guantánamo Bay for a second time, again in a shack at the Camp Iguana section of the detention facility.

6.  At our first meeting, Mr. Zaid directly authorized me to represent him.

7.  During that meeting, Mr. Zaid stated that he understood that his authorization allows me to meet with him at Guantánamo Bay and to gain access to records concerning him that are presently in the custody of the United States government.

8.  During that meeting, Mr. Zaid explained to me that he had been on hunger strike since June 2005. He described how, twice a day, Guantánamo staff restrained him to a chair, inserted a tube into his nose, and fed him without consent.

9.  During that meeting, Mr. Zaid explained that he has been suffering from severe back pain, kidney pain, and pain in the knees, ankles, and other joints. He fears that he has kidney failure.

10. During that meeting, Mr. Zaid explained that he has asked for medical treatment for his various ailments. In an attempt to break his hunger strike, he was told by medical personnel that he would not receive treatment unless he stopped his hunger strike.

1

## ACKNOWLEDGMENT

State of Connecticut
County of <u>New Haven</u>          ss. <u>New Haven</u>

On this the <u>28</u> day of <u>February</u>, 2008, before me,
<u>Maureen Furtak</u>, the undersigned officer, personally appeared <u>Ramzi
Kassem</u>, known to me to be the person whose name is subscribed to the within instrument
and acknowledge that he executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

_____
Signature of Notary Public

Date of Commission Expires: _____

MAUREEN F. FURTAK
NOTARY PUBLIC
MY COMMISSION EXPIRES MARCH 31 2012

3



**DEPARTMENT OF DEFENSE**
OFFICE OF FREEDOM OF INFORMATION
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

JUN 1 1 2008

Ref: 08-F-0911

Mr. Ramzi Kassem
Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511

Dear Mr. Kassem:

This is in further response to your February 28, 2008, Freedom of Information Act request which the Department of the Navy referred to this Office. Your request was on behalf of Ahmed Zaid (ISN 669), also known as "Ahmed Zeid Salem Zohair, Ahmad Zayid Salim Zuhayri, or Ahmed Zaid Salim Zuhair" and you requested "copies of all records held by the U.S. Department of the Navy concerning any and all medical evaluations, procedures, treatments, assessments, diagnoses, prognoses, or prescriptions administered or prescribed by employees or agents of the United States Government, including any such records generated during his ongoing detention in Guantanamo." You additionally seek records in any form that concern or mention Mr. Zaid's medical conditions and/or treatment, including but not limited to 12 specifically described items.

In our letter dated April 2, 2008, (copy enclosed) we advised you that documents concerning medical procedures and re-feeding were available on our website but that access to medical records would require a completed and signed "Authorization for Disclosure of Information," DA Form 5006, from Mr. Zaid. Our processing has reached the point where we cannot proceed without this authorization. Therefore, I am requesting that if you are not able to obtain a signed and written release from Mr. Zaid authorizing you to receive his medical records, that you advise this Office so that we can close your request.

Sincerely,

Will Kammer
Chief

Enclosure:
As stated



Yale Law School
Allard K. Lowenstein International Human Rights Clinic
National Litigation Project

Will Kramer
Department of Defense
Office of Freedom of Information
1155 Defense Pentagon
Washington, DC 20301

July 28, 2008

**FREEDOM OF INFORMATION ACT RE: MEDICAL AUTHORIZATION FORM**

Dear FOIA Officer,

This letter is in response to your letter dated June 11, 2008 regarding Requester Ahmed Zaid, FOIA Case Ref. No. 08-F-0911.

On June 11, 2008, the Department of Defense sent a letter requesting a completed and signed "Authorization for Disclosure of Information," DA Form 5006. We had previously included the signed and dated form with our original FOIA request dated May 29, 2008.

We are including the Authorization form once again with this letter and hope it is sufficient for you to process our originally filed FOIA request.

Thank you for your consideration of this request. Please direct all future responses to my attention at the address or telephone number provided below.

Sincerely,


Ramzi Kassem
Supervising Attorney


Allard K. Lowenstein International Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
Phone: (203) 432-0138
Fax: (203) 432-1222

| MEDICAL RECORD | AUTHORIZATION FOR DISCLOSURE OF INFORMATION |
|---|---|
| | For use of this form, see AR 40-66; the proponent agency is Office of The Surgeon General. |

**This form will not be used for authorization to disclose alcohol or drug abuse patient information from medical records or for authorization to disclose information from records of an alcohol or drug abuse treatment program. For authorization to disclose alcohol or drug abuse patient information, see 42 USC section 290dd, 42 CFR part 2, AR 40-66, and AR 600-85.**

(Pursuant to the Privacy Act of 1974, 5 USC section 552a)

| PHYSICIAN OR MEDICAL TREATMENT FACILITY AUTHORIZED TO RELEASE INFORMATION | |
|---|---|
| *Dept. of Defense ; BAGRAM MEDICAL FACILITIES JTF-GTMO ; GUANTANAMO BASE MEDICAL FACILITIES* | It is understood that this authorization may be revoked at any time, if requested in writing, except to the extent that action will have already been taken. |

**PATIENT DATA**

| NAME (Last, First, MI) | DATE OF BIRTH (YYYYMMDD) | SOCIAL SECURITY/IDENTIFICATION NUMBER |
|---|---|---|
| *ZAID, AHMED* | | *N/A* |

| PERIOD OF TREATMENT (YYYYMMDD to YYYYMMDD) | TYPE OF TREATMENT |
|---|---|
| *2002* TO *PRESENT* | ☐ OUTPATIENT   ☐ INPATIENT   ☒ BOTH |

**RESTRICTIONS ON INFORMATION (Specify)**

*NONE. ALL INFORMATION ON FILE.*

**USE OF MEDICAL INFORMATION**

☐ FURTHER MEDICAL CARE   ☐ INSURANCE CLAIM(S)   ☒ ATTORNEY   ☐ DISABILITY DETERMINATION
☐ OTHER (Specify)

**INFORMATION DESTINATION**

INDIVIDUAL OR ORGANIZATION TO WHOM INFORMATION SHOULD BE RELEASED (Name and Address)

*RAMZI KASSEM, ESQ.*
*P.O. BOX 209096*
*NEW HAVEN, CT 06520-9090*

(ANY DISCLOSURE OF MEDICAL RECORD INFORMATION BY THE RECIPIENT(S) IS PROHIBITED EXCEPT WHEN IMPLICIT IN THE PURPOSES OF THIS DISCLOSURE)

**RELEASE AUTHORIZATION**

| I hereby request and authorize the named physician/medical treatment facility to release the medical information described above to the named individual/organization indicated. | DATE (YYYYMMDD) |
|---|---|
| | *2008/05/06* |
| SIGNATURE OF PATIENT/PARENT/GUARDIAN *AHMed ZAid* | RELATIONSHIP TO PATIENT *SELF* |

IMPRINT OF PATIENT IDENTIFICATION PLATE WHEN AVAILABLE

احمد زيد قطر الشاش

| DA FORM 5006, FEB 2003 | DA FORM 5006-R, NOV 1996, IS OBSOLETE. | USAPA V1.00 |
|---|---|---|

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABDUL RAHMAN SHALABI, *et al.* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 05-0520 (RMU) |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## DECLARATION OF MARC D. FALKOFF

I, MARC D. FALKOFF, pursuant to 28 U.S.C. § 1746, do hereby declare:

    1.    I am an attorney-at-law licensed to practice in New York State and the District of Columbia. I am an associate with the law firm of Covington & Burling, located at 1330 Avenue of the Americas, New York, New York 10019. I make the following representations based on my personal knowledge.

    2.    Covington & Burling represents seventeen Yemeni men being detained at the U.S. Naval Base in Guantánamo Bay, Cuba. We have filed habeas corpus petitions in the U.S. District Court in the District of Columbia for each of them. The four cases in which petitions are pending are *Abdah v. Bush*, 04-CV-1254 (HHK), *Al-Hela v. Bush*, 05-CV-1048 (RMU), *Hatim v. Bush*, 05-CV-1429 (RMU), and *Attash v. Bush*, 05-CV-1592 (RCL).

    3.    Under the terms of a Protective Order entered in the four habeas cases listed in the preceding paragraph, all communications we receive from our clients must

be treated as if they were classified. They may be made public only after undergoing classification review by a Privilege Review Team in the Department of Justice. All client communications that I discuss in this declaration have been deemed unclassified by the Privilege Review Team.

    4.     From February 5 to February 9, 2006, I visited Guantánamo Bay with Robert Knowles and two other associates from Covington & Burling. We spoke with a number of our clients with the aid of two Arabic interpreters.

    5.     On February 7, 2006, Mr. Knowles and I met with our client Hassan bin Attash. We were assisted by Mahmoud Hasnain, one of our interpreters. Like many of our clients, Mr. Attash gave us detailed information about the military's recent crackdown on the detainees' hunger strike. According to Mr. Attash, beginning about six weeks earlier, the military had started taking extreme measures to make the hunger strikers stop. Any detainee who initiated a hunger strike by refusing three consecutive meals was immediately punished by having all of his personal belongings taken away. Men who continued to strike were force-fed.

    6.     Mr. Attash described the force-feeding in graphic terms. The hunger strikers are tied down for extended periods so that they cannot move at all. During this time they are forbidden to engage in ablutions and prayers, and are not allowed to use the restroom or showers. A feeding tube is inserted through the hunger-striker's nose and into his stomach. The feeding tubes are at present larger in diameter than those that the military has used in the past, and they are therefore more painful. Although previously hunger strikers had been forced to ingest four cans of "Ensure" nutrient a day, they are now forced to ingest five cans, which has led a number of the men to vomit. Because the

hunger strikers are strapped down and not allowed to use the restroom, a number of them have soiled themselves during these procedures. The feeding tubes, which previously had been inserted only once and then left in place, are now being inserted and extracted at every meal, three times a day. Some of the men have vomited blood as a result of these procedures. The detainees believe that this painful process of inserting, removing and reinserting the gastro-nasal tubes has no medical purpose and is intended as nothing less than physical torture.

7.    Mr. Attash also told us about a disturbing incident that occurred to a detainee who has been on hunger strike during this recent crackdown. The detainee was being force-fed with a gastro-nasal tube when a piece of the tube broke off, requiring him to undergo an operation to have it removed. Mr. Attash does not know precisely when this event occurred. He knows this detainee by the name "Abdulrahman," and he knows that Abdulrahman is a Saudi citizen whose internee serial number is "in the 40s, maybe 42 or 49."

8.    Pursuant to the Protective Order in Mr. Attash's case, all of our notes from our meeting with Mr. Attash were collected by military personnel at Guantánamo Bay before we departed from the Naval Base. The notes were sent to a secure facility in the Washington, D.C. area and arrived there on February 16, 2006. There, the Privilege Review Team reviewed the notes to determine their classification level. The notes were deemed unclassified on February 27, 2006 and were retrieved by me from the secure facility on March 1, 2006. The notes of our conversations with Mr. Attash remain in my possession.

3

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed:     New York, New York
              March 7, 2006

Marc D. Falkoff
_____
Marc D. Falkoff

4

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABDUL RAHMAN SHALABI, *et al.* | ) | |
| Petitioners, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 05-0520 (RMU) |
| | ) | |
| **GEORGE W. BUSH,** *et al.*, | ) | |
| Respondents. | ) | |

## DECLARATION OF STEWART EISENBERG

I, STEWART EISENBERG, pursuant to 28 U.S.C. § 1746, do hereby declare:

1.      I am an attorney-at-law licensed to practice in the Commonwealth of Massachusetts and have been admitted *pro hac vice* in the District of Columbia. I am Of Counsel to Weinberg & Garber, P.C. located at 71 King Street, Northampton, Massachusetts, 01060. I make the following representations based on my personal knowledge.

2.      I and co-counsel William C. Newman, Esq represent a Saudi Arabian man being detained at the U.S. Naval Base in Guantánamo Bay, Cuba. We have filed a habeas corpus petition in the U.S. District Court in the District of Columbia on his behalf in March of 2005, captioned *Abdul-Salam Gaithan Mureef Al-Shihry v. Bush, et al*, 05-CV-0490 (PLF).

3.      Under the terms of a Protective Order entered in the above referenced case, all communications we receive from our client are presumptively classified.

Only those portions deemed "unclassified" may be made public, and only if so determined after undergoing classification review by the Privilege Review Team in the Department of Justice.

4.     From March 1 to March 5, 2006, I was at Guantánamo Bay, where I met and spoke with my client with the aid of an Arabic interpreter. Pursuant to the Protective Order in Mr. Al-Shihry's case, all of my notes from our meetings were collected by military personnel at Guantánamo Bay before I departed from the Naval Base. The notes were scheduled to have been sent the morning of March 6th to a secure facility in the Washington, D.C. area. There, the Privilege Review Team should soon review the notes to determine their classification level. I returned home late on March 5, 2006.

5.     On the morning of March 6, 2006, I contacted Jennifer Ching, Esq. of Paul, Weiss, Rifkin, Wharton & Garrison LLP ("Paul Weiss") and informed her that as a result of my visit I have information bearing on one of her clients. We discussed the fact that until my notes have been cleared by the Privilege Review Team I am unable to share that information with her, even though she has secret security clearance, unless we are face-to-face and otherwise in compliance with the Protective Order. She is in New York and I am in Massachusetts. She informed me of a pending motion she will soon be filing. She asked if I could contact the Litigation Security Office and seek clearance to hand-write that portion of a declaration that I am not yet permitted to use my computer to write. I could then Fedex the declaration for review by the Privilege Team, and it could be reviewed, then held at the secure facility so that Attorney Ching could review it for possible inclusion in her motion. I agreed to explore that plan, but neither Christine Gunning nor Jennifer Campbell was available on March 6th.

2

6.      At the first opportunity on Tuesday March 7, 2006, I contacted Jennifer Campbell of the Litigation Security Office.

7.      I asked whether I would be in compliance with her understanding of my obligations under the Protective Order if I was to handwrite upon a Declaration the information which I believe is important to communicate to Attorney Ching, and send it through the Privilege Review Team, to be reviewed then delivered to Attorney Ching and/or Paul Weiss. She indicated that under the circumstances I may handwrite the information which has not yet been reviewed on the Declaration, and immediately have it Fedexed it to her attention with a note requesting that it be left for Jennifer Ching at the Secure Facility.

8.      My client advised me that Yousif al-Sheery, whom he knows and am familiar with because they had the same next friend, is in very, very bad health. Yousif has been hunger-striking, and he has been force fed through a large feeding tube inserted through the nose to the stomach, and was told the tube is inserted then extracted 3-4 times per day, in order to cause great pain to Yousif. I was told Yousif wants to die at this point and is gravely ill. I am sending this Declaration in order to notify the court and Attorney Ching, of what appear to be the grave risks and painful treatment of this detainee. I understand he is 19 or 20 years of age.

3

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed:     Northampton, Massachusetts
              March 7, 2006

              Stewart Eisenberg

No COPIES MADE OF THIS DOCUMENT

4

# Exhibit 7

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

FILED WITH
COURT SECURITY OFFICER
101405 [signature]
DATE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAJID ABDULLA AL JOUDI, *et al.*,

          Petitioners/Plaintiffs,

          v.

GEORGE W. BUSH, *et al.*,

          Respondents/Defendants.

Case No. 1: 05-CV-00301 (GK)

## DECLARATION BY ANDREA J. PRASOW, ESQ.

I, Andrea J. Prasow, declare that the following statements are true to the best of my knowledge, information, and belief:

1.    I am associated with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Petitioners in the above-captioned action. I offer this Declaration in further support of Petitioners' Motion to Compel Access to Counsel and Information Related to Medical Treatment.

2.    Attached hereto as Exhibit A is a true and correct copy of handwritten attorney notes that have been reviewed by the Privilege Review Team and determined unclassified as redacted therein.

3.    Attached hereto as Exhibit B is a true and correct copy of the Declaration of Thomas B. Wilner submitted in *Al Odah* v. *U.S.A.*, Case No. 02-0828(CKK).

4.    Attached hereto as Exhibit C are true and correct copies of news articles containing statements by a representative of the International Committee of the Red Cross regarding the hunger strike at Guantánamo.

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

2

5.     I declare, under penalty of perjury under the laws of the United

States that the foregoing is true and correct.


Executed this 14th day of October 2005
Washington, D.C.

_____
Andrea J. Prasow

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

# Exhibit A

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

02/05 Al Shalabi: 31 years old — weighs 111 pounds (73cm; 143 pounds before)

4) 2wks ago — on hunger strike for 1 request — freedom
purplish/reddish forehead

4) tubes put in by force when we refused — they shackled us — Dr. ███ responsible — gave orders and supervised us — later — removed tubes and inserted 18 inch stick-like tubes — bigger than finger — couldn't breathe when they put in nose and bled from nose and mouth, many wounds in throat and nose. they deliberately put it in wrong way. made it bleed then another nurse inserts again. Then, 4-5 hour late — they remove and next day you have to go through same. Trying to terrorize and make them change mind. Person from US supervised this torture. (Old man, white hair, glasses, civilian clothes — uniform outside green)

4) your govt didn't follow laws/rules they set. Rules they fighting to implement for last 100 years. hunger strike till released or die. Some now 80-85 pounds and losing weight. We'll die because tubes aren't good. They have insulted the Koran, fought us in every manner. there is no law here, only injustice. hair. Started August 8 - 10½ is 56 days.

Dr. ██ — 25 people force-fed in hospital — didn't take stomach after tubes — vomited when tried to give Ensure — big tube — shackeld hands, feet, head — couldn't breathe — passed out —

UNCLASSIFIED

Cleared by DoD for Public Filing
Protected information redacted in black
October 14, 2005

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

Shalabi - 2

thin - heart problem - ulcer - colon -
big fight because saw he was about to die -
where everyone could see

(u) IRF team participates in forcefully putting tubes in
they took us to mental disturbance hospital -

(u) Delta - building near hospital - 9 people
5-6 soldiers tied our hand/feet

(u) Dr. ▮ came (▬▬) - he tortured us - he inserted
tube the wrong way. He knew it was the
wrong way. made wounds inside nose -
when tube reached throat, he moved it up
and down - started throwing up blood.

(u) Tried to resist - didn't breathe, suffocating -
when removed the tube was full of blood
told him to rest 2 min - then nurse inserted
again. Next day - brought same tubes -
covered with dirt, blood - they didn't clean
there was food residue. Guards joked and
said "it's your stomach" - mocking us.
we asked for anesthesia - they said no
woke up at night - horrible pain

(u) food not enough for children - bad and just bread
but real issue is injustice - blood in urine
in beginning - hard to urinate - blood in urine
better now.

block  IRF hit/beat up in Delta
hospital - 1 hand ▬▬ handcuffed. Can't walk.

**UNCLASSIFIED**

Cleared by DoD for Public Filing
Protected information redacted in black
October 14, 2005

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

Shalabi - 3/3

(u) Can't walk -
(u) Put Stretcher on bed - put in ambulance -
Put stretcher in floor - put in wheelchair
These are young. These are innocent.
The US thought they had information.
These people don't have information.
Situation more severe. - 4 years now.
Now, life and death are the same.
People on this Island lost trust in any
human being.
(u) In beginning, interrogators used to
say trust us. Delegations from others
said trust us. All promises we've
been given are lies. We lost trust.

last line p2
hospital - 1 hand, 1 ft always
handcuffed can't walk

UNCLASSIFIED

Cleared By DoD for Public Filing
Protected information redacted in black
October 14, 2005

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

Yusef Al Shehri   10/1/05

In first strike they gave us promises. Said we'll respect you and your religion and we'll give you your rights. They promised me I would be freed. They promised many detainees they would be released. We waited. They did not deliver. They did not respect our religion. The threw Koran on floor. Mohammad Qatany - they took Koran and stripped him naked. We are descending our religion, our dignity, and our humanity. Later, they took me from Camp 5 and started torturing me. Right after lawyers left. Beginning of August. Strike started August 8. They took to hospital - if you don't break strike, you'll see something you won't like. I didn't do any harm to Americans or American govt. They can't prove anything against me.

Dr. ▆▆ - head of torture team, ▆▆▆▆▆▆▆▆▆ hair.

▆▆ Delta hospital - took me & 4 others 3 Saudi - 1 Yemeni - took us out of camp - no food/water for 1 week - civilians in hospital, detainee wing. We said all we want is dignity. They said shut up. You have no say here. They shackled us. Gave us IVs. - Didn't know how. Swollen arms shackled - arms, under arms, head - waist, knee. If we moved - they hit us in the chest/heart. I detainee fainted. They gave shot - woke up in 1 hour.

UNCLASSIFIED

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

(5)    ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

Al-Shehri - 2

(u)  Later - release 1 hand, 1 foot - shackle if take
v. out. Refused to let pray/ clean themself
Urinated in can. - Later let us pray. After 1 day
said swollen arms were normal. Wanted to sleep
but couldn't because shackles. Medical team
from U.S. came. They said going to force feed
He asked did Ct order this. They said yes. They
Said case was on appeal. Civilian head (not military)
went back to US - he said he failed - US - nobody
knew - a secret. 2nd to have tube inserted
in nose. not able to speak - much pain.
No anesthesic. Soldier held chin, hair. 3 tube
inserted in painful way. Blood came out of
nose. Stone had stomach problems. 2 days unable
to talk - felt like iron/metal inside you.
can't sleep from the pain. 1½ days - nopaintiller.
(u)  After 2-3 days, could speak. gave Ensure through
tube. Gave too much fatty food - made vomit -
vomitted lots and lots of blood. - friends even more.
(u)  Soldier /doctors/ medical staff - make fun. Use curse
words - "look what your religion brought you." We know
good/bad people everywhere - didn't want to think
Americans use words like this. 14 days later -
- 5 them.

soldiers laugh, make noise, wouldn't let sleep -
rattled metal, interrupted prayers. no food/water - 6 days

UNCLASSIFIED

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

Al-Shehr, -3

scary there 'foam sponges' on walls, weird
light, hole in floor to urinate.

(u) Insert thick tube - thickness of finger
down nose, into stomach. They said this
will happen every day - Take in / take out.
Did that 2 days. Pain unbearable No
anesthesia, no painkillers. cant move neck -
filled and extended nose. Taking out worse
than inserting it. 3 reached near death

(u) Not able to breathe with tube. Lots of
blood came when tube removed. Fainted
loss consciousness. approx 2-3 weeks ago People
about to die. They promised not to deal
with us in savage way. "We did this on
purpose to make you stop hunger strike".
Lt team from US said

(u) Cant walk now - some lost vision, daily
vomiting - constipation - severe headache -
pain in ear - urinate only once every
2 days - sent IRF team to Delta ≈ 2 weeks
ago. Removed tubes by force- doctors with IRF
team. Detainees begged- please leave tubes in.
stepped on tube - yanked head back to rip
tube out - doctor held tube in hand.

**UNCLASSIFIED**

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

Al-Shehri - 4

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL
ATTORNEY-DETAINEE MATERIALS

put tubes in without cleaning it. tube
that had been in someone else's
nose. — very dirty — not sanitized,
contents of stomach. All takes place
from Dr. ████ and head of team from
US

(u) What did we do wrong? What crime did I
commit? Why are they torturing me?
I don't know the answer.

(u) Threw up this morning — still vomiting
Even with thinner tubes
57th day of strike —

(u) 91 being force fed — another 15 on way
Very minimal medical
— when want to sleep
suspension in
guards say stop hunger strike. — No sleep
for 13 days —

(u) I didn't do anything wrong to America No
reason to do this to me.

(u) 5 days ago — ARB

(u) saying in Islam — can't be bitten from
same snake twice Every time they
promise no torture, they lie.

UNCLASSIFIED

JAN-14-2004  00:06

Cleared by DoD for Public Release
Protected information redacted in black
October 14, 2005

TEAM  REVIEW:

Jennifer Ching
05-CV-301
05-CV-520
05-CV-1453
10/5/05

Notes:

Jaudi: participaty in current hunger strike.
Pledge to die. Participated in July
strike. Became so weak after rejecting
water + food that he was force fed
via IV. IV was painfully administered-
forced by guards. led to injuries in
arm. He was not told (1) that
we visited or (2) mail given to him was
from us. He did not reject mail or
meeting. Would like to meet with us
again, will not reject our meetings,
please know that he will NOT reject
our meetings. Gave me his Will re-
distribution of assets. Mon will join strike.

Shebri: Gave us his will

**UNCLASSIFIED**

Cleared by DoD for Public Filing
Protected information redacted in black
October 14, 2005

# Exhibit B

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FAWZI KHALID ABDULLAH FAHAD AL ODAH,   )
   et al.,   )
                    **Plaintiffs-Petitioners,**   )
                                )
                  v.   )    No. CV 02-0828 (CKK)
                                )
UNITED STATES OF AMERICA, et al.,   )
                                )
                    **Defendants-Respondents.**   )

## DECLARATION OF THOMAS B. WILNER

I, Thomas B. Wilner, hereby declare under penalty of perjury that the following is true and correct:

1.      My name is Thomas B. Wilner. I am over 18 years of age and a citizen of the United States of America.

2.      I am a member of the Bars of the District of Columbia, the Commonwealth of Pennsylvania, the State of New York, the Supreme Court of the United States and various federal District Courts and Courts of Appeals around the country. Since April of 2002, I have represented the Kuwaiti citizens detained at Guantanamo Bay and their families.

3.      On September 12, 2005, I traveled to Guantanamo, along with Neil Koslowe and Kristine Huskey of our office and our interpreter, Ashraf Michael, to meet with our clients detained there. We arrived the evening of September 12 and met with our clients in Camp Echo at Guantanamo on September 13, 14 and 15. During that period, one other lawyer, a solo practitioner, arrived on the evening of

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

Tuesday, September 13, and met with his single client on September 14 and 15.
No other lawyers were present at Guantanamo conducting interviews during the
entire time we were there.

4.    I met the morning of September 13 with Omar Amin. I had met with Mr. Amin
on all my previous trips to Guantanamo. He has suffered from a number of health
problems while at Guantanamo, including hemorrhoids, swelling and pain in his
sinuses, swelling of his lymph nodes and heart problems. The doctors at
Guantanamo had operated on him previously for hemorrhoids, and those
operations had proved unsuccessful. We had reported all these health problems
previously to the U.S. government. Based on my observation, Mr. Amin had
deteriorated significantly from our last visit. He was extremely thin, weak and
depressed. I observed bald patches on his arms where the hair had fallen out. He
reported that he had been on a hunger strike, but had stopped because he was too
weak. He said that his health problems had grown worse. He reported that his
chest constantly hurts, that his heart beats irregularly and that his left arm often
becomes numb. He said that his sinuses are still bothering him and that his glands
are still swollen. He also reported that his hemorrhoids are still very painful. He
said that he has reported these conditions to the authorities at Guantanamo but has
not received treatment. He reported that he was told that the doctors at
Guantanamo will not treat his medical conditions until the hunger strike ends. He
has been given only aspirin for his problems. He said that the medical care at
Guantanamo is "atrocious," and that, even if the doctors say he needs one, he does

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

not want another operation for his hemorrhoids because the doctors at Guantanamo are "terrible."

5.  Mr. Amin said a number of the Kuwaitis are refusing food. He said that Abdulaziz al Shammari and Fawzi Al Odah have been refusing food for many weeks and that he heard they were both hospitalized and in dire physical condition.

6.  In the afternoon, I met with Mohammed Al Daihani, who is participating in the hunger strike. Mr. Koslowe had met with him in the morning. Mr. Al Daihani appeared weak and gaunt and clearly had lost significant weight since our last visit. We tried to encourage him to end his hunger strike, telling him that we believed there had been positive developments before the courts and that we hoped he would be granted a hearing soon. Mr. Daihani told us that he had no faith in the U.S. courts. We had brought him a pizza from the local Subway on the base, which he refused to eat. Pointing to the pizza box, he said that "The American justice system is like this pizza box. It looks very good on the outside, but it is empty on the inside. It is nothing but air." He said that the only control he has at Guantanamo is over what he eats, and that he will not eat again until he is released or charged and tried so that he can defend himself and prove his innocence. Mr. Daihani informed us that he had written us a letter at the end of July and asked why we had not responded. We had not received his letter as of September 12 when we left for Guantanamo.

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

7.    I then met with Saad Al-Azmi. Mr. Al-Azmi is the youngest of the Kuwaiti detainees. He is 26 and has spent almost four of those years at Guantanamo. Although thin, he had always appeared healthy. He had changed significantly. He is participating in the hunger strike and has lost substantial weight. His shoulder bones were sticking out of his prison uniform. He is pale with circles under his eyes. He told us that the doctors had informed him that he had lost more than 30 pounds in the last few weeks, and now weighs only 140 pounds.

8.    Mr. Al-Azmi told us the origins of the current hunger strike. He said that there had been a hunger strike that began in July with the prisoners asking: (1) to be charged and tried or released; (2) to be treated in compliance with the Geneva Conventions; (3) to be provided with adequate and proper food and water and medical care; (4) and to be accorded respect for their religion and, particularly, the Koran. Mr. Al-Azmi said that the prior hunger strike had been ended as a result of a negotiated agreement under which the U.S. authorities at Guantanamo agreed to the last three conditions. He said that conditions improved for several days, but that the interrogators then sabotaged the agreement by abusing him and a Tunisian detainee. Mr. Al-Azmi said the interrogators had opposed improving the conditions at Guantanamo and wanted to undermine the agreement. He said that his interrogator, Megan, had sexually taunted and humiliated him during interrogation, forced him to sit in the interrogation for seven hours without allowing him to relieve himself and that he was forced to urinate on himself as a result. He then refused to go to the next interrogation unless promised that he would not be abused. He said that he did not object to being interrogated but that

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

he would not "let his own feet take him to get abused." As a result of his refusal, the Emergency Response Force ("ERF") team came into his cell in riot gear, beat him, took him to the hospital to be bandaged, and then took him on a stretcher to his interrogator. I observed bruises on Mr. Al-Azmi's arms and on his wrists and ankles. He said that the ERF team had also treated his Koran with disrespect.

9.      Mr. Al-Azmi reported another incident which he believed helped precipitate or reinforce the renewed hunger strike. He said that in August a congressional delegation had visited Guantanamo. He believed it was led by Senator Kennedy. He said the delegation passed close to "Whiskey Block" in Camp 4 on its way to go into the Guantanamo hospital. Several detainees in Whiskey Block who spoke English yelled out the window that the delegation was not seeing the real picture of Guantanamo and that it should visit Camp 5 and talk to detainees there. Mr. Al-Azmi was in Whiskey Block in Camp 4 at that time. He said that two days later the guards came and took all 60 people from Whiskey Block and put them in different cells scattered throughout Camp Delta and removed items of their clothing and other comfort items. Mr. Al-Azmi said that the guards expressly told them that they were being taken from Camp 4 and punished because they had spoken out to the congressional delegation.

10.     Mr. Al-Azmi also explained that the hunger strike takes many forms. Some people accept the food that is given them but then flush it down the toilet. The government, according to him, does not know these people are on hunger strike until they collapse in their cells. Other people skip only some meals each day, or

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

only meals on some days.  Other people openly refuse food, and other people openly refuse both food and water.

11.   We were required to leave Mr. Al-Azmi at approximately 5 p.m. on Tuesday, September 13.  We asked the guards to see him again the next morning.  The guards told us that they had orders to take him back to his regular cell and that he would not be available the next day.

12.   We had been told that we would be able to interview four of our clients on Wednesday, September 14.  That morning, however, only one of them, Fouad Al Rabiah, was in Camp Echo for us to interview.  We met with him that morning. Mr. Rabiah has suffered numerous health problems while at Guantanamo; he has lost an enormous amount of weight, his eyesight is deteriorating and his back is extremely painful.  He reported that, for health reasons, he could not join the strike fully but that he was skipping two of three meals a day.  He confirmed the reasons for the hunger strike that had been described by Mr. Al-Azmi.

13.   In the afternoon, I met with Fayiz Al Kandari who had been brought to Camp Echo.  Mr. Al Kandari also confirmed the reasons for the hunger strike that had been described to us.  He reported that he had joined the hunger strike for six days, then ate for a day to renew his strength, then joined the hunger strike for another six days, and had recently begun eating again.  He also reported that several incidents of disrespect of the Koran had occurred after the first hunger strike had ended.  He described the underlying reason for the hunger strike to be

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

the hopelessness of the situation at Guantanamo and the distrust of receiving any

justice from the government or the courts.

14.    Following my meeting with Mr. Fayiz Al Kandari, I met late in the afternoon with

Mr. Abdullah Al Kandari. We had not left much time to meet with Abdullah Al

Kandari because we had not been told he was on a hunger strike and he had

always been one of the healthiest and most optimistic of our clients. Abdullah Al

Kandari was a member of the national volley ball team of Kuwait and is a superb

athlete. He had previously been detained in Camp 4, where limited socialization

is permitted, and although he had limited room to exercise, had kept himself in

superb condition. He had also always been cheerful and optimistic. I was

absolutely shocked when I walked into the cell this time to see him. He was a

completely different person. He looked terrible – bleary eyed, very weak and

emaciated – and he was barely able to conduct a conversation. He reported that

he had not eaten for 15 days. He said that he had been one of the people in

Whiskey Block in Camp 4 who, after some of the people in that block had yelled

out to a congressional delegation, had been taken to other cells and other camps

and punished. He said that he has been treated with "absolutely no dignity; like

an animal, not a human being." He emphasized that he had done nothing wrong

and, if the U.S. thinks he has, then he should be charged so that he can defend

himself. We tried to encourage him to stop the hunger strike and reported recent

developments in the U.S. court system that we thought were positive. He said

that, although he appreciated our efforts, he has lost patience and any belief in the

U.S. courts. He told us that his file of our confidential legal papers had been

Cleared by DoD for Public Filing
Protected information redacted in black
October 14, 2005

searched and documents removed. He also said that the guards had taken his pen
so that he could not write us. Because we had not known that Abdullah Al
Kandari was on a hunger strike, we had allocated only approximately one hour at
the end of the day to meet with him. I have never seen a greater change in a
person over a short time, both mentally and physically.

15.    On Thursday morning, September 15, Fawzi Al Odah was transported to Camp
Echo from the detainee hospital, and I was able to speak with him. Although we
had been told that he would be available to meet with us for approximately four
hours, we were able to meet with him for only an hour and a half. The military
authorities told us that they were under strict orders to return him to the hospital
after that period "for medical reasons." Mr. Al Odah has been on a hunger strike
since August 8. He had lost a significant amount of weight and told us that he
now weighs only 113 pounds. He had a plastic tube protruding from his nose that
was secured with tape. During the interview, he bled intermittently from his nose.

16.    Mr. Al Odah said that he is among 20 detainees currently being force fed under a
new method supervised by doctors flown to Guantanamo three weeks ago. He
said that he heard in the hospital that six more detainees will be added to the
number being force fed over the next several days. He said that the new method
used is a larger feeding tube that forces a larger quantity of food into the detainee,
but that causes nausea and vomiting. Mr. Al Odah said that he has been
experiencing constant nausea, vomiting and diarrhea. Instead of gaining weight
under this feeding method, he has lost an additional four pounds. He also said
that, presumably to cause pain and encourage detainees to stop the hunger strike,

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

the medical staff at the hospital had been removing the tube after each feeding and then inserting it again for the next feeding without using an anesthetic. He said that the tube has now been left in. He also said that there is no use resisting the insertion of the tube, because the medical staff will just strap you down and force the tube in and keep you strapped during feeding.

17. Mr. Al Odah said that he has vowed not to eat or drink anything until he is either released or dies. He said that he is innocent and, "if the United States thinks I am guilty of something, then charge me so that I can defend myself." He also indicated that he had heard of reports of U.S. Congressmen coming back from Guantanamo and saying that the detainees were all being well treated and eating very good food. He said that "I can no longer be part of this lie. If I eat, I condone the lie." We tried to encourage him to begin eating again, but he said that he would not and that this was a personal decision he had made.

18. After meeting with Mr. Al Odah, I met briefly again with Saad Al-Azmi who had been returned to Camp Echo. Mr. Al-Azmi had asked us during our visit on September 13 about the health of his family. We learned in the interim that his father had died. We had the sad task of informing Mr. Al-Azmi of that fact. Mr. Al-Azmi provided us more details on the manner in which he had been treated by his interrogator. He had been reluctant to provide greater detail earlier, apparently because Ms. Huskey had been in the room. As mentioned, his interrogator uses the name Megan. He described her as an attractive woman with blonde hair in a cut that goes approximately to her shoulders. He said that she had consistently acted inappropriately and sexually in the interrogations. She was accompanied by

Cleared by DoD for Public Filing
Protected Information redacted in black·
October 14, 2005

another woman and a woman interpreter. She removed her outer shirt and was
wearing a see-through undergarment. Mr. Al-Azmi said that you could clearly
see her full breasts. He said that she did not touch him, but came up behind him
and blew on his neck and also blew smoke in his face. He said that she and the
other women talked dirty to him and about sexual acts. He repeated that they had
kept him in the interrogation for seven hours without allowing him to relieve
himself and mocked him when he urinated on himself. Mr. Al-Azmi said that·
Megan has treated him this way for quite some time. He apologized to me for not
telling me about this sort of treatment earlier, but said that he did not want to
jeopardize his treatment in Guantanamo and make the interrogators angry at him.
I unfortunately was not able to stay long with Mr. Al-Azmi, because Abdulaziz al
Shammari had been brought to Camp Echo for us to interview.

19. The government had not originally told us that Mr. Shammari was on a hunger
strike. However, he has been on a hunger strike since August 4, longer than
anyone else at Guantanamo. He was transported to Camp Echo from the detainee
hospital in a van. Six people assisted him to the interview. He is skin and bones,
and could only sit in a chair with the aid of a walker. He looked like the pictures
one sees of starving people in the Sudan. He is being force fed in the same
manner as Fawzi Al Odah. Like Mr. Al Odah, he had a plastic tube protruding
from his nose that was secured with tape. He is not kept at the hospital with Mr.
Al Odah, but at a special ward in the prison camp. We also tried to encourage
him to begin eating and reported what we thought were positive developments in
the court cases. Mr. Shammari expressed the same opinion as the others that the

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

court system had not provided relief and he had no faith that it ever would. He emphasized to us that what he is doing is a very personal act. While he supports the other people, he is not on a strike with them. He said that he has no faith in the courts and that they are "useless." He said that the only control he has at Guantanamo is over what he eats and drinks and that he simply will not voluntarily eat or drink again until he is home in Kuwait. Mr. Shammari also reported that his file of confidential legal papers had been taken from him, searched by the guards, and that he wanted it returned to him.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Thomas B. Wilner

Executed on September 29, 2005 in Washington, DC

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

# Exhibit C

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

ABC Online

**Red Cross confirms Guantanamo hunger strike. 07/10/2005. ABC News Online**

[This is the print version of story http://www.abc.net.au/news/newsitems/200510/s1477449.htm]

Last Update: Friday, October 7, 2005. 8:15pm (AEST)

# Red Cross confirms Guantanamo hunger strike

The International Committee of the Red Cross (ICRC) says prisoners are on hunger strike at the US Guantanamo Bay prison camp in Cuba, and that the situation there is serious.

But spokeswoman Antonella Notari declines to comment on yesterday's statement by a defence lawyer that the action involves 200 of 500 prisoners and that 21 are being force-fed.

Ms Notari says the humanitarian agency, which last visited the US naval base in late September, is in contact with US authorities about the situation.

"There is a hunger strike, the situation is serious, and we are following it with concern," she said.

"During our recent 10-day visit we were able to visit the infirmary, see the detainees and speak with them as well as the American authorities."

The ICRC backs a 1975 Tokyo declaration by the World Medical Association stating that doctors should not participate in force-feeding, but keep prisoners informed of the sometimes irreversible consequences of their hunger strike.

Amnesty International and human rights lawyer Clive Stafford Smith, a lawyer representing some 40 detainees, said yesterday that US authorities were keeping 21 alive by forcing food into their stomachs through tubes pushed up their noses.

He said the prisoners were shackled to their beds 24 hours a day to stop them removing the tubes.

"This is the 56th day of the hunger strike," Mr Stafford Smith before making a comparison with the Irish Republican campaign of 1981, when 10 prisoners starved themselves to death in protest at British policy in Northern Ireland.

The United States opened the prison camp in January 2002. Many detainees were seized in Afghanistan.

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

~~Only four, including 30-year-old Adelaide man~~ David Hicks, have been charged and many
have been held more than three years.

Some former prisoners have said they were tortured.

Reuters

© 2005 Australian Broadcasting Corporation
Copyright information: http://abc.net.au/common/copyrigh.htm
Privacy information: http://abc.net.au/privacy.htm

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

# BBC NEWS

## ICRC concern at Guantanamo strike

By Adam Brookes
BBC Pentagon correspondent

The International Committee of the Red Cross (ICRC) says it is worried about a hunger strike inside the US detention camps at Guantanamo Bay.

The ICRC spokeswoman, Antonella Notari, said the situation there was serious, and her organisation was following it with concern.

But she would not give details of what the ICRC had found during its visits.

The ICRC rarely takes its concerns to the public, but it has done over these hunger strikers.

The US military said that 28 prisoners were on hunger strike.

The military defines a hunger strike as missing nine consecutive meals.

'Force-fed'

A military spokesman said the hunger strikers were all clinically stable and were receiving nutrition and fluids as needed.

Lawyers for some of the detainees believe that means the hunger strikers are being force fed.

One British lawyer, Clive Stafford Smith, has accused the American military of shackling patients to their beds in order to insert feeding tubes.

Other lawyers have put the number of hunger strikers much higher than the figure given by the US military.

Some say as many as 200 of the 500 or so detainees in the camps have refused food.

Reports of hunger strikes at Guantanamo Bay first surfaced back in July.

The military says some detainees have taken part periodically as a protest against their conditions and then returned to taking regular meals.

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/1/hi/world/americas/4321324.stm

# Exhibit 8


PRINTER-FRIENDLY FORMAT
SPONSORED BY    CHOKE

February 9, 2006

# Tough U.S. Steps in Hunger Strike at Camp in Cuba

**By TIM GOLDEN**

United States
military authorities have taken tougher measures to force-feed detainees engaged in hunger strikes at Guantánamo Bay, Cuba, after concluding that some were determined to commit suicide to protest their indefinite confinement, military officials have said.

In recent weeks, the officials said, guards have begun strapping recalcitrant detainees into "restraint chairs," sometimes for hours a day, to feed them through tubes and prevent them from deliberately vomiting afterward. Detainees who refuse to eat have also been placed in isolation for extended periods in what the officials said was an effort to keep them from being encouraged by other hunger strikers.

The measures appear to have had dramatic effects. The chief military spokesman at Guantánamo, Lt. Col. Jeremy M. Martin, said yesterday that the number of detainees on hunger strike had dropped to 4 from 84 at the end of December.

Some officials said the new actions reflected concern at Guantánamo and the Pentagon that the protests were becoming difficult to control and that the death of one or more prisoners could intensify international criticism of the detention center. Colonel Martin said force-feeding was carried out "in a humane and compassionate manner" and only when necessary to keep the prisoners alive. H e said in a statement that "a restraint system to aid detainee feeding" was being used but refused to answer questions about the restraint chairs.

Lawyers who have visited clients in recent weeks criticized the latest measures, particularly the use of the restraint chair, as abusive.

"It is clear that the government has ended the hunger strike through the use of force and through the most brutal and inhumane types of treatment," said Thomas B. Wilner, a lawyer at Shearman & Sterling in Washington, who last week visited the six Kuwaiti detainees he represents. "It is a disgrace."

The lawyers said other measures used to dissuade the hunger strikers included placing them in uncomfortably cold air-conditioned isolation cells, depriving them of "comfort items" like blankets and books and sometimes using riot-control soldiers to compel the prisoners to sit still while long plastic tubes were threaded down their nasal passages and into their stomachs.

Officials of the military and the Defense Department strongly disputed that they were taking punitive measures to break the strike. They said that they were sensitive to the ethical issues raised by feeding the detainees involuntarily and that their procedures were consistent with those of federal prisons in the United States. Those prisons authorize the involuntary treatment of hunger strikers when there is a threat to an inmate's life or health.

"There is a moral question," the assistant secretary of defense for health affairs, Dr. William Winkenwerder Jr., said in an interview. "Do you allow a person to commit suicide? Or do you take steps to protect their health and preserve their life?"

Dr. Winkenwerder said that after a review of the policy on involuntary feeding last summer Pentagon officials came to the basic conclusion that it was ethical to stop the inmates from killing themselves.

"The objective in any circumstance is to protect and sustain a person's life," he said.

Some international medical associations and human rights groups, including the World Medical Association, oppose the involuntary feeding of hunger strikers as coercive.

Lawyers for the detainees, although troubled by what they said were earlier reports of harsh treatment of the hunger strikers, have generally not objected to such actions when necessary to save their clients.

The Guantánamo prison, which is holding some 500 detainees, has been beset by periodic hunger strikes almost since it was established in January 2002 to hold foreign terror suspects. At least one detainee who went on a prolonged hunger strike was involuntarily fed through a nasal tube in 2002, military officials said.

Since last year, the protests have intensified, a sign of what defense lawyers say is the growing desperation of the detainees. In a study released yesterday, two of those lawyers said Pentagon documents indicated that the military had determined that only 45 percent of the detainees had committed some hostile act against the United States or its allies and that only 8 percent were fighters for Al Qaeda.

After dozens of detainees began joining a hunger strike last June, military doctors at Guantánamo asked Pentagon officials to review their policy for such feeding. Around that time, officials said, the Defense Department also began working out procedures to deal with the eventual suicide of one or more detainees, including how and where to bury them if their native countries refused to accept their remains.

"This is just a reality of long-term detention," a Pentagon official said. "It doesn't matter whether you're at Leavenworth or some other military prison. You are going to have to deal with this kind of thing."

Military officials and detainees' lawyers said the primary rationale for the hunger strikes had evolved since last summer. In June and July, they said, the detainees were mostly complaining about their conditions at Guantánamo.

Several lawyers said that military officers there had negotiated with an English-speaking Saudi detainee, Shaker Aamer, who is thought to be a leader of the inmates, and that the detainees had agreed to stop their hunger strike in return for various concessions.

Military officials denied that such negotiations had occurred. But military officials and the lawyers agreed that when another wave of hunger strikes began in early August they were more generally focused on the indefinite nature of the detentions and that it was harder for the authorities there to address.

Colonel Martin said the number of hunger strikers peaked around Sept. 11 at 131, but added that he could not speculate about why other than to note that "hunger striking is an Al Qaeda tactic used to elicit media attention and also to bring pressure on the U.S. government."

Until yesterday, Guantánamo officials had acknowledged only having forcibly restrained detainees to feed them a handful of times. In those cases, the officials said, doctors had restrained detainees on hospital beds using Velcro straps.

Two military officials, who insisted on anonymity because they were not authorized to discuss the question, said that the use of restraint chairs started after it was found that some hunger strikers were deliberately vomiting in their cells after having been tube-fed and that their health was growing precarious.

In a telephone interview yesterday, the manufacturer of the so-called Emergency Restraint Chair, Tom Hogan,

said his small Iowa
company shipped five $1,150 chairs to Guantánamo on Dec. 5 and 20 additional chairs on Jan. 10, using a military postal address in
Virginia. Mr. Hogan said the chairs were typically used in jails, prisons and psychiatric hospitals to deal with violent inmates or patients.

Mr. Hogan said that he did not know how they were used at Guantánamo and that had not been asked how to use them by military representatives.

Detainees' lawyers said they believed that the tougher approach to the hunger strikes was related to the passage in Congress of measure intended to curtail the detainees' access to United States courts.

Federal district courts have put aside most lawyers' motions on the detainees' treatment until questions about applying the measure have been litigated.

"Because of the actions in Congress, the military feels emboldened to take more extreme measures vis-à-vis the hunger strikers," said one lawyer, Sarah Havens of Allen & Overy. "The courts are going to stay out of it now."

Mr. Wilner, who was among the first lawyers to accept clients at Guantánamo and represented them in a case in 2004 before the Supreme Court, said a Kuwaiti detainee, Fawzi al-Odah, told him last week that around Dec. 20, guards began taking away items like shoes, towels and blankets from the hunger strikers.

Mr. Odah also said that lozenges that had been distributed to soothe the hunger strikers' throats had disappeared and that the liquid formula they were given was mixed with other ingredients to cause diarrhea, Mr. Wilner said.

On Jan. 9, Mr. Odah told his lawyers, an officer read him what he described as an order from the Guantánamo commander, Brig. Gen. Jay W. Hood of the Army, saying hunger strikers who refused to drink their liquid formula voluntarily would be strapped into metal chairs and tube-fed.

Mr. Odah said he heard "screams of pain" from a hunger striker in the next cell as a thick tube was inserted into his nose. At the other detainee's urging, Mr. Odah told his lawyers that he planned to end his hunger strike the next day.

Another lawyer, Joshua Colangelo-Bryan, said one of his three Bahraini clients, Jum'ah al-Dossari, told him about 10 days ago that more than half of a group of 34 long-term hunger strikers had abandoned their protest after being strapped in restraint chairs and having their feeding tubes inserted and removed so violently that some bled or fainted.

"He said that during these force feedings too much food was given deliberately, which caused diarrhea and in some cases caused detainees to defecate on themselves," Mr. Colangelo-Bryan added. "Jum'ah understands that officers told the hunger strikers that if they challenged the United States, the United States would challenge them back using these tactics."

---

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | **XML** | Help | Contact Us | Work for Us | Site Map | Back to Top

# Exhibit 9



**PHR**

**Physicians for
Human Rights**



# BROKEN LAWS,
# BROKEN LIVES

## Medical Evidence of Torture by
## US Personnel and Its Impact

A Report by Physicians for Human Rights
June 2008



# BROKEN LAWS, BROKEN LIVES:

## Medical Evidence of Torture by US Personnel and Its Impact

A Report by Physicians for Human Rights
**June 2008**

© 2008, Physicians for Human Rights
All rights reserved.
ISBN: 1879707543
Library of Congress Number: 2008925849
Cover image: © Fernando Botero, courtesy, Marlborough Gallery, New York.
    Detail from Abu Ghraib 44 (right panel), 2005, 191 x 107 cm
Report Design: Glenn Ruga/Visual Communications

# PHYSICIANS FOR HUMAN RIGHTS

Physicians for Human Rights (PHR) mobilizes health professionals to advance the health and dignity of all people through actions that promote respect for, protection of, and fulfillment of human rights. PHR has a track record of more than 20 years documenting torture around the world, including in Turkey, Chile, Chechnya, Kosovo, Israel, India, and Chiapas, Mexico. PHR has extensive expertise in evaluating survivors of torture as well as experience with prisoner health issues. PHR was one of the lead initiators and authors of the Istanbul Protocol on the investigation and documentation of torture, adopted as an official document by the United Nations in 1999.

As one of the original steering committee members of the International Campaign to Ban Landmines, PHR shared the 1997 Nobel Prize for Peace.

## About PHR's Campaign Against Torture

PHR has documented the systematic use of torture by the United States during its interrogations of detainees at US detention facilities, including those at Guantánamo Bay, in Iraq and Afghanistan, and elsewhere. It has previously published two groundbreaking reports on the human impact and the legality of abusive interrogation tactics authorized by the Bush Administration: *Break Them Down: Systematic Use of Psychological Torture by US Forces* and *Leave No Marks: "Enhanced" Interrogation Techniques and the Risk of Criminality*. PHR has repeatedly called for an end to the use of the "enhanced" tactics by all US personnel, an end to all health professional participation

in interrogations, a full Congressional investigation of the use of psychological and physical torture by the US Government, and accountability for perpetrators.

PHR has successfully organized and mobilized thousands of health professionals and helped to secure the leadership of the major health professional associations to develop ethical guidelines related to interrogation that protect against medicine and science being employed to aid the abuse of prisoners. PHR's work contributed to the adoption of ethical standards by the American Medical Association, the World Medical Association, and the American Psychiatric Association prohibiting direct participation of physicians in interrogations. PHR has helped move the American Psychological Association (APA) to prohibit the involvement of its members in the Central Intelligence Agency's "enhanced" interrogation techniques and has supported a movement within the APA to end the direct participation of psychologists in interrogations.

Physicians for Human Rights
2 Arrow Street, Suite 301
Cambridge, MA 02138
Tel. (617) 301.4200

Washington Office
1156 15th Street, Suite 1001
Washington, DC 20005
Tel. (202) 728.5335
www.physiciansforhumanrights

# TABLE OF CONTENTS

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . vi

List of Acronyms . . . . . . . . . . . . . . . . . . . . . . . vii

Executive Summary . . . . . . . . . . . . . . . . . . . . . . 1

Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Findings . . . . . . . . . . . . . . . . . . . . . 2

Legal Prohibitions Against Torture and
Ill-Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Recommendations . . . . . . . . . . . . . . . . . . . . . . . 9

Chapter 1: Introduction . . . . . . . . . . . . . . . . . . 11

Chapter 2: Methods . . . . . . . . . . . . . . . . . . . 13

Identification of Study Population . . . . . . . . . . . . 13

Evaluators . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Medical Evaluations in Accordance with the
Istanbul Protocol . . . . . . . . . . . . . . . . . . . . . . . . 13

Source of Information for Medical Evaluations . . 15

Human Subjects Protection . . . . . . . . . . . . . . . . 15

Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Chapter 3: Medical Evidence of Ill-Treatment
in US Detention Facilities . . . . . . . . . . . . . . . . . 17

Chapter 4: Patterns of Torture and
Ill-Treatment . . . . . . . . . . . . . . . . . . . . . . . . . 73

Beatings and Other Ill-Treatment During Arrest,
Transport, and Initial Custody . . . . . . . . . . . . . . 73

Deprivation of Basic Necessities and Sanitary
Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Stress Positions: Forced-Standing, Handcuffing,
and Shackling . . . . . . . . . . . . . . . . . . . . . . . . . 76

Isolation, Sensory Deprivation, or
Bombardment . . . . . . . . . . . . . . . . . . . . . . . . . 77

Threats of Harm to Detainees and
Their Families . . . . . . . . . . . . . . . . . . . . . . . . . 79

Instilling Fear Through Use of Military Dogs . . . . 80

Use of Temperature Extremes . . . . . . . . . . . . . . 80

Beatings and Other Physical Assault . . . . . . . . . 81

Sleep Deprivation . . . . . . . . . . . . . . . . . . . . . . . 83

Sexual, Religious, Cultural, and Other Forms of
Degrading Treatment . . . . . . . . . . . . . . . . . . . . . 83

Witnessing Torture and Cruel Treatment . . . . . . . 84

Health Professional Complicity and Denial of
Medical Care . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Response by US Personnel to ICRC Visits . . . . . 87

Chapter 5: Short-Term and Lasting Harm
from Torture and Ill-Treatment . . . . . . . . . . . 89

Acute Impact of Ill-Treatment . . . . . . . . . . . . . . 89

Chronic Physical Consequences of
Ill-Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Lasting Psychological Consequences of
Ill-Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Diminution of Social and Work Life
After Detention . . . . . . . . . . . . . . . . . . . . . . . . . 92

Chapter 6: Legal Analysis . . . . . . . . . . . . . . . 95

Legal Prohibitions Against Torture and
Ill-Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Systematic Torture by the United States . . . . . . . 98

Applicability of the Law to Acts Committed by US
Personnel Against Detainees . . . . . . . . . . . . . . . 99

Reparations and Justice for Victims
of Torture . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Chapter 7: Conclusion and
Recommendations . . . . . . . . . . . . . . . . . . . . . 113

Appendix I: Torture: Psychological
and Medical Consequences . . . . . . . . . . . . . . 117

Psychological Trauma: The Common
Denominator . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Physical Consequences of Torture . . . . . . . . . . . 119

Physical Evidence of Torture . . . . . . . . . . . . . . . 120

# ACKNOWLEDGMENTS

The lead author for this report was Farnoosh Hashemian, MPH, Research Associate, Physicians for Human Rights (PHR), who was joined in its writing by Sondra Crosby, MD, Boston Center for Refugee Health and Human Rights; Vincent Iacopino, MD, PhD, PHR Senior Medical Advisor; Allen Keller, MD, Bellevue/NYU Program for Survivors of Torture; Leah Nguyen, PhD, Bellevue/NYU Program for Survivors of Torture; Onder Ozkalipci, MD, International Rehabilitation Council for Torture Victims; Christian Pross, MD, Berlin Center for the Treatment of Torture Victims; and Juda Strawczynski, LLB, former PHR Research Fellow. Leonard Rubenstein, JD, PHR President, oversaw the report and provided crucial guidance throughout on report's structure and content; Alicia Yamin, JD, MPH, former PHR Director of Research and Investigations oversaw the planning and implementation of the investigation its initial stages.

Scott Allen, MD, PHR Medicine as a Profession Fellow; Vincent Iacopino, MD, PhD, PHR Senior Medical Advisor; and Brigadier General Stephen Xenakis, MD, USA (Ret.) offered detailed comments on the medical evaluations and, along with Drs. Ozkalipci and Pross, reviewed the medical records of one of the detainees held at Guantánamo. Nathaniel Raymond, PHR Senior Communications Strategist, reviewed, edited, and provided technical expertise for the report. This report was edited and prepared for publication by Tara Gingerich, JD.

This report has benefited from review by Shereef Akeel, JD, Akeel & Valentine, PLC; Barbara Ayotte, former PHR Director of Communications; John Bradshaw, JD, PHR Director of Public Policy; Carolyn Patty Blum, JD, Consultant, Center for Constitutional Rights; Susan Burke, JD, Burke O'Neil, LLC; Colonel Daniel L. Cohen MD, USAF (Ret.); Frank Davidoff, MD, and Vice President PHR Board of Directors; Benjamin Davies, former PHR Chief of Staff; Frank Donaghue, PHR Chief Executive Officer; Sebnem Korur Fincanci, MD, Professor of Forensic Medicine, Istanbul University; Justice Richard J. Goldstone, Justice of the South African Constitutional Court, Retired, and member of PHR Board of Directors; Emi MacLean, JD, Staff Attorney, Center for Constitutional Rights; Paul Rocklin, JD, former PHR Senior Program Associate; Barry Rosenfeld, PhD, Professor and Director of Clinical Training, Fordham University; Susannah Sirkin, PHR Deputy Director; and Ronald Waldman, MD, MPH, Professor of Clinical Population and Family Health, Mailman School of Public Health, Columbia University, and member of PHR Board of Directors.

PHR is grateful for the dedication and extensive research assistance over many months by Klara Bolen. The following individuals contributed to legal and other research: Patrick Childress, Joanne Cossitt, Jesse Hamlin, Louise Place, Brent Savoie, and Daniel Scarvalone. Remy Gerstein and Majid Jumoor assisted with the logistics and played an essential role in ensuring that investigations were carried out successfully.

PHR extends special gratitude to the following organizations for their pivotal support: Akeel & Valentine, PLC, Bellevue/NYU Program for Survivors of Torture, Berlin Center for the Treatment of Torture Victims, Boston Center for Refugee Health and Human Rights, Burke O'Neil, LLC, Center for Constitutional Rights, Fordham University, and International Rehabilitation Council for Torture Victims. Two centers affiliated with IRCT facilitated the medical evaluations and made this investigation possible; they cannot be named to protect the confidentiality of the participants.

PHR thanks the JEHT Foundation, the Morton and Jane Blaustein Foundation, The Open Society Institute, and The Herbert Block Foundation for financial support that made this investigation and report possible.

PHR would like to acknowledge the artist Fernando Botero for granting PHR permission to use one of the paintings from his Abu Ghraib series on the cover of this report.

We are most indebted, however, to the eleven former detainees who were willing to share their painful experiences with us, sometimes at significant risk to themselves and their families.

# LIST OF ACRONYMS

**BHS:**    Behavioral Health Science Teams

**CIA:**    Central Intelligence Agency

**CIDT:**    Cruel, Inhuman, or Degrading Treatment

**DoD:**    Department of Defense

**DTA:**    Detainee Treatment Act of 2005

**ECHR:**    European Court of Human Rights

**ERB:**    Ethics Review Board

**FBI:**    Federal Bureau of Investigation

**IACHR:**    Inter-American Court of Human Rights

**ICRC:**    International Committee of the Red Cross

**ICCPR:**    International Covenant on Civil and Political Rights

**ICTR:**    International Criminal Tribunal for Rwanda

**ICTY:**    International Criminal Tribunal for Yugoslavia

**IRF:**    Immediate Reaction Force

**IRCT:**    International Rehabilitation Council for Torture Victims

**MCA:**    Military Commissions Act of 2006

**MDD:**    Major Depressive Disorder

**NOS:**    Not Otherwise Specified

**OLC:**    Office of Legal Counsel, Department of Justice

**PHR:**    Physicians for Human Rights

**POW:**    Prisoner of War

**PTSD:**    Post-traumatic Stress Disorder

**SERE:**    Survival, Evasion, Resistance, and Escape training

**SOP:**    Standard Operating Procedure

**TVPA**:    Torture Victims Protection Act of 1991

**WCA:**    War Crimes Act

# PREFACE

This report tells the largely untold human story of what happened to detainees in our custody when the Commander-in-Chief and those under him authorized a systematic regime of torture. This story is not only written in words: It is scrawled for the rest of these individual's lives on their bodies and minds. Our national honor is stained by the indignity and inhumane treatment these men received from their captors.

The profiles of these eleven former detainees, none of whom were ever charged with a crime or told why they were detained, are tragic and brutal rebuttals to those who claim that torture is ever justified. Through the experiences of these men in Iraq, Afghanistan, and Guantanamo Bay, we can see the full-scope of the damage this illegal and unsound policy has inflicted —both on America's institutions and our nation's founding values, which the military, intelligence services, and our justice system are duty-bound to defend.

In order for these individuals to suffer the wanton cruelty to which they were subjected, a government policy was promulgated to the field whereby the Geneva Conventions and the Uniform Code of Military Justice were disregarded. The UN Convention Against Torture was indiscriminately ignored. And the healing professions, including physicians and psychologists, became complicit in the willful infliction of harm against those the Hippocratic Oath demands they protect.

After years of disclosures by government investigations, media accounts, and reports from human rights organizations, there is no longer any doubt as to whether the current administration has committed war crimes. The only question that remains to be answered is whether those who ordered the use of torture will be held to account.

The former detainees in this report, each of whom is fighting a lonely and difficult battle to rebuild his life, require reparations for what they endured, comprehensive psycho-social and medical assistance, and even an official apology from our government.

But most of all, these men deserve justice as required under the tenets of international law and the United States Constitution.

And so do the American people.

**Major General Antonio Taguba, USA (Ret.)**

*Maj. General Taguba led the US Army's official investigation into the Abu Ghraib prisoner abuse scandal and testified before Congress on his findings in May, 2004.*

# EXECUTIVE SUMMARY

This report provides first-hand accounts and medical evidence of torture and cruel, inhuman, or degrading treatment or punishment ("ill-treatment"[1]) of eleven former detainees who were held in US custody overseas. Using internationally accepted standards, Physicians for Human Rights (PHR) conducted medical evaluations of the former detainees to document the severe, long-term physical and psychological consequences that have resulted from the torture and ill-treatment. The evaluations provide evidence of violation of criminal laws prohibiting torture and of the commission of war crimes by US personnel.[2]

Four of the men evaluated were either arrested in or brought to Afghanistan between late 2001 and early 2003 and later sent to Guantánamo Bay, Cuba, where they were held for an average of three years before release without charge. The other seven were detained in Iraq in 2003 and released without charge later that year or in 2004, with an average period of detention of six months. All of the former detainees evaluated by PHR reported having been subjected to multiple forms of torture or ill-treatment that often occurred in combination over a long period of time.

The medical evaluations were based in each case on intensive two-day clinical interviews that included diagnostic testing and, in two cases, review of medical records. With this evidentiary record, this report provides the most detailed account available thus far of the experience of detainees in US custody who suffered torture — a

war crime — at the hands of US personnel. Additionally, this report provides further evidence of the role health professionals played in facilitating detainee abuse by being present during torture and ill-treatment, denying medical care to detainees, providing confidential medical information to interrogators, and failing to stop or document detainee abuse.

Methods of torture experienced by the former detainees evaluated by PHR included interrogation and detention practices such as isolation, sleep deprivation, forced nakedness, severe humiliation and degradation, and sensory deprivation that were officially authorized by military and civilian officials during certain periods when these men were incarcerated.[3] Additional practices recounted by the interviewees including beatings and other forms of severe physical and sexual assault that, while not officially authorized by government documents now part of the public record, came to be part of a regime of brutality at the facilities where the detainees were held.

This report demonstrates that the permissive environment created by implicit and explicit authorizations by senior US officials to "take the gloves off"[4] encouraged forms of torture even beyond the draconian methods approved at various times between 2002 and 2004.[5] In an environment of moral disengagement that countenances authorized techniques designed to humiliate and dehumanize detainees, it is not surprising that other forms

---

[1] Ill-treatment refers to "cruel, inhuman or degrading treatment or punishment" as is defined in the UN Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR. 39th Sess. Supp. No. 51, *entered into force* June 26, 1987, U.N. Doc. A/Res/39/46, *available at* http://www.unhchr.ch/html/menu3/b/h_cat39.htm [hereinafter UN Convention Against Torture].

[2] The definition of US personnel for the purpose of this report encompasses: service members with the US Armed Forces, US civilian personnel of other government agencies outside the Department of Defense, and US government private contractors. This definition is intentionally broad due to the fact that the detainees evaluated often knew little specific information about the affiliation of the personnel at the facilities where they were held, other than that they were Americans in most cases and often wore US military uniforms.

[3] Relevant documents containing these authorizations are included in two published books: Jameel Jaffer & Amrit Singh, Administration of Torture (2007); The Torture Papers: The Road to Abu Ghraib (Karen J. Greenberg & Joshua L. Dratel eds., 2005).

[4] Cofer Black, head of the CIA's counterterrorist center, famously told a September 26, 2002 Congressional hearing, "After 9/11, the gloves came off." *Joint Investigation Into September 11th: Hearing Before the Joint House-Senate Intelligence Comm.*, 109th Cong. (2002) (statement of Cofer Black, Former Chief of the Counterterrorist Center, Central Intelligence Agency). According to a July 2007 *Vanity Fair* article, William Haynes, General Counsel of the Department of Defense, told the "admiral in charge of detainees in Afghanistan "to 'take the gloves off' and ask whatever he wanted" in the questioning of John Walker Lindh." Katherine Eban, *Rorschach and Awe*, Vanity Fair Online, July 17, 2007. *available at* http://www.vanityfair.com/politics/features/2007/07/torture200707?printable=true&currentPage=all.

[5] See *supra* note 3.

1

of human cruelty such as physical and sexual assault were practiced. The fact that these unauthorized torture practices happened over extended periods of time at multiple US detention facilities suggests that a permissive command environment existed across theatres and at several levels in the chain-of-command. This climate allowed both authorized and unauthorized techniques to be practiced, apparently without consequence.

Given the limited number of detainees evaluated, the findings of this assessment cannot be generalized to the treatment of all detainees in US custody. The patterns of abuse documented in this report, however, are consistent with numerous governmental and independent investigations into allegations of detainee ill-treatment,[6] making it reasonable to conclude that these detainees were not the only ones abused, but are representative of a much larger number of detainees subjected to torture and ill-treatment while in US custody.

## Methods

PHR identified individuals through referring non-governmental organizations and law firms that provide legal representation to former and current detainees in US custody. The evaluations were conducted between December 2006 and September 2007, after consent was obtained by the individuals. No former detainee PHR

located who was eligible and consented to an evaluation was excluded from the study. For each former detainee, a team of two experienced clinicians evaluated the individual and documented allegations of torture and ill-treatment in accordance with the guidelines for assessing physical and psychological evidence of torture set out in the *Istanbul Protocol, Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (hereafter *Istanbul Protocol*).[7] Sources of information for the medico-legal reports include the clinical interview, psychological testing, physical examinations and medical diagnostic tests. The Guantánamo Bay detention medical records of one individual and an independent medical record of another former detainee were available for review as well. In each case, the clinicians provided opinions on possible torture and ill-treatment based on correlations between individual allegations of torture and specific physical and psychological evidence. They found no evidence of deliberate exaggeration in any case. The study was approved by PHR's Ethics Review Board. In order to protect confidentiality, the names of the individuals evaluated were changed and information that could potentially identify the former detainees has been omitted.

## Summary of Findings

### Synopses of the Cases of Former Detainees Profiled

The following summaries of three evaluations of the eleven cases illustrate the torture and ill—treatment that the detainees experienced and the resulting long-term physical and psychological harm. The torture and ill-treatment described were corroborated by the medical evidence.

*Kamal* is in his late forties. He served in the Iraqi Army during the 1980s and later became a businessman and Imam of a local mosque. In September 2003 he was arrested by US forces. At the time of his arrest, he was beaten to the point of losing consciousness. After being brought to Abu Ghraib prison, he was kept naked and isolated in a cold dark room for three weeks, where both during and in between interrogations he was frequently beaten, including being hit on the head and in the jaw with

---

[6] Hina Shamsi, Human Rights First, Command's Responsibility: Detainee Deaths in U.S. Custody in Iraq and Afghanistan (2006), *available at* http://www.humanrightsfirst.info/pdf/06221-etn-hrf-dic-rep-web.pdf; Amnesty International, Cruel. Inhuman. Degrades us All. Stop Torture and Ill-Treatment in the "War on Terror" (2005), *available at* http://web.amnesty.org/library/index/engACT400102005; Human Rights Watch, "No Blood, No Foul": Soldiers' Accounts Of Detainee Abuse In Iraq (2006), *available at* http://www.hrw.org/reports/2006/us0706/ [hereinafter HRW No Blood]; Gen. Randall Schmidt & Brig. Gen. John Furlow, U.S. Army, Investigation into Fbi Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility (2005), *available at* http://www.defenselink.mil/news/Jul2005/d20050714report.pdf [hereinafter Schmidt Report]; Major General Antonio Taguba, Article 15-6: Investigation of the 800th Military Police Brigade (2004), *available at* http://www.globalsecurity.org/intell/library/reports/2004/800-mp-bde.htm [hereinafter Taguba Report]; Situation of Detainees at Guantánamo Bay, U.N. ESCOR Comm'n on Human Rights, 62nd Sess., Agenda Items 10-11, U.N. Doc E/CN.4/2006/120 (2006), *available at* http://www.ohchr.org/english/bodies/chr/docs/62chr/E.CN.4.2006.120_.pdf [hereinafter UN Guantánamo report]; Allen S. Keller, *Torture in Abu Ghraib*, 49 Perspectives in Biology and Medicine 553 (2006), *available at* http://muse.jhu.edu/login?uri=/journals/perspectives_in_biology_and_medicine/v049/49.4fabrega.pdf; Office of the Inspector Gen., U.S. Dep't of Justice, A review of the FBI's Involvement in and Observation of Detainee Interrogations in Guantánamo Bay, Afghanistan, and Iraq (2008), *available at* http://www.usdoj.gov/oig/special/s0805/final.pdf (relating interagency dissent over the use of interrogation techniques considered to be illegal and referrals of complaints about the tactics to the highest level of the US government) [hereinafter OIG Report].

[7] Office of the U.N. High Comm'r for Human Rights, *Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc HR/P/PT/8/Rev.1 (1999), *available at* http://www.unhchr.ch/pdf/8istprot.pdf [hereinafter *Istanbul Protocol*].

a rifle and stabbed in the cheek with a screwdriver.

He was then placed in isolation in a urine-soaked room for two months. When Kamal was allowed to wear clothes, they were sometimes soaked in water to keep him cold. On approximately ten occasions he was suspended in a stress position, causing numbness that lasted for a month. He was made to believe that his family members were also in prison and that they were being raped and tortured. He recounted, "[T]hey were telling me, making me hear voices of children and women, and told me they were my children and [wife]." He was eventually transferred to a tent area of Abu Ghraib, where he remained for seven months until his release in June 2004.

PHR's clinicians found physical and psychological evidence consistent with the abuse Kamal reported. He continues to experience chronic pain in his jaw and numbness from the suspensions. He also meets diagnostic criteria for several psychiatric diagnoses, including major depressive episodes, a panic disorder, and post-traumatic stress disorder (PTSD) that are attributable to his experience in detention. Particularly striking is the severity of Kamal's depressive symptoms, with feelings of hopelessness, worthlessness, and guilt, and difficulty sleeping. His symptoms are indeed so severe that, in the opinion of PHR's clinicians, they would qualify him for hospitalization in the United States.

*Amir* is in his late twenties and grew up in a Middle Eastern country. He was a salesman before being arrested by US forces in August 2003 in Iraq. After his arrest, he was forced, while shackled, to stand naked for at least five hours. For the next three days, he and other detainees were deprived of sleep and forced to run for long periods, during which time he injured his foot. After Amir notified a soldier of the injury, the soldier threw him against a wall and Amir lost consciousness. Ultimately, he was taken to another location, where he was kept in a small, dark room for almost a month while being subjected to interrogations that involved shackling, blindfolding, and humiliation. Approximately one month later, he was transferred to Abu Ghraib. At first he was not mistreated, but then was subjected to religious and sexual humiliation, hooding, sleep deprivation, restraint for hours while naked, and dousing with cold water. In the most horrific incident Amir recalled experiencing, he was placed in a foul-smelling room and forced to lay face down in urine, while he was hit and kicked on his back and side. Amir was then sodomized with a broomstick and forced to howl like a dog while a soldier urinated on him. After a soldier stepped on his genitals, he fainted. In July 2004, he was transferred to the prison at Camp Bucca, where he reported no abuse. He was returned to Abu Ghraib in November 2004 and released two days later.

Amir continues to experience physical symptoms consistent with the abuse he reported. Physical examination revealed features consistent with his account, including tenderness of one of his testicles and rectal tearing. Psychologically, he continues to suffer from debilitating symptoms of severe PTSD, disturbed sleep, moodiness, anxiety, sexual dysfunction, hostility and outbursts of anger, and very frequent suicidal thoughts. He has changed from a stable provider for his family to an unemployed man. Although stressors related to the war in Iraq may exacerbate his symptoms, his most debilitating symptoms are attributable to his experience of torture and sexual violation. "No sorrow can be compared to my torture experience in jail," he said. "That is the reason for my sadness."

*Youssef* is in his early thirties. Unable to find work in his country of origin, he sought employment in Afghanistan. In late 2001 or early 2002, Youssef was detained as he attempted to cross the Afghanistan-Pakistan border without a passport while trying to return home. He was held in a Pakistani prison for two months, where he was often shackled in unsanitary conditions and given little food. During this time, he was interrogated by US personnel and eventually hooded, shackled, and transferred to the US detention facility in Kandahar, Afghanistan.

In Kandahar, Youssef was immediately interrogated and subjected to beatings with sticks and fists as well as kicking, although he did not sustain serious injuries at the time. After that, he was stripped naked. The first night he was not allowed to sleep, as guards hit the detainees and threw sand at them. While in Kandahar, Youssef endured forced nakedness, intimidation by dogs, hooding, and repeated assaults by being thrown against a wall. He was subjected to electric shock from a generator, feeling "as if my veins were being pulled out."

After about six weeks, he was transferred to the US detention facility at Guantánamo Bay, Cuba. During the transatlantic flight he was dressed in an orange suit, fitted with dark goggles and headphones and shackled to the floor of the plane. The tight cuffs caused his wrists to swell. Upon arrival, he was stripped, sprayed with water and examined by a doctor. Like other detainees, he described the conditions at Camp X-Ray as deplorable, with detainees living in cages that were extremely hot and denied anything but a bucket for a toilet. In Camp X-Ray lengthy interrogations accompanied by sleep deprivation began. Small infractions such as speaking

with other detainees led to beatings, and a person whom he perceived to be a doctor checked the injuries of the detainees after the beatings. In order to avoid beatings, Youssef was compliant. Nevertheless, the Immediate Reaction Force (IRF) team forced him into stress positions, including sitting on his knees with his hands pressed together behind his back or head and tied to his feet, forcing his legs up.

After approximately three months, Youssef and others were transferred to Camp Delta, where general cell conditions were better, although detainees were rarely let out of their cells. He was beaten once for hiding food in his cell. An IRF team also sprayed him in the eyes with what may have been pepper spray, so that "my whole body would feel like it was burning — not just my face, but my whole body...I felt like I was losing consciousness from the burning."

His interrogations, which took place almost every other day during his initial period at Guantánamo and he would be kept in the interrogation room for as long as eighteen to twenty hours. He denied having been beaten during the lengthy interrogations or while being held in the interrogation room. Youssef described these episodes as some of his most painful experiences at Guantánamo. He was chained and forced to assume stressful positions; at times, ice-water was poured on him and, at other times, loud music was played. He was deprived of access to the toilet and time for prayer. While being held in the interrogation room, the temperature in the room would be made extremely cold or hot for extended periods of time. Demands for confessions were constant, accompanied by claims by interrogators that his name was found on documents and that his brother, who has leukemia, had been arrested; soldiers also threatened to shoot him. Humiliation was part of the interrogation regime: he was forced to look at pornography, and soldiers ripped the Koran apart and threw it in the toilet in front of him. He described being horrified by an incident in which a naked woman entered the interrogation room and smeared what he believed to be menstrual blood on him. He reported being given injections of unknown substances against his will, and these injections often caused rashes several hours later. He believes that in some interrogations medical personnel were present and that they examined him periodically. Although he was not privy to the discussions between the medical personnel and interrogators, it appeared to Youssef that that the medical personnel were being consulted as to whether interrogations should continue. They always did.

At one point while at Camp Delta at Guantánamo,

Youssef asked to speak with a psychologist because of the distress and sadness he felt due to the separation from his family. He believes that not only did his interrogators have access to the information he shared with the psychologist, but that they exploited it by threatening that he would spend the rest of his life in Guantánamo. Following this interrogation session, he was moved to what he believed to be the worst section of Camp Delta, where he was not allowed to have a blanket or mattress.

After being transferred out of Camp Delta and signing a form, he was released in the fall of 2003. He was again handcuffed and chained to the floor of the plane during the lengthy flight. Upon returning home, he served over a year of military service, during which he was mostly confined in a psychiatric hospital because he was deemed "too aggressive."

On physical examination, Youssef was noted to have surgical scars on his wrists consistent with his report of surgery following his release for chronic wrist pain as a result of shackling during his detention. Pain in his right wrist still persists. He also has a scar on the back of his left wrist consistent with the handcuffing he described. While Youssef experienced symptoms of depression before detention, PHR's evaluators concluded that these symptoms became more pronounced, disabling and chronic as a result of his experience; he also now suffers from moderate PTSD. Many of his physical symptoms, including shortness of breath and "heart problems," are consistent with a panic disorder. Youssef acknowledged difficulty functioning and has not found steady employment since his detention.

## Common Experiences of Torture and Ill-Treatment

Even though the eleven detainees examined by PHR were held at different places, and each person's experience was unique, certain detention and interrogation practices appear over and over again in the accounts.

### Beatings During Arrest, Transport, and Initial Custody

Many of the most severe injuries from beatings that the former detainees reported were sustained shortly after they were arrested. All seven of the men who were detained in Iraq (hereafter referred to as "the Iraqi former detainees") recounted experiencing violent treatment during their arrests, some of which involved severe physical assault on their family members as well as destruction or looting of their homes.

The beatings inflicted on detainees at US facilities at

Bagram and Kandahar in Afghanistan were particularly intense, and included beatings with sticks and fists, kicks to the stomach and genitals and blows to the head. As a result, Haydar, who was held at Kandahar before being transferred to Guantánamo, lost three of his teeth and Rasheed, who was held at both Bagram and Kandahar facilities, lost consciousness and was hospitalized. Similarly, all former detainees held at Guantánamo reported that the most intense and widespread physical beatings they experienced at the facility took place during transfer and shortly after arrival there.

The Iraqi former detainees also reported severe beatings during the first days and weeks of detention at facilities including one at Baghdad International Airport. Hafez, who was held at a US facility at Baghdad International Airport and Abu Ghraib for over seven months, was forced to the ground and beaten severely on his legs and back, causing his lips, forehead, and nose to bleed; he also reported being stripped and having his chest and pubic hair ripped out by hand and being simultaneously beaten, hit, and choked while being doused with cold water.

While physical evidence of beatings often may not be detectable in later medical evaluations, findings from bone scans of six of the former detainees as well as scars and lesions visible during physical examination are consistent with the history of beatings described by the victims.

## Deprivation of Basic Necessities and Sanitary Conditions

All of the former detainees reported frequent denial of basic necessities during periods of their detention; over half of the men evaluated reported being denied food on at least one occasion. Each former detainee also reported being subjected to extreme temperatures during his confinement.

The conditions detainees in Iraq endured were particularly appalling. Among the conditions one or more of the detainees reported were placement in a urine-soaked punishment room, being forced to wear soiled underwear, often for weeks or months at a time, denial of access to food, water and toilets of any kind, and exposure to cold without blankets.

Two of the detainees who were held in Guantánamo during the first year the facility was in operation reported harsh physical conditions and being housed in steel cages. Although as time passed, the physical conditions improved there, deprivation sometimes accompanied by acts of cruelty continued. Haydar reported that in Guantánamo the soldiers would often either spit in or throw out part of their food rations.

## Stress Positions: Forced Standing, Handcuffing, and Shackling

All of the former detainees reported having been subjected to painful stress positions that involved having their hands and feet bound for extended periods of times, or suspension from walls or barbed wire. These positions were often coupled with the use of blindfolding, sleep deprivation, isolation, and exposure to temperature extremes, either as components of interrogations or conditions of confinement.

For example, three former detainees evaluated by PHR reported that in Guantánamo they were kept in extremely hot or cold interrogation rooms, chained in a crouching position to a ring on the floor for eighteen to twenty hours. Two of the Iraqi former detainees reported losing consciousness as a result of being subjected to stress positions.

Findings on medical examination were consistent with these accounts. All of the former detainees reported that they continue to suffer from a wide range of musculoskeletal pains. For example, Laith, an Iraqi former detainee who was held in Abu Ghraib for nine months, reported arm numbness and weakness following being suspended by his arms, which is highly consistent with a brachial plexus (nerve group supplying the upper extremity) injury that often results from suspension.

## Isolation, Sensory Deprivation, or Bombardment

### A) Prolonged Isolation

All of the former detainees reported being subjected repeatedly to lengthy periods of isolation that ranged from ten days to as long as two months in duration. The interviewees reported that, while being kept in isolation, they were subjected to shackling, blindfolding, physical abuse, humiliation, sexual humiliation, and stress positions, as well as temperature extremes and light control.

During periods of isolation, the Iraqi former detainees consistently reported being kept hooded and naked in small, dark holding cells that made Rahman, who was held at Abu Ghraib for nine months, feel "claustrophobic." Similarly, former Guantánamo detainees reported that they were repeatedly held in isolation. The psychological impact of isolation and other forms of abuse was enormous. Rasheed engaged in hunger strikes, exhibited psychotic behavior, and even became suicidal after prolonged isolation.

### B) Hooding/Blindfolding

Sensory deprivation by means of hooding or other types of blindfolding was frequently used in combination with other techniques in the places the former detainees were held (Afghanistan, Iraq, and Guantánamo Bay, Cuba). According to the detainees, blindfolding and hooding instilled in them a sense of fear, disorientation, and dependency on their captors.

According to the detainees evaluated, sensory deprivation was employed in Afghanistan during arrest and transportation between facilities as well as during interrogations. At Guantánamo, however, the four detainees evaluated experienced hooding only when being transferred. In Iraq, hooding was routinely used during interrogations and general detention and was combined with forced nakedness and isolation, among other techniques.

### C) Sensory Bombardment

Eight former detainees reported that sensory bombardment with loud noise or music was utilized frequently in what appeared to be a strategy to disorient them or disrupt detainees' sleep.

The detainees who were held in Afghanistan reported that they were subjected to loud music over long periods of time, and in one case exposed to powerful flood lights twenty-four hours a day. At Guantánamo, Rasheed reported that during a period of isolation and frequent lengthy interrogations, his cell was bombarded with loud unpleasant noise.

The former detainees reported that in Iraq this technique was combined with forced running, isolation, and sleep deprivation. Similar to three other Iraqi former detainees, Morad, who was held in various facilities for a total duration of ten months, was subjected to "deafening, loud music" while being held in Saddam Hussein's former ranch (used as a US detention facility).

### Threats of Harm to Detainees and Their Families

Almost all of the detainees reported being threatened with severe harm, most commonly through verbal threats during interrogations. Eight of the eleven men reported that the US military utilized dogs to instill fear in the detainees. Two of the Iraqi former detainees were threatened with execution, and two others were threatened with forced disappearance since they did not have prisoner identification numbers, were unregistered, and therefore considered "ghost" detainees. Youssef recalled being threatened with being shot by a guard during an interrogation in Guantánamo.

Interrogators also told detainees that their families would be killed or severely harmed. Laith told PHR that the interrogators "were threatening me...they were saying 'Then you will hear your mothers and sisters when we are raping them.'" Interrogators also threatened detainees with harm or torture following their release. Strikingly, transfer to Guantánamo was a threat used on half of the former detainees held in Iraq. Yasser recalled being told he would be sent to Guantánamo "where even dogs won't live."

### Use of Extreme Temperatures

All of the former detainees reported being exposed to extremes of temperature in their cells. For some of the Iraqi former detainees, this practice was coupled with weeks of isolation and sexual humiliation; for others, this practice was used as a form of group punishment. Four detainees, of whom three were held in Guantánamo, reported that cold water was poured on them during interrogation. In the cases of three individuals who were held in facilities in Iraq, cold water was used in combination with lengthy interrogations, sensory bombardment, beatings, and sexual humiliation.

### Electric Shocks, Sexual Assault, and Physical Assault

In addition to the beatings upon arrest, initial detention and transfer described earlier, some of the detainees were physically assaulted again later during their detention. Two former detainees were sodomized with a broomstick or a rifle at Abu Ghraib and three were subjected to electric shock (two in Iraq and one while at Kandahar, Afghanistan).

Physical assaults during detention included being kicked, stepped on, dragged, slapped, and forcefully thrown against a wall. Adeel, who was later transferred to Guantánamo Bay, reported receiving daily beatings while he was held at the Bagram facility. The Iraqi former detainees described being struck with a rifle, stabbed in the cheek with a screwdriver, burned on the chest with a cigarette, and other episodes of severe physical abuse during interrogations that in some cases resulted in loss of consciousness. Five former detainees reported soldiers exploiting detainees' injuries. For example, Yasser, who was held at Abu Ghraib for four months, stated that his injured hand was deliberately stepped on and squeezed by soldiers at Abu Ghraib.

Of the Guantánamo detainees, only one reported routine physical abuse: Rasheed reported frequent beatings and one episode of harsh beatings during an interrogation. Youssef and Haydar stated that multiple times

the IRF teams (referred to by the former detainees as the "riot police") subjected them to chemical spray and pressurized water, which left Haydar "writhing on the ground in pain."

Many of the physical assaults reported would likely have resulted in bruises and soft tissue injuries that would not leave lasting physical marks. However, the bone scan findings of six individuals, and scars and healed lesions observed on physical examination of all detainees corroborated their specific allegations of physical assault. Scarring on Yasser's thumbs was highly consistent with the scarring caused by electric shock. Further, reports of rape and sexual assault were corroborated in two cases by medical examination.

### Sleep Deprivation

Nine of the eleven former detainees evaluated reported that they were often subjected to sleep deprivation, in combination with other techniques, through loud noise or banging, use of cold water, or stress positions. Laith explained: "If you ask me about being chained to the window [standing], it was every day. They were especially doing that at night, to prevent me from me sleeping."

### Sexual, Religious, Cultural, and Other Forms of Degrading Treatment

According to detainee accounts, humiliation was pervasive in detention facilities in both Iraq and Afghanistan. Guards taunted, shamed, insulted, spat and urinated upon, and embarrassed detainees, forced most to be naked, observed some on the toilet, wrote degrading phrases in indelible marker on the body of one, and forcibly cut the beards and shaved the heads of others. In one incident, Amir reported having been pulled by a leather dog leash in Abu Ghraib and was ordered to "howl like dogs do." He was repeatedly kicked when he refused to do so.

Cultural and religious humiliation was reported by more than half of the individuals evaluated, and took many forms, including taunting men at prayer and desecrating the Koran. Rasheed stated that in protest of such practices, detainees in all five blocks of Guantánamo held a simultaneous uprising by banging their heads against the walls and demanding "an end to the mocking of their religion."

One of the worst forms of humiliation detainees reported, though, was sexual, and it was reported by virtually all of the individuals evaluated by PHR, at facilities in Afghanistan, at Guantánamo, and in Iraq. The forms of sexual humiliation were as varied as they were cruel: parading men naked in front of female soldiers, forcing

them to disrobe before female interrogators, touching or provoking them in a humiliating way, and forcing them to watch pornography or real or feigned sexual activities. Furthermore, nakedness became the normal mode of operation in the Iraqi detention facilities, especially in Abu Ghraib, where the detainees were forced to be naked for long periods of time. Kamal stated that his genitals were touched multiple times during interrogations in Abu Ghraib. Further, he reported that when the American soldiers "got me naked, they used to bring all female soldiers to look at me and say, 'Hello, Imam'."

### Witnessing Torture and Cruel Treatment

More than half of the former detainees evaluated by PHR recounted witnessing torture and other cruel, inhuman or degrading treatment towards other detainees by US personnel. Two detainees witnessed other detainees being bitten by dogs; others witnessed detainees being subjected to various forms of sexual humiliation. In Abu Ghraib, Rahman recounted that he was forced to watch other detainees being forced to simulate anal intercourse and recalled that the detainees "were begging, 'This is a sin against our religion, please show mercy.' The soldiers were pushing them into each other, and these guys were trying to push away, and this was more than half an hour and this was in front of our eyes."

## Health Professional Complicity and Denial of Medical Care

Health professionals in detention settings are required by domestic and international standards not only to provide medical care to detainees but to protect their health and well-being. A few of the former detainees reported that they received appropriate care from health professionals while in US custody.[8] Adeel was diagnosed and treated for tuberculosis while detained in Guantánamo, and Morad received "humane treatment" from a doctor for his diabetic foot ulcer.

At the same time, former detainees reported that medical personnel played a role in facilitating torture and ill-treatment in all three theatres of operations through the monitoring of abuse during interrogations, providing medical information to interrogators, denying medical care, and failing to take action to stop and/or document detainee abuse. Three of the Iraqi former detainees and one former Guantánamo detainee reported that individuals acting in a health professional capacity examined their condition during an episode of torture or

---

[8] The detainees often did not know what kind of health personnel interacted with them (e.g., doctor, nurse, medic, or psychologist).

physical abuse but made no effort to stop it. Two former Guantánamo detainees suspected that the psychologist shared information about them with interrogators.

Several men reported facing difficulties accessing care while in detention. At Guantánamo, Youssef recounted that he never received treatment despite his "many, many" requests for medical attention to his persistent stomach pain, as well as for swelling in his wrists. Two men detained at Abu Ghraib reported being denied medical treatment, including for injuries inflicted by soldiers. In response to PHR's query whether or not any doctors treated Amir's injuries in Abu Ghraib; he responded: "Did I need to ask for help? I was there naked and bleeding… .These were not real doctors."

In addition, all the former detainees from Guantánamo reported that they were given injections or medication without their consent and medical procedures were performed on them against their will.

The medical records of one of the former detainees, Rasheed, illuminate the role of medical personnel at Guantánamo, and PHR's evaluators were able to compare his account with entries in his medical file. The records are largely consistent with his own account: shortly after arriving at Guantánamo in 2002, Rasheed's mental health began to deteriorate; he attempted suicide and other acts of self-harm, including self-mutilation. Mental health staff at Guantánamo responded with heavy doses of medication, which made him feel unbearably hot and made his skin and joints ache. When his acts of self-harm continued, medical staff placed him in restraints and treated his access to bottled water and blankets as privileges. In response to his repeated requested to be removed from isolation, the medical files note that the psychiatric personnel "informed him that [they] had no control over that and told him to ask his interrogator to have him moved."

It is not clear exactly how long Rasheed was kept in isolation or how long Rasheed's interrogations continued after his severe signs and symptoms appeared — although it appears to have been at least one year. What is clear, though, is that during the critical periods in 2002 and 2003 when his health severely deteriorated, his health condition did not result in halting interrogations, nor in relieving a regime of isolation and sleep deprivation; nor do the records indicate that the medical staff connected his ill-treatment — including use of isolation, sleep deprivation, physical assault, violation of his religious and moral codes, and the use of sexual humiliation — to the obvious decline in his mental condition. Nor is there evidence from the records that the medical

staff intervened to end his torture, except for one note with a recommendation that resulted in a brief move out of isolation. Instead, the thinking of the medical staff appears reflected in a medical note that mentions him being subject to "routine stressors of confinement." Further, one of the most likely diagnoses for Rasheed's psychological symptoms, PTSD, is never mentioned in the medical record. The medical staff thus not only failed to document that Rasheed was being tortured through the use of isolation and other methods (and presumably did not report it), but also became complicit themselves in his abuse. Indeed their mental health interventions may have worsened Rasheed's suffering by patching him up so that further interrogation and torture could be inflicted.

## Short-Term and Lasting Harm from Torture and Ill-Treatment

All the detainees experienced severe, even excruciating physical pain from being kicked, punched, choked, shocked or sodomized, and many were terrorized by both the experience of the assaults on them and threats of more to come. Most of the detainees lost consciousness at least once as a result of beatings or other physical assaults. Some experienced bruising and trauma to their genitals. Some of the men were not only severely injured as a result of torture, but they then had to endure additional pain from the exploitation of those injuries by their tormenters. Almost all of the men PHR interviewed continue to experience physical after-effects from the torture they experienced, including chronic headaches as well as persistent pain in their limbs, joints, back, muscles, and ligaments from being beaten or kept suspended or in other stress positions for long periods of time.

The experience of torture was horrifying to the men as it was taking place. Men experienced shame, humiliation, and terror that they or their loved ones would suffer even more; others were terrified by the claustrophobic conditions of isolation. These in turn brought about symptoms ranging from chest pain to severe anxiety to sleeplessness. One reported: "I was having really bad nightmares… I felt like I couldn't breathe." According to medical files, during an interrogation session in Guantánamo one detainee had a seizure and "was unresponsive and fell… [while] his feet [were] buckled."

### Lasting Psychological Consequences of Ill-Treatment

With one exception, the former detainees have experienced and continue to experience severe psychological effects of torture and ill-treatment as a result of their

detention in US custody. All but one feel utterly hopeless and isolated, and lack the ability to sleep well, work, or engage in normal social relationships with their families. Seven individuals disclosed having contemplated suicide either while in detention or after being released. Most of the released detainees, to this day, live with severe anxiety, depression, and post-traumatic stress disorder, including intrusive recollections of trauma suffered in detention, hyperarousal (persistent symptoms of increased arousal, e.g., difficulty falling or staying asleep, anger, and hypervigilance), avoidance and emotional numbing behavior. PHR's clinicians determined that these symptoms were directly related to the torture and ill-treatment reported having taken place while in US custody, even after taking into account the fact that the released Iraqi former detainees are living in a war-torn environment. Amir explained, "These are the memories that I can never forget. I want to forget, but it is impossible."

For the four detainees who had experienced symptoms of depression or other mental disorders prior to detention, torture and ill-treatment by the US Personell severely exacerbated these conditions, and in one case it ignited such deep despair and dysfunction as to lead the detainee to repeated suicide attempts while at Guantánamo.

### Diminution of Social and work Life After Detention

Many former detainees reported encountering social stigma and fear in their communities as a result of their status as former US detainees. Some relocated, and others attempted to do so unsuccessfully. All except one have lost their livelihood and are facing financial hardships, and many were concerned about their physical safety and security. These fears are not unfounded as three Iraqi former detainees were rearrested and detained by both American forces and the Iraqi government, though subsequently released. Since the interviews were completed, PHR has authoritatively learned that one of the former Guantánamo interviewees has been arrested in his home country and is still being detained.

## Legal Prohibitions Against Torture and Ill-Treatment

All of the abusive interrogation techniques and patterns of ill-treatment endured by these eleven men — including beatings and other forms of severe physical and sexual assault, isolation, sleep deprivation, forced nakedness, severe humiliation and degradation, and sensory deprivation, many of which were experienced over long periods of time and often in combination with other prohibited acts — constituted

acts of torture as well as cruel, inhuman or degrading treatment under domestic criminal statutes and international human rights and humanitarian treaties, including the Convention Against Torture and the Geneva Conventions, that were in effect at the time the acts were committed.

According to courts and entities responsible for interpreting the Convention Against Torture, including the UN Special Rapporteur on Torture and the UN Committee Against Torture, each of the interrogation techniques and conditions of incarceration and treatment identified in this report, when considered on its own, constitutes prohibited conduct in the form of torture or cruel, inhuman or degrading treatment or punishment. In fulfilling its obligation to assess and report upon the human rights conditions in other countries, the US State Department relies upon international human rights treaties including the Convention Against Torture; in innumerable instances, it has identified the very practices evidenced by this study, when committed in foreign countries, as torture or cruel, inhuman or degrading treatment or punishment. In addition, based on the severity of physical and psychological pain and suffering caused by these practices, the *Istanbul Protocol* has determined that they constitute torture and/or ill-treatment.[9] Likewise, the medico-legal evidence leaves little doubt that the interrogation methods used by US personnel constitute torture under the US Torture Act,[10] the Uniform Code of Military Justice (UCMJ),[11] and other laws.

## Recommendations

Based on the findings of this investigation, the United States should take the following actions:

1. The executive branch must repudiate all forms of torture and cruel, inhuman or degrading treatment. It should explicitly and in writing establish a uniform standard of conduct for all agencies that prohibits any of its military, intelligence or other officials, including all forms of contract personnel, from engaging in torture and cruel, inhuman or degrading treatment, including but not limited to any of the following interrogation or conditions of confinement methods, either alone or in combination:

   • Stress positions

   • Beatings and other forms of physical assault

---

[9] *Istanbul Protocol, supra* note 7, ¶ 144, at 28.

[10] Torture Convention Implementation Act of 1994, 18 U.S.C.A. § 2340 (2004).

[11] Uniform Code of Military Justice, 10 U.S.C. §§ 801—946 (2007).

- Use of extremes of temperature

- Waterboarding or any other form of simulated drowning[12]

- Threats of harm to the detainee, his family, or friends

- Sleep deprivation

- Sensory bombardment through the use of extreme noise and/or light

- Violent shaking

- Religious, cultural, and sexual humiliation including, but not limited to, forced nakedness

- Prolonged isolation

- Sensory deprivation, including, but not limited to, hooding and blindfolding

- Use of psychotropic, mind-altering, or other drugs for the purpose of decreasing resistance or gaining information

- Mock execution

- Exploitation of phobias, psychopathology, or physical vulnerability

- Rape and sexual assault

- Electric shocks

- Deprivation of basic necessities and sanitary conditions

Congress should enact into law the prohibitions listed above and establish criminal liability for their violation.

2. The executive branch and Congress should establish an independent commission to fully investigate and publicly report on the circumstances of detention and interrogation in Bagram, Kandahar, and elsewhere in Afghanistan, Iraq, Guantánamo Bay, and other locations since 2001. This independent commission should have subpoena power to compel witnesses and have full access to all classified materials concerning interrogation techniques and conditions of detention, including medical records and documentation by behavioral health science consultant personnel, in order to establish a full public record. The investigation should extend to individuals in the position of making policy as well as those who carried those policies out, including all healthcare profes-

sionals who were in the position of providing care or supporting the interrogation of detainees.

3. All individuals who played any role in the torture or ill-treatment of detainees, including those who authorized the use of methods amounting to torture or exercised command authority over them, should be held to account through criminal and civil processes (such as disciplinary action). Officials at every level should be held accountable for crimes they committed or for the acts of officials subordinate to them. Health professionals, both civilian and uniformed, who engaged in or facilitated the abuse of detainees and/or failed to report torture and ill-treatment should be investigated, appropriately sanctioned, and disciplined via the Department of Defense, other executive branch agencies, and state licensing boards.

4. The government should issue a formal apology to detainees who were subjected to torture and/or ill-treatment as part of US military and intelligence operations since fall 2001 in Afghanistan, Iraq, Guantánamo Bay, Cuba, and elsewhere.

5. The government should establish a fair process for compensation and victim assistance, including access to rehabilitation and re-integration services, for individuals subjected to torture or ill-treatment in US custody.

6. All places of detention operated by the United States should be subject to monitoring by international bodies that investigate detainee treatment and are capable of reporting findings to the public and government, including the UN Special Rapporteur on Torture, the UN Committee Against Torture, and the International Committee of the Red Cross. These organizations tasked by treaties to which the United States is a party must be granted full access to detainees, their medical records, and all other pertinent files documenting past and current treatment of detainees during their incarceration. Furthermore, Congressional and executive branch oversight of US military and intelligence activities relevant to detainee treatment and interrogation should be immediately strengthened and improved.

7. The US Department of Justice should publicly release all legal opinions and other memoranda concerning standards regarding interrogation and detention policy and practices.

---

[12] None of the detainees evaluated experienced waterboarding.

# I. INTRODUCTION

This report recounts and evaluates the experiences of eleven men who were detained by the United States in Afghanistan, Iraq, and Guantánamo Bay, Cuba who allege they were tortured and abused before being released without charge.

Physicians for Human Rights conducted rigorous, in-depth clinical interviews with the former detainees held in US custody, seven of them in Iraq, and four at Afghanistan and Guantánamo Bay facilities. These interviews, each conducted by an internist and a psychologist or psychiatrist, do more than merely allow the voices of the released detainees to be heard. Because the information gathered from the former detainees is supported by extensive medical evaluations — based on the Istanbul Protocol,[13] an internationally accepted standard on documenting torture — as well as psychological and medical diagnostic tests and, in one case, medical records from Guantánamo, the report provides the most detailed accounts of the torture of detainees over extended periods of times by US personnel published thus far. The medical evidence, gathered by experienced clinicians, strongly corroborates the detainees' accounts of torture and ill-treatment. The findings of the report also bring to light the significant and long-term harm the former detainees have suffered as a result of their treatment.

It is now recognized that after September 11, 2001, officials within the Bush Administration radically changed the manner in which detainees in US custody were treated and interrogated. Administration officials, including White House and Department of Justice lawyers, denied the full protection of the Geneva Conventions to certain detainees in US custody and re-interpreted US laws and international treaties[14] so as to permit inter-

rogation techniques previously found to be unlawful by courts and oversight bodies responsible for reporting on torture. These techniques had also been classified as human rights abuses by the US State Department when perpetrated by other countries.[15] The public record now abundantly shows how, starting in 2002, the Defense Department began authorizing the use of highly coercive interrogation methods, among them long-term isolation, stress positions, severe humiliation, and sensory deprivation, first at Guantánamo Bay and later in Iraq.[16] While a few low-level military personnel have been prosecuted for their actions in prisoner abuse, officials higher up the military and civilian chains of command have not yet been held to account.

In previous publications, Physicians for Human Rights has reviewed scientific and medical literature and clinical experience about highly coercive interrogation methods and demonstrated that US "enhanced" interrogation techniques, whether inflicted alone or in combination, can cause severe physical and psychological pain and suffering.[17] This report reviews the experiences of eleven men who were detained by the United States and actually endured the newly-authorized methods. Moreover, it shows that, once certain highly coercive interrogation

---

B. Comey, Deputy Attorney General (December 30, 2004), *available at* http://www.usdoj.gov/olc/dagmemo.pdf. The American Civil Liberties Union (ACLU) also alleges that the Office of Legal Counsel issued an August 2002 legal memorandum specifying "interrogation methods that the CIA may use against top al-Qaeda members." Dan Eggen, *CIA Acknowledges 2 Interrogation Memos: Papers Called Too Sensitive for Release*, Wash. Post, Nov. 14, 2006, at A29, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/11/13/AR2006111301221.html.

[15] For more information on the legal standards and US State Department human rights findings, see *infra* Chapter 6.

[16] See *supra* note 3.

[17] Physicians for Human Rights, Break Them Down: The Systematic Use of Psychological Torture by US Forces (2005), *available at* http://physiciansforhumanrights.org/library/report-2005-may.html [hereinafter PHR Break Them Down]; Physicians for Human Rights & Human Rights First, Leave No Marks (2005), *available at* http://physiciansforhumanrights.org/library/report-2007-08-02.html [hereinafter PHR Leave No Marks].

---

[13] *Istanbul Protocol, supra* note 7.

[14] *See, e.g.,* Jan Crawford Greenburg, Howard L. Rosenberg & Ariane de Vogue, *Bush Aware of Advisers' Interrogation Talks*, ABC News, April 11, 2008, at http://abcnews.go.com/TheLaw/LawPolitics/story?id=4635175&; Memorandum from Jay Bybee, Assistant Attorney General, Office of Legal Counsel, Department of Justice to Alberto R. Gonzales, Counsel to the President (August 1, 2002), *available at* http://www.washingtonpost.com/wp-srv/nation/documents/dojinterrogationmemo20020801.pdf [hereinafter Bybee Memo]; Memorandum from Daniel Levin, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice, to James

methods intended to humiliate and "dehumanize"[18] the detainees were permitted, other extreme violations that apparently were not specifically authorized, including electric shocks, beatings and sexual assault, including rape, were employed. Hence, both authorized and unauthorized techniques documented in this report are part of the overall regime of torture.

The report contains graphic descriptions of the men's experiences of beatings, forced nakedness, threats to their lives and those of their families, sexual assault, temperature extremes, sensory deprivation and bombardment, sleep deprivation, and more during the course of their incarceration, and how the methods were often used in combination and employed for months at a time. The report further reveals both the severe immediate pain and suffering that these methods brought and their longer-term physical and psychological impacts — including musculoskeletal pain, headaches, and weak-

ness and numbness related to injuries, post-traumatic stress disorder, major depression, anxiety, and sexual dysfunction. Some former detainees also experienced upon release a dramatic increase in alcohol consumption, difficulty in maintaining family relations, loss of employment, and the effect of perceived negative social status.

The relatively small, non-random sample of former detainees evaluated does not allow this report alone to support a generalized conclusion about the treatment of all detainees in US custody. Yet the patterns of abuse PHR found are consistent with numerous documents released by the Department of Defense and reports by the US government, independent organizations and the media,[19] making it reasonable to conclude that these eleven detainees were far from the only ones subjected to torture and ill-treatment, but rather add to the body of evidence of widespread and systematic violations of human rights.

They call out for investigation, accountability, and redress.

---

[18] According to Major General George Fay's report, systematic use of forced nakedness to humiliate detainees "likely contributed to an escalating "de-humanization" of the detainees and set the stage for additional and more severe abuses to occur." MG GEORGE R. FAY & LTG ANTHONY R. JONES, U.S. ARMY, AR 15-6 INVESTIGATION OF INTELLIGENCE ACTIVITIES AT ABU GHRAIB PRISON AND 205TH MILITARY INTELLIGENCE BRIGADE 10 (2004), *available at* http://www4.army.mil/ocpa/reports/ar15-6/AR15-6.pdf [hereinafter FAY REPORT].

---

[19] See *supra* note 6.

# II. METHODS

PHR conducted in-depth medical and psychological evaluations with a group of eleven individuals formerly held in the custody of the US military in Afghanistan, Iraq, and Guantánamo Bay, Cuba. The assessments were conducted in accordance with the guidelines for collecting physical and psychological evidence of torture outlined in the *Istanbul Protocol*.[20]

## Identification of Study Population

PHR sought to identify former detainees through a variety of sources including human rights organizations, lawyers representing detainees, support organizations, and direct contact with former detainees themselves. The criteria for inclusion of detainees were: the former detainee's presence in US custody for some period following September 2001; PHR's ability to evaluate the detainee in a setting where his safety could be assured; the former detainee's residence in a place where the person's safety could be reasonably assured post-evaluation; the possibility of referral to rehabilitation services to former detainees in need of them; and the individual's willingness to agree to a medical evaluation. Despite very extensive outreach, PHR encountered numerous difficulties identifying individuals who were willing to discuss their experience in US custody and to go through a medical evaluation. The Center for Constitutional Rights (CCR) and the law firms of Burke O'Neil, LLC and Akeel Valentine, PLC helped

PHR to identify the eleven individuals evaluated in this report. Burke O'Neil, LLC, Akeel Valentine, PLC, and CCR are representing former Iraqi former detainees in legal claims against CACI International Inc and Titan Corporation, private security contractors that operated in US prisons in Iraq. The Center for Constitutional Rights has coordinated much of the representation of prisoners in Guantánamo, including in *habeas corpus* petitions challenging the detention of those imprisoned, as well as legal and advocacy actions on behalf of those released. PHR conducted evaluations in two different European countries between December 2006 and September 2007.

## Evaluators

Each evaluation team consisted of two experts, a physician and either a psychiatrist or a psychologist. The evaluators all had substantial experience in medical and/or psychological documentation of allegations of torture. The team of evaluators were Sondra Crosby, MD, Boston Center for Refugee Health and Human Rights; Allen Keller, MD, Bellevue/NYU Program for Survivors of Torture; Leanh Nguyen, PhD, Bellevue/NYU Program for Survivors of Torture; Onder Ozkalipci, MD, International Rehabilitation Council for Torture Victims; Christian Pross, MD, Berlin Center for the Treatment of Torture Victims; and Barry Rosenfeld, PhD, Fordham University. In addition to providing their findings for this report, the evaluators also serve as experts to lawyers.

## Medical Evaluations in Accordance with the *Istanbul Protocol*

The *Istanbul Protocol* consists of detailed guidelines for the effective investigation and documentation of torture and ill-treatment. It has been adopted by the United Nations as the "gold standard" for legal investigations and medical documentation of torture and ill-treatment and is applied routinely in a variety of medico-legal contexts. The medical documentation component of the *Istanbul Protocol* involves a comprehensive clinical assessment of physical and psychological evidence and correlation of specific physical and psychological findings

---

[20] *Istanbul Protocol*, *supra* note 7. The Protocol provides standards for medical evaluations of allegations of torture. It was the product of three years of analysis, research, and drafting undertaken by more than seventy-five forensic doctors, physicians, psychologists, human rights monitors, and lawyers representing forty organizations and institutions from fifteen countries. The Protocol also sets forth principles for effective investigations of torture and ill-treatment, including the requirement that States ensure effective investigation and documentation of allegations of torture and ill-treatment committed under its authority such as granting access to evaluations by impartial medical or other experts. *Id.* at Annex I. The UN Commission on Human Rights has included these principles in several torture prevention resolutions. *See, e.g.,* Human Rights and Forensic Science, C.H.R. res. 2000/32, U.N. ESCOR Comm'n of Human Rights, 56th Sess., U.N. Doc. E/CN.4/RES/2000/32 (2000); Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, C.H.R. res. 2000/43, U.N. ESCOR Comm'n of Human Rights, 56th Sess., U.N. Doc. E/CN.4/RES/2000/43 (2000).

with individual allegations of abuse. The *Istanbul Protocol* states that interpretations of physical evidence should:

A. Correlate the degree of consistency between the history of acute and chronic physical symptoms and disabilities with allegations of abuse.

B. Correlate the degree of consistency between physical examination findings and allegations of abuse. (Note: The absence of physical findings does not exclude the possibility that torture or ill-treatment was inflicted.)

C. Correlate the degree of consistency between examination findings of the individual with knowledge of torture methods and their common after-effects used in a particular region.[21]

According to the Protocol, interpretation of psychological evidence of torture and ill-treatment should:

A. Correlate the degree of consistency between the psychological findings and the report of alleged torture.

B. Provide an assessment of whether the psychological findings are expected or typical reactions to extreme stress within the cultural and social context of the individual.

C. Indicate the status of the individual in the fluctuating course of trauma-related mental disorders over time (i.e., what is the time-frame in relation to the torture events and where in the course of recovery is the individual, and other related questions).

D. Identify any coexisting stressors affecting the individual (e.g., ongoing persecution, forced migration, exile, loss of family and social role) and the impact these may have on the individual.

E. Mention physical conditions that may contribute to the clinical assessment, especially with regard to possible evidence of head injury sustained during torture or detention.[22]

Such clinical correlation of individual allegations of torture and specific physical and psychological evidence are generally described using subjective terms to indicate various levels of consistency, i.e., inconsistent, consistent, highly consistent, virtually diagnostic, or similar terms. These subjective descriptions convey the opinion of qualified, experienced clinicians and serve as the basis for the clinician's conclusions regarding the possibility of torture and ill-treatment. The clinician's conclusions should take into account all sources of relevant evidence (physical and psychological findings, historical information, photographic findings, diagnostic test results, and knowledge of regional practices) gathered in the medical evaluation as well as documentation of relevant regionally specific form of torture.[23] The application of *Istanbul Protocol* guidelines provides clinical, evidence-based conclusions that enable adjudicators and other legal experts to assess allegations of torture and ill-treatment.

In accord with the *Istanbul Protocol*, the evaluators prepared written reports for each individual evaluated, including the following:

1. Case information, including the name of the subject and the name and affiliation of those present at the examination; the exact time and date, location, nature, and address of the institution where the examination was conducted; and the circumstances of the subject at the time of the examination;

2. Background information of the subject including general demographic information, past medical and psychological history, review of prior medical evaluation of torture and ill-treatment;

3. A detailed record of the subject's allegations of torture and ill-treatment as given during the interview, including alleged methods of torture or ill-treatment, the time when torture or ill-treatment was alleged to have occurred and all complaints of physical and psychological symptoms;

4. Physical symptoms and disabilities, where the development of acute and chronic symptoms and disabilities and the subsequent healing processes is documented;

5. Physical examination;

6. Psychological history and examination;

7. Diagnostic test results;

8. An interpretation of findings as to the probable relationship of the physical and psychological findings to possible torture or ill-treatment; and

9. Conclusions and analysis of medical findings.

The interviews were conducted in the primary language of each individual with the assistance of professional interpreters. The evaluations were all conducted in a confidential manner.

---

[21] *Istanbul Protocol*, *supra* note 7, at 72 (Annex IV).

[22] *Id.*

[23] *Id.*

## Source of Information for Medical Evaluations

Sources of information for the medico-legal reports included: the clinical interview, psychological testing, physical examinations, and medical diagnostics tests.

Psychological tests were administered to all former detainees evaluated and included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).[24] The self-report psychological tests had been translated previously into the subject's first language. Where possible, the clinical examination included appropriate medical diagnostic tests. Medical diagnostic tests were administered to seven individuals and included bone scans (six cases), an electrocardiogram (one case), a troponin test (one case), radiographic tests (two cases), and a blood test for Prostate Specific Antigen.

In one case, a forensic evaluation report conducted in 2004 by representatives of a center affiliated with the International Rehabilitation Council for Torture Victims was available for corroboration with PHR findings. Similarly, the Guantánamo Bay medical record was available in respect of another individual and was used for corroboration purposes.

All the medical evaluations were subjected to an extensive peer review process by PHR's qualified and experienced clinicians. The findings and conclusions of the medical reports are exclusively those of the evaluators.

This report contains condensed versions of the medico-legal evaluation reports, but no relevant findings were omitted in the summaries. To protect the privacy and anonymity of participants in the PHR investigation, the individuals' actual names and other identifiable characteristics have not been included in the report.

## Human Subjects Protection

An independent PHR ethics review board (ERB) was established for this investigation. The ERB consisted of five individuals with expertise in clinical medicine, public health, bioethics, and international human rights law who reviewed and approved the investigation plan. In reviewing the investigation procedures, the ERB was guided by the relevant process provisions of Title 45 of the US Code of Federal Regulations and complied with the Declaration of Helsinki, as revised in 2000.[25]

PHR limited case selection of former detainees to individuals who are currently eighteen years of age or older. The evaluation team obtained both oral and written consent from the individuals. Consent forms were translated into each subject's first language. Additional oral consent was obtained for access to individual medical records. No former detainee who was eligible and consented to an evaluation was excluded.

PHR made every effort to ensure protection and confidentiality and to reduce any potential adverse consequence to subjects for having participated in the evaluations. Evaluations were conducted in the most private setting available. Efforts were made to ensure that the assessments were conducted in a culturally sensitive manner. Participants did not receive any material compensation for participating in the evaluations and were informed of this in the consent process.

Former detainees face some risk in being evaluated, including continued harassment by the government in their country of return, social stigma and humiliation, and the risk of re-traumatization. The evaluators took measures to minimize these risks by consulting with individual participants or their legal representatives regarding such possibilities. As needed and where available, the evaluators made referrals to local treatment centers for survivors of torture or other physical and mental health services.

## Limitations

The non-random selection and the small number of former detainees evaluated do not permit generalization of PHR's findings to all detainees in US custody. Nevertheless, the study provides critical insight into the experiences of individuals formerly held in US custody in Iraq, Afghanistan and Guantánamo Bay, Cuba during the

---

[24]  The Dot Counting Test is a brief instrument that assesses test-taking effort in individuals ages seventeen and older. This test is designed to detect lack of effort on cognitive measures, whether it is intentional (malingering) or unintentional (unconscious). The Dot Counting Test measures an "overlearned" skill that is preserved in all but the most severe brain injuries. Therefore a poor performance on the test suggests lack of effort. This test is highly useful in any setting where examinees have external incentives, such as personal injury litigation, disability evaluations, and criminal cases, to fabricate or exaggerate cognitive problems. Further, since this test assesses exaggeration by counting the dots on a number of cards, it is most likely least impacted by culture compared to language-based exaggeration tests. *See* MURIEL D. LEZAK, NEUROPSYCHOLOGICAL ASSESSMENT (3d ed. 1995).

[25]  World Med. Ass'n, Declaration of Helsinki: Ethical Principles for Medical Research Involving Human Subjects, World Medical Association Doc. 17.C (1964, am. 1975, 1983, 1989, 1996, and 2000), *available at* http://www.wma.net/e/policy/b3.htm.

period covered by the report. These accounts are consistent and add to the existing evidence on detainee abuse detailed in other independent human rights organizations' reports,[26] International Committee of Red Cross reports that have been made public,[27] government investigations on allegations of detainee abuse,[28] one prior case report of medical evaluations conducted on two former Abu Ghraib detainees,[29] and the 2006 report of five United Nations experts on the situation of detainees at Guantánamo Bay.[30]

It is possible that allegations of torture and ill-treatment made by the former detainees were affected by recall bias and/or intentional exaggeration or misrepresentation for personal and/or political gain. PHR could not independently investigate and corroborate all statements made by the former detainees in this report, nor assess the consistency of the detainees' accounts. Due to logistical and security reasons, PHR was unable to obtain either 1) corroboration from any of the former detainee's family members concerning post-detention health and functioning, or 2) prior medical records to determine prior history. Where possible, PHR sought to corroborate the former detainees' allegations with external sources.

The detention medical records of one individual and the independent medical evaluation of another former detainee were used to corroborate their accounts. Media sources and released US government investigations on allegations of detainee abuse were used to corroborate accounts by two other former detainees.

In all cases, the evaluators made independent determinations of veracity and credibility as part of the evaluations, which they recorded in their reports. In each of the medical evaluations, the physical and psychological evidence was found to be consistent with torture and/or ill-treatment. The evaluators used a number of methods to ascertain the credibility of reported abuses and resulting disabilities. These methods included a comparison of self-report to objective medical evidence (e.g., scarring and diagnostic test results) and analysis of psychological test data (including a measure specifically designed to detect symptom exaggeration). In each case, the clinicians, all of whom have extensive experience evaluating both torture survivors and/or individuals involved in litigation, considered the individual evaluated to be credible. There was no evidence of deliberate exaggeration in any case.

---

[26] *See, e.g.*, HINA SHAMSI, *supra* note 6; AMNESTY INTERNATIONAL, *supra* note 6; HRW NO BLOOD, *supra* note 6.

[27] INTERNATIONAL COMMITTEE OF THE RED CROSS, REPORT OF THE COMMITTEE OF THE RED CROSS (ICRC) ON THE TREATMENT BY THE COALITION FORCES OF PRISONERS OF WAR AND OTHER PROTECTED PERSONS BY THE GENEVA CONVENTIONS IN IRAQ DURING ARREST, INTERNMENT, AND INTERROGATION (2004), *available at* http://www.globalsecurity.org/military/library/report/2004/icrc_ report_iraq_feb2004.htm [hereinafter ICRC REPORT].

[28] SCHMIDT REPORT, *supra* note 6; TAGUBA REPORT, *supra* note 6.

[29] Keller, *supra* note 6.

[30] UN Guantánamo Report, *supra* note 6.

# III. MEDICAL EVIDENCE OF ILL-TREATMENT IN US DETENTION FACILITIES

The following summaries of the medical evaluations of the eleven former detainees are presented in the format of the original medico-legal evaluations and with sufficient details to illustrate the evidence on which the clinical evaluators based their conclusions regarding torture and ill-treatment. The first seven profiles are of Iraqi men who were detained at Abu Ghraib prison and, in some cases, other facilities in Iraq. The following four profiles are of men who were arrested in either Afghanistan or Pakistan, detained at Kandahar, Bagram or other locations in Afghanistan, and ultimately were brought to Guantánamo Bay, Cuba. To protect the privacy and anonymity of participants in the PHR investigation, the individuals' actual names and other identifiable characteristics have been omitted from the narratives.

## PROFILE 1: KAMAL[31]

On September 21, 2003, Kamal was arrested in Baghdad by US personnel and detained at Abu Ghraib prison. There he endured beatings, sexual humiliation, and exposure to temperature extremes. He was released from Abu Ghraib prison in June 2004. In January 2005, Kamal was arrested again by US personnel and was detained in several different prisons over the next 21 months. During this time he was not subject to any physical abuse; he was, however, occasionally deprived of basic necessities such as food, water, and access to toilets. The physical examination revealed several findings consistent with Kamal's allegations of the torture that he claimed to have experienced during his initial detention at Abu Ghraib. He now suffers from major depressive episodes, a panic disorder without agoraphobia (fear of public places or open areas), and post-traumatic stress disorder (PTSD).

*"They were spitting on me, and insulting me — holding me from my beard. They were kicking me in my chest, on my abdomen, and at one time they pulled me [up]*

---

[31] Kamal's medical evaluation was conducted by Sondra Crosby, MD and Barry Rosenfeld, PhD.

*the stairs and I have a scar on my leg [from it] ... I had a bag on my head, so sometimes they made me walk into the wall, because I could not see anything."*

### Background

Kamal, an Iraqi in his late forties, was raised in a relatively poor family. Despite having a disadvantaged start, Kamal graduated with a degree in basic sciences. He then attended military school, became an army officer in the mid-1980s, and ultimately served in the military for more than a decade. His duties included overseeing a prison and later protecting oil fields in Kirkuk, but Kamal never engaged in combat. He stated that he "escaped from the military" in the mid-1990s because he was asked to enroll in the Baath party. He recalled that the authorities "tried to arrest me many times — because of that I moved from one place to another...In the [mid-1990s] they captured me once but I escaped through a small window."

In the mid-1980s, Kamal married and now has seven children; the youngest one is four years old. Their lives were difficult after his "escape" from the army, as they were required to occasionally relocate, and were concerned that Kamal would be detained by the Iraqi authorities again. Kamal was initially quite happy when the United States invaded Iraq, hoping that he would have more freedom as a result.

After leaving the military Kamal supported his family by selling goods in a small shop. He explained that he was able to earn a sufficient income. After the American occupation began, his community offered him the honored position as the Imam of a local mosque. Kamal described taking great pride in this position, although he was ever fearful that he and his family would be arrested by the authorities.

### Allegations of Arrest and Abuse

According to Kamal, US personnel arrested him at his home in Baghdad at approximately 2:00 A.M. on September 21, 2003. "A very strong explosion took place in my home. American soldiers had put bombs in front

of my door, and they exploded my home, the kitchen, the car." Kamal was then handcuffed and his head was covered with a bag. American soldiers hit his family members and "pulled [me] in a very bad way and started hitting me in front of [my family]." Kamal recalled being taken for a short ride in a humvee. Upon arrival at Abu Ghraib, he was thrown to the ground and his head was stepped on. This attack caused bleeding from his mouth and eyebrow. He stated, "They broke one of my teeth," which later was extracted by a doctor in the tent area of Abu Ghraib. Kamal noted that he lost consciousness and eventually woke up in a cell block.

During his detention, Kamal described a range of ill-treatment. He recalled initially being taken "directly to a dark room" where he was stripped naked. The next morning "they started questioning me and the torture started... .They knew I was an Imam and they said I was provoking people against Americans." He stated that he was kept naked in a cold, dark room for the first three weeks at Abu Ghraib, and remained shackled throughout much of this time. He explained: "They were spitting on me, and insulting me — holding me from my beard. They were kicking me in my chest, on my abdomen, and at one time they pulled me on the stairs and I have a scar on my leg [from it]... .I had a bag on my head, so sometimes they made me walk into the wall, because I could not see anything."

Kamal described several assaults that caused painful injuries. He described one incident in which he was struck with a rifle in the head and right jaw while lying on the ground. On another occasion, a soldier stabbed him in the cheek with a screwdriver, causing intense pain and bleeding. In one instance an interpreter kicked him in the nose, causing bleeding. In one occasion, a soldier jumped from a table onto his right thigh; in another incident a soldier stamped on his right big toe, causing severe pain that continues to this day. Kamal was also placed in "the punishment room" several times, often for hours at a time, and has subsequently developed rashes and "allergies...because there was urine there."

Despite describing many physical beatings, Kamal pointed out that "One of the most painful things, when it got cold in November, they used to put my clothes in the water and make me put them on, and get me into my room without any blanket." He was also subjected to bombardment by extremely loud music for many hours, which resulted in pain in his ears and bleeding. He reported that he "heard the music after it was turned off" and he continues to suffer from hearing loss as a result.

Kamal stated that he was suspended in painful positions on approximately ten different occasions — often elevated off the ground and for hours at a time. Kamal described a particularly severe suspension:

*[O]ne time they took me to be questioned and there was a chain coming from the ceiling. It was a winch. They pulled me [by my wrists, from behind] and they left me for about four hours. Only my toes were touching [the floor]. I started saying to them, "It is very painful — I have a very severe headache," and after that I passed out.*

He reported experiencing numbness in his right hand for approximately one month following this suspension, and experienced pain in his shoulders and back but noted that his pain has gradually decreased.

In addition to the many forms of physical ill-treatment Kamal described, he recalled numerous occasions of sexual humiliation. During interrogations, he stated: "They intended to make me naked and show me to everyone in the rooms, and humiliate me, and say, 'This is the Imam of [...].' The same time, when they got me naked, they used to bring all [the] female soldiers to look at me and say 'Hello, Imam'." Kamal was photographed while naked, and US personnel threatened that the pictures would be displayed in his home district. Soldiers also touched his penis multiple times, causing Kamal to feel humiliated and ashamed.

Kamal was shown pictures of a destroyed home and was informed, "This is your home — we destroyed it." Kamal stated that he came to believe that his family was also in the prison, and that they were being raped and tortured. He said, "They were telling me, making me hear voices of children and women, and told me they were my children and [wife]." He also reported threats of prison dogs being used to attack him.

Kamal estimated that he was interrogated on fifteen different occasions. The interrogations were always conducted by "civilians," with the exception of one incident when he was interrogated by soldiers. When asked how he could differentiate civilians from soldiers, Kamal explained that he understood some English and was often able to understand what the soldiers and civilians were saying. He noted, "Some of the guards there did not intend really to attack us — they were ordered by the interrogators to attack us."

According to Kamal, he remained in the isolation cell for approximately two months, until November 2003. He was then transferred to the tent area of the prison for another seven months. Although he recalls no further

episodes of physical abuse, he described lasting problems as a result of the ill-treatment he suffered: "I told the guards every day I had pain in my heart. They did not do anything until after I had a heart attack. Then they took me [to] the hospital." Kamal was given medications (Tylenol, Zocor, and aspirin) after he was returned to the tents. Kamal also reported that he developed high blood pressure in prison.

Kamal was released without charge from Abu Ghraib prison in June 2004 and returned to his family. He resumed making and selling goods, but became very concerned that his wife and children were afraid of him. He began living with his sibling and only visited his family once each week because he believed his visits made them uncomfortable.

In January 2005, Kamal was stopped by Iraqi police and asked for identification. The police claimed that he failed to obey them (an allegation he denied) and he was turned over to American forces. According to Kamal, he was detained in several different prisons over the next twenty-one months but he did not report any beatings during this time. He was occasionally kept in "lockdown," where he and the other prisoners would be kept "for twenty-four hours without eating, without drinking, [and] without going to the toilet." He was also insulted by soldiers and guards. He was released from prison for the second time in October 2006.

Kamal was evaluated two months following his most recent release from prison. At that time, he had not yet resumed work. He explained, "When I got released again...I was not concerned about [my business]. I was a very ambitious man but I am not interested in that any more." He added that he continues to believe that his family is afraid to be with him, and would like to take his family out of Iraq but does not have sufficient resources to do so.

## Medical Evaluation

### Assessment of Physical Evidence

The physical examination revealed several findings consistent with Kamal's allegations of torture. His appearance was noteworthy for a missing right upper incisor. He has a lesion anterior to his right ear consistent with a healed cut from a sharp-edged instrument, and an indentation before the left ear consistent with a healed puncture injury, which is consistent with Kamal's description of being stabbed with a screwdriver in his cheek by a soldier. Kamal also has a scar on the nose

consistent with a healed laceration resulting from being kicked on the nose. The hyper-pigmented (i.e., darker than the surrounding skin) flat lesion on his knee is consistent with a healed laceration, such as Kamal's falling on a stair while being forced to walk shackled and blindfolded. Further, a large area of palpable tenderness on his right anterior thigh is consistent with the injury caused by a soldier jumping on Kamal's thigh. A lesion on the right hand and the small hyper-pigmented, linear lesion on the left ankle are consistent with scars from shackles. The enlarged and irregular inter-phalangeal joint on the left big toe is consistent with the injury he described in which a soldier stepped on his toe, causing significant pain. Kamal had physical evidence of nerve injury, which can occur due to the suspension from his arms that he described. Finally, there was evidence of a prior jaw injury consistent with Kamal's claim he was struck with a rifle.

*Medical Diagnostic Tests*: Bone scan findings of Kamal's ankles are consistent with the repetitive blunt trauma that often occurs when walking while shackled. An electro-cardiogram revealed some nonspecific ST-T wave changes, but no evidence of a prior myocardial infarction (heart attack). A troponin test (blood test that determines whether patient had a heart attack) was also negative, which in the presence of Kamal's report of chest pain on the evening prior to this evaluation, suggests that these episodes of chest pain are more likely to be psychogenic (caused by the mind or emotions) than cardiac in origin.

### Assessment of Psychological Evidence

Kamal described himself as depressed and spontaneously articulated numerous depressive symptoms such as feelings of guilt, worthlessness, and hopelessness. He reported having lost interest in many of the activities that he previously enjoyed, such as his work, and described a lack of energy and a general feeling of sickness and listlessness. He also reported a diminished appetite and difficulty sleeping, including waking up frequently. He reported frequent intrusive thoughts about the sexual humiliation he experienced and noted that he is unable to distract himself from these thoughts. He reported frequent thoughts of revenge, but denied any specific intent to harm others. He also denied suicidal or homicidal ideations, and denied hallucinations or bizarre, unrealistic beliefs (delusions), although his perception that his family is afraid to be with him may reflect paranoia.

*Psychological Tests:*[32] On the self-report measures administered, Kamal reported numerous symptoms of severe depression, PTSD, anxiety, and disturbed thinking and paranoid ideation.

## Analysis and Conclusions

Kamal's clinical presentation, reported history of abuse, and the results of psychological testing support the presence of several psychiatric diagnoses including major depressive episodes, a panic disorder without agoraphobia, and PTSD. Particularly striking is the severity of Kamal's depressive symptoms. Indeed, the extent of Kamal's depressive symptoms is suggestive of an extremely severe depressive disorder that, in the United States, would warrant psychiatric hospitalization. In addition, Kamal described a number of symptoms indicative of intense anxiety, including occasional panic attacks characterized by chest pain (typically triggered by thoughts about his past experiences and resulting anger) accompanied by shortness of breath, tingling in his hands and feet, and numbness. Although the latter symptoms are confounded by Kamal's report that he had a heart attack while incarcerated at Abu Ghraib, his description of subsequent "attacks," as well as the results of electro-cardiographic and troponin testing, suggest that his symptoms likely reflect a panic disorder rather than a cardiac condition. This disorder likely emerged during his incarceration, although a cardiac condition cannot be excluded on the basis of this evaluation. Finally, Kamal described numerous symptoms indicative of PTSD, including intrusive thoughts and memories of the traumatic events (particularly the sexual humiliation), as well as avoidance and emotional numbing behaviors (e.g., anhedonia, feeling estranged from others), and hyperarousal symptoms (e.g., sleep and concentration difficulties, anger).

The results of the history and physical examination also indicate that Kamal has persistent pain and physical symptoms that he attributed to the injuries he sustained during his arrest and detention at Abu Ghraib. Kamal describes his physical health since release from Abu Ghraib: "I always feel I am sick." He described left arm numbness, chronic headaches, and persistent pain in his right thigh and right toe. He also reported hearing loss, which he believes is from the loud music he was forced to listen to in Abu Ghraib, as well as jaw pain, espe-

cially when he chews. Many of the specific pains Kamal reported, and his description of the abuse that caused these injuries, were supported by findings from the physical examination. Although scarring is usually non-specific in nature (i.e., the details of the injury cannot be determined by the appearance of the scar), the observed scars are all consistent with the injuries he described. Other pains, however, such as chronic headaches, are of unknown etiology, although chronic headaches may occur as a result of head trauma. In addition, symptoms may be psychological in nature (i.e., somatic), as many individuals who have experienced severe trauma report physical complaints that have no identifiable organic basis. Other reported injuries, such as his complaint of lasting hearing loss, could not be reliably evaluated without additional testing (e.g., audiogram, evaluation by an otolaryngologist) that was not *available at* the time of this evaluation. However, his report of hearing loss is consistent with the effects of exposure to loud noises. In addition, his muscle weakness is consistent with nerve damage from suspension.

Numerous indicators support the veracity in Kamal's report of the physical and psychological repercussions from his ill-treatment. A test specifically designed to detect psychological symptom exaggeration revealed no such exaggeration and, in combination with the observed consistency between the physical examination and his description of physical ill-treatment and/or observable scarring, supports his credibility.

In conclusion, based on the available evidence, Kamal appears to have suffered severe and lasting physical and psychological injuries as a result of his incarceration and treatment at Abu Ghraib prison.

## PROFILE 2: HAFEZ[33]

On November 19, 2003, US soldiers raided Hafez's house in Baghdad and arrested him, detaining and interrogating him first at the Baghdad Airport and then at Abu Ghraib prison over the course of seven months. Hafez was subjected to stress positions, sexual abuse, sensory deprivation, isolation, and sexual humiliation, among other torture techniques. The physical examination found persistent physical symptoms due to the injuries he sustained in detention. Further, Hafez is suffering from post-traumatic stress disorder as a result of his arrest, incarceration, and related ill-treatment.

---

[32] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

[33] Hafez's medical evaluation was conducted by Sondra Crosby, MD and Barry Rosenfeld, PhD.

*"[A]fter that they hanged me. There was some kind of machine — a winch — that pulled me up [by my arms] after each question...and because of this torture, I lost consciousness two times...and when I lose [consciousness] they pour[ed] cold water on me and go on questioning me."*

## Background

Hafez, an Iraqi man in his fifties, was born to a middle-class family. He completed two years of university but withdrew from school before obtaining his Bachelor's degree because he needed to support his family. He worked in a managerial capacity at a company for twenty years preceding the American occupation. He stated that this position allowed him to avoid mandatory military service. Although the business at which Hafez worked has been destroyed after the US-led invasion of Iraq, Hafez explained that, "like other Iraqis," he continues to receive his salary.

Hafez is married with four children, the youngest of whom is thirteen years old, and has two grandchildren, all of whom are living in the same household. He attributed this living situation to "the bad circumstances that we live in." Hafez stated that he has never received mental health treatment prior to or since his arrest and incarceration. However, he noted that he felt a profound "sadness" after his father and best friend were "killed by the Americans" in the 1991 Gulf War. Despite feeling depressed as a result of these losses, he was still able to work and fulfill his family obligations, including helping to provide for his deceased friend's family.

Although Hafez described himself as generally healthy prior to his incarceration, he noted that he was badly injured during a 1998 bombing of the company where he worked, which he attributed to the American military. His injury required several surgeries and a few months of hospitalization. He described suffering from chronic lower leg pain, which required taking daily medication, but stated that these problems have been stable for several years.

## Allegations of Arrest and Abuse

After midnight on November 19, 2003, US personnel raided Hafez's house in Baghdad and arrested him. He stated that "my home was bombed.... Everything in my home [was] broken — the doors, the windows, parts of the walls." The soldiers "were hitting everyone who [stood] in front of them ... One of the soldiers hit [my wife] on the head with his gun." He reported that his wife currently suffers severe damage to her vision as a result

of this attack. He added that the soldiers stole all of the money and valuables they had: "they took everything they could find...and what remains...they destroyed."

A plastic mask was then placed on Hafez's face; he was handcuffed and taken to the Baghdad airport where, he stated, "My miserable life started." He reported being held and interrogated in a "small room" for approximately four to five hours. He stated he was questioned about his political involvement and what he knew about al-Qaeda. He remembered being forced down onto the soil and being beaten severely on his legs and back by the interrogating soldiers, which caused his lips, forehead, and nose to bleed. He stated that he thought he would lose consciousness. He reported having been stripped and that his chest and pubic hair were ripped out by hand. He added that, simultaneous to these abuses, "Others were beating, hitting, and trying to choke me ... [Also] they were putting very cold water on me."

In addition to repeated beatings, Hafez reported that the soldiers pulled his penis and testicles, causing severe pain. He recalled being threatened with a hammer and was told, "We can break your head." A soldier pushed his hands into Hafez's ribs very hard, causing severe pain and shortness of breath. He stated, "After that they hanged me. There was some kind of machine — a winch — that pulled me up after each question...and because of this torture, I lost consciousness two times... and when I [lost consciousness] they pour[ed] cold water on me and [went] on questioning me." He noted that his shoulder was dislocated as a result of being suspended. He also reported losing feeling in his arms while being suspended, and the numbness persisted for approximately three months afterward. Hafez also described a sharp puncture to his left foot that felt "like a needle." He described the room as severely cold and felt like "his heart stopped."

Hafez recalled that during this initial interrogation, someone who may have been a doctor examined him. He stated that this individual "checked my heart and blood pressure." In addition, the doctor tried to put his shoulder "back in its place" without providing him with pain medication, a procedure that Hafez described as "very painful." He added that when the doctor had finished treating him, "I heard the doctor say 'continue' [to the interrogators]."

After several hours of torture and interrogation at the airport, Hafez said he was taken to Abu Ghraib prison. When asked to describe his treatment at Abu Ghraib, Hafez replied, "[At Abu Ghraib] the torture stopped, but they started trying to affect me psychologically. I was in a very dark and small room [measuring approximately 1.5

by 2 meters] and I was totally [naked]. And the weather was very, very cold — and you don't have any blanket or clothes to wear and I was sitting on the ground. And you don't know what is there on the ground and you don't know where you were, and there was very scary silence. The only thing you can hear is the voices of those who have been tortured at that time — screams and cries."

During this time in isolation, he reported suffering considerable pain from the previous physical abuse, including frequent headaches, back and knee pains, mouth pain, and trouble closing his mouth completely because of a punch to the jaw. Hafez recalled that, due to these injuries, he was unable to eat or drink for about seventeen days. He acknowledged that because he was kept in complete darkness and isolation, his only record of time passing was based on listening to the prayer calls, creating the possibility that he was confused as to the amount of time he refused food and water.

Hafez recalled having been interrogated three times while he was kept in the isolation cell at Abu Ghraib. The first interrogation reportedly occurred after about two weeks of his incarceration and lasted about thirteen hours. He explained, "The interrogators asked me the same questions, without hitting, but they were dealing me very bad — insulting me, speaking in a bad way with me." He recalled that a Lebanese translator "asked the interrogator to come out from the room and he started offering to help me." The "civilian" interpreter offered him water, clothes, blankets and a bed if he cooperated, but threatened that if he refused to assist them that he would be taken to "Guantánamo — [where] you will never see your family again." Hafez recalled being given a blanket and clothing after the end of this first interrogation.

Despite the reported ill-treatment and deprivation, Hafez stated that he received medical attention shortly after arriving at Abu Ghraib. "[The doctor] helped me ... he told the soldiers, 'If you go on torturing him in this way, he will die.'" Hafez recalled that the person whom he perceived to be a doctor "tried to put [my arm] in its place," and "periodically came to me... [and] look[ed] after my health." On several occasions he was given injections to his arms and a sublingual medication that was helpful in relieving some of the pain he suffered.

After an estimated twenty-two days in isolation, Hafez recalled being transferred to another part of the prison for an additional thirteen days where, although he had no further interrogation or ill-treatment, he felt threatened since he did not have a prisoner identification number and "expected to be killed." He was subsequently transferred to the tent area of the prison.

Hafez remained in Abu Ghraib for a total of seven months and was subsequently released without charge. He reported suffering from many physical problems at the time of his release including "a kind of swelling" in his genitals. He attributed the swelling to both "the torture" he had experienced and because he was forced to wear "one suit [for] seven months," which did not fit well and was filthy. He reported experiencing "swelling" in the anal area that required surgery.

Hafez reported that he sought medical and mental health treatment following his release from prison, including "heart doctors, and internal diseases doctor," and he received medication for "my broken bones...and psychological medicine — Valium." However he rarely took the Valium since he was depressed and felt that the medication increased his depression.

When speaking about his release, Hafez broke into tears and described, "After I got out, I found my home totally broken. I found my wife blind, and my children are not good at their [schoolwork] any more. No one could look after them well — no one helped them. They were very poor, they were desperate. They even could not find a door that could close the home — for three months our home was open." Hafez added that since being released, he has relocated from his home.

## Medical Evaluation

### Assessment of Physical Evidence

The physical examination revealed several findings consistent with Hafez's allegations of torture, including: two small lesions on the center and left of his forehead that are consistent with blunt trauma to the head, as he described occurring during his arrest; an asymmetrical left nasal bridge that is nonspecific but could be due to blunt trauma to the nose; diffuse lower back pain that is consistent with the history of beatings to the back; a circular lesion on Hafez's foot that is consistent with a puncture wound, as he described occurred during his interrogation. Further, the medical examination revealed right shoulder pain to range of motion and limited internal rotation that is consistent with a shoulder injury resulting from suspension, as he described. The scarring of Hafez's anus is highly consistent with a prior injury or surgery to the anus.

*Medical Diagnostic Tests*: Radiographic test results (plain films of the nasal bones, right knee and right shoulder) were unremarkable, with no evidence of fractures.

### Assessment of Psychological Evidence

Hafez was calm and cooperative with the evaluation, but became visibly upset (openly crying) when discussing

past experiences such as the death of his close friend. He described himself as "depressed." Hafez reported feeling emotionally numb much of the time and thinking about his experiences during imprisonment "constantly," referring to both the physical ill-treatment as well as the losses his family has suffered. He reported continued difficulty sleeping, noting that he re-experiences these traumatic events both in his dreams and while awake. He added that he has moved from his home "because my home reminds me of what happened." He described avoiding thoughts and reminders of his incarceration and only speaking about his experiences infrequently to close friends. He reported fatigue, as well as problems concentrating and thinking, diminishment in appetite and sexual functioning, and decreased pleasure in daily activities, in addition to general nervousness and anxiety. He stated that he becomes particularly distressed when he observes the American soldiers in Baghdad, although he denied any specific fear of being re-arrested. He was alert and oriented to person, place and time, and his memory and concentration were grossly intact upon formal examination.

*Psychological Tests:*[34] On the self-reported psychological measures, Hafez demonstrated severe depression; many symptoms of somatization (e.g., dizziness, nausea, numbness); and many PTSD symptoms. He did not exhibit symptoms of avoidance or emotional numbing. In sum, findings from the self-report questionnaires indicated the presence of considerable psychological distress consistent with diagnoses of depression, PTSD, and somatization disorders.

## Analysis and Conclusions

Hafez's clinical presentation, reported history of trauma, and the results of the psychological testing support the presence of several psychiatric diagnoses including a major depressive episode, PTSD, and a probable somatization disorder. The last diagnosis, however, must be considered tentative given the possibility that some or many of his reported physical symptoms (e.g., persistent pain) may result from a genuine organic pathology. However, other symptoms (e.g., persistent nausea, frequent headaches, rashes) may well reflect underlying psychological distress suggestive of a somatization disorder rather than a physical disorder.

Hafez described a number of symptoms indica-

tive of the presence of a major depressive episode of moderate severity. The depressive symptoms appear directly related to the multiple traumatic experiences he described. Although Hafez reported previous depressive feelings, particularly around the death of his father and close friend in 1991, he denied having any significant difficulty functioning at that time and described far more severe symptoms at present. However, it is not possible to conclusively determine the extent to which his depressive symptoms are the result of his arrest and incarceration experience versus the impact of other stressors he described (e.g., his wife's blindness due to head trauma, his children's increased behavioral problems, his loss of income and deteriorated lifestyle). Hafez's reported PTSD symptoms, on the other hand, appear clearly linked to his arrest, incarceration, and related physical maltreatment.

The medical history and physical examination also support Hafez's report of persistent physical symptoms due to the injuries he sustained after his arrest and initial interrogation. Hafez described chronic daily headaches and diffuse musculoskeletal pain. In particular, he reported significant right shoulder pain and functional impairment. Such chronic shoulder pain can result from suspension from the arms and subsequent injury to the joints, muscles, and ligaments. Likewise, although many of Hafez's scars are nonspecific (i.e., the cause is not clear), they are consistent with the abuses he described (i.e., blunt trauma to the head and nose, and a puncture wound to his foot during his arrest and interrogation).

Since his arrest and detention, Hafez also described sexual dysfunction ("sexual ability [is] gone"), difficulty breathing, and frequent rashes. Sexual dysfunction is common in survivors of sexual trauma, and can be due to both physical and psychological factors. Similarly, it is not uncommon for people who have been traumatized to have multiple physical complaints without an organic basis (somatization). Although it was not possible to determine whether some of Hafez's symptoms (e.g., difficulty breathing, rashes) are organic versus psychological, they are all symptoms that are consistent with traumatic experiences.

Although there is no way to determine the veracity of Hafez's report of torture and resulting physical and psychological symptoms with absolute certainty, numerous indicators support Hafez's credibility. His performance on a test specifically designed to detect psychological symptom exaggeration in combination with the observed consistency between the physical examina-

---

[34] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

tion and his description of physical ill-treatment as well as his ready acknowledgement of prior traumatic experiences and physical consequences, strongly support the credibility of his self-report. It is possible that Hafez's recollection of not drinking or eating for seventeen days in Abu Ghraib was a product of the sensory deprivation, pain, and confusion he experienced there rather than any deliberate desire to exaggerate the extent of his suffering.

In conclusion, the physical and psychological evidence demonstrate that Hafez continues to suffer from considerable physical and psychological pain as a result of his experiences during his arrest, incarceration, and interrogation while in US custody.

## PROFILE 3: LAITH[35]

Laith was arrested in October 2003 and was released from Abu Ghraib in June 2004. During his imprisonment he was subjected to sleep deprivation, electric shocks, different forms of suspension, threats of sexual abuse to himself and family members, and other forms of abuse; the evaluators suspect that he was also subject to sodomy. As a result of his arrest and incarceration, Laith is currently suffering from lasting physical and psychological injuries including major depressive episode, PTSD, and alcohol dependence.

*I was in handcuffs and they poured the urine [into my mouth] and sometimes I vomited from that but when I vomited they kept on pouring [the urine] on my head ... I died at that time."*

### Background

Laith is an Iraqi man in his mid-forties, who was born to a poor family. He has three wives, two of whom remain in Iraq and one who currently lives with him in another country. He has several children from his first marriage.

Laith helped his father care for his younger siblings, and also graduated from secondary school and university. He joined the military soon after. He described his work as extremely dangerous due to the state of continuous conflict with Iran. He sustained multiple injuries during his service and frequently feared that he would be killed. For example, Laith described several gunshot wounds sustained during different conflicts that have occurred since the 1980s. He also reported incurring significant shrapnel injuries when the car in which he was riding

was hit by an Iranian rocket in the mid-1990s. He stated that this injury required prolonged hospitalization and multiple surgeries. Despite these numerous injuries, Laith expressed considerable pride in his accomplishments and described himself as a fierce fighter who would give his life for his country.

Laith noted that he became increasingly frustrated by unfair government policies, such as the execution of citizens without just cause, and began speaking out against these actions. He was eventually arrested by the Iraqi government and sentenced to nearly two decades of imprisonment, although he described this punishment as comparatively lenient given Iraqi law. He was incarcerated for approximately eighteen months, during which he reported being humiliated in interrogations. However, he denied physical ill-treatment. He was released in 2002, when Saddam Hussein granted amnesty to prisoners in the hopes that they would help "defend Iraq." He noted that he joined the military, "I went to defend [Iraq] strongly, and with braveness. And I do not regret that, because I was not defending Saddam Hussein, I was defending my country."

### Allegations of Arrest and Abuse

Laith was living in Baghdad with his second wife and children when US soldiers arrested him at 1:40 A.M. on October 19, 2003. His house was surrounded and he recalled being surprised when the American soldiers exploded the doors since he had turned on the light when he saw the humvees arrive. He stated, "My wife and children started screaming; the glass [windows] was broken, and they forced us to lie down on the [broken glass]." He recalled that he was forced to walk on broken glass and that glass shards became embedded in his feet, remaining there for many months, including throughout his incarceration at Abu Ghraib. Laith remembered that he and his wife and children were all handcuffed behind their backs, and the soldiers started kicking and beating him with their guns. "I cannot remember all the details of that night, but I remember that I was swimming in blood." Laith's wife and children were also beaten. He believed that the beating caused his wife, who was four months pregnant at the time, to have a miscarriage. Soldiers placed bags over the heads of Laith, his wife and children, removed them from their house, and "then they exploded the home."

Initially Laith recalled being taken to a home in Baghdad where he was "question[ed] until the morning. And they did torture to me — the torture was very, very bad." During that time, Laith reported being hooded,

---

[35] Laith's medical evaluation was conducted by Sondra Crosby, MD and Barry Rosenfeld, PhD.

having his hands and legs tied with chains, and being in pain because of the cuts from the broken glass in his feet. His Deshdasha (traditional floor-length white robe) was removed, leaving him in his underwear. He reported being kicked "whenever I had fainted or fell asleep." He was told that he should write his will because, one of the interrogators said, "after two hours you will be executed." Throughout this preliminary interrogation, Laith recalled bleeding from his nose, mouth and legs.

Laith was transferred to a second location, possibly an airport. He could not ascertain the length of time that elapsed or his actual location since he was continuously hooded for about three days. He was detained inside "a dark, closed room;" his hands and feet were tied; he was dressed only in his underwear with a hood covering his head; and he was periodically beaten and kicked. He recalled that in one incident, "They took off even my underwear. They asked me to do some movements that make me look in a very bad way so they can take photographs….They were trying to make me look like an animal." He stated that his genitals were touched "in a very humiliating" manner and probed with a "stick with electricity" and added that electric shocks were administered to his "private parts." He described these shocks as "painful, but not very much."

Laith described his subsequent imprisonment at Abu Ghraib as being "divided into two periods." The first lasted for approximately thirty-five to forty days, during which time he was kept in isolation, in a dark cell approximately 1.5 by 2.5 meters in size. This room was "a cage, and inside this cage there is another cage." According to Laith, at times he was forced to stay inside the smaller cage.

Laith's brother was also imprisoned at Abu Ghraib, and interrogators "wanted me to see my brother [being] humiliated like me…I saw his head bleeding …his hand broken … He was naked …with a piece of fabric covering his private parts." He added, "They were expecting me to lose all my strength when I [saw my brother's condition]…and to further distress my brother…[to demonstrate] that the Americans control everything." Laith remembered being punched when he tried to communicate with his brother.

While in isolation, Laith was interrogated for about eight hours at a time and reported being beaten by fists and kicked frequently. However he noted, "They were not trying to [get] information…They were only trying to humiliate me." He recalled having been spit on and his chest burned with a cigarette. He described one incident when his hands and legs were shackled and he was thrown into a muddy puddle of water about ten centimeters deep. He added that he was kept "naked

in these days [of isolation]…Only the last three days they gave clothes."

According to Laith, he was also suspended in the cage and was forced to spend many hours with one arm elevated and another tied to his ankle, or chained to a bed with his arms and legs splayed apart. In another stress position, his arms were suspended up behind him, his feet were raised off the ground and he felt that his "arms came out of place." He occasionally fainted during these suspensions, waking up on the ground. He recalled that a medical person "put my arms back in place and gave me [an] injection." The suspensions "caused a lot of pain" and Laith experienced numbness in his arms for two to three hours after each session. He explained that his hands were weak and he was "unable to hold even a glass of water" after the suspensions. He estimated that the "free suspension" (i.e., when he was elevated above the ground by his arms) occurred "not less than four to five times" but added, "If you ask me about being chained to the window [standing], it was every day. They were especially doing that at night, to prevent me from me sleeping." He added that dogs were brought to frighten him while he was suspended, and he often received scratches on his hands and arms but was not bitten.

Laith also described receiving hard slaps over his ears, causing considerable pain, and being forced to dance with loud music playing, resulting in ringing in his ears for several weeks afterwards.

While Laith described these episodes as extremely painful, he said the most "painful" experiences involved threats to his family. He explained that "they were threatening me, saying they will bring [my] mother and sisters [here] and . . . rape them. And they asked me, 'Have you ever heard voices of women in this prison?' I answered 'yes.' They were saying, 'Then you will hear your mothers and sisters when we are raping them.'" He recalled telling the soldiers, "Do whatever you want to me but don't touch my mother or sisters. They are women." Laith reported that he believed that the voices he heard were his family members.

He also recalled having been forced to wear soiled underwear, often for weeks or months at a time. "I had diarrhea and I was in handcuffs. I was making my toilet in my underwear and I was very dirty. That was very painful." He reported being denied medical attention for any of his injuries. When he asked to see the doctor he was told that "we brought a medicine to you.'" Laith explains that, in fact, "They brought to me bottles [of] urine and [they] told me if you do not drink these now we will bring your mother and sisters. Because I was hearing the voices of

women and children, I [believed him and] drank it. I was in handcuffs and they poured the urine [into my mouth] and sometimes I vomited from that but when I vomited they kept on pouring [the urine] on my head … I died at that time — after that I could not eat anything." He said that he was forced to drink urine from the soldiers on eleven different occasions.

Laith described being threatened with sodomy on several occasions but said he was not sodomized. He recalled a soldier that "had a stick in his hand [that he] was trying [hard] to insert in my [anus]…but I was saying that I will kill myself if you do these things" and screaming loudly "like crazy people," which in his view may have prevented him from being raped. He added that the soldiers took many photographs of him in humiliating positions.

Laith reported that the second period of his imprisonment lasted for seven months, where he was kept in an overcrowded tent with dozens of other prisoners. He denied any further abuse during this time but described being "punished as a group", including incidents when the detainees were forced to leave the tent to remain in the cold without blankets and being refused permission to go to the toilet to the point that "some of the prisoners were peeing in their clothes."

Laith was diagnosed with diabetes shortly before his release from Abu Ghraib and is currently being treated with medication. He was released from Abu Ghraib on June 24, 2004 without charge. Laith immediately left Iraq for another country, fearing re-arrest. After his relocation, he described feeling "very, very nervous … Sometimes I would hit the window, to break it." He added, "After I got out from the prison, I started drinking a lot — every time I was always feeling that I want to get rid of these pictures from the prison that I have in my mind…I cannot sleep without alcohol or some Valium."

Laith has been in another country for much of the past two years, living with his third wife. He does not have permanent residency in this country, and therefore must leave the country every few months to re-validate his visa. He noted that he spends most of his time alone, drinks alcohol as much as possible, does not work, and described himself as "a housewife" because of his inability to support himself.

## Medical Evaluation

### Assessment of Physical Evidence

The physical examination revealed several findings that are consistent with the musculoskeletal trauma that Laith described during beatings at Abu Ghraib.

There is fullness and crepitation (a common finding in osteoarthritis, which can be caused by trauma) at the right lateral knee, which is consistent with trauma to the knee, and diffuse musculoskeletal pain in the upper and lower back and in both legs consistent with prior trauma such as the repeated beatings Laith described having sustained during his arrest and detention at Abu Ghraib. The irregular lesion below the right tibial tuberosity and the small round hyper-pigmented lesion above the right medial malleolus (rounded protuberance on inside of the ankle) are consistent with scarring from lacerations, as Laith described having occurred during his beatings while at Abu Ghraib. The scars on the right wrist, on the dorsum of both hands, on the left hand, flexor surface at the base of the left thumb, and on the right heel are consistent with cutting wounds, which Laith described as occurring when he was dragged and cut, possibly with glass. Although Laith maintained that he was only threatened with sodomy, the physical examination revealed scarring at both the inferior and superior poles of the anus. These lesions are highly consistent with scars that would result from attempted or actual penetration of the anus with an object, as Laith described occurred to others at Abu Ghraib. There is a two centimeter-wide irregular flat area of slight hyper-pigmentation anterior to the left ear that is consistent with a healed abrasion that could have resulted from being dragged, which Laith reported occurred at Abu Ghraib prison. There were no visible cigarette burn scars on his chest, although it is probable that this injury healed with scarring if the injury was superficial. Examination also revealed multiple findings that were, based on Laith's report, unrelated to his arrest and incarceration at Abu Ghraib.

*Medical Diagnostic Evidence*: A bone scan revealed uptake in the right mandible, in the medial right tibia, and in both ankles and feet, which are findings consistent with injuries sustained from walking when shackled for a prolonged period. The findings in the right mandible could be consistent with either blunt trauma or prior dental infections. The findings regarding his medial right tibia are consistent with prior trauma to the right knee.

### Assessment of Psychological Evidence

Laith reported no previous history of psychiatric illness and reported that prior to his detention in US custody he drank alcohol only sporadically and in small quantities. By contrast, Laith described himself as being extremely angry and depressed most of the time after his release. His affect during the evaluation was varied and appropriate to topic, smiling at times while at other times he

seemed on the verge of tears. He endorsed a number of symptoms indicative of depression, anxiety, and PTSD, including insomnia, diminished appetite, and concentration difficulties. He reported feelings of worthlessness because of his inability to work and care for his family. He denied thoughts of suicide, but expressed homicidal ideation towards one of the men who had interrogated him in prison. In addition to periodic nightmares, Laith described frequent intrusive thoughts about the abuses he experienced in Abu Ghraib prison and stated that, although he tries to avoid thinking about these events, he is unable to do so.

He stated that he feels upset whenever he sees soldiers ("anything that relates to the military bothers me and upsets me — uniforms [and] buildings bother me") and attempts to avoid places where he might encounter soldiers. He added that he occasionally experiences heart palpitations that he characterized as psychological in nature and noted that he has frequent gastrointestinal discomfort. He reported daily headaches and described occasionally severe headaches that require analgesic medication, as well as pain in other parts of his body that he attributed to his prison experiences.

*Psychological Tests:*[36] On the self-report measures administered, Laith endorsed numerous symptoms of depression, PTSD, and paranoia. His responses to the Beck Depression Inventory (BDI) were indicative of a severe level of depression, and were well above the threshold typically used to identify a major depressive episode. He also reported a number of vague somatic symptoms (e.g., dizziness, nausea, numbness) that often reflect psychological distress rather than physical illness and that often occur in the context of PTSD.

## Analysis and Conclusions

Laith's clinical presentation, reported history of trauma, and the results of psychological testing support the presence of several psychiatric diagnoses including major depressive episode, PTSD, and alcohol dependence.

Laith's symptoms support the presence of a major depressive episode. In addition, Laith endorsed all three elements of PTSD diagnosis, including frequent intrusive images, recollections, and nightmares, amnesia with respect to periods of his traumatic experiences in Abu Ghraib, and avoidance behavior. He displays severe hyperarousal symptoms, such as irritability, sleep diffi-

culties, and hypervigilance. He also described occasional chest pain ("a stab in his heart") that he attributed to psychological origin, but denied other symptoms of panic disorder. Laith reported a dramatic increase in his alcohol use, stating that he has been drinking alcohol on a daily basis and feels irritable and uncomfortable, with hand tremors and jitteriness, when he wakes in the morning.

Laith's report of multiple traumatic events prior to his arrest and incarceration at Abu Ghraib complicates assessment of the origin of these psychological symptoms. He acknowledged having been shot multiple times while serving in the Iraqi army, and reported a prior period of incarceration prior to US occupation. However, the content of his intrusive memories and avoidance behaviors focused primarily on his experiences at Abu Ghraib, which suggests a clear link to his experiences at Abu Ghraib prison. In addition, Laith adamantly denied any prior periods of depression or PTSD symptoms, and claimed that he previously drank alcohol only sporadically and in small quantities. Indeed, he stated that these symptoms emerged only after his incarceration at Abu Ghraib, suggesting that these experiences may have caused the symptoms he revealed. In fact, while his prior traumatic experiences may have left Laith more vulnerable to the subsequent traumas he described (which is a common finding in the PTSD research literature), there is no evidence that he suffered from significant psychological distress prior to this incarceration.

The results of the history and physical examination support the conclusion that Laith has experienced persistent medical symptoms due to the injuries he sustained during his arrest and detention at Abu Ghraib. Laith described his physical health as "bad" since his release from Abu Ghraib prison, and he reported chronic pain in his neck, legs, right shoulder, and feet, all of which he attributed to injuries sustained during his incarceration (from beatings, suspension by his arms). He reported chronic headaches, sometimes two or three times a day, since his release from Abu Ghraib and denied suffering from headaches prior to his imprisonment. He also described constipation, occasional blood with his bowel movements, sexual dysfunction, and feeling that his stomach is upset and "full of gas" daily. Many of these symptoms (chronic headaches, musculoskeletal pain, chest pain, and abdominal pain) are common physical sequelae of persons who have suffered multiple beatings to the head and body, suspensions, forced stress positions, and sexual trauma. For example, chronic shoulder pain can result from suspension from the arms

---

[36] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

and subsequent injury to the joints, muscles, and ligaments. Sexual dysfunction is also common in persons who have experienced sexual trauma, and can be due to both physical and psychological factors. In addition, it is not uncommon for those who have been traumatized to have multiple physical complaints without an organic basis (whether due to somatization or other, psychological causes such as depression).

Although it is not possible to determine the injuries that caused Laith's scars, the observed lesions and reported injuries are consistent with the injuries that he described. For example, his report of experiencing arm numbness and weakness following the suspension by his arms ("Palestinian suspension") is highly consistent with a brachial plexus (network of spinal nerves supporting the arms and shoulders) injury that often results from this type of suspension. Perhaps most important are the anal scars that were observed. Not only are these scars highly consistent with anal trauma (i.e., as would result from forced sodomy or penetration with an object), these scars are in a location where accidental injuries would not occur. Thus, these scars raise the possibility that, despite his denial of anal penetration, Laith may have actually under-reported the extent of the sexual trauma he experienced.

Numerous indicators support the veracity in Laith's report of ill-treatment and physical and psychological repercussions including (but not limited to) his performance on a test specifically designed to detect psychological symptom exaggeration. This finding, in combination with the observed consistency between the physical examination and his description of physical ill-treatment, as well as his failure to endorse many psychological symptoms strongly support the credibility of his self-report. In fact, the findings regarding possible sexual trauma suggest that Laith may have actually diminished the severity of trauma that he experienced, particularly given his claim that he was not sodomized because of his objections. In addition, Laith readily acknowledged that many of the injuries he has suffered and multiple traumatic experiences pre-dated (and were unrelated to) his arrest and incarceration.

In conclusion, based on the available evidence, Laith appears to have suffered severe and lasting physical and psychological injuries as a result of his arrest and incarceration at Abu Ghraib prison. His description of acute symptoms (e.g., physical pain) during his arrest and incarceration, as well as chronic physical and psychological symptoms since his release, is consistent with the trauma he reported, and many are supported by observable physical findings.

## PROFILE 4: YASSER[37]

Yasser was arrested by the US military in Baghdad on October 13, 2003. While held at Abu Ghraib prison Yasser endured sexual assault, beatings, stress positions, long-term isolation, and electric shocks. He was released from Abu Ghraib in February 2004. Medical findings are consistent with Yasser's allegations of electric shocks and other traumatic experiences. He now suffers from major depressive disorders and PTSD.

*"I felt that my eyes would go out or blow, and I feel my teeth, and one time I bit my tongue... When they shock you with electricity it feels like your eyes will explode."*

### Background

Yasser is in his mid-forties and reported that his father was a "simple farmer." He was raised in a big family, completed secondary school, attended an Islamic university, and eventually became a teacher. In the late 1990s, he changed his career and became a farmer. According to Yasser he was a respected member of the community; people sought his help in resolving social disputes and family problems and considered him a "wise man." He recalled many accomplishments during this period and describes it as "the best days of our lives."

Yasser noted that his only significant traumatic experience prior to his incarceration by the American military occurred in the early 1990s, when he was arrested and detained for seven months by the Iraqi government because he had joined a group that sought to "help the poor people." He explained that his incarceration was "difficult...sometimes they hit us, punch[ed] us...but not difficult after what we saw with the Americans." Yasser maintained that he does not suffer from any significant or lasting problems resulting from this incarceration.

Yasser reported a severe injury to one of his upper extremities for which he was hospitalized and had surgeries. Yasser reported that due to his detention in Abu Ghraib, he lost the opportunity to repair his injury and now suffers permanent disfigurement and functional impairment.

### Allegations of Arrest and Abuse

Yasser was arrested by the US military on October 13, 2003. He described being "surprised by two Hummers and one tank" in the parking lot of the mosque he

---

[37] Yasser's medical evaluation was conducted by Sondra Crosby, MD and Barry Rosenfeld, PhD.

attended in Baghdad. He was handcuffed behind his back, blindfolded with a hood, placed in one of the trucks, and subsequently transferred into the tank. In the tank the soldiers made him lie down and put their feet on his back. Yasser then was taken to an "old military area" in the El Amrea region of Baghdad and was detained in "a garage for . . . vehicles, surrounded by the fences." He was transferred to Abu Ghraib on October 15, 2003. According to Yasser, he was never informed of the reason for his arrest.

Upon arrival at Abu Ghraib, Yasser recalled that he was not forced to disrobe, although he felt "insulted" by the US personnel as they "put their hands in my privates." He said he was forced to sit on the ground with other detainees for four hours and then to crawl on the ground with fellow detainees. Three people conducted the initial interrogation, during which Yasser was commanded to sit on the ground by an area near a putrid, dirty toilet. He was asked whether he knew where Osama Bin Laden or Saddam Hussein was. He was also asked about his injury and was accused of "attacking the American forces."

After this initial interrogation, Yasser recalled having been blindfolded and taken in a truck to another area, where he was kicked to the ground. Yasser stated he was initially placed in the tented area of the prison for about twenty-five days. He said he was interrogated once during this period, when he was asked the same questions as before and was threatened with being sent to Guantánamo, which the interrogator described as "a place [where] even dogs won't live." He reported being handcuffed to a ring in the ground, though he was not physically harmed during this interrogation. Yasser recalled that despite his repeated requests for medical attention for his pre-incarceration injury, he was only given one tablet daily for the pain.

Yasser remembered that he was transferred to another section of Abu Ghraib just before the end of Ramadan. He explained that he was handcuffed, had his face covered, and was transported in a humvee with his feet tied to a chain. When he arrived, he was told to "take off all [his] clothes." He followed the order but "kept the underwear [on]." The US soldiers stripped him of his remaining clothing. He subsequently had his face covered and was handcuffed and chained at the feet. Yasser recalled, "They started hitting and [told] me 'Let's go, let's go'… [W]hen they took off the cover… I found myself in a very long hall. I used to hear some dogs barking and some people shouting in a loud voice, in Arabic and English. I walked for a few steps and there [were] stairs, and they . . . hit me [and kicked me and told me] to go up… It was

very difficult to go up because of the chain, so I fell, and I started to move on my knees and [used my chin] to go up step by step…."

Yasser tearfully described that when he reached the top of the steps "the party began…They started to put the [muzzle] of the rifle [and] the wood from the broom into [my anus]. They entered my privates from behind." He noted that several other soldiers and civilians were present, including an interpreter with "a Lebanese accent." Yasser estimated that he was penetrated five or six times during this initial sodomy incident and saw blood "all over my feet" through a small hole in the hood covering his eyes.

Yasser recalled that this "party" of abusive behavior continued for approximately five days. In a particularly traumatic experience, which Yasser describes as the "music party," he was forced to lie on the ground with loudspeakers blasting music into his ears at a very painful volume. He recalled that this lasted "about one day, but you can say two years." He reported having suffered from the pain and resulting deafness for several hours afterwards and stated that he still feels upset whenever he hears loud music.

According to Yasser, when he was finally returned to his cell, he was denied clothing and a blanket for about fifteen days, when the most abusive treatment stopped. Other forms of abuse continued, such as being woken up in the night and taken to a cold shower, where he was again sodomized with a stick.

Yasser sobbed uncontrollably as he reported that he was sodomized on about fifteen different occasions. He felt severe pain and had difficulty defecating for approximately three months afterwards. "I kept feeling the wounds there — and it caused me a lot of pain. Especially there —you can't go to the toilet." He added that he received no medical care for these injuries, but was occasionally given napkins and coffee grounds to clean the wounds by "the man who takes the garbage — I used to tell him it was for my hand wound because I was shy about the injury."

Many of the abusive incidents described by Yasser occurred in the context of interrogations. In addition to frequent, painful beatings, he reported suffering extremely painful electrical shocks on three separate occasions. "I felt that my eyes would go out or blow, and I feel my teeth, and one time I bit my tongue… When they shock you with electricity it feels like your eyes will explode," Yasser recalled. On one occasion, Yasser said he passed out on the floor, and a doctor "opened my mouth with his feet and poured the water in my mouth.

Then he said 'continue.'" During these electrical shocks his eyes felt like they would "pop out," his muscles shook, and his teeth clenched. Further, Yasser reported having burns on his thumbs, where round metal rings were applied to administer the electric shock.

Yasser also recalled having been forced to assume painful postures for extended periods of time. He demonstrated by holding one arm to the floor with his second arm raised above his head and explained, "They tied one hand like this and one to the door of the cell — and this is very uncomfortable." This lasted for a whole day, after which point the "position was changed to another side."

Yasser described a number of other abuses, including having his already-injured hand deliberately stepped on and squeezed by American soldiers. Further, soldiers had written degrading phrases in permanent marker on his head, in addition to other writings "all over my body ... and they sign[ed] their names on my body."

Yasser stated that he remained in the isolation cell for about fifty days before being transferred to the tent area of the prison.

Yasser described another incident that, although not physically painful, was extremely upsetting, particularly given his religious beliefs. Shortly after his arrest, soldiers removed his egal (Arab headpiece) and kicked it once it had fallen to the ground. He also witnessed soldiers forcing Iraqi men to lie naked on top of one another.

Yasser reported that he did not receive any medical care while in the isolation cell. However, he stated, "Doctors... used to be included with the questioning. ... Sometimes the dog[s] [bit] the prisoner, and [the doctor] gives the needle to the female soldier for stitching — I saw it." When asked how he knew the individual was a doctor, Yasser replied, "He had this bag... They call him the doctor." He added that the "two doctor[s]" usually wore "an Army uniform, but sometimes they wore civilian [clothing]."

Yasser was released from Abu Ghraib prison in February 2004 without charge. He left Iraq shortly afterward out of fear of being re-arrested and to avoid frequent painful reminders of his incarceration. Yasser described a number of dramatic changes to his personality and functioning since his imprisonment including a great deal of anger towards the abusive soldiers, a general distrust of Americans he encounters, and "a great sadness inside me," along with frequent nightmares about the abuses that were inflicted during his incarceration.

## Medical Evaluation

The traumatic experiences suffered by Yasser made it extremely difficult for him to participate in the evaluation. He unexpectedly left the clinic to return to his hotel without informing the evaluators on the first scheduled examination date. He arrived promptly on the second day, but appeared nervous and guarded, and chain-smoked cigarettes for the first two hours of the interview. He explained that he was chain-smoking because "it hurts to talk about this." As noted above, Yasser was reduced to crying uncontrollably while discussing some of the more traumatic experiences he suffered. He was unwilling to fully disrobe for the physical examination, and permitted only an extremely limited physical examination of his hands and tongue and a very brief external rectal examination. Additionally, he declined the recommended medical testing (e.g., a bone scan). He explained his reluctance by noting that, "Americans always want us to undress." It should be noted that, given his experience with the American soldiers, Yasser understandably exhibited a high degree of distrust toward the American clinicians and was on-guard in the beginning of the evaluation. However, he became increasingly relaxed as the interview progressed, occasionally smiling and engaging in a more friendly exchange with the interpreter and examiners.

### Assessment of Physical Evidence

The results of the limited physical examination Yasser permitted provide support for his allegations of the abuses he reported, including evidence of scarring on his thumbs that is consistent with his report of electric shocks. He has two small areas of irregularities in the contour on both his right and left sides of his tongue. These lesions are nonspecific, but are consistent with biting the tongue, as he reported occurred when the electric shocks were administered. He has 0.5 and 1.0 cm hypo-pigmented scars in the same location on both of his thumbs, consistent with scarring caused by electric shocks, of which Yasser appeared genuinely unaware prior to the examination. Yasser allowed a very brief and limited external rectal exam, and no lesions were observed; the exam was incomplete, however, and thus inconclusive. There is a deformity of his left hand with partial amputations of the fourth and fifth digits and extensive scarring and injury of the hand. Yasser attributed this injury to an incident prior to his arrest and incarceration. However, he stated that he has been unable to obtain medical care for his injured hand since his release and reported that he was informed that it was too late to repair the

damage because so much time had elapsed while he was incarcerated.

### Assessment of Psychological Evidence

Yasser described his mood as "sad," and his affect was clearly dysphoric, sobbing uncontrollably while discussing some of the more traumatic experiences he suffered. He reported numerous symptoms of depression and anxiety, including frequent crying, intense anger, diminished appetite, and weight loss. Although he denied feelings of guilt or a lack of energy, he noted that he has lost interest in everything except "my work" with other torture survivors. He also described feelings of worthlessness ("As a person [who] had the stick of the brush put inside his body, what [do] you want him to feel?") and severe insomnia, with difficulty falling asleep and staying asleep. He reported frequent nightmares in which he relives his experiences in prison, as well as intrusive memories of these events while awake ("How can I forget this?"). Yasser noted that these incarceration experiences have made him feel very "uncomfortable" in his home region and added that he left Iraq in order to avoid the frequent reminders of his imprisonment. He stated that he also feels uncomfortable whenever he sees policemen or Americans. Yasser reported difficulty concentrating and no longer reads literature as he once did. He also described periods of anxiety and occasionally becomes short of breath, but denied heart pounding or palpitations, sweating, or other indicators of panic. Yasser denied current suicidal ideations or intent, but acknowledged that "Inside the jail, I did pray to Allah to make me die."

*Psychological Tests:*[38] Yasser evidenced a number of symptoms indicative of moderate levels of depression, anxiety, PTSD, and paranoia, as well as physical symptoms likely indicative of a somatization disorder, all of which warrant mental health treatment. Further, on a clinician-administered test of symptom exaggeration, Yasser's performance indicated that he put forth considerable effort to respond honestly, with no evidence of deliberate exaggeration. It should be noted that Yasser's responses to self-report measures were less pronounced than suggested by his clinical presentation, raising the possibility that he either lacks insight into the severity of his emotional difficulties or is reluctant to acknowledge the extent of the problems he experiences (i.e., defen-

siveness). Thus, interpretation of the test results offered may underestimate the true extent of Yasser's psychological difficulties.

## Analysis and Conclusions

Yasser's clinical presentation, reported symptoms, and the results of psychological testing support a diagnosis of major depressive disorder and post-traumatic stress disorder. Specifically since his incarceration, Yasser reported difficulty concentrating. He also experiences periods of anxiety and occasionally becomes short of breath.

Yasser described a number of symptoms of moderate depression that have persisted since his imprisonment. In addition, he revealed numerous PTSD symptoms that have persisted for many months, including intrusive thoughts and memories of the abuse he experienced in Abu Ghraib, particularly sexual assault. Among other things, Yasser suffers from avoidance symptoms, as well as several hyperarousal symptoms. Moreover, the timing of his reported symptoms (following his incarceration, with no reported psychological difficulties prior to his arrest) and nature of his intrusive memories and avoidance behaviors suggest that this period of incarceration, and the sexual assault in particular, are likely to have directly caused these psychological symptoms. It must be noted that the severity of Yasser's emotional difficulties may be mitigated by his activities in support of survivors of torture.

Perhaps most importantly, the available evidence strongly supports the credibility of Yasser's reported symptoms and experiences. What is less clear is the accuracy of Yasser's report that his preexisting injuries were significantly worsened during his incarceration. He attributed the severity of his current disfigurement and limited mobility to both direct, additional trauma (when his pre-existing injury was deliberately exploited by a soldier) and the indirect effect of preventing the surgery he needed (and was reportedly scheduled at the time of his arrest). However, without consultation from his treating physician at the time of the injury and subsequent surgeries; it is not possible to ascertain the accuracy of his report.

The evidence of scarring on Yasser's thumbs and his description of the symptoms he experienced during the shocks (the optical pressure and bodily convulsions) is highly consistent with reports of other individuals who have suffered such abuse and supports the accuracy of his reported experience. Although his refusal to permit a complete physical examination

---

[38] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

limits the degree of evidence available to corroborate his reported sexual assault and sodomy, his description of rectal bleeding and the injuries he suffered during these sexual assaults is highly consistent with the typical effects of such abuse, as is his mistrust, guarded demeanor, and inability to tolerate a physical examination. In addition, Yasser revealed significant psychological distress that appeared directly related to his traumatic experiences during incarceration.

## PROFILE 5: MORAD[39]

Morad was arrested in September 2003 in Baghdad and was detained for ten months, first in an American-controlled "camp" and then at Abu Ghraib prison. Although subjected to far less physical abuse than other detainees evaluated, Morad was subjected to various forms of ill-treatment including humiliation, sensory bombardment, sleep deprivation, isolation, and threats to his family. An older man with health problems, Morad by and large received proper medical care during his period of detention, although his health deteriorated significantly due to the his conditions of confinement. The findings of his physical examination are highly consistent with the events Morad described. Morad is experiencing a mild level of psychological maladjustment that does not reach a clinically significant level.

*"It felt like being in a tunnel. I didn't know when I would get out. I couldn't sleep very well. Thoughts of my family, the future and the conditions of [my home-town]... I was afraid that they had been killed.... [It wasn't] clear that we were going to die, but we had lost hope of being released."*

### Background

Morad is in his late fifties and was born into a self-described "rich family." He completed high school and worked for the government prior to his retirement in the late 1980s. Morad reported that he was supporting his family —a wife and six children, the youngest of whom was ten years old—with a retirement pension and income earned from a business selling supplies.

Morad described his life prior to his arrest in September 2003 as "happy" and reported that he was involved in community activities. He denied any past trauma or mental health problems. He reported a medical history

prior to his detention that included diabetes, a heart attack, and an infection in his left toe, which was being treated at the time of his arrest. He additionally reported injuring his left hand in the mid-1960s during an accident, requiring surgery; an extensive, well-healed scar on the left hand and a missing finger were noted during the physical examination. Medications taken on a daily basis at the time of his arrest included insulin, isordil (usually used to treat angina) and aspirin.

### Allegations of Arrest and Abuse

Morad reported that he was arrested in early September 2003 in Baghdad and subsequently imprisoned for approximately ten months until early July 2004. He described his arrest as follows: "I was at home, we were sleeping. They came at dawn. All of a sudden, I just felt that the Americans were standing over my head in my bed. I was very embarrassed. They had broken into my house. I asked them, 'Why didn't you just call me in? I would have come in.' But they were shouting and yelling, 'No talking!'" Morad reported that the Americans inspected the house and separated the men from women. The men sat on the ground while the women were ordered to stay in the garden.

Morad described being taken out onto the street, with his hands restrained with plastic cuffs. He recalled noticing that about ten humvees had come into his residential area. He was hooded and put into one of the humvees without being allowed to get his medications to take with him.

He was taken to a nearby American-controlled "camp" where he was kept in a large hall for several days. He recalled that the prisoners were kept hooded and handcuffed in the back. They were also photographed. He stated that although water was available, he was not given food until the second day of his imprisonment. He did not report any beatings while held at this facility, although he recalled being "pushed and shoved around." In the approximately six days that Morad spent in the large hall his hands were continuously tied, "even when we went to the bathroom." He described the bathroom as "just an area in a garage. And we were constantly watched by soldiers when we did our business." He also stated that he informed the authorities in that camp on the first day about his medical problems, and they provided him with insulin.

Morad reported being interrogated twice on the third day of his imprisonment. He was accused of training the resistance and of being a Baathist activist. According to Morad, in another interrogation, an American major, "the

---

[39] Morad's medical evaluation was conducted by Allen Keller, MD and Leanh Nguyen, PhD.

one who arrested me," threatened to arrest his "beautiful wife and daughter" and send them to "Gitmo" if he did not "talk."

Morad denied any physical ill-treatment during these interrogations. However, he reported subsequently asking for more medications, which were denied. "The soldier said, 'No more medicine.' I think they said that as if I [was] not cooperating with them." Morad was uncertain about whether he received his medication on the day after his interrogation.

He recalled being accused of being "a liar" and was then taken to a former ranch of Saddam Hussein, where he described being placed in solitary confinement for nine to ten days. "Being in solitary was the worst," noted Morad, "There was nothing in the cell. I was watched when I went to the bathroom, with the gun pointed at me....They refused to give me the soap that I asked for to wash myself."

Prior to his arrest, Morad had been afflicted with an infection in his left big toe. He described that, as a direct result of the unsanitary conditions during his arrest and detention, the infection worsened. This condition was finally attended to, following the intervention of a soldier who called a doctor for him. The doctor treated Morad by cleaning his infected toe, administering antibiotics, insisting that his hands (which had remained cuffed in front of him for four to five days and had began to bleed at the wrist) be untied, and providing him with insulin. Morad noted that the doctor kept his daily doses of insulin fresh by keeping it on ice. Morad remarked that that he had received "humane treatment" from that doctor.

In contrast, he remembered being sleep-deprived during that period of his detention. "They played very loud music in the hallway. It was deafening. No sleep was possible." He also recalled being subjected to another interrogation, where he was forced to "sit in the bathroom." He described that he was not allowed to kneel—which he felt would have been more comfortable—but was instead made to squat on the toilet. The interrogation was aided by a Lebanese interpreter, who said, "You will die here."

After that period of detention at the ranch, Morad was hooded, handcuffed, and transported to a "military building at the airport." He reported feeling disoriented and confused about the reasons for, and location of, his transfer. He remembered being worried about being transferred to Guantánamo. When inside the building, he was given a red uniform and put in a room with three or four other men. He recalled, "It was like hell there. I began to see what humiliation means, in that place.

American soldiers would bang loudly on the door. They forced us to face the wall with our hands raised. They called us by number, not by name."

Morad recalled one interrogation that was conducted by a Korean-American soldier assisted by an interpreter who was an Iraqi Christian. He described the soldier as "polite" and the interpreter as "a very polite older man." During that interrogation, he was questioned about the reasons for Iraqi resistance, the difference between American and British occupation (as experienced from his Iraqi perspective), and information about Iraqi tribes in his hometown. According to Morad, he was "very frank" and forthcoming with explanations about Iraqi culture and with information about the customary activities in his region. He noted that "there was no appreciation" but he was assured that he would be released as soon as he was found "innocent."

After nine days, Morad's prisoner number was called and he was transported in a truck with his hands tied. He believed that he was being released but, upon arrival, he was roughly dragged down from the vehicle by an American soldier and was told that he had arrived at Abu Ghraib. For most of the time he was imprisoned at Abu Ghraib, he was held in a tent where prisoners were not allowed to have visits from family members. "I was out of the world, no news, no radio, nothing to link me with the outside world. No contact with my family for them to know if I was alive or dead." Morad was not questioned at all during the months he was held in the communal tent.

Morad described inspections, on one or two occasions, by "the riot police." He recalled, "This happened in the winter on a cold night... We were outside for almost one hour, sitting down on the ground... And the soldiers would enter the tent, inspecting everything and throwing things down, and then after it would take us several days to find our things. They would take many of the blankets and leave us with only three each and it was very cold...."

On another occasion, during warmer weather, Morad described a punishment he was given: "I saw another prisoner returning from the bath, and I said to myself, 'Oh I recognize him.' But the American soldier thought I was speaking to him...He came and handcuffed me and took me outside and made me sit on the ground for an hour."

Approximately four to five months into his imprisonment Morad developed a new infection, this time on his right foot. He attributed the progression of the infections on his feet to the prison conditions: "[D]uring the summer it was very hot in the tents. In the winter it was very cold, for the first seven months, approximately. The floor was

the bare ground-dirt and was not smooth.... While I was imprisoned, I wore the slippers that I wore at the time I was arrested. They gave me a boot in prison that was too small. I told them many times it was too small, but they did not replace [it] with a larger one even though they knew I was a diabetic. When I would stay in my bed, it was okay for me. But when I would get out of bed, my foot would get dirty, and I would bang my foot more because the ground was not smooth. At that time I began to use [a] cane because my feet were hurting."

Morad reported that he had asked to see a doctor about his leg "more than ten times," but only limited care for his infection was provided. He recalled that a doctor would come to the tent and give him "simple treatment." He did, however, receive his medications on a daily basis from a nurse.

Morad described a particularly significant episode in relation to his medical care. He recalled that the infections in his feet had worsened to the point where he could not stand. An ICRC representative visited him and then intervened on his behalf, telling him that he "must be hospitalized either today or tomorrow." Morad was transferred to the Abu Ghraib infirmary, where he was attended by an American doctor whom he described as "a nice guy." Soon after, he was taken by helicopter to a hospital in the "Green Zone."

In that hospital, Morad reported that the surgeon who examined him declared that his foot had to be amputated. Morad, who understands basic English, protested and refused the procedure. Morad believed that, had he not understood English, the doctors would have proceeded with the amputation. He reported the following, "The doctor said, 'Why no cutting? This is my decision.' I insisted, 'No this is my decision.'"

After he refused the surgical procedure, Morad was returned to Abu Ghraib. At the reception processing center in Abu Ghraib, Morad described the following incident: "The soldier told me to hold my hands up with my face to the wall. I was standing for approximately ten minutes and I was tired. I put my hands half down, and the soldier kicked me on my right leg and I fell on the ground. I think he knew that I was in the hospital; my right leg was wrapped, and he could see that. He asked me why I had lowered my hands. I told him I was very sick and that I was in the hospital, and I began to cry at that moment. So he brought me a bottle of water."

He remained in Abu Ghraib's infirmary for fifty days. He recalled that an African-American surgeon from the hospital in the Green Zone would visit him. Morad stated that the doctor told him that his foot did not need to

be amputated. Morad was eventually returned to the tent area of Abu Ghraib. He reported that although he explained many times that he is a diabetic, he was nevertheless given the same food served to other prisoners.

Morad described the ill-treatment of another detainee in his tent who could not walk very well and had to use crutches. "The prisoner, he was around fifty-five to sixty years old, told me that during an interrogation he was thrown to the ground and lost consciousness. When he opened his eyes he was in the hospital [with] a cast on one of his legs. Later, at a time after his cast was removed...[the military] took him outside the tent [for interrogation] and made him stand outside next to the guards for two hours, using his crutches. I heard him ask, 'Why am I standing here?' We could see him standing with the guards, and he was told that the interrogation was postponed, and then he was brought back in. It was very cold outside. .... He looked very weak."

Morad was allowed to see his family on three visits after he was released from the infirmary of Abu Ghraib. "They cried when they saw me. I had many changes. I had lost weight, had bad eyesight, my knees were very weak. I had to use a stick to walk." Two months after he left the infirmary, Morad was released from Abu Ghraib without charge.

After release from Abu Ghraib, Morad reported struggling with economic difficulties related to the loss in his business. He described a quick rehabilitation into civilian life, however, regaining his status in the community and enjoying once again being the leader of his large family. He noted that he received much sympathy from people regarding his arrest and imprisonment.

## Medical Evaluation

### Reported Physical Symptoms

Morad reported that his eyesight had become much worse and he felt much weaker compared to before his imprisonment. He had lost weight, and he also described continued problems with his feet. "When I left Abu Ghraib, my feet were in very bad shape. There was discharge from the left toe that smelled bad and the right foot had a hole from the infection." He described having difficulty walking after being released and stated that it took approximately two years for the feet ulcers to improve to their current state. He reported that the condition of his feet has been stable for the past six months. He also described experiencing some pain in his knees.

### Assessment of Physical Evidence

Physical examination revealed that Morad has two hypo-pigmented jagged scars, one on his left wrist

(measuring .8 cm long and .6 cm wide) and one on his right wrist (measuring 1.5 cm long and 1 cm wide). He believed these scars were from wounds from wearing plastic shackles. Such marks are consistent with handcuffing.

On the lateral aspect of the left big toe, there are marked hyper-keratotic changes (dried thickened skin) with three fissures (linear cracks) forming a stellate (star-shaped) with a black center. There is no discharge. On the right side of his right heal there are marked hyper-keratotic changes, with cracking and thickening of the skin. There is no discharge. These changes are consistent with the history of foot ulcers that Morad described.

While Morad was observed to walk without a cane, he was observed walking slowly and cautiously, with some difficulty.

### Assessment of Psychological Evidence

Morad presented an open, good-natured attitude. He summarized his current attitude and condition in life as "telling the truth and forgiving the past." In recounting his experience during the period of his imprisonment, Morad emphasized the feelings of humiliation and indignation at the behavior of American soldiers, which was disrespectful and lacked honor. He also remembered the separation from his family as quite difficult. In particular, he described not knowing of their well-being and not being able to communicate to them his condition as painful and hard to tolerate. He remembered eventually settling into the following state of mind, "It felt like being in a tunnel. I didn't know when I would get out. I couldn't sleep very well. Thoughts of my family, the future, and the conditions of [my hometown]... I was afraid that they had been killed.... [It wasn't] clear that we were going to die, but we had lost hope of being released."

Morad confirmed feeling "stressed" and "bothered" by "a few bad things": the American occupation of Iraq, the losses that his family had to endure, the compromised living conditions because of the war, and his experience of being mistreated and disrespected.

Morad described how memories and thoughts of prison caused "feverish feelings in my body." He confirmed still having occasional flashbacks of his arrest and imprisonment in Abu Ghraib. In particular, he still has some intrusive thoughts and recurrent memories of American soldiers standing over his bed during his arrest.

*Psychological Tests:*[40] Morad declined to complete several standardized tests. His responses on the stan-

---

[40] Brief Symptom Inventory (BSI) measures various indices of psychological dysfunction such as somatization, phobic anxiety and depression.

dardized structured brief symptom inventory showed insignificant symptoms. The only items he endorsed that reached any degree of significance indicated a fear of being exploited, harmed, or betrayed by people.

## Analysis and Conclusions

The findings on physical examination, particularly of Morad's feet, are highly consistent with the events Morad described. It is likely that the stress from Morad's imprisonment and the conditions he described facing while in prison, including being held in a tent with a dirt floor, being forced to sit outside in the cold on a muddy ground, and not having adequate footwear, contributed to the worsening of the foot ulcer on his left big toe and the development of the right foot ulcer he described. While records of his medical care in Abu Ghraib were not available for review, it appeared that he received medical care from which he clearly benefited. However, it is possible that his foot ulcers were not adequately monitored or treated earlier in his imprisonment, to prevent their progression to the point of requiring hospitalization and nearly amputation of his feet.

Although Morad still has difficulty walking, he reported that he currently walks without a cane. It is likely that the residual scarring from his foot ulcers impacts his ability to walk to some degree. Given his underlying medical conditions, particularly his diabetes, Morad's imprisonment and the conditions of his confinement likely contributed substantially to his presentation of foot ulcers and wounds.

Morad's self-reports of his daily functioning, his responses on the BSI standardized test, and the clinician's behavioral observations and mental status examination during the evaluation suggest the picture of an individual who is experiencing a mild level of psychological maladjustment. Morad's emotional distress is connected to both his past experience in prison and the current stressful conditions of living in an occupied and war-torn region. However, his distress does not reach a clinically significant level and does not seem to impair his functioning.

Based on the manner in which Morad described his imprisonment (both in content and in style), as well as the clinical findings from the physical and psychological examinations, the clinicians had high confidence in his credibility. He was forthcoming in the history he provided about what he did and did not remember, when he was and was not treated well, and which scars, notably on his left hand, were unrelated to his imprisonment.

Morad still experiences some psychological symptoms, including occasional disturbing memories, relating

to his arrest and imprisonment. However, the lack of psychological impairments (as defined in stringent clinical terms) is likely a function of both his coping resources and the nature of his trauma experiences, which inflicted fear and humiliation but did not include elements of extreme violation or mortal threats.

## PROFILE 6: RAHMAN[41]

Rahman was imprisoned beginning in October 2003 at Abu Ghraib prison for approximately nine months and was eventually released in late May 2004. He was subjected to beatings, temperature extremes, sexual humiliation, isolation, and stress positions. The medical evaluation found significant physical and psychological injuries that are consistent with his reports of symptoms and trauma history. He suffered from PTSD after his release from prison and is currently experiencing avoidance symptoms and the clinical syndrome of shame.

*"When they finished hitting me...they shaved my hair. The only hair I had was in the middle. This was only to humiliate me. They just wanted to laugh. Then they took me to the bath and opened the cold water and they pushed me there, and they used to hold my arms, and push my head under water, and sometimes to breathe, I was pushing back and pulling my head out of the water."*

### Background

Rahman is in his early forties. He completed three years of university education. Prior to his arrest he owned his own business. While life in Iraq was "not easy," Rahman described being generally happy. He also described himself as ascribing to the religious teachings of Islam, "I wished everybody a good life. I tried to practice love, peace, altruism."

Rahman stated that he did not have any physical or mental health problems or traumatic experiences prior to his imprisonment. He reported being summoned for questioning in 1989 and 1994 by local authorities under the regime of Saddam Hussein, a reportedly common experience for shop owners to endure. However, Rahman denied any ill-treatment during these meetings.

### Allegations of Arrest and Abuse

Rahman was arrested at his shop in Baghdad in October 2003 by American and Estonian troops who handcuffed

his hands behind his back, arrested him, and searched his shop. He was not beaten. He was taken to a US facility, photographed, and questioned about various individuals from his region. During that session, an officer accused Rahman of attacking and killing Americans, which Rahman denied.

Rahman was transferred the next day to Abu Ghraib prison and was kept in a small tent. On the fifth day, he reported being hooded with a bag and was taken to a room with two female interrogators, an interpreter, and a soldier. "My heart was beating so much and I was really scared," said Rahman. His clothes were forcibly removed after he refused to remove them himself. In an attempt to hide his genitals, Rahman knelt to the ground. During this interrogation his hands were handcuffed behind his back.

Following this interrogation, Rahman was again hooded with a bag and taken to a prison cell, where he was kept naked for five to six days. He was interrogated several times during this period, and was regularly kicked and hit. Rahman reported that cold water was thrown on him repeatedly and he was forced to stand the entire night shackled while he was in his cell. Moreover, he described how cold water was thrown on him and he was forced to bathe in it: "I was very low and sitting in a corner in a small position to relieve myself. And he [a guard] came with a bucket of water and just threw it on me...The whole night he was throwing water on me." Rahman reported that later that night he was forced to take a cold bath and was then returned to his cell, where he was handcuffed to his bed and kept standing all night.

Following the first few days in Abu Ghraib, Rahman was kept in a dark, windowless, cold room, naked, for approximately fifty days. During this time, he reported the recurrent practice of being forced to stand naked and hooded outside of his cell for several hours. In addition, Rahman's head was immersed in cold water on a daily basis.

Rahman developed a fear of his dark, windowless cell. In one incident, while receiving medication, he pleaded to a person whom he perceived to be a doctor for permission to remain on the outside of his cell. "I told him that I couldn't take it any more. The room didn't have a light." The doctor transmitted his request but the soldiers refused. Rahman said that remembering the claustrophobic conditions of his cell and his nakedness are the most difficult parts of his experience to recall emotionally.

On one occasion in the small cell, he was beaten, his hair was shaved, and he was immersed in water. He reported, "When they finished hitting me...they shaved my hair. The only hair I had was in the middle. This was only to humiliate me. They just wanted to laugh. Then

[41] Rahman's medical evaluation was conducted by Allen Keller, MD and Leanh Nguyen, PhD.

they took me to the bath and opened the cold water and they pushed me there, and they used to hold my arms, and push my head under water, and sometimes to breathe. I was pushing back and pulling my head out of the water."

Rahman was shown photographs of naked prisoners by the soldiers. "You feel insulted, you feel humiliated. It became kind of a joke with the soldiers. They were showing the pictures and saying, 'Which butt is yours?'" On one occasion, Rahman stated that he was forced to wear women's undergarments. On several occasions Rahman was confined for several hours in a small, cold, dark, windowless cell that smelled of urine. He described feeling the urge to urinate without being able to do so. According to Rahman, beatings and kicking, cold-water immersion, and unpredictable and arbitrary confinement in the small, dark room occurred repeatedly. Occasionally, while blindfolded, he was threatened with death.

Rahman reported that he tripped when soldiers pushed him down the stairs, injuring his right foot. He was pulled and yelled at to stand up: "I was crying and screaming … I asked to see a doctor, but they told me to 'shut up'". According to Rahman, when he asked one soldier to look at his foot, the soldier hit him on the shoulders, kicked his legs, and then ordered him to stand by the wall. Subsequently, he was tied to the bars in his cell and was forced to stand until the morning. Rahman reported that he was unable to bear weight on his right foot for two months. When he was forced to stand, he would lean against the bunk so as not to put weight on that foot. His foot was swollen and black and blue, and it took approximately a month and a half for the swelling to subside. He was neither provided with medical care or with crutches until he was transferred to the communal tents, where he was able to use a stick to walk.

In another incident, Rahman recalled that he received a severe, heavy blow to his head that caused him to lose consciousness. He could not identify or remember the object with which he was struck.

Rahman also reported that the food that he was given was "barely enough" and was "really bad." His food would be tossed or kicked by the guards into his cell in a small bag, and was sometimes thrown into or near the toilet.

Rahman did not recall being subjected to any ill-treatment while he was kept in the communal tent area of Abu Ghraib: "Life in the tent was simple. There were not too many things to remember." One detail, however, stood out from that period: his fellow prisoners in the tent section told him that, while in the individual-cell section of Abu Ghraib, they had witnessed him being beaten, tied

up and pulled like a dog. This fact was troubling to him, as Rahman had no recollection of that event. He had no explanation for the discrepancy between his recall and that of his fellow prisoners.

Initially Rahman denied adamantly that he himself was threatened with or a victim of any direct sexual assault or rape, but in a later interview he described one instance of attempted rape. Late one night, a soldier approached him in a threatening manner and asked if he was a bomber or a terrorist. Rahman recalled the following, "He started to go closer to me and said, 'You are a bad man,' and he unzipped his pants and took out his penis. I had to defend myself. I fought him off. This fight between us took a minute. Three to four times I was on the ground and he was pushing me back and I said 'No! No! No!'"

Before his transfer to the communal tents, Rahman recalled seeing naked prisoners forced into a position where their genitals would touch each other and into another position that simulated anal intercourse. He reported seeing guards throw candies at the genitals of naked prisoners. Rahman recalled other sexually humiliating practices, one involving a naked human pyramid. On one occasion, he was ordered to watch naked men being tied by the neck and forced to walk close to one another. As the men cried out "This is sinful" and struggled to shield their genitals from touching the back of the person in front, the soldiers would yank on the rope, thus producing a reflexive motion where the back would arch and the lower-body pelvic area would thrust forward. The soldiers, he recalled, would chant, "Fuck him!" Rahman reported an overwhelming sense of "embarrassment" and terror as he watched. "I thought they were going to do the same thing to me. I was so scared to be a part of that. I used to thank God afterwards for being spared the pyramid. I much preferred the cold water than that."

In another "terrifying" incident, a group of five soldiers descended upon him and threw him on the floor. As he lay on his belly, with hands tied behind his back, soldiers unleashed a snarling dog on him, while other restrained dogs surrounded him and barked at his head. He was not bitten, but added that he had seen another prisoner being bitten.

After approximately nine months Rahman was released in late May 2004 without charge. As a result of his imprisonment by US authorities, Rahman lost his business. He reported trying to relocate to a rural area, away from Baghdad, but the aridity in that region forced him to return to Baghdad. Rahman currently supports his wife and eight children with savings and rental income from their various home properties.

In the summer of 2006 Rahman was "taken away" by the Iraqi secret police and detained for eighteen days. He disclosed this fact to the evaluators only at the very end of the follow-up interview session and would not provide any details about the experience. He went on at length, however, about fearing for his life now. Rahman reported an acute level of fear about being re-arrested and his deep conviction that he was a "marked man" because of his status as a former detainee held by the United States.

## Medical Evaluation

### Reported Physical Symptoms

Rahman described having difficulty breathing and experiencing chest pressure while imprisoned at Abu Ghraib that resolved after his release. He reported that at the time of his release, he experienced weakness and had lost weight. He also reported musculoskeletal pain, bruising, and headaches following his beatings. He described a blow to the head that caused him to bleed and rendered him unconscious. Rahman reported significant pain and discomfort in his right foot, and difficulty bearing weight after he was pushed down the steps. Rahman described experiencing urinary symptoms, including frequency, urgency and a sense that he has not completely voided, which started while in prison and have persisted; he also reported experiencing decreased sexual functioning.

### Assessment of Physical Evidence

The physical symptoms Rahman described and the physical examination findings strongly support his reports of torture and ill-treatment. It is important to note that many of the beatings Rahman described likely resulted in additional bruises and soft tissue injuries, which would not leave lasting physical marks.

The physical examination revealed a linear, depressed scar on the center of Rahman's forehead at the base of his hairline. This scar is consistent with a scar caused by blunt traumatic injury. He has two hyper-pigmented depressed oval scars on his right lower back. There is also a depressed oval scar on the lower portion of his left back. Rahman was unsure about the etiology of the scars noted on his back, but the scars are consistent with traumatic injuries, such as being kicked. Examination of his right ankle shows signs of atrophy and tenderness compared with the left. This is highly consistent with Rahman's report of the injury from being pushed down steps while in prison. The significant pain and difficulty of bearing weight on his right foot while detained, and

continued discomfort and difficulty walking, are likely the result of this injury.

The difficulty breathing and chest pressure that Rahman described are most likely somatic manifestations resulting from the acute stress of his imprisonment. The physical examination revealed a normal size prostate, which was mildly tender. Rahman's urinary symptoms, decreased sexual functioning, and difficulty being aroused are also likely manifestations of persisting stress from his imprisonment and ill-treatment, including the forced nakedness and sexual humiliations he experienced.

*Medical Diagnostic Tests*: Findings of a bone scan provided further corroboration with his reported trauma. The test revealed accumulation of nuclear material in both feet and ankles, more prominent on the right foot and ankle, particularly the right ankle. This is consistent with a history of trauma, particularly to the right foot/ankle as described. A blood test for prostate specific antigen (PSA) was within normal limits. These findings make prostatitis (inflammation of the prostate gland) at the time of this evaluation less likely, but still possible.

### Assessment of Psychological Evidence

Throughout the account, Rahman looked visibly tense and showed a consistent pattern of minimizing the description of his emotional impairments. In parallel, although he explicitly stated his trust and comfort with the evaluation, he alluded several times to his fear of people, as well as his significant apprehension about participating in the evaluation. He clarified that, although he wanted to "tell the truth to the world," he was also reluctant about coming forward with his story. He expressed concern about potentially being harmed again.

Rahman was focused, articulate, and finely discriminate in his physical-memory recall. He produced many fine details about the physical features, objects, activities, and interpersonal exchanges that occurred during his arrest and detention. For example, he described the physical conditions of his cells at great length. Rahman's long-term memory was within normal range (except for a few normative lapses and one significant deletion that is addressed below). Throughout his narrative he consistently emphasized the points of social disgrace, such as the shame of being arrested in front of the community, the tarnishing of his reputation, and the destruction of his business. Honor and dignity seemed to be of great significance to Rahman as he carefully conveyed the implications of acts that were injurious to his sense of dignity. For example, he looked straight at the interviewers and

repeated several times, "The soldier called 'shit' to me." He wanted to be sure that the debasement of such verbal insults was registered.

Rahman's behavioral signs revealed strong indications of an individual who was highly distrustful and uncomfortable about revealing himself, who was likely experiencing substantial anxiety, and who applied a general approach of avoidance (both in internal thought processes and in overt action) in order to manage his fear and anxiety.

As mentioned, he reported symptoms of sexual dysfunction that were still current, although he refused to elaborate on the extent, triggers, or precise duration of this problem.

Rahman reported experiencing several symptoms during his arrest and imprisonment. He described predictable fear reactions during his arrest, including fearing for his life and worrying about his children. He described rapid heart palpitations, trouble breathing, and urinary frequency. His fearful reaction about losing face and about the damage to his reputation was also normal and consistent with his self-described valuation of dignity and propriety.

When asked about his mental state during his detention, he described various experiences of distortion in time and feeling "confused." He confirmed having frequent bad dreams and feeling generally "helpless, no control." In particular, he remembered growing to feel terrified of the narrow confined space of his cell. He reported, "I didn't think I could take the small cell anymore," and would plead not to be taken back.

Rahman described feeling as if "I was going to lose my mind." Although he denied suicidal thoughts or attempts (invoking his adherence to Islam), he recalled wishing to die. Further, he added that "There was nothing to kill myself with in the cell." He denied wanting revenge or redress for the harm done to him. "I just want the U.S. to stop the violations."

Rahman has developed a strong avoidance defense mechanism, which made his evaluation difficult. "There is too much fear, too much pain. So I try to push it all away." From his recounts it appears that Rahman developed this defense mechanism of avoidance soon after his release from prison, at the period during which his post-traumatic stress symptoms were at their most acute phase. There are many indications that this avoidance continues to predominate. For instance, he categorically emphasized not wanting his children to know about his jail experience. "I want to stay strong in their minds. I don't want to ruin my reputation with them." Within his immediate family, only his wife knows

about the extent of his ordeal and, as a general rule, the topic of Abu Ghraib is not mentioned between them. In his own lay terms, he provided a typical description of avoidance: "I never want to think or talk about it...I try to get rid of my bad memories. I try not to stay alone, [I try] to smile and have [a] cheerful attitude." But he acknowledged that this defense mechanism would falter, "I would cry sometimes... when I remember what my children went through."

The fact of the predominance of avoidance as a defense mechanism is directly relevant to two other psychological data. The first concerns Rahman's lack of clear memory in the last months of his imprisonment (after being transferred to the communal tents). For example, Rahman could not remember his date of release. As noted, he had no recollection of being dragged around like a dog, yet could not explain the discrepancy between his memory and what other prisoners observed and told him. Although it may be that the other prisoners saw someone other than Rahman, if their observations are correct, his lack of memory in the last months of his imprisonment may be due to denial (to preserve his dignity) as well as dissociation (from the public shame of the disclosure that he conceived of as unbearable). It may be that for Rahman having the loss of his dignity and manhood become public knowledge was equally, if not more, injurious. Avoidance likely developed as a strategy — to deny that such injury happened, and/or to preserve some pride by maintaining a public denial.

Rahman spoke at length about memories and feelings of humiliation in Abu Ghraib. He described an incident of attempted rape, which he claimed he had never told anyone about before. The description of his witnessing the naked human pyramid was dominated by his memory of being "embarrassed" for these men and of being terrified that he would be subjected to such "sinful" acts. He stated that he used to feel shame merely at the thought of this incident. As he spoke about it, he looked visibly shaken. His eyes were averted. His face was contorted in a seeming effort to control some internal discomfort. His hand-rubbing and foot-twisting suggested a great deal of anxious stimulation. Finally, he broke down in tears when attempting to summarize his condition of living with shame. He talked about the modesty of never having been fully naked in front of his wife. In light of this history, it was particularly traumatizing that female soldiers had seen him naked, that his genitals had been exposed, scrutinized, commented upon, and ridiculed by a group of strangers.

In summary, there are ample indications that shame

— that is, the subjective sense that his dignity had been stolen, a sense of damage to his manhood, the sense of humiliation vis-à-vis others — is a predominant and intense emotional experience for Rahman. It seemed to define his sense of self, pervade his thought process and emotional reactions, and cause his avoidance.

Rahman's descriptions of the few months after his release from Abu Ghraib support the diagnosis of PTSD during that period of his life. His descriptions of this period clearly indicated symptoms of traumatic re-experiencing (e.g., intrusive thoughts, nightmares). For example, for the few months after his release from Abu Ghraib, Rahman described that he would "just sit and remember" his prison experience. "My mind used to go to suffering. I wouldn't even hear my family talking to me." He also described states of hyperarousal (e.g., loss of impulse control, high irritability, and disturbed sleep). He described himself as "not smiling," "easily angry," and "disturbed." "I would yell at the children a lot." He was also afraid of the dark and of being left alone in a room. His sleep would be interrupted by the frequent urge to urinate and by nightmares. He disclosed having many intrusive thoughts of one guard in particular when he tried to fall asleep. As noted above, Rahman developed a strong avoidance defense (e.g., keeping to himself, avoiding the topic of prison). All of these symptoms were clearly directly linked to the traumatic imprisonment and torture that he reported. When asked about his means of coping during these months, he mentioned God and his wife.

Regarding inquiry into his sexual functioning, he replied, "There is no joy. I don't feel my manhood anymore." However, he declined to further elaborate regarding the extent of this problem. He then maintained, "It's a medical problem. I have a problem with my prostate" and strongly resisted considering any connection between his sexual dysfunction and his torture experience.

Rahman no longer meets all the DSM-IV criteria for a PTSD diagnosis, as only symptoms of avoidance still persist. There are two plausible explanations. One is that his post-traumatic stress disorder naturally remitted over time. This is plausible but unlikely. Given the severity of symptoms in his reports for that time period, the lack of any kind of therapeutic interventions that might have alleviated these symptoms and ongoing stressors and potentially re-traumatizing events (i.e., the war, his economic impotence, his re-arrest by the Iraqi secret police, his ongoing sense of threat about being exposed and humiliated because of his Abu Ghraib history), one would expect a continuation, if not exacerbation, of his symptoms. The other possible explanation is that the patient is under-

reporting and denying the actual experience and level of severity of his current psychological problems. This would be consistent with his defense of avoidance and his need to preserve any sense of dignity.

The subjective sense of shame and of damage to his manhood and reputation is indisputable. This is a psychological injury that typically results from experiences of violation and devaluation and is a significant, hallmark injury of trauma victims. It leaves the person with a sense of impotence, isolation, and fear. Rahman's disclosures about his subjective sense of self reflect this dynamic of shame. In most clinical cases of shame and avoidance, the person can maintain some superficial basic level of functioning, but harbors a deep sense of isolation. This often translates into an inability to cultivate close, meaningful relationships and a pervasive sense of dysphoria and hopelessness about one's potential for a productive and good future. In Rahman's case, he denied experiencing depression but showed many signs of interpersonal isolation, distrust, and hopelessness that often correlate with the clinical syndrome of shame.

*Results of psychological testing*:[42] On the self-report measures administered, Rahman scored below the threshold for a significant, diagnosable level of PTSD and depressive symptomatology. On the BSI he reported a pattern of low-moderate psychological dysfunctions on various indices.

## Analysis and Conclusions

Rahman demonstrates historical, physical, and psychological evidence strongly supporting his claims of torture and ill-treatment while in the custody of US authorities in Iraq. He provides substantial detail regarding his abuse, yet he is forthcoming about what he does and does not recall. The initial, profound reluctance to report a history of attempted sexual assault, which he later revealed, is consistent with an individual who has experienced such traumatic events.

The detail with which Rahman described his imprisonment and torture, as well as the findings on physical and psychological examination, supports his credibility. That he had several scars which he acknowledged were unrelated to his imprisonment and others the source of which he was unsure of, further bolsters his credibility. It is likely that he continues to suffer from the physical and psychological effects of his abuse.

---

[42] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

His description of a host of symptoms that signaled the onset of post-traumatic stress disorder was consistent with the report of antecedent traumatic events. It was further consistent with the subsequent description of patterns of defensive behaviors that indicated avoidance. For when avoidance is reported — and observed — in the pervasive and consistent manner that was in Rahman's case, it is usually motivated by profound psychic trauma, the kind that overwhelms the person's psychological resources and undermines his sense of safety and integrity (hence the development of avoidance in order to preserve some sense of intactness and to minimize further injury). Thus, the development of avoidance as a predominant defense mechanism is logical and consistent with the reported trauma of torture and violation, with the onslaught of post-traumatic stress symptoms, and with the high valuation that this individual placed on dignity and pride.

The scores from the psychological instruments do not cohere with the data that emerged from the patient's unstructured reports and from his self-disclosures and emotional reactions, where shame, fear, a sense of "disease" and general hopelessness come through in a consistent and dramatic progression. When considered in light of the totality of other psychological data, the pattern of low-to-average scoring in psychological instruments is expected and consistent with the observed avoidant defensive mechanism. Further, the higher endorsements on phobic anxiety and paranoid ideation are consistent with his described sense of distrust and general preference to avoid contact with people. This is an individual whose main way of coping is to avoid exposure, deny his distress, minimize his sense of injury, and "push it away." Thus, one can reasonably view his low endorsements on the objective standardized tests as one derivative of his general defensive effort to distance himself from his own distress.

Given the totality of the clinical data collected from this evaluation, solid evidence supports a conclusion of significant physical and psychological injuries as well as consistency and credibility in Rahman's reports of symptoms and trauma history.

## PROFILE 7: AMIR [43]

Amir was arrested in August 2003 in Baghdad and remained in US custody until January 2005. He was subjected to brutal sessions of beatings, stress positions,

---

[43] Amir's medical evaluation was conducted by Allen Keller, MD and Leanh Nguyen, PhD.

sodomy, forced nakedness and sexual humiliation, and noise bombardment, as well as other forms of torture. Amir continues to suffer from physical and psychological symptoms since his release. He reported several marked impairments in his social, sexual, and emotional functioning subsequent to his detention.

*"No sorrow can be compared to my torture experience in jail. That is the top reason for my sadness. I cannot forget it."*

### Background

Amir is an Iraqi man in his late twenties who spent some time as a refugee in another country when he was a child. After the Iran-Iraq war, his family returned to Iraq, where he received an elementary-school education. At the time of his arrest, Amir made a living as a salesman. He was the sole provider for his family, which consisted of his mother, his younger brother, his younger brother's wife, and their three children. He was also engaged to a long-time neighborhood friend whom he married shortly after his release from detention.

### Allegations of Arrest and Abuse

Amir reported that early one morning in August 2003, US soldiers raided his room at a Baghdad hotel while he was sleeping. He and other individuals were informed that if they moved they would be shot. Amir was blindfolded, his hands were shackled behind his back and he was taken in a truck to Saddam Hussein's former palace. He recalled that he had a severe stomachache when he arrived there. "I begged the American soldier to permit me to go to the bathroom... When he saw I was in a very bad case, he said, 'Sit down here,' and I made my toilet there in front of him."

A few hours later, Amir was transported by truck to another location that he could not identify. He and other detainees were required to sit on their knees for about two hours, with their hands bound and eyes blindfolded. Later, they were taken to another room, where they were required to remove their clothing. They were photographed while naked and were forced to stand for approximately five to six hours. He was blindfolded, and his hands were tightly shackled. Amir recalled, "We were in a miserable [state]." He remembered feeling hungry, thirsty, hot, and tired.

Amir reported that during this time he and other detainees were questioned about their background. He noted that the detainees complained and "asked the soldiers to permit us to sit down." They were instead told, "Now, we will make you dance." The soldiers played

"a very frightening voice" loudly over a stereo and forced the detainees to run around in a narrow room. This forced running continued over the course of the next three days. The detainees were denied rest or sleep and were forced to eat while standing.

During this time, Amir's left foot was injured: "I noticed my blood everywhere." Nonetheless, he was forced to continue running. He described that he leaned against a stretcher, and reported his foot injury to the soldiers. One of the soldiers raised the stretcher sharply and he was thrown against a wall, hitting his head and losing consciousness. After regaining consciousness, Amir recalled that an interpreter hit him on his nose with a plastic water bottle, causing it to bleed. Amir believed that his nose was broken. Subsequently, he was forced to stand and was questioned along with the other detainees. After this incident Amir noted marked difficulty walking, and there was swelling in his knees and foot.

Amir recalled that his interrogators threatened to send him to Guantánamo Bay if he was a terrorist. Amir reported that after three days of sleep deprivation and forced running, the prisoners were allowed to sleep. However, he recalled that the forced running and sitting on their knees continued for about ten days.

Amir was then taken to another location, where he remained for several days. In the course of being transferred, plastic handcuffs placed on him were tightened to the point of causing his hands to swell and turn blue. Amir reported being held at this facility for twenty-seven days in a small dark room, where he was fed only twice daily and had to use a bucket as a toilet. He added, "You make your toilet in this bucket and you eat right next to it." He was repeatedly interrogated during this time. In certain sessions interrogators pushed his head against the wall. He recalled that the soldiers humiliated him for having swollen knees. In one interrogation, while he was blindfolded and his hands were bound behind his back, he was forced to bend over and "walk zigzag and sometimes [was] pushed into the wall."

In September 2003, Amir was taken to Abu Ghraib prison. He was placed in a cell and told not to speak. When he continued to speak, soldiers pushed him to the ground and called him a "girl" in Arabic. He was subsequently shackled to the door of another cell for two hours before being returned to his cell.

Except for the abuse he experienced on arrival, Amir recalled that he was generally treated well during his first month at Abu Ghraib. The food was better than before, and he was allowed to help soldiers distribute food to other detainees. However, he remembered that his situa-

tion changed when a new group of soldiers arrived at Abu Ghraib. He recalled that a soldier mistakenly suspected him of throwing a piece of food to a prisoner in another cell. The soldier yelled at him, "Bullshit, fuck you, fuck you." Amir recounted, "I can never forget these words because I knew he was insulting me." He was denied food that day, and that night soldiers took him to another room, restrained one of his hands to the wall, and put a bag over his head. A soldier lit a cigar and blew smoke into the bag over Amir's head. Amir recalled having a gun run up his body, poking at him, and pressed against his face. He was then taken back to his regular cell and told to sleep but, after fifteen minutes, the soldier returned screaming at him, took him back to the other cell, and tied him to the wall. Over the next two days the procedure was repeated four to five times. Amir described being deprived of sleep because the soldiers would hit a barrel or the doors of a cell with a hammer. "Because of this we could never sleep. Even if they permit you to sleep, you could not because of this."

During the course of detention, Amir recalled experiencing several other abuses. On one occasion, Amir was playing with a broken toothbrush while sitting in front of his cell. When the soldiers saw this, they confiscated the broken tooth brush and accused him of manufacturing a dangerous weapon. They told him to take off his clothes. Amir recalled that he pleaded that his religion forbids nakedness. He was nevertheless restrained naked to the bars of his cell's door for two to three hours. He was then returned to his cell naked and without a blanket. He noted that the soldiers would come to his cell and humiliate him because of his nakedness.[44]

Amir recounted remaining naked and being forced to pray in that condition. During that time, he recalled that a soldier came to his cell and started shouting. Amir was praying, so he did not answer. The soldier entered the cell, and pushed Amir's head to the floor. He was then suspended with his arms up and behind his back for several hours, with only his toes touching the ground. During this time, Amir also heard increasingly high-pitched screaming from, in his words, "others who were tortured. The screaming was getting higher and higher."

Subsequently, Amir was taken to a small foul-smelling room and was forced to lay face down in urine and feces. He noted, "You can't even breathe because of that smell... [The soldier] pushed me to lie down. I tried to move my shoulder so my face would not go to the ground. They

---

[44] PHR was able to corroborate this episode of Amir's abuse with General Fay's report. FAY REPORT, *supra* note 18, at 76–77.

brought a loudspeaker and started shouting in my ear. I thought my head would explode." Amir reported that a broomstick was forcibly inserted into his anus. He was hit and kicked on his back and on his side. At this point, he was bleeding from his feet and shoulders, and the urine exacerbated the pain from these wounds. He was pulled by a leather dog leash and was ordered to "howl like dogs do." When he refused to do so he was repeatedly kicked. Amir felt a hot liquid on his back and guessed that someone was urinating on him. He received more kicks on his left side and in the groin, and one of the men stepped on his genitals, causing him to faint.

Amir subsequently woke up to cold water being poured on his head. He recalled hurting all over his body, particularly on the left lateral side of his chest, his right middle finger, and his groin and genitals. He noticed that his genitals were swollen and had wounds.

When asked about his internal responses to this episode of abuse, Amir described, "My soul was flying away. Like my body was not there. I started to think about my family …When I woke up [from the beatings], I felt like I was not of this life. But my body was there, the pains in my body were there."

Following this episode, Amir was kept naked in his cell for about four days. During that period, representatives of the International Committee of the Red Cross (ICRC) visited him and he told them about his ill-treatment. The ICRC personnel provided him with clothing and blankets, which were confiscated after they left. When the Red Cross returned the following day, these provisions were given back to him — only to be taken away again when the visitors left.

Amir noted, "After four days, they gave me back my clothes and blankets and I went back to normal prison routine. By normal I mean they stopped hitting and torturing me." Amir reported that the soldiers started calling him "Tarzan." That nickname was written on a piece of paper and pasted on his cell door for six days. Explained Amir, "They called me this, because I had the toothbrush in my hand and I was naked like Tarzan, who held a knife and was naked. The interpreter explained this to me in detail."

When asked "Did any doctor help you with your injuries?," Amir uncharacteristically interrupted the interviewer and cried out, "Did I need to ask for help? I was there naked and bleeding. They were supposed to help… These were not real doctors. They had no compassion. They were not there to practice medicine but to make war."

He reported that he remained in that cell, alone, for another two months and then was transferred to the communal tents at Abu Ghraib. In July 2004, Amir stated he was transferred to Bucca prison, and then in November 2004 was returned to Abu Ghraib for two days before being finally released without charge. He did not report any torture or ill-treatment while at Camp Bucca.

In addition to the abusive treatment Amir reported directly experiencing, he also reported witnessing other prisoners being tortured and humiliated. Once, he saw naked prisoners being forced into a pile that formed a human pyramid. On another occasion, he was forced to watch two prisoners appearing to simulate anal intercourse. Amir stated, "[The prisoners] were begging 'This is a sin against our religion, please show mercy.' The soldiers were pushing them into each other, and these guys were trying to [push] away, and this [lasted] more than half an hour and this was in front of our eyes."

## Medical Evaluation

### Reported Physical Symptoms

Amir reported feeling extremely weak, losing a great deal of weight, and experiencing severe headaches during his detention. While the headaches have improved, they persistently occur approximately once every one to two weeks. The headaches can be induced by feelings of nervousness, hunger, or anger; are often associated with vomiting and sensitivity to light; and can last from one hour to several hours or even an entire day. Amir also experiences periods of dizziness since his detention.

Following the reported sodomy, Amir described having rectal bleeding and painful bowel movements that lasted approximately two weeks. The injuries to his genitals caused him chronic penile pain (lasting more than two months); blood in the urine (for about two weeks); and significant scrotal pain that gradually improved. He continues to have chronic discomfort in his left testicle, including during sexual intercourse.

Following the beatings, Amir described having pain all over his body. He continues to experience pain in his back and knees (particularly when walking) and discomfort in his right middle finger and in his left big toe while walking. Moreover, Amir described having persistent significant left lateral-side chest pain, which hindered him from sleeping on his side for more than one and one-half years. Also, since the trauma to his nose while in prison, Amir has had difficulty breathing. He reported that he continues to experience some discomfort when sleeping on his left side, and it gets worse when he takes a deep breath.

Amir described currently experiencing palpitations (irregular heartbeats) multiple times every day. The

palpitations would typically last a few minutes, and he attributed them to his memories of abuse. "These are the memories I can never forget…I want to forget, but it is impossible."

*Assessment of Physical Evidence*

Many of the beatings Amir described would likely have resulted in bruises and soft tissue injuries that would not leave lasting physical marks. However, the physical symptoms he described and findings on physical examination strongly support Amir's reports of torture and ill-treatment. Physical examination revealed a slightly curved and depressed scar on the left lower side of the nose, a slight bony prominence on the top left side of his nasal ridge, and a faint crackling sound on palpation at the tip of the nose. The several scars noted on his head are consistent with the reported kicks or other blunt trauma injuries that he sustained during detention. Further, several scars were noted on his hands. Thickening of skin and prominent linear scars on the knees is consistent with Amir's reports. The two-centimeter raised hypo-pigmented (i.e., lighter than the surrounding skin), slightly angled, fibrotic band at the base of his left big toe is highly consistent with a scar resulting from a significant laceration and subsequent bleeding that Amir described.

Musculoskeletal examination was significant for some slight tenderness over his scapular regions bilaterally, and tenderness over the area of the left lateral sixth rib with a slight prominence noted on palpation.

The genital examination showed there was tenderness to palpation of the left testicle and a fibrous band between the base of the head of the penis and the shaft of the penis that Amir reported did not exist before. This is highly consistent with the events Amir described, including a traumatic injury and subsequent scarring process. Examination of the peri-anal area showed signs of rectal tearing that are highly consistent with his report of having been sodomized with a broomstick.

The continued scrotal discomfort that he described is likely as a result of the injuries to this area that he reported sustaining.

Chronic headaches and dizziness are common among torture survivors who have experienced head trauma. The headaches and dizziness that Amir described, which he did not have prior to his imprisonment, are likely to be a result of the head trauma. Moreover, his continued psychological symptoms and distress likely contribute to these headaches as well.

*Medical Diagnostic Tests*: Bone scan findings are consistent with a history of trauma to his ribs. Further, accumulation of the nuclear materials in both feet and ankles are consistent with a history of trauma to these areas.

*Assessment of Psychological Evidence*

Prior to his arrest, Amir described himself as a "calm and gentle person", who has been an effective provider, "good" to his family, and "smooth" and "patient" with everyone. In contrast, he described feeling that his family has been shattered and that much calamity had fallen on them because of him, and he spoke at length about feeling helpless to protect or provide for his family.

Following his release, Amir found himself constantly being "nervous" and "on edge." He described a high level of stress caused by bombings, nightly raids, uncertainty about personal safety, frequent funerals of neighbors and acquaintances due to the war, and ongoing sadness about the losses that his family had sustained. Moreover, as a result of conditions related to the war, Amir was unemployed at the time of evaluation. Nevertheless, Amir emphasized that his post-prison, war-related stressors are not the primary reason for his emotional "disturbances." He stated, "No sorrow can be compared to my torture experience in jail. That is the top reason for my sadness. I cannot forget it."

Amir's reported symptoms and behaviors conform to all three clusters of PTSD symptoms including intrusive recollections of the trauma, hyperarousal, and avoidance. These symptoms are directly traceable to the traumatic experience that he reported.

Amir described suffering from flashbacks and intrusive memories. His days are often preoccupied with images and thoughts of his experiences at the prison. He added, "It is like in my head I have never left Abu Ghraib." He also suffers from flashbacks and recurrent nightmares about his traumatic imprisonment. He confirmed experiencing distress, including fear and outrage, and exhibits physiological reactivity (i.e., startle response, throat constriction, chest pain, heart palpitations) upon being exposed to cues that are reminiscent of the trauma, such as the sight of US soldiers or the recollection of his torture.

He reported numerous symptoms of hyperarousal including suffering from severely disturbed sleep, often sleeping approximately two hours a night; moodiness; outbursts of anger; exaggerated startled response; and low tolerance ("I constantly feel disturbed. I would break everything in the house. When I disagree with my wife, I would smash things.").

In addition to the above symptoms of re-experiencing and hyperarousal symptoms, Amir described symptoms of avoidance and emotional numbing, including having trouble being naked in front of his wife; avoiding open space, people, and social activities; and feeling flat or constricted in his emotions ("Maybe I feel about one quarter of my feelings."). He also confirmed feeling isolated, as well as detached or disinterested in forming social relations after his release from prison.

Amir described feeling helpless and having a "dark" sense of the future. Moreover, he articulated a sense of wounded pride and stolen honor. He explained that the dissemination of photographs from Abu Ghraib on the Internet had exposed his humiliation to the world. He is plagued with an acute sense of scrutiny wherever he goes. Worse is his perception that this public knowledge has ensured that his children will suffer the blame and dishonor of his reputation as a former detainee and will thus be at risk for a life of shame.

Amir disclosed that he constantly harbors suicidal ideation, although he adheres to the teachings of Islam, which prohibit suicide. He further described that while in prison he tried to kill himself by banging his head against a hard surface. He reported frequent thoughts of revenge and homicidal fantasies.

The symptoms of sexual dysfunction are consistent with a previous history of sexual violation. As noted above, he reported having trouble being naked in front of his wife. He described being easily scared by his wife's sudden, even slight movements in sleep. Flashbacks of his torture, especially the sexual aspects, would often intrude during sex with his wife. In such instances, he would then "lose all strength." Along with this symptom of erectile dysfunction, he also reported low sexual drive and minimal interest in sex. Amir specifically described triggers, context, and time frame that connect the sexual dysfunction to the traumatic violation of his experiences at Abu Ghraib. The impairment is likely linked to post-traumatic re-experiencing of the sexual violation.

*Psychological Tests*:[45] with no evidence of deliberate exaggeration. On the self-report measures administered, Amir reported several symptoms of PTSD, anxiety, somatization, hostility, paranoid ideation, phobic anxiety, and obsessive-compulsiveness, interpersonal insensitivity, and depression. Although his score on the BDI suggested a moderate-high level of depressive state, it did not

approach the diagnostic level of clinical depression. On the Dot Counting Test, a clinician-administered test of symptom exaggeration, Amir's performance earned him a score within the normal range

## Analysis and Conclusions

Amir demonstrated historical, physical, and psychological evidence strongly supporting his allegations of torture. He provided substantial detail regarding many components of his abuse. He was forthcoming about what he does and does not recall.

Amir appears to have been suffering from physical and psychological symptoms since his release from Abu Ghraib, and described several marked impairments in his social, sexual, and emotional functioning subsequent to that experience. These impairments are consistent with Amir's allegations of having been subjected to extreme ill-treatment, injuries and threats, and of having experienced an intense degree of terror and helplessness about the integrity of his mind and body.

The physical symptoms Amir described and findings on physical examination strongly support Amir's report of torture and ill-treatment. The ongoing physical effects of his abuse include headaches, dizziness, musculoskeletal symptoms, and decreased sexual drive. These physical effects may have psychosomatic aspects as well, as a result of the PTSD from his imprisonment and ill-treatment.

The psychological findings on Amir's current symptoms and mental status during the evaluation are highly indicative of significant psychological injuries. The cumulative psychological findings form a coherent and realistic pattern of severe PTSD impairments. His clinical profile is highly consistent with a history of severe traumatic violation. The particular constellation of symptoms documented cannot be accounted for by psychological maladjustment prior to his arrest and imprisonment, as Amir's description of the pre-arrest period suggests that he was psychologically well-adjusted and resourceful, and his account of his feelings, self-experience, and functioning following his release from Abu Ghraib is highly consistent with the onset of PTSD. Amir's high percentile rankings on the indices of somatization, anxiety, hostility, phobic anxiety, and paranoid ideation concur with the clinical profile of an individual suffering from post-traumatic stress and lend further support to the above diagnosis of PTSD.

While stressors related to the current war in Iraq and to his public status as a former Abu Ghraib detainee may have exacerbated some of his symptoms (e.g., his sense

---

[45] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

of distrust and scrutiny, sense of economic impotence, anticipatory anxiety about further arrest), his most debilitating symptoms are tightly connected to his experiences while imprisoned and subjected to torture, ill-treatment and sexual violations. Moreover, the pattern, extent, and course of his symptoms are more likely and coherently explained in connection to his experiences during imprisonment than to the stressors of unemployment or daily life in a war-torn region.

The manner in which Amir described his detention experience, both in content and in style, as well as the clinical findings lead us to conclude with high confidence that he is credible.

In conclusion, the evaluation produced findings that support significant physical and psychological injuries from torture as well as consistency in Amir's symptoms and trauma history.

## PROFILE 8: HAYDAR[46]

Haydar came to be in US custody after being detained first by the Taliban and then by Afghan forces allied with the United States in late October or early November 2001. He was held in Kandahar and Guantánamo Bay detention facilities, where he was subjected to beatings, sexual and cultural humiliation and extreme temperature manipulation. He was released in the summer of 2004. The medical findings show that his ill-treatment led to a major depressive episode, post-traumatic stress disorder, and panic disorder. Additionally, visible scarring is consistent with Haydar's allegations of physical abuses endured.

> "[In Guantánamo, a] female soldier subjected me to pepper gas and then sprayed me with water with extreme force, and I was writhing on the ground in pain."

### Background

Haydar, who grew up in a large middle-class family, is in his late thirties. He described his childhood as quite happy but reported being unhappy for having resigned himself to an "intolerable" marriage. He has four children, whom the youngest is now ten years old. He reported becoming severely depressed and increasingly desperate over the year prior to his arrest and eventually traveled to Afghanistan as the result of this desperation.

Having dropped out of high school, Haydar explained that he held many different jobs but "didn't have a profession." After he was married, Haydar launched an unsuccessful business that left him deep in debt. He reported that the ensuing severe financial difficulties led him to make the risky decision to spend all his money trying to win a lottery, which in turn caused him to lose his remaining money. He recalled that he read a newspaper advertising lucrative employment opportunities in Afghanistan. ("I read that they give a house, a car and work to those who are willing to work in Afghanistan.") He decided to leave for Afghanistan but he reported that he made it only as far as the border before being picked up and detained by the Taliban.

Haydar reported that the stresses of his personal situation led to psychological symptoms even before his detention experience, noting that he had attempted suicide twice, had severe sleeping difficulties, and diminished appetite and nausea due to excessive cigarette smoking and daily alcohol use.

### Allegations of Arrest and Abuse

Haydar reported that he was initially arrested by the Taliban shortly after his arrival in Afghanistan in late October or early November 2001. Easily identifiable as a foreigner because of his "Western" clothing, he was accused of not being Muslim because of his lack of a beard and inability to read the Koran. He was detained in two separate locations for seven or eight days and was eventually transferred to a house with ten or twelve other people where "they gave us food and drink" and told us, "You are our guests." Subsequently, Afghan forces allied with the United States raided this house. Haydar and the others had their wrists tied, were struck in the head, and then put on a minibus. He recalled, "They were beating us on the way, and they put us in a small prison."

Haydar recalled being beaten severely by "American allies" in this facility and was struck with rifle butts, kicked, and beaten with shovel handles, causing his mouth to bleed. He was kicked in the side of the head and described that the injury was "like a fountain [of blood] — my clothing had blood — it shot out of my ear — the membrane exploded inside my ear." They then took him to a room covered in feces, kicked him such that the feces were forced into his mouth. He recalled, "I was just thinking [about] when . . . the strikes would end and [if] I [was] going to die." He also described having had his testicles pulled very hard for several minutes but did not believe he had suffered any damage as a result. Haydar remained in this prison cell for nine days

---

[46] Haydar's medical evaluation was conducted by Allen Keller, MD and Barry Rosenfeld, PhD.

before being transferred to another prison, "Ismail Han Zindan," where he remained for approximately two to three months.

At Ismail Han Zindan prison, run by Afghans allied with the United States, he was visited by representatives of the ICRC, who brought him blankets and soap and water for bathing. Haydar reported that he was hungry during much of his detention at Ismail Han Zindan. There was no water or bathing facilities for the prisoners, and "we didn't need to search for lice on [our bodies]. You could scoop them up in your hands." This prison held 200-300 detainees and, according to Haydar, it was "very crowded," with fifty people staying in units built for fifteen to twenty people. American personnel eventually shackled and hooded him, transferring him by air to the US facility at Kandahar. During transfer he recalled having difficulty breathing because of the hood and thinking about "torture, fear of death...that they were going to kill you."

Upon arrival at the Kandahar facility, chains were put around his feet, wrists and hands from behind. He noted, "[Americans] cut all of our clothing [off] with scissors — everyone there was stark naked, and everyone could see each other's sexual organs." He noted feeling humiliated, and added, "There were many women in the group of soldiers. One of the soldiers made me bend over and inserted a finger into my anus — I don't know if it was medical or to humiliate me." He stated that a soldier "sprayed us everywhere with something that smelled like insect repellent — and they shaved everything on our body. Then they dressed us and put hoods over our heads."

Subsequently, he was forcefully kicked while on the ground, causing his lip to swell. He reported being "beaten so mercilessly that three of my teeth fell out and a fourth was taken out in Guantánamo...They kicked me so hard that I had a very large bump [on my head]...It was so large that the doctors removed it." When asked how long the beatings lasted, Haydar replied, "If I said hours it would be an exaggeration, because if someone beat you like that for hours you would die, but I was beaten for at least 10 minutes." At that point, he both believed and wished that he would die. Haydar recalled having been interrogated three times in the three days he was held at Kandahar. He reported that the soldiers "hit my head against wooden columns" while he was being taken to his first interrogation. He was repeatedly asked the same questions: "Are you a terrorist? Are you Taliban?" After these three days, and still in pain from the initial beatings he received on arrival, he was

hooded by American personnel, placed on an airplane, and transferred to Guantánamo. During the flight, he and the other prisoners were chained to hooks on the floor in a crouched position. "I might have passed out. I couldn't think of anything other than the pain in my back in that position."

Haydar did not find out that he was at Guantánamo until months after he had arrived. Similar to their treatment at Kandahar, upon arrival to Guantánamo, he and the other detainees had their clothing cut with scissors. Haydar said that they were sent to communal showers, where they bathed while soldiers, some of whom were female, watched and laughed. After the showers, they were again chained and "a doctor put a finger in our anus." When asked how he knew the individual was a doctor, Haydar replied, "I'm saying 'doctor' in order to comfort myself now." The detainees then were dressed, hooded, and beaten by the soldiers while they walked to their cells. Soldiers kicked them and threatened them with dogs ("I still see the dogs in my dreams — that they are coming for me and are going to bite me.") Although Haydar was not bitten, he reported at one point seeing another detainee being bitten. Haydar added that he was hit with fists, kicked, and dragged on the floor. He reports bruises and bleeding "all over" from this treatment. He recalled, "In fact, the next day when they took me to the doctor, the doctor couldn't control his own tears, saying [to the military guard], 'How could you do this to him?'" He noted that the doctors treated his wounds and "they gave me injections and made me take medicines" but added that he was unsure what medications he was given or why.

Following this incident at Guantánamo, Haydar denied any other severe physical abuse, although he described a number of occasions in which he suffered significant physical pain. For example, he recalled having been sprayed with pepper spray ("This one female soldier subjected me to pepper gas and then sprayed me with water with extreme force — and I was writhing on the ground in pain.")

Haydar was held in one cell for about three or four months before being transferred to a second camp at Guantánamo. Haydar described the conditions in the first camp as "egregious — the conditions we were living in — We were treated like animals-they were treating the dogs better than they were treating us." He explained that his cell had only a bucket to use as a toilet and a second bucket for water.

During his transfer to the new camp, Haydar was hooded, his hands and feet were chained, and he was

put in a vehicle that brought him to the second camp. "Our bodies [were] pushed forward [causing] back and neck pain. The pain was so bad that I would cry from the pain." In the second facility, the toilet and water situation in the cells were improved, but Haydar noted that "the other one was airier." He noted that the new camp was similar to the first one, but he was allowed to go to a small recreation area for ten or fifteen minutes once or twice a week. He added, "I wasn't beaten, but I was subjected to the pressurized water," which soldiers would spray on the detainees while they were sleeping under the guise of cleaning the cells. Haydar also reported that soldiers would yell and taunt detainees during the call to prayer and would sometimes spit in or throw out part of their food rations. However, he noted that not all of the soldiers were so malicious, and some "treated us well." Haydar estimated that he spent approximately two years in this second camp before being released. During this time, he recalled being interrogated approximately twenty times. In at least one instance, he recalled having been forced to sit in an extremely cold room with his hands and feet chained to a ring on the ground.

While in Guantánamo, Haydar recalled hitting his head against the door many times "so hard … that I would faint" and explained, "I had a lot of pain in my chest — it felt like I was choking." Haydar reported receiving psychological and medical care throughout his detention. He stated that the soldiers "called me crazy there and the doctors told them to leave me alone," despite the fact that he would frequently spit or throw water at them. He noted that he was prescribed Zoloft for much of the two years he was detained in Guantánamo and saw a psychologist regularly. He explained, "I was having really bad nightmares…I felt like I couldn't breathe. They gave me repeated injections in my hips to calm me down." Haydar indicated, however, that he suspected the psychologists shared information with the soldiers.

Haydar also described numerous physical problems from which he suffered while in Guantánamo, including headaches, chest pain, and pain in his back and left side, as well as numbness in his legs and hands. He was given injections and believed they were treatment for these pains. Haydar recalled seeing doctors frequently ("almost every day — Sometimes a doctor would come and put a chair down and observe me for an hour or so. He would watch me, observe me walking, eating, how I interacted with people in my environment.") He also reported having had several operations to remove a large bump caused by being beaten in Kandahar. He noted that he continues to have headaches periodi-

cally and acknowledged that they had worsened since his incarceration.

In addition to medical and mental health treatment, Haydar recalled being seen by representatives from the ICRC on many occasions. However, he noted, "They didn't pay much attention to us because they didn't speak our language." He stated that he was never given the opportunity to speak with a lawyer.

Haydar was eventually released, without any charges being brought against him, in the summer of 2004. He recalled, "They took our photographs. As soon as we boarded the plane they bound our hands and feet and put sacks over our heads." He recalled thinking, "We are not free; they are taking us to kill us. And just as I was taken in chains and a sack in this abusive way from Afghanistan to Guantánamo, they took us from Guantánamo to [my home country]. In front of the Red Cross and media and cameras, they made it look like we were free, but as soon as we were on the plane we were bound again."

Haydar noted that he was never asked by US officials to sign any documents or confessions prior to being released but stated that his home government asked him to sign statements upon his arrival in his home country. He stated that he was detained for several days upon his return and was interrogated extensively about his experiences in Guantánamo; he did not report any abusive treatment by the local police. When asked to describe the documents he signed, Haydar replied, "I don't remember anything. I was completely exhausted — I have no idea what I signed." He stated that he later contested the validity of the documents and was ultimately released.

During his detention in US custody, Haydar's family experienced great upheaval: his wife left him, and his father was killed. Haydar explained that it still causes him pain to think about these events. He stated, "At this very point, when you mention it, I feel a pain in my chest."

After his release, Haydar reported he was unable to find employment. "I tried very hard, but I can't work — I tried a few times but I experienced intense pain in my back and I couldn't sleep through the night. I applied for a few jobs for lighter work but I didn't get them." He noted that he has occasionally found work for a day or two, through friends, but described this as infrequent. He added that he subsequently relocated, after gaining custody of his children, and his mother has moved into his home to help with their care.

Shortly after his release from Guantánamo, Haydar received treatment for his physical and psychological problems at a center affiliated with the International

Rehabilitation Council for Torture Victims (IRCT). He stated that he continued taking Zoloft, an antidepressant medication he was given by the US doctors at Guantánamo ("From America they had given me a bag full of medicine"). He stated that he continues to take antidepressant medication, although he acknowledged many continued symptoms and difficulties.

Haydar stated that, despite his continued physical and psychological difficulties, he maintains many social relationships and has been engaged in romantic relationships. He noted, however, that he is somewhat more withdrawn than he was before his arrest and detention and added that he has also increased his cigarette smoking considerably, from approximately one pack per day before his arrest and detention to nearly two packs per day, explaining, "I feel more relaxed when I smoke."

## Medical Evaluation

### Assessment of Physical Evidence

Haydar reported experiencing daily chest pain and occasional headaches that began while he was in Guantánamo, although the pain has improved after his release. Haydar also described experiencing persistent stomach pain, which has improved with the medicine he has now been prescribed. Haydar described experiencing daily lower back pain and numbness in his legs, which began while he was in Guantánamo and is exacerbated by lifting heavy objects and walking. He reported that this pain wakes him up every two to three nights. He attributed this pain to having been chained in a "bent over" position for extended periods of time (e.g., during the plane ride to Guantánamo and whenever he was outside his prison cell).

Haydar's physical examination yielded several significant findings. He has poor dentition with several missing teeth, consistent with his report that three of his teeth were knocked out when he was beaten in Kandahar, with a fourth extracted while he was at Guantánamo. He is missing three other teeth, which he reported were extracted prior to his imprisonment. A musculoskeletal examination revealed some pain when he tried to flex or elevate his leg, which was greater on the right side than on the left. There is point tenderness with palpation over the lumbosacral region (vertebrae and bones in his lower back).

Haydar also had numerous scars on his body, some of which can be attributed to his treatment while in detention. There is a jagged scar extending laterally on the left side of his lower lip consistent with his report of being kicked in the lip. Dermatologic findings include a slightly indented atrophic scar on the back of his left forearm. He attributed this scar to being pulled on the floor while at Guantánamo. He has a hypopigmented linear scar on his right ankle, which he attributed to shackling while imprisoned. A faint hypopigmented scar at the base of his right and left wrists were reportedly injuries resulting from, and are consistent with, handcuffs rubbing against his skin. Haydar also has several dermatologic findings, which he reported were unrelated to his imprisonment. The forensic evaluation report conducted in 2004 by representatives of a center affiliated with the IRCT and reviewed by PHR professionals revealed a number of similarities to the findings of the present evaluation.

*Medical Diagnostic Tests*: A total body scan conducted in 2004 by a center affiliated with IRCT revealed no evidence of abnormalities.[47]

### Assessment of Psychological Evidence

Haydar, a tall, thin male who appeared somewhat older than his stated age, was easily engaged in the evaluation. Despite his superficially cheerful demeanor, Haydar described himself as quite depressed, although he acknowledged that he suffered from bouts of depression before his arrest and detention. He reported frequently crying and feeling irritable, particularly in the mornings. He also described feelings of guilt and worthlessness, blaming himself for his father's death and mother's subsequent suffering. He reported frequent chest pain ("feeling a sudden crisis in my heart") that occurs "more often when I'm stressed." He also described an extreme fear of black dogs and cats that he attributes to the dog attacks in Guantánamo ("Whenever I see black dogs I immediately try to get away"). Haydar also reported having occasional nightmares in which he is attacked by dogs. He acknowledged considerable fatigue prior to his detention that he attributed to his marital problems, but stated that this fatigue worsened significantly while in Guantánamo ("I always wanted to sleep. I didn't want to talk to anyone. I couldn't think about the future."). He was alert and oriented to person, place and time, and his concentration was grossly intact, but his memory and abstract reasoning abilities were somewhat limited. His overall intellectual functioning appeared below average, and his insight and judgment were limited.

The report prepared by the center affiliated with IRCT revealed similarities to findings in this evaluation, including symptoms of a severe sleep disturbance

---

[47] The absence of a positive diagnostic test result must not be used to suggest that torture did not occur. See *Istanbul Protocol*, *supra* note 7, at 42.

including nightmares, frequent awakenings, and a generally restless sleep pattern "crying out and crying during sleep." He also reported frequent chest pain, episodes of intense anger, and headaches. Symptoms of depression recorded included occasional tearfulness, anhedonia (feeling estranged from others) and a diminished interest in sexuality, memory and concentration problems, and thoughts of suicide. The examiners at the center affiliated with IRCT also noted that Haydar had considerable guilt related to his father's death, along with feelings of worthlessness about himself. He was diagnosed with PTSD and major depression, both of which were thought to have resulted from his own experiences and those of his family while he was in captivity. Treatment notes indicate that Haydar was initially prescribed antidepressant and anti-anxiety medications.

*Psychological Tests:*[48] Haydar's responses to self-report measures administered were indicative of a severe PTSD and major depressive episode far exceeding published cut-off scores for clinically significant distress. He further reported an extreme level of somatization and high degree of anxiety, phobic anxiety, paranoia, and psychotic symptoms, all of which were consistent with his self-report. It should be noted that Haydar denied many other symptoms, indicating that his responses were not simply the product of indiscriminant endorsement. Thus, these results suggest the likely presence of several psychological disorders (depression, anxiety, PTSD, and somatization), with no evidence of any tendency to exaggerate the extent of his symptoms.

## Analysis and Conclusions

Haydar's clinical presentation, reported symptoms, and the results of psychological testing indicate the presence of several psychological disorders including a major depressive episode, PTSD, and panic disorder without agoraphobia (fear of being in public places). His description of intense chest pain accompanied by shortness of breath and intense anxiety is strongly suggestive of a panic disorder, although other possibilities (e.g., esophageal reflux) cannot be eliminated. It should also be noted that although Haydar reported significant depressive symptoms prior to his incarceration, his description of

worsening symptoms during the period of incarceration and the nature of his intrusive memories and avoidance behaviors suggest that his incarceration experiences are likely to have substantially exacerbated his reported pre-existing psychological difficulties. This conclusion is also supported by Haydar's description of ongoing treatment throughout the two and a half years in which he was detained. His treating physicians at the center affiliated with IRCT had concluded that he suffers from a major depressive episode and post-traumatic stress disorder.

The physical symptoms and findings on physical examination support his report of ill-treatment while imprisoned. It is also important to note that many of the beatings Haydar reported likely resulted in soft tissue injuries and bruises that would not leave lasting physical marks. Nevertheless, the scarring on his ankles and wrists is consistent with lengthy periods of shackling. His report of continued back pain is consistent with being shackled in uncomfortable positions for long periods (e.g., bent over, chained to the floor for hours).

The evidence supports the credibility of Haydar's reported symptoms and experiences. His report to the PHR evaluators was consistent with that detailed in an evaluation prepared two years earlier by his treating physicians in his home country. Haydar's apparent credibility does not, however, necessarily mean that all aspects of his self-report were accurate. His report may have been somewhat exaggerated, such as the description of "a fountain" of blood spurting from his ear, which was not supported by evidence of injury to the tympanic membrane. It is most likely that such a report is due to distorted perceptions due to extreme pain and psychological distress rather than deliberate exaggeration. There was no evidence of any deliberate distortion or fabrications.

In conclusion, the available evidence provides strong support for the validity of Haydar's report of abusive treatment while in US custody, which appears to have resulted in lasting physical and psychological symptoms that far exceed the level of distress Haydar reported experiencing prior to his arrest and detention.

## PROFILE 9: ADEEL[49]

Adeel was originally detained in Pakistan in May 2002. He was transferred to US custody at Bagram military base and was subsequently transferred to Guantánamo. He

---

[48] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration). Of note, several of the measures administered had been previously translated and validated in his first language, with the exception of the Harvard Trauma Questionnaire (HTQ), which was translated by the interpreter.

[49] Adeel's medical evaluation was conducted by Onder Ozkalipci, MD and Christian Pross, MD.

was released in the fall of 2006, approximately two years after he was cleared to be released from Guantánamo. While in US custody, he was subjected to a range of abuse including prolonged isolation, stress positions, beatings, sexual humiliation, threats, forced nudity, religious humiliation, sleep deprivation, and food/water deprivation. The medical evaluation reveals physical and psychological evidence that strongly support Adeel's allegations of ill-treatment. He is currently suffering from a major depressive episode and PTSD.

*"For two months I couldn't sleep because there was very strong light. We didn't know if it was day or night. If you fell asleep just for a few minutes they played very loud American music, so you could not sleep."*

## Background

Adeel is in his early forties. He grew up in a large family and received a professional degree in the health field. Adeel initially left his country to provide humanitarian services in the midst of the refugee crisis resulting from the Soviet occupation of Afghanistan more than a decade prior to his detention. However, he was unable to return home because of political problems in his country and the persecution of his family. Some of his brothers had been imprisoned and others had been killed. At the time of his arrest, he was living in Pakistan with his pregnant wife and five children and was working as a teacher for an international organization.

## Allegations of Arrest and Abuse

Adeel reported that in May of 2002, Pakistani soldiers invaded his house at night, searching for a man of a different name and nationality. The Pakistani soldiers left after not finding this particular person, only to return a couple of hours later and arrest Adeel in front of his wife and children. Adeel reported that he was hooded and kept for nine days in a house that Pakistani intelligence services used as a prison. He was photographed and fingerprinted. He was not given enough food nor was he allowed to go to the toilet more than once a day. Adeel recalled that other than these deprivations, the Pakistani soldiers treated him fairly and he was not physically abused. After nine days, the Pakistani soldiers told him that he would be taken to Islamabad, but he, in fact, was transferred to Bagram military base in Afghanistan.

In Peshawar airport, he and other detainees were handed over to US soldiers. In the plane, the soldiers took all of Adeel's belongings, handcuffed him and shackled his feet. Adeel reported that it was hot, and he was hooded, chained to the floor and tightly shackled around his chest and waist, which caused him to have difficulty breathing. According to Adeel, the flight from Peshawar to Bagram felt like it lasted about fifteen hours. Adeel recalled that there were more than fifty detainees on the plane who were all transferred in the same conditions as he was. He recalled that the soldiers beat the detainees if they moved and insulted them with humiliating words that included sexual humiliation. Adeel recalled that during the flight the American soldiers grabbed him by the throat and threatened to choke him.

Upon arrival at the Bagram airport, all of the detainees were tied to one rope and dragged along into a hall. The rope was tied very tightly around Adeel's arm, which caused him severe pain. Soon after arriving, the detainees were taken one by one to a small room where they were forced to strip off all of their clothes. Adeel recalled that if they refused, they were beaten. He reported that he was subjected to a full body search in which the soldiers touched his private parts and also examined his body cavities including his anus, a treatment that he remembered as a particularly humiliating experience.

Adeel reported that at Bagram, he was never given any reason for his detention. He was kept for two months in a hangar in a compartment made of barbed wire and blankets. There were between twelve and to fifteen detainees in each compartment. "We were beaten every day in Bagram. You cannot move. If you move, you are punished. Punishment is suspension to barbed wire for one to two hours," Adeel recalled. Moreover, he reported that he was beaten almost every day as a punishment for talking to other detainees. He recalled: "During those two months we were not allowed to speak any word." Adeel recounted that in one incident when he recited the Koran while praying alone, the guards accused him of having spoken to another detainee. He was beaten and was chained to the barbed wire for several hours and "then I was taken to interrogations." Adeel recalled that it was excruciating to be suspended that way since the barbed wire hurt him when he lost his balance.

Adeel reported that the guards did not let the detainees pray together, which he said is very important for Muslims. "They didn't let us recite the Koran. They threw the Koran into the toilet in front of us," stated Adeel.

Furthermore, Adeel recalled that the detainees were fed cold meals, uneatable moldy bread, cereal and candies. In Bagram, he noted that during the first two weeks, the detainees including himself were continuously handcuffed and had to eat while handcuffed. Adeel recalled that some detainees remained handcuffed for

several months. Moreover, he did not have a mattress and had to sleep on the wooden floor, which was difficult and painful.

During his detention in Bagram, Adeel reported that he was not given a toothbrush and toothpaste. He therefore resorted to using a piece of a plastic bag to clean his teeth. However, the detainees were not allowed to keep any of the food packaging. He reported: "One day the guards found a very small plastic bag of candy. I wanted to keep it to clean my teeth. Then they beat all the persons in the hangar."

He recalled that the detainees were only allowed to take showers with one to two liters of water. Adeel noted that he and other detainees had to use communal showers — "ten prisoners at the time had to remove their clothes" — and he found that very shameful. Adeel recalled: "It was not easy to use the toilet" because the toilet was in an open space without doors. He noted that using the toilet in an open space was very humiliating for Muslims, and consequently many detainees, including him, often did not eat in order to avoid using the toilet. He reported: "[I] didn't go [to the toilet] for five days, because I didn't want to go." Adeel reported that during his detention in Bagram, he was constipated and suffered from severe renal and abdominal pain because the detainees were given limited water and because of his reluctance to use a toilet in public. Following Adeel's complaint, a "doctor" ordered the guards to give him more water and his pain subsided.

Adeel reported that he could not sleep because the compartments in the hangar were lit with very strong lights twenty-four hours per day, and loud rock music was played all the time. He recalled that the detainees had to sleep with their hands above their blankets or otherwise they were punished. As a result of these conditions, he stated that he lost any sense of time, not being able to distinguish night and day: "For two months I couldn't sleep because there was very strong light. We didn't know if it was day or night. If you fell asleep just for a few minutes they played very loud American music, so you could not sleep."

Between two weeks and a month into Adeel's detention at Bagram, the detainees were allowed one by one to walk around inside the compartment for about ten minutes a day. Some of the detainees including him were never taken outside: "for two months I didn't see the sun," Adeel recalled.

Adeel reported that some female guards abused the detainees more than the men: "Females made more problems than men. They ordered punishments. If you

didn't obey, then ten [guards] would come and beat you... We were naked several times. It was very shameful for us." He reported that the soldiers forcibly shaved his beard and head three times during his detention at Bagram. He noted one ICRC visit and that he was given Ibuprofen by the guards.

Adeel was interrogated two times for about three hours with the help of an interpreter. He stated that they suspected him of having worked for Al Qaeda in Afghanistan. He told his interrogators that he had not been to Afghanistan in the past decade and had been gainfully employed with an international organization. He reported that the interrogation stopped because, he believed, they could not confirm any of the accusations.

However, in early to mid-August 2002, Adeel was transferred to Guantánamo. During the transfer he was handcuffed, his feet chained to the floor and his body shackled very tightly to his chair. He was forced to wear a respiratory mask, black goggles, earphones with a humming sound, and long firm "special gloves so that you cannot move your fingers." Adeel stated that the plane was specifically designed for the transfer of detainees as they sat in a row, chained to a single long seat with their hands, legs and waist chained. Adeel recounted that he could not move any body part except for his head during the approximately "twenty-four hour flight." He recalled that the guards forced the detainees to take a drug that made him hallucinate. He imagined that the door of the airplane would open and he would fall out. After about six hours, they had to change planes, and he was dragged along by two guards. During this transfer, somebody touched him in a humiliating manner, which he considered the worst experience for him during those four years of detention. Due to its humiliating nature, he would not describe it in more detail.

Upon arrival in Guantánamo, the detainees were forced to stand outside while being exposed to the hot sun for five to eight hours. He asked permission to sit, which was refused. Adeel recalled that some of the detainees collapsed. He reported that a series of humiliating procedures similar to the one in Bagram followed: "They made the same examination as in Bagram — a, naked, forced anal examination. They took our pictures without clothes," stated Adeel. He also recalled that a blood sample and chest X-ray were taken.

He was interrogated for approximately four to five hours, taken to a block in Camp II, and detained in a small isolation cell, which he described as a metal container with a bed with sheets and blankets, and a camping mat that was later replaced by a mattress.

Adeel reported that his cell had a sink and a toilet and he estimated it to be about two meters in length and 1.5 meter in width. Adeel recalled, "Everything in [the] isolation [cell] was of iron."According to Adeel, the cell was constantly air-conditioned and very cold. When he tried to block the air-conditioning vent with a piece of cloth, the guards would remove it. Adeel recounted that he was told he would be kept in such conditions and in isolation for one month. He noted that only during food delivery did he have the chance to exchange a few words with other detainees.

After two weeks in isolation, he was handcuffed and interrogated by someone he perceived to be a civilian who spoke Arabic. Adeel believed him to be a CIA agent based on the conversation. He recalled that this interrogator was very friendly, gave him good food, and offered to release Adeel if he was willing to work for the US government. If Adeel refused, the interrogator said, he "would stay in Guantánamo all his life." Subsequently, Adeel was transferred to a different block, where conditions were somewhat better. He was kept in a "cage" but could freely talk to the other detainees.

Adeel noted that six months after his arrival to Guantánamo, he received a letter from his family via a Red Cross representative. He was subsequently allowed to send letters to his family every six to eight months during the periodic ICRC visits.

According to Adeel, the detention rules prohibited detainees from storing food in their cells. He recalled one detainee being punished with one month of isolation because he had kept an apple in his cell. Adeel noted that when the detainee reported this to the ICRC, this detainee was punished with an additional month of isolation after the Red Cross had left the camp.

While at Guantánamo, Adeel recounted an incident in which he refused to talk to an Arabic-speaking interrogator whom he thought was Lebanese, and he was punished with two weeks of isolation.

Adeel reported that after two months, he was transferred to a different block in Camp I, where he remained for seven months. According to Adeel, his conditions deteriorated. During Ramadan, he recalled receiving very little food that was given at ordinary meal times. He stated that he was always hungry. The food was of bad quality, and he noticed detainees were losing about ten to twelve kilograms. According to Adeel, once a week they were given a piece of meat the size of a matchbox. They were given water that was of a yellow color and that

smelled of feces.[50] Adeel avoided drinking it and subsequently got constipated and suffered from pain in the renal (kidney) region of his back. He described that most of the guards were very rude; they provoked the detainees, and he witnessed that they would punish detainees with handcuffing (shackling connecting the hands, feet and chest), checking body cavities and touching their "private area." Adeel recalled that he could not sleep because the guards were always making loud noises, stepping on and cleaning the iron floors.

Adeel recalled that the detainees were kept in extreme isolation in parts of the Camp Echo, including in one area in which he was isolated for two weeks. He reported that everybody in that camp "went crazy." According to Adeel, detainees were exposed to sounds and given lots of medications and injections. After two weeks in Camp Echo, he was taken to the interrogation room, and they asked him to cooperate with them. Again he refused.

He reported being fearful of being transferred to Camp X-Ray, where detainees were kept outdoors in cages, although Camp X-Ray had been closed by that time. The guards searched the cells with German Shepherd dogs. He noted the dogs jumping and barking at the detainees as a "very frightening experience."

Adeel reported that he believed the guards planted suspicions among the detainees by spreading rumors that some of the detainees among them were informers, which some men believed to be true. He stated that every time he was transferred to a new camp, he saw detainees whispering about him, and this made him feel very lonely.

Adeel stated that he believed that because of good conduct, during the last two years of his confinement he was transferred to a more communal setting, in Camp 4. Adeel described this camp as a "luxury" compared to the other camps. However, he recalled that there were ten detainees and one bathroom per cell and that there was no space for privacy. Adeel recalled that regardless of the better conditions, he felt isolated and "bad."

Finally, in the fall of 2006, he was released, without any charges being brought against him. Upon his transfer and release, Adeel recalled: "All the personal items

---

[50] He was shown the color codes at the below internet link for describing the color range of the drinking water: http://www.pitt.edu/~nisg/cis/web/cgi/rgb.html. He responded that the color of the water changed between the color codes: 255  250   240 up to 255  218   185. Every time when they filtered the water with toilet paper it was still a brown color. When asked whether he or other prisoners had suffered from gastroenteritis or whether a gastroenteritis epidemic occurred in the camp, he said no. He remembered the water smelled of chlorine.

that they had taken were not given back to me. They [released me] with only my clothes." Despite his release, Adeel reported that he experiences discrimination as a result of his detention in Guantánamo and continues to face various obstacles to integrating back into his pre-detention life. He currently lives far away from his family and is unemployed with limited prospects for changing his situation.

## Medical Evaluation

### Reported Physical Symptoms

Adeel reported that, prior to his detention, he had surgery on his nasal bone, a tonsillectomy and a duodenal ulcer, for which he was treated and had no complaints thereafter. Apart from that, he reported that he was a healthy man prior to his arrest and detention. However, currently he suffers from various health problems.

Adeel reported that since his detention in Guantánamo, he has been suffering from back and knee pain; he explained that his knee was swollen, and he was given anti-inflammatory drugs in Guantánamo. Currently, when he stands up, he hears a cracking sound in his knee that he attributed to not having been allowed to move in Bagram, to having been kept in painful stress positions on the floor in Guantánamo, to having been forced to sleep on a metal bed, and having been kept in "iron cages" with cold air conditioning. He reported that after his release, he could not move and continues to suffer from pain in his hip joint and back.

Adeel reported that in Guantánamo, he was diagnosed with tuberculosis and was given isoniazid and vitamin B6. According to Adeel, he recovered just before his release. Since his detention in Bagram, he reported having suffered from constipation; he can only go to the toilet two to three times a week. He stated that he often had gastric pain for which he was sometimes given drugs like "Librax." He has had stomach problems with epigastric pain, which is associated with a bad taste in his mouth in the morning and exacerbated when he eats butter, oil or spicy food.

While in Guantánamo, he got fungus on his feet and on the axillary (armpit) area and attributes this to the fact that the detainees did not have personal overalls and their clothes would get mixed up when they would return from the laundry. In the last two years of detention his skin turned dark on the left abdominal region. He used antifungal medication, which did not help.

Since his early days in Guantánamo, Adeel reported sometimes having ear pains that, despite his requests, were not examined; nor was he given any medication.

Adeel reported that while in detention, twelve of his teeth began to rot. He attributed this to not having a toothbrush and only using "bad toothpaste." He did not seek to see a dentist since he feared that the dentists would remove his teeth instead of repairing them.

### Assessment of Physical Evidence

The physical examination revealed several findings consistent with Adeel's allegations of torture. For example, the diagnoses of otitis externae (inflammation of the outer ear canal) and atrophic tympanic membrane (thinning of the eardrum) are consistent with his allegation of eardrum perforation as a result of beatings with subsequent secondary infection. The neurological examination of Adeel showed no neurological and pathological signs. Constipation can occur secondary to stress conditions and can result from inadequate intake of fluids and food and restrictions on mobility. The chronic constipation Adeel reported also may represent a psychosomatic manifestation of several forced anal cavity searches and a physical response to the detention conditions he reported.

Adeel had demonstrated gingival (gum) recession and absence of teeth which is highly consistent with Adeel's report of poor hygiene and health conditions in detention. Adeel had demonstrated vertebral abnormalities. Spondyloarthrosis[51] and discopathy[52] at the level of the second and third lumbar (L2-L3) vertebrae is consistent with his reports of long-lasting restriction of movements and physical trauma during detention. He experienced pain in right knee movements which is consistent with restriction of movements and reported knee trauma. However a dermatological expert opinion is needed to determine whether the darkening of the skin in the abdominal region is an after-effect of some kind of chronic intoxication by chemicals used for sanitary purposes or other substances applied during detention or post-inflammatory change after a fungal infection. Moreover, an orthopedic expert opinion and bone scan would aid in the detection of signs of non-visible soft tissue and bone injuries by beatings.

*Medical Tests*: Laboratory tests showed a normal blood count and normal blood chemistry results with the exception of an elevated hepatitis B antibody level (24 mU/ml) indicating exposure to the hepatitis B virus.

---

51  A complication from degeneration of the vertebra and intervertebral disks. Osteophytes, or bone spurs, form about the degenerating tissue which may, in turn, compress spinal nerves.

52  Refers to disease of the intervertebral disks.

Because Adeel does not remember any vaccination of hepatitis B, it may be the result of a past hepatitis B infection.

## Assessment of Psychological Evidence

Adeel reported that there is no history of psychiatric disorders in his family. He described feeling helpless, desperate, devastated, destroyed and very confused during his detention. Recalling his darkest moments while in detention, Adeel remembered thinking that "Satan" tempted him to commit suicide. But he said he adhered to Islamic rules. He stated that he was in constant fear, felt threatened and was always on the alert and under stress. He had palpitations and sweated profusely. He sometimes heard people speaking about him and then realized that he had only imagined it. He realized that he was hallucinating, which made him afraid that he was going "crazy."

Adeel stated that he currently feels that this traumatic experience has transformed him into a different person, and he no longer has a strong will: "I have lost all my life," he noted. He reported feeling lonely, isolated and abandoned. He stated that he does not have a job and lives far from his family or anyone with whom he can communicate and share his problems. He stated that he only lives with a small subsidy. He mentioned that he misses his family terribly and that he is afraid of the future. "I feel like I am in a big prison and still in isolation."

He reported having nightmares of Guantánamo that force him to wake up in the middle of the night, and not being able to go back to sleep because he ponders his misery. He reported starting to panic when somebody walks behind him and that he often feels people are looking at him, which makes him think that he is not normal. He stated that he is nervous and he gets irritated about minor problems. Adeel reported that he sometimes suffers from blackouts and he has lost some of his memory capacity. He cannot remember the Koran very well, and he has no desire to read like he did before.

Adeel reported that he generally mistrusts and is afraid of people unlike before. He stated that he avoids making friends and does not want to talk to anybody. He said that his view of the world has changed for the worse. He is haunted by the bad memories from Guantánamo every day, and he avoids people with uniforms when he is in the public. He reported that he avoids thinking about his situation in order not to bring back bad memories. However, his solitude and overall situation make it difficult for him to distract himself from thinking about these traumatic experiences.

*Psychological Tests*:[53] On the self-report measures administered, Adeel reported numerous symptoms of PTSD, anxiety, somatization, and depression. Adeel's responses to the Dot Counting Test, a clinician-administered test of symptom exaggeration, indicated that he responded honestly with no evidence of deliberate exaggeration.

## Analysis and Conclusions

Adeel demonstrated historical, physical, and psychological evidence that strongly supports his allegations of ill-treatment.

Adeel suffers from chronic constipation. This symptom may be an after-effect of forced body cavity searches and physical response to detention conditions given the level of psychological trauma associated with his experiences. Evidence of eardrum perforation and chronic outer-ear infection is consistent with Adeel's history of beatings to the head. He suffers from inflammation of the gums and loss of teeth likely due to poor hygiene in detention. He was diagnosed with Spondyloarthrosis and discopathy at the level of second and third lumber (L2-L3) vertebrae and suffers from chronic pain of his knees and joints that is consistent with Adeel's history of restricted movements, prolonged exposure to cold temperatures and being shackled in painful positions for long periods of time. He also suffers from chronic gastritis. Considering that there is a pre-detention history of duodenal ulcer, his gastric complaints are most likely due to a preexisting ulcer disease and likely have been aggravated and become chronic because of detention.

Based on the self-report, Adeel suffered from transitory psychotic episodes that were likely due to long-term isolation in Guantánamo and the effects of the medications he received. Presently there are no signs of psychosis. The results of psychological testing and the clinical findings support the presence of several psychiatric diagnoses including major depressive episode and post-traumatic stress disorder. He suffers from intrusions, avoidance behavior and hyperarousal. He is constantly haunted by the memories of trauma; he avoids triggers that remind him of Guantánamo; and he has sleeping problems. He suffers from irritability, startle response, inability to concentrate, and memory loss. He is hypervigilant and has lost trust in people. All these symptoms confirm the diagnosis of PTSD. Additionally

---

[53] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

he feels hopeless and sees no future for himself. He has lost his energy and he isolates himself from people, all symptoms that support the diagnosis of depression.

Adeel's condition is particularly aggravated by the fact that he lives in social isolation, is unemployed, below the poverty line, and cut off from his family. He has virtually no opportunity for building a new life or finding a job. In addition, he does not have access to health care and psychological support services. Accordingly he sees his current life as an extension of his detention in Guantánamo.

In conclusion, the physical and psychological evidence demonstrate that Adeel is suffering from considerable physical and psychological pain as a result of his arrest, incarceration and ill-treatment.

## PROFILE 10: YOUSSEF[54]

Youssef was originally detained at the border of Pakistan in late 2001 or early 2002. He was held by US personnel at Kandahar and Guantánamo Bay detention centers. He was subjected to beatings, electric shocks, sleep deprivation, and sexual and cultural humiliation. He was released in November 2003. The medical findings indicated that Youssef is suffering from a major depressive episode, moderate PTSD, and panic disorder without agoraphobia.

> "[In Kandahar] as soon as we landed they started hitting us — some of them were hitting us with sticks, and some of them were punching us, and some of them were kicking us, and when we were on the ground some of them were kicking us between the legs."

### Background

Youssef, a male in his early forties, grew up in a large family. His father was a factory worker. His family often suffered from financial difficulties and illness. One of his brothers developed leukemia, and another had a physical disability. He described being raised as an observant Muslim.

Youssef attended school until the age of eighteen but dropped out because of his family's financial difficulties. He had problems finding work in his home town and eventually moved to another city where he found occasional employment as a construction worker. Later, he delivered water and medical supplies to refugees for a local charity. Still unable to meet his financial needs after several months, Youssef decided to travel with a friend to

Afghanistan in early 2001. He recalled that he was "told by a friend that my life would be better there — and I guess I believed him." After he arrived, he quickly learned there was little hope for employment in Afghanistan, but said he could not leave because his friend had taken his passport to get him a work visa. After the US war in Afghanistan began, he decided to leave Afghanistan via Pakistan and return to his home country.

### Allegations of Arrest and Abuse

Youssef recalled being detained at the Pakistani border in late 2001 or early 2002, while trying to cross the Afghan-Pakistan border without his passport. He requested access to his home country's authorities but was placed in a Pakistani prison for nearly two months where he experienced harsh treatment (legs shackled constantly, no ability to bathe, and little food). While in Pakistani custody he was interrogated by "the Americans" and, eventually, was transferred to a US prison in Kandahar, Afghanistan. During his transfer, he was hooded, making it difficult to breathe, and was shackled to the floor of the plane with his hands tied behind his back. He was never informed of where he was being taken or why and realized he was in US custody only when the bag was removed from his head in Kandahar.

Youssef reported, "As soon as we landed [at Kandahar] they started hitting us — some of them were hitting us with sticks, and some of them were punching us, and some of them were kicking us, and when we were on the ground some of them were kicking us between the legs." He related that the initial assault lasted for three to four hours and was extremely painful, although he suffered no serious injuries at the time. He also stated that he had difficulty urinating for the first "one or two weeks" after this assault, presumably from groin injuries. Youssef noted that he was interrogated during this initial encounter but stated that he did not understand the questions because he did not speak Arabic and only recognized the word "Taliban."

Youssef recalled that after his interrogation, soldiers stripped him naked. He noted that many of the soldiers were female and he believed that "they were just trying to humiliate us." He was allowed no sleep during his first night in Kandahar because the guards "kept kicking us [and] throwing sand at us." Throughout his roughly six weeks in Kandahar, he endured other abuse, including being stripped naked, being intimidated by dogs, being hooded, and being thrown against the wall on repeated occasions. He did not lose consciousness during these assaults. He also recalled having been subjected to

---

54  Youssef's medical evaluation was conducted by Allen Keller, MD and Barry Rosenfeld, PhD.

electric shocks once by purposefully being pushed into a generator and described feeling "as if my veins were being pulled out." He was threatened with electric shock on other occasions, but was shocked only that one time. With the exception of persistent wrist pain, he denied any lasting physical injuries from the beatings or the electric shock.

Youssef was subsequently transferred to Guantánamo in early 2002. He recalled that he was forced to disrobe in front of female soldiers, was clothed in an orange suit and dark goggles, and his ears were covered with headphones. He stated, "They didn't tell us anything — I remember the plane and the doors opening and there was warm air." He stated that he was unsure how long the flight lasted "but it felt like 24 hours." Youssef added that he was handcuffed and shackled to the floor of the airplane throughout the trip and noted, "We had those cuffs on for a very long time ... and they tightened up the cuffs on the plane and my hands started swelling up."

Youssef injured his leg when he slipped and cut his leg on a piece of metal while being transported to Guantánamo, but reported that it was not the result of ill-treatment. He stated before being taken to "Camp X-Ray," he was again stripped, sprayed with water and superficially examined by a doctor looking for wounds or broken bones ("They just asked if I had any pain ... I told them about my foot — and they took a blood sample and a hair sample, and they took saliva.").

Youssef described the conditions at Camp X-Ray as deplorable: "It was just a big plot of concrete and they had these steel cages [and] it was really, really hot...even in the night." The prisoners were let out of the two-square-meter "cages" only for questioning, were not allowed to speak to each other, and had to use a bucket as a toilet. Even small infractions could result in beatings. "If they would find one piece of string on the floor they would send in the 'robocops' [the IRF soldiers dressed in riot helmets and padded uniforms] to beat us." The detainees were kicked all over, including in the back, legs, and head. According to Youssef, during the two to three times that he was beaten this way in Camp X-Ray someone who he presumed to be a doctor was always present; he suspected this was to make sure there were no injuries. Youssef suffered bruising as a result of these beatings and did his best to follow prison rules in order to avoid such abuses. However, he witnessed other detainees being beaten this way on a daily basis.

In other incidents, he recalled, "the robocops" would enter his cell, forcing him to sit on his knees with his hands pressed together behind his back or head; or forcing him to lie on the floor with his hands behind his back and tied to his feet, forcing his legs to lift up. He stated that he was forced to maintain these stress positions for up to an hour.

He noted that he was provided adequate food and water in Camp X-Ray ("Compared to normal daily intake it wasn't enough, but we survived on it — it was bearable"). He reported frequent sleep deprivation and fatigue due to lengthy interrogations and the guards disrupting his sleep whenever his hands or feet were under the blanket.

After the first few weeks at Camp X-Ray, conditions improved slightly. Youssef and the other detainees were no longer beaten for speaking to each other, and he was allowed out of his cell at noon "to go to the bathroom" and for weekly showers, in addition to for occasional interrogations.

Youssef was transferred to Camp Delta with other detainees after approximately three months. He described the overall conditions at Camp Delta as better than those at Camp X-Ray. The camp had been built recently and included toilets and running water in the cells. The detainees were allowed to speak with each other; they were still confined to their two-square-meter cells, however, and let outside to exercise only for about fifteen minutes once a week, although this later increased to two and even three times per week.

Youssef reported that he was sometimes beaten by the IRF guards after interrogations and for infractions like hiding food in his cell. Once, following an interrogation, the chains on his wrist were pulled, causing him severe pain. He also recalled that the guards "would come with a spray and spray us in the eyes" causing severe pain. ("My whole body would feel like it was burning — not just my face, but my whole body, and it felt like they had filled my eyes with sand. And sometimes I felt like I was losing consciousness from the burning.") He noted that he "felt very dizzy and...I felt it very hard to breathe."

Apart from following interrogations or beatings, and despite his frequent requests for medical attention ("many, many" requests) for persistent stomach pain and swelling in his wrists, Youssef noted that he rarely saw physicians at Guantánamo. He was of the opinion that no one was concerned with the detainees' health and recalled having been told by one of the physicians, "We're making sure you don't die in here — besides that whatever happens doesn't interest us." Youssef reported that he was forced to take medications as part of what he considered "experiments" and recalled receiving an estimated ten to fifteen unknown injections, often developing rashes several hours after these injections

("red dots on my body and shoulders that would start to itch"). A fellow detainee informed him that the injections could cause impotence or heart attacks, although nothing was ever said by the doctors. He also indicated that some individuals administering the injections were "civilians … coming to take lessons — it was like internships" but acknowledged that this may only have been his perception.

Youssef stated that he was interrogated almost every other day while at Camp Delta. Although he was not subject to any physical assaults while being interrogated, some of his most painful experiences at Guantánamo occurred while being held in the interrogation rooms. He recalled being held in extremely hot or cold interrogation rooms for extended periods of time ("forcing us to sit chained for eighteen or twenty hours"); sometimes ice cold water was poured over him. He added that "sometimes they were playing very loud music" that was painful, although he denied sustaining any hearing damage. During the lengthy interrogations, he was not allowed to use the toilet or pray and described experiencing significant back pain from the extended forced sitting. He recalled "physicians" participating in these interrogations and occasionally checking on him; he thought their job was to determine whether the abuse could continue. He acknowledged, however, that he was unsure of precisely what was said between those he perceived to be the doctors and the soldiers, only that the abuse always continued ("The doctor was working with [the soldiers]").

While in Camp Delta, Youssef asked to speak with a psychologist because he was distressed, and the two spoke about him missing his family and his feelings of sadness. Although Youssef believed the meeting was confidential, he stated that shortly after the psychologist left, he was brought to an interrogator who immediately brought up information connected to his disclosures, such as telling him that he was going to stay at Guantánamo for the rest of his life and discussing his family ("Don't you want to leave this place and get back together with your family?"…If you do as we tell you, you can get back to your family."). He stated, "I figured out the reason they had called me for the interrogation was because the psychologist had told them about the meeting." He stated, "They were stressing these fears very much." Following this interrogation, Youssef reported that he was moved to the "worst" section in Camp Delta, where he was not allowed to have a blanket or a mattress.

Youssef also described a number of experiences that were extremely upsetting and humiliating. He reported being forced to look at pornography and to witness naked men and women appearing to have intercourse. He also described an incident in which a woman entered the interrogation room naked and smeared what he perceived to be menstrual blood on him, which he described as horrifying. He also witnessed soldiers desecrating the Koran, ripping it apart or writing offensive words on the pages, and occasionally throwing the Koran in the toilet or deliberately stepping on it. He also stated that the soldiers in Camp Delta loudly hit the cell bars with sticks when the detainees were praying. Youssef also said he was threatened by guards during interrogations, including threats that he would be shot. Interrogators claimed that his fingerprints had been found on weapons and that his name was in documents found in Afghanistan. They also claimed that his brother with leukemia had been arrested. He stated that he was asked to confess to both fighting against the United States and being part of al Qaeda or the Taliban. He was told that he would be released if he confessed to these accusations.

Youssef was transferred out of Camp Delta to another location that he referred to as "Camp Four." He explained, "It was better — generally they were saying that people who were sent there would eventually leave." He received medical attention for his stomach pain, headaches, and other problems (e.g., feet and eye problems), but added that, "They never treated anything." However, he acknowledged that "When I first got [to Camp Four I thought] I was about to die, because of the change in temperature [in the interrogation room] — that's when they gave me saline." He stated that he eventually returned to Camp Delta for another few days and told that if he signed a statement he would be released. He stated that he agreed to sign this form because "I was already under so much pressure." He was released in November 2003 without any charges being brought against him. He was then handcuffed, chained to the floor of an airplane, and returned to his home country.

Upon arrival at his home country, Youssef was detained by the local police but "was taken to court and I was set free." He noted that, in contrast to his detention at Guantánamo, the local authorities "were very civilized."

Youssef reported that he has had difficulty functioning since his release and has not been able to find steady employment, in large part due to his psychological problems. As soon as he returned to his home country, he served fourteen months of mandatory military service, where he spent most of the time in a psychiatric hospital ward because he was labeled "too aggressive" and "was not treating people above me the way I should

have been." At the time of the evaluation, Youssef was unemployed and volunteering part-time for a refugee aid organization.

## Medical Evaluation

### Assessment of Physical Evidence

Youssef denied having any significant medical problems prior to his imprisonment. He reported, however, that since his release from Guantánamo, he has felt chronically tired and weak. He did not mention any persistent back or muscle aches at the time of his evaluation, although he reported severe pain while in custody. He underwent surgery on both wrists to alleviate chronic pain caused, he believed, by the extended time he spent in handcuffs. Nonetheless, he noted that he has experienced renewed pain in his right wrist. Youssef added that he has continued to experience stomach pain that began while incarcerated. He also described frequently experiencing bitemporal headaches radiating to his eyes that last two hours or more and are relieved with pain medication. Youssef reported some difficulty breathing out of the right side of his nose, but was unsure of the cause or when it started. He also reported "trouble with my heart — it feels trapped, but when I went to the hospital and had various checks done, nothing was diagnosed — but I know it contracts."

Several significant findings were noted during Youssef's physical examination. His nose is slightly deviated to the left, but this deviation is of unknown origin. He also has tenderness in the muscles of his right wrist with extension. There is an area on the lateral posterior aspect of Youssef's left wrist with atrophic (i.e., thinning of the skin) changes and decreased hair, which he attributes to handcuffs rubbing against his skin. Well-healed vertical surgical scars are evident on the back of both wrists. A scar on his left ankle with slight atrophic changes is attributable to the injury he sustained while getting into a truck during his transfer to Guantánamo. Youssef has several other dermatologic findings, which he reports are unrelated to his imprisonment and is unsure of their etiology.

*Medical Tests*: A bone scan showed increase focal activity of both shoulders consistent with degenerative arthritis. Nasal bone X-rays showed deformation of the former detainee's nasal bone with deviation to the left, which is highly consistent with a history of trauma.

### Assessment of Psychological Evidence

Youssef was quiet and reserved, with little emotional expression in his voice or demeanor. He recounted having

many friends before his incarceration but has become more isolated since his release from Guantánamo. He acknowledges that prior to his imprisonment, his family problems distressed him, resulting in some sleep difficulties, diminished appetite, lack of energy, and periods of tearfulness. He attributes this state mostly to feelings about his brother's leukemia and not being able to help his family financially. While these symptoms were present when he was arrested, they worsened over the two years of incarceration. He described that after his release he has been "constantly sad" and noted that he cries periodically but less often than in the months following his return. He stated that he is usually lonely and is no longer able to feel happy; instead he feels irritable and short-tempered much of the time ("Nothing makes you happy — sometimes the most natural events will make you angry."). He denied sleep difficulties at present, but reported frequent past nightmares and dreams of being re-arrested. He also described feelings of guilt and hopelessness, feeling as if he has no future. He described himself as fatigued ("I feel like I never get enough sleep") and reported having difficulty getting out of bed. He also described feeling very uncomfortable whenever he sees military personnel or people wearing orange clothing (the color of his Guantánamo uniform).

He described being easily startled by loud noises and avoids places and interactions that remind him of his detention experiences. He cited this avoidance as one of the reasons why he left his home and is currently living in another city, i.e., to avoid discussing his experiences with his friends and family. He noted that he experiences periodic "heart problems" in which "my heart feels trapped." He explained that he has shortness of breath and frequent stomach pains, but does not experience numbness in his extremities or amnesia. When asked about his smoking, he acknowledged his intake increased dramatically, from only a few cigarettes per day before his detention to roughly half a pack per day at present. He acknowledged having a short temper, but denied suicidal or homicidal ideation and denied auditory or visual hallucinations. However, he revealed considerable paranoid ideation, both related to his detention experiences (e.g., believing that doctors were "experimenting" on him) and at present (e.g., feeling as if the government is monitoring his activities, feeling that he is being followed in the streets).[55] He was alert and oriented

---

[55] It must be noted that there may be some legitimacy to Youssef's suspicions. His perception that psychologists were complicit in interrogations and conveying his confidential information to interrogators is consistent with the well-documented role of psychologists in the

to person, place and time, and his memory and concentration were grossly intact but his abstract reasoning abilities were limited. His overall intellectual functioning appeared approximately average, and his insight was fair and his judgment was intact.

*Psychological Tests*:[56] On the self-report measures administered, Youssef reported a number of test items indicative of depression, anxiety, and PTSD, all of which were consistent with his self-report. He demonstrated symptoms of severe PTSD, far exceeding the established cut-off for identifying individuals with clinically significant distress. However, his responses to measures of depression suggested the presence of numerous depressive symptoms but likely not of the magnitude of a major depressive disorder. Youssef also endorsed a number of physical symptoms that are typically attributable to psychological causes (e.g., dizziness, nausea, numbness, stomach pain). Although the latter symptoms cannot be conclusively attributed to psychological, rather than organic causes, the possibility that these symptoms reflect a somatization disorder certainly exists.

## Analysis and Conclusions

Youssef's clinical presentation, reported symptoms, and the results of psychological testing indicate the presence of several psychological disorders including a major depressive episode,[57] moderate PTSD, and panic disorder without agoraphobia. Specifically, Youssef described a number of symptoms of depression that, while present to a lesser extent before his arrest and extended incarceration at Guantánamo, appear to have become pronounced, disabling, and chronic since his detention. His PTSD appears to have persisted throughout the three years since his release from custody. Youssef's description of "heart problems" and shortness of breath, with no identifiable medical etiology, is strongly suggestive of a panic disorder. It should be noted that although Youssef reported depressive symptoms prior to his incarceration, the timing of Youssef's reported symptoms and nature of his intrusive memories and avoidance behaviors indicate that the incarceration directly caused and/or exacerbated his psychological difficulties.

The physical symptoms Youssef described and the findings on physical examination support Youssef's reports of ill-treatment while imprisoned. Many of his scars are consistent with his described ill-treatment (e.g., being dragged while being handcuffed, beatings). Many of the beatings Youssef reported likely resulted in soft tissue injuries and bruises, which would not leave lasting physical marks. His report of headaches is certainly consistent with the history of head trauma he reported, although the possibility of a more psychogenic etiology of these headaches also exists. Likewise, his report of frequent stomach pain may be the result of a peptic ulcer disease or gastritis, but could also reflect a somatic manifestation of his psychological distress. Other findings appear clearer, such as the increased activity in both shoulders observed on the bone scan, which is consistent with degenerative arthritis. Given his young age, these findings are likely to have resulted from being forced to maintain uncomfortable arm positions as he described. The findings on a nasal bone X-ray film of a deformation of the nasal bone with deviation to the left are consistent with a prior history of trauma.

The available evidence strongly supports the credibility of Youssef's reported symptoms and experiences. Youssef was forthcoming in describing which symptoms have continued as well as those that have resolved. He was also forthcoming in describing what he experienced, including stating that he did not personally experience certain abuses reported by others. Furthermore he readily acknowledged that many of the scars noted on physical examination were unrelated to his imprisonment and ill-treatment and acknowledged considerable psychological distress prior to his arrest. Moreover, psychological testing suggests that Youssef responded honestly to the psychological tests, with no evidence of any deliberate exaggeration.

interrogations at US-run detention facilities. *See* M. Gregg Bloche & Jonathan H. Marks, *Doctors and Interrogators at Guantánamo Bay*, 353 New Eng. J. Med. 6 (2005). Further there have been numerous other allegations of experimental forced injections including for the purpose of interrogations. *See* Joby Warrick, *Detainees Allege Being Drugged, Questioned: U.S. Denies Using Injections for Coercion*, Wash. Post, Apr. 22, 2008, at A1, *available at* http://www.washington-post.com/wp-dyn/content/article/2008/04/21/AR2008042103399_pf.html. Psychological testing included both self-report measures of symptom distress (the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory) and the Dot Counting Test (a clinician-administered test of symptom exaggeration). Of note, several of the measures administered had been previously translated and validated in his original langue, with the exception of the Harvard Trauma Questionnaire (HTQ), which was translated by the interpreter.

56   Psychological testing included both self-report measures of symptom distress (the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory) and the Dot Counting Test (a clinician-administered test of symptom exaggeration). Of note, several of the measures administered had been previously translated and validated in his first language, with the exception of the Harvard Trauma Questionnaire (HTQ), which was translated by the interpreter.

57   A major depressive episode is not a disorder in itself, but rather is a description of part of a disorder, most often major depressive disorder.

Youssef's apparent credibility does not, however, necessarily mean that all of his perceptions and interpretations were accurate. For example, his description of medical experimentation and involvement in forced experiments may reflect a paranoid interpretation of events. Such a paranoid interpretation of ambiguous events is consistent with the presence of PTSD, as individuals typically become hypervigilant with a heightened expectation of additional ill-treatment. His perception that the treating psychologist had conveyed information to the individuals who subsequently interrogated him seems plausible and convincing because of credible, independent reports that the Guantánamo Behavioral Sciences Consultant Teams had access to detainees' personal health information.[58] On the other hand, Youssef's perception may reflect a heightened sensitivity to ill-treatment that often results from exposure to traumatic abuse (i.e., torture). Youssef may also have made mistaken assumptions about the identity of various personnel he encountered; for example, it may be that medics or nurses were present at interrogations or beatings, not physicians.

In sum, the available evidence provides strong support for the validity of Youssef's reports of abusive treatment while in US custody. In turn, this abusive treatment appears to have resulted in lasting physical and psychological symptoms that far exceed the mild level of distress Youssef reported experiencing prior to his arrest and detention by the United States.

## PROFILE 11: RASHEED[59]

Rasheed was originally detained in Afghanistan at the end of November 2001. He was held by US forces at Bagram, Kandahar, and Guantánamo. He was subjected to a range of abuse including prolonged isolation, sensory deprivation, forced nudity, beatings, various injections, unwanted medical procedures, forced shaving and exposure to cold temperature and loud noises. In the fall of 2006, Rasheed was released from Guantánamo. The medical evaluation reveals a wide range of physical ailments due to injuries endured during detention. He is currently suffering from complex PTSD and somatization disorder due to severe sequential traumatization by US forces.

"I am not the person I used to be. I have lost my kind attitude to people,. I lost my nerves. I have turned [completely]."

### Background

Rasheed is in his mid-thirties. After he finished high school, he attended a center for scientific research and became an engineer. He is married and has two young daughters. He lost two sons when they were infants. He converted to Islam in the mid-1990s. A few years later, when he refused to shave his beard and renounce his religion, he lost his job at a company as a result of his government's anti-Islamic stance. He then made a living by repairing audio players and working as a private construction worker. In 2000,[60] the police of his home country arrested him and held him on assertions of terrorism. While in custody, Rasheed was badly beaten on his head, back and abdomen. He reported that he lost consciousness, vomited and had blood in his urine.

Rasheed recounted that after his release, he was told by government officials that he either had to leave the country or he would be taken to prison. He fled his homeland in early 2001, and was forced to live in a transitory refugee camp in another country for four months. Rasheed reported that, because he did not have proper legal documents, government officials of the country in which he had sought refuge then flew him out of that country and into Afghanistan where he resided until the war began. In Afghanistan, he worked in various jobs, including as an engineer on the lighting system of a local mosque.

### Allegations of Arrest and Abuse

At the end of November 2001, when the US war in Afghanistan began, the members of the village in which Rasheed resided fled into the mountains where they stayed for a few months. Rasheed reported that one day, members of the village were stopped by bandits. He was abducted by the bandits, who sold him to US and Northern Alliance troops who were searching for insurgents and "offering $3000 for a captured insurgent."

In April 2002, he was taken to Kunduz, Afghanistan in handcuffs, with his eyes covered with goggles. His clothes were cut off and his body was searched, including "impossible" places. Rasheed recalled that he was beaten and remained confined and naked on a concrete floor. Because he was not allowed to go to the toilet, he

---

[58] Bloche & Marks, *supra* note 55, at 6-8.

[59] Rasheed's medical evaluation was conducted by Onder Ozkalipci, MD and Christian Pross, MD.

[60] Rasheed reported to the evaluators that he was arrested in November 2001 by authorities in his home country. However, his date of arrest has subsequently been confirmed to be August 2000.

recalled that he "defecated on the floor and spent the night in [my] feces."

In May 2002, Rasheed recalled being taken to Mazar-i-Sharif where he was beaten severely to the point of unconsciousness. Rasheed noted that when he woke up, he felt pain under his ribs, over his kidneys and in the area of his liver, and had blood in his urine. After three days, he was transferred by airplane to the military base in Bagram.[61]

## Bagram and Kandahar Prisons, Afghanistan

Rasheed reported that he was beaten by US soldiers during his transfer by plane to Bagram. He recalled that he stayed fourteen days in Bagram, where he was put in a cage and was interrogated over long periods of time. During the first two lengthy interrogations, he was not beaten; he was only hooded. During the third interrogation, he reported that he was hooded, repeatedly beaten by blows and kicked in his abdomen. As a result of the beatings, his head struck the ground and he lost consciousness.

When he woke up, he found himself in a clean room. He had a painful large swelling in his right lower abdomen. He recalled asking to see a doctor. Someone whom he perceived to be a doctor subsequently took blood and urine samples. Rasheed recalled that at that point he "wanted to die" because of the intense pain. However, against his will, Rasheed was held down by force and was given an unknown injection. He recounted that he woke up in a military hospital after having had a medical procedure without his consent, without information about the type of procedure, and against his wishes. Rasheed was told the swelling was not his appendix, but the nature of the operation was not disclosed.[62]

Rasheed recounted that while he was hospitalized he was handcuffed and tied to the bed with a leather strap. Rasheed recalled that his pain and the swelling remained present. When he was released from the military hospital after four days, two soldiers had to carry him because he could not move on his own.

Soon after his surgery, the Americans transferred Rasheed to Kandahar. During the flight, although he was in very bad health and only recently had undergone the operation described above, he was hooded, and his hands and feet were shackled and tightly tied together.

Rasheed recalled that his knees were tied in a kneeling position by adhesive tape. In this painful position, he was tied to the floor and was unable to move.

Upon arrival in Kandahar, Rasheed recounted that the US soldiers cut off all his clothes and stripped him naked. His hands and legs were in shackles and he was forced to wear goggles and earphones that prevented him from seeing and hearing. He was tied to a table with his hands behind his back. Rasheed reported that female soldiers sat on the detainees, took photographs, beat them on the head, and humiliated them by laughing and offending their religion.

After approximately two hours, Rasheed reported that the American soldiers tied him and the other detainees together with a rope and dragged them about 200 meters along a rocky pathway. He recalled that when he screamed because of the ongoing pain in his abdomen, the soldiers pushed his face forcefully down on the ground. The detainees were brought into a tent, where it was extremely hot; he felt it to be approximately 100 degrees Fahrenheit. Rasheed recounted that he was kept in the tent for about twenty days; he felt very sick. For the first seven to nine days he couldn't eat anything and requested to see a doctor. The soldiers told him they did not have a doctor. At that point, the swelling in his abdomen was "the size of half an orange," and its color had become black and blue. Rasheed noted that it took more than six months for him to recover fully from the pain and the swelling in his abdomen, and he received no medical treatment for his condition during that time.

Rasheed described that during his detention in Kandahar, he was unable to sleep because the soldiers played loud US rock music all the time. Rasheed also reported that the soldiers would unleash dogs on the detainees.

## Guantánamo Bay

In early summer of 2002, after he had been in Kandahar for approximately one month, the guards shaved Rasheed's head and beard and transferred him to Guantánamo. During the cross-Atlantic flight he approximated as "twenty-two hours," he recalled that he was shackled, his hands were fixed in stiff gloves, and goggles, a respirator mask, and earphones prevented him from hearing or seeing. Rasheed recalled that during the flight, the detainees were hit on the head very hard if they moved.

Upon arrival at Guantánamo American guards stripped detainees naked while their hands and feet were in shackles and conducted body cavity searches. Rasheed was taken to a block where he was interrogated several

---

[61] Rasheed did not identify the perpetuators of the abuse he endured before being transferred to US custody in Bagram (i.e., while being detained in Kunduz or transferred to Mazar-i-Sharif).

[62] Rasheed's Guantanamo medical file noted that he had an inguinal hernia repair in Bagram.

times with an interpreter. Rasheed reported that between interrogations he was chained to the floor. He recalled that the interrogators asked him the same questions over and over again, and he was threatened that he would "be forced to tell the truth."

Rasheed recalled that these frequent and lengthy interrogations were carried out while he was kept in an isolation cell for five days and deprived of his blankets. He recalled that his cell was kept very cold and that he had blood in his urine again and suffered from nausea and vomiting. However, he did not receive any medical attention. Rasheed reported that he was given very little food and was extremely hungry. He recalled that he could not sleep because there was a constant, very loud, unpleasant noise and "every fifteen minutes the guards banged loudly on the doors." Further, Rasheed noted that the guards walked around with truncheons and dogs and threatened to unleash the dogs on detainees. In one incident, Rasheed described that the guards tried to remove his shirt and shorts by force. He reported that when he resisted, two or three soldiers pushed him against the wall, and as a result, his head started bleeding.

According to Rasheed, after he complained to the commander and threatened to do "wild things with them," he was transferred to another block where the overall conditions were better, and he was given sufficient food. Rasheed recalled that during that time, he was interrogated by a "more friendly FBI-man" about military equipment, which he knew about from his service in his home country's army. Later, he was interrogated by a man from the military. Rasheed recounted that this interrogator tied him to the ground, threatened and shouted at him, pressed on his throat to the point of choking, and hit him in the chest and the jaw. Subsequently, he experienced swelling of the jaw and pain with chewing. The interrogator accused Rasheed of being a leader of Al Qaeda and a terrorist group in his home country and working with the Taliban. He recalled that the interrogator also said that Rasheed was mentally ill and threatened to extradite him to his home country where Rasheed would be tortured. When Rasheed refused to cooperate, he said that interrogators used a different approach involving a female interrogator acting in a sexual and provocative way. Rasheed recalled that this interrogator apologized for the rude behavior of her predecessor and came very close to him, touched his knees and talked to him in a seductive way. This was a very shameful experience and very hard for him to tolerate.

To avoid further interrogations, Rasheed said that he behaved as if he was mentally unstable. He reported that he shouted and threw his urine at guards. According to Rasheed, they did not punish him but his behavior compelled the guards to call in psychologists. Rasheed recalled that approximately every two days, two psychologists, a man and a woman, came and asked him whether he intended to commit suicide or harm himself. There was a big red cross on his file and on his door, which indicated to him that he was considered "abnormal." Officials took away all items with which he could use to harm himself. Rasheed recalled that he was feeling under intense pressure, and one day he managed to find a "device" that he could use to hang himself. He also was able to simultaneously manipulate the lock of his cell door, so the guards could not enter. He threatened to hang himself unless the soldier who threatened and harassed him was punished. According to Rasheed, it appeared to him "they signed a contract that they would not bother [him] any longer."

After two months, Rasheed was transferred to block "Delta," which he believed was especially constructed for detainees "who caused problems." Rasheed recalled that Delta block consisted of special medical blocks, numbered 25-30, with observation cells equipped with camera surveillance. According to Rasheed, it was staffed by Navy personnel, consisting of one nurse, two "psych techs" who gave out the pills, and eight other assisting soldiers. Every two weeks a doctor with the rank of a colonel made rounds. During his first eleven months in block Delta, there was a female "psychological commander," who prohibited the soldiers guarding the block from harassing the detainees. According to Rasheed, she was replaced by a new commander who he believed was "educated to break us down."

In Delta block, Rasheed stated that he was forced to take a minimum of six unknown tablets four times a day. The commander threatened that if Rasheed did not take his medication, he would be given forced injections. Rasheed stated that he was repeatedly given injections against his wishes, which "brought [me] down to [my] knees." He stated that the injections would make him "lose [his] mind" and sleep for about three days. When he woke up, all his joints and his skin were aching as if "a burning iron" had been forced against him. He reported that the injections made him feel an unbearable heat spreading through his body and caused him to get tears in his eyes and lose his memory. Rasheed recalled that he felt sick, asphyxiated, under enormous pressure, and had an extreme desire to escape. He felt "so miserable

that [he] didn't want to live anymore." [63]

Rasheed stayed in Delta block for almost one year between December 2002 and December 2003. He remembered that during confinement in Camp Delta, he tried to commit suicide several times. He reported: "they wanted to turn us into robots, humiliate us; they made fun of us. The soldiers were having a good time."

According to Rasheed, there was one "doctor" who tried to help the detainees, and one soldier who showed compassion. Rasheed recalled that the doctor informed the detainees about new strategies that were planned to break them down and warned them "that there was a spy among them." The detainees employed collective actions to protest against the conditions. Rasheed recalled that some detainees tried to hang themselves, cut their veins with razor blades or bang their heads against the walls. A hunger strike was organized for about ten days, and the participants demanded to leave the block. Rasheed reported that he did not observe any force-feeding in his block, but in other blocks he saw detainees with feeding tubes and intravenous drips tied to their beds. According to Rasheed, the hunger strikers were eventually released from Delta block under the condition that they would stop rebelling.

Subsequently, he was transferred out of Delta block to another block which had medium security and which he believes served as a transition block to Camp Four, which for many was a transition block to repatriation out of Guantánamo. Rasheed's medication regimen was continued there. He had to take three to six pills four times a day, with similar health impact, making him mentally unstable and sleeping for approximately three days. Rasheed mentioned that he avoided talking to the guards. He reported that he "had no strength," could not eat, had "very strong saliva", and his hands and feet trembled. Moreover, he reported that every month he got a forced injection. After these injections, he would feel "like a piece of wood, completely stiff like a statue, not like a human being." He said he could not comprehend what happened around him and frequently had nightmares. Rasheed reported that he tried to avoid taking all these tablets by hiding them. However, the staff would regularly do a blood test on him to see whether he was taking the medication.

Rasheed described a number of occasions in which, during cell searches, guards stamped on the Koran with their feet. He recalled that the detainees in all five blocks had a simultaneous uprising to oppose such practices. The detainees banged their heads against the walls and demanded "an end to the mocking of their religion." Rasheed recalled that armored vehicles arrived with 200-300 soldiers. According to Rasheed, a commanding officer negotiated with the detainees, and after the officer "promised that the guards guilty of offending their religion would be punished," the detainees stopped their protest.

During his detention in Guantánamo, Rasheed reported that he was beaten approximately every two or three days. He estimates that he was beaten about 300 times. Right after the first beatings in Guantánamo, he suffered from chronic headaches. Rasheed reported that for long periods of time in Guantánamo, he was not given enough water. According to Rasheed the delivery of water served in part as a means to enforce his compliance with taking psychopharmacological drugs.

In the fall of 2006, Rasheed was released from Guantánamo without any charges being brought against him. Rasheed described many difficulties following his release. He continues to live far away from his family and community. He also reported being unemployed and carrying the stigma of being a former Guantánamo detainee. Rasheed stated that the transitional facility in which he had been living at the time of the interview —which was surrounded by barbed wire, with massive iron barred windows and guards — constantly reminded him of Guantánamo. He distrusts the authority figures tasked to support him and is angry about what he perceives as dishonesty. He noted: "I am not the person I used to be, I have lost my kind attitude to people, I lost my nerves. I have turned [completely]."

## Summary of Guantánamo Medical File

Rasheed provided his consent for PHR evaluators to be allowed access to his 1200-page, very detailed and extensive medical file from Guantánamo.

### Summary of medical notes during the first year of detention: Summer of 2002–Summer of 2003

Rasheed's admission diagnosis in Guantánamo disclosed that he had chronic watery diarrhea, right inguinal hernia repair versus (illegible writing), dental abscess, history of gastritis, probable irritable bowel syndrome, and intermittent headaches.

In July 23, 2002, a first suicide attempt by hanging is documented. Audiovisual hallucinations and self-injurious behavior are also reported. In an evaluation

---

[63] In addition to the above, Rasheed self-reported symptoms of strong saliva, trembling of feet and hands, and feeling stiff like a piece of wood after injections. These are typical symptoms of side effects after long-term treatment with neuroleptics and antidepressants — i.e., dyskinesia, parkinsonoid, photosensitivity.

in Camp Delta, the Behavioral Health Science (BHS) team noted personal and family history of psychiatric disturbance as well as a history of excessive drinking and use of marijuana. Rasheed was diagnosed with Major Depressive Disorder (MDD) with psychotic features and treated with sedatives, neuroleptics and antidepressants. The medical file noted that Rasheed was held in "legal isolation" although the file did not make clear what that was. A couple of days later he showed severe agitation and self-mutilation behavior (cutting himself, banging his head against the wall), and was put in restraints (shackled and helmeted), and his "comfort items"[64] were taken away.

On July 27, 2002, the "psych" noted: "[W]ill rule out personality disorder cluster 'c' and leave MDD as provisional for now." On August 8, the diagnosis "psychosis versus attention seeking behavior" is listed. On September 18, 2002, after a suicide attempt by hanging, Rasheed was diagnosed with Personality Disorder (PD). The psych noted: "Pt. [patient] has a history of maladaptive coping and manipulation behavior including dramatic and extreme behavior (e.g., self-mutilation, writing in blood, pseudo-seizures) to deal with [detention] stress. This self-injurious behavior is another episode characteristic of severe Personality Disorder with borderline [and] antisocial features."

Rasheed continuously complained of audiovisual hallucinations with violent images of destruction, killing and blood. On July 29, 2002, the notes stated: "[C]laims to have been tortured by Americans in beginning of May of 2002. He reported hearing screams and seeing people taking children away, people with body limbs gone and burning. States the voices said he failed his missions. Claimed that he was reliving past experiences."

Symptoms of severe depression as well as suicide intentions are noted with two more suicide attempts, one by ingesting two ice packs containing ammonium chloride and one by hanging. The notes indicated that Rasheed frequently requested that he be placed with a prisoner who speaks his language and that his loneliness [being kept in isolation] seemed to worsen his condition.

The medical notes indicate that Rasheed was in a constant struggle with the staff, who used physical restraints and prescribed medication, including sedatives, neuroleptics, and antidepressants to control Rasheed's behavior. The staff wrote: "Hx [history] of palming drugs! Be Aware!" On other occasions, blood was forcibly drawn to check his drug levels.

For some time, bottled water was used as a privilege. This "privilege" subsequently was taken away from him because staff felt he was using somatic complaints as a form of manipulation to get cold water. The medical files noted that he gets angry when "comfort items" are taken from him as a punishment for bad conduct, such as for yelling and spitting on guards. Later on, his blanket was taken away because it was reportedly used as a means of self-harm, and this is noted as a suicide prevention measure. The files noted that Rasheed complained that not having a blanket was a form of torture because he was exposed to cold temperatures at night. The files noted that he made dolls out of paper to give himself comfort.

Rasheed's words are quoted in the notes by the staff and exhibit his significant despair and hopelessness: "I want the guards stop being mean to me. I made another doll so I could look at the woman in my dreams;" "guards are torturing me by laughing, pointing and saying things to me;" "I don't know why I am cut off from the outside world, I do not want to live any longer." Yet another noted, "It is this prison. This is worse than you just killed us. You are keeping this human body alive, but killing our souls." On another occasion: "I am depressed and I just want to die." The notes also recite that he "stated that the nightmares continue to bother me and it is driving me crazy."

In October 2002, he was reported as participating in a hunger strike demanding: "Either send me home or prosecute me."

He constantly verbalized frustration at not having another detainee who speaks his language with whom he could communicate. On October 28, 2002, the psychiatric staff's response is quoted in the file: "informed him that psych had no control over that and told him to ask his interrogator to have him moved."

On November 5, 2002, he was quoted as saying: "I want to move to the end of the cell block. There are people down there who can speak my language and I could take my mind off of these visions." Three days later, the "psych" recommended approval of his request. The apparent rationale was that communicating with a detainee who speaks his language would help to relieve Rasheed's psychotic symptoms and facilitate psychiatric care through receiving some reality feedback from the fellow detainees. After the move, Rasheed reported

---

[64]  Basic provisions in Guantánamo, referred to as "Comfort Items," include: one copy of the Koran, one mattress, one sheet, one blanket, one prayer mat, one two-piece suit, one pair of flip-flop shoes, one prayer cap, one washcloth and towel, and one salt packet for seasoning food. The "comfort items" vary according to the location and classification of the detainee. These items could be removed as punishment or given as a reward for cooperation in interrogations or good conduct.

that he felt better since he was able to speak to his cell mate. The psych observed him as: "brighter affect, more animated."

However, on November 20, 2002, the problems escalated. The notes quote Rasheed as saying: "I made these dolls because they make me happy. I want to hurt myself all the time...I see two people here and they want to attack me. They are sitting in my cell telling me to hurt myself." Thereafter, his dolls were taken away, he was placed on self-harm-prevention, and moved to another cell. Rasheed stated that he did not want to move away from his cellmates (who spoke his language), but according to the medical notes, the staff moved him to "prevent him from harming himself." Two hours later, he expressed suicidal thoughts. One day later, he asked to be moved back to the cell with the detainees who spoke his language. When his request was refused, the file reports that Rasheed spat on the guards, was put in shackles and taken to the shower by the guard while his cell was searched without his presence.

A quote from the file on November 22, 2002 demonstrates the reasons the medical staff gave for Rasheed's self-injurious behavior: "Pt. stated he is upset because the guards are laughing and pointing at him due to him banging his head on the cell. Complains of sharp pain in the back of his head and dizziness. Stated he bangs his head because "they" won't give him his midraine for headaches....Discuss with pt. the reason medical did not give midraine because his pulse was too high. Told him that banging his head will only make it worse. Pt. educated on consequences of banging his head and that the guards said they're going to put him in shackles if he does it again." The medical staff withheld pain-killers for apparent medical reasons; he banged his head to protest which in turn worsened the headaches, a vicious cycle.

This oscillation of behavior continued during Rasheed's entire first year of detention in Guantánamo. On April 10, 2003, he was put in restraints and isolation apparently for spitting at another "tech." He stated he spat as a payback for an unjust blood drawn against his will and because his comfort items were taken away. The psychiatrist tried to calm Rasheed down and apologize for the blood draw. On April 20, 2003, Rasheed was observed socializing well with his cell mate, reading a dictionary and learning English. On May 2, 2003, he was reported as extremely agitated, yelling and cursing at staff, threatening to spit on military police, and cutting his forearm. Rasheed was given a cocktail injection of Ativan, Haldol and Benadryl and was placed in restraints.

Two notes from May 8, 2003 described Rasheed as: "in good spirits, no management problem"; and "detainee is social with staff and peers. Was noted to talk and laugh."

On July 9, 2003, the doctor on duty observed Rasheed "as he was unresponsive and fell during interrogation with his feet buckled but did not hit head according to witnesses." The medical files note that after being hydrated intravenously and given four milligrams Ativan, he became responsive and began talking slowly with slurred speech, complained of severe headache and chest pain. He was admitted to fleet hospital with a probable seizure, non-convulsive status (seizure without observable movement abnormalities) versus psychiatric disorder.

From July 2003 until the fall of 2006, Rasheed's medical records indicate that he suffered from a number of medical problems including a possible kidney stone and urinary tract infection, chronic diarrhea, chronic dyspepsia, knee pain, and fractures of his fourth and fifth fingers. He continued to suffer from chronic headaches and had a normal CAT scan of his head. During this period of time, the psyche notes mention fewer active psychological problems. For example, no hallucinations are noted in the last year of detention; only "major depressive disorder with psychotic features"; "personality disorder NOS (Not Otherwise Specified)", "narcissistic and antisocial features"; and "routine stressors of confinement" are mentioned. The last psychiatrist's progress note did not record any active psychological symptoms or diagnoses; it simply listed: "history of noncompliance with treatment; narcissistic Personality Disorder with borderline features; history of hunger striking, history of suicide attempt (3/03), history of multiple suicide gestures including acts of self-harm by hanging or banging his head to the wall."

## Medical Evaluation

### Reported Physical Symptoms

Rasheed currently complains of lumbar pain, pain in the renal lodges, headaches and chewing problems. He complains of loose teeth as well as problems with his knees. He suffers from pain in the right upper quadrant of his abdomen and has been suffering from stomach pain for several years. In the past five years, he suffered a few times from renal colic with blood in his urine. Rasheed reported that his vision decreased after release from Guantánamo. He was given contact lenses during detention.

## Assessment of Physical Evidence

The physical examination revealed findings consistent with Rasheed's allegations of torture. For example, the three-centimeter-long, linear irregular edged scar on his forehead is consisted with Rasheed's description of the injury caused by being pushed against the wall in Guantánamo. According to Rasheed, during another beating he suffered a fracture of his hand bones. This allegation was corroborated with information in the medical file that noted that medical personnel splinted and buddy taped his right small finger and fourth digit. Further, the tenderness observed in his right hand is consistent with fracture of hand bones allegation, but needed to be confirmed by radiological examination.

Tenderness to palpation in the left and right lower quadrants and the 6.5-cm-long linear scar with partial irregularity in Rasheed's right lower abdomen is consistent with reported surgical operation of unclear nature during detention in Kandahar. This surgery also is corroborated in the Guantánamo medical records which indicate a prior inguinal hernia repair.

The examination of the musculoskeletal system revealed findings that were consistent with his medical records and his description of his abusive treatment, including the observed tenderness on palpation of right hand, general tenderness in right and left lumbar area, the palpation to both sides in the costovertrebal angel (renal region), and the painful movements of the right knee.

Rasheed reported that during the initial beatings in Guantánamo, he began to suffer from chronic headaches. Rasheed stated that he was never given painkillers for his headaches or for pain in other parts of his body. In his medical files, though, delivery of pain killers is noted but sometimes withheld for medical and disciplinary reasons.

*Medical Tests*: As might be anticipated in a subject who has survived extensive physical and psychological abuse and, particularly, with the complicity of medical personnel, Rasheed was reluctant to allow a complete medical evaluation. He was suspicious and indicated that he believed that the medical evaluation would not help him. The following diagnostic tests and medical consultations have not yet been completed: neurologic, urologic, ophthalmologic and dental consultation. The evaluators believe that an orthopedic expert opinion, including bone scan, is needed to evaluate possible signs of non-visible, soft tissue and bone injuries resulting from blunt trauma during beatings. An X-ray of right hand, diagnostic imaging studies of the head and kidneys, and laboratory studies of blood and urine were all recommended.

## Assessment of Psychological Evidence

Rasheed reported that he has not taken any medication since his release from Guantánamo. Following his release from Guantánamo, Rasheed reported suffering from frequent episodes of full body trembling. After an episode it is "as if [his] brain stops functioning" where he cannot type on his computer or "process information." He suffers from flashbacks of his Guantánamo experiences. He described numerous symptoms of hyperarousal. For example, he continues to have difficulty sleeping. He has a disruptive sleep pattern, as he normally sleeps about six hours a night, from midnight to four A.M., then he wakes up and sleeps again from five to seven A.M. He reported that he loses his temper quickly, and he has a tendency to shout at people. Often, when there is a misunderstanding with others, Rasheed fantasizes he "is in a confrontation with a US soldier standing in front of [him]." Whenever he gets the impression of dishonesty or hypocrisy, he becomes enraged. In general, Rasheed reported that he has great difficulty trusting people.

Rasheed was very nervous and suspicious during and especially at the beginning of the medical evaluation. At times, the evaluators felt that they might not be able to complete the full evaluation. Rasheed was ill at ease, appeared to be constantly on edge and on alert. During the days in which the medical evaluation occurred, Rasheed was in a particularly difficult life situation as he had left the transitional facility in which he had been living for a variety of reasons, including that it was reminiscent of Guantánamo. Unlike any of the other interviewees, he was homeless at the time PHR's medical evaluation occurred. He repeatedly expressed that he was frustrated and felt betrayed by everybody, especially the authorities at his place of residence. The evaluators arranged two nights in a hotel for him during the evaluation but could not offer any long-term support or social services, and few were available for his use. Rasheed's anxieties were lessened by the second day of the evaluation when he was notified of an ability to move out of the transitional facility.

It is evident that Rasheed is deeply affected by what he went through during his short imprisonment and torture in his home country, and long-term confinement and torture in US military prisons in Afghanistan and in Guantánamo Bay. Rasheed suffered from memory intrusions, avoidance behavior and hyperarousal symptoms. He is constantly haunted by the memories of abuses he endured; he has sleeping problems, is extremely irritable and easily loses his temper. He is unable to concen-

trate and is extremely suspicious and hypervigilant. He reported that he has lost his basic trust in people, which extends to people who clearly support him. He said he believes that everyone makes false promises to him, and he expected that PHR evaluators would do the same. He suffered from dissociative states.[65] This, as well as his almost paranoid suspicion and his extreme irritability, get him into trouble with people around him, including the authorities. He described how his personality has changed and that he felt that he is not the same person he used to be.

His symptoms, together with the results of the psychological tests, confirm the diagnosis of PTSD with somatization disorder. Rasheed carried all three symptom complexes — intrusion, hyperarousal and avoidance. Rasheed's self-endangering behavior (that occurred while in custody), the change of his personality, his extreme mistrust, his tendency to isolate and alienate himself from other people and his dissociative states are clear signs of a more severe form of PTSD - Complex PTSD (C-PTSD). Rasheed's symptoms of Complex PTSD are attributed to the repeated sequential traumatization during detention in his home country, in US custody in Afghanistan and the four-year detention in Guantánamo. Complex PTSD occurs in survivors of repeated on-going trauma. The symptoms include: explosive anger, amnesia, dissociative states, depersonalization, feelings of helplessness, loneliness, hopelessness and despair, social isolation, persistent thoughts of revenge, extreme mistrust, dysfunction in interpersonal relationships, and self-endangering behavior.[66]

During the two days of the examination, the evaluators did not detect any signs of psychosis or personality disorder, and he did not express any suicidal thoughts.

*Psychological Tests*:[67] On the self-report measures administered, Rasheed reported numerous symptoms of PTSD, anxiety, somatization, and depression. Rasheed's responses to the Dot Counting Test, a clinician-administered test of symptom exaggeration, indicated he responded honestly with no evidence of deliberate exaggeration.

## Analysis of Medical Records in Connection with PHR Evaluation

Rasheed reported no previous history of diseases or psychiatric illness and no family history of mental illness in his PHR evaluation. However, in July 2002, a medical evaluation by the Behavioral Health Science (BHS) team in Guantánamo states that Rasheed told the BHS team that he had headaches as a child which dissipated with age. These headaches returned after he was beaten by village people in a fight two years before his incarceration in Guantánamo. The medical file also indicated that he stated that he "heard and saw [imaginary] people" as a child. Rasheed reported to the BHS team that his mother had a similar problem. The files noted that he reported being hospitalized for eleven days in 1991 for psychiatric problems. The records also note that he indicated that his condition improved with medication.

In his first medical assessment upon arrival at Guantánamo, though, no psychiatric disorder was noted. Rasheed stated that he was repeatedly interrogated after his arrival. According to Rasheed, because he claimed to be innocent and did not confess to wrongdoings, the interrogators punished him with isolation, exposed him to cold temperature and loud noises, shackled him in painful positions, and deprived him of sleep. According to his medical file, about four weeks after his arrival in Guantánamo, and approximately half a year after his initial detention, he attempted to commit suicide for the first time, complained of audiovisual hallucinations and showed self-injurious behavior. These files demonstrated that his condition deteriorated steadily. Although the medical file indicates he was held in isolation, he was not removed from it. He complained of feeling lonely because he had no one to talk to in his language. When he asked to be moved to a cell with a cellmate who spoke his language, the "psych" staff told him that only his interrogator could grant him this privilege. Scientific studies name hallucinations, psychotic states and regressive behavior as frequent and typical effects of isolation.[68] According to the medical file, Rasheed had audiovisual hallucinations and showed regressive behavior, i.e., making paper dolls and talking to them. This mental anguish is consistent

---

[65] From a psychological perspective, dissociation is a protective activation of altered states of consciousness in reaction to overwhelming psychological trauma.

[66] See Judith Herman, *Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma*, 5 J. TRAUMATIC STRESS 377-91 (1992); Bessel A. van der Kolk et al., *Disorders of Extreme Stress: The Empirical Foundation of a Complex Adaptation to Trauma*, 18 J. TRAUMATIC STRESS 389-99 (2005).

[67] Psychological testing included the Beck Depression Inventory, the Harvard Trauma Questionnaire, and the Brief Symptom Inventory and the Dot Counting Test (a clinician-administered test of symptom exaggeration).

[68] See Peter Kempe & Jan Gross, *Deprivationsforschung und Psychiatrie*, SONDERDRUCK AUS PSYCHIATRIE DER GEGENWART, Bd 1 u. 2. 2. Aufl., (1980); P. Kempe et al., *Sensorische Deprivation als Methode in der Psychiatrie*, 45 NERVENARZT 561-68 (1974); *Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124-56 (Jan. 2003).

with reports of agitation and self-injurious behavior in Rasheed's medical file and his self-report.

As noted above, in evaluations of Rasheed after his suicide attempt, the BHS team at Guantánamo noted a history of psychiatric disorder, which Rasheed denied in the evaluation interview, possibly because he felt ashamed disclosing it. The details of that history are vague and the BHS team did not report any specific psychiatric diagnosis. He certainly was, and is, a very vulnerable person. It may be inferred that under the condition of extreme stress and maltreatment in detention a latent pre-existing psychiatric disorder recurred and exacerbated in terms of a major depression with several suicide attempts and psychosis. The BHS team attributed his aggressive outbursts, mood swings and self-injurious behavior as signs of borderline personality disorder. During his medical evaluation with PHR evaluators, and in his self-report, Rasheed said that he behaved like "a mental case" to avoid further interrogations. In fact, one can infer from his Guantánamo medical file that his abnormal behavior was at least partly intentional. Therefore his borderline behavior, and his reported self-history inside Guantánamo, may have been deliberate shamming to protect himself from ill-treatment and duress in Guantánamo. On the other hand, his abnormal behavior escalated whenever the guards punished or mistreated him. From the medical file one can conclude that he also behaved that way as a form of protest to his detention conditions.

In the medical files, Rasheed continuously complained of audiovisual hallucinations with violent images of destruction, killing and blood and told his caretakers that he "was reliving past experiences" and had "been tortured by Americans" while detained in Afghanistan. It is likely that, in fact, these hallucinations, in part, reflect his real experiences. According to the traumatic history Rasheed gave the PHR medical evaluators, he described in detail his beatings and torture after he was handed over by Northern Alliance troops to US forces and kept in several military prisons in Afghanistan.

After he was diagnosed by the BHS team as being mentally ill with a pre-detention history of psychiatric disorder, one would reasonably expect that Rasheed would be classified as a person with severe mental health problems and be taken off the ordinary prison regime. In particular, concern for his health would have led to removing him from isolation, which, at the very least, appears to have exacerbated his mental health problems. Instead, however, interrogators reportedly continued to subject him to solitary confinement, removed basic items

such as his blanket and separated him from the other detainees who spoke his language. From the medical records, it appears that the psychologists, doctors, and nurses made some attempt to address Rasheed's severe psychological symptoms. However, they did not evaluate Rasheed's symptoms of PTSD, which Rasheed manifested early in his incarceration. Also his medical records do not indicate that he received supportive and verbal therapies. Instead, against his will, Rasheed was treated exclusively with psychopharmacological drugs, which were associated with severe side-effects. Moreover, the records do not indicate that the health professionals inquired into or documented any form of ill-treatment that Rasheed was enduring, much less the relationship between that ill-treatment and his mental condition. Under the circumstances, the psychiatrist's and psych tech's mention of "routine stressors of confinement" in their list of diagnoses seems to be a deliberate attempt to minimize the nature and extent of Rasheed's psychological symptoms and to disregard cruel, inhuman and degrading treatment as a likely cause of these symptoms. It is possible, moreover, that the mental health interventions may even have worsened the suffering of Rasheed, by patching him up sufficiently so that further interrogation and torture could be inflicted. These all suggest that the health professionals either willingly or unwittingly aided the ill-treatment.

There is further supporting evidence that ill-treatment was the cause of Rasheed's psychological symptoms. His psychotic and depressive symptoms lessened after he was transferred to blocks with less harsh conditions, including being transferred to Camp Four in August 2005, and subsided completely before his release. On July 7, 2005, the psychiatrist noted that Rasheed would be removed from the Behavioral Health Services Program because his Psychotic Disorder NOS (not otherwise specified) was considered stable. To the diagnosis Major Depressive Disorder, the words "Single Episode, Mild to Moderate" were added. In the last year of detention the diagnosis psychosis NOS was dropped, as well as the diagnosis of Major Depression in the last medical evaluation in October 2006. The only remaining psychiatric diagnosis, then, was narcissistic personality disorder with borderline features. The PHR evaluators believe that it is reasonable to infer that with the prospect of his imminent release, his symptoms of psychosis and depression resolved. At the same time, the PHR evaluators consider the diagnosis of personality disorder cluster B as questionable. Judgment of personality is very much shaped by cultural concepts and values. It is evident from the

medical files that many of the problems between Rasheed and the Guantánamo staff, including the medical staff, may be attributed to ill-treatment, extremely stressful conditions of detention and intercultural communication problems. As stated above, Rasheed may have intentionally behaved like a borderline-case to protest against ill-treatment and avoid interrogations.

Rasheed told PHR evaluators that after being handed over to US forces and Northern Alliance troops in Afghanistan and held in Mazar-i-Sharif, and Bagram and Kandahar prisons, he was severely and repeatedly beaten on all parts of his body (e.g., kicked in his belly and head), that he lost consciousness and suffered from a severe abdominal trauma. In the military hospital in Bagram, he was told that he had to have an emergency operation on his kidney. Rasheed reported that when he woke up he was told it was "not an appendix". Rasheed may have suffered from a strangulated inguinal or femoral hernia, an abnormal displacement of a loop of bowel through the abdominal wall and in association with compromised blood flow to the affected bowel segment. It is also possible that he was operated on for a trauma-related injury such as a hematoma (collection of blood) or a contusion or rupture of an abdominal organ.

Rasheed had a pre-detention history of headaches. His chronic, severe headaches in detention are likely due to stress-related psychological symptoms, but also may be related to post-concussion effects of head trauma from beating that occurred in his home country, Bagram and Kandahar and his frequently noted self-harm behavior of banging his head against the wall in Guantánamo. He also reported one incident where his head started bleeding after Guantánamo guards pushed his head against the wall. The CT of the brain obtained on June 7, 2004 in Guantánamo did not demonstrate any significant abnormality, but this does not exclude the possibility of a post-concussion syndrome.

## Analysis and Conclusions

The historical, physical, and psychological evidence strongly supports Rasheed's allegations of torture and cruel, inhuman and degrading treatment.

Rasheed's present mental and physical condition is fragile. He suffers from a wide range of physical complaints due to injuries endured during detention. Rasheed's general mistrust in people made it very difficult to establish trust in the course of the medical and psychological evaluation. Some of his testing remains incomplete.

The medical history and physical examination support Rasheed's report of multiple injuries, and are consistent

with the abuses he described. For example, the linear scar on his forehead is consistent with allegations of his head being pushed against the wall by soldiers in Guantánamo. The medical examination also supports Rasheed's history of having gone through an acute abdominal operation of an unclear nature in Kandahar. The fracture of two fingers of the right hand is consistent with the allegations of abuse but need to be confirmed by radiological examination.

Additionally, Rasheed described a history of chronic headaches that are most likely due to stress during detention and post-concussion syndrome after multiple episodes of head trauma from beatings during detention in his homeland, US military prisons in Bagram and Kandahar and self-harm behavior in Guantánamo.

Based on the self-report, the psychological tests, the evaluation of the Guantánamo medical file and clinical findings, Rasheed suffers from complex post-traumatic stress disorder with somatization disorder due to severe sequential traumatization by physical and psychological torture for a lesser period in a prison in his home country and over a long period of time in US military prisons in Afghanistan and Guantánamo. Rasheed described numerous symptoms indicative of PTSD, including intrusive thoughts and memories of the traumatic events (e.g., feeling haunted by the memories of his abuse), avoidance and emotional numbing behaviors (e.g., lost of basic trust in people, being extremely suspicious, dissociative states), and hyperarousal symptoms (e.g., sleep and concentration difficulties, anger and loss of control), and he shows self-endangering behavior. He further reported a change of his personality that has limited his ability to function, as he would like to, in daily life and interact with other people.

During detention in Guantánamo, Rasheed suffered from a three-year episode of major depression with several suicide attempts, psychosis and self-injurious behaviour. These conditions should be considered in connection with a likely pre-detention history of psychiatric disorder that recurred and exacerbated due to physical and psychological torture in US military prisons in Afghanistan and Guantánamo.

There are some contradictions and missing links in his self-reported history. On the one hand, Rasheed has an impressive memory; he remembers details, names, and dates that match with the data from his medical file. On the other hand, parts of his memory are fragmented. This combination of hypermnesia and hypomnesia is a typical post-traumatic symptom in survivors of severe trauma. We have no reason to doubt the credibility of Rasheed's

allegations. Moreover, Rasheed's allegations of trauma are congruent and consistent with the information in his medical records. Also the clinician-administered test of symptom exaggeration indicated that Rasheed responded honestly with no evidence of deliberate exaggeration.

The question arises as to why an obviously sick and vulnerable person with a possible history of psychiatric disorder was kept in detention for four years and exposed to the full range of stressors of confinement, some of which amount to torture, in Guantánamo including long interrogations, physical abuse, verbal threats, prolonged isolation, exposure to cold temperature and loud noises, violation of religious and moral codes, and sexual humiliation. These stressors seriously exacerbated and/or caused the psychological symptoms observed in the medical files during detention, some of which have persisted to the present time. The Guantánamo medical file show that doctors and nurses provided Rasheed a high level of access to care. Although the motives of the medical personnel cannot be gleaned from a review of Rasheed's medical record, it is clear that these individuals, particularly the mental health personnel,

contributed to Rasheed's stress-related psychological symptoms by not adequately identifying the cause of his psychological symptoms, failing to obtain his consent for medical interventions, and failing to seek an end to physically and psychologically destructive practices carried out by US interrogators and guards.

It appears that the clinicians involved in Rasheed's care were negligent in their duty to inquire about and document possible evidence of torture and ill-treatment. In addition, they failed to recognize and address the causes of Rasheed's profound psychological symptoms of complex PTSD.

Rasheed's current mental and physical condition is negatively impacted by the fact that he has been uprooted, lives in poverty, and is socially isolated by being cut off from his family. Rasheed described his life since his release as an extension of his detention in Guantánamo. He has little opportunity for building a new life or finding a job. Further, no adequate health care and psychological support is available to him. Rasheed is in urgent need of social, psychological, and medical assistance and support.

# IV. PATTERNS OF TORTURE AND ILL-TREATMENT

*[In Abu Ghraib] the torture stopped, but they started trying to affect me psychologically — I was in a very dark and small room [measuring approximately 1.5 by 2 meters] and I was totally [naked]. And the weather was very, very cold — and you don't have any blanket or clothes to wear and I was sitting on the ground. And you don't know what is there on the ground and you don't know where you [are], and there was very scary silence. The only thing you can hear is the voices of those who [are being] tortured at that time — screams and cries.*

**An Iraqi former detainee
evaluated by PHR**

This chapter synthesizes the evidence of ill-treatment detailed in the eleven individual accounts in the previous chapter according to common themes of abuse. It reports no facts that are not contained in the case narratives, but instead shows how the torture and ill-treatment experienced by the interviewees were not random and isolated occurrences, but instead were part of a larger pattern of abuse. In seeking to differentiate among various techniques of torture there is some repetition in this chapter because the US personnel employed multiple forms of torture on these men at the same time.

The experiences of the eleven detainees evaluated for this report varied considerably, not only among the three theatres in which they were held (e.g., Afghanistan, Iraq, and Guantánamo Bay, Cuba), but in some cases, among those held in the same facility. Nevertheless, all except one of the Iraqi former detainees were severely and relentlessly brutalized during at least part of their detention. The former Guantánamo detainees experienced severe physical abuse during both their incarceration at facilities in Afghanistan before being transferred as well as during their initial detention at Guantánamo Bay. Moreover, all the men evaluated experienced interrogation and detention conditions that involved one or more of a number of draconian and unlawful practices including isolation, sleep deprivation, sensory depriva-

tion, stress positions, and sexual humiliation that were conducted in an official capacity and were specifically authorized at each facility during the time that these men were under US custody.[69]

It is also noteworthy that none of the individuals evaluated was given any official explanation for his arrest and detention or charged with a crime, let alone convicted. None has received either an apology or compensation from the United States for the grievous ill-treatment they experienced.

## Beatings and Other Ill-Treatment During Arrest, Transport, and Initial Custody

The arrests of the Iraqi former detainees were characterized by American personnel inflicting a very high level of violence against them. Six of the former detainees reported being arrested late at night or early in the morning, and five stated that they were arrested at their places of residence. Four reported being beaten during their arrest, some in front of their families. One man recounted that during his arrest US personnel threatened to shoot him if he moved. Another detainee, who suffers from diabetes, reported that when he was arrested he was not given an opportunity to take his medications with him, and that he was not provided with food until the second day of his detention. Another Iraqi former detainee recalled being handcuffed, kicked and beaten with guns until, as he described, "I was swimming in blood."

The former detainees were not the only subjects of physical abuse at the time of their arrests. Two of the Iraqi former detainees evaluated reported that American soldiers abused their family members as well. One recalled that he and his family were forced to both lie down and walk on the broken glass created when the

---

[69] See PHR Break Them Down, *supra* note 17; Office of the Inspector Gen., U.S. Dep't of Defense, Review of DoD-Directed Investigations of Detainee Abuse (U), Rep. No. 06-INTEL-10 (2006), *available at* http://www.fas.org/irp/agency/dod/abuse.pdf; Schmidt Report, *supra* note 6; Fay Report, *supra* note 18.

soldiers "bombed" the windows of his house. This individual recalled that the glass shards remained embedded in his feet for many months, including throughout his incarceration at Abu Ghraib. He reported that his wife and children were also blindfolded and beaten. He told PHR that he believed the beating caused his wife, who was four months pregnant, to have a miscarriage. According to another Iraqi former detainee, at the time of his arrest, "One of the soldiers hit [my wife] on the head with his gun." He reported that his wife currently suffers severe damage to her vision, he believes, as a result of this assault.

Of the four Iraqi former detainees who were arrested in their homes, three reported extensive damage to their personal property during their arrest. One recalled that his home and car were destroyed by American explosives. Another man had a similar experience, recalling that his home "was bombed," his door, walls, and windows demolished. He also stated that the soldiers who arrested him had stolen property from his domicile and destroyed the remaining items.

After being taken into custody, six of the former detainees reported violence inflicted on them by American forces during transfer to their various holding facilities and shortly after their arrival. Indeed, many of the most severe injuries from beatings documented in this report occurred during the former detainees' arrest, transfer and initial custody.

The beatings inflicted on detainees upon their arrival at US facilities in Afghanistan before they were transferred to Guantánamo were particularly intense. Two interviewees reported being beaten by US soldiers during their transfer to Bagram or an unknown prison in Afghanistan. Another former detainee recalled that while being transferred from Peshawar to Bagram, he and fifty other detainees on the plane were hooded, chained to the floor of the plane, and shackled very tightly around their chests and waists such that breathing was difficult. He stated that during the fifteen-hour flight, detainees were beaten and insulted if they moved. Further, he recounted that one American soldier grabbed him by the throat and threatened to choke him. Another individual, who was in poor health, recalled that during his transfer from Bagram to Kandahar he was hooded; his hands and feet were tightly shackled; his knees were held together in a kneeling position with adhesive tape; and he was tied to the floor so that he was unable to move.

Upon entry at a detention facility in Kandahar run by American soldiers, one individual stated that he was forcefully kicked while on the ground, causing his lip to swell. He also reported that his head was hit against wooden columns and he was beaten so mercilessly that three of his teeth fell out and a fourth was later removed at Guantánamo. A similar experience was reported by another individual; upon his arrival at a Kandahar detention facility, this individual recalled being beaten with sticks and fists, while being kicked repeatedly in his genitals. Upon arrival at a US-operated facility at Bagram airport, another former detainee recalled that he was tied very tightly to a rope with other detainees, causing him severe pain as they were dragged into a hall. Further, he reported that the detainees were beaten if they refused to remove all of their clothes. This same former detainee also recalled that, at Bagram airport, he was beaten almost every day as a punishment for talking to other detainees.

The four former detainees who were transported to Guantánamo Bay, Cuba reported very harsh treatment throughout the transfer process. As in Iraq, the most intense and widespread physical brutality took place during transfer and shortly after arrival. This physical abuse was accompanied by extreme stress positions and humiliation. At least one of the men evaluated recalled that when he was transferred, he was forced to disrobe in front of female soldiers, was clothed in an orange suit, and had his ears covered with headphones and eyes covered with dark goggles. All four Guantánamo detainees stated that they were handcuffed and chained in a crouched position to a hook on the floor for the duration of the transatlantic flight. Two former detainees recalled having been forced to wear a respiratory mask, black goggles, earphones with a humming sound, and long firm "special gloves so that you cannot move your fingers."

According to one individual, the guards forced the detainees to take a drug that made him hallucinate. According to another man, upon arrival at Guantánamo the detainees were hooded and beaten by the soldiers while they were taken to their cells. Soldiers kicked them and threatened them with dogs. This individual recalled that he was punched and dragged, causing bleeding and bruises "all over" his body. Another reported enduring significant pain during transport from one camp in Guantánamo to another, when he was hooded, his hands and feet were chained, and his body was pushed forward in a painful position.

Two of the former detainees from Guantánamo also reported that even during their return flight from Guantánamo to their home countries, they were handcuffed, blindfolded, and chained to the floor of the airplane throughout the lengthy flight. One former

detainee also stated that upon his release and transfer from Guantánamo, his personal items were not returned to him.

Physical evidence of beating often was not detectable because the medical evaluations were conducted after the resolution of the acute signs and symptoms. However, the findings from bone scans of six individuals corroborate the history of beatings described by the former detainees. For example, one former detainee's bone scan revealed increased focal activity of both shoulders consistent with degenerative arthritis. The presence of this condition corroborates his allegation that he was forced to maintain uncomfortable arm positions for extended periods of time during his transfer to Guantánamo. Moreover the scars and lesions observed on all the former detainees were consistent with their reports of injuries sustained during their arrest and detention. For example, the lesions noted on the heads and noses of two individuals could corroborate the blunt trauma they described earlier.

## Deprivation of Basic Necessities and Sanitary Conditions

The poor conditions of confinement in US detention facilities described by former detainees, especially in Iraq but also in Afghanistan and during the first year Guantánamo Bay was in operation, constituted a substantial form of ill-treatment by themselves. All of the former detainees evaluated by PHR reported experiencing lack of proper sanitation, hygiene, food, and clothing. Further, uncertainty regarding their fate (i.e., whether charges would be brought against them, whether they would be killed, whether/when they would be released) and the denial of, or substantial delay in, communication with family significantly affected these individuals.

Detainees destined for Guantánamo were deprived of food and sanitation during the initial stages of their detention. One former detainee reported that while detained in Bagram airport, detainees were fed cold meals and inedible moldy bread. He also stated that while in detention in Bagram airport, "It was not easy to go to toilet" because the toilet was a non-closable public toilet shared among all of the detainees. He reported that he and many other detainees often did not eat in order to avoid having to use the toilet. He also recalled that the detainees were only allowed to take communal showers and were only given one to two liters of water for bathing. This former detainee also recalled not being given a toothbrush and toothpaste and having resorted to using a piece of plastic

to clean his teeth; in fact, he reported that when he was caught trying to save a small plastic bag to use for the same purpose, he and his fellow detainees were beaten as a group punishment. He also stated that detainees had to eat while being handcuffed.

Detainees who arrived at Guantánamo Bay's Camp X-Ray in early 2002 experienced brutal conditions. One explained that they were kept in "steel cages and it was really, really hot, even in the night." This individual also stated that the detainees were let out of the two meter-square "cages" only for questioning, were not allowed to speak to each other, and had to use a bucket as a toilet. Similarly, another former Guantánamo detainee described conditions at Camp X-Ray as "egregious — the conditions we were living in — we were treated like animals...they were treating the dogs better than they were treating us." One detainee also recalled that his daily food rations in Camp X-Ray of Guantánamo were meager.

A few weeks after arrival at Guantánamo, two former detainees evaluated by PHR reported having been transferred to Camp Delta, and they described overall detention conditions as improved. These individuals stated that Camp Delta had been built recently and included toilets and running water in the cells. However, the detainees were still confined to their two-meter square cells and let outside only for about fifteen minutes once a week to exercise, although this later increased to two or even three times per week. Other than these brief exercise periods, one detainee recalled that he was only allowed out of his cell for interrogations or "to go to the bathroom" and clean himself.

Moreover, movement into the other camps did not always mean an improvement in conditions, especially for those kept in isolation. One former detainee stated that for five days he was kept in an isolation cell in Guantánamo, where he was given very little food, was extremely hungry, and was deprived of his blankets. Another detainee recalled that in Guantánamo the soldiers would sometimes spit in or throw out part of their food rations. Another former detainee recalled that in Camp I of Guantánamo during Ramadan, while he and the other detainees were fasting, they received reduced quantities of food at ordinary meal times instead of the religiously appropriate time (e.g., before sunrise and after sunset). He also recalled that he and the other detainees would receive one piece of meat the size of a matchbox. Similarly, another former detainee recalled that for long periods of time in Guantánamo, he was not given a sufficient quantity of water. One participant attributed getting fungus on his feet and his axillary (armpit)

area to the fact that in Guantánamo the detainees did not have personal overalls and their clothes would get mixed up at the laundry.

The physical circumstances at American facilities in Iraq were, if anything, worse. One Iraqi former detainee stated that during his initial days of detention at an American-controlled camp, the bathroom was an open space "and we were constantly watched by soldiers when we did our business." Another Iraqi former detainee stated that unsanitary conditions at Abu Ghraib worsened an infection that he had developed in his toe. In the Abu Ghraib communal tents where one individual was detained, he reported that the unsanitary conditions there seemed to be a form of group punishment. He reported that the detainees were occasionally denied access to a toilet. "Some of the prisoners were peeing in their clothes," he said. Another individual stated that he was intermittently placed in "lockdown," where he and the other prisoners would be kept for durations of up to twenty-four hours without food, water, or access to a toilet. Yet another reported being placed in the "punishment room" in Abu Ghraib several times, where he developed rashes and allergies due to the deplorable sanitary conditions, such as the presence of urine on the floor of the room. One Iraqi former detainee recalled that he was forced to wear the same filthy suit for seven months. Another Iraqi former detainee recounted being forced to wear soiled underwear, often for weeks or months at a time. He told PHR: "I had diarrhea and I was in handcuffs. I was making my toilet in my underwear and I was very dirty. That was very painful."

Moreover, an Iraqi man recalled that in Abu Ghraib, the food that he was given was "barely enough" and was "really bad." He reported that his food would be thrown or kicked by the guards into his cell in a small bag and was sometimes thrown into or near the toilet.

In addition to the denial of food and a lack of access to a toilet, eight of the former detainees were denied clothing or were kept naked during portions of their detention.[70]

## Stress Positions: Forced-Standing, Handcuffing, and Shackling

*[O]ne time they took me to be questioned and there was a chain coming from the ceiling. It was a winch. They pulled me [by my wrists, from behind] and they left*

*me for about four hours. Only my toes were touching. I started saying to them 'it is very painful — I have a very severe headache' and after that I passed out.*

**An Iraqi former detainee evaluated by PHR**

Except possibly for the use of isolation, the most frequently employed form of torture reported to PHR was the use of stress positions. All former detainees reported having been subjected to painful stress positions, often for long periods of time, including during lengthy interrogations.

Individuals detained in Afghanistan before being sent to Guantánamo were subjected to the routine use of stress positions. One former detainee stated that upon his arrival in Kandahar, he was stripped naked, forced to wear goggles and earphones, his hands and feet were shackled, and he was tied to a table with his hands behind his back. This same man recounted another episode where he was beaten so severely during an interrogation at Bagram that he lost consciousness; he was subsequently hospitalized while handcuffed and strapped to the bed with a leather strap. Another former detainee recalled one incident in Bagram where he was beaten by guards who believed he was speaking to another detainee while reciting the Koran during prayer. He was beaten and chained to barbed wire for several hours, and he recalled that it was excruciating to be suspended that way because the barbed wire hurt him when he lost his balance.

Detainees described interrogations at Guantánamo as often accompanied by shackling and stress positions. One former detainee recalled that between interrogations at Guantánamo he was chained to the floor. Two others reported that they were held in extremely hot or cold interrogation rooms chained to a ring on the ground for extended periods of time ("forcing us to sit chained for eighteen or twenty hours"). They both described this experience as extremely painful.

An Iraqi former detainee described being suspended in painful positions on numerous occasions, often being elevated off the ground for hours at a time — resulting in a dislocated shoulder and pain that plagues him to this day. Three Iraqi former detainees reported losing consciousness as a result of being subjected to painful stress positions. One described being suspended in his "cage" in Abu Ghraib and forced to spend many hours with one arm elevated and another tied to his ankle, or being chained to a bed with his arms and legs splayed apart. In another episode he was lifted off the ground by his arms which were tied behind his back, and he felt

---

[70] Forced nudity and denial of the most basic forms of decency and privacy will be discussed in detail in the Sexual Humiliation section.

his shoulders being dislocated. This individual estimated that the "free suspension" (elevation above the ground by his arms) occurred "not less than four or five times" and added that he was chained to the window every day, especially at nights in order to deprive him of sleep. He added that dogs were brought to frighten him while he was suspended, and they scratched his hands and arms. Another detainee recalled being suspended in a similar manner while detained at Baghdad airport with "some kind of a machine—a winch." He reported having lost consciousness twice and that the interrogators threw cold water at him to revive him so they could continue his interrogation.

Another Iraqi former detainee described being hand-cuffed to the ground during an interrogation in Abu Ghraib. This individual reported being forced to assume painful postures for extended periods of time. He demonstrated one position in which one hand was tied to the floor and a second raised above his head. He reported having to maintain this position for approximately a full day, after which time the soldiers put him in another stress position. Another Iraqi individual described that while at Abu Ghraib, after being kicked in the shoulders and legs, he was forced to stand on an injured foot with one hand tied to the upper bunk of his cell. Another Iraqi former detainee reported that in the first days of his arrest at an unknown detention location, while he was blindfolded and his hands were shackled behind his back, he was forced to stand for five to six hours together with other detainees. He noted, "We were in a miserable [state]."

The severity of the detainees' physical restraints was often exacerbated by the accompanying blindfolding, hand-cuffing, shackling, sleep deprivation, isolation, and exposure to temperature extremes that often occurred during detention as well as during interrogation. One individual recalled that, while in detention in an unknown location in Iraq, he was blindfolded, handcuffed behind his back, and then forced to bend over and walk in a zigzag while soldiers pushed him into the wall. Another Iraqi former detainee described that during his first interrogation in an unknown place in Baghdad he was hooded and chained while suffering significant pain because of broken glass embedded in his feet. Another Iraqi former detainee reported that while he was detained along with other prisoners in an American-controlled "camp," he was kept hooded and handcuffed with his hands behind his back in a large hall for several days. One individual recalled being forced repeatedly to lie with his hands and feet tied together behind his back, in what is convention-ally known as a "hog tie," for up to an hour at a time. One

of the Iraqi former detainees described an incident in Abu Ghraib when he was thrown into a muddy pool of water with his hands and legs shackled. Another individual who was detained in Iraq reported that while in Abu Ghraib, he was forced to stand in his cell the entire night, naked and handcuffed to his bed, as he was doused with water. The same individual recalled another episode where he was tied to the bars of his cell and forced to stand in that position the entire night. Another detainee in Abu Ghraib recalled having been kept in a cold, dark room for the first three weeks of his incarceration, shackled throughout much of this time.

Medical evaluation, while not conclusively confirming these accounts, was consistent with them. All of the former detainees reported that they continue to suffer from diffuse musculoskeletal pain, and pain in limbs, joints, muscles, and ligaments that they did not expe-rience prior to detention. For example, one detainee reported arm numbness and weakness following being suspended by his arms ("free suspension"), which is highly consistent with a brachial plexus injury that often results from this type of suspension. Since his release from Abu Ghraib prison, this individual has been suffering from chronic pain in his neck, legs, right shoulder, and feet, all of which he attributed to injuries sustained during his incarceration (from beatings and being suspended in stress positions). Another former detainee described experiencing daily lower back pain and numbness in his legs, which began while he was in Guantánamo, and is exacerbated by lifting heavy objects and walking. This type of injury corroborates the allega-tion of being subjected to shackling and handcuffing for extended periods of time. Additionally, the thinning of the skin and decreased hair on this individual and another former detainee's wrists were attributable to handcuffs having rubbed against their skin.

## Isolation, Sensory Deprivation, or Bombardment

The use of isolation, sensory deprivation, and sensory overload became almost routine in the treatment of detainees, especially during — but not restricted to — the first few months of detention.

### Prolonged Isolation

All of the men evaluated by PHR reported being subjected to lengthy periods of isolation, one for as long as two months at a time and others for periods ranging from about ten days to more than a month. Most also reported being kept in small, dark holding cells that one Iraqi

former detainee said made him feel "claustrophobic." The men reported that while being kept in isolation they were subjected to multiple other forms of ill-treatment including shackling, blindfolding, physical abuse, humiliation, sexual humiliation, and stress positions as well as temperature and light control.

One former detainee reported that after a lengthy interrogation in Guantánamo, for about one month, he was kept in a small isolation room that was constantly air-conditioned and was very cold. He described the isolation cell as a metal container with a bed and a toilet. At another time, he was punished with two weeks of isolation because he refused to speak to an interrogator. In another incident, he recalled being put in extreme isolation for a period of two weeks in Guantánamo before being interrogated. This individual stated that during this extreme isolation period, detainees were bombarded with loud music and given many different kinds of medications and numerous injections. As noted above, another detainee recalled that while repeatedly being subjected to lengthy interrogations, he was put in isolation for five days in Guantánamo; deprived of his blanket, sufficient food, and sleep; and was denied medical attention for his nausea, vomiting, and blood in his urine.

In another case, a detainee developed severe mental health problems that could be directly attributed to his isolation, including suicide attempts, banging his head against walls and other objects, and hallucinations. Nevertheless, he was treated with heavy doses of psychotropic drugs and continued to be kept in isolation for considerable periods of time. Only months after these symptoms appeared did the medical staff seek to have him removed from isolation.

 According to the detainees' accounts, isolation in Iraqi facilities was an even more routine procedure. As described above, one Iraqi former detainee reported having been taken to a dark room where he was shackled for most of the time and kept isolated and naked in a cold cell for approximately the first three weeks of his incarceration there. Another Iraqi former detainee similarly recounted that he was kept in isolation at an unknown prison for a period of twenty-seven days during which time he was frequently interrogated.

One Iraqi former detainee recalled that he was detained in the Baghdad airport prison inside a dark room dressed only in his underwear, with a hood covering his head. His hands and feet were tied, and he was periodically beaten and kicked. This individual was subsequently subjected to similar treatment at Abu Ghraib. He stated that he was held for approximately thirty-five to forty days in isolation

in a dark cell measuring approximately 1.5 by 2.5 meters. He described the room as "a cage, and inside this cage there [was] another cage." He reported that at times he was forced to stay inside the smaller cage. During this time, he reportedly underwent lengthy, intense interrogation sessions lasting up to nine hours at a time.

Another Iraqi former detainee stated that he was kept in an isolation cell for about fifty days—the first fifteen days of which he was kept naked and without a blanket. Upon his arrival at Abu Ghraib prison, yet another man recalled that for approximately two months, he was kept naked in a dark, windowless, cold room that smelled like urine. During this time, he reported the recurrent practice of being forced to stand naked and hooded outside of his cell for several hours at a time.

One former detainee recalled the conditions of isolation while detained at a facility at Saddam Hussein's former ranch, "Being in solitary was the worst...There was nothing in the cell. I was watched when I went to the bathroom, with the gun pointed at me." Another Iraqi former detainee reported being isolated, completely naked and alone, in a small, totally dark cell for over three weeks upon arriving in Abu Ghraib.

## Hooding/Blindfolding

Sensory deprivation by means of hooding or other types of blindfolding was reported by all of the former detainees evaluated in this investigation. Apart from being subjected to these techniques during arrest and transportation between facilities as described earlier, detainees, particularly those held at Abu Ghraib, reported being blindfolded during interrogations and during general detention. Blindfolding was generally done by placing a hood or plastic bag over the head or a plastic mask over the face. Blindfolding was frequently used in combination with other techniques, and the detainees reported that it instilled in them feelings of fear, disorientation, and dependency.

Detainees held in Afghanistan before being transferred to Guantánamo reported that hooding was used in combination with other abusive tactics. One former detainee recalled that in one interrogation session at Bagram while he was hooded he was subjected to severe beatings to the point that he lost consciousness. As noted previously, this individual recalled that he was put in a stress position upon arrival at Kandahar while he was wearing goggles and earphones that prevented him from hearing and seeing. At Guantánamo, on the other hand, the four detainees evaluated experienced hooding only when being moved.

In Iraq, hooding was a more routine practice. One former detainee recalled being hooded during his first interrogation upon arrival at Abu Ghraib prison. Another former detainee in Abu Ghraib reported having a bag put over his head while a soldier lit a cigar and blew smoke into the bag. A third explained how he was hooded while being physically assaulted: "They were kicking me in my chest, my abdomen ... I had a bag on my head, so sometimes they made me walk into the wall, because I could not see anything."

Another Iraqi former detainee recalled a recurrent practice in Abu Ghraib, described previously, of being forced to stand naked and hooded outside of his cell for hours at a time. In an unknown prison, another Iraqi former detainee described being hooded for approximately three consecutive days following his initial arrest. During that period he suffered other abuses, including being forced to maintain uncomfortable stress positions.

### Sensory Bombardment

*For two months I couldn't sleep because there was very strong light. We didn't know if it was day or night. If you fell asleep just for a few minutes they played very loud American music, so you could not sleep.*

**Former Bagram detainee evaluated by PHR**

According to eight former detainees evaluated by PHR, sensory bombardment with loud noise or music or extreme light was utilized in what appeared to them to be a strategy to disrupt sleep or to disorient them.

One detainee reported that he was sleep deprived for two months in Bagram because his cell was lit with very strong lights twenty-four hours every day and loud rock music was played all the time. Another recounted that he was unable to sleep during his detention in Kandahar because soldiers were playing very loud rock music all the time. The use of loud music continued at Guantánamo. One detainee stated that in Camp Echo at Guantánamo, he was kept in isolation and he was exposed to loud sounds. Another who was detained in block Oscar recalled Guantánamo guards playing very loud, unpleasant music and banging "every fifteen minutes" on the doors of their cells.

When the Iraqi former detainees came into US custody in 2003, this practice was in place as well. One individual reported being forced to listen to extremely loud music for many hours at Abu Ghraib, which not only caused pain but reverberated for hours after it ended; he now reports hearing loss that he attributes to this experience. Another former detainee recounted a similar episode in Abu Ghraib, where he was forced to lie on the ground while loudspeakers blasted music into his ears at a very painful volume. Still another stated that in Abu Ghraib he was subjected to "a very frightening voice" over a stereo as he was forced to run around in a narrow room with other detainees for three days. He said: "I thought my head would explode." Another former detainee from Abu Ghraib was forced to dance to loud music that caused him to hear ringing in his ears for weeks after the incident. For another Iraqi former detainee, the use of loud music was combined with sleep deprivation.

## Threats of Harm to Detainees and Their Families

*They were telling me, making me hear voices of children and women, and told me they were my children and [wife].*

**An Iraqi former detainee evaluated by PHR**

Almost all of the detainees reported being threatened with severe harm, most commonly through verbal threats during interrogations. Some threats were terrifying claims that the detainee or members of his family would be killed or severely harmed — or that the detainee would never be released. One Iraqi former detainee told PHR that he was led to believe that his family was also in the prison where he was being held, and that they were being raped and tortured. Another of the Iraqi participants in this investigation said that the threat against members of his family was the most painful episode he experienced while in detention. He recalled, "They were threatening me, saying they will bring [my] mother and sisters [here] and . . . rape them."

US personnel routinely threatened to severely harm the detainees. One former detainee reported that in Kandahar prison he was threatened with electric shock, and in Guantánamo the guards threatened to shoot him. Another detainee recalled that in his initial interrogations at Guantánamo, he was asked the same question over and over again and was threatened that he would "be forced to tell the truth." This same individual recalled that in another episode, an interrogator threatened to extradite him to his home country where he would be tortured. Another former Guantánamo detainee recalled that in one interrogation he was threatened that if he did not cooperate with the interrogators, he "would stay in Guantánamo all his life."

In Iraq, one detainee reported that he was told he should write his will for his wife and children and that he would be executed in two hours. Another Iraqi former detainee recalled being told by an interpreter, "You will die here." A third Iraqi former detainee reported that while being detained at Baghdad airport, he was threatened with a hammer and told: "we can break your head," while another Iraqi former detainee recalled that at Abu Ghraib, he was poked with a gun that was run up the length of his body. Another Iraqi recalled that at Abu Ghraib he was occasionally threatened with death while he was blindfolded. Two former detainees related that they were threatened with forced disappearance, since they were unregistered and were considered "ghost" detainees. After an estimated twenty-two days in isolation, one Iraqi man recalled being transferred to another part of the prison for an additional thirteen days. There, although he was no longer interrogated or mistreated, he felt threatened since he did not have a prisoner identification number and "expected to be killed." Another recalled that he remained in Abu Ghraib for four months while "no one knew about me [or that] I was in Abu Ghraib. And when I was in the cell I didn't have a number on my hand."

It is striking that being sent to Guantánamo was itself used as a threat in Iraq — one heard by half of the Iraqi former detainees evaluated. One recalled being told he would be sent to Guantánamo "where you will never see your family again" and another stated he would be sent "where even dogs won't live." Another reported that he was threatened during an interrogation that his wife and daughter would be arrested and sent to "Gitmo" if he did not talk.

Other threats exploited cultural fears and sources of humiliation. For example, one Iraqi former detainee reported that he was photographed while naked and was threatened that the pictures would be displayed in his home district.

## Instilling Fear Through Use of Military Dogs

The use of dogs to instill fear among the former detainees was reported by more than half of the participants in this investigation. Eight individuals recounted being threatened or witnessing other detainees being threatened or injured by dogs. For example, one participant recalled that in Guantánamo during cell searches the guards would allow the dogs to jump and bark at other detainees

and remembered this as a "very frightening experience." Another former detainee recalled that guards in Guantánamo and in Kandahar threatened to unleash dogs on detainees. A former detainee who had been threatened by dogs during his detention in Guantánamo said: "I still see the dogs in my dreams that they are coming for me and are going to bite me."

Three former detainees at Abu Ghraib reported that they were personally threatened with the use of dogs. One individual disclosed that while he was in Abu Ghraib, five soldiers descended upon him and threw him on the floor. They then unleashed a snarling dog on him, while other restrained dogs surrounded him, barking at his head. He was not bitten, but saw another prisoner being bitten. As described previously, another former detainee reported that in Abu Ghraib dogs were used to frighten him while he was suspended in a stress position. He received scratches on his arms and hands, but was not bitten.

## Use of Temperature Extremes

*One of the most painful things, when it got cold in November, they used to put my clothes in the water and make me put them on, and get me into my room without any blanket.*

**An Iraqi former detainee evaluated by PHR**

All of the participants in this investigation reported being subjected to temperature manipulation, either through exposure to extreme cold or extreme heat. Cold water to chill detainees, as well as removal of clothing or blankets, was apparently used to keep detainees awake during interrogations, to deprive them of sleep during detention, and to generally to heighten their sense of fear and insecurity.

All of the former detainees at Guantánamo Bay evaluated reported conditions of extreme heat or cold during their detention. One said that upon his arrival in Kandahar, he was kept in a tent for about twenty days, where it was extremely hot, approximately 45°C, and he felt very sick. At Guantánamo, one individual recalled that after an interrogation session he was moved to the "worst" section, where he was not allowed to have a blanket or a mattress. Another detainee stated that upon arrival in Guantánamo, the detainees were forced to stand outside while being exposed to the hot sun for five to eight hours. He recalled asking permission to sit, which was refused

and remembered that some of detainees collapsed from this exposure to the sun. Similarly, as described previously, another former detainee stated that when he was in isolation in Guantánamo, his cell was constantly air-conditioned and very cold. He recalled that when he tried to block the air-conditioning vent with a piece of cloth, the guards would remove it. Another former detainee from Guantánamo recounted being held in extremely hot or cold rooms for extended periods of time while ice-cold water was at times poured over him.

Temperature extremes were also employed during interrogation. As described previously, another former Guantánamo detainee recalled that he went through lengthy interrogations on five days while he was simultaneously subjected to isolation, cold temperatures, sensory bombardment, and sleep and food deprivation.

The same technique was also used in Iraq. One Iraqi former detainee described his room at the Baghdad International Airport as extremely cold, and another was kept naked in a cold room for the first three weeks of his detention in Abu Ghraib. Another man held at Abu Ghraib said that detainees were denied blankets periodically in the tent area there and were occasionally forced to stay in the cold as a form of group punishment. Still another former Abu Ghraib detainee recalled that at times he was denied clothing or blankets despite cold weather and/or cold cells.

Cold water was also employed as part of more generalized physical abuse. One former detainee reported being woken up in Abu Ghraib by cold water being poured on his head after he fainted during an episode of harsh physical abuse. Another detainee described that water was poured on him while he was being beaten during an episode of interrogation at Baghdad airport, and recalled thinking he would lose consciousness. A third Iraqi reported that while in Abu Ghraib, his head was immersed in cold water on a daily basis. Also, as described previously, this individual recalled an incident in which he was forced to bathe in cold water while handcuffed to his bed and forced to stand all night. As noted previously, another detainee reported that after an episode of abusive interrogation that included physical abuse and stress positions, he was put in an extremely cold room and recalled feeling like "[his] heart stopped." Finally, an Iraqi former detainee reported an episode in Abu Ghraib where he was woken up in the middle of night and forced to take a cold shower, presumably to disrupt his sleep.

## Beatings and Other Physical Assault

*We were beaten every day in Bagram. You cannot move. If you move, you are punished. Punishment is suspension to barbed wire for one to two hours.*

**Former Guantánamo detainee evaluated by PHR**

Aside from the beatings upon arrest and initial detention and transfer described earlier, some of the detainees were beaten later during their time at Abu Ghraib and Guantánamo. Three were sodomized at Abu Ghraib. Three were subjected to electric shock at detention facilities, two in Iraq and one at Kandahar in Afghanistan. Many of the physical assaults reported would likely have resulted in bruises and soft tissue injuries that would not leave lasting physical marks. However, bone scans of six individuals as well as scars and healed lesions on the former detainees, are consistent with the physical abuse reported. Scarring on one individual's thumbs is highly consistent with the scarring caused by electric shock. Further, reports of rape and sexual assault were also corroborated by medical examination.

### Exploitation of Injuries

Four Iraqi former detainees reported that soldiers deliberately exploited their injuries. One individual recalled having his already injured hand deliberately stepped on and squeezed by soldiers in Abu Ghraib. Another recalled that after refusing an amputation, his right leg was wrapped in a bandage and a soldier knowingly kicked him in his injured right leg, making him fall to the ground. The third detainee reported that an already existing foot injury was worsened deliberately during an episode in an unknown prison location, where he and others were forced to run in a circle in a narrow room. Despite profuse bleeding, he was forced to continue running. He recalled that at one point he leaned against a stretcher and reported his foot injury to the soldiers; one of the soldiers raised the stretcher sharply, and he was thrown against a wall, hitting his head, causing him to lose consciousness. Another detainee recalled that in Abu Ghraib he was injured when he was pushed down the stairs by soldiers. This individual recalled that when he asked a soldier to look at his injured foot, the soldier hit him on the shoulders, kicked his legs, and ordered him to stand by the wall.

Another former detainee recounted that soon after undergoing surgery in Bagram related to injuries

suffered after a severe episode of beatings, he was transferred to Kandahar in an abusive manner. Upon his arrival in Kandahar, American soldiers tied him and other detainees together with a rope, dragging them about 200 meters along a rocky pathway. He recalled that when he screamed because of the severe pain he was suffering, the soldiers pushed his face forcefully down on the ground.

## Abuse by IRF Teams

Two former detainees at Guantánamo stated that they had endured abuse by guards whom they referred to as the "riot police," which were most likely members of the Immediate Reaction Force (IRF) teams. One former detainee recalled that even after minor infractions, "robocops" dressed in riot helmets and padded uniforms would come and beat the detainees. This individual stated that these beatings happened on a regular basis and would include kicks to the back, legs and head. He also reported that guards beat him for infractions like hiding food in his cell or speaking with other detainees. Additionally, he recalled that the IRF team used an irritant spray that caused severe pain in his whole body, "Sometimes I felt like I was losing consciousness from the burning." Another former detainee recounted the brutal force and harsh treatment utilized by the "riot police" at Guantánamo. He said that a female soldier subjected him to a chemical spray and assaulted him with an industrial strength hose that left him "writhing on the ground in pain."

## Use of Electric Shock

Three detainees reported being subjected to electric shocks during their detention. One Iraqi former detainee said that in combination with sexual humiliation, electric shocks were administered to his private parts. The third individual reported suffering extremely painful electrical shocks on three separate occasions during his detention in Abu Ghraib. "I felt that my eyes would go out or blow, and I feel my teeth, and one time I bit my tongue... when they shock you with electricity it feels like your eyes will explode." One detainee said that in a Kandahar prison he was purposefully pushed into a generator that shocked him. None of the detainees reported having been subjected to electric shock in Guantánamo Bay.

## Beatings During Detention

Beatings and physical abuse continued beyond the first weeks of detention in Iraq. One Iraqi former detainee described an incident of physical abuse in Abu Ghraib where he was kicked in the chest and abdomen, and

on another occasion he was pulled on the stairs. He described other incidents in which he was struck with a rifle in the head and right jaw while laying on the ground and also recalled an incident when a soldier stabbed him with a screwdriver in his cheek, causing intense pain and bleeding. In another instance, an interpreter kicked him in the nose, causing bleeding. On two other occasions, a soldier jumped from a table onto his right thigh and another soldier stamped on his right big toe, causing severe pain which persists to this day.

Yet another Iraqi individual reported being punched and kicked frequently during interrogations in Abu Ghraib and at an unknown prison location. He also recalled his chest being burned by a cigarette during an interrogation session in Abu Ghraib and receiving hard slaps over his ears, causing considerable pain.

Another Iraqi former detainee also reported several episodes of physical abuse. In one instance, during interrogation sessions in an unknown prison location, his head and body were repeatedly pushed into the wall. In another episode in Abu Ghraib, he said that an interpreter hit him on the nose with a plastic water bottle, causing bleeding. He believed his nose was broken as a result of this assault. During interrogation sessions in Abu Ghraib, he recalled being hit and kicked, losing consciousness on one occasion from a severe blow to his head.

Likewise, another detainee also reported episodes of physical abuse in Guantánamo after the initial period of detention. He said he was beaten frequently. He recounted that while being held in isolation in Camp Oscar at Guantánamo for five days, guards tried to remove his shirt and shorts by force and after he resisted, soldiers pushed him against the wall, causing his head to bleed. He also stated that while detained at Guantánamo, an interrogator tied him to the ground, threatening him and shouting. The interrogator then pressed on his throat to the point of choking and hit him in the chest and the jaw.

## Sexual Assault and Attempted Sexual Assault

Several Iraqi participants recalled incidents of sexual assault, most of them occurring in Abu Ghraib. One Iraqi former detainee reported that during one abusive episode in Baghdad airport he was beaten severely and the soldiers pulled his penis and testicles, causing severe pain. Another Iraqi man described an attempted rape while he was in Abu Ghraib prison. Late one night, a soldier approached him in a threatening manner with the intent of sexually assaulting him, according to the former detainee.

Two detainees described being sodomized at Abu Ghraib. One reported that guards took him to a small, foul-smelling room, where they forced him to lay down in urine and feces, while shouting into his ear through a loudspeaker. They then forcibly inserted a broomstick into his anus while he was hit and kicked in his back and on his side repeatedly. He recalled that he was bleeding from his feet and shoulders, and the urine on the floor with which he came in contact exacerbated the pain from these wounds. During this time he recounted being pulled by a leather dog leash and being forced to howl like a dog. He explained that if he did not respond, the soldiers would kick him. He recalled that he felt a hot liquid on his back and believed that someone was urinating on him. He was kicked again, this time in his left side and in the groin, and one of the Americans stepped on his genitals, including his testicles and penis, which caused him to lose consciousness.

The other detainee recalled an episode at Abu Ghraib where he was chained, kicked repeatedly as he went up a staircase, and when he reached the top of the stairs, "The party began...They started to put the [muzzle] of the rifle [and] the wood from the broom into [my anus]. They entered my privates from behind." This individual estimated being sodomized five to six times during this abusive incident and saw blood all over his feet.

Another Iraqi former detainee described being threatened with sodomy on several occasions but said he was not sodomized, although the evaluators suspected that he actually had been.[71] In one instance at Abu Ghraib, a soldier that "had a stick in his hand [that he] was trying [hard] to insert in my [anus]...but I was saying that I will kill myself if you do these things" and screaming loudly "like crazy people," which in the detainee's view may have prevented him from being raped.

## Sleep Deprivation

*If you ask me about being chained to the window [standing], it was every day. They were especially doing that at night, to prevent me from sleeping.*

**Iraqi former detainee
evaluated by PHR**

Nine of the eleven former detainees evaluated reported being subjected to sleep deprivation in combination with other techniques. As described earlier, US personnel

prevented the detainees from sleeping by playing loud and sometimes deafening music, throwing cold water on detainees, keeping very bright lights on during the night, and banging on the bars of cells. Other detainees were kept in stress positions, preventing sleep.

## Sexual, Religious, Cultural, and Other Forms of Degrading Treatment

*They called me [Tarzan], because I had the toothbrush in my hand and I was naked like Tarzan, who held a knife and was naked. The interpreter explained this to me in detail.*

**Iraqi former detainee
evaluated by PHR**

Systematic sexual, religious and cultural humiliation and degradation were reported by all of the former detainees evaluated by PHR.

### Cultural and Religious Humiliation

US personnel subjected more than half of the individuals evaluated to cultural and religious humiliation. In one case, an Iraqi former detainee stated that soldiers removed his egal (Arab headpiece), and kicked it after it fell to the ground. Another man reported that soldiers in Guantánamo would yell and taunt detainees during the call to prayer, while another stated that at Guantánamo he witnessed soldiers desecrating the Koran, ripping it apart or writing offensive words on the pages, and occasionally stepping on it. One Iraqi former detainee reported having been called "girl" in Arabic. Another former detainee described a number of occasions during cell searches at Guantánamo where guards stamped on the Koran with their feet. He recalled that the detainees in all five blocks of Guantánamo organized a simultaneous uprising to oppose such practices. He stated that the detainees banged their heads against the walls and demanded "an end to the mocking of their religion." Yet another participant reported that while in Bagram, the guards did not let the detainees pray together, which he stated as being very important for Muslims and added, "They didn't let us recite the Koran. They threw the Koran into the toilet in front of us."

### Humiliation and Degrading Treatment

Eight participants recounted experiencing various additional forms of degrading treatment in combination with other techniques described above. Two Iraqi former detainees recalled having been spat upon. Another recalled that soldiers in Abu Ghraib wrote degrading

---

[71] Although this individual denied anal penetration, the evaluators found scars highly consistent with anal trauma. The medical experts concluded that these scars raise the possibility that, despite his denial of anal penetration, it may have actually have taken place.

phrases in permanent marker all over his body. Yet another recalled that soldiers in Abu Ghraib called him "Tarzan" and pasted the nickname on his cell door for six days. This individual was pulled by a leather dog leash at Abu Ghraib and was ordered to howl like a dog; he suspects that soldiers also urinated on his back. Another reported being forced to drink the urine of soldiers. When asked about this incident, he stated, "I died at that time... after that I could not eat anything."

Many individuals evaluated described feeling humiliated by being observed naked or while using the toilet. One Iraqi former detainee recalled that on one occasion an American soldier forced him to defecate in front of him. Yet another Iraqi former detainee recounted having the sides of his head shaven, solely so the soldiers could laugh at him.

Humiliation was pervasive at US facilities in Afghanistan as well. One detainee recalled that his beard and head were shaved forcibly three times while he was in Bagram. Another former detainee stated that upon arrival in Kandahar, female soldiers sat on the detainees, took photographs, beat them on the head, and humiliated them by laughing at them and offending their religion.

## Sexual Humiliation

Sexual humiliation was reported by virtually all of the individuals evaluated by PHR. The beatings detainees experienced at facilities in Afghanistan were accompanied by sexual humiliation. One detainee stated that during his transfer from Bagram to Guantánamo, he was touched in a humiliating manner; he would not elaborate further but said he considered it the worst experience during his four years in detention. The detainee also recalled that in Bagram he was forced to shower with other detainees and kept naked several times: "It was very shameful for us." As described previously, this individual noted that upon arrival at Bagram airport, detainees were forced to strip off all of their clothes and if they refused, they would be beaten. Similarly, another former detainee described that upon admission to the Kandahar prison, his clothes (and those of fellow detainees) were cut off with scissors in front of female soldiers.

Sexual humiliation continued at Guantánamo, especially during interrogations. One man stated that when he refused to cooperate with one interrogator, a female interrogator began acting in a sexual and provocative way toward him. He stated that this was a very shameful experience for him and very hard to tolerate. Another detainee reported an extremely upsetting and humiliating episode in Guantánamo during which he was forced to watch pornography and witness naked men and women appearing to have intercourse. He also described an incident in which a woman entered the interrogation room naked and smeared blood that he believed to be menstrual blood on him, and he described this incident as horrifying.

At Abu Ghraib, detainees were often kept naked, sometimes for weeks at a time, and some described sexual humiliation during interrogation sessions. One recalled that his genitals were touched multiple times by soldiers and that he was photographed naked, which made him feel especially humiliated and ashamed. American soldiers threatened to send the photos to his home district. Another Iraqi former detainee reported that he was stripped to his underwear when he was first interrogated at an unknown prison. He was kept naked for three days while he was forced into stress positions, and his genitals were touched by guards. He recalled that in one incident at Abu Ghraib his underwear was taken off and he was forced to pose in humiliating positions so "they can take photographs....They were trying to make me look like an animal."

A third Iraqi former detainee recounted that upon his arrival at Abu Ghraib and during his first interrogation, his clothes were forcibly removed. As described previously, he was kept in a dark, windowless, cold room, naked, for about fifty days. During this time, he reported the recurrent practice of being forced to stand naked and hooded outside of his cell for several hours. This individual further described being forced to wear a woman's undergarment on one occasion. He also recalled being shown photographs of naked prisoners by the soldiers.

Similarly, another Iraqi former detainee recounted being forced to strip naked while being photographed by US officials in an unknown detention location. He reported that on a separate occasion he was kept naked in his cell for four days and that he resorted to praying while naked, even though he explained that nakedness is forbidden. He noted that the soldiers would come to his cell and humiliate him because of his nakedness.

# Witnessing Torture and Cruel Treatment

*[The interrogators] wanted me to see my brother [being] humiliated like me...I saw his head bleeding... his hand broken...he was naked...with a piece of fabric covering his private parts.*

**Iraqi former detainee
evaluated by PHR**

More than half of the former detainees evaluated by PHR recounted witnessing torture and other cruel, inhuman or degrading treatment inflicted on other detainees. One individual stated that he witnessed his brother being abused at Abu Ghraib. Another Iraqi individual detained at Abu Ghraib recalled hearing high-pitched screaming from "others who were tortured," while he was being suspended in a stress position. Two of the individuals evaluated, one who was detained at Abu Ghraib and the other at Guantánamo, reported that they witnessed other detainees being bitten by dogs.

Three of the former detainees reported having witnessed other detainees being subjected to various forms of sexual humiliation. One reported that while at Abu Ghraib he witnessed soldiers forcing Iraqi men to lie naked on top of one another. The two others noted that they witnessed US personnel at Abu Ghraib forcing naked prisoners to form a human pyramid. These two individuals both recalled seeing detainees being forced to simulate anal intercourse. "For more than half an hour" one was forced to watch the naked detainees being forced to enact anal intercourse by being pushed into each other. Watching them caused him overwhelming "embarrassment" and terror. Another Iraqi former detainee reported witnessing the sexual humiliation of other prisoners who were forced into positions where their genitals would touch, as well as positions that simulate anal intercourse.

## Health Professional Complicity and Denial of Medical Care

Some of the detainees reported that they received good and appropriate medical care during their detention. However, both the experiences recounted by the detainees and the medical records available in one of the cases show how physicians and other health workers became, at best, ethically compromised in these detention settings. At worst, health professionals at these sites became enablers of torture by providing medical care in an environment where torture was taking place. In fact, in some cases health professionals may have given interrogators the "green light" to continue with abusive techniques and, in other cases, the health professionals effectively patched the detainees up so that they could be abused further.

One detainee who was tortured during his initial detention in Baghdad Airport stated that he received medical attention shortly after arriving at Abu Ghraib: "[The doctor] helped me ... he told the soldiers, 'If you go

on torturing him in this way, he will die.'" One detainee noted that he was diagnosed with tuberculosis and was given medications. He also reported that he received care for constipation and gastric pain. Another former detainee reported that he received medical attention for his stomach pain, headaches, and other problems just before being released from Guantánamo. Another former detainee stated that during his detention in a special medical block, there was a female "psychological commander" who prohibited the soldiers from harassing the detainees.

Access to care, though, was sometimes difficult. One detainee stated that during his detention in Guantánamo, he suffered pains in his ears, and despite his requests he did not have an examination nor was he given any medication. Another reported that despite his "many, many" requests for medical attention for persistent stomach pain, as well as for swelling in his wrists, he never received care.

In Iraq, the availability of professional and humane care was far worse. Although there was an exceptional case — a detainee noted that a surgeon respected his refusal of a recommended amputation of one of his feet and reported that he received "humane treatment from the doctor" after developing an infection on his foot — the detainees reported that even accessing medical care was very difficult.[72] The very detainee, a diabetic, who complimented the performance of the doctors, had difficulty getting the care and medication he needed. He was given insulin during his first day of detention but was later denied additional medication and believes that the refusal was due to a perception that he was not cooperating with officials. Moreover, during his detention in the communal tent area of Abu Ghraib, his foot and leg problems persisted, and he had to ask to see a doctor more than ten times before he was referred for care, and only when the ICRC intervened was he transferred to a hospital.

Several other men at Abu Ghraib reported being denied needed medical treatment, including for injuries inflicted by soldiers (e.g., shards of glass in feet from a violent arrest and a foot injury from being pushed down a set of stairs by soldiers). In the latter case, the soldiers simply told the detainee to "shut up." His foot was swollen and

---

[72] The detainees' accounts in this respect are consistent with a report of the US Army Surgeon General confirming that health care in Iraq was chaotic in the early years of the occupation. OFFICE OF THE SURGEON GENERAL, U.S. ARMY, FINAL REPORT: ASSESSMENT OF DETAINEE MEDICAL OPERATIONS FOR OEF, GTMO, AND OIF (2005), *available at* http://www1.umn.edu/humanrts/OathBetrayed/Army%20Surgeon%20General%20Report.pdf.

bruised, and it took approximately six weeks for the swelling to subside. He was not provided with crutches, a cane, or any medical care until he was transferred to the communal tents at Abu Ghraib, where he was able to use a stick to walk.

Questions of quality and access, however, do not fully encompass the very problematic role health professionals played, especially at Guantánamo. Even those health professionals who sought to restrict themselves to clinical roles and steered clear of interrogation support became part of the machinery of torture. PHR has no information about whether physicians or other health personnel reported torture to authorities, but they surely did not intervene to stop torture when they were in its midst or were examining those subjected to it. Moreover, in the one case where medical records are available, it is apparent that the health staff provided pharmacological treatment for suicidal, self-destructive, and partly psychotic behavior that is at least partially attributable to the torture — including isolation —the detainee experienced, yet the health providers only marginally intervened to stop his torture.

Nine former detainees evaluated reported that health professionals examined their condition during an episode of torture or physical abuse but, as far as the detainees could tell, made no effort to stop it. One man stated that during his initial interrogation at Baghdad airport someone who seemed to be a doctor was present to monitor his heart and blood pressure. The detainee was suspended in the air, which caused his arm to dislocate. The person whom the detainee surmised to be a doctor put his arm back in its place and then informed the interrogators that they could "continue." A detainee at Abu Ghraib reported that after having electric shock administered, he passed out on the floor. He remembered gaining consciousness as a person whom he believed was a doctor revived him and appeared to grant permission for the interrogators to continue. He also recalled that despite repeated requests for medical attention for his hand, he was only given one tablet daily for pain.

At Guantánamo, two detainees said that a person who seemed to be a doctor was present during beatings in Guantánamo Bay. Detainees also suspected that medical and psychological information gained from the detainees for treatment was shared with and used by interrogators. Three of the former Guantánamo detainees said that they spoke with psychologists. Although the men initially thought the meetings were confidential, they later had reason to believe that the psychologists shared information with interrogators.

The detainees from Guantánamo reported that they were given injections or medication without their consent. For example, one man recalled receiving an estimated ten to fifteen injections that often caused rashes. He also indicated that sometimes the injections were administered by "civilians...coming to take lessons — it was like internships."

The medical record available for one detainee sheds special light on torture, the impact of torture, and the treating health professionals' response to the clinical signs and symptoms. After having been beaten, held in stress positions, and kept in isolation in Guantánamo for three or four weeks after his arrival, the detainee started showing severe symptoms of mental distress. He attempted suicide, repeatedly banged his heat against the wall, was defiant, and, at some points, hallucinated. Although there is ambiguity about the degree to which the detainee exhibited psychopathology and the degree to which he was rebelling, mental health staff identified psychiatric conditions and gave him significant doses of psychotropic medication, which had significant side effects, but did almost nothing to address the origins of his severe distress. Although they acknowledged that isolation worsened his condition and recognized his constant begging to be placed in be in a cell with someone who spoke his language, the record indicates that they only intervened once, three months after his symptoms appeared, and his reprieve lasted only a short while. In doing so, they became complicit in his torture, essentially patching him up in order for him to be subjected to further ill-treatment.

Moreover, PHR evaluators concluded that the health professionals clearly failed to adequately evaluate, document, or treat severe psychological symptoms and their behavioral manifestations, particularly post-traumatic stress disorder. Finally, despite multiple incidents of self-injurious behavior and suicide attempts by the individual, including banging his head against a wall, attempted hanging, and participating in hunger strike, psychiatrists list "routine stressors of confinement" as part of their findings in diagnosing the detainee. In doing so, they disregarded cruel or ill-treatment as a likely cause of these symptoms. This is reinforced by the fact that when torture ended in the last years of his confinement, so did his symptoms of mental illness. In sum, the health professionals were complicit in the torture of this detainee.

The medical records do not indicate that the health professionals inquired into or documented any form of ill-treatment perpetrated by US soldiers. Instead, their

interventions and documentation obfuscate the relationship between the detainee's abuse and ill-treatment in confinement and his deteriorating mental and physical condition.

## Response by US Personnel to ICRC Visits

Three of the former detainees evaluated for this report mentioned that a representative of the International Committee of the Red Cross (ICRC) visited them during their detention. One man reported that while he was being kept naked in Abu Ghraib, representatives of the ICRC visited him, and he told them about his ill-treatment. He stated that the ICRC personnel provided him with clothing and blankets but that these items were confiscated after they left. Before the ICRC returned the following day, these provisions were given back to him, only to be taken away again when the visitors were gone.

ICRC representatives visited another former detainee in Abu Ghraib after an infection in his foot had worsened to the point where he could not stand. This individual believed that because of ICRC intervention, he was transferred to a hospital. Another participant reported that six months after his arrival to Guantánamo he received a letter from his family via an ICRC representative and was then allowed to send letters to his family every six to eight months. This former detainee reported witnessing another detainee being punished with one month of isolation because he had kept an apple in his cell and recalled that when he reported this to the ICRC, the detainee was punished with an additional month of isolation after the ICRC had left the camp.

# V. SHORT-TERM AND LASTING HARM FROM TORTURE AND ILL-TREATMENT

All of the detainees suffered severe physical and mental pain as a result of the assaults on them by US personnel. The pain was often searing at the time it was inflicted and, for most of the detainees, continues to this day in the form of deep physical discomfort and/or severe mental anguish, which includes depression, anxiety, and post-traumatic stress disorder (PTSD).

## Acute Impact of Ill-Treatment

All former detainees evaluated by PHR recalled experiencing excruciating physical and emotional pain during the infliction of abuse upon them by American personnel. Most, if not all, former detainees lost consciousness at some point during an episode of ill-treatment, either as a result of direct head trauma or overwhelming pain. One former detainee was beaten so severely during an interrogation in Bagram, Afghanistan that he lost consciousness and subsequently required surgery. Soon after the surgery he was transferred to Kandahar and though weak, he was hooded and shackled, with his knees taped together in a kneeling position while tied to the floor. Later, he was forced to walk along a rocky pathway while he was suffering from excruciating abdominal pain.

The individuals evaluated by PHR suffered acute and severe physical pain from practices including being made to walk or run while injured, or being physically attacked with a variety of implements, such as being stabbed in the cheek with a screwdriver; and some former detainees suffered excruciating pain from being kicked, punched, choked, or sodomized. Three former detainees suffered immense pain from the intentional application of electric shocks. Other former detainees reported severely painful swelling or bruising of the genital region due to physical assault. Another detainee recalled suffering from nausea and vomiting and saw blood in his urine during his initial detention at Guantánamo. Six of the former detainees reported suffering chronic headaches while in US custody. Many of the detainees suffered muscular pain in their necks, arms, and backs that lasted long beyond when they were forced into painful suspended and stress positions for prolonged periods.

They all experienced terror — of being attacked by dogs, of being physically beaten, shocked or sodomized again, of threats to themselves or their families or to be sent to their home country where they would be tortured, or by witnessing or hearing abuse being inflicted on others. And they all experienced the acute shame and pain of severe sexual, cultural, and religious humiliation. Being kept without clothing in a dark, claustrophobic cell for extended periods of time caused anxiety attacks as well as emotional trauma in many of the former detainees. One former detainee reported chest pain and shortness of breath when he became nervous, and another reported severe emotional trauma from sustained, repeated sexual abuse. Several detainees reported not being able to sleep, and one stated: "I was having really bad nightmares...I felt like I couldn't breathe." According to medical files, during an interrogation session in Guantánamo one detainee had a seizure and "was unresponsive and fell ...[while] his feet [were] buckled."

All former Guantánamo detainees reported receiving multiple injections against their wishes. One reported that he often experienced rashes several hours after these injections ("red dots on my body and shoulders that would start to itch"). Another suffered from the physical and mental consequences of forced injections that not only caused joint and skin pain, but also memory loss and shortness of breath. He recalled that the injections made him "lose [my] mind...and brought [me] to [my] knees."

Seven of the eleven individuals evaluated disclosed having contemplated suicide as a result of the abuses they suffered while in US custody. Suicidal ideation is particularly significant and pathological in these cases given the strict prohibition against suicide in the Muslim religion, to which many of the detainees adhered. Nevertheless, two individuals described being so desperate while at Guantánamo that they tried to kill themselves by banging their heads against a hard surface. Another participant stated that he constantly harbored suicidal ideation

but adhered to the teachings of Islam, which prohibits suicide. Another detainee similarly described invoking his adherence to Islam, despite wishing to die while in Abu Ghraib. Further, he added that "there was nothing to kill myself with." Another individual acknowledged that "inside the jail, I did pray to Allah to make me die." Similarly, one participant recalled his darkest moments while in Guantánamo when he thought "Satan" would tempt him to commit suicide, but he adhered to Islamic rules. For another individual the isolation, beatings, and other abuse he experienced in Guantánamo had a severe impact on him, causing his mental condition to seriously deteriorate. According to his medical records, this former detainee had audiovisual hallucinations and was diagnosed with a major depressive disorder and psychosis. He was treated with psychopharmacological drugs that were associated with severe side-effects. However, the lengthy interrogations, isolation, and sleep deprivation to which he reported being subjected continued. During this time, he engaged in several acts of self-harm such as self-mutilation, attempted hanging, ingestion of the liquid in ice packs, which contains ammonium chloride, and banging his head against the prison walls. According to his medical files from the first year of his detention at Guantánamo, he also participated in a hunger strike, saying to the officials, "Either send me home or prosecute me." Yet the abuse and ill-treatment continued.

## Chronic Physical Consequences of Ill-Treatment

All of the individuals evaluated by PHR reported that after their incarceration they suffered from headaches ranging from occasional to chronic, occurring as often as three times a day or lasting up to three hours at a time. While the etiology of headaches cannot be definitively determined, these reports were highly consistent with a history of head trauma. Continued psychological symptoms and emotional distress may contribute to these headaches as well. One detainee also reported hearing loss, which he believed was due to the loud music that was blared at him in Abu Ghraib.

All of the former detainees examined by PHR reported that they continue to suffer from diffuse musculoskeletal pain that they did not experience prior to detention. Many of the persistent pain reported, as well as the descriptions of the abuse that caused these injuries, were supported by findings from the physical examination. However other reported pains of unknown etiology and with no identifiable organic basis may be psycho-

logical in nature, possibly indicative of trauma-induced somatization disorder, described below.

Many former detainees reported significant persistent pain in their limbs, joints, muscles, and ligaments, as well as functional impairments that, as the individual case reports reveal, can be attributed to injuries sustained during episodes of physical abuse. One individual reported arm numbness and weakness following suspension by his arms, which is highly consistent with a brachial plexus injury often resulting from the type of suspension he described enduring. Since his release from Abu Ghraib prison, he has been suffering from chronic pain in his neck, legs, right shoulder, and feet, all of which he attributed to, and are consistent with, reports of injuries sustained during his incarceration (e.g., beatings, being suspended in stress positions).

Another man experiences daily lower back pain and numbness in his legs that began while he was in Guantánamo and is exacerbated by lifting heavy objects and walking. This type of injury is consistent with his report of being subjected to shackling and handcuffing for extended periods of time. Similarly, the diffuse lower back pain that another former detainee described is consistent with his report of beatings to the back. Further, the significant right shoulder pain and functional impairment another individual reported is consistent with a shoulder injury resulting from suspension.

One former detainee's spondylarthrosis and discopathy at the level of second and third lumber (L2-L3) vertebrae[73] is consistent with prolonged restriction of movement, prolonged exposure to cold temperatures, and being shackled in painful positions for long periods of time. The pain this individual suffers when moving his right knee is consistent with having been subjected to restriction of movement and the trauma to his knee that he reported during his detention in Guantánamo. The same detainee reported suffering from chronic constipation, which can occur as a secondary symptom of several stress conditions and also because restriction on mobility of inadequate intake of fluids and food which he reported intentionally limiting to avoid having to use an open toilet. The chronic constipation may also represent a psychosomatic manifestation stemming from the several forced anal cavity searches reported by this individual. Also the diagnosis of external ear infection and thinning of the eardrum is consistent with a history of the beatings to the head, which the detainee had reported sustaining in detention.

---

[73] For an explanation of the spondylarthrosis and discopathy, see *supra* notes 51-52.

# Lasting Psychological Consequences of Ill-Treatment

Ten of the eleven individuals' clinical presentations, reported history, and the results of their psychological testing supported the presence of ongoing psychiatric disorders that can reasonably be attributed to their experiences while in detention at US facilities.

## Major Depressive Disorder

Severe depression is one of the most common long-term consequences of torture. The clinical presentation and the results of psychological testing indicated the presence of major depressive disorder among seven of the participants examined. Many detainees suffer from symptoms such as feeling hopeless and isolated, and feeling that they have no future. One participant reported that he cannot remember the Koran very well and he has no desire to read it as he did before. The depressive symptoms appear directly related to the multiple traumatic experiences these men described. In one case these symptoms were exacerbated by a pre-existing depression and became disabling and chronic after the detainee's incarceration.

The severity of these depressive symptoms varies considerably among the former detainees. One man has an extremely severe depressive disorder that, according to the evaluating clinicians, warrants psychiatric hospitalization. Three other participants were diagnosed with major depressive episodes that appeared to be directly related to the multiple traumatic experiences they described. Another former detainee's symptoms indicate moderate levels of depression that warrant mental health treatment. Finally, another individual who had significant coping resources had only a mild level of psychological maladjustment that did not reach a clinically significant level and did not seem to impair his functioning.

## Post-traumatic Stress Disorder

After their release, all except one of the interviewees showed symptoms that meet the diagnostic standards of all three clusters of PTSD symptomology, including intrusive recollections of the trauma, hyperarousal, and avoidance and emotional numbing behavior. These symptoms can be directly traced to the traumatic experiences the detainees reported.

Flashbacks and intrusive memories provide important evidence that the symptoms displayed by an individual are in fact attributable to an identifiable cause. Moreover, unlike many symptoms such as headaches or depressed mood, flashbacks and intrusive memories are rarely attributable to minor stressors or pre-existing psychopathology. Suffering from flashbacks and intrusive memories preoccupied the days of all of the former detainees examined by PHR. "It is like in my head I have never left Abu Ghraib," one of the former detainees told PHR. For one man, the intrusive thoughts and memories of the traumatic events were particularly related to the sexual humiliation he had endured. Another reported having occasional nightmares in which he is attacked by dogs, and one reported re-experiencing the traumatic events he endured both in his dreams and while awake. One former detainee is constantly haunted by the memories of the trauma and tries to avoid triggers that remind him of Guantánamo, like avoiding people with uniforms when he is in the public. Another man said, "These are the memories I can never forget...I want to forget, but it is impossible."

Avoidance and emotional numbing behaviors such as anhedonia (the loss of interest in previously pleasurable activities), resulting in feeling estranged from others, were also commonly reported. One former detainee described having trouble being naked in front of his wife, avoiding open spaces, people, and social activities as well as feeling flat or constricted in his emotions. He explained, "Maybe I feel about one quarter of my feelings." Another former detainee noted that he has moved from his home "because my home reminds me of what happened." Similarly one man left his home region in order to avoid frequent reminders of his imprisonment. Nonetheless, he noted, "How can I forget this?"

Hyperarousal symptoms such as concentration difficulties, outbursts of anger and irritability, as well as sleep difficulties and hypervigilance were also commonly reported by the men evaluated. In the case of one of the former detainees who reported significant depressive symptoms prior to his incarceration, the nature of his intrusive memories and avoidance behaviors suggested that his experiences during incarceration had substantially exacerbated his psychological difficulties.

## Anxiety Disorders

Many former detainees described symptoms indicative of intense anxiety, including occasional panic attacks warranting mental health treatment. For many, these attacks were typically triggered by thoughts about the trauma endured and were characterized by chest pain, shortness of breath, tingling in the hands and feet, and numbness. One man characterized the chest pains as "feeling a sudden crisis in my heart" that occurs "more often when I'm stressed" and another described it as "a

stab in my heart." Another participant reported starting to panic when somebody walks behind him and that he often feels people are looking at him, which makes him think that he is not normal. He stated that he is also nervous and he gets irritated about minor problems.

### Somatization

Although it is always difficult without long-term observation and extensive medical diagnostic evaluations to conclusively attribute physiological symptoms to a psychogenic origin, the extensive literature on PTSD in general and in survivors of torture in particular is consistent with the attribution of many of these symptoms to somatization. Physical complaints with no identifiable organic origin are common in the context of PTSD and often reflect psychological distress rather than physical illness. All except one of the former detainees evaluated by PHR were diagnosed with somatization disorders. Reported somatization symptoms included dizziness, nausea, and numbness, difficulty breathing, rashes, and chest pressure.

### Sexual Dysfunction

More than half of the eleven individuals reported persistent sexual dysfunction. Sexual dysfunction can be due to both physical and psychological factors, but many of the descriptions of sexual dysfunction reported by these detainees, such as erectile dysfunction, low sexual drive, and minimal desire and interest in sex are consistent with a history of sexual violation. One man described his inability to be fully naked in front of his wife. He further explained that he was traumatized that female soldiers had seen him naked and that his genitals had been exposed, scrutinized, commented upon, and ridiculed by a group of strangers. For another former detainee, flashbacks of his torture, especially the sexual aspects, would often intrude during sex with his wife. In such instances, he would then "lose all strength."

### Smoking and Alcohol Abuse

Two men reported a dramatic increase in their alcohol consumption following release. One individual stated that he has increased his cigarette smoking considerably from approximately one pack per day before his arrest and detention to nearly two packs per day, explaining, "I feel more relaxed when I smoke." One individual stated that he has been drinking alcohol on a daily basis since his release despite religious prohibitions against alcohol and that he feels irritable, uncomfortable, and has noticed hand tremors and jitteriness when he wakes in the morning. This individual stated, "After I got out

from the prison I started drinking a lot — every time I was always feeling that I want to get rid of these pictures from the prison that I have in my mind…I cannot sleep without alcohol or some Valium."

## Diminution of Social and Work Life After Detention

*After I got out, I found my home totally broken, I found my wife blind [from injuries sustained during my arrest], and my children are not good at their schoolwork any more. No one could look after them well — no one helped them. They were very poor, they were desperate. They even could not find a door that could close the home [after the Americans destroyed it during my arrest] — for three month[s] our home was open.*

**An Iraqi former detainee evaluated by PHR**

With one exception, all of the former detainees described profound life difficulties and disruptions after their release from detention. The exceptional case is an Iraqi former detainee who was subjected to the least egregious treatment while in US custody. After release this individual quickly reintegrated into civilian life, regaining his status in his community, resuming and enjoying the leadership of his large family. He was not subjected to any further difficulty with the authorities and received sympathy from people regarding his arrest and imprisonment. All others suffered enormous difficulties trying to resume normal life and reintegrate into their families and communities after their release.

### Social Relationships and Stigma

Many former detainees reported a change in their family relationships upon their return home after detention in US custody. One individual stated that he became very concerned that his wife and children were afraid of him and as a result of this concern he began living with a brother. He only has visited his family once a week because he believes his visits make them uncomfortable. One man explained that he felt that his family has been shattered and that he caused much calamity to befall them because of his detention. Another individual emphasized not wanting his children to know about his experiences in detention: "I want to stay strong in their minds. I don't want to ruin my reputation with them." Within his immediate family, only his wife knows about the extent of the detention ordeals, and as a general rule, the topic of Abu Ghraib is not mentioned between them. Similarly, another former

detainee who had many friends before his incarceration noted that he has become more isolated since his release from Guantánamo. This individual further stated that he moved out of his hometown to avoid discussing his detention experiences with his friends and family. Two former detainees reported feeling lonely, isolated, and abandoned in their new places of residence. They both described feeling completely uprooted and without a social support network, including their families. Another reported that his personality has changed, he is extremely irritable, and he has lost his trust in people. Although another former detainee remains estranged from his family, he has become involved in human rights activism since he has moved to another country and works with other Iraqi refugees and torture survivors.

Most detainees expressed that they have lost their status in their community and carry the stigma of being a former US detainee. One expressed his deep belief that he was a "marked man."

### Employment

Many individuals evaluated by PHR described feelings of helplessness, shame or guilt because of their inability to protect or provide for their families.

The war in Iraq has shattered the country's infrastructure and deprived Iraqis of basic security. Thus, examining the impact of detention and torture on the livelihood of the Iraqi men evaluated is confounded, of course, by the devastated condition of the country in which they live. Men detained at Guantánamo Bay were not from Iraq and so their vocational functioning can be more easily assessed.

All the former Guantánamo detainees reported losing their employment or being in a precarious financial situation as a result of their detention. All former Guantánamo detainees reported having been unable to find employment since release. Yet another former Guantánamo detainee reported having difficulty functioning in work environments since his release, due in large part to his psychological problems (e.g., PTSD, panic disorder).

Iraqi individuals reported economic struggles and an inability to resume their employment. One of the Iraqi former detainees explained that although he used to be a "very ambitious man," his loss of interest in things he used to enjoy has significantly impaired both his ability and motivation to resume work. One former Iraqi detainee recounted having lost his business. Similarly, another Iraqi individual lost his business and currently supports his wife and eight children with savings and rental income from real estate. Another Iraqi individual described himself as "a housewife" because of his inability to support himself.

### Relocation

Seven individuals reported having relocated after their release. Two others stated that they have attempted to or wished that they had the means to relocate because of the stigma and the insecurities they have faced since their detention. One individual stated that he believed that his family is afraid to be with him and would like to take them out of Iraq but does not have sufficient resources to do so. Another reported having tried to relocate to a rural area of Iraq, away from his hometown, but was unable to do so. One participant stated that he moved "because my home reminds me of what happened." Similarly, one individual stated that he feared re-arrest and left Iraq to avoid frequent painful reminders of his incarceration, while another stated that his incarceration experiences have made him feel very "uncomfortable" in his home region. This individual left Iraq in order to avoid the frequent reminders of his imprisonment. Another individual left his home and moved to another city to avoid discussing his experiences with his friends and family. Yet another Iraqi has relocated to a neighboring country for much of the past two years. He reported that his life is difficult because he does not have permanent residency in this country and therefore must leave every few months to re-validate his visa.

### Safety and Security

Many of the men evaluated by PHR were concerned about their safety and security. One Iraqi former detainee disclosed that five months prior to his evaluation (in summer of 2006) he had been "taken away" by the Iraqi secret police and detained for eighteen days. He described fearing for his life because of this recent experience and reported an acute level of fear of being re-arrested. Another former detainee stated that he feels uncomfortable whenever he sees policemen or Americans. Similarly, another Iraqi former detainee described a high level of stress caused by the bombings, nightly raids, uncertainty about his personal safety, the frequent funerals of neighbors and acquaintances due to the war, and ongoing sadness about the losses that his family had sustained. Nevertheless, he emphasized that the stressors of his experience in US detention are the primary reasons for his emotional "disturbances," stating, "No sorrow can be compared to my torture experience in jail. That is the top reason for my sadness. I cannot forget it."

# VI. LEGAL ANALYSIS

## Legal Prohibitions Against Torture and Ill-Treatment

Many of the practices described in this report are torture under the law.

In the wake of the unspeakable atrocities wrought by the Second World War, the member states of the United Nations established universal standards to protect human dignity.[74] To prevent further tragedies like the Holocaust, states agreed that certain rights were so fundamental that they could never be abrogated. Among those inalienable rights is the right to be free from torture and cruel, inhuman or degrading treatment or punishment.[75]

The international agreements promulgated include the International Covenant on Civil and Political Rights (ICCPR) (prohibiting cruel, inhuman or degrading punishment),[76] the Geneva Conventions (including provisions governing prisoners of war and Common Article 3, which prohibits torture and "outrages on personal dignity"),[77] and the UN Convention Against Torture (prohibiting both torture and cruel, inhuman or degrading treatment in all circumstances).[78] These treaties, to which the United States is a party, absolutely prohibit the use of torture and other cruel, inhuman or degrading treatment.[79]

Further, this prohibition has also long been a part of customary international law and has risen to the level of *jus cogens*, such that it is now a "higher law" that cannot be violated by any State.[80] All countries are bound by the international instruments to which they are a party as well as *jus cogens* norms. Any prohibition against torture or cruel, inhuman or degrading treatment must be inter-

---

[74] Universal Declaration of Human Rights, G.A. Res. 217A, at 71, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc A/810 (1948). The Preamble recognizes "the inherent dignity... of all members of the human family." *Id.* pmbl.

[75] *Id.* art. 5.

[76] International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 7, 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976 [hereinafter ICCPR].

[77] The Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, incl. Annex 1, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; the Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; the Convention Relative to the Treatment of Prisoners of War, incl. Annexes I–V, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 [hereinafter Third Geneva Convention]; and the Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 [hereinafter Fourth Geneva Convention]. Article 3 in each of the conventions ("Common Article 3") prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" and "outrages upon personal dignity, in particular humiliating and degrading treatment." *E.g.*, Third Geneva Convention, *supra*, art. 3.

[78] UN Convention Against Torture, *supra* note 1. The United States rati-

fied the UN Convention Against Torture and the ICCPR subject to the reservation that "cruel, inhuman or degrading treatment" in Article 16 of the CAT and Article 7 of the ICCPR be interpreted in accordance with the "cruel and unusual punishment" prohibited under the Fifth, Eighth, and Fourteenth Amendments to the US Constitution. US Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, 13 CONG. REC. S17486 (1990).

[79] *See, e.g.*, ICCPR, *supra* note 76, art. 4, ¶ 2 (prohibiting derogation from the obligations under Article 7); UN Convention Against Torture, *supra* note 1, art. 2 ("No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.") The UN Committee against Torture has explicitly considered and rejected the notion that torture can be justified in the context of anti-terrorism efforts. *See Consideration of Reports Submitted by States Parties under Article 19 of the Convention, Initial Report of the Republic of Korea*, Summary Record of the First Part (Public) of the 267th Meeting, 17th Sess., Dec. 12, 1996, Comm. against Torture, ¶ 23.C, U.N. Doc. CAT/C/SR.267, *available at* www.unhchr.ch/tbs/doc.nsf/0/4b3833d4b2926c45c1256418002f5e7e?Opendocument ("The Committee is aware of the security problems and the tense situation on the Korean peninsula. The Committee has tried to take this fact into consideration in formulating its conclusions and recommendations. However, it must be emphasized that no exceptional circumstances can ever provide a justification for failure to comply with the terms of the Convention."); *Concluding Observations of the Committee against Torture: Israel*, Sept. 5, 1997, Comm. against Torture, ¶ 258, U.N. Doc. A/52/44, *available at* www.unhchr.ch/tbs/doc.nsf/0/69b6685c93d9f2518025649800506d3a?Opendocument [hereinafter *UN Israel Report*]; *Activities of the Committee against Torture Pursuant to Article 20 of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment: Egypt*, Mar. 5, 1996, Comm. against Torture, U.N. Doc. A/51/44, *available at* www.unhchr.ch/tbs/doc.nsf/(Symbol)/beaf1e1493d8c8cb8025659300389b53?Opendocument.

[80] Filartiga v. Pena-Irala, 630 F.2d 876, 884 (2d Cir. 1980), *remanded to* 577 F.Supp. 860 (E.D.N.Y. 1984). The court famously noted, "[T]he torturer has become like the pirate and slave trader before him *hostis humani generis*, an enemy of all mankind." *Id.* at 890.

preted in light of the overarching spirit of the conventions and customary state practice, namely respect for human dignity.[81]

Numerous international and regional instruments also codify the absolute prohibition against torture and cruel treatment: the American Convention of Human Rights;[82] the Inter-American Convention to Prevent and Punish Torture;[83] the European Convention for the Protection of Human Rights and Fundamental Freedoms;[84] the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment;[85] the African Charter on Human and People's Rights;[86] the Arab Charter on Human Rights;[87] and the Rome Statute

of the International Criminal Court.[88] Although these instruments are not directly binding on the United States, collectively they are indicative of the core standards of customary international law that apply to all nations.

The United States has traditionally embraced these standards, reporting to the UN Committee against Torture in 2000:

> Torture is prohibited by law in the United States. It is categorically denounced as a matter of policy and as a tool of state authority…Every act of torture within the meaning of the Convention is illegal under existing federal and state law, and any individual who commits such an act is subject to penal sanctions as specified in criminal statutes….Torture cannot be justified by exceptional circumstances . . . .[89]

This prohibition against torture is firmly embedded in US law. The sources of law related to the US prohibition of torture and cruel, inhuman or degrading treatment include the War Crimes Act,[90] the Military Commissions Act,[91] the Torture Convention Implementation Act (hereafter Torture Act),[92] the Detainee Treatment Act,[93] the Torture Victims Protection Act,[94] as well as the Fifth, Eighth and Fourteenth Amendments of the US Constitution.[95] The Torture Act criminalizes acts of torture that take place outside the United States.[96] The War Crimes Act (WCA),

---

[81] Torture is described as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

UN Convention Against Torture, *supra* note 1, art. 1.1.

[82] American Convention on Human Rights, Nov. 22, 1969, art. 5, 1144 U.N.T.S. 123 ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.").

[83] Inter-American Convention to Prevent and Punish Torture, O.A.S. Treaty Series No. 67, *entered into force* Feb. 28, 1987, *reprinted in* Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 83 (1992).

[84] European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, art. 3, 213 U.N.T.S. 221, as amended by Protocols Nos. 3, 5, 8, and 11, *entered into force* Sept. 21, 1970, Dec. 20, 1971, Jan. 1, 1990, and Nov. 1, 1998. ("No one shall be subjected to torture or to inhuman or degrading treatment or punishment.").

[85] European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, *entered into force* Feb. 1, 1989, E.T.S. 126.

[86] African [Banjul] Charter on Human and Peoples' Rights, *adopted* June 27, 1981, art. 5, OAU Doc. CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982), *entered into force* Oct. 21, 1986 ("All forms of exploitation and degradation of man particularly slavery, slave trade, torture, cruel, inhuman or degrading punishment and treatment shall be prohibited.).

[87] Revised Arab Charter on Human Rights, May 22, 2004, art. 8.1, *reprinted in* 12 Int'l H.R. Rep. 893 (2005), *entered into force* March 15, 2008 ("No one shall be subjected to physical or psychological torture or to cruel, degrading, humiliating or inhuman treatment."). Article 4.2 states that the prohibition on torture is non-derogable. *Id.* art. 4.2.

[88] Rome Statute of the International Criminal Court, *entered into force* July 1, 2002, art. 7.1(f), 2187 U.N.T.S. 90, UN Doc. A/CONF. 183/9, *reprinted in* 37 ILM 1002 (1998) (listing torture among the acts that, "when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack," constitute a crime against humanity) [hereinafter Rome Statute].

[89] Consideration of Reports Submitted by State Parties under Article 19 of the Convention: Report of the United States of America, U.N. Comm. against Torture, Add., at ¶¶ 6, 100, U.N. Doc. CAT/C/28/Add.5 (2000), *available at* http://www1.umn.edu/humanrts/cat/cat-reports2000.html.

[90] War Crimes Act of 1996, Pub. L. 104-192, § 2(a), 110 Stat. 2104, Aug. 21, 1996 (codified as amended at 18 U.S.C. § 2441) (2007).

[91] Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (amending 18 U.S.C.§ 2441) (2006).

[92] Torture Convention Implementation Act of 1994 (Torture Act), Pub. L. No. 103-236, 108 Stat. 463 (1994) (codified at 18 U.S.C. § 2340 and 2340A) (2004).

[93] Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739 (2005) (to be codified in scattered sections of 10, 28, and 42 U.S.C.).

[94] Torture Victims Protection Act of 1991, Pub. L. No. 102-56, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 (2007).

[95] US Const. amend. V, VIII, and XIV.

[96] Torture Act 18 U.S.C. § 2340A(a).

which applies to any circumstance "where the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States," criminalizes "torture" and "other cruel or inhuman treatment."[97]

In response to claims by the Bush Administration that certain laws did not apply to all detainees in US custody, Congress passed the Detainee Treatment Act (DTA) in 2005. Although the DTA was enacted after the events described in this report, it reaffirmed the long-standing US prohibition on cruel, inhuman, or degrading treatment.[98] It clearly states that the prohibition applies extraterritorially, in contrast to the position of the Bush Administration.[99] It also defines cruel, inhuman or degrading treatment, using the standard set out in the US reservation to the Convention Against Torture, as meaning the inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States.[100] The DTA also requires adherence to the standards for military interrogations set by the Army Field Manual on human intelligence gathering.[101]

Likewise, the Military Commissions Act of 2006 (MCA), which was enacted after the Supreme Court rendered its decision in *Hamdan v. Rumsfeld*,[102] was not in force at the time the detainees evaluated for this report were in custody, but reinforced the already-standing legal prohibition on torture. The MCA amended and narrowed the War Crimes Act to limit the instances in which criminal sanctions could apply to certain "grave breaches" of Common Article 3 of the Geneva Conventions, but includes torture and cruel or inhuman treatment as war crimes.[103] "Torture" is defined in the MCA as "an act specifically intended to inflict severe physical or mental pain or suffering (other than pain and suffering incidental to lawful sanctions) upon another person for the purpose of obtaining information or a confession, punishment, intimidation, coercion, or any reason based on discrimi-

nation of any kind."[104] "Cruel or inhuman treatment" is defined by the MCA as "an act intended to inflict severe or serious physical or mental pain or suffering including serious physical abuse, upon another within his custody or control."[105]

Three of these sources of US law are particularly important in assessing the conduct of US personnel against the detainees evaluated for this report.

First, the federal criminal statute prohibiting the commission of torture outside the United States, defines torture as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering...upon another person within his custody or physical control."[106] The statute defines "severe mental pain or suffering" as prolonged mental harm caused by or resulting from—

A. the intentional infliction or threatened infliction of severe physical pain or suffering;

B. the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

C. the threat of imminent death; or

D. the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.[107]

Second, the Geneva Conventions, which are international treaties that govern the conduct of war, outlaw the conduct described here. The Third Geneva Convention, addressing treatment of prisoners of war, provides that:

*No physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind.*[108]

---

[97] War Crimes Act § 2(a).

[98] Detainee Treatment Act of 2005 42 U.S.C. § 2000dd.

[99] *Id.* § 2000dd(b).

[100] *Id.* § 2000dd(d).

[101] Detainee Treatment Act of 2005, Pub. L. No. 109-163, div. A, title XIV, § 1402(a), 119 Stat. 2739 § 1002(a) (2005) (codified at 10 U.S.C. § 801 note).

[102] Hamdan v. Rumsfeld, 548 U.S. 557 (2006).

[103] Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (amending 18 U.S.C.§ 2441) (2006).

[104] Id.

[105] Id.

[106] 18 U.S.C. § 2340(1).

[107] 18 U.S.C. §2340(2). For an explanation of how the anti-torture statute applies to acts of psychological torture, see PHR Break Them Down, *supra* note 17.

[108] Third Geneva Convention, *supra* note 77, art. 17.

Even in circumstances of armed conflict where other provisions of the Geneva Conventions do not apply, Article 3, common to all the Conventions, ("Common Article 3") does apply and prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" and "outrages upon personal dignity, in particular humiliating and degrading treatment."[109] Under the law as it applied during the period covered by this report, that is, prior the enactment of the MCA, all violations of Common Article 3 were deemed war crimes under the War Crimes Act.

Third, US military law also outlaws torture. The Uniform Code of Military Justice (UCMJ) is applicable to US military personnel at all times and in all places throughout the world. It establishes penalties for acts of cruelty, oppression or maltreatment.[110] The UCMJ prohibits actions that are intended to degrade or humiliate. Article 128 prohibits assault, which includes the use of threatening words accompanied by a menacing act or gesture.[111]

The meaning of these provisions, moreover, can be illuminated by reference to decisions interpreting anti-torture law by other countries and by international bodies responsible for interpreting international conventions.

## Systematic Torture by the United States

While the experiences of the detainees evaluated for this report varied, as chapter 4 shows, consistent patterns of abuse emerge. Because the participants in the study were selected in a non-random manner, we cannot conclude that the abuses they suffered can be generalized to the entire population of detainees in US custody in Iraq, Afghanistan and Guantánamo Bay, Cuba during the period covered by the report. The accounts, however, do add to a growing body of evidence that the United States has perpetrated systematic torture of detainees as part of US counterterrorism operations since 9/11.[112]

Both the UN Committee Against Torture and cases decided by international criminal tribunals have addressed the point at which torture becomes "systematic." In a 1993 report, the Committee Against Torture reported to the UN General Assembly that it had established the following criteria to define "systematic" torture:

*The Committee considers that torture is practiced systematically when it is apparent that the torture cases reported have not occurred fortuitously in a particular place or at a particular time, but are seen to be habitual, widespread and deliberate in at least a considerable part of the territory of the country in question. Torture may in fact be of a systematic character without resulting from the direct intention of a Government. It may be the consequence of factors which the Government has difficulty in controlling, and its existence may indicate a discrepancy between policy as determined by the central Government and its implementation by the local administration. Inadequate legislation which in practice allows room for the use of torture may also add to the systematic nature of this practice.[113]*

In the context of determining elements of a crime against humanity, the appeals chamber of the International Criminal Tribunal for the former Yugoslavia (ICTY) examined two factors in assessing whether torture was "systematic": 1) the "organized nature of the acts," and 2) the "improbability of their random occurrence."[114] It stated, "[P]atterns of crimes — that is the non-accidental repetition of similar criminal conduct on a regular basis — are a common expression of such systematic occurrence".[115] The ICTY made it clear, however, that it is not necessary to show that the acts were the result of the existence of a policy or plan.[116]

In assessing whether the torture perpetrated by the United States during the period covered by this report was systematic it is striking that common patterns have been shown in a variety of reports and investigations, including how widespread the abuses were and

---

[109] *Id.* art. 3 (imposing obligations on states even "[i]n the case of armed conflict not of an international character"). This prohibition is found in all four of the Conventions.

[110] Uniform Code of Military Justice, 10 U.S.C. §§ 801—946 (2007).

[111] *Id.* § 928.

[112] *See* sources cited *supra* notes 6 and 19. Whether torture is systematic does not have any bearing on individual culpability for war crimes, as any act of torture is a grave breach of the Geneva Conventions and also violates US criminal law. Systematic and widespread use of torture can have a bearing, however, on whether an individual can be held criminally liable for crimes against humanity. See, e.g., Rome Statute, *supra* note 88, art. 7.1.

[113] Activities of the Committee against Torture Pursuant to Article 20 of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment: Turkey, Comm. Against Torture, Nov. 15, 1993, U.N. Doc. A/48/44/Add.1, Official Records of the General Assembly, 48th Sess., Supp. No. 44, ¶ 39.

[114] Prosecutor v. Kunarac, Case Nos. IT-96-23-A & IT-96-23/1-A, Appeal Judgment, ¶¶ 94-95 (June 12, 2002), *available at* http://www.icwc.de/fileadmin/media/ICTY_Kunarac_ACh.pdf.

[115] *Id.*

[116] Id.

how many practices were authorized by policies at the highest levels. The evidence from this report is consistent with and reinforces information gleaned from official US government reports[117] independent investigations by the media and human rights organizations,[118] as well as documents made public from reviews by the International Committee of the Red Cross.[119] These reports all support the accounts of the former detainees evaluated for this report on the pervasive use of certain techniques, such as long-term isolation, sexual humiliation and sexual abuse, forced nakedness, temperature extremes, stress positions, and sleep deprivation. Many became standard operating procedure.

It is also clear that numerous abuses reported by the detainees in this study were officially authorized during at least some of the periods during which the detainees were in custody. These include isolation, forced nakedness, use of dogs, sleep deprivation, sexual and other forms of humiliation, stress positions, threats of harm to the detainee or family members, temperature extremes, and sensory overload and deprivation, among others.[120] These authorizations reinforce the conclusion that torture was systematic. From evidence available to PHR, some of the forms of torture detainees in this study experienced, including beatings, use of electric shock and sexual violence, were not specifically autho-

rized by the Department of Defense or its commanders on the ground. The accounts of the detainees evaluated suggest, however, that once multiple forms of torture were allowed at the highest levels of command, direct perpetrators felt confident in employing other forms of torture as well.

## Applicability of the Law to Acts Committed by US Personnel Against Detainees

Before turning to each specific detention and interrogation technique experienced by the individuals examined in this investigation, it must be recognized that multiple abusive techniques were usually used in combination presumably for the intended effect of amplifying physical and psychological pain. Nevertheless, as is demonstrated below, according to courts and entities responsible for interpreting the Convention Against Torture, including the UN Special Rapporteur on Torture and the UN Committee Against Torture, each technique, when considered on its own, constitutes prohibited conduct in the form of torture or cruel, inhuman or degrading treatment or punishment. The US State Department, which is charged by Congress to assess the human rights record of other governments, and in doing so relies on international human rights treaties including the Convention Against Torture, in innumerable instances, specifically has identified these practices as torture or cruel, inhuman or degrading treatment or punishment when carried out by other nations.

### Stress Positions: Forced-Standing, Handcuffing, and Shackling

All of the former detainees were subjected to stress positions such as suspensions, forced standing and various awkward poses, often while shackled. Stress positions such as tying detainees' hands behind their backs and pulling their arms backwards, or shackling their hands or both hands and feet for days at a time have been prohibited by the Convention Against Torture.[121] The UN Committee against Torture has determined that restraining detainees in very painful positions is by itself an act of both torture and cruel, inhuman or degrading

---

117  *E.g.*, OIG Report, *supra* note 6 (May 2008 DOJ/OIG report relating interagency dissent over the use of interrogation techniques considered to be illegal and referrals of complaints about the tactics to the highest level of the US government); Taguba Report, *supra* note 6 (reporting that high-ranking officials had knowledge of abusive behavior at Abu Ghraib such as having male detainees pose nude while female guards pointed at their genitals; having female detainees expose themselves to the guards; having detainees perform indecent acts with each other; and guards physically assaulting detainees by beating and dragging them with choker chains); Fay Report, *supra* note 18 (reporting on violence and sexual abuse of detainees); Independent Panel to Review DoD Detention Operations, Final Report of the Independent Panel to Review DoD Detention Operations (2004), *available at* http://www.defenselink.mil/news/Aug2004/d20040824final-report.pdf [abuses were "widespread" and serious in numbers and effect] [hereinafter Schlesinger Report]; Schmidt Report, *supra* note 6 (documenting use of dogs, sexual humiliation, sleep deprivation, isolation, and other practices authorized for use at Guantánamo); Shelton Young, US Department of Defense, Review of DoD-Directed Investigations of Detainee Abuse (use of techniques designed to train US soldiers to withstand torture on detainees at Guantánamo and elsewhere), *available at* http://www.dodig.osd.mil/fo/Foia/ERR/06-INTEL-10-part%201.pdf.

118  HRW No Blood, *supra* note 6; Keller, *supra* note 6.

119  ICRC Report, *supra* note 27, ¶ 43.

120  For relevant documents containing these authorizations, see *supra* note 3. A review of the policies that authorized the use of these methods can be found at PHR Leave No Marks, *supra* note 17.

121  UN Comm. against Torture, Report on Mexico Produced by the Committee Under Article 20 of the Convention, and Reply from the Government of Mexico, U.N. Comm. Against Torture, 30th Sess., ¶¶ 143, 165, U.N. Doc. CAT/C/75 (2003), *available at* http://193.194.138.190/tbs/doc.nsf/(Symbol)/f2950e0f6a5560f1c1256d5500535b97?Opendocument [hereinafter UN Report on Mexico].

treatment.[122] It recently determined that the use of "short shackling" by US personnel constitutes either torture or cruel, inhuman or degrading treatment and has recommended that the method be prohibited.[123] The US State Department has repeatedly described stress positions as a form of torture.[124] In a review of US practices, the UN Special Rapporteur on Torture has condemned the use of stress positions on detainees by the United States as violating the Convention Against Torture.[125]

Leading foreign courts have determined that these techniques amount to torture or cruel, inhuman, or degrading treatment, either used alone or in combination. These techniques all unduly infringe the suspect's rights to dignity and bodily integrity.[126] The Supreme Court of Israel has determined that the "frog crouch"[127] and the "Shabach position" amount to torture.[128] The European Court of Human Rights has held that "wall-standing," when used in combination with four other coercive detention and interrogation methods, amounted to cruel, inhuman or degrading treatment.[129] Similarly the Inter-American Court of Human Rights (IACHR) has determined that needlessly handcuffing a detainee constitutes torture.[130] Moreover, US federal courts have determined that the use of stress positions, such as being chained to a cot or a wall, constitutes torture for purposes of civil liability of foreign perpetrators and their commanders.[131] More generally, the US Supreme Court has recognized the right of detainees to be free from unnecessary bodily restraint as a due process right protected by the Fourteenth Amendment.[132] Further, use

---

[122] UN Israel Report, supra note 79, ¶ 257.

[123] UN Committee against Torture, Advance Unedited Version, Consideration of Reports Submitted by States Parties Under Article 19 of the Convention, Conclusions and recommendations of the Committee against Torture, 36th Sess., ¶ 24, U.N. Doc. CAT/C/U.S.A/CO/2 (2006) [hereinafter UN Comm. against Torture Report].

[124] The US State Department considers suspending victims from their feet a form of torture. See, e.g., Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Egypt (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61687.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Egypt]. Stress positions have been enumerated as forms of torture in State Department reports on Eritrea, Iran, Lebanon, North Korea, Sri Lanka, and Tunisia. Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Eritrea (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61568.htm; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Iran (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61688.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Iran]; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Lebanon (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61693.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Lebanon]; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Democratic People's Republic of Korea (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61612.htm [hereinafter State Dep't 2005 Hum. Rts. Report on North Korea]; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Sri Lanka (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61711.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Sri Lanka]; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Tunisia (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61700.htm [hereinafter State Dep't 2005 Hum. Rts. Rep. on Tunisia].

[125] Human Rights Questions: Implementation of Human Rights Instruments: Torture and other Cruel, Inhuman or Degrading Treatment or Punishment - Note by the Secretary-General, U.N. GAOR, 59th Sess., Agenda Item 107(a), ¶ 17, U.N. Doc. A/59/324 (2004), available at http://daccess-ods.un.org/access.nsf/Get?Open&DS=A/59/324&Lang=E [hereinafter Torture Note by the Secretary-General]; see also PHR Break Them Down, supra note 17, at 115.

[126] H.C. 5100/94, Public Committee against Torture in Israel v. Israel, 53(4) P.D. 817, ¶ 27.

[127] Id. at ¶ 11. The frog crouch is a technique involving "consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals."

[128] The Shabach position is a technique where:

> [A] suspect … has his hands tied behind his back. He is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support. The suspect's head is covered by an opaque sack, falling down to his shoulders. Powerfully loud music is played in the room.

Id. at ¶ 10. According to the affidavits submitted in court proceedings, "[S]uspects are detained in this position for a prolonged period of time, awaiting interrogation at consecutive intervals." Id.

[129] Ireland v. United Kingdom, 25 Eur. H.R. Rep. (ser. A), ¶ 96 (1978). The UN Committee against Torture has since determined that stress positions alone constitute prohibited conduct. See UN Israel Report, supra note 79, ¶ 257.

[130] Urrutia v. Guatemala, 2003 Inter-Am. Ct. H.R. (ser. C) No. 103, ¶ 94 (Nov. 27, 2003).

[131] See generally Cicippio v. Islamic Republic of Iran, 18 F.Supp.2d 62 (D.C. Cir. 1998) [chaining plaintiff to a wall, shackling him in a painful position, and not permitting him to stand erect among many other forms of ill-treatment perpetrated by the Iranian government constitutes torture under the TVPA]; Hilao v. Marco, 103 F.3d 789, 790 (9th Cir. 1996) (being chained to a cot for three days, among many other forms of ill-treatment perpetrated by Filipino military against plaintiff, constitutes torture under the TVPA).

[132] Youngberg v. Romeo, 457 U.S. 307, 316 (1982) (holding that an individual has a substantive due process right to freedom from bodily restraint even if they are civilly committed or criminally incarcerated). For lower court decisions applying the standard, see, for example, Davis v. Rennie, 264 F.3d 86 (1st Cir. 2001) (upholding a §1983 claim for violation of a right to be free from unreasonable restraints and from excessive use of force against an involuntarily committed mental patient, and for the failure to intervene to prevent a violation of those rights); S.M. v. Feaver, No. 03-80567-Civ, 2004 WL 213198, at *3 (S.D. Fla. Jan. 22, 2004) (denying a motion to dismiss a §1983 claim based on plaintiff's allegation that she was

of stress positions amounts to torture under the Torture Act and are war crimes under the War Crimes Act.[133]

Based on the analysis above, the use of stress positions by US personnel upon the former detainees in this investigation constituted torture under US and international law.

## Prolonged Isolation

All of the former detainees evaluated by PHR as part of this investigation reported having been put in prolonged isolation. Isolation, also referred to as "solitary confinement" and "separation," is a method whereby a detainee is removed from other prisoners and has contact with only guards or interrogators. The negative psychological impacts of extended solitary confinement, a form of sensory deprivation, have been well documented, and an international legal consensus has emerged to prohibit prolonged solitary confinement, even when it is applied for administrative and security reasons.[134] International jurisprudence supports the conclusion that prolonged isolation can lead to severe or serious prolonged mental pain and suffering. In interrogation, this technique is used to disrupt profoundly the senses or personality, and, therefore, could be prosecuted as an act of psychological torture. In its human rights country reports on Jordan, the US State Department has repeatedly criticized the Jordanian government's practice of using prolonged isolation as constituting torture.[135]

The UN Committee against Torture has encouraged states to abolish the practice, noting that, outside the interrogation context, solitary confinement "should be applied only in exceptional cases and not for prolonged periods of time"[136] and has determined that prolonged

solitary confinement could constitute cruel, inhuman or degrading treatment or punishment.[137] Furthermore, according to the UN Special Rapporteur on Torture, solitary confinement may impact the psychological "integrity of the prisoner."[138]

The Inter-American Court of Human Rights has already documented and formally recognized that the practice is "cruel and inhuman treatment which harms the psychological and moral integrity of the person,"[139] and that incommunicado detention places the detainee "in a particularly vulnerable position, and increases the risk of aggression and arbitrary acts in prisons."[140] The Court has also noted that the combination of isolation and fear for life can lead to "extreme psychological and moral suffering" and amounts to prohibited conduct.[141]

Although the US Supreme Court has held that solitary confinement under some circumstances may be justified for certain administrative and security reasons,[142] US courts have found in a number of cases that solitary confinement violates the Eighth Amendment when used for extensive duration.[143] The use of solitary confinement

---

subjected to "the use of undue physical (four-point restraints) and chemical (psychotropic) restraints" while involuntarily committed); *but see* Fuentes v. Wagner, 206 F.3d 335 (3d Cir. 2000), *cert. denied*, 531 U.S. 821 (2002) (putting pre-trial detainee in restraining chair for eight hours while releasing the detainee every two hours for a ten-minute period of stretching, exercise, use of toilet and meal, when faced with detainee's disruptive and violent behavior, did not violate detainee's substantive due process rights).

[133]  *See* PHR Leave No Marks, *supra* note 17.

[134]  *See* PHR Break Them Down, *supra* note 17, at 15.

[135]  *See e.g.*, Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Jordan (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61691.htm; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2006 Country Rep. on Hum. Rts. Prac.: Jordan (March 6, 2007), *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78855.htm.

[136]  *Decisions of the Committee Against Torture Under Article 22 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Communication No. 202/2002:*

*Denmark*, U.N. Comm. against Torture, 32nd Sess., ¶ 5.6, U.N. Doc. CAT/C/32/D/202/2002 (2004), *available at* U.N. Doc. CAT/C/32/D/202/2002.

[137]  *Consideration of Reports Submitted by States Parties under Article 19 of the Convention: Conclusions and Recommendations of the Committee against Torture: New Zealand*, U.N. Comm. against Torture, 32nd Sess., ¶ 5(d), U.N. Doc. CAT/C/CR/32/4 (2004).

[138]  *Torture Note by the Secretary-General, supra* note 126, ¶ 46.

[139]  *Velasquez Rodriguez Case*, 1988 Inter-Am. Ct. H.R. (ser. C). No. 4, ¶187 (July 29, 1988).

[140]  *Suárez Rosero Case*, 1998 Inter-Am. Ct. H.R. (ser. C) No. 35, ¶¶ 90-91 (Nov. 12, 1997).

[141]  *Villagran Morales et al. Case (the "Street Children" Case)*, 1999 Inter-Am. Ct. H.R. (ser. C) No. 63, ¶¶ 163, 167 (Nov. 19, 1999).

[142]  Sandin v. Conner, 515 U.S. 472 (1995) (holding that convicted prisoner's segregation in solitary confinement for thirty days did not implicate liberty interest under procedural due process analysis but reserved plaintiff's right to assert Eighth Amendment claim).

[143]  *See* Hutto v. Finney, 437 U.S. 678, 686 (1978) (upholding thirty-day limit on solitary confinement set by district court, concluding that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards"); Tillery v. Owens, 907 F.2d 418, 426 (3d Cir. 1990) ("The denial of medical care, *prolonged isolation* in dehumanizing conditions, exposure to pervasive risk of physical assault, severe overcrowding, and unsanitary conditions have all been found to be cruel and unusual under contemporary standards of decency.") (emphasis added); Maxwell v. Mason, 668 F.2d 361, 363 (8th Cir. 1981) ("[P]laintiff's confinement as a punitive measure, in isolation, without adequate clothing or bedding fully supports [the] conclusion that an Eighth Amendment violation was established..."). *But see* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), *overruled on other grounds* by Procunier v. Martinez, 416 U.S. 396 (1974) (holding that segregated confinement for twelve

has led one US federal court of appeals to call into question the legitimacy of information gleaned from interrogations.[144] Prolonged isolation as used on the detainees here constitutes torture under the US Torture Act and the War Crimes Act.[145]

Based on the above analysis, the use by US personnel of prolonged isolation as a technique of interrogation and a condition of detention with respect to the former detainees in this investigation was a violation of US and international law.

## Hooding /Blindfolding

All individuals evaluated were hooded or blindfolded for long periods of time. Hooding, blindfolding, or otherwise depriving a detainee of sight — like prolonged isolation, is a form of sensory deprivation and is prohibited under international law. The UN Committee against Torture has determined that "hooding under special conditions" constitutes both torture and cruel, inhuman or degrading treatment or punishment.[146] It noted that this finding would be "particularly evident" when hooding is used in combination with other coercive interrogation methods.[147] The Committee against Torture has subsequently reaffirmed that blindfolding constitutes torture.[148] The UN Special Rapporteur on Torture has determined that "blindfolding and hooding should be forbidden."[149]

The European Committee for the Prevention of Torture

and Inhuman or Degrading Treatment or Punishment has noted that blindfolding "will frequently amount to psychological ill-treatment," and that the practice should be abolished.[150] The US Department of State has described blindfolding as a form of torture.[151]

The European Court of Human Rights held that blindfolding a prisoner constitutes cruel or inhuman treatment when it is used in combination with other interrogation or detention methods[152] and can constitute torture when used with other techniques. [153]

To the extent that hooding and blindfolding are used for prolonged sensory deprivation, they constitute torture under the US Torture Act and are war crimes under the War Crimes Act.[154] The new Army Field Manual on human intelligence collection also prohibits the use of sensory deprivation and techniques such as placing of hoods or sacks over the heads of detainees or using duct tape over the eyes.[155]

As per the above discussion, the hooding and blindfolding of the former detainees in this investigation by US personnel was a violation of US and international law.

## Sensory Bombardment

Seven of the former detainees in this investigation reported being subjected to sound and light bombardment. Sound and light bombardment is used to disorient, cause anxiety, and even contribute to personality disintegration, as well as to deprive the person of sleep. It is often combined with other tactics. The UN Committee against Torture has determined that "sounding of loud music for prolonged periods" constitutes torture and cruel, inhuman or degrading treatment or punishment both when it is used in combination with other methods of interrogation and when it is used by itself.[156] The UN Special Rapporteur on Torture has similarly determined that depriving a detainee of, or exposing him to, light for a

---

months and eight days where prisoner was provided a diet of 2,800 to 3,300 calories a day, adequate personal hygiene, the opportunity for exercise and for participation in group therapy, reading matter, and the constant possibility of communication with other segregated prisoners, until prisoner agreed to abide by prison rules, did not violate Eighth Amendment).

[144] *See* Stidham v. Swenson, 506 F.2d 478, 481 (8th Cir. 1974) (finding that defendant's confession was coerced and stating, "The record would indicate that Stidham was not a model prisoner, and there is substantial testimony in the record indicating that he participated in the brutal killings; but these facts do not excuse the use of an extorted confession. We remain a government of laws, and those charged with law enforcement have a special responsibility to see that the guilty as well as the innocent are given the protection of the Constitution. If we depart from this principle, we deal the administration of justice a heavy blow.").

[145] *See* PHR Leave No Marks, *supra* note 17.

[146] *UN Israel Report*, *supra* note 79, ¶ 257.

[147] *Id.*

[148] *UN Report on Mexico*, *supra* note 121.

[149] *Civil and Political Rights, Including the Question of: Torture and Detention, Report of the Special Rapporteur, Sir Nigel Rodley, Submitted Pursuant to Commission on Human Rights Resolution 2001/62*, U.N. ESCOR, 58th Sess., Annex 1, Agenda Item 11(a), ¶ (f), U.N. Doc. E/CN.4/2002/76 (2001); *see also*, PHR Break Them Down, *supra* note 17, at 115.

[150] *Report to the Turkish Government on the visit to Turkey carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 2 to 14 September 2001*, ¶¶ 30–31, *available at* http://www.cpt.coe.int/documents/tur/2002-08-inf-eng.htm.

[151] *E.g.*, State Dep't 2005 Hum. Rts. Report on Egypt, *supra* note 124.

[152] Ireland v. United Kingdom, 25 Eur. H.R. Rep. (ser. A) (1978); Ocalan v. Turkey, 37 Eur. Ct. H.R. 238, ¶ 222 (2003).

[153] Aksoy v. Turkey, 1996-VI Eur. Ct. H.R. 2260 (1996); Aydin v. Turkey, 1997-VI Eur. H.R. Rep. 1866 (1997).

[154] *See* PHR Leave No Marks, *supra* note 17, at 33.

[155] Army Field Manual 2-22.3, *supra* note 101.

[156] *UN Israel Report*, *supra* note 79, ¶ 257.

prolonged period constitutes torture and ill-treatment.[157] The use of both light bombardment and prolonged loud noise by other countries has been severely criticized by the US State Department in its human rights Country Reports. It voiced concern over the use of light bombardment in Senegal: "Police also reportedly forced detainees to sleep on the floor without any bedding, directed bright-lights at their pupils, and beat them with batons."[158] In a Country Report on Cuba, the State Department focused on the plight of one individual subjected to loud music and light bombardment.[159]

The UN decisions and US State Department concerns are consistent with international jurisprudence prohibiting the use of sound bombardment. The European Court of Human Rights determined that the use of loud, continuous noise constitutes inhuman and degrading treatment when used in combination with other coercive interrogation techniques.[160] The Inter-American Court of Human Rights found that playing the radio at full volume while hooding a detainee or otherwise subjecting her to light manipulation constitutes "mental torture," as these techniques formed part of an overall effort to "obliterate the victim's personality and demoralize her."[161] The Supreme Court of Israel prohibited the playing of loud music as an interrogation method, finding that this specific technique causes "particular pain and suffering."[162]

Because these methods severely disrupt the senses or personality, exposure to extremes of light and sound constitutes torture under the Torture Act[163] and amounts

to war crimes under the War Crimes Act.[164] At least one US federal court has found that treatment that included keeping detainees under bright lights for twenty-four hours a day constituted cruel, inhuman and degrading treatment prohibited by international law.[165] Further, US federal courts have found that exposure to extreme noise and light in detention and interrogations violates the Eighth Amendment.[166]

In sum, the sensory bombardment of the former detainees in this investigation by US personnel constituted a violation of US and international law.

## Use of Extreme Temperatures

All of the individuals whom PHR evaluated reported being subjected to temperature extremes. The UN Committee against Torture has found that exposure to extreme temperatures, even in the absence of other forms of abusive interrogation or detention techniques, constitutes both torture and cruel, inhuman and degrading treatment.[167] The UN Committee against Torture re-affirmed this position in finding that placing a naked inmate in a freezing, air-conditioned room for extended periods constitutes torture and is prohibited.[168] The UN Special Rapporteur on Torture has similarly determined that depriving detainees of clothing and exposing them to extremes of heat or cold constitutes torture and ill-treatment.[169] These findings are consistent with other international decisions prohibiting exposure to extreme

---

[157] *Torture Note by the Secretary-General, supra* note 125, ¶ 17 (describing "depriving them of sleep and light for prolonged periods, exposing them to extremes of heat, cold, noise and light, hooding" as torture).

[158] Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Senegal (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61589.htm.

[159] Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Cuba (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm ("Throughout March and April, authorities subjected political prisoner Jose Daniel Ferrer Garcia to deafeningly loud music and noise from a speaker placed by the guards at the entrance to his cell from the early morning until late each night; as of April 28, he had been denied exposure to sunlight for seven months.").

[160] Ireland v. United Kingdom, 25 Eur. H.R. Rep. (ser. A) [1978].

[161] Urrutia v. Guatemala, 2003 Inter-Am. Ct. H.R. (ser. C) No. 103, ¶¶ 58.6, 94 (Nov. 27, 2003).

[162] H.C. 5100/94, Public Committee against Torture in Israel v. Israel, 53[4] P.D. 817, ¶¶ 10, 28, 29, 30.

[163] Under the Torture Act, acts that cause prolonged mental harm include procedures "calculated to disrupt profoundly the senses or personality." 18 U.S.C. § 2340[2][D] [2004].

---

[164] *See* PHR Leave No Marks, *supra* note 17, at 25.

[165] Jama v. INS, 22 F.Supp.2d 353, 358 (D. N.J. 1998) (finding actionable claim for cruel, inhuman and degrading treatment under the Alien Tort Claims Act where detainees were kept under bright lights twenty-four hours a day and not permitted to sleep and where other ill-treatment including being forced to live in filth and constant smell of human waste, packed in rooms with twenty to forty detainees, beaten, deprived of privacy, subjected to degrading comments from guards and sexual abuse).

[166] *See* Lucien v. Peters, 107 F.3d 873 (7th Cir. 1997) ("Allegations of excessive noise can support the objective element of an Eighth Amendment claim."); Kost v. Kozakiewicz, 1 F.3d 176, 180 (3d Cir. 1993) (Section 1983 challenge to conditions of confinement, including allegations of unbearable noise pollution causing inmates to suffer degenerative hearing, should not have been dismissed on ground that issues were addressed in context of previous class action suit); Williams v. Boles, 841 F.2d 181, 183 (7th Cir. 1988) (incessant noise may cause agony even though it leaves no physical marks); Toussaint v. McCarthy, 801 F.2d 1080, 1110 (9th Cir. 1986) (affirming scope of relief granted by district court based on noise level in the prison, where evidence showed that there was a "constant level of noise" that adversely affected the inmates' hearing).

[167] *UN Israel Report, supra* note 79, ¶ 257.

[168] *UN Report on Mexico, supra* note 121, ¶ 165.

[169] *Torture Note by the Secretary-General, supra* note 125, ¶ 17.

temperatures,[170] as well as the US Department of State's own conclusion that exposure to temperature extremes constitutes torture.[171]

US federal courts have recognized exposure to extreme heat and cold as a form of torture when used in other countries, and have held that abuse involving such treatment creates a valid civil claim for damages under the Torture Victims Protection Act[172] and is a basis for asylum relief for refugees.[173] According to the US Supreme Court, even deliberate indifference, much less intentional action, to such basic needs of a detainee violates that detainee's rights under the Fifth, Eighth, and Fourteenth Amendments.[174] Use of temperature extremes also constitutes torture under the Torture Act and is a war crime under the War Crimes Act.[175]

Based on the analysis above, the use of temperature extremes by US personnel upon the former detainees in this investigation constituted a violation of both US and international law.

### Sleep Deprivation

All except two of the participants evaluated by PHR have reported prolonged sleep deprivation, usually in combination with other abusive interrogation methods. Courts and other bodies responsible for interpreting the UN Convention Against Torture have noted that sleep deprivation is used primarily to break down the will of the detainee and is clearly prohibited under international anti-torture law when it is not a mere side effect of a lengthy interrogation. The UN Committee against Torture has noted that sleep deprivation used to extract confessions from suspects is impermissible,[176] and that

"sleep deprivation for prolonged periods" constitutes torture.[177]

The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment found that sleep deprivation, prolonged standing, and threats to harm a detainee and/or his family "are clearly designed to break a detained person's will and have no place in the interrogation process."[178] The US State Department has equated sleep deprivation with torture in its reports on Iran and Lebanon and has described this technique as "a primary form of torture" in Yemen.[179] The UN Special Rapporteur on Torture has opined that sleep deprivation, "condoned and used to secure information from suspected terrorists" by the United States, violates the Convention Against Torture.[180] The European Court of Human Rights (ECHR) found that depriving detainees of sleep pending their interrogation constitutes inhuman and degrading treatment when used in combination with other techniques.[181] The Supreme Court of Israel recognized that while some interrogations may be lengthy in order to obtain urgently needed information, sleep deprivation, as "an end in itself," violates the rights and dignity of the suspect because the purpose of such a method is "breaking" the detainee.[182] The Inter-American Court of Human Rights has determined that when sleep deprivation is used "to obliterate the victim's personality and demoralize her" it constitutes torture.[183] US federal courts have repeatedly found sleep deprivation to violate both the Eighth and Fourteenth Amendments. The Supreme Court has held that a confession obtained by depriving a prisoner of sleep for thirty-six hours violated the individual's right to due process.[184] Subsequently, US

---

170  *See, e.g.*, Tekin v. Turkey, 1998-IV Eur. Ct. H.R. ¶ 54 (1998).

171  State Dep't 2005 Hum. Rts. Report on Egypt, *supra* note 124; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Yemen (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61703.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Yemen].

172  Torture Victims Protection Act of 1991, Pub. L. No. 102-56, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 (2007).

173  *See, e.g.*, Lhanzom v. Gonzales, 430 F.3d 833, 848 (7th Cir. 2005) [listing exposure to the cold as form of torture used by the government of China against Tibetans as stated in the US State Department Report in political asylum case].

174  DeShaney v. Winnebago, 489 U.S. 189, 199-200 (1989); Hope v. Pelzer, 536 U.S. 730, 731 (2002); Martino v. Carey, 563 F.Supp. 984, 999 (D. D.C. 1983).

175  *See* PHR Leave No Marks, *supra* note 17, at 16.

176  *Concluding Observations of the Committee against Torture: Republic of Korea*, Nov. 13, 1996, Comm. against Torture, ¶ 56, U.N. Doc. A/52/44 [hereinafter UN Korea Report].

177  *UN Israel Report*, *supra* note 79; *see also UN Report on Mexico*, *supra* note 121, ¶ 143.

178  *Report to the Turkish Government on the visit to Turkey carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 7 to 15 September 2003*, ¶ 11 (2004), *available at* http://www.cpt.coe.int/documents/tur/2005-18-inf-eng.pdf.

179  State Dep't 2005 Hum. Rts. Report on Iran, *supra* note 124; State Dep't 2005 Hum. Rts. Report on Lebanon, *supra* note 124; State Dep't 2005 Hum. Rts. Report on Yemen, *supra* note 171.

180  *Torture Note by the Secretary-General*, *supra* note 126, ¶ 17.

181  Ireland v. United Kingdom, 2 Eur. H.R. Rep. (ser. A) 25 (1978).

182  H.C. 5100/94, Public Committee against Torture in Israel v. Israel, 53(4) P.D. 817, ¶ 31.

183  Urrutia v. Guatemala, 2003 Inter-Am. Ct. H.R. (ser. C) No. 103, ¶ 94 (Nov. 27, 2003).

184  Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944); *see also* Ashcraft v. Tennessee, 327 U.S. 274 (1946); *see generally* United States *ex*

federal courts have held that sleep deprivation constitutes a violation of the Eighth Amendment's protection from cruel and inhuman punishment because sleep is "considered a basic life necessity."[185] Sleep deprivation is also a form of mental torture under the Torture Act and is a war crime under the War Crimes Act.[186]

As per the analysis above, the use of sleep deprivation by US personnel upon the former detainees in this investigation constituted torture and inhuman and degrading treatment under US and international law.

## Threats of Harm to Detainees and Their Families

The use of various forms of threats were reported by all the former detainees evaluated by PHR. Threats against a detainee or a detainee's family or friends can lead to severe or serious prolonged mental suffering, and have accordingly been prohibited under international law as either cruel and inhuman treatment or torture. The UN Human Rights Committee has found that conducting a mock execution within a prison environment constitutes cruel and inhuman treatment and breaches a State's obligation to respect human dignity.[187] The UN Committee against Torture determined that threats, including but not limited to death threats, constitute both torture and cruel, inhuman or degrading treatment.[188] In its Report on Mexico, the UN Committee described death threats as well as threats of harm to family members as "torture methods."[189] The use of threats has also been described as torture by the US Department of State in its Country Reports for Bangladesh and Iran.[190]

The international jurisprudence is unanimous in its determination that threats, including threats to a third person, are prohibited conduct constituting cruel or inhuman treatment[191] and in some cases part of a regime of mental torture.[192] The utterance of threats has been found in at least one case before the European Court of Human Rights to trigger "long-term symptoms of anxiety and insecurity, diagnosed as post-traumatic stress disorder and requiring treatment by medication," which led the Court to find that the threats themselves "constituted torture."[193]

Under US law, threats of imminent death or severe physical pain or suffering to the individual or others are explicitly banned as forms of mental torture that can lead to long-term harm under the Torture Act and are war crimes under the War Crimes Act.[194] An American army soldier was convicted under the Uniform Code of Military Justice for violating regulations of handling detainees, fined $12,000 and sentenced to forty-five days in a military prison after carrying out a mock execution near Ramadi, west of Baghdad, in July 2003. According to sworn statements, he took a suspect to a remote desert location and forced him to dig his own grave, interrogated the man, and then ordered soldiers to pretend to shoot him.[195] Courts have found that credible verbal threats of the use of deadly force can constitute cruel and unusual treatment that "shocks the conscience" in violation of the Fifth and Fourteenth Amendments. For instance, federal appeals courts have found that pointing a loaded weapon at a civilian without a legitimate law enforcement purpose violated the Fourteenth Amendment.[196]

---

*rel.* Wade v. Jackson, 256 F.2d 7 (2d Cir. 1958) (depriving arrestee of sleep for twenty-two hours contributed to violations of due process rights).

[185] Merritt v. Hawk, 153 F.Supp.2d 1216, 1228 (D. Colo. 2001); *see also* Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996) (holding that constant illumination of plaintiff's cell caused "grave sleep problems" and could constitute constitutional violation); Hoptowit v. Spellman, 753 F.2d 779, 783 (8th Cir. 1983) ("Adequate lighting is one of the fundamental attributes of 'adequate shelter' required by the Eighth Amendment."); LeMaire v. Maass, 745 F.Supp. 623, 636 (D. Or. 1990) ("There is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional."), *vacated on other grounds,* 12 F.3d 1444 (9th Cir. 1993).

[186] *See* PHR Leave No Marks, *supra* note 17, at 24.

[187] Linton v. Jamaica, U.N. Human Rights Comm., 46th Sess., Communication No. 255/1987, ¶ 8.5 CCPR/C/46/D/255/1987 (1992).

[188] *UN Israel Report, supra* note 79, ¶ 257.

[189] *UN Report on Mexico, supra* note 121, ¶¶ 143-44.

[190] Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Bangladesh (March 8, 2006), *available at* http://

www.state.gov/g/drl/rls/hrrpt/2005/61705.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Bangladesh]; State Dep't 2005 Hum. Rts. Report on Iran, *supra* note 124.

[191] Campbell v. United Kingdom — 4 Eur. Ct. H.R. 293 (ser. A) ¶ 26 (Feb. 25 1982), *available at* http://www.worldlii.org/eu/cases/ECHR/1982/1.html.

[192] Urrutia v. Guatemala, Inter-Am. Ct. H.R., (Ser. C) No. 103, ¶¶ 93-94 (2003).

[193] *Akkoç v. Turkey.* App. nos. 22947/93 and 22948/93, 116-17 (Oct. 10, 2000).

[194] *See* PHR Leave No Marks, *supra* note 17, at 21.

[195] Mike Mount, *Army: Soldiers Did Mock Executions,* CNN, May 19, 2005, *available at* http://www.cnn.com/2005/U.S./05/19/detainee.abuse/index.html.

[196] Hawkins v. Holloway, 316 F.3d 777, 787 (8th Cir. 2003) (holding that "threatening deadly force a as means of oppressing those employed in his department" elevated "his conduct to the arbitrary and conscience shocking behavior prohibited by substantive due process"); Robinson v. Solano County, 278 F.3d 1007, 1014 (9th Cir. 2002) (discussing in dictum that an officer's conduct in pointing a

Based on this discussion, threats to the former detainees in this investigation and their families by US personnel constituted violations of US and international law.

### Instilling Fear Through Use of Military Dogs

The use of dogs to instill fear was reported by more than half of the participants in this investigation. Dogs have been used in combination with nakedness, hooding and other techniques to exploit detainees' fears and as a means of degrading them. Both the UN Committee against Torture and the Special Rapporteur have held that the use of dogs by US personnel during interrogations constitutes torture or cruel, inhuman or degrading treatment.[197] The US Department of State has included the threat of dog attacks as a reported method of torture used against prisoners in Libya.[198]

The technique likely amounts to a form of mental torture under the Torture Act because it profoundly disrupts the senses or personality.[199] It has subsequently been explicitly prohibited as an interrogation method under the new Army Field Manual in accordance with US Department of Defense Directive 3115.09, which states, "[M]ilitary working dogs, contracted dogs, or any other dog in use by a government agency shall not be used as part of an interrogation approach nor to harass, intimidate, threaten, or coerce a detainee for interrogation purposes."[200]

As such, the use of military dogs by US personnel upon the former detainees in this investigation constituted torture and cruel, inhuman, or degrading treatment under US and international law.

### Electric Shocks, Sexual Assault, and Physical Assault

All of the former detainees evaluated by PHR reported being subjected to some form of physical assault. International jurisprudence condemns all forms of beatings. The UN Committee against Torture has held that physical beatings such as "blows to various parts of the body, including the ears, with fists, police weapons or truncheons" constitute methods of torture.[201] Additionally, the UN Human Rights Committee found that beatings rendering a person unconscious and requiring medical attention violate Article 7 of the ICCPR (prohibiting torture, cruel, inhuman or degrading treatment or punishment) and disregard respect for human dignity.[202] The US State Department has determined that beatings and other varied forms of physical abuse constitute torture, finding that beatings with hands or fists, sticks, police batons or metal rods,[203] burning with cigarettes,[204] applying electric shocks,[205] and systematic beatings to obtain a confession during interrogations all constitute torture.[206]

Domestic, foreign, and international courts have all determined that beatings constitute torture or cruel, inhuman or degrading treatment or punishment. Both the European Court of Human Rights and the European Commission of Human Rights have held that beating is at minimum, a form of cruel, inhuman or degrading treatment or punishment and likely constitutes torture.[207] The European Court has also determined that use of electric

---

loaded weapon at a civilian without a legitimate law enforcement basis shocks the conscience; *see also* Burton v. Livingston, 791 F.2d 97 (8th Cir. 1986) 99, 100-101 (finding that a prisoner had stated a substantive due process claim when he alleged that a prison guard drew and pointed a loaded pistol at him and ordered him to run so that the guard would be justified in shooting him).

[197] *UN Comm. against Torture Report*, *supra* note 123, ¶ 24; *Torture Note by the Secretary-General*, *supra* note 126, ¶ 17; *see also* PHR Break Them Down, *supra* note at 115.

[198] Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Libya (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61694.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Libya].

[199] 18 U.S.C. § 2340(2)(B) (2004) ("'[S]evere mental pain or suffering' means the prolonged mental harm caused by or resulting from . . . the administration or application, or threatened administration or application, of . . . procedures calculated to disrupt profoundly the senses or the personality . . . .").

[200] Army Field Manual 2-22.3, *supra* note 101, ¶ 8-2.

---

[201] *UN Report on Mexico*, *supra* note 121, ¶ 143.

[202] Linton v. Jamaica, U.N. Human Rights Comm., Communication No. 255/1987, 46th Sess., ¶ 8.5, U.N. Doc CCPR/C/46/D/255/1987 (1992).

[203] State Dep't 2005 Hum. Rts. Report on Egypt, *supra* note 124; State Dep't 2005 Hum. Rts. Report on Tunisia, *supra* note 124.

[204] State Dep't 2005 Hum. Rts. Report on Tunisia, *supra* note 124.

[205] State Dep't 2005 Hum. Rts. Report on Libya, *supra* note 198; State Dep't 2005 Hum. Rts. Report on Egypt, *supra* note 124; State Dep't 2005 Hum. Rts. Report on Tunisia, *supra* note 124; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Tajikistan (March 8, 2006), *available at* www.state.gov/g/drl/rls/hrrpt/2005/61679.htm [hereinafter State Dep't 2005 Hum. Rts. Report on Tajikistan]; Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Argentina (March 8, 2006), *available at* www.state.gov/g/drl/rls/hrrpt/2005/61713.htm; State Dep't 2005 Hum. Rts. Report on Sri Lanka, *supra* note 124; State Dep't 2005 Hum. Rts. Report on Bangladesh, *supra* note 190.

[206] State Dep't 2005 Hum. Rts. Report on Tajikistan, *supra* note 205.

[207] Greek Case, 1969 Y.B. Eur. Conv. on H.R. 12 (Eur. Comm'n H.R.); Selmouni v. France, 1999-V Eur. Ct. H.R. 149, ¶ 105.

shocks in combination of other techniques constitutes torture.[208] US federal courts have repeatedly cited beatings as a form of torture intended to inflict "severe pain or suffering," and therefore found that it violates the Torture Victims Protection Act.[209] Such conduct also violates the Torture Act and the War Crimes Act.[210] Moreover, beatings of any individual is illegal under the Detainee Treatment Act, which prohibits conduct that violates the Fifth, Fourteenth, or Eight Amendments.[211]

Four former detainees reported being sodomized, subjected to anal probing, or threatened with rape. Rape not only is an unspeakable infringement of human rights, but often leaves deep and lasting psychological scars. The international human rights, criminal justice, and humanitarian law communities, including the International Criminal Court (ICC), the ad hoc international criminal tribunals, regional human rights courts, and the UN human rights bodies, are uniform in their designation of rape as a violation of human rights and a crime. Perhaps most significantly, the International Criminal Court statute considers rape, including sexual violence, a war crime and, if used systematically against a civilian population, a crime against humanity.[212] The ICC statute also establishes that rape is a "grave breach" of the Geneva Conventions.[213] Further, the statutes of both the International Criminal Tribunal for Rwanda (ICTR) and the International Criminal Tribunal for the Former Yugoslavia (ICTY) include rape as a crime that, if used systematically against a civilian population, may constitute a crime against humanity.[214] The ICTY has noted that rape by a state agent will almost always be torture as well.[215] Article 2(b) of the ICTY statute identifies "torture or inhumane treatment" as a grave breach of the Geneva Conventions.[216]

The Fourth Geneva Convention considers rape as an act of torture and a war crime.[217] Both the European Court of Human Rights and the Inter-American Court of Human Rights have characterized rape as inhumane treatment, and the Inter-American Court later determined that rape is a form of torture and thus a violation of Article 5.2 of the American Convention on Human Rights.[218][219] The European Court of Human Rights also found that rape can constitute a violation of Article 3 of the European Convention, which prohibits torture.[220] The court found that "[r]ape of a detainee by an official of the State must be considered to be an especially grave and abhorrent form of ill-treatment given the ease with which the offender can exploit the vulnerability and weakened resistance of his victim."[221]

Incidents of penetration with a foreign object clearly

---

208 *See* Mammadov v Azerbaijan, Eur. Ct. H.R. App. No. 34445/04 (2006) (finding alleged ill-treatment, including infliction of electric shocks, blows struck on the soles of the feet, blows to the body while person was handcuffed in suspended position, was sufficiently severe to amount to torture); *see also* Ozkan v. Turkey, Eur. Ct. H.R. App. No. 21689/93 (2004).

209 Tachiona v. Mugabe, 234 F. Supp. 2d 401, 420-423 (S.D.N.Y. 2002) (awarding $1,000,000 in compensatory and $5,000,000 in punitive damages under the TVPA for torture that resulted in Plaintiff's death and which included beating the soles of Plaintiffs' feet; beating Plaintiff with rods, rocks and iron bars; hitting Plaintiff in the face; and whipping Plaintiff with a fan belt from a car); Cabiri v. Assasie-Gyimah, 921 F. Supp. 1189, 1191, 1196 (S.D.N.Y. 1996) (holding in TVPA action that beatings committed during interrogations in combination with the application of electric shocks "violate[] a fundamental principle of the law of nations: the human right to be free from torture").

210 *See* PHR LEAVE NO MARKS, *supra* note 17, at 14.

211 Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739 (2005) (to be codified in scattered sections of 10, 28, and 42 U.S.C.).

212 Rome Statute, *supra* note 88, at arts. 7(1)(g), 8(2)(b)(xxii) & 8(2)(e)(vi).

213 *Id.* art. 8(2)(b)(xxii).

214 Christine Strumpen-Darrie, *Rape: A Survey of International Jurisprudence*, 7 HUM. RTS. BR. 12 (2000).

215 Prosecutor v. Delalic, Case No. IT-96-21-T, Judgment (Nov. 16, 1998).

216 The ICTY stated that rape constitutes torture if it "1) causes severe pain or suffering, whether mental or physical; 2) which is inflicted intentionally; 3) for such purposes as obtaining information or a confession from the victim, or a third person, punishing the victim for an act he or she or a third person has committed or is suspected of having committed, intimidating or coercing the victim or a third person, or for any reason based on discrimination of any kind; and is 4) committed by, or at the instigation of, or with the consent or acquiescence of, an official or other person acting in an official capacity." *Id.*

217 Fourth Geneva Convention, *supra* note 77, art. 27.

218 Article 5.2 states, "No one shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment. All persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person." American Convention on Human Rights, Nov. 22, 1969, art. 5.2, 1144 U.N.T.S.

219 Raquel Martin Mejía v. Perú, Case 10.970, Report No. 5/96, Inter-Am. C.H.R. 157, OEA/ser.L/V/II.91, doc. 7 rev. (1996). The court announced that rape constituted torture if it was: "1) an intentional act through which physical and mental pain and suffering is inflicted on a person; 2) committed with a purpose; and 3) committed by a public official or by a private person acting at the instigation of the former." *Id.*

220 Aydin v. Turkey, 1997-VI Eur. H.R. Rep. 1866, ¶¶ 80-88 (1997).

221 *Id.* ¶ 83.

constitute rape under domestic law such as the War Crimes Act.[222]

For the reasons stated above, the beatings, use of electric shock, and sexual abuse that US personnel committed upon the former detainees in this investigation constituted torture and cruel, inhuman, or degrading treatment under US and international law.

### Forced Nakedness and Sexual Humiliation

All except one of the former detainees evaluated by PHR described being subjected to forced nakedness and other forms of sexual humiliation. Sexually degrading acts have historically been used in combination with other methods to break down a detainee. Forced nakedness and sexual humiliation violate human dignity and can lead to long-term psychological harm.[223] Sexual humiliation and stripping a detainee of his clothes adds to his sense of vulnerability[224] and are "intended to cause . . . feelings of humiliation and inferiority."[225] The use of sexually humiliating acts at Abu Ghraib, Guantánamo, and other US overseas detention facilities exploited the cultural values of detainees and has left detainees with deep, prolonged feelings of shame and humiliation. General George Fay found that keeping detainees in a state of undress and forcing them to simulate sexual positions at Abu Ghraib was clearly degrading and humiliating and violated the Uniform Code of Military Justice and other laws and regulations.[226] Partially in response to the detainee abuse uncovered in Iraq and at Guantánamo, sexual humiliation is now categorically prohibited by the new Army Field Manual. [227]

The severe mental pain and suffering of those who have been subjected to sexually humiliating acts constitute cruel or inhuman treatment and can also be considered a psychological form of torture. The UN Special Rapporteur on Torture has found that both depriving detainees of clothing and stripping them naked are psychologically harmful methods used by the United States that constitute torture and ill-treatment.[228] The UN Committee against Torture has explicitly called on the United States to rescind interrogation methods involving sexual humiliation.[229] These findings are consistent with the US State Department's own determinations. It has concluded that stripping individuals of their clothes constitutes torture or cruel, inhuman or degrading treatment. For example, in its Country Report for Cameroon, the agency noted: "Security forces continued to subject prisoners and detainees to degrading treatment, including stripping..."[230] In its Country Report for Egypt, it determined that, "Principal methods of torture reportedly employed by the police and the [state intelligence service] included stripping and blindfolding victims..."[231] It has similarly reported that in North Korea "methods of torture reportedly included ...prolonged periods of exposure" and "humiliations such as public nakedness".[232]

The European Court of Human Rights recognizes that the feelings of anguish and inferiority that result from sexual humiliation may continue to persist after the actual event has passed.[233] The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment has found that even mere threats of sexual humiliation "could be considered to amount to psychological torture."[234]

In the United States, a federal appeals court has stated, "[C]lothing is a 'basic necessity of human existence' which cannot be deprived in the same manner

---

[222] Rape is defined in the MCA as:

> The act of a person who forcibly or with coercion or threat of force wrongfully invades, or conspires or attempts to invade, the body of a person by penetrating, however slightly, the anal or genital opening of the victim with any part of the body of the accused, or with any foreign object.

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 [amending 18 U.S.C.§ 2441] (2006).

[223] Aydin v. Turkey, 1997-VI Eur. H.R. Rep. 1866, ¶¶ 80-88 (1997).

[224] *Id.* at ¶ 25.

[225] Iwanczuk v. Poland, No. 25196/94, 38 Eur. H.R. Rep. 8, § 59 (2001).

[226] Fay Report, *supra* note 18, at 69.

[227] The new Army Field Manual prohibits "forcing an individual to perform or simulate sexual acts or to pose in a sexual manner; exposing an individual to outrageously lewd and sexually provocative behavior" under any circumstances; and "forcing the detainee to be naked, perform sexual acts, or pose in a sexual manner" in conjunction with intelligence interrogations. Army Field Manual 2-22.3, *supra* note 101, ¶ 5-20.

[228] *Torture Note by the Secretary-General*, *supra* note 126, ¶ 17.

[229] *UN Comm. against Torture Report*, *supra* note 123, ¶ 24.

[230] Bureau of Democracy, Hum. Rts., & Lab., U.S. Dep't State, 2005 Country Rep. on Hum. Rts. Prac.: Cameroon (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61558.htm.

[231] State Dep't 2005 Hum. Rts. Report on Egypt, *supra* note 124.

[232] State Dep't 2005 Hum. Rts. Report on North Korea, *supra* note 124.

[233] Valasinas v. Lithuania, App. No. 44558/98, 2001-VIII Eur. Ct. H.R. 117 (Sect. 3).

[234] *Report to the Russian Government on the visit to the Russian Federation carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 2 to 17 December 2001*, ¶ 18, Doc. No. CTP/Inf [2003] 30 (2003).

as a privilege an inmate may enjoy."[235] The US Supreme Court has also recognized that the protection of human dignity is a primary function of the Eighth and Fourteenth Amendments.[236]

The legislative history of the War Crimes Act reinforces that it is a war crime to force detainees to be naked, perform sexual acts, or pose in a sexual manner.[237] A July 2007 Executive Order implementing the Military Commissions Act forbids conditions of detention and practices of interrogation that includes sexual humiliation.[238]

Based on the analysis above, the use of forced nakedness and sexual humiliation by US personnel upon the former detainees in this investigation constituted violations of both US and international law.

## Other Conditions of Detention

Each of the former detainees evaluated by PHR stated that they had endured harsh and abusive living conditions during their time in US custody. In addition to conditions of detention such as forced nakedness, isolation, sleep deprivation and others that appear to have been part of the interrogation strategy — and which amount to torture and cruel, inhuman or degrading treatment regardless of the purpose — other circumstances the former detainees reported include denial of food, inadequate or inappropriate use of lighting, and being held in unsanitary and/or tiny cells. These conditions amount to cruel, inhuman or degrading treatment under numerous international treaties to which the United States is a signatory. The jurisprudence of several regional human rights bodies also helps to establish that the conditions reportedly endured by the former detainees evaluated for this report amount to violations of international law.

The ICCPR obligates the US government to not subject persons within its control to torture or cruel, inhuman or degrading treatment. Conditions of detention including lack of sanitary conditions and decent food constitute acts of cruel, inhuman, or degrading treatment under the ICCPR and the Convention Against Torture.[239] In *Mukong v. Cameroon*, for example, the UN Human Rights Committee held that the detention of a prisoner in unsanitary conditions without food or clothing violated the prisoner's right to protection against cruel, inhuman or degrading treatment.[240] The conditions complained of in *Mukong* were very similar to many of the reports of substandard treatment made by the former detainees evaluated for this report.

In addition to violating the international legal norms discussed above, a number of regional human rights bodies have deemed conditions of detention similar to those described in this report as illegal. The Inter-American Commission on Human Rights, for example, held that keeping a detainee confined for twenty-three hours per day in a cell infested with flies and maggots, deprived of food, adequate lighting and ventilation constituted cruel, inhumane or degrading treatment.[241] Further, the African Commission on Human and People's Rights deemed that a prisoner who was chained to a floor, not allowed to bathe, and fed only twice a day had endured treatment that amounted to cruel, inhuman or degrading treatment.[242]

---

235  Maxwell v. Mason, 668 F.2d 361, 363, 365 (8th Cir. 1981) (holding that even inmates in solitary confinement have dignitary interest in being clothed where inmate was kept in his underwear) (citing Finney v. Arkansas Board of Corrections, 505 F.2d 194, 207-8 (8th Cir. 1974)).

236  Trop v. Dulls, 356 U.S. 86, 101 (1958) (plurality opinion) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man."); Hope v. Pelzer, 536 U.S. 730 (2002) (emphasizing the humiliation caused by depriving the prisoner of bathroom breaks while he was handcuffed to a hitching post as part of Eighth Amendment violation); Rochin v. California, 342 U.S. 165, 174 (1952) (holding that pumping man's stomach in search of swallowed narcotics was means "so brutal and so offensive to human dignity" that it violated the Fourteenth Amendment).

237  152 CONG. REC. S10,390 (daily ed. Sept. 28, 2006) (statement of Sen. Warner), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S10390&dbname=2006_record; *see also* 152 CONG. REC. S10,384 (daily ed. Sept. 27, 2006) (statement of Sen. Levin), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getpage.cgi?position=all&page=S10384&dbname=2006_record.

238  Interpretation of the Geneva Conventions Common Article 3 as Applied to a Program of Detention and Interrogation Operated by the Central Intelligence Agency, Exec. Order No. 13,440, § 3(b)(i)(E), 72 Fed. Reg. 40,707 (July 24, 2007).

239  *See, e.g.*, Henry v. Trinidad and Tobago, Comm. No. 752/1997, U.N. GAOR Hum. Rts. Comm., 64th Sess., ¶¶ 1.1-2.4, U.N. Doc. CCPR/C/64/D/752/1997 (1999) (finding that inmate endured cruel, inhuman, or degrading treatment when confined in cell that was filthy and infested with roaches, flies, and rats, without natural lighting or ventilation for up to twenty-four hours at a time); U.N.H.R. Comm., Hylton v. Jamaica, Comm. No. 407/1990, U.N. GAOR Hum. Rts. Comm., 57th Sess., ¶¶ 2.6-2.7, U.N. Doc. CCPR/C/51/D/407/1990 (1994) (finding that inmate endured cruel, inhuman, or degrading treatment when subjected to at least two weeks of confinement with only one or two meals a day and sometimes without water, as well as beatings that resulted in serious physical injuries).

240  Mukong v. Cameroon, Comm. No. 458/1991, U.N. GAOR Hum. Rts. Comm., ¶ 9.4, U.N. Doc. CCPR/C/5/51/D/458/1991 (1994).

241  McKenzie v. Jamaica, Case 12.023, Inter-Am. C.H.R. 918, Report No. 41/00, ¶¶ 85-90 (1999).

242  Media Rights Agenda v. Nigeria, Afr. Comm'n on Human and Peoples' Rts., Comm. No. 224/98, ¶ 40, 2000-2001 Afr. Ann. Act. Rep., Annex V; *see also* Huri-Laws v. Nigeria, African Comm'n on Human and Peoples' Rts., Comm. No. 225/98, 14th Ann. Activity Report of the Afr. Comm'n on Human and Peoples' Rts., Annex V, ¶¶ 5-9 (2000) (holding that pre-trial detainee confined for approximately two

Based on the above discussion, many of the conditions of detention to which US personnel subjected the former detainees in this investigation constituted violations of US and international law.

## Reparations and Justice for Victims of Torture

Reparations by the US government for the unlawful arrest and detention, torture and/or cruel, inhuman or degrading treatment that these former detainees endured is a necessary step toward re-establishing the historic US commitment to the rule of law. Redressing the damage caused to these individuals should include, as required by individual circumstances, a variety of reparations, such as clearing the detainee's name, restoring social status, citizenship, employment and place of residence, and returning property. Monetary compensation is warranted for damage resulting from the physical and mental harm, emotional distress, and loss of earnings, harm to dignity, medical, psychological and social services as well as legal fees. Further reparations could include public acknowledgement of the facts, apology, and acceptance of responsibility and guarantees of non-repetition.[243]

In any form it might take, reparation would send a clear message that torture cannot be perpetrated with impunity. Although reparation alone can never be a substitute for accountability,[244] it is an element of justice for these former detainees as well as a way of enabling those who are in precarious living situations as a result of the abuses they endured to return to normal life. Monetary compensation, in particular, is needed to ensure recovery and rehabilitation for the long-term health consequences caused by being subjected to torture or other cruel, inhuman or degrading treatment. Both international and domestic instruments make provision for such reparations.

International law obliges the United States to provide compensation for the unlawful arrest and detention of these individuals, as well as for the torture and/or cruel, inhuman or degrading treatment to which they have been

subjected.[245] Articles 2(3) and 9(5) of the ICCPR set the standard for effective compensation under international law.[246] Article 9(5) of the ICCPR states, "[A]nyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation." Similarly, the right to compensation is protected under the UN Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law.[247] Further, Article 14 of the Convention against Torture stresses that: "each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible."[248] The Declaration of Basic Principles of Justice for Victims of Crimes and Abuse Power is also indicative of the international norm that torture victims are entitled to reparations.[249]

In January 2007 the Canadian government offered Maher Arar a formal apology and a $10.5 million (Canadian dollars) compensation package after he was detained by US officials and sent to Syria where he was tortured for ten months before being released and sent back to Canada.[250] This and other foreign cases indicate

---

weeks during which he was subjected to unsanitary conditions, denied necessary medical attention, and physically beaten, had suffered cruel, inhuman or degrading treatment). Communication 225/98, 14th Ann. (2000-2001)

[243] For a comprehensive summary of types of reparation, see Redress, *What is Reparation*, at www.redress.org/what_is_reparation.html.

[244] Luc Walleyn, *Incorporating Victims' Views in Reparation Cases: a Challenge for Lawyers* 3, *available at* www.redress.org/PeacePalace/IncorporatingVictimsLW.pdf

[245] *See* Amnesty Int'l, *USA: Despite Releases, Guantánamo Remains an Affront to the Rule of Law*, AI Index AMR 51/041/2004, Feb. 27, 2004, *available at* http://web.amnesty.org/library/index/engamr510412004.

[246] ICCPR, *supra* note 76, art. 2(3), 9(5). Article 2(3) states, "Each State Party to the present Covenant undertakes: (a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity; (b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy; (c) To ensure that the competent authorities shall enforce such remedies when granted." *Id.* art. 2(3).

[247] Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, G.A. Res. 60/147, U.N. GAOR 3d Comm., 60th Sess., U.N. Doc. A/C.3/60/L.24 (Mar. 21, 2006).

[248] UN Convention Against Torture, *supra* note 1, art. 14.1.

[249] Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power, G.A. Res. 40/34, U.N. GAOR, 96th Sess., Supp. No. 53, at 214, ¶¶ 12-13, U.N. Doc. A/RES/40/34 (1985), *available at* http://www.unhchr.ch/html/menu3/b/h_comp49.htm.

[250] *Harper's apology "means the world": Arar*, CBC News, Jan. 26, 2007, *available at* http://www.cbc.ca/canada/story/2007/01/26/harper-apology.html (stating that the US government, in part, had relied on inaccurate intelligence reporting from the Canadians).

a trend toward accountability and reparation that the United States must emulate.

Despite leading international efforts such as the UN Voluntary Fund for Victims of Torture,[251] the United States has declined to apologize, much less pay compensation to any individual in connection with its detention and interrogation practices in Iraq or Guantánamo Bay. Indeed, in the case of Maher Arar, it has vigorously fought all claims for compensation, even to the point of claiming that national security and foreign policy considerations prevent the case from being brought at all.[252] In the case of Khaled El-Masri, another individual subjected to extraordinary rendition and torture, the United States successfully invoked a state secrets defense as a means of blocking discovery of key evidence in a claim for compensation.[253]

Claims for compensation for torture committed by US agents anywhere in the world should be recognized. In a landmark 1980 decision, *Filártiga v. Peña-Irala*, a US appeals court held that the prohibition on torture was so universally accepted that a US Court could hold responsible a Paraguayan official charged with torturing a dissi-

dent in Paraguay. The court declared that when officials violate a fundamental norm such as torture, they can be held accountable anywhere within the United States that they are found.[254] In the 2004 case *Sosa v. Alvarez-Machain*,[255] the US Supreme Court left open the possibility that federal courts could consider certain violations of widely accepted international norms under the Alien Tort Statute.

Aside from these possible legal remedies, which force victims to seek redress in the courts, the United States should recognize a moral obligation to provide compensation. Moreover, if victims do bring civil actions for redress, the US government should end its current obstructionist policy of seeking to prevent the courts from even deciding the merits of the claims by invoking state secrets, sovereign immunity, or similar defenses.

## Conclusion

Many of the techniques reported to have been employed against the eleven individuals evaluated by PHR, some over long periods of time and often in combination with other prohibited techniques, constituted acts of torture or cruel, inhuman or degrading treatment under domestic and international law. Some amounted to war crimes.

---

[251]  *See* Daniel Prémont, *Voluntary Fund: UN Support to Victims of Torture*, at http://www.un.org/events/torture/fund.htm; *UN Voluntary Fund for Victims of Torture*, at http://www.ohchr.org/EN/Issues/Pages/TortureFundMain.aspx.

[252]  Arar v. Ashcroft, 414 F. Supp. 2d 250 (E.D.N.Y. 2006).

[253]  El Masri v. United States, 479 F.3d 296 (4th Cir. 2007), cert. denied128 S. Ct. 373 (2007), *available at* http://pacer.ca4.uscourts.gov/opinion.pdf/061667.P.pdf.

[254]  Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), *remanded* to 577 F.Supp. 860 (E.D.N.Y. 1984).

[255]  Sosa v. Alvarez-Machain, 542 U.S. 692 (2004).

# VII. CONCLUSION AND RECOMMENDATIONS

Even though the particular experiences of the former detainees evaluated by PHR varied during their time in US custody, and although clear differences existed between the treatment of detainees in Iraq, Bagram, Kandahar and elsewhere in Afghanistan, and at Guantánamo Bay, Cuba — such as the routine use of long-term nakedness, suspensions, and instance of rape at Abu Ghraib and the routine beatings at the Afghanistan facilities — significant consistencies were found among all the accounts. Repeated and combined use of techniques including beatings, isolation, stress positions, temperature extremes, sensory overload and deprivation, sleep deprivation, and other forms of torture were reported by all former detainees evaluated. This consistent pattern, especially when considered in conjunction with the many other reports about detainee treatment, including those from official investigations by the US government, the International Committee of the Red Cross, first-hand accounts, and the media, as well as government documents, leads to the conclusion that United States systematically employed torture and ill-treatment against detainees during the periods covered by this report.

The abusive practices reported by the detainees in this investigation took place in a context of official authorization, legal justification, and tactical standardization across three operational theatres. Many of the methods used were officially authorized by civilian and military authorities during at least some of the periods during which the detainees were held in US custody. From evidence available, other abusive practices found in this report, such as routine beatings, electric shocks, and sexual violence, do not appear ever to have been authorized, but were nevertheless tolerated within a permissive command environment. The creation of this environment was neither incidental nor accidental. Rather, it resulted directly from a radical and unjustifiable re-interpretation of US and international law that stripped human rights protections from detainees in U.S custody. Legal opinions issued by the Department of Justice and the Department of Defense dehumanized detainees and encouraged the formulation of policies and practices that inevitably led to widespread abuse.[256]

Congress has taken some steps to end many of these practices and authorizations, although some have been undermined or subverted by the President. The Detainee Treatment Act extends the prohibition on cruel, inhuman or degrading treatment extra-territorially, although a signing statement by the President assumed authority to ignore the law; and the Military Commissions Act, while narrowing the definitions of war crimes under US law, nevertheless criminalizes all forms of torture and cruel treatment documented in this report.[257]

The Defense Department, too, has both repudiated and prohibited many of the interrogation practices and conditions of detention set out in this report. In September 2006, it issued a new field manual on interrogation[258] that requires compliance with the Geneva Conventions and prohibits the use of torture or cruel, inhuman or degrading treatment. It explicitly prohibits the following: forcing a detainee to be naked, perform sexual acts, or pose in a sexual manner; placing hoods or sacks over the head of a detainee, using duct tape over the eyes, and other forms of sensory deprivation; applying beatings, electric shock, burns, or other forms of physical pain; "waterboarding;" using military working dogs to harm or threaten a detainee; inducing hypothermia or heat injury; conducting mock executions; depriving the detainee of necessary food, water, or medical care; and threats of harm to the detainee or his family. It also identified a "golden rule" standard, under which a technique that an interrogator would not want used on an American soldier should not be used "against any detainee regardless of status or characterization." On the other hand, an

---

[256] See Bybee Memo, *supra* note 14; Memorandum from John C. Yoo, Assistant Attorney General, Office of Legal Counsel, Department of Justice to William J. Haynes II, General Counsel of the Department of Defense (March 14, 2003), *available at* http://media.washingtonpost.com/wp-srv/nation/pdfs/OLCMemo1-19.pdf?sid=ST2008040102264 and http://media.washingtonpost.com/wp-srv/nation/pdfs/OLCMemo20-39.pdf. Memorandum from General Ricardo Sanchez to Combined Joint Task Force Seven and the Commander, 205th Intelligence Brigade 4 (Sept. 10, 2003), *available at* http://www.humanrightsfirst.info/pdf/06124-etn-sep-10-sanchez-memo.pdf.

[257] See PHR Leave No Marks, *supra* note 17.

[258] Army Field Manual 2-22.3, *supra* note 101, ¶ 5-20.

appendix in the new field manual continues to permit the use of isolation for up to thirty days per authorization and limiting sleep to four hours a night for individuals who are Unlawful Enemy Combatants and are not designated as Prisoners of War.

The new interrogation standards, however, only apply to individuals in Defense Department custody, and the President vetoed a bill that would have applied the new field manual to the Central Intelligence Agency (CIA). Moreover, the Bush Administration has claimed, without legal basis, that the Military Commissions Act gives the CIA wide latitude in the use of "enhanced" interrogation techniques. In an executive order issued in July 2007,[259] the President introduced a definition of humiliating and degrading treatment to mean only "willful and outrageous acts of personal abuse done for the purpose of humiliating or degrading the individual in a manner so serious that any reasonable person, considering the circumstances, would deem the acts to be beyond the bounds of human decency." Subsequent testimony and statements by Bush Administration officials, including a letter of March 5, 2008, from the Justice Department to Congress, make it clear that they claim that the standard put forth by this executive order provides them great leeway in using "enhanced" techniques, even to the point of using a new test that allows the claimed value of the information to be weighed against the harm to the individual.[260] Under this standard, even waterboarding would be permissible in some circumstances.

It must be noted that no independent investigation that includes access to all relevant documents and officials has been conducted of US detainee treatment and interrogation practices during the period covered by this report, and no individuals other than a few enlisted personnel and one officer at Abu Ghraib have been prosecuted for their actions in performing or authorizing the conduct described here. Furthermore, no effort to provide compensation of any kind to the individuals who have suffered grievous harm as a result of the torture and cruel, inhuman and degrading treatment inflicted on them has been forthcoming.

Based on the findings of this investigation, the United States should take the following actions:

1. The executive branch must repudiate all forms of torture and cruel, inhuman or degrading treatment. It should explicitly and in writing establish a uniform standard of conduct for all agencies that prohibits any of its military, intelligence or other officials, including all forms of contract personnel, from engaging in torture and cruel, inhuman or degrading treatment, including but not limited to any of the following interrogation or conditions of confinement methods, either alone or in combination:

- Stress positions

- Beatings and other forms of physical assault

- Use of extremes of temperature

- Waterboarding or any other form of simulated drowning[261]

- Threats of harm to the detainee, his family, or friends

- Sleep deprivation

- Sensory bombardment through the use of extreme noise and/or light

- Violent shaking

- Religious, cultural, and sexual humiliation, including, but not limited to, forced nakedness

- Prolonged isolation

- Sensory deprivation, including but not limited to hooding and blindfolding

- Use of psychotropic, mind-altering, or other drugs for the purpose of decreasing resistance or gaining information

- Mock execution

- Exploitation of phobias, psychopathology, or physical vulnerability

- Rape and sexual assault

- Electric shocks

- Deprivation of basic necessities and sanitary conditions

Congress should enact into law the prohibitions listed above and establish criminal liability for their violation.

---

[259] Exec. Order No. 13,440, § 3(b)(i)(E), 72 Fed. Reg. 40,707 (July 24, 2007). These acts include: "sexual or sexually indecent acts undertaken for the purpose of humiliation, forcing the individual to perform sexual acts or to pose sexually, threatening the individual with sexual mutilation, or using the individual as a human shield; or ...acts intended to denigrate the religion, religious practices, or religious objects of the individual." Id.

[260] Mark Mazzetti, Letters Give C.I.A. Tactics a Legal Rationale, N.Y. TIMES, Ap-r. 27, 2008, available at http://www.nytimes.com/2008/04/27/washington/27intel.html?_r=1&ref=us&oref=slogin.

[261] None of the detainees evaluated experienced waterboarding.

2. The executive branch and Congress should establish an independent commission to fully investigate and publicly report on the circumstances of detention and interrogation in Bagram, Kandahar, and elsewhere in Afghanistan, Iraq, Guantánamo Bay, and other locations since 2001. This independent commission should have subpoena power to compel witnesses and have full access to all classified materials concerning interrogation techniques and conditions of detention, including medical records and documentation by behavioral health science consultant personnel, in order to establish a full public record. The investigation should extend to individuals in the position of making policy as well as those who carried those policies out, including all healthcare professionals who were in the position of providing care or supporting the interrogation of detainees.

3. All individuals who played any role in the torture or ill-treatment of detainees, including those who authorized the use of methods amounting to torture or exercised command authority over them, should be held to account through criminal and civil processes (such as disciplinary action). Officials at every level should be held accountable for crimes they committed or for the acts of officials subordinate to them. Health professionals, both civilian and uniformed, who engaged in or facilitated the abuse of detainees and/or failed to report torture and ill-treatment should be investigated, appropriately sanctioned, and disciplined via the Department of Defense, other executive branch agencies, and state licensing boards.

4. The government should issue a formal apology to detainees who were subjected to torture and/or ill-treatment as part of US military and intelligence operations since fall 2001 in Afghanistan, Iraq, Guantánamo Bay, Cuba, and elsewhere.

5. The government should establish a fair process for compensation and victim assistance, including access to rehabilitation and re-integration services, for individuals subjected to torture or ill-treatment in US custody.

6. All places of detention operated by the United States should be subject to monitoring by international bodies that investigate detainee treatment and are capable of reporting findings to the public and government, including the UN Special Rapporteur on Torture, the UN Committee Against Torture, and the International Committee of the Red Cross. These organizations tasked by treaties to which the United States is a party must be granted full access to detainees, their medical records, and all other pertinent files documenting past and current treatment of detainees during their incarceration. Furthermore, Congressional and executive branch oversight of US military and intelligence activities relevant to detainee treatment and interrogation should be immediately strengthened and improved.

7. The US Department of Justice should publicly release all legal opinions and other memoranda concerning standards regarding interrogation and detention policy and practices.

# APPENDIX I: TORTURE: PSYCHOLOGICAL AND MEDICAL CONSEQUENCES[262]

Torture can have devastating health consequences on an individual's physical, psychological, and social well-being. These dimensions of health often impact one another. For example, musculoskeletal pain from beatings can result in recurrent, intrusive memories of prior abuse. Depression resulting from trauma may lead to somatic symptoms including headaches and stomach aches. Torture can result in individuals becoming withdrawn and socially isolated. Furthermore, torture impacts the broader community as well through promoting a culture of fear and mistrust.

## Psychological Trauma: The Common Denominator

Psychological abuse is inherent in the concept of torture. Systematic, repetitive infliction of psychological trauma establishes control over another person. Methods of psychological control are designed to instill terror, pain, and helplessness and destroy a detainee's sense of autonomy without direct use of physical violence. Such methods include the use of sleep deprivation, sensory bombardment and deprivation, use of temperature extremes, stress positions, solitary confinement, mock execution, severe humiliation, mind-altering drugs and threats of violence — as well as the exploitation of personal and cultural phobias. The ultimate effect of these techniques is to convince the victim that the perpetrator is omnipotent, that resistance is futile, and that his life depends on absolute compliance.

Although discussion of torture and other cruel, inhuman and degrading treatment of detainees can be divided into psychological and physical techniques, ultimately all techniques that violate human dignity carry a high risk of psychological damage. Further, the distinction between harsh physical and psychological techniques is artificial as most torture techniques involve both components.[263] For example, the consequences of sexual torture, even in the absence of physical assault, are both physical and psychological. Torture is a means of denying an individual's humanity. By reducing an individual to a position of extreme helplessness and inducing a constant state of fear, torture often leads to a deterioration of cognitive, emotional and behavioral functions.[264]

Many torture survivors suffer from debilitating psychological damage that stems from various combinations of intense and prolonged fear, shame, humiliation, horror, guilt, grief, and mental and physical exhaustion.[265] Ample evidence from both uncontrolled and controlled studies[266] document that most torture survivors suffer an array of prolonged and serious psychiatric symptoms such as depression, anxiety disorders, somatic complaints such as headaches and back pain, post-traumatic stress disorder (PTSD), memory and concentration impairment, sleep disturbance and nightmares, sexual dysfunction, self-harming behaviors and personality changes.[267]

Feelings of helplessness, anger, guilt, and fear are

---

[262] This discussion is drawn from the following sources: PHR Leave No Marks *supra* note 15; *Istanbul Protocol, supra* note 7.

[263] *Istanbul Protocol, supra* note 7, at 45.

[264] *Id.*

[265] PHR Break Them Down, *supra* note 17, at 48 (2005).

[266] Similar to research of victims of organized violence, epidemiological studies of torture survivors are difficult to conduct and have limitations such as small sample size and lack of control groups.

[267] *E.g.,* Caroline Gorst-Unsworth & Eva Goldenberg, *Psychological Sequelae of Torture and Organized Violence Suffered by Refugees from Iraq: Trauma-Related Factors Compared with Social Factors in Exile,* 172 Brit. J. Psychiatry 90 (1998); Mark Van Ommeren et al., *Psychiatric Disorders Among Tortured Bhutanese Refugees in Nepal,* 58 Archives Gen. Psychiatry 475 (2001); Joop T.V.M. de Jong et al., *Lifetime Events and Posttraumatic Stress Disorder in 4 Postconflict Settings,* 286 JAMA 555 (2001); Derrick Silove, et al., *The Impact of Torture on Post-Traumatic Stress Symptoms in War-Affected Tamil Refugees and Immigrants,* 43 Comprehensive Psychiatry 49 (2002); Allen Keller & Joel Gold, *Survivors of Torture,* in 1 Kaplan and Sadock's Comprehensive Textbook of Psychiatry 2400 (Benjamin J. Sadock & Virginia A. Sadock, eds., 8th ed. 2005); Peter Mygind Leth & Jytte Banner, *Forensic Medical Examination of Refugees Who Claim to Have Been Tortured,* 26 Am. J. Forensic Med. & Pathology 125 (2005); Pia A. Moisander & Erik Edston, *Torture and Its Sequel – A Comparison Between Victims from Six Countries,* 137 Forensic Sci. Int'l 133 (2003).

common psychological reactions to torture and are often associated with major depression and PTSD.[268] The psychological reactions to torture are undoubtedly very complex since the torture survivor may experience PTSD as a result of specific torture experiences; depression as a result of multiple losses associated with torture; physical symptoms resulting from the specific forms of torture; and the "existential dilemma" of surviving in a world in which torture is a reality. [269]

## Post-Traumatic Stress Disorder

PTSD is one of the most common long-term consequences of torture. It is estimated that the rates of PTSD range from 45% to 92% across diverse samples of torture survivors.[270] Of note, the rate of PTSD stemming from different forms of trauma among the general population between the ages of eighteen and fifty-four in the United States is approximately 3.6 percent.[271]

The symptoms of PTSD fall into three main categories: 1) reliving the experience of the traumatic event; 2) emotional numbing and detachment; and 3) hypervigilance and chronic arousal. The Diagnostic and Statistical Manual (DSM-IV) requires a one-month duration of symptoms for a diagnosis of PTSD. PTSD that endures for three months or more is considered to be chronic.[272]Torture survivors may continue to re-experience the trauma in the form of intrusive memories or flashbacks or recurrent nightmares. They may exhibit avoidance of any thought, conversation or activity that arouses recollection of the trauma. Victims also may exhibit hyperarousal or hypervigilance, which may result in difficulty concentrating, irritability or outbursts of anger.[273]

Studies show that more than one third of those who suffer from PTSD fail to recover even after many years.[274]

Several studies conducted on POWs from World War II and the Korean War and on Holocaust survivors have confirmed the chronic nature of PTSD, which sometimes persists forty years after exposure to the severe trauma.[275]

PTSD can have a negative impact on the successful management of other chronic medical diseases and therefore can impact physical health over the long term. For example, misdiagnosis or under-treatment of PTSD has been associated with poor control of diabetes in Cambodian refugees.[276] Survivors of the Holocaust and concentration camps were observed to die at an earlier age than expected and demonstrated higher rates of infectious diseases, cancer, cerebrovascular accidents and heart problems.[277]

## Major Depression and Self-Harming Behavior

Major depression and PTSD are widely acknowledged as the most common emotional and psychological forms of distress in torture survivors.[278] Epidemiological findings have disclosed that 56% of refugees subjected to prolonged traumatization such as torture suffer from both PTSD and a depressive disorder.[279] Further, PTSD patients with depression report a higher frequency of suicidal thoughts, whereas patients with PTSD alone manifest an increased frequency of suicidal attempts.[280]

Studies have consistently demonstrated that exposure to torture and life-threatening events are associated with suicidal behaviors. The intractable suffering associated with torture has been found to play a central role in increased self-destructive and suicidal behavior among refugees who previously experienced traumatic events. In a study investigating suicidal behavior among

---

[268]  Turner, *supra* note 267.

[269]  *Id.*

[270]  Van Ommeren, *supra* note 267; Moisander, *supra* note 267; Allen Keller et al., *Traumatic Experiences and Psychological Distress in an Urban Refugee Population Seeking Treatment Services*, 194 J. NERVOUS & MENTAL DISEASE 188 (2006); Ronald C. Kessler, et al., *Prevalence, Severity, and Comorbidity of 12-month DSM-IV Disorders in the National Comorbidity Survey Replication*, 62 ARCHIVES GEN. PSYCHIATRY 617 (2005) [hereinafter Kessler, *Prevalence, Severity, and Comorbidity*].

[271]  Kessler, *Prevalence, Severity, and Comorbidity*, *supra* note 270.

[272]  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL (4th ed. 2000) (the main diagnostic reference of mental health professionals in the United States) [hereinafter DSM-IV].

[273]  *Istanbul Protocol*, *supra* note 7, at 44.

[274]  Ronald C. Kessler, et al., *Post-Traumatic Stress Disorder in the National Comorbidity Survey*, 52 ARCHIVES GEN. PSYCHIATRY 1048 (1995) [hereinafter Kessler, *PTSD*].

[275]  Brian Engdahl, et al., *Post-Traumatic Stress Disorder in a Community Group of Former Prisoners of War: A Normative Response to Severe Trauma*, 154 AM. J. PSYCHIATRY 1576 (1997); Robert A. Zeiss & Harold R. Dickman, *PTSD 40 Years Later: Incidence and Person-Situation Correlates in Former POWs*, 45 J. CLINICAL PSYCHOL. 80 (1989); Cynthia Lindman Port, et al., *A Longitudinal and Retrospective Study of PTSD Among Older Prisoners of War*, 158 AM. J. PSYCHIATRY 1474 (2001); Rachel Yehuda, et al., *Impact of Cumulative Lifetime Trauma and Recent Stress on Current Post-Traumatic Stress Disorder Symptoms in Holocaust Survivors*, 152 AM. J. PSYCHIATRY 1815 (1995).

[276]  Richard F. Mollica, *Surviving Torture*, 351 NEW ENG. J. MED. 5 (2004).

[277]  Leo Eitenger & Axel Strom, *Mortality and Morbidity After Excessive Stress*, 11 AM. J. COMMUNITY PSYCHOL. 473 (1983).

[278]  Mollica, *supra* note 276.

[279]  Marcello Ferrada-Noli, et al., *Suicidal Behavior After Severe Trauma, Part 1: PTSD Diagnoses, Psychiatric Comorbidity, and Assessments of Suicidal Behavior*, 11 J. TRAUMATIC STRESS 103 (1998).

[280]  *Id.*

refugees previously subjected to diverse forms of torture (including isolation, water torture, mock execution, and electric shock), 50% of the sample reported suicidal behavior.[281] A study of former POWs found that 57% of subjects who had been POWs under Japanese control had suicidal thoughts following their experiences, and 7% of the German-held POWs had attempted suicide.[282]

Strikingly, researchers have found that traumatized individuals expose themselves to situations reminiscent of their torture experience[283] — and that the form of self-destructive or suicidal behavior parallels the type of torture they experienced. In a sample of sixty-five refugees who survived torture, those who were subject to blunt force trauma applied to their head and body were more likely to jump from a height or in front of a train; those who experienced water torture were more likely to attempt drowning; and those who were tortured with sharp force were more likely to engage in self-inflicted stabbing or cutting.[284]

### Damaged Self-concept and Foreshortened Future

Torture survivors may have a damaged self-concept (i.e., the individual has a subjective feeling of having been irreparably damaged and having undergone an irreversible personality change) and a sense of foreshortened future (e.g., not expecting to have a career, marriage, children, or a normal life span).[285] They may exhibit dissociation, a disruption in the integration of consciousness, self-perception, memory and actions, depersonalization, a feeling of being detached from one's self or body, or atypical behavior such as impulse control problems or engagement in high-risk behaviors.[286]

### Psychosis

Although uncommon among survivors of torture, psychosis is among the most serious psychological consequences of torture, and may present itself in the form of delusions (including auditory, visual, tactile and

olfactory), bizarre ideations and behaviors, illusions or perceptual distortions and paranoia. Other serious consequences include substance abuse and exacerbations of prior mental illness.[287]

Other residual effects of torture include experiencing somatic complaints such as pain, headache or other physical complaints.[288]

## Physical Consequences of Torture

Physical manifestations of torture may involve all organ systems. Some effects are typically acute while others may be chronic. Beatings or being restrained in painful positions can result in musculoskeletal injuries, fractures and chronic pain syndromes.[289] Dermatologic manifestations include scars from injuries, lacerations, or burns. Prolonged, tight shackling of extremities can result in linear scarring.[290] Poor dentition, including missing/fractured teeth, may result from beatings, malnutrition, and inadequate access to appropriate dental care.[291]

Neurological symptoms and findings include headaches, nerve damage (either central or peripheral), decreased strength or sensation, auditory and visual impairment, cognitive deficits and dizziness.[292] Sexual abuse and humiliation can result in chronic dysuria, genital pain, Peyronies disease, strictures, damage to ligaments (suspensory ligament), erectile dysfunction (from damage to nerves and arteries as well as psychological), rectal injuries, and exposure to infectious diseases such as HIV.[293]

Empirical evidence has shown that a common physical consequence in torture survivors involves pain in

---

[281] *Id.*

[282] Thomas W Miller, et al., *Traumatic Stress Disorder: Diagnostic and Clinical Issues in Former Prisoners of War*, 30 Comprehensive Psychiatry 139 (1989).

[283] Shakeh Momartin & Mariano Coello, *Self-Harming Behaviour and Dissociation in Complex PTSD: Case Study of a Male Tortured Refugee*, 16 Torture 20 (2006).

[284] Ferrada-Noli, *supra* note 279.

[285] DSM-IV, *supra* note 272, at 424-29; *Istanbul Protocol*, *supra* note 7, at 45.

[286] *Istanbul Protocol*, *supra* note 7, at 45.

[287] *Id.* at 44.

[288] *Id.*

[289] Istanbul Protocol; Physicians for Human Rights, Examining Asylum Seekers: A Health Professionals Guide to Medical and Psychological Evaluations of Torture, (Vincent Iacopino, et al., eds., 2001); Jose Quiroga & James M. Jaranson, *Politically Motivated Torture and Its Survivors: A Desk Study Review of the Literature*, 15 Torture: J. on Rehabilitation of Torture Victims & Prevention of Torture 1 (2005); Allen Keller, *Caring and Advocating for Victims of Torture*, 360 Lancet (Supp.) s55 (2002).

[290] *Istanbul Protocol*, *supra* note 7; Michael Peel & Vincent Iacopino, The Medical Documentation of Torture (2002).

[291] *Istanbul Protocol*, *supra* note 7.

[292] Alejandro Moreno & Michael Grodin, T*orture and Its Neurological Sequelae*, 40 Spinal Cord 213 (2002); Ole Vedel Rasmussen, *Medical Aspects of Torture*, 37 Danish Med. Bull. (Supp. 1) 1 (1990); *Istanbul Protocol*, *supra* note 7.

[293] *Istanbul Protocol*, *supra* note 7; Marie Norredam, et al., *Urologic Complications of Sexual Trauma Among Male Survivors of Torture*, 65 Urology 28 (2005).

multiple sites that is long-lasting. For example, musculoskeletal symptoms are present as both acute and chronic physical consequences associated with torture. Frequent pains experienced by the survivors are in the head, neck, shoulder girdle, and the lower back.[294] These disabilities often remain years after release from detention and limit the survivors' capacity to do anything other than light work. These pains have been associated with beatings and painful stress positions, and confinement in cramped, damp, and unsanitary conditions.[295] The pain can also be psychosomatic and can be directly due to psychological torture.

It must be noted that torture is often designed to maximize stress and physical pain *without* causing serious physical injury or death. In advocating for various aggressive interrogation procedures, a working group established in the Department of Defense by Secretary Donald Rumsfeld argued that the removal of prisoners' clothing would create "a feeling of helplessness and dependence" and that slapping a prisoner — "a quick glancing slap to the fleshy part of the cheek or stomach" — could be useful "as shock measures." [296]

## Physical Evidence of Torture

While torture and ill-treatment can have devastating health consequences, it is important to recognize that there is individual variability in physical and psychological findings. Individuals respond to and recover from traumatic events, including torture, in a variety of ways. In some cases, physical evidence may not be detectable because most medical evaluations are conducted after the resolution of acute signs and symptoms of physical injury.

The method of torture, its severity, and the anatomical location of injury often indicate the likelihood of specific physical findings. For example, beatings and other physical assaults may result in fractures that produce a loss of bone integrity due to the effect of a blunt mechanical force on various vector planes.[297] Findings from bone scans can corroborate the history of trauma described by the victim. Burns may also produce characteristic scars and deformities. The use of electricity and various methods of burning may also leave highly characteristic skin changes. Different forms of body suspension and stretching of limbs may result in characteristic musculoskeletal and nerve injuries. Other unnatural positions and forms of restraint may cause severe pain and produce injuries to ligaments, tendons, nerves and blood vessels. For example, the potential side effects of "Palestinian-type suspension"[298] is chronic nerve damage (brachial plexus) and shoulder dislocation that can result in degenerative arthritis. Despite severe chronic disability, such forms of torture can leave few, if any, external marks or radiological findings.[299]

Other forms of torture may or may not produce physical findings but are strongly associated with other conditions. For example, cortical atrophy, diffuse axonal damage, lesions and scalp bruises can be expected to be observed in head trauma victims. Beatings to the head that may have resulted in loss of consciousness are particularly important to the clinical diagnosis of organic brain dysfunction. Also, trauma to the genitals such as the crushing, wringing or pulling of the scrotum or direct trauma to the region can result in complaint of pain and sensitivity and hyperaemia (redness due to increase blood flow); marked swelling and bruises can also be observed.[300] Even if physical findings are not observed, sexual torture is often associated with subsequent sexual dysfunction.

It is important to note that only a minority of survivors of torture and/or ill-treatment may present with permanent scarring, and the scars are frequently subtle or non-specific.[301] Scars due to external traumatic injuries (sharp objects, blunt objects, thermal or electrical sources) result when there is penetration through the entire thickness of the skin. A scar results from the response of the body to repair the injury. Scars may or may not reflect the nature of the object that caused the injury. It may not be possible to extrapolate the appearance of the scar to the type of object that caused the injury. In addition, many scars are non-specific, in that scars are consistent with injuries made by a multitude of objects. It is not possible to determine the age of scars

[294]  Kristine Amris & Patricia Roche, Pain and Disability Rating in Torture Survivors: Preliminary Findings (2002) (poster presented at the 10th World Congress on Pain, San Diego, CA).

[295]  AMNESTY INTERNATIONAL, A GLIMPSE OF HELL: REPORTS ON TORTURE WORLDWIDE (Duncan Forrest, ed., 1996).

[296]  Douglas Jehl, *Files Show Rumsfeld Rejected Some Efforts to Toughen Prison Rules*, N.Y. TIMES, June 23, 2004, *available at* http://www.nytimes.com/2004/06/23/politics/23PENT.html?ex=1212292800&en=7b9c2e7d547ca113&ei=5070.

[297]  *Istanbul Protocol*, *supra* note 7, § 193, at 36.

[298]  "Palestinian-type suspension" consists of suspending the victim with one hand facing forward and the other one facing backwards. Grethe Skylv, *Physical Sequelae of Torture*, in TORTURE AND ITS CONSEQUENCES — CURRENT TREATMENT APPROACHES 39 (Metin Basoglu, ed. 1992).

[299]  *Istanbul Protocol*, *supra* note 7, § 209, at 38.

[300]  *Id.*, § 228, at 41.

[301]  Alejandro Moreno & Michael A. Grodin, Photo Essay, *The Not-So-Silent Marks of Torture*, 284 JAMA 538 (2000).

by their appearance. Further, since most lesions heal within about six weeks of torture, leaving no scars or non-specific scars, a characteristic history of the acute lesions and their development until healing might be the only support of an allegation of torture.[302]

In some cases, medical diagnosis tests are valuable supporting evidence.[303] However the absence of a positive diagnostic test result must not be used to suggest that torture did not occur.[304]

In conclusion, it is important to note that, "the absence of...physical evidence should not be construed to suggest that torture did not occur, since such acts of violence against persons frequently leave no marks or permanent scars."[305]

---

[302] *Istanbul Protocol*, *supra* note 7, § 2188, at 35.

[303] *Id.*, § 232, at 42.

[304] *Id.* at 42.

[305] *Id.* at 31.