APPROVED FOR PUBLIC FILING BY THE CSO

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AHMED ZAID SALEM ZUHAIR,

     *Petitioner*,

v.

                               Civil Action No. 08-864 (EGS)

GEORGE W. BUSH, ROBERT GATES,
REAR ADM. DAVID M. THOMAS, and
ARMY COL. BRUCE VARGO,

     *Respondents*.

## PETITIONER'S RESPONSE TO GOVERNMENT'S BRIEF REGARDING PRELIMINARY AND PROCEDURAL FRAMEWORK ISSUES

Petitioner Ahmed Zaid Salem Zuhair, through his attorneys, submits this Response to the Government's Brief Regarding Preliminary and Procedural Issues filed on August 12, 2008. In its Order of July 31, 2008, this Court enumerated eight questions to be addressed in this procedural briefing. This Response addresses each of these questions in turn.

## INTRODUCTION

Petitioner has been detained by the United States for over six years, without charge, trial or due process. Mr. Zuhair is a civilian and has never participated in armed activities against the United States or its allies. To protest his unlawful detention, Mr. Zuhair has been on hunger strike for over three years, longer than anyone else at Guantánamo. In late 2001, he was abducted in Pakistan, away from any battlefield, while traveling on business and visiting his wife's family. Mr. Zuhair was detained and tortured in Pakistan, and was subsequently rendered to U.S. custody in Afghanistan, where he was also tortured and subjected to cruel, inhuman, and

degrading treatment.  Mr. Zuhair was transferred to Guantánamo Bay, Cuba in June 2002, where he has been abused by guards as well as medical staff and subjected to all manner of debasing and humiliating treatment.

## I.    STRUCTURE OF HABEAS PROCEEDINGS

In its brief to this Court, the Government seeks to deny Mr. Zuhair the full and fair proceeding to which he his constitutionally entitled.  In *Boumediene v. Bush*, 128 S.Ct. 2229, 2275 (2008), the Supreme Court declared that "the costs of delay can no longer be borne by [Guantánamo detainees] who are held in custody.  The detainees in these cases are entitled to a prompt habeas corpus hearing."  From the founding of the Republic through modern times, habeas corpus has served as a flexible remedy aimed at assessing the lawfulness of custody.  In working through preliminary issues, this Court should be guided by the overriding principle of conducting a prompt and meaningful habeas hearing.  That principle, rationally applied within the context of this case, should result in reasonable discovery so Petitioner can prepare his case, an evidentiary hearing, a reasonable right to confront the Government's witnesses, and a significant burden imposed on the Government to justify Petitioner's continued detention after all these years.

### A.  This Petition Is Governed By The Habeas Corpus Statute, 28 U.S.C. § 2241

Petitioner has invoked the Court's jurisdiction pursuant to 28 U.S.C. § 2241(c)(1), which authorizes challenges to "custody under, or by color of authority of the United States."  This provision codifies §14 of the Judiciary Act of 1789, and thus mirrors the core common law process available to challenge the factual and legal authority to detain, *see INS v. St. Cyr*, 533 U.S. 289, 305 (2001), which the *Boumediene* Court confirmed exists for the Guantánamo petitioners.   128 S.Ct. at 2262, 2274; *see also Rasul v. Bush*, 542 U.S. 466, 484 (2004)

("[H]old[ing] that § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base.").

Petitioner also invokes § 2241(c)(3), which separately authorizes challenges to "custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). In *Boumediene*, the Supreme Court held that the fundamental constitutional right to habeas corpus protected by the Suspension Clause applies to Guantánamo, *see Boumediene*, 128 S. Ct. at 2253–58, rejecting the formalistic approach of the D.C. Circuit, which had declined to recognize any fundamental rights for persons detained "without property or presence in the United States." *Boumediene v. Bush*, 476 F.3d 981, 991 (D.C. Cir. 2007). Thus, in addition to the common law habeas rights protected by § 2241(c)(1), the Petitioners are now entitled to fundamental rights throughout the adjudication of their petitions, including the right to due process. *See In re Guantánamo Bay Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005) (Green, J.) ("[T]here can be no question that . . . the right not to be deprived of liberty without due process of law . . . is one of the most fundamental rights recognized by the U.S. Constitution.").

The Supreme Court has clearly stated that MCA § 7, which purported to repeal statutory habeas authority over detainees in Guantánamo, is unconstitutional. *Boumediene*, 128 S. Ct. at 2275 ("The only law we identify as unconstitutional is MCA § 7, 28 U.S.C.A. § 2241(e) (Supp. 2007)."). The Government in its opening brief mentions that the MCA "repealed" section 28 U.S.C. § 2241(e) without even discussing *Boumediene*'s invalidation of that repeal. Gov't Br. 6-7. Instead, the Government contends that notwithstanding *Boumediene*, Guantánamo detainees are limited only to "constitutional habeas," which it interprets as a form of common law habeas as it existed in 1789. According to the Government, "the only appropriate procedures are those

required by the Constitution itself" and therefore any development in procedure after 1789 is not available to Guantánamo detainees.  Gov't Br. 7.

The Government's position is flawed for multiple reasons.  The decision in *Boumediene* revives this petitioner's statutory right to habeas under 28 U.S.C. § 2241, which incorporates its own procedural framework.  In *Rasul v. Bush*, 542 U.S. 466, 483-84 (2004), the Supreme Court held that § 2241 applies to Guantánamo detainees.  In response to that decision, the executive branch persuaded Congress to enact the Detainee Treatment Act of 2005 (DTA).  Section 1005(e)(1) of the DTA amended § 2241 to eliminate habeas rights for Guantánamo detainees.  The Supreme Court then held that DTA § 1005(e)(1) did not apply to pending habeas petitions.  *Hamdan v. Rumsfeld*, 548 U.S. 557, 576-77 (2006). The Executive next persuaded Congress to enact the Military Commissions Act of 2006 (MCA).  Section 7(a) of the MCA again amended 28 U.S.C. § 2241, superseding the DTA-borne amendment, to include the following provision:  "No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

The Supreme Court in *Boumediene* expressly declared MCA § 7 unconstitutional.  128 S. Ct. at 2274.  Prior to enactment of MCA § 7, *Rasul* and *Hamdan* made clear that Guantánamo detainees have a right to invoke the statutory habeas corpus procedure under 28 U.S.C. § 2241.  This Court must now read § 2241 without the clause added by MCA §7.  A plain reading of that statute without the unconstitutional provision, as confirmed by *Rasul*, gives Guantánamo detainees a statutory right of habeas corpus.  The Court did not parse § 7 or limit its holding to "constitutional habeas."  *See id.* at 2240 ("§ 7 of the [MCA] . . . operates as an unconstitutional

4

suspension of the writ."); *id.* at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."); *id.* at 2275 ("The only law we identify as unconstitutional is MCA § 7."). The decision in *Boumediene* thus rendered MCA § 7 void in its entirety.[1]  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void."). This is especially so because nothing in the DTA or MCA purported to modify statutory habeas procedures in the event that the repeal proved ineffective. Indeed, the Supreme Court in *Boumediene* expressly noted the absence of such a provision, pointing out that neither the MCA nor the DTA contain any "saving clause." 128 S. Ct. at 2266.

As a result, lower courts must apply the statute without the unconstitutional provision. *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1871) (disregarding unconstitutional statute that divested court of jurisdiction and reinstating judgment obtained under prior statutory scheme); *accord Armstrong v. United States*, 80 U.S. (13 Wall.) 154 (1871) (same); Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1387 (1953) ("If the court finds that what is being done is invalid, its duty is simply to declare the jurisdictional limitation invalid also, and then proceed under the general grant of jurisdiction."). This Court should not narrow or modify the Supreme Court's express holding. Accordingly, this case is in the same position it would be if the MCA were never enacted: subject to the statutory procedures that Congress enacted, which set out "a

---

[1] The Government misreads Justice Souter's separate statement that "now there must be constitutionally based *jurisdiction* or none at all," *Boumediene*, 128 S. Ct. at 2278 (concurring opinion) (emphasis added), to suggest that a reference to *jurisdiction* somehow alters the statutory *procedures* applicable here. The Government's argument is meritless. The Suspension Clause did indeed require that there be "jurisdiction" in these cases, which led to the conclusion that MCA § 7 (which expressly barred jurisdiction) was invalid and that section 2241 (which confers jurisdiction) was fully restored. But neither the Court nor Justice Souter suggested that, following the reinstatement of jurisdiction, habeas procedures were *limited* to those protected under the Suspension Clause. A turn of phrase in a concurrence regarding the Constitution's effect on "jurisdiction" cannot, without more, rewrite the statutory procedures enacted by Congress in section 2241 *et seq.*

very specific process that the court and parties must follow." *Khalid*, 355 F. Supp. 2d at 323 n.15 (Leon, J.) (citing 28 U.S.C. §§ 2241 *et seq.*).

Even if § 2241 did not apply directly, the procedural framework developed under that statute should apply as a matter of discretion. The Government's position that *procedural* developments in habeas are frozen as of 1789 is absurd. Improved procedures give courts a better means of reaching the correct result under the substantive law, and it would be foolish to repudiate those procedures because they were unknown in 1789. The fact that discovery was not available until 1939 is precisely the point. *See infra* Part II.E.1 Electric lights and word processors also were unknown in 1789, but "constitutional habeas" in 2008 does not require hearings by candlelight or briefs written in longhand with quill pens. The Court should invoke the procedural mechanisms adapted for jurisprudence in the modern world. Those mechanisms are outlined in the following section.

**B. The Federal Habeas Corpus Statutes At 28 U.S.C. §§ 2243-48 Provide The Basic Procedural Framework To Govern This Case**

Regardless of the source of the detainee's substantive rights, the habeas corpus statute sets out the basic framework for adjudicating all challenges to federal executive detention brought under § 2241(c).[2] Indeed, a portion of the framework has already been applied in Guantánamo cases. In the consolidated cases before Judge Green and in many later Guantánamo cases, including this one, the Government was ordered to produce "the return certifying the true cause of the detention," in accordance with 28 U.S.C. § 2243, ¶ 3. The next step in the statutory process entitles the petitioner to traverse the return or, in other words, to "deny any of the facts set forth in the return or allege any other material facts." *Id.* § 2243, ¶ 6; *cf.* § 2248

---

[2] *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion) ("[A]ll agree that § 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review.").

("[A]llegations of a return . . . *if not traversed*, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true.") (emphasis added). Amendments to the return or the traverse are permissible by leave of court, *id.* § 2243, ¶ 7, and this Court has already issued an Order allowing Petitioner to file a traverse on or before October 6, 2008. The statute also expressly authorizes the taking of discovery in certain circumstances. *Id.* § 2246; *see also infra*, Part II.E.1 Ultimately, the Court must "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243, ¶ 8. Remedies available to the court include a discharge where, "on the facts admitted, it may appear that, as a matter of law, the prisoner is entitled to the writ." *Walker v. Johnston*, 312 U.S. 275, 284 (1941); *see also Boumediene*, 128 S. Ct. at 2266.

Although the statute provides the basic operating structure to manage these cases, courts often augment that structure as required by the circumstances of a given case. Ultimately, because "there is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus," courts must fill in the "necessary facilities and procedures for an adequate inquiry." *Harris* v. *Nelson*, 394 U.S. 286, 292, 300 (1969). The Supreme Court has explained:

> The scope and flexibility of the writ—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes—have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

*Id.* at 291.

### C. The *Hamdi* Plurality's Dicta Is Neither Controlling Nor Limiting

In place of the governing habeas statute, the Government seeks to impose a narrow and rigid "framework" that it argues is compelled by the plurality opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). The proposed framework would give the Government advantages not authorized by statute or permitted by due process, including an undefined presumption in favor of the Government's evidence, a presumption in favor of hearsay, and a sweeping prohibition against discovery. The Government's attempt to fashion a *Hamdi* "framework" out of the suggestive dicta of a plurality of the Supreme Court cannot be controlling here or limit this Court's authority to establish an appropriate framework for adjudicating Mr. Zuhair's habeas petition.

The Supreme Court in *Boumediene* has flatly rejected the argument that the *Hamdi* plurality's suggested procedures are binding precedent in these cases. "Setting aside the fact that the relevant language in *Hamdi* did not garner a majority of the Court, it does not control the matter at hand." *Boumediene*, 128 S. Ct. at 2269. Indeed, those procedures were not necessarily binding in *Hamdi* itself: the Court did not say, for instance, "hearsay is admissible." It said, "Hearsay . . . *may* need to be accepted as the most reliable evidence from the Government in such a proceeding." 542 U.S. at 533-34 (emphasis added).

The *Hamdi* dicta is rendered all the less persuasive as a result of Justice Souter's concurrence. Justice Souter, joined by Justice Ginsburg, refused to accept the plurality's suggestion that the Government could be entitled to a presumption or that the burden of proof could fall on the petitioner. *See* 542 U.S. at 553 (Souter, J., concurring) ("It should go without saying that in joining with the plurality to produce a judgment, I do not adopt the plurality's resolution of constitutional issues that I would not reach. . . . I do not mean to imply agreement

that the Government could claim an evidentiary presumption casting the burden of rebuttal on Hamdi.").[3]

There is thus no rigid "*Hamdi* Framework" that can be applied across the board to all "war on terror" habeas cases. Rather, as stated in Judge Traxler's controlling opinion in the Fourth Circuit's recent *en banc* decision in *Al-Marri v. Pucciarelli*, *Hamdi* sets forth *one* particular fact-based application of a *Mathews v. Eldridge* due process balancing framework. *See Al-Marri v. Pucciarelli*, 534 F.3d 213, 2008 WL 2736787, at *47 (4th Cir. July 15, 2008) (Traxler, J., concurring) (noting that the *Hamdi* plurality does not impose "a cookie-cutter procedure appropriate for every alleged enemy-combatant."). As *Boumediene* recognized, habeas is an "adaptable remedy. Its precise application and scope changed depending upon the circumstances." 128 S. Ct. at 2267. The plurality wisely left the details to trial judges, for appropriate balancing of the competing interests in light of the circumstances prevailing at the time.

In any event, even the *Hamdi* plurality dicta does not support the Government's position. The balancing test of *Mathews v. Eldridge*, as adopted by the Supreme Court in *Boumediene* and in the plurality opinion in *Hamdi*, requires consideration of "the risk of an erroneous deprivation of [a liberty interest] and the probable value, if any, of additional or substitute procedural safeguards." *Boumediene*, 128 S. Ct. at 2268 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335

---

[3] Nothing in *Marks v. United States*, 430 U.S. 188 (1977), lends any support to the Government's position that dicta in a plurality opinion—dicta specifically disclaimed by two concurring justices whose votes were necessary to the judgment—is transformed into binding precedent by Justice Thomas's dissent. Gov't Br. 10. In *Marks*, the Supreme Court observed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who *concurred in the judgments* on the narrowest grounds." 430 U.S. at 193 (emphasis added; citations and quotations omitted). Justice Thomas *dissented* in *Hamdi*. His opinion cannot be used to transform a plurality opinion into a binding precedent. *See also King* v. *Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*) ("*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions.").

(1976)); *see also Hamdi*, 542 U.S. at 529. Mr. Zuhair's liberty interest has grown as the years of indefinite detention have worn on, while the Government's national security interest with respect to this particular detainee, if it ever existed, has become weaker and more remote.

It is the Government's burden to show—not through generalized and unsupported assertions, but through a specific showing targeted to a particular petitioner's case—that any deviation from the "normal way" is warranted. *Al-Marri*, 2008 WL 2736787 at *47 (Traxler, J., concurring). Although the specific procedures warranted in any one case may differ depending on the circumstances, certain differences between this case and *Hamdi* can be identified that suffice to reject the Government's blanket approach here.

First, the facts of the two cases show that the risk of misclassifying Hamdi was much lower: Hamdi was captured in a "foreign combat zone" allegedly carrying an assault rifle as part of a "Taliban unit," 542 U.S. 512-13, 523; *see also id.* at 549 (Souter, J., concurring) (Hamdi was allegedly "taken bearing arms on the Taliban side of a field of battle"). In contrast, Mr. Zuhair's abduction had no nexus to any armed conflict: he was traveling on business and visiting his wife's family in a major city in Pakistan far from any battlefield.

Second, the definition of "enemy combatant" applied by the Court in *Hamdi* was much narrower and therefore less susceptible to erroneous application than the definition the Government applied in Petitioner's Combatant Status Review Tribunal (CSRT). In *Hamdi*, the Court limited the definition to a person who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in armed conflict against the United States there." *Hamdi*, 542 U.S. at 516. Through the CSRT process, Mr. Zuhair has been improperly held subject to an expansive definition of "enemy combatant" purportedly authorizing the detention of a person picked up anywhere in the world, and for mere "support" of

10

forces "hostile to the United States," even if that support was unintentional. *See In re Guantánamo Bay Detainee Cases*, 355 F. Supp. 2d 443, 475 (D.D.C. 2005) (noting that under the "enemy combatant" definition employed in Guantánamo, the Government claims authority to detain "a little old lady from Switzerland who writes checks to what she thinks" is an Afghan orphanage but is "really a front to finance al Qaeda"). If the Government is correct that even unintentional conduct can justify indefinite detention under the laws and Constitution of the United States (a proposition that this Court should reject), then the "risk of error" in these cases is high, indeed. *Boumediene*, 128 S. Ct. at 2270. Due process therefore requires more protective procedures than the *Hamdi* plurality suggested "may" be permitted in certain circumstances.

Finally, the Government's attempts to transform the *Hamdi* plurality's suggestions into a catch-all limitation on Mr. Zuhair's fundamental rights stand in stark contrast to recent Supreme Court precedent. It should now be clear that detainees held at Guantánamo have fundamental due process rights. Relying again upon *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a case distinguished away once by *Rasul* and again by *Boumediene*, the Government claims that "*Boumediene* did not upset the well-established holding that the Fifth Amendment and other individual rights secured by the Constitution do not apply to alien enemy combatants lacking any voluntary connection to the United States." Gov't Br. 11. Thus, the Government implies, whatever restricted procedures were available for Hamdi "must be good enough for an alien." Gov't Br. at 8. The Government's premise is incorrect.

Judge Green ruled in the cases previously transferred to her for coordinated consideration that the detainees at Guantánamo have rights under the Fifth Amendment. *See In re Guantánamo Bay Detainee Cases*, 355 F. Supp. 2d at 465. The Government appealed that ruling, but the applicability of the Fifth Amendment was not addressed on appeal. It is therefore

the law of the case in the cases in which it was entered.  *See Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) ("[T]he same issue presented a second time in the same case in the same court should lead to the same result.") (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*)). But even as to the cases that were not before Judge Green (such as this one), the Supreme Court in *Boumediene* relied heavily on the line of cases, including the *Insular Cases*, that applied fundamental rights in territories controlled by the United States.  *See Boumediene*, 128 U.S. at 2254-57, and cases cited therein; *see also id.* at 2261 ("In every practical sense Guantánamo is not abroad; it is within the constant jurisdiction of the United States."). Thus, detainees at Guantánamo are entitled to fundamental rights, and there is no right more fundamental than the right not to be deprived of liberty without due process of law.  *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *In re Guantánamo Bay Detainee Cases*, 355 F. Supp. 2d at 465.

For all these reasons, this Court is not confined by *Hamdi* to apply a set of procedures outlined in dicta by a plurality decision in a different context.  Instead, *Boumediene* makes clear that the framework for these proceedings is governed by the habeas corpus statute, 28 U.S.C. § 2241 *et seq*.

## II.  RESPONSE TO THIS COURT'S OTHER QUESTIONS

### A. The Authority to Detain Here Is Defined By the AUMF and the Lawfulness of Detention Must Be Established Beyond a Reasonable Doubt or, at the Very Least, Clear and Convincing Evidence

#### 1. *The President's Detention Power Is Defined By the AUMF and Must Be Interpreted According to the Laws of War and Congress's Constitutional Prerogatives*

The President's military detention power here is only that power recognized by the laws of war as incidental to the powers conferred on him by the Authorization for Use of Military

Force (AUMF). Such power was limited to the power to detain enemy soldiers or civilians who directly participated in combat or contributed to the September 11 attacks. Mr. Zuhair is neither. Accordingly, he "is in custody in violation of the … laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

When Congress delegates military power to the Executive without gloss, the laws of war define the scope of that power. *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2774 (2006) (relying on law of war to interpret Article 21 of Uniform Code of Military Justice); *Hamdi v. Rumsfeld*, 542 U.S. at 517-9 (plurality relies on international law of war definition of enemy combatant); *id.* at 550 (concurring justices find detention unauthorized because of noncompliance with Geneva conventions); *In re Quirin*, 317 U.S. 1, 27-8 (1942) (Court has "recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights, and duties of enemy nations as well as enemy individuals.").

Here, the relevant enabling legislation was the AUMF, which authorized the President:

> to use all necessary and appropriate force against those nations, organizations, or persons he determines *planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001*, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

AUMF § 2(a) (emphasis added).[4] Because the authorization included no direct detention power, the only detention authority delegated to the Executive was the implicit power recognized under the laws of war, limited to the enemy Congress defined.

---

[4] The legislative record confirms the AUMF's limitation to entities and persons connected to the attacks of September 11. *See, e.g.,* 147 Cong. Rec. S9417 (Sen. Feingold) (the AUMF "is appropriately limited to those entities involved in the attacks that occurred on September 11") (daily ed. Sept. 14, 2001); *id.* at S9416 (Sen. Levin) ("[The AUMF] is limited to the nations, organizations, or persons involved in the terrorist attacks of September 11.").

Detention power exists first and foremost as to combatants, *i.e.* persons who join "the military arm of the enemy government."  *Hamdi*, 542 U.S. at 519; *see also Quirin*, 312 U.S. at 37-8.  Civilians may also be treated as combatants if and for such time as they actually "take … active part in the hostilities."  Third Geneva Convention, art. 3, 6 U.S.T. 3316.[5]  Our Supreme Court has always recognized this distinction between civilians who actively engage in hostilities and those who may support or sympathize with the enemy but do not fight on its behalf.  It is why Hamdi, alleged to have carried a Kalashnikov against U.S. troops on an Afghan battlefield, was subject to military detention, *Hamdi*, 542 U.S. at n.1, and Milligan, the Confederate sympathizer who conspired with the enemy and sought the overthrow of the government during wartime, but did not engage in battlefield activity, was not.  *Ex parte Milligan*, 71 U.S. 2 (1866).  This insistence on distinguishing between combatants and non-combatant civilians reflects the framers' abhorrence of unbridled executive power.  *See, e.g., Loving v. United States*, 517 U.S. 748, 760 (1996) ("[T]he Framers harbored a deep mistrust of executive military power and military tribunals."); *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 14 (1955) ("[A]ssertion of military authority over civilians cannot rest on the President's power as commander-in-chief, or on any theory of martial law.").  Congress's refusal to authorize force against civilians in circumstances not authorized by the laws of war remains conclusive.[6]

---

[5] The laws of war also authorize the internment of civilians in an occupied territory who are unaffiliated with enemy forces but who may pose a threat to the security of the occupying power.  Fourth Geneva Convention, art. 42, 6 U.S.T. 3516.  Since Mr. Zuhair was captured in Pakistan, hundreds of miles from any armed conflict, and is presently imprisoned in Cuba, that provision is clearly inapplicable here.

[6] Of course, civilians may be *punished* for activities short of active participation in hostilities, even though they cannot be targeted with *military force*. Unlike the privileged belligerent, the civilian who engages in violence may be liable for crimes such as murder and assault. Such activity may or may not have anything to do with terrorism (another crime), but all such activities may be (and at all relevant times have been) criminalized by Congress. *See, e.g.*, 28 U.S.C. §§ 2339B (material support to foreign terrorist organization); 2339C (financing of terrorist acts).

Addressing the scope of the detention power is especially important in Mr. Zuhair's case, as several of the allegations against him made by the CSRT even if true—which they emphatically are not—could not possibly merit inclusion under the terms of the AUMF because they are unconnected in any way to the 9/11 attacks. Mr. Zuhair was abducted in Pakistan. Other than when he was forcibly taken to Afghanistan and held there by U.S. authorities, he has never traveled, let alone participated in armed conflicts there, nor has he ever been a member or supporter of any terrorist group. Most egregious is the allegation against Mr. Zuhair—which he also vigorously denies on the facts—concerning a 1997 bombing in Mostar, Bosnia-Herzegovina which took place years before 9/11, has never been claimed by or attributed to any terrorist group, and did not target any persons, property, or interests of the United States.

In this context, the Government's demand for "substantial deference" to Executive Branch interpretation of the AUMF cannot be used to support an overbroad interpretation of detention authority, misreads binding precedent, and ignores Congress's constitutional prerogatives. Gov't. Br. at 15. An executive agency's power is limited by Congressional delegation. *See Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374 (1986); *Railway Labor Ass'n v. National Mediation Board*, 29 F.3d 655 (D.C. Cir. 1994) (*en banc*). Quasi-legislative power (for example, expanding existing law as to who may be detained by the military) must be "rooted in a grant of … power by the Congress and subject to limitations which that body imposes." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). As the D.C. Circuit has explained:

> [T]he board's position in this case amounts to the bare suggestion that it possesses *plenary* authority to act within a given area simply because Congress has endowed it with some authority to act in that area. We categorically reject that assertion. Agencies owe their capacity to act to the delegation of authority, either express or implied, from the legislature.

*Railway Labor*, 29 F.3d at 670 (where statute conferred standing on certain persons, but not on carriers, agency had no "gap-filling" power to confer standing on carriers).

The Government's reliance on the second step of the analysis in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984) to argue that it can proffer any "reasonable" interpretation of the AUMF is improper here.[7]  Gov't Br. 16.  "To suggest . . . that *Chevron* step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power (*i.e.*, when the statute is not written in 'thou shalt not' terms) is both flatly unfaithful to the principles of administrative law outlined above, and refuted by precedent." *Railway Labor*, 29 F.3d at 671.[8]

The Government's sweeping assertion that the President's commander in chief power provides a source of detention authority here entirely outside the AUMF provides no limiting principle and is patently untenable.  Gov't Br. 17.  The commander in chief power does not displace Congress's constitutional powers to name the enemy in warfare and to "make rules concerning captures on land and water."  U.S. Constitution art. I, § 8, cl. 11; *see Hamdi*, 542 U.S. at 552 (Souter, J., concurring in part, dissenting in part, concurring in the judgment).  Congress was exquisitely careful in naming the enemy here.  When the President sought leave to use force against persons unconnected with September 11 "to deter and pre-empt any future acts of terrorism and aggression against the United States," Congress declined, and instead defined the

---

[7] According to "step two" of the analysis in *Chevron*, where Congress is silent as to a specific issue but has delegated general authority, an agency may make a reasonable construction of the enabling statute and fill that gap. *Id.* at 844.

[8] The D.C. Circuit has repeatedly emphasized that the *Railway Labor* rule is the law of this Circuit.  *See, e.g., Aid Ass'n for Lutherans v. U.S.P.S.*, 321 F.3d 1166, 1174-75 (D.C. Cir. 2003) (rejecting Postal Service's position that regulations were permissible because statute did not expressly foreclose them); *Halverson v. Slater*, 129 F.3d 180, 187 (D.C. Cir. 1997) (silence did not authorize regulation); *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 46 F.3d 82, 90 (D.C. Cir. 1995) (same); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("We refuse to presume a delegation of power merely because Congress has not express withheld such power.").

enemy only by express reference to the September 11 attacks.  *See* Proposed Joint Resolution Authorizing the Use of Force provided by the President to Congress, *available at* 147 CONG. REC. S9949-51 (daily ed. Oct. 1, 2001) (read into record by Sen. Byrd).  Congress defined the enemy in one way and not another, and authorized the use of military force (including detention) against that enemy and not another.  The Department of Defense has no power to revoke this constitutional prerogative by rule.

### 2.   *The Government's Allegations Must Be Carried Beyond a Reasonable Doubt or, at a Minimum, By Clear and Convincing Evidence*

*Boumediene* made clear that the ultimate burden of persuading the Court that Mr. Zuhair is lawfully imprisoned rests with the Government, although it left for the district court to decide the "*extent* of the showing required of the Government in these cases."   128 S. Ct. at 2271 (emphasis added).  As the Supreme Court has noted, the choice of a standard of proof is ultimately an allocation of the risk of error in factfinding:

> There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt.

*Speiser v. Randall*, 357 U.S. 513, 525-26 (1958); *see also In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring) ("[A] standard of proof represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.").  In addition to society's interest in being confident of the result, Mr. Zuhair has at stake an "interest of immense importance, both because of the possibility that he may lose his liberty upon [a determination of enemy combatant

status] and because of the certainty that he would be stigmatized by the [determination]." 397 U.S. at 363. When interests of such transcending value are implicated, proof beyond a reasonable doubt is the starting point of our jurisprudence.

Mr. Zuhair's situation of potentially indefinite imprisonment is for all practical purposes indistinguishable from a criminal sentence, which would require proof beyond a reasonable doubt. As in a criminal case, the United States has "a substantial and fundamental interest in assuring accuracy in these cases," not least because the "'moral force'" of U.S. law should not be "'diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.'" *In re Ballay*, 482 F.2d 648, 663 (D.C. Cir. 1973) (quoting *In re Winship*, 397 U.S. 358, 363-364 (1970)). Given the Government's overwhelming ability to gather and present evidence in cases of actual wrongdoing, the Court should have the highest confidence in the Government's evidence before consigning a Petitioner to unlimited confinement and isolation. There is accordingly a strong case for requiring proof beyond a reasonable doubt. At the very least, however, Mr. Zuhair's claims should not be dismissed on *less* evidence than is required for pretrial detention, deportation, or civil commitment, namely clear and convincing evidence.

Although proof beyond a reasonable doubt is the hallmark of criminal cases—and Mr. Zuhair has never been charged with a crime—the standard of proof is appropriate here where "loss of liberty and stigma" and the interests of the Petitioners are of such magnitude that they should be protected by the "standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Addington v. Texas*, 441 U.S. 418, 423 (1979). Mr. Zuhair's stake is no less important than that of a criminal defendant: He has already been imprisoned for over six years and stands to be imprisoned "for the duration of hostilities that may last a generation or more," such that the risk of error is "too significant to ignore." *Boumediene*,

128 S. Ct. at 2270.  And the Supreme Court identified a "considerable risk of error" in the Government's determination of Mr. Zuhair's detainability, given the Government's failure to provide any meaningful prior review proceeding.  *Id.*  The Government's own personnel have admitted that their detention decisions have been flawed: as early as 2002, the former Guantánamo  commander stated that "[s]ometimes we just didn't get the right folks." Christopher Cooper, *Detention Plan: In Guantánamo, Prisoners Languish in a Sea of Red Tape*, Wall St. J., Jan. 26, 2005, at A1, A10.[9]

The interests in these cases support a higher standard of proof than the pretrial detention context addressed in *United States v. Salerno*, 481 U.S. 739 (1987).  *Salerno* upheld a clear and convincing standard in significant part because the duration of pretrial detention is not indefinite; it is "limited by the stringent time limitations of the Speedy Trial Act." *Id.* at 747.  Here, the detention is indefinite, potentially lasting a lifetime. Equally important to *Salerno* was the limited, narrow category of persons to whom detention could apply. *Id.* at 750.  Here, the scope of the Government's enemy combatant definition is extremely broad and (Mr. Zuhair would argue) unlawfully so.  Considering the scope, breadth, and duration of Mr. Zuhair's detention, this Court should not condone it absent the highest level of confidence in the Government's proof.

At the very least, the Government should be held to proof by clear and convincing evidence.  As the D.C. Circuit has explained: "in situations where the various interests of society are pitted against restrictions on the liberty of the individual, a more demanding standard is

---

[9] *See also Frontline: Son of Al Qaeda* (PBS television broadcast, Apr. 11, 2004), transcript available at http://www.pbs.org/wgbh/pages/frontline/shows/khadr/interviews/khadr.html (quoting CIA operative who had spent a year undercover at Guantánamo as estimating that "only like 10 percent of the people that are really dangerous, that should be there and the rest are people that don't have anything to do with it, don't even, don't even understand what they're doing here"); Tom Lassetter, *America's Prison for Terrorists Often Held the Wrong Men*, McClatchy Newspapers, June 15, 2008, *available at* http://www.mcclatchydc.com/detainees/story/38773.html (quoting U.S. intelligence analyst who stated that "[o]ver about three years, I assessed around 40 of these individuals, mostly Afghans. . . . I only can remember recommending that ONE should be kept at GITMO").

frequently imposed, such as proof by clear, unequivocal and convincing evidence." *In re Ballay*, 482 F.2d 648, 662 (D.C. Cir. 1973). Indeed, the Supreme Court has repeatedly held that, where the Government seeks to impose serious deprivations of liberty, the Government must justify the sufficiency of its case by clear and convincing evidence. *See Woodby v. INS*, 385 U.S. 276, 286 (1966) (deportation); *Schneiderman v. United States*, 320 U.S. 118, 122-23 (1943) (denaturalization); *Kansas v. Hendricks*, 521 U.S. 346, 361-62 (1997) (indefinite civil commitment of sex offender); *Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992) (continued commitment of criminal defendant found not guilty by reason of insanity); *Salerno*, 481 U.S. at 750 (pretrial detention based on dangerousness).

Mr. Zuhair faces an even more serious deprivation of liberty than persons in these categories. Unlike pretrial detention, Mr. Zuhair's imprisonment has no "maximum length," nor was there a "prompt" proceeding where the Government was required to justify detention in "a full-blown adversary hearing." *United States v. Salerno*, 481 U.S. 739, 747, 751 (1987). Unlike removable aliens, whose deportability the Government must likewise prove by clear and convincing evidence, Mr. Zuhair has been deprived not of the right to live in the United States (which he has never sought), but the right to live *anywhere* but a cramped cell on an island prison. Unlike civilly committed persons confined within their home states where they may have contact with and visits from relatives and loved ones as well as access to newspapers and television, Mr. Zuhair is isolated and totally deprived of direct contact with anyone other than guards, interrogators, counsel, and (on rare occasion) other prisoners. This near-complete restraint, essentially without parallel in the American prison system, should not be allowed on a mere preponderance of the evidence. *See, e.g.*, *Woodby*, 385 U.S. at 285 (refusing to base

grievous deprivation of liberty "upon no higher degree of proof than applies in a negligence case").

With respect to the standard of proof, the Government has shown no basis for applying any standard less exacting than clear and convincing evidence. As the Supreme Court has held, lower standards (such as a preponderance) are reserved for "private suits" involving "a monetary dispute between private parties." *Addington v. Texas*, 441 U.S. 418, 423 (1979). This Court would not grant attorney's fees in a patent case without making a finding by clear and convincing evidence. *See, e.g.*, *Innovation Techs. Inc. v. Splash! Med. Devices, LLC*, 528 F.3d 1348, 1351 (Fed. Cir. 2008). Indefinite imprisonment at Guantánamo should not be doled out more easily.

The Government's arguments to the contrary rest on several incorrect assumptions. First, the Executive's actions have not been "taken with the full authority of Congress" (Gov't Br. 20)—indeed, the extent or lack of congressional authorization for detention is one of the very issues the Supreme Court remanded for consideration. *Boumediene*, 128 S. Ct. at 2277 (stating that "the content of the law that governs petitioners' detention" is "a matter yet to be determined"). Nor is it true that hearings are not "the norm" when the Government seeks to hold people for lengthy terms. Gov't Br. 20. *Hamdi* itself recognized that military regulations "dictat[e] that tribunals be made available to determine the status of enemy detainees who assert prisoner-of-war status." 542 U.S. at 538 (plurality opinion).[10] And again, references to "service

---

[10] Such tribunals are convened promptly after detention and near the location of capture, maximizing the availability of witnesses and evidence. *See, e.g.*, United States Forces, Korea Reg. 190-6, § 7-2.a ("normally . . . within 2 days of capture"), *available at* http://www.usfk.mil/usfk/Publications/Publication_Records_Reg_USFK.htm. Indeed, the U.S. military's first written procedures for such tribunals—developed during the Vietnam War, which was waged in significant part against non-traditional combatants—recognized a detainee's right to a "fair hearing" and the right to counsel as a "fundamental" component of such a hearing. U.S. Military Assistance Command, Vietnam, Directive 20-5, Annex A.7, reprinted in 62 Am. J. Int'l L. 754, 771 (1968). At such hearings, counsel for the detainee was allowed to present "witnesses, documents, affidavits, real evidence, and sworn or unsworn statements on behalf of the detainee." *Id.* annex A.14.i, 62 Am. J. Int'l L. at 773.

members" placing themselves "in harm's way on a daily basis" (Gov't Br. 20-21) have no place in cases where civilians, such as Mr. Zuhair, are taken into custody far from any battlefield by agents of a foreign state. Accordingly, the reasons that the Supreme Court has held require proof by clear and convincing evidence apply equally here.

**B. Petitioner is Entitled to an Evidentiary Hearing on Disputed Issues of Material Fact**

Mr. Zuhair's habeas petition and the CSRT record have already raised disputed issues of material fact. The Court should therefore hold an evidentiary hearing in order to resolve those factual issues. *See, e.g.*, *Walker v. Johnston*, 312 U.S. 275, 286 (1941) ("[I]f the petition, the return, and the traverse raise substantial issues of fact it is the petitioner's right to have those issues heard and determined in the manner the statute prescribes."); *accord Blackledge v. Allison*, 431 U.S. 63, 71-72 (1977); *see also Johnson v. Zerbst*, 304 U.S. 458, 466-67 (1938) (habeas petitioner is entitled to "a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention . . . [s]uch a judicial inquiry involves the reception of testimony"). Although proof may be offered by affidavit, disputes of fact generally cannot be decided on affidavits alone. *Jones v. Cunningham*, 313 F.2d 347, 349 n.4 (4th Cir. 1963) ("[I]ssues of fact presented in habeas corpus proceedings may not be established by ex parte affidavits."); *Campbell v. Minnesota*, 487 F.2d 1, 4 n.3 (8th Cir. 1973) (affidavits under 28 U.S.C. § 2246 "cannot be used to resolve substantial disputed questions of fact"); *Owens v. Frank*, 394 F.3d 490, 498 (7th Cir. 2005) ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive.") (internal quotation marks omitted).

The need for evidentiary hearings to resolve factual disputes is acknowledged throughout habeas corpus jurisprudence. *See Boumediene*, 128 S. Ct. at 2266 (explaining that § 2241 "accommodates the necessity for factfinding that will arise in some cases" by authorizing an

appellate court to transfer a case to a district court "whose institutional capacity for factfinding is superior to his or her own"); *Stewart v. Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When a factual issue is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process. This is a chief purpose of the habeas corpus proceeding."); *see also id*. at 342-43 (collecting cases).

As part of the traverse and hearing process, Mr. Zuhair is entitled to present any evidence that may reasonably bear on his "enemy combatant" designation, including evidence that a confession from the detainee or the statements of persons implicating him was procured by torture. *See Waley v. Johnston*, 316 U.S. 101, 104 (1942) (holding that petitioner is entitled to a hearing on "the material issue whether the plea was in fact coerced by the particular threats alleged"); *accord Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("There can be no doubt that, if the allegations [regarding coercion] contained in the petitioner's motion and affidavit are true, he is entitled to have his sentence vacated."); *see also Overholser*, 186 F.2d at 345 (ordering factual hearing "involving the taking of testimony followed by a decision based on the facts and the law" regarding the petitioner's sanity).

After much qualification and citation to numerous cases from the post-conviction criminal context, the Government ultimately concedes that substantial factual disputes between Petitioners and the Government should be the subject of evidentiary hearings with live testimony. Gov't Br. 36. The Government proposes, however, that hearings should be permitted only after written submissions (including, apparently, another round of pre-hearing briefing) and only after a presumption of the validity of the Government's evidence has been overcome to the extent that "the weight of the evidence supports the habeas petitioner." *Id.* 39. The Government appears to believe that a hearing should only be held to shore up the *Government's* position. The

Government has provided no authority for its cramped view of evidentiary hearings in the Executive detention context. Rather, in cases where factual issues remain in dispute, an evidentiary hearing is both the most fair and speedy way to resolve those issues.

Contrary to the Government's claim (Gov't Br.38), neither *Boumediene* nor *Hamdi* held that hearings were exceptional in this context. On the contrary, both cases recognized the importance of a hearing. *Boumediene*'s holding that a habeas court must possess "sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain" (*id.* at 2269) certainly includes the opportunity for a live hearing to resolve disputes of material fact. *See also Hamdi*, 542 U.S. at 533 (plurality opinion) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'") (quoting *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985)). The Government's claim that evidentiary hearings did not occur in habeas proceedings "in 1789 or for decades thereafter" (Gov't Br. 37) is both irrelevant (as discussed in Part I.A above) and incorrect; several habeas courts in both the United States and in England heard live testimony from petitioners and other witnesses.[11]

The Government's main argument against evidentiary hearings is that "soldiers must [not] be distracted from 'the serious work of waging battle' to provide eyewitness accounts of actions that occurred half a world away." Gov't Br. 38; *see also id* at 35, 39. This objection is decidedly premature, since Mr. Zuhair was not captured by and has not yet sought testimony

---

[11] *E.g.*, *Delaware v. Clark*, 2 Del. Cas. 578 (Del. Ch. 1820) (discharging petitioner based on affidavits and live testimony from third parties proving that petitioner had enlisted while intoxicated and without his father's authority); *Wilson v. Izard*, 30 F. Cas. 131, 131 (C.C.N.Y. 1815) (reviewing claim that petitioners were exempt from impressment as "alien enemies," which was "a fact not appearing on the return, but sworn to at the time of the allowance of the habeas corpus"); *R. v. Turlington*, 97 Eng. Rep. 741 (K.B. 1761) (discharging woman from custody after reviewing doctor's affidavit and conducting examination of petitioner's mental condition); *R. v. Lee*, 83 Eng. Rep. 482 (K.B. 1676) (considering petitioner's testimony on "oath in court" that "she went in danger of her life by [her husband]" and should be freed from his custody).

from any "soldier."   Given the remoteness of Mr. Zuhair from any actual "battle"—he was

captured in a busy marketplace in Lahore, Pakistan, hundreds of miles from any fighting—the

situation may never arise.  The Government's extreme hypotheticals cannot justify the denial of

a hearing.[12]

## C.  The Government Bears the Burden of Persuasion at All Times

The Court's role in reviewing executive detention on habeas is to assess the credibility of

the Government's evidence, not to presume it reliable or correct.  *Boumediene* reaffirmed the

importance of the Court's independent review of the Government's evidence: habeas necessarily

requires "authority to assess the sufficiency of the Government's evidence against the detainee."

128 S. Ct. at 2270.  In the executive detention context, where a Petitioner has received no prior

fair, adversarial review, the Court's first task is to perform a searching review of the

Government's evidence, in addition to hearing the controverting evidence submitted by the

Petitioner.  *See id.* (common law habeas courts "'examined the written depositions on which [the

petitioner] had been arrested or committed, and others even heard oral testimony to determine

whether the evidence was sufficient to justify holding him'") (quoting Dallin H. Oaks, *Legal

History in the High Court-Habeas Corpus*, 64 Mich. L. Rev. 451, 457 (1966)).[13]

---

[12] In urging the rarity of evidentiary hearings on habeas, the Government cites cases from the *post-conviction* context, where habeas petitions follow a jury trial and direct appeal.  *See* Gov't Br. 39-40 (citing *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007); *Harris v. Nelson*, 394 U.S. 286 (1969); *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999); *Tijerina v. Thornburgh*, 884 F.2d 861, 866 (5th Cir. 1989)).  Such cases provide no guidance for these habeas cases, which challenge the lawfulness of executive detention where no neutral factfinder has heard the facts of the petitioner's case.  *See Boumediene*, 128 S. Ct. at 2264 (postconviction review cases "give little helpful instruction (save perhaps by contrast) for the instant cases, where no trial has been held").

[13] Common law habeas courts afforded no deference to an executive official's view of the facts.  In *Ex parte Bollman*, 8 U.S. 75, 125 (1807), Chief Justice Marshall declined to defer to a magistrate's determination that the facts justified holding a pretrial detainee for treason; instead, the Court held five days of factual hearings during which it "fully examined and attentively considered" the relevant evidence and ordered the petitioner released.  Similarly, in *Ex parte Randolph*, 20 F. Cas. 242 (C.C.D. Va. 1833) (No. 11,558), Chief Justice Marshall reviewed the commitment of a civil debtor by local municipal authorities, took new evidence, and reached his own conclusions despite prior factual findings by executive officials.  *Accord Boumediene*, 128 S. Ct. at 2268 (citing *Ex*

Accordingly, the Government's return must consist not merely of "evidence," but of "*credible* evidence" that constitutes "*meaningful* support" for the Government's position that the petitioner should be imprisoned. *Hamdi*, 542 U.S. at 534 (plurality opinion) (emphasis added). The Court then assesses the reliability of the Government's evidence as presented. Because the burden is on the Government to prove that imprisonment is lawful, the writ must issue if the Government fails to present evidence that the Court is able to assess as "credible." *See, e.g.*, *Boumediene*, 128 S. Ct. at 2271 (recognizing that a "showing [is] required of the Government in these cases," but leaving the "extent of the showing" as a "matter to be determined").

The D.C. Circuit Court of Appeals' decision in *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977 (D.C. Cir. June 20, 2008), issued after *Boumediene*, provides valuable guidance regarding the skepticism with which the Court should treat the Government's evidence. In *Parhat*, the Court of Appeals (Garland, J., joined by Sentelle, C.J., & Griffith, J.) assessed the reliability and credibility of the Government's evidence and invalidated a determination by a CSRT that the petitioner was properly detained as an enemy combatant. Notably, *Parhat* reviewed the Government's case for detention under the DTA, which both the Supreme Court and the D.C. Circuit recognized involves *less* searching review than is required on habeas. *See Boumediene*, 128 S. Ct. at 2266 ("[T]he procedures adopted [in the DTA] cannot be as extensive or as protective of the rights of the detainees as they would be in a § 2241 proceedings."); *Parhat*, 2008 WL 2576977, at *15 ("The habeas proceeding will have procedures that are more protective of Parhat's rights than those available under the DTA."). Importantly, *Parhat*

---

*parte Robinson*, 20 F. Cas. 969, 971 (C.C. Ohio 1855) (No. 11, 935) (McLean, J.)). One court aptly summarized the state of the law:

> "[T]o require the court in its investigation to be governed by the decision of an executive officer, acting under instructions from the head of the department in Washington, would be an anomaly wholly without precedent, if not a flagrant absurdity."

*In re Jung Ah Lung*, 25 F. 141, 143 (D. Cal. 1885); *see also* Jared Goldstein, *Habeas Without Rights*, 2007 Wis. L. Rev. 1165 (2007) (Appendix) (collecting cases).

reviewed *only* the Government's evidence; it did not consider any evidence proffered by the prisoner.

The D.C. Circuit's analysis in *Parhat* makes clear that, even in the constrained context of DTA review, the Court may not presume that the Government's evidence is true, correct, or reliable. Rather, the court "must be able to assess the reliability of the [Government's] evidence ourselves," 2008 WL 2576977, at *12—a requirement no less applicable in habeas than under the more restrictive DTA. For instance, the Government relied in *Parhat* on "four government intelligence documents" asserting that a particular organization (the East Turkestan Islamic Movement (ETIM)) was associated with Al Qaeda. *Id.* at *11. In its submissions, the Government demanded that the D.C. Circuit pay "extraordinary deference" to its assertions regarding ETIM. Corrected Resp. Br. 32, *Parhat* (D.C. Cir. Mar. 6, 2008). Despite the Government's arguments, the D.C. Circuit refused to credit these "intelligence documents" because, *inter alia*, the Government did not provide "any of the underlying reporting upon which the documents' bottom-line assertions are founded, nor any assessment of the reliability of that reporting." *Parhat*, 2008 WL 2576977, at *11. Far from presuming them to be true, the D.C. Circuit held that the "bare assertions" in the intelligence documents could not support Parhat's imprisonment. *Id.*; *see also id.* (declining to credit government lists designating terrorist organizations because they did not "disclose[] the grounds upon which the designation was made").

Mr. Zuhair agrees with the Government that, unlike in post-conviction habeas cases, the Petitioner does not bear "the burden of showing that he was unlawfully detained"; rather, the Government must justify imprisonment. Gov't Br. 18 (quoting *Eagles v. United States ex rel. Samuels*, 329 U.S. 304, 314 (1946)). Petitioners also agree that the Government's return must

contain "credible evidence" supporting detention. *Id.* 3, 18-19. Finally, although it does not even mention *Parhat* in this context, the Government appears to accept that, if the return does not provide a basis for evaluating the Government's evidence as reliable, then the writ must issue even without any further evidence from the Petitioner. Gov't Br. 3 (stating that, following filing of the return, Petitioners "may question the sufficiency of the Government's showing"); *id.* 15 n.3 (accepting that Petitioners may "file a motion for judgment" after filing of the return).

Beyond that, however, the Government's proposals are erroneous. Indeed, the Government appears to seek to impose the ultimate burden of persuasion on *the Petitioner* by stating that the case must be dismissed unless the Petitioner produces evidence "more persuasive" than that of the Government. Gov't Br. 19. Such a requirement—that the Petitioner ultimately persuade the Court that he is *not* detainable—would turn habeas review of Executive detention on its head. The Government does not identify a single case in which a prisoner of the Executive, held without trial, was required to prove a negative and persuade a court of his non-detainability, rather than requiring the jailer to demonstrate the lawfulness of imprisonment. *See, e.g.*, *Boumediene*, 128 S. Ct. at 2271 (a "showing [is] required of the Government in these cases"); *Foucha v. Louisiana*, 504 U.S. 71, 81-82 (1992) (invalidating confinement scheme that "place[d] the burden on the detainee to prove that he is not dangerous").

As discussed above, the *Hamdi* plurality's suggested "burden-shifting scheme" has no application or relevance outside of a "battlefield" context, especially absent any showing of actual need for such a scheme in a particular case. A presumption in the Government's favor, and a shifting of the burden, might have made sense for an armed prisoner taken in battle who was given a hearing soon after capture, but it makes no sense for prisoners taken in the midst of civilian life who have been imprisoned for close to seven years. *See, e.g.*, *Al-Marri*, 2008 WL

2736787, at *46 (Traxler, J., concurring in the judgment) (noting that "the risk of erroneously detaining" an alien civilian "is much greater inside the United States than in the very different context addressed by the Supreme Court in *Hamdi*, *i.e.*, a conventional battlefield within the borders of a foreign country in which we are fighting our enemies").

Although the *Hamdi* plurality proposed that Hamdi may have needed to produce "more persuasive evidence" to respond to any "credible evidence" in the Government's return (*Hamdi*, 542 U.S. at 534), the plurality did not suggest that this "scheme" would shift the *ultimate* burden to Hamdi. Rather, as with "all presumptions," the *Hamdi* plurality envisioned that the prisoner would have a shifted burden of *production*, not the ultimate burden of *persuasion*. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *see also* Fed. R. Evid. 301 (a presumption "does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast"). Accordingly, even under *Hamdi*, once both parties have produced their evidence, the burden-shifting scheme falls away, and the Court resolves any disputed issues of fact neutrally.

**D. Hearsay Evidence Should Only Be Admissible If Necessary and If the Court Can Assess its Reliability**

Any reliance on affidavits or hearsay evidence should generally be governed by 28 U.S.C. § 2246 and Federal Rules of Evidence 803-807. The habeas statute permits admission of affidavits in the court's discretion, but such permission triggers the opposing party's "right to propound written interrogatories to the affiants, or to file answering affidavits." 28 U.S.C. § 2246. Moreover, the discretion to admit evidence by affidavit must be exercised with caution. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("[A]ffidavits are disfavored [in a habeas corpus action] because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.").

In determining whether to admit or rely on hearsay in lieu of live testimony or a deposition, the Court's discretion should be guided by a number of considerations. The application of these considerations will vary widely from case to case and statement to statement. *See Al-Marri*, 2008 WL 2736787, at *45 (Traxler, J., concurring in the judgment) (before admitting hearsay evidence, court must "weigh the competing interests of the litigants in light of the factual allegations and burdens placed before it for consideration"). In particular, the Court should *first* consider the Petitioners' substantial liberty interests and the high risk of error. Mr. Zuhair faces indefinite detention. *See, e.g.*, *Boumediene*, 128 S. Ct. at 2270 ("[T]he consequence of error may be detention of persons for the duration of hostilities that may last a generation or more."). Mr. Zuhair was not captured by the U.S. military, not captured on any battlefield, and is not alleged to have committed any battlefield hostile acts against the United States or its allies. *See generally* Mark Denbeaux *et al.*, Seton Hall University School of Law, *Report on Guantánamo Detainees: A Profile of 517 Detainees Through Analysis of Department of Defense Data* 2-4 (2006), *available at* http://law.shu.edu/aaafinal.pdf (only 5% of Guantánamo prisoners were captured by United States forces on the battlefield). Under these circumstances, the risk of factual error is exceptionally high. Moreover, the burden on the Government of providing live testimony will be lower, particularly where the testimony is of employees posted in the United States or at Guantánamo, as opposed to U.S. military personnel actively engaged in combat operations abroad.

*Second,* the Court should also consider whether the hearsay affidavit is necessary and is the "most reliable available evidence." *Hamdi*, 542 U.S. at 533-34 (plurality opinion); *see also United States v. Dunford*, 148 F.3d 385, 393 (4th Cir. 1998) (the requirement of circumstantial guarantees of trustworthiness is the "most important element" for admissibility under the residual

hearsay exception).  Out-of-court statements should be viewed skeptically and can and should be excluded if they lack reliability, particularly where the Government shows no basis for concluding that the declarant could not appear for cross-examination.  *See Parhat*, 2008 WL 2576977, at *9 (rejecting hearsay evidence that lacked indicia of reliability); *United States v. Fernandez*, 892 F.2d 976, 982-83 (11th Cir. 1989) (rejecting hearsay based on unreliability of declarant); *Jian An Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998) (affirming exclusion of deposition testimony under Federal Rules of Evidence 403 due to lack of reliability of source).

Therefore, before accepting hearsay evidence from the Government, the Court must have adequate information to assess the reliability of the source and to determine that the information presented is credible.  The D.C. Circuit did precisely that in *Parhat*.  In rejecting "intelligence reports" as a basis for supporting the petitioner's classification as an "enemy combatant," the D.C. Circuit noted that there was no information concerning the sources of the allegations allowing the court to assess their reliability.  2008 WL 2576977, at *11.  As the D.C. Circuit held, information concerning the reliability of the declarant is essential in evaluating the evidence.  *See id.*  Without it, the Government's claim of reliability amounts to no more than a bare assertion, which, as the D.C. Circuit recognized, "comes perilously close to suggesting that whatever the government says must be treated as true."  *Id.* at *13.

Given the concerns expressed in *Parhat* and the fact that most of the CSRT record already submitted by the Government in Mr. Zuhair's case relies on poorly sourced and sensationalist accounts from the Bosnian press, the Court should apply a healthy dose of skepticism in assessing the "weight" to be given to the Government's hearsay.  *See Al-Marri*, 2008 WL 2736787, at *47 (Traxler, J., concurring in the judgment) (rejecting hearsay where the Government "made no attempt to show that this hearsay evidence 'need[s] to be accepted as the

most reliable available evidence from the [g]overnment") (quoting *Hamdi*, 542 U.S. at 535 (plurality opinion)).

In contrast, the Government argues that not only should hearsay be admitted, but that it should be "the norm, not the exception," and that this principle is "establish[ed]" by *Hamdi*. Gov't Br. 43. In acknowledging that hearsay "may" sometimes be accepted as "the most reliable available evidence," the *Hamdi* plurality's dicta did not suggest that the Government could put in its entire case on paper without making any witnesses available for live testimony. *See* 542 U.S. at 533-34 (plurality opinion). Like its other statements regarding procedural matters, the plurality's comment was tentative: hearsay "may" be accepted. The plurality's language suggests that it was merely acknowledging that courts have discretion to admit affidavits under 28 U.S.C. § 2246 or other hearsay under Federal Rules of Evidence 803-807, and that the reliability of such hearsay will frequently be the decisive factor as to whether it should be admitted. *See also Al-Marri*, 2008 WL 2736787, at *49 (Traxler, J., concurring in the judgment) (hearsay is admissible only if Government bears its burden to demonstrate that reliance on non-hearsay evidence would be "unduly burdensome"). At a minimum, hearsay not otherwise admissible under Rules 803-807 of the Federal Rules of Evidence should be made under oath and subject to the statutory requirements of 28 U.S.C. § 2246.[14]

Although the Court may take into consideration the Government's interest in protecting its sources and methods of intelligence gathering, *Boumediene*, 128 S. Ct. at 2276, such interests cannot be an excuse for crediting hearsay without sufficient information to assess its reliability.

---

[14] Notably, the *Hamdi* plurality addressed only "the narrow question" of the process due an enemy soldier captured in combat against the United States in Afghanistan. 542 U.S. at 516 (plurality opinion); *id.* at 513, 517, 522 n.1; *see also id.* at 549 (Souter, J., concurring) ("[T]he Government here repeatedly argues that Hamdi's detention amounts to nothing more than customary detention of a captive taken on the field of battle."). In a traditional battlefield capture where there are obvious visible signs of hostility, there may be a diminished risk of error. The same is not true for Mr. Zuhair, who was taken into custody in situations far removed from any "field of battle." Accordingly, Government-proffered hearsay in this case will likely have far fewer indicia of reliability than the evidence the *Hamdi* plurality envisioned.

*See Parhat*, 2008 WL 2576977, at *13 ("[W]e do *not* suggest that hearsay evidence is never reliable—only that it must be presented in a form, or with sufficient additional information, that permits the Tribunal and court to assess its reliability."). This Court may protect legitimate national security interests without sacrificing reliable factfinding, including, for example, providing information only to counsel with security clearances or by adapting procedures under the Classified Information Procedures Act, 18 U.S.C. App. III, § 4. *See Parhat*, 2008 WL 2576977, at *13.

For present purposes, however, the Court should reaffirm the fundamental principle that no Petitioner may "be prejudiced by evidence which he had not the liberty to cross examine." *Crawford v. Washington*, 541 U.S. 36*, 49 (2004) (internal quotation marks omitted). As with other procedural issues, the Government is free to make a specific, targeted showing that honoring that right to confrontation with respect to a particular witness or document would impose an actual undue burden on the Government. The Court should rule on such situations as they arise; there is no need to impose a broad general ruling that cannot anticipate what will actually happen in each case.

### E. Petitioner is Entitled to Discovery and to Exculpatory Evidence

#### 1. Petitioner is Entitled to Discovery on the Basis of Specific Allegations

A Petitioner is entitled to "the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories." *Hamdi*, 542 U.S. at 525 (citing § 2246). *See also Al-Marri*, 2008 WL 2736787, at *49 n. 16 (Traxler, J., concurring) (citing "discovery" as part of the "process normally available [to persons] who challenge their executive detention"); *El-Banna v. Bush*, No. 04-CV-1144, 2005 WL 1903561 (D.D.C. 2005) (Roberts, J.) (ordering the Government to preserve evidence regarding petitioners' detention at Guantánamo, in view of the habeas court's

plenary power of inquiry, and petitioners' right to discovery); Rule 6 of the Rules Governing Section 2254 Cases (authorizing discovery in § 2254 cases; applicable to other types of habeas cases through Rule 1(b)).

Habeas is and always has been, a searching fact-finding endeavor.[15]  Discovery in habeas cases generally requires leave of court and should be allowed if the request is based on "specific allegations" by the petitioner.  *See Harris*, 394 U.S. at 300 (where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry").

Not only is discovery statutorily available, this Court should exercise its discretion broadly to allow fact-finding in Mr. Zuhair's case, for two reasons.  *First*, unlike in cases such as *Harris*, which involved a collateral attack on a prior state court judgment, Mr. Zuhair has not had a previous full opportunity for discovery pursuant to state or federal rules of criminal procedure; has not been provided full access to exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); and has not had the full opportunity to confront and cross-examine all witnesses against him.  A regime of partially constrained discovery makes sense in a post-conviction context, where the full apparatus of criminal procedure and constitutional law presumptively afforded the convict all the information he could legitimately demand.  By contrast, in the present challenges to executive detention, where, as here, Petitioner has not had a "full and fair

---

[15] Historically, the Judiciary Act of 1789 gave courts authority "to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment."  1 Stat. 73 at 82.  To accomplish this task, the courts have a "duty . . . to cause the facts on which they found their sentence or decree, fully to appear upon the record."  1 Stat. at 83.  The Judiciary Act of 1789 further provided, "[t]hat the mode of proof by oral testimony and examination of witnesses in open court shall be the same in all the courts of the United States, as well in the trial of causes in equity and of admiralty and maritime jurisdiction, as of actions at common law."  1 Stat. at 88.  *See also* Act of Aug. 29, 1842, ch. 257, 5 Stat. 539, 539 (judges "shall proceed to hear the said cause" to determine if it were "duly proved"); Act of Feb. 5, 1867, ch. 28, 14 Stat. 385, 386 (judges "shall proceed in a summary way to determine the facts of the case, by hearing testimony and the arguments of the parties interested").

opportunity" of adversarial adjudication, *Boumediene*, 128 S.Ct. at 2273, ordinary post-conviction limitations do not apply. Accordingly, the need for discovery in these cases may well be more compelling. *See Id.* at 2267 ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention.").

*Second*, this case presents a number of unique challenges to Mr. Zuhair's ability to gather evidence. Substantial time has passed; the events at issue occurred in and involve distant countries; English is not his native language; Mr. Zuhair's ability to communicate with his attorneys is severely circumscribed; and his physical health has suffered gravely as a result of his confinement. Mr. Zuhair may need to undertake some preliminary discovery in order to be able to identify the evidence that is helpful to his case. He may also need to investigate whether statements against him were obtained by coercion or torture and are therefore unreliable. The Supreme Court has long recognized that "[t]he very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291. This case will especially require "initiative and flexibility" in the administration of discovery. The Court should apply that principle to the discovery requests made here, based on an evaluation of Petitioner's legitimate need for discovery in order to have a meaningful opportunity to test and counter the Government's allegations.

The Government's discussion of discovery begins with a lengthy and irrelevant excursion into the history of the common law writ. Gov't Br. 22-24. But the availability of discovery before 1789 has no bearing on these statutory cases, since discovery is plainly available under the habeas statute. *See* 28 U.S.C. § 2246 ("[E]vidence may be taken orally or by deposition, or,

in the discretion of the judge, by affidavit."); *Harris*, 394 U.S. at 290 ("[I]n appropriate circumstances, a district court, confronted by a petition for habeas corpus which establishes a prima facie case for relief, may use or authorize the use of suitable discovery procedures, including interrogatories, reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require.'" (quoting 28 U.S.C. § 2243)).[16]   Indeed, the notable absence of discovery in DTA review contributed to the Supreme Court's conclusion that a DTA proceeding "falls short of being a constitutionally adequate substitute." 128 S. Ct. at 2272.

In fact, the Government appears to agree that (1) the purpose of these habeas proceedings is to allow the Court to make a fair assessment of the legality of the detention at issue and (2) that the production of potentially exculpatory evidence in the Government's control is an important component of that process.  *See* Gov't Br. 29 (agreeing to provide *some* potentially exculpatory materials to Petitioners because "the Government has no interest in erroneously holding a person").  Petitioners' proposal of limited, targeted discovery is fully consistent with these interests, and the Government has not shown that it would impose any undue burden in any *actual* case before the Court.  To the extent that particular requests should raise a real concern, the "prudent and incremental" course is for the Court to address them as they come, rather than attempting to resolve in advance issues that may never arise.

The Government's discussion of discovery burdens consists mainly of the Government first assuming that Petitioners will make exaggerated demands (implicating "battlefields" and

---

[16] As a peripheral matter, the Government's constitutional analysis proceeds as if *Boumediene* were never decided. *Boumediene* specifically noted that the Court had always left open the possibility that the Suspension Clause protected post-1789 expansions of habeas procedures.  128 S. Ct. at 2248.  *Boumediene* also rejected the Government's suggestion (Gov't Br. 21) that *Felker v. Turpin*, 518 U.S. 651 (1996), somehow showed that post-1789 expansions were not protected.  *Boumediene*, 128 S. Ct. at 2264.  Accordingly, the Suspension Clause may well protect some right to discovery in habeas, particularly where there has not been any prior fair trial.  The Court need not decide this issue, however, as the habeas statute clearly authorizes discovery in these cases.

"rubble") and then emphasizing the dangers such demands would pose. Gov't Br. 34. Contrary to the Government's assertions, however, Petitioners have no interest in directing the Government on a "fishing expedition." Petitioners seek only the process to which the Supreme Court has said they are entitled: a meaningful proceeding in which they can fairly test the Government's bases for detention. *Boumediene*, 128 S. Ct. at 2267. To that end, Petitioners must be provided with means to obtain information in the Government's possession that could undermine the Government's assertions. *See Harris*, 394 U.S. at 300 (where development of certain facts would allow the petitioner to demonstrate the illegality of his detention, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.").

### 2.  Petitioner is Entitled to Exculpatory Evidence in the Government's Possession

The Government has a duty and ongoing obligation to disclose to Mr. Zuhair evidence in its possession that falls within the definition of "exculpatory" and "impeaching" material, concepts that are well-known and understood by the Government. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667 (1985). The Government "has a duty to learn of any favorable evidence known to the others acting on the government's behalf," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), and must disclose exculpatory and impeaching evidence that is "material," *Bagley*, 473 U.S. at 668.

Failure to disclose exculpatory information "undermines confidence in the outcome." *Bagley*, 473 U.S. at 668. Thus, this obligation not only guarantees fair treatment for detainees subject to a substantial liberty deprivation, *Brady*, 373 U.S. at 87, but it is also necessary to preserve the fundamental truth-seeking function of any serious, adjudicatory proceeding. *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986); *Freeport-McMoRan Oil & Gas Co. v. F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (Mikva, C.J.) (reiterating Supreme Court's

admonition in *Berger v. United States*, 295 U.S. 78, 88 (1935), now chiseled on the walls of the Justice Department, that a government lawyer "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation . . . is not that it shall win a case, but that justice shall be done").

Indeed, in light of the "considerable risk of error" inherent in the CSRT determinations, *Boumediene*, 128 S. Ct. 2270, and the widely-disclosed reports of large numbers of innocent men detained at Guantánamo, an order regarding exculpatory evidence is not mere housekeeping, proposed to serve a routine administrative obligation.   Rather, it is necessary to fulfill this Court's role in assessing "the sufficiency of the Government's evidence against a detainee."  *Id.*

Thus, Petitioner proposes that this Court order as follows:   The Government shall disclose to counsel all exculpatory evidence, including impeaching evidence, in its possession relating to that detainee.  Disclosure by the Government should occur as soon as it discovers this evidence, and shall in no event occur later than thirty (30) days prior to the scheduled date of the evidentiary hearing in a case.  The term "exculpatory material," including impeaching evidence, refers to evidence that falls within the definition of this term in ordinary criminal proceedings in the United States.  *See Kyles v. Whitley*, 514 U.S. 419 (1995).

In the criminal context, it is well-settled that the Government has a duty to disclose exculpatory material in the possession of the prosecution regardless whether the defendant requests such material. *Agurs*, 427 U.S. at 112-13.  Similarly, the Government's duty to disclose here should be independent of a request from a Petitioner, or even an order from this Court, and continues during the pendency of habeas proceedings.  *See Steidl v. Fermon*, 494 F.3d 623, 469 (7th Cir. 2007) (state's "ongoing duty to disclose exculpatory information . . . extends throughout the legal proceedings that may affect guilt or punishment, including post-conviction

proceedings."). Petitioner submits that it would be appropriate for the Court to put the Government on notice, well in advance, that *sua sponte* disclosure of these materials is an essential element of its production obligations.

Petitioners in Guantánamo, including Mr. Zuhair, are even *more* dependent on information in the Government's possession than the typical criminal defendant. Here, the Government holds all the cards. While permitting itself over six years to build its factual allegations against Mr. Zuhair, the Government has systematically deprived him of meaningful opportunities to obtain or preserve evidence that could now be used in his defense. Requiring the Government to locate and produce potentially exculpatory evidence is necessary to ensure an "adequate inquiry" into the legality of the detentions at issue. *Id.* No less than in the criminal context, permitting the Government to withhold exculpatory evidence would place the Executive "in the role of an architect of a proceeding that does not comport with standards of justice." *Brady*, 373 U.S. at 87; *see also Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned.").

The Government's voluntary undertaking to provide some exculpatory information to Petitioners implicitly acknowledges that production of exculpatory information in the Government's possession is necessary to preserve fairness. But the Government simply does not want to take on the added responsibility of *looking* for additional information that it does not happen to "encounter" on its own during its circumscribed review of certain files. Gov't Br. 3. Moreover, the individual Government attorney compiling Mr. Zuhair's return would be under no obligation to confer with other Government attorneys who may find exculpatory material

pertinent to Mr. Zuhair's case in the course of their work on other detainees' returns. The Government's self-serving limitation is not supported by the law and exaggerates any actual burden that Petitioners' proposal might impose.

As the Government acknowledges, a requirement that the Government produce exculpatory evidence is grounded in "strictures against misrepresentation." *Kyles v. Whitely*, 514 U.S. at 431 (1995) (quoted at Gov't Br. 28). Of course, the Government has no right to benefit from misrepresentation and concealment of information in these cases any more than in the criminal context. *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.").

The Government's suggestion that disclosure of exculpatory evidence should be eliminated in the name of "expedited consideration" (Gov't Br. 33) cannot be taken seriously. The Government has steadfastly resisted any meaningful merits proceeding in these cases for over six years. Now that the Supreme Court has definitively rejected its delaying tactics, the Government cannot invoke expedition to demand that Petitioners proceed to trial on a newly-disclosed factual return while the Government withholds contrary evidence favorable to the Petitioner. Petitioners have the utmost interest in promptness, but the Court should not pursue recklessly speedy process at the expense of accuracy and fairness.

Finally, the Government has made no showing that compliance with a disclosure obligation would impose an undue burden on the Government in this case. The Government's own regulations required it to preserve the so-called "Government Information" in order that it be shown to officials involved in the Combatant Status Review Tribunal process. *See* Memorandum from Secretary of the Navy Gordon England, ¶ G(4) (attached as Exhibit 1)

(noting that the Personal Representative completes a Detainee Election Form "[a]fter the Personal Representative has reviewed the Government Information").  The Government may well believe that the D.C. Circuit erred in requiring production of the full "Government Information" under the Detainee Treatment Act—defined as all "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant," *see Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007)—but Mr. Zuhair is not seeking *production* of that information in the first instance.  Rather, he seeks only that the Government *review* it and produce any exculpatory information contained therein.  This task should hardly be characterized as a burden, given the Government's statutory and regulatory obligation to preserve and review that body of evidence.

Although Petitioner welcomes the Government's undertaking to provide exculpatory evidence "which the attorneys preparing the factual return encounter in developing the return" (Gov't Br. 3), it is hardly sufficient.  The Government does not explain what its attorneys—as opposed to other Government officials—will be reviewing in preparing the returns or what it means for those attorneys to "encounter" information.  There is a significant concern that the Government will turn a blind eye to information that could play a critical role in any fair determination of the legality of imprisonment—just as the CSRTs did when they failed to consider evidence easily accessible to the Government.[17]

Indeed, the Government's recent behavior confirms that it is deliberately refusing to review documents that likely contain exculpatory evidence, even when specifically directed to

---

[17] For example, in connection with his CSRT, Petitioner Saber Lahmar in *Boumediene* (No. 04-1166) requested evidence in the form of a document the CSRT identified as "Bosnian government document finding detainee not guilty of attempting to bomb the U.S. Embassy."  The Tribunal President determined the document was "not reasonably available."  However, those Bosnian court documents were appended as exhibits to Lahmar's habeas petition and multiple other filings served on the Government prior to Lahmar's CSRT.  Petition for Habeas Corpus, *Boumediene* (No. 04-1166), Dkt. 1, Ex. 4.

such documents.  For example, the *Boumediene* Petitioners have provided the Government with a detailed index, prepared by the Government itself in another case, of pertinent materials regarding the *Boumediene* Petitioners that the Government has assembled and Bates-labeled. Declaration of Robert C. Kirsch ¶ 3, attached as Ex. 2.  Counsel in that case have asked the Government to confirm that its attorneys will review these documents, *which the Government has already gathered and numbered*, and produce any exculpatory evidence "encountered" therein pursuant to its undertaking. *See id.* ¶ 6.  Yet the Government has so far refused to confirm that it will even review those materials, let alone that it will provide exculpatory material they contain, even though its attorneys are now clearly on notice of their existence and location. The Government's refusal to review specifically identified documents in its possession demonstrates the emptiness of its undertaking and the need for this Court to order the Government to locate and produce exculpatory evidence.

**F.  This Court Should Adopt a Presumption that Petitioner has the Right to Compel the Appearance of and Confront Witnesses**

The habeas statutes and the Federal Rules of Evidence plainly anticipate that Petitioner, through his counsel, will have the right to cross-examine available witnesses, either in court or by deposition, and to object to inadmissible hearsay.  *See* Fed. R. Evid. 1101(e); 28 U.S.C. § 2246.  Moreover, the Court plainly has the power to compel the attendance of witnesses within its jurisdiction and to authorize the taking of depositions outside of its jurisdiction.  *See* Fed. R. Civ. P. 45.

There is no doubt that the opportunity to confront a witness is a central and crucial feature of the common law adversarial system. *Pointer v. Texas*, 380 U.S. 400, 408 (1965) (Harlan., J., concurring) (the "right of confrontation is 'implicit in the concept of ordered liberty'") (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  As Justice Scalia explained,

"[i]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine." *Crawford v. Washington*, 541 U.S. 36, 49 (2004) (citation omitted). This feature is not limited to the criminal context:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so he has an opportunity to show that it is untrue. . . . [This principle] is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. . . . This Court has been zealous to protect these rights from erosion . . . . [including] in all types of cases where administrative and regulatory actions were under scrutiny.

*Greene v. McElroy*, 360 U.S. 474, 496-97 (1959); *see also In re Oliver*, 333 U.S. 257, 273 (1948) (right to opportunity to be heard in one's defense includes one's "right to examine the witnesses against him").

Indeed, in upholding the legality of other administrative detention schemes, the Supreme Court has insisted on the preservation of this principle. *See, e.g. Kansas v. Hendricks*, 521 U.S. 346, 353 (1997) (civil commitment of violent sexual offenders). It is a necessary requirement in a deportation proceeding, *see, e.g. Kwong Hai Chew* v. *Colding*, 344 U.S. 590, 596 (1953), for a hearing involving the termination of government benefits, *see Goldberg v. Kelly*, 397 U.S. 254, 270 (1970), and as a part of trials conducted under the Uniform Code of Military Justice, *see, e.g.*, *United States v. Anderson*, 51 M.J. 145, 149 (C.A.A.F. 1999) ("There are few subjects perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement.").

The most effective method of testing the reliability of evidence is cross-examination. Petitioner acknowledges that hearsay may be admissible in certain contexts if sufficient circumstantial guarantees of trustworthiness are shown to exist. *See supra* Part II.D. But the baseline assumption, applying a prudent and incremental approach, should be that evidence will be presented by witnesses subject to cross-examination. *See Al-Marri*, 2008 WL 2736787 at *49 (Traxler, J., concurring). A party seeking to admit hearsay should face a heavy burden to show that it is both necessary and reliable. Rulings on specific items should await a concrete setting at the hearing.

The possibility that the Government may include in its habeas returns evidence beyond that presented in the CSRT proceedings highlights the need for this Court to establish procedural presumptions against hearsay and for compulsion and confrontation. The Government had close to seven years to further develop the evidence submitted to the CSRT convened to ensure that Mr. Zuhair was properly held, and to gather new evidence. Should the Government provide new evidence at this stage in Mr. Zuhair's detention, Mr. Zuhair's counsel will have little time to investigate its veracity or reliability absent the ability to confront and cross-examine the witnesses who provided the testimony and to obtain discovery regarding documentary evidence.

The Government argues, contrary to precedent and prudence, for a presumption against confrontation and compulsion in Mr. Zuhair's proceeding. The Government's position rests upon three contentions, each incorrect: First, that the twin rights of confrontation and compulsion, embodied in the Sixth Amendment, attach only in criminal proceedings; second, that the Fifth and Fourteenth Amendments do not apply to Mr. Zuhair; and, third, that Mr. Zuhair's habeas petition is "constitutional habeas" and, therefore, is not to be accorded the procedural protections developed in the context of 28 U.S.C. § 2241. Leaving aside the

Government's disregard of the Supreme Court's holding that Guantánamo "is not abroad" (*Boumediene*, 128 S. Ct. at 2261), and numerous holdings applying Fifth Amendment rights to detainees at Guantánamo, *see supra* Part I.C at 11-12, the Government's focus on a "constitutional" foundation is again a red herring, since confrontation rights inhere in the statutory framework of habeas corpus and the "fundamental procedural protections" to which *Boumediene* held that Petitioners were entitled.  128 S.Ct. at 2277.

The ability to cross-examine witnesses is guaranteed by the habeas statute and is necessary to protect both Mr. Zuhair's liberty interests and this Court's fact-finding abilities. The production of witnesses—either live or via videoconference—should pose no problem in Mr. Zuhair's case.  He was not captured on a battlefield; there is no reason to presume that any witnesses upon whose testimony the Government's case depends are still involved in the day-to-day activities of combat in Afghanistan.

Furthermore, live testimony from Mr. Zuhair should be allowed in the course of this proceeding in situations where he himself may be best (and perhaps uniquely) able to rebut the allegations made against him.  As the Government acknowledges, "[w]here … there are substantial issues of fact as to events in which the prisoner participated, the trial court should require his production for a hearing."  *United States v. Hayman*, 342 U.S. 205, 223 (1952) (quoted at Gov't Br. 42).

Mr. Zuhair—or any other detainee whose testimony may be necessary to these proceedings—may appear live or via videoconference.  Furthermore, should the live presence of a detainee witness be necessary or appropriate, the Department of Homeland Security  is specifically authorized to *parole* into the United States "[a]liens who will be witnesses in proceedings being, or to be, conducted by judicial … bodies in the United States."  8 C.F.R. §

212.5(b)(4).  Under federal immigration law, the "parole of such alien shall not be regarded as an admission of the alien."  8 U.S.C. § 1182(d)(5)(A); *see also Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007) (noting the "well-settled principle that parole does not effect a legal entry or admission to the United States").  Regardless of its own powers to bring a detainee into the domestic borders of the United States, *see Clark v. Martinez*, 543 U.S. 371 (2005), this Court should request that the Secretary of the Department of Homeland Security parole a prisoner into the United States for the limited purpose of testifying at a hearing.

### G. CSRT Proceedings Do Not Constitute the Record on Review, Nor are Their Findings to be Presumed Valid

The CSRT proceedings have indeed been no "more than an empty shell."  *Boumediene*, 128 S.Ct. 2229 at 2270.  Accordingly, it is incumbent on this Court to conduct full and fair hearings to decide contested factual questions.  The Court held insufficient the procedures contemplated by the Detainee Treatment Act ("DTA"), which only provided for appellate record review of the sufficiency of the evidence that *had been* considered by a Combatant Status Review Tribunal.  *Boumediene* thus required the Government to justify to a district court in a plenary proceeding the current sufficiency of the evidence to detain each  Petitioner. *Id.* at 2270.

The CSRT findings in themselves should not be accorded any presumptive weight.  *Boumediene* has already rejected the Government's argument that CSRT findings are entitled to deference.  The Court treated the fact that the CSRT accorded the Government's evidence a "presumption of validity" as a *defect*, not as an acceptable variation on habeas procedures.  128 S. Ct. at 2260.  Although habeas courts do owe "considerable deference" to "the judgment of a court of record," the CSRT procedure took these cases "outside these categories for here the detention is by executive order."  *Id.* at 2268.

## CONCLUSION

For the reasons stated herein, Petitioner Ahmed Zaid Salem Zuhair respectfully requests that the Court enter an order in accordance with the foregoing arguments.

Dated: August 22, 2008

Respectfully submitted,

_____/s/_____
Ramzi Kassem
Michael J. Wishnie
*Supervising Attorneys*

Anand Balakrishnan
Madhuri Kumar
Darryl Li
*Law Student Interns*

Allard K. Lowenstein International Human Rights
   Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138
ramzi.kassem@yale.edu
*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2008, I caused a true and accurate copy of Petitioner's Response to Government's Brief Regarding Preliminary and Procedural Framework Issues to be served upon the following counsel for Respondents by electronic filing via the Court's ECF system:

Arlene Groner, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530

_____/s/_____
MADHURI KUMAR
Allard K. Lowenstein International
Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 0651

# Exhibit 1



THE SECRETARY OF THE NAVY
WASHINGTON, D.C. 20350-1000

29 July 2004

MEMORANDUM FOR DISTRIBUTION

Subj:  Implementation of Combatant Status Review Tribunal
       Procedures for Enemy Combatants detained at Guantanamo
       Bay Naval Base, Cuba

Ref:   (a) Deputy Secretary of Defense Order of July 7, 2004
       (b) Convening Authority Appointment Letter of
           July 9, 2004

Encl:  (1) Combatant Status Review Tribunal Process
       (2) Recorder Qualifications, Roles and Responsibilities
       (3) Personal Representative Qualifications, Roles and
           Responsibilities
       (4) Combatant Status Review Tribunal Notice to Detainees
       (5) Sample Detainee Election Form
       (6) Sample Nomination Questionnaire
       (7) Sample Appointment Letter for Combatant Status Review
           Tribunal Panel
       (8) Combatant Status Review Tribunal Hearing Guide
       (9) Combatant Status Review Tribunal Decision Report
           Cover Sheet

1.  Introduction

    By reference (a), the Secretary of Defense has established a
Combatant Status Review Tribunal (CSRT) process to determine, in
a fact-based proceeding, whether the individuals detained by the
Department of Defense at the U.S. Naval Base Guantanamo Bay,
Cuba, are properly classified as enemy combatants and to permit
each detainee the opportunity to contest such designation.  The
Secretary of the Navy has been appointed to operate and oversee
this process.

    The Combatant Status Review Tribunal process provides a
detainee:  the assistance of a Personal Representative; an
interpreter if necessary; an opportunity to review unclassified
information relating to the basis for his detention; the
opportunity to appear personally to present reasonably available
information relevant to why he should not be classified as an
enemy combatant; the opportunity to question witnesses
testifying at the Tribunal; and, to the extent they are

Subj:  Implementation of Combatant Status Review Tribunal
       Procedures for Enemy Combatants detained at Guantanamo
       Bay Naval Base, Cuba

reasonably available, the opportunity to call witnesses on his
behalf.

2.  Authority

    The Combatant Status Review Tribunal process was established
by Deputy Secretary of Defense Order dated July 7, 2004
(reference (a)), which designated the undersigned to operate and
oversee the Combatant Status Review Tribunal process.  The
Tribunals will be governed by the provisions of reference (a)
and this implementing directive, which sets out procedures for
Tribunals and establishes the position of Director, Combatant
Status Review Tribunals.  Reference (b) designates the Director,
CSRT, as the convening authority for the Tribunal process.

3.  Implementing Process

    The Combatant Status Review Tribunal Process is set forth in
enclosure (1).  Enclosures (2) and (3) set forth detailed
descriptions of the roles and responsibilities of the Recorder
and Personal Representative respectively.  Enclosure (4) is a
Notice to detainees regarding the CSRT process.  Enclosure (5)
is a Sample Detainee Election Form.  Enclosure (6) is a Sample
Nominee Questionnaire for approval of Tribunal members,
Recorders, and Personal Representatives.  Enclosure (7) is an
Appointment Letter that will be signed by the Director of CSRT
as the convening authority.  Enclosure (8) is a CSRT Hearing
Guide. Tribunal decisions will be reported to the convening
authority by means of enclosure (9).  This implementing
directive is subject to revision at any time.

CC:
Secretary of State
Secretary of Defense
Attorney General
Secretary of Homeland Security
Director, Central Intelligence Agency
Assistant to the President for National Security Affairs
Counsel to the President

2

Deputy Secretary of Defense
Secretary of the Army
Secretary of the Navy
Secretary of the Air Force
Chairman of the Joint Chiefs of Staff
Director, Federal Bureau of Investigation
Director of Defense Agencies
Director, DOD Office of Detainee Affairs

3

## G. **Tribunal Procedures**

(1)  By July 17, 2004, the convening authority was required to notify each detainee of the opportunity to contest his status as an enemy combatant in the Combatant Status Review Tribunal process, the opportunity to consult with and be assisted by a Personal Representative, and of the jurisdiction of the courts of the United States to entertain a habeas corpus petition filed on the detainee's behalf. The English language version of this Notice to Detainees is at enclosure (4). All detainees were so notified July 12-14, 2004.

(2)  An officer appointed as a Personal Representative will meet with the detainee and, through an interpreter if necessary, explain the nature of the CSRT process to the detainee, explain his opportunity to personally appear before the Tribunal and present evidence, and assist the detainee in collecting relevant and reasonably available information and in preparing for and presenting information to the CSRT.

(3)  The Personal Representative will have the detainee make an election as to whether he wants to participate in the Tribunal process. Enclosure (5) is a Detainee Election Form. If the detainee elects not to participate, or by his silence or actions indicates that he does not want to participate, the Personal Representative will note this on the election form and this detainee will not be required to appear at his Tribunal hearing. The Director, CSRT, as convening authority, shall appoint a Tribunal as described in paragraph C (1) of this enclosure for all detainees after reviewing Nomination Questionnaires (enclosure (6)) and approving Tribunal panel members. Enclosure (7) is a sample Appointment Letter.

(4)  The Director, CSRT, will schedule a Tribunal hearing for a detainee within 30 days after the detainee's Personal Representative has reviewed the Government Information, had an opportunity to consult with the detainee, and notified the detainee of his opportunity to contest his status, even if the detainee declines to participate as set forth above. The Personal Representative will submit a completed Detainee Election Form to the Director, CSRT, or his designee when the Personal Representative has completed the actions above. The 30-day period to schedule a Tribunal will commence upon receipt of this form.

(5)  Once the Director, CSRT, has scheduled a Tribunal, the President of the assigned Tribunal panel may postpone the Tribunal for good cause shown to provide the detainee or his Personal Representative a reasonable time to acquire evidence deemed relevant and necessary to the Tribunal's decision, or to accommodate military exigencies as presented by the Recorder.

(6)  All Tribunal sessions except those relating to deliberation or voting shall be recorded on audiotape. Tribunal sessions where classified information is discussed shall be recorded on separate and properly marked audiotapes.

5

**Enclosure (1)**

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BOUMEDIENE v. BUSH | Civil Case No. 04-1166 (RJL) |
| SLITI v. BUSH | Civil Case No. 05-0429 (RJL) |
| KABIR v. BUSH | Civil Case No. 05-0431 (RJL) |
| MAMMAR v. BUSH | Civil Case No. 05-0573 (RJL) |
| AL-KHAIY v. BUSH | Civil Case No. 05-1239 (RJL) |
| AL GINCO v. BUSH | Civil Case No. 05-1310 (RJL) |
| AL BIHANI v. BUSH | Civil Case No. 05-1312 (RJL) |
| GHAZY v. BUSH | Civil Case No. 05-2223 (RJL) |
| RUMI v. BUSH | Civil Case No. 06-0619 (RJL) |
| OBAYDULLAH v. BUSH | Civil Case No. 08-1173 (RJL) |

**DECLARATION OF ROBERT C. KIRSCH**

I, Robert C. Kirsch, declare pursuant to 28 U.S.C. § 1746:

1.  I am Senior Partner at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, 60
    State Street, Boston, Massachusetts, 02109.  My office telephone is (617) 526-6779.  I
    am counsel for Petitioners in  04-cv-1166.

2.  I am admitted to the bars of the Commonwealth of Massachusetts and the State of New
    Hampshire.

3.  On August 12, 2008, at 2:58 p.m., my partner Gregory P. Teran sent an e-mail to Nicholas
    Oldham and Paul Ahern at the United States Department of Justice enclosing a so-called
    "*Vaughn* Index" of documents identified and Bates-numbered by the Government in a
    litigation under the Freedom of Information Act, Oleskey v. Dep't of Defense,  No. 05-

10735-RGS (D. Mass).  Mr. Teran's e-mail and the attached index is attached as Exhibit A.

4.  In his e-mail, Mr. Teran asked the Government to produce the documents listed on the *Vaughn* Index to security-cleared counsel at the Secure Facility no later than August 22, 2008.

5.  On August 14, 2008, at 9:43 a.m., Mr. Teran sent a second e-mail to Nicholas Oldham and Terry Henry at the Department of Justice.  Mr. Teran's second e-mail is attached as Exhibit B.

6.  Mr. Teran's second e-mail asked the Government to confirm that, pursuant to its the representation voluntary agreement as stated in its brief dated August 12, it would review the documents reflected on the *Vaughn* Index and produce any exculpatory information therein.  Mr. Teran reiterated the request that the *Vaughn* Index materials be produced to counsel at the Secure Facility no later than August 22, 2008.  Mr. Teran requested that the Government respond no later than close of business on August 18, 2008.

7.  On August 12, 2008, at 6:00 a.m., I sent an e-mail to Nicholas Oldham, Judry Subar, Terry Henry, Andrew Warden, and Paul Ahern at the Department of Justice requesting, inter alia, that the Government stipulate to certain facts in order to avoid the need to establish them through discovery.  I inquired whether the Government would stipulate that (1) the arrest of five of our clients by Bosnian authorities in 2001 was caused solely by the demand of the United States, and (2) the hand over of our six clients in 2002 resulted from demands of the United States, including communications by U.S. military personnel that they use all available means, including the use of force, if the Bosnian government did not turn over the six to the U.S. This e-mail is attached as Exhibit C.

8. On August 18, 2008, at 12:00 a.m.,  Nicholas Oldham responded to both Mr. Teran's e-mails of August 12 and 14, and my e-mail of August 12, 2008.   Mr. Oldham wrote that the Government would not agree to the stipulations proposed in my August 12, 2008 e-mail.  Further, Mr. Oldham wrote that with respect to the FOIA documents the Government's position regarding its preparation of factual returns and production of exculpatory materials was contained in the briefs the Government filed with Judge Leon and Judge Hogan. Mr. Oldham's e-mail is attached as Exhibit D.


I hereby declare under the penalty of perjury that the foregoing is true and correct. Executed at Boston, Massachusetts on August 19, 2008.


\_\_\_\_\_/s/ Robert C. Kirsch_____
Robert C. Kirsch
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000