IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AHMED ZAID SALEM ZUHAIR,                    )
                                            )
          Petitioner,                       )
                                            )
    v.                                      )          Civil Action No. 08-0864 (EGS)
                                            )
GEORGE W. BUSH, et al.,                     )
                                            )
          Respondents.                      )
_____     )

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO
COMPEL PRODUCTION OF COMPLETE MEDICAL RECORDS AND FOR
ORDER PERMITTING INDEPENDENT MEDICAL EXAMINATION**

Respondents hereby oppose petitioner's motion (dkt. no. 37) to compel the production of

his complete medical records and for an order permitting an independent medical examination.

For the reasons discussed below, this Court lacks jurisdiction to consider petitioner's motion,

which challenges aspects of his detention and conditions of his confinement that the Military

Commissions Act of 2006 (MCA) specifically withdrew from the Court's purview.  This is so

even in light of the Supreme Court's decision in *Boumediene v. Bush*, , ___ U.S. ___, 128 S.Ct.

2229 (June 12, 2008).  On this basis alone, petitioner's motion should be denied.

Moreover, even if the Court had jurisdiction, petitioner's motion has failed to meet the

standard for obtaining the extraordinary and drastic remedy of injunctive relief.  For over three

years, petitioner has participated in a self-imposed hunger strike.  The protocols and procedures

currently in place at Guantanamo Bay to treat hunger striking detainees are medically

appropriate, humane, and designed to provide the necessary nutrition and fluids essential to

maintaining petitioner's life and health.  During the time petitioner has participated in his hunger

strike, the Joint Task Force-Guantanamo medical staff has closely monitored his life and health.

To maintain both, the medical staff has instituted enteral feeding, which is administered in a

humane and compassionate fashion and never in a manner designed to intentionally inflect pain

or discomfort as punishment or retaliation.  The medical staff also has closely monitored

petitioner's general health and medical condition since his detention began at Guantanamo Bay.

At no time has proper medical care been withheld from petitioner as a condition that he ends his

hunger strike or as a form of punishment for persisting in the strike.  To the contrary, petitioner

has received extensive medical diagnoses and treatments for a variety of physical ailments.

Petitioner, accordingly, fails to demonstrate that he faces an imminent threat of irreparable injury

without injunctive relief.

Petitioner fails also to satisfy each additional requirement for preliminary injunctive

relief.  Petitioner's unsupported and, as detailed below, refuted conditions-of-confinement claims

fail to establish a substantial likelihood of success on the merits.  Further, the Court's micro-

management of a detainee's medical care and health at Guantanamo—which is what petitioner

seeks—would impose significant burdens upon the government and other detainees, and would

harm the public interest.  Thus, the Court should deny petitioner's motion.

## BACKGROUND

Petitioner alleges that Guantanamo medical personnel have conducted his enteral feeding

sessions in an "unnecessarily brutal" manner as a means to punish and coerce the petitioner into

ending his hunger strike.  He also alleges that he was denied proper medical diagnosis and care to

achieve the same purpose.  The declaration of Captain Bruce C. Meneley, M.D., attached hereto

as Exhibit 1, directly refutes the petitioner's allegations of medical misconduct and claims of

inadequate medical care.  Captain Meneley is the Commander, Joint Medical Group,

Guantanamo Bay and serves as the Joint Task Force Surgeon for Joint Task Force – Guantanamo

Bay, Cuba (JTF-GTMO).  *See* Exhibit 1("Meneley Decl.") ¶ 1.  He is responsible for the medical

care provided to personnel stationed at Guantanamo Bay and oversees the operation of the Joint

Medical Group that provides medical care to the detainees being held at Guantanamo Bay**.**  *Id.*

As detailed by Captain Meneley, the Joint Medical Group provides unconditional,

appropriate, and comprehensive medical care to all detainees regardless of their disciplinary

status, cooperation, or participation in a hunger strike.  *Id.* ¶ 7.  Detainees receive timely,

compassionate, quality healthcare and have regular access to primary care and specialist

physicians.  *Id.*  The quality of healthcare provided to the detainees is comparable to that

provided to active duty service members.  *Id.*  The medical staff does not withhold, nor condone

the withholding of, medical care as a form of punishment.  *Id.* ¶ 10.

Petitioner began his hunger strike on or around August 15, 2005.  *Id.* ¶ 15.  Captain

Meneley's declaration details the current protocols for evaluating the health of detainees who

participate in hunger strike and for determining if the administering of enteral feeding is

appropriate to preserve detainees' health and life.  *Id.*  ¶ 12.  In accordance with those protocols,

petitioner's enteral feedings began when it became medically necessary to preserve his health.

*Id.* ¶ 15.  Petitioner has been enterally fed continuously since August 2005.  *Id.*

Captain Meneley's declaration also details the current protocol for administering enteral

feeding, a process which typically lasts less than an hour and requires the detainee to remain in a

restraining chair to ensure his safety and that of the Guantanamo staff.  *Id.* ¶ 13-14.  A lubricant

always is used on the feeding tube used to administering the feedings and the detainee is offered,

but may refuse, a topical anesthetic. *Id.* Petitioner is typically fed twice a day and his typical feeding times vary between approximately 35 and 55 minutes. *Id.* ¶ 16. Therefore, his typical total feeding time is approximately 70 to 110 minutes a day, not the four hours alleged in his motion. *Id.* Due to petitioner's long-term cooperation, the guard staff typically only applies the restraining chair's wrist, ankle, and lap restraints during the feeding. *Id.* The guard staff does not currently use the head restraint, meaning only five of the six restraint points are currently used. *Id.* In petitioner's case, based upon his request, olive oil is used as a lubricant, rather than viscous lidocaine. *Id.* ¶ 18. This is an acceptable alternative for lubrication. *Id.* He also is offered, and declines the use of, anesthetic lozenges. *Id.* Nasal passages are checked prior to inserting the feeding tube and petitioner's medical records do not indicate that he has complained of blocked nasal passages to the staff. [1] *Id.*

Petitioner has also been diagnosed with, and receives treatment for, a number of physical ailments. *Id.* ¶ 20-35. Petitioner specifically complained of a number of kidney and urination problems from August, 2003, to March, 2008. *Id.* ¶ 21-29. On these occasions, medical staff have evaluated the petitioner, diagnosed the issue, and prescribed treatment as necessary. *Id.* For

---

[1] Petitioner attached an affidavit by Dr. Robert Cohen, in which Dr. Cohen states petitioner's counsel's notes indicate that petitioner was sprayed with mace while being strapped into the restraining chair. Pet'r's Mot. Ex. 2 ¶¶ 34-35. Attached hereto as Exhibit 2 is a declaration from Colonel Bruce E. Vargo, Commander of the Joint Detention Group (JDG) for JTF-GTMO. Colonel Vargo is responsible for all detention operations at JTF-GTMO Detention Camps. Exhibit 3 ("Vargo Decl.") ¶ 1. As detailed by Colonel Vargo, authorization of Oleoresin Capsicum (OC) spray is restricted and it cannot be used in any situation in which control is obtained, such as situations where a detainee is restrained and not a harm for to himself or others. *Id.* ¶ 12. Records do not reflect any information that petitioner was sprayed by OC Spray while being restrained to a chair. *Id.* ¶ 13. Being in a restrained chair would preclude the need for the use of OC spray, and such use would be inappropriate and contrary to policy and procedures. *Id.*

example, in November, 2003, following petitioner's complaint of painful urination with blood

visible in his urine, medical staff diagnosed that petitioner had a left sided kidney or urethral

stone. *Id.* ¶ 22. Petitioner was prescribed pain medication following a helical CT of the

abdomen and pelvis that indicated no evidence of any stones within the kidneys and a small area

of possible stone formation 3 mm x 4 mm in diameter at the ureteralvesicular junction. *Id.* When

a second CT scan was performed, at which time petitioner was no longer experiencing pain, no

stone was detected, indicating that the stone had passed on its own. *Id.* Follow-up included

another visit with a urologist in December, 2003, another x-ray of kidneys and ureters, and a

urinalysis. *Id.* At that point, medical staff assessed this medical condition to be resolved. *Id.*

As detailed by Captain Meneley, the JTF-GTMO medical staff's treatment of petitioner's

urinary tract problems was medically appropriate and within the standard of care for such

conditions. *Id.* ¶ 29. Petitioner's records indicate a total of twenty nine urinalyses from June

2002 to the present, along with multiple Helical CT scans and KUB abdominal / pelvic X-rays.

*Id.* It should be noted that petitioner's urinary tract issues are not associated with his hunger

strike. *Id.* ¶ 20. Petitioner has continued to drink water since his hunger strike began. *Id.* ¶ 20.

Petitioner has received treatment for numerous other physical aliments and complaints.

*See, e.g. id.* ¶ 31 (petitioner prescribed appropriate medications and consulted to physical therapy

for lower back pain); *id.* ¶ 32 (petitioner provided orthotic shoe supports and special medical

athletic shoes and consulted to physical therapy for bilateral knee and ankle swelling and pain[2] );

---

[2] Petitioner alleges that Guantanamo camp guards confiscated an ankle brace that he had
obtained from another detainee to relieve ankle pain. Pet'r's Mot. at 3. Colonel Vargo details
that it is camp policy for guards to search for contraband items. Vargo Decl. ¶ 10. Contraband
is considered any item, article, or substance not issued to detainees, not authorized for their use,
and any item altered by the detainee. *Id.* Records indicate that on April 8, 2007, camp guards

*id.* ¶ 34 (petitioner prescribed appropriate medical therapy for chronic extreme hemorrhoids and anal fissure). A review of his medical records showed no complaints or symptoms associated with acute or chronic gout, and a test of his uric acid levels in November, 2003, which would serve as an indicator of gout, were within normal ranges. *Id.* ¶ 30. Petitioner did suffer two lacerations on his face or head that required sutures; his medical records document that he was given 3-4 ml of injectable lidocaine anesthetic agent to numb the edges of the wounds before sutures were applied. *Id.* ¶ 33.

Despite allegations in petitioner's motion, there is no evidence in his medical records of a broken finger. *Id.* ¶ 35. Medical records indicate that petitioner complained on two occasions of pain in the digits of his hand. *Id.* X-rays were performed on the petitioner in March, 2004, and August, 2008; there was no sign of fracture of the bone. *Id.*

Petitioner also declined medical care in a number of instances, including prescribed medications, procedures recommended by consulting specialists, physical therapy appointments, and laboratory studies. *Id.* ¶ 37-47. For example, in October, 2003, petitioner declined to take an antibiotic prescribed to treat symptoms compatible with bacterial pharyngitis. *Id.* ¶ 38. In November, 2007, petitioner declined a colonoscopy to help the general surgeon better assess the cause of his recurring rectal bleeding. *Id.* ¶ 41. And, throughout his detention, petitioner has on occasion declined to allow blood work to be drawn or urinalysis to be performed to confirm

---

conducted a search of the petitioner and discovered an ankle brace on his ankle that had not been issued or given by any authorized source, such as staff or medical personnel. *Id.* ¶ 11. Because the ankle brace met the definition of contraband, it was seized by the guards. *Id.* Captain Meneley details that orthopedic consultants have never concluded that a brace is required for his ankle condition, which has been diagnosed as mild left ankle laxity. Meneley Decl. ¶ 32. Instead, petitioner was referred to physical therapy for ankle strengthening exercises. *Id.*

medical staff's diagnoses. *Id.* ¶ 47.

In summary, petitioner has received extensive and ongoing medical care from Guantanamo medical personnel. Petitioner was administered the enteral feeding process in a humane and compassionate manner, and only to preserve his health. The enteral feeding is helping the detainee maintain his body weight. *Id.* ¶ 17. To date, medical personnel have conducted 61 radiologic imaging studies and 370 laboratory studies on the petitioner; of the laboratory studies, 308 were conducted were conducted since he began his hunger strike. *Id.* ¶¶ 9, 19. Petitioner has had over 20 urinalyses and urine cultures, along with several CT scans and KUB abdominal/pelvic x-rays. *Id.* ¶ 29. Petitioner is currently in good health with no significant medical problems. *Id.* ¶ 48.

### ARGUMENT

For the reasons discussed below, this Court lacks jurisdiction to consider petitioner's conditions-of-confinement claim because, even after the Supreme Court's *Boumediene* decision, 28 U.S.C. § 2241(e)(2) prevents this Court from considering challenges to any aspect of a detainee's detention apart from the core habeas function of inquiring into the lawfulness of that detention. Moreover, even if this Court had jurisdiction, petitioner's challenge would fail because he has not met his burden of demonstrating the need for the extraordinary injunctive relief that he seeks.

### I.    THIS COURT LACKS JURISDICTION TO CONSIDER PETITIONER'S CHALLENGES, AND HIS MOTION SHOULD ACCORDINGLY BE DENIED OUTRIGHT.

Through section 7 of the MCA, Congress expressly withdrew from this Court's jurisdiction two independent types of actions that individuals detained by the United States as

enemy combatants could bring.  Specifically, Congress carved out of this Court's jurisdiction

claims concerning statutory habeas corpus generally:

> No court, justice, or judge shall have jurisdiction to hear or consider an
> application for a writ of habeas corpus filed by or on behalf of an alien detained
> by the United States who has been determined by the United States to have been
> properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1).  Congress separately withdrew federal court jurisdiction concerning any

other aspects of the detention outside of the core habeas function, such that:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other
> action against the United States or its agents relating to *any aspect of
> the detention, transfer, treatment, trial, or conditions of confinement of an alien* who
> is or was detained by the United States and has been determined by the United
> States to have been properly detained as an enemy combatant . . . .

28 U.S.C. § 2241(e)(2) (emphasis added).  Under the recent decision in *Boumediene*, it is clear

that the Supreme Court did not invalidate the MCA except to the extent that it precluded courts

from exercising core habeas functions, i.e., challenging the legality of the detention itself.

Petitioner's claims here indisputably fall outside the *Boumediene* holding because they do not

concern the core habeas function.  They do not challenge the legality of the petitioner's detention,

but rather the ancillary issue of the conditions of his confinement.  Jurisdiction is therefore

lacking and the motion must be denied.

    **A.**    ***Boumediene* Did Not Invalidate The MCA Except To The Extent That It
Precluded Courts From Exercising Core Habeas Functions.**

In *Boumediene*, the Supreme Court held that Guantanamo Bay detainees have a

constitutional right to seek habeas corpus protected by the Suspension Clause, and that, as

applied to detainees who are being held on the basis of an enemy combatant determinations by a

Combatant Status Review Tribunal ("CSRT") and whose habeas challenge goes to the legality of

their detention, section 7 of the MCA operates as an unconstitutional suspension of the writ. This holding is limited in two important respects.

First, *Boumediene* holds that the first part of section 7 of the MCA, 28 U.S.C. § 2241(e)(1), is unconstitutional in some circumstances, but only insofar as it denies habeas review to detainees who have available to them only the CSRT process and who raise a core habeas challenge, that is, one that challenges the legality of their *detention*. *See Boumediene*, 128 S.Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power *to detain*.") (emphasis added). Put another way, to the extent a petitioner seeks habeas relief concerning collateral or ancillary issues not directly connected to the legality of detention, *Boumediene*'s holding does not invalidate the jurisdiction limiting provision of § 2241(e)(1). The result in *Boumediene* thus can be read not as a facial invalidation of § 2241(e)(1), but an invalidation of § 2241(e)(1) only as applied to the particular factual situation presented, as it was never established that "no set of circumstances exists under which [section 7] would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Indeed, it is indisputable that the challenge presented by the *Boumediene* petitioners only was the legality of their detention, not the right to raise a habeas challenge to some ancillary issue. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 328–29 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'") (citation omitted).

With regard to how much of § 2241(e)(1) remains operative following *Boumediene*, a reviewing court has an obligation to preserve as much of a statute as is legally permissible. Thus, "a court should refrain from invalidating more of the statute than is necessary," and "whenever an

act of Congress contains unobjectionable provisions separable from those found to be

unconstitutional, it is the duty of [the] court to so declare, and to maintain the act in so far as it is

valid." *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion).  Thus, because Acts of

Congress are valid to the extent they operate constitutionally, the Court's holding must be applied

with an eye to "limit[ing] the solution to the problem." *Ayotte*, 546 U.S. at 328.  Because the

problem alleged in *Boumediene* as to § 2241(e)(1) concerned only a core habeas challenge to the

legality of detention made by a petitioner with access only to the CSRT process, and not to an

ancillary issue related only to conditions of confinement, § 2241(e)(1) remains operative here and

removes jurisdiction with regard to the instant challenge.

Second, *Boumediene*'s holding does not invalidate the second part of section 7.  Indeed,

the Court expressly noted that it was not deciding whether Guantanamo detainees have a

constitutional right to bring non-core habeas claims, such as conditions-of-confinement

claims—one type of claim barred by § 2241(e)(2).  *See Boumediene*, 128 S.Ct. at 2274 ("[W]e

need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment

or confinement."); *id.* at 2277 ("It bears repeating that our opinion does not address the content of

the law that governs petitioners' detention.").  Therefore, even after *Boumediene*, Congress'

withdrawal of federal court jurisdiction over "any other action . . . relating to any aspect of the

detention, transfer, treatment, trial, or conditions of confinement" remains operative to deprive

this Court of jurisdiction over petitioner's claims, which are ancillary to the core habeas issue.

The Supreme Court's rationale for invalidating § 2241(e)(1), as applied, has no

application to § 2241(e)(2).[3]  The *Boumediene* majority discusses the detainees' constitutional right to bring only core *habeas* actions—challenging the lawfulness of detention—as opposed to the broader class of "any other action . . . relating to any aspect of the detention."  *See, e.g., id*. at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas corpus *to challenge the legality of their detention*.") (emphasis added).  Unlike § 2241(e)(1) however, § 2241(e)(2) does not impair the Guantanamo detainees' ability to pursue a writ of habeas corpus.  Rather, it expressly limits *other* types of actions that Guantanamo detainees might bring.  Recently, another Judge in this Court came to the same conclusion:

> In deciding *Boumediene*, the Court limited its analysis to whether detainees could challenge the legality of their detention through constitutional habeas, *Boumediene*, 128 S. Ct. at 2240, 2262 (noting that "other questions regarding the *legality* of the detention are to be resolved in the first instance by the District Court" and that "[p]etitioners . . . are entitled to the privilege of habeas corpus to challenge the *legality* of their detention") (emphasis added), and explicitly stated that it was not determining "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement," *id*. at 2274.  And therefore, this court interprets *Boumediene* to invalidate only 28 U.S.C. § 2241(e)(1).

*In re Guantanamo Bay Detainee Litigation*, No. 05-CV-01509 (RMU), Memorandum Opinion at 6 (dkt. no. 151, dated Aug. 7, 2008) (Urbina, J.) (hereinafter "Urbina Memorandum Opinion").  The Suspension Clause thus provides no basis for invalidating § 2241(e)(2), because that section addresses "other action[s]" and not any constitutional core habeas right the detainees may hold.

----

[3] Although the Court's opinion refers generally to section 7, without identifying a particular subsection of 28 U.S.C. § 2241(e), *see, e.g., Boumediene*, 128 S.Ct. at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."), that is an insufficient basis for construing the Court's opinion to invalidate all of section 7.  This is particularly so because the Court's rationale for invalidating § 2241(e)(1) has no application to § 2241(e)(2).  In fact, at one point in its opinion, the Court seems to acknowledge that its reference generally to section 7 is simply short-hand for referring to § 2241(e)(1). *See id*. at 2265 (stating that MCA section 7 is the source of the relevant "jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

While the continuing vitality of § 2242(e)(2) is therefore clear, if any doubt remains this Court must consider its duty to preserve as much of a statute as is constitutional. *See* Urbina Memorandum Opinion at 6 ("[T]he court recognizes that it must 'refrain from invalidating more of the statute than is necessary [w]henever an act of congress contains unobjectionable provisions separable from those found to be unconstitutional.'") (citation omitted); *Tilton v. Richardson*, 403 U.S. 672, 684 (1971) ("'The unconstitutionality of a part of an act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the Legislature would not have enacted those provisions which are within its power . . . the invalid part may be dropped if what is left is fully operative as a law.'") (citation omitted). Indeed, because § 2241(e)(2) is severable, there is no obstacle to continuing to apply that provision, despite *Boumediene*'s holding that § 2241(e)(1) cannot validly withdraw the privilege of the writ of habeas corpus as applied to detainees at Guantanamo who have only the benefit of CSRT procedures. *See Ayotte*, 546 U.S. at 330 ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?"). Thus, the Court's holding that the Suspension Clause requires invalidation of section 7 of the MCA as applied to aliens detained at Guantanamo should be read to apply only to the first part of section 7, that is, § 2241(e)(1), and only as discussed above.

**B.    The Right to Seek a Writ of Habeas Corpus Recognized in *Boumediene* Does Not Encompass a Right to Challenge Ancillary Issues, including Conditions of Confinement.**

Section 2241(e)(1) still validly removes this Court's jurisdiction over issues ancillary to and beyond the core habeas function of challenging the legality of detention and § 2241(e)(2) remains fully operative. Consequently, there is no federal court jurisdiction over "any other

action" concerning "any aspect" of petitioner's detention, treatment or confinement, including petitioner's medical care, except insofar as such actions may be constitutionally protected under *Boumediene*'s interpretation of the Suspension Clause. Therefore, under § 2241(e)(1) as applied to this claim and under § 2241(e)(2), petitioner cannot state cognizable habeas claims, such as a challenge to the conditions of his confinement, unless his constitutional right to habeas corpus encompasses those claims.

The elimination of jurisdiction over such ancillary claims, however, could not constitute a Suspension Clause violation because they do not go to the core of habeas—challenges to the legality of detention—addressed by the Supreme Court in *Boumediene*. A habeas action has historically been understood as a vehicle for challenging one thing only: the fact of detention or its duration. Nothing else. That is, the Great Writ concerns only relief that, if granted, will result in petitioner's release from confinement, not with other ancillary issues. Petitioner's claims here, which concern his medical treatment and care during his three year self-imposed hunger strike, are far from the heart of habeas as a remedy for unlawful detention. Jurisdiction is therefore lacking to consider these claims.

The Supreme Court thus far has been unwilling to water down the writ from its core purpose in the way petitioner seeks. *See Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."); *see also Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring) (noting that conditions-of-confinement claims in habeas would "utterly sever the writ from its common-law roots"); *Brown v. Plaut*, 131 F.3d 163, 168–69 (D.C. Cir. 1997) (indicating that requiring the use

of habeas corpus for conditions claims would extend the writ beyond its core).[4]  Indeed, in *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), the D.C. Circuit recognized that a habeas action "is not the correct remedy" for challenging "discipline or treatment," *id.* at 419–20.[5]

Thus, even prior to the MCA, a detainee could not have challenged his conditions of confinement under statutory habeas jurisdiction.  And if statutory habeas jurisdiction prior to the MCA did not encompass challenges to conditions of confinement, *a fortiori* the writ as it existed

---

[4] Indeed, the courts of appeals have held that conditions-of-confinement claims that do not seek accelerated release from custody are not within the scope of the writ.  *See Doe v. Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 100 n.3 (3d Cir. 2008) (noting that habeas is limited to "[a]ttacks on the fact or duration of the confinement" and does not include "[c]hallenges to conditions of confinement"); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006) (noting that habeas corpus actions are not the proper vehicle for challenging conditions of confinement); *Glaus v. Anderson*, 408 F.3d 382, 387–88 (7th Cir. 2005) (noting the Supreme Court has "never found" a challenge to prison conditions that "qualified" as a habeas corpus claim); *Rael v. Williams*, 223 F.3d 1153, 1154 (10th Cir. 2000) ("[F]ederal claims challenging the conditions of . . . confinement generally do not arise under § 2241."); *Pischke v. Litscher*, 178 F.3d 497, 499 (7th Cir. 1999) (stating that habeas action is proper "only if the prisoner is seeking to 'get out' of custody in a meaningful sense"); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) ("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement," but not to "challeng[e] 'conditions of . . . confinement.'") (citation omitted).

[5] In *Miller*, the D.C. Circuit allowed the petitioner to challenge the legality of his confinement to a mental institution, because the challenge was essentially a core habeas claim—disputing that he was not insane and thus could not be held in a facility for the criminally insane—rather than an attack on the conditions of lawful confinement.  *See* 206 F.2d at 418 ("[T]his habeas corpus proceeding . . . tests only the legality of his present confinement . . . ."); *id.* at 419 (noting that the "legal validity of confinement in a certain place is a different problem" than "discipline or treatment in a place of legal confinement"); *see also Blair-Bey v. Quick*, 151 F.3d 1036, 1041–42 (D.C. Cir. 1998) (acknowledging possibility that habeas "might be available to challenge prison conditions in at least some situations," but that "pure prison-conditions cases" are "easy to identify" as outside the scope of habeas corpus); *Plaut*, 131 F.3d at 168–69 (use of habeas corpus to challenge conditions of confinement would extend "beyond the 'core' of the writ").  The same consideration is not present here, where petitioner as an enemy combatant is lawfully detained—or have recourse in core habeas proceedings to challenge that detention—and here attacks only the conditions of his detention.

-14-

at common law in 1789 would not have permitted such claims. *See Rasul v. Bush*, 542 U.S. 466, 474 (2004) (stating that the "habeas statute clearly has expanded habeas corpus 'beyond the limits that obtained during the 17th and 18th centuries'").  Although the Supreme Court in *Boumediene* noted that the Court has not "foreclose[d] the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments," *Boumediene*, 128 S. Ct. at 2248, there is nothing in the Court's opinion to suggest that detainees' constitutional habeas rights extend beyond the common-law writ as it existed in 1789, or require them to be able to challenge their conditions of confinement.  In fact, the *Boumediene* Court expressly declined to address whether the constitutional writ of habeas corpus encompasses claims regarding unlawful conditions of confinement.  *See id*. at 2274.  Thus, the Suspension Clause should be read, at most, to protect the common-law writ as it existed in 1789.  In any event, however, even if the writ protected by the Suspension Clause has expanded along with the habeas statute, the habeas statute has not been interpreted to allow challenges to conditions of confinement, as explained above.[6]  Accordingly, the MCA's elimination of jurisdiction over conditions-of-confinement claims brought by Guantanamo detainees does not implicate the Suspension Clause.

Indeed, the Court's decision in *Munaf v. Geren*, ___ U.S. ___, 128 S. Ct. 2207 (June 12, 2008)—decided the same day as *Boumediene*—further supports this understanding of the writ's scope.  In *Munaf*, the Court emphasized that "[h]abeas is at its core a remedy for unlawful

---

[6] Even if the habeas statute were to permit conditions-of-confinement claims, the Guantanamo detainees have no rights under the habeas statute.  *See* MCA § 7, 28 U.S.C. § 2241(e)(1); *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring) ("Subsequent legislation eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all.").  There is no authority for the proposition that *constitutional* habeas corpus encompasses challenges to the conditions of confinement.

detention. . . . The typical remedy is, of course, release." *Munaf*, 128 S. Ct. at 2221 (citing

*Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)); *see also Preiser v. Rodriguez*,

411 U.S. 475, 484 (1973), quoted in *Munaf*, 128 S. Ct. at 2221 ("[T]he traditional function of the

writ is to secure release from illegal custody."). Accordingly, the Court refused to extend the

relief that a habeas court could grant to the *Munaf* petitioners' collateral challenge to their

transfer to Iraqi custody. *Munaf*, 128 S. Ct. at 2228 ("Habeas corpus does not require the United

States to shelter such fugitives from the criminal justice system of the sovereign with authority to

prosecute them."). As with the collateral claims at issue in *Munaf*, petitioner's plea for relief here

falls well outside the core of a habeas corpus proceeding, and requests a form of relief that may

not be granted in habeas.

**C.    The All Writs Act does not Provide a Basis for the Relief Sought by Petitioner.**

The petitioner's invocation of the All Writs Act, 28 U.S.C. § 1651(a), also falls short in

providing the relief he seeks. The All Writs Act provides that courts "may issue all writs

necessary or appropriate in aid of their respective jurisdictions." That statute "'confines [a

court's] authority to the issuance of process 'in aid of' the issuing court's jurisdiction" and "does

not enlarge that jurisdiction.'" *In re Tennant*, 359 F.3d 523, 527 (D.C. Cir. 2004) (quoting

*Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999)). As discussed above, this Court lacks

jurisdiction to hear or consider a motion to alter petitioner's conditions of confinement. And

because the All Writs Act does not expand that jurisdiction, petitioner cannot invoke it to obtain

relief. *Id.* ("As this statutory language makes clear, the Act is not itself a grant of jurisdiction . . .

. [T]he Act does not enlarge [] jurisdiction.") (citation and quotation marks omitted).

Petitioner's reliance on *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008), is misplaced. In *Belbacha*, the petitioner appealed the district court's determination that it lacked jurisdiction to adjudicate his request for interim relief to bar his transfer to a country that might torture him. *Belbacha*, 520 F.3d at 455-56. Recognizing the scope of the district court's jurisdiction could potentially be impacted by the Supreme Court's then-pending decision in *Boumediene,* the D.C. Circuit issued the limited holding that when "the Supreme Court grants certiorari to review this court's determination that the district court lacks jurisdiction, a court can, pursuant to the All Writs Act, 28 U.S.C. § 1651, and during the pendency of the Supreme Court's review, act to preserve the status quo in other cases raising the same jurisdictional issue if a party satisfies the criteria for issuing a preliminary injunction." *Id.* at 457. Petitioner's circumstances in this case are entirely distinct from that in *Belbacha*. The Supreme Court already has ruled in *Boumediene,* and it did not invalidate the MCA except to extent that it precluded courts from exercising core habeas functions, which, as discussed above, only focuses on the legality of the detention itself. And as detailed below, petitioner does not satisfy the criteria for a preliminary injunction. Therefore, under the D.C. Circuit's limited holding in *Belbacha*, this Court lacks jurisdiction to entertain petitioner's claims.

Even on the merits, it is unclear how issuing the relief petitioner seeks would be necessary or appropriate to "aid" the Court in its "respective jurisdiction." The All Writs Act is "an extraordinary remedy pursuant to which a court may enjoin almost any conduct which, left unchecked, would have. . .the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *Al-Anazi v. Bush*, 370 F.Supp.2d 188, 195 (D.D.C. 2005) (internal citation and quotation marks omitted). Petitioner cites the necessity of the All Writs Act

to protect his "ability to participate in his habeas proceedings" and interact with his counsel.
Pet'r's Mot. at 6.  But petitioner does not explain how his medical condition has impacted either.
To the contrary, the declaration by Captain Meneley factually refutes that petitioner has received
inadequate medical care petitioner or that his health is in a fragile state.  There is simply no
evidence that the medical care provided to petitioner has thwarted this Court's jurisdiction.

      For these reasons, the All Writs Act does not provide a basis for the relief petitioner
seeks.

## II.   EVEN IF THIS COURT HAD JURISDICTION TO ENTERTAIN THE PETITIONER'S MOTION, IT SHOULD BE DENIED BECAUSE THE PETITIONER FAILS TO MEET HIS BURDEN OF SHOWING A NEED FOR THE EXTRAORDINARY AND DRASTIC INJUNCTIVE RELIEF HE SEEKS.

      To prevail in his request for a preliminary injunction, petitioner "must 'demonstrate 1) a
substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the
injunction is not granted, 3) that an injunction would not substantially injure other interested
parties, and 4) that the public interest would be furthered by the injunction.'"  *See Katz v.
Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting *CityFed Financial Corp. v.
Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  In assessing a motion for a
preliminary injunction, the district court should "balance the strengths of the requesting party's
arguments in each of the four required areas."  *Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290, 297 (D.C.Cir. 2006) (citation and quotation marks omitted).  Because a showing of
irreparable harm is the basis of injunctive relief, however, a "movant's failure to show any
irreparable harm is therefore grounds for refusing to issue a preliminary injunction."  *Id.*   It is
well-established that a request for preliminary injunctive relief "is an extraordinary and drastic

remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

### A.    Petitioner Has Not Established that He Faces Any Imminent, Irreparable Injury.

Even if this Court had jurisdiction to consider petitioner's motion (which it does not), his request for a preliminary injunction should be denied because his submission on its face fails to demonstrate an irreparable harm that may be remedied by the relief he seeks.

The irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted; emphasis in original). Injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991) (citations and quotation marks omitted).

Petitioner claims that the Guantanamo medical staff have failed to treat or properly diagnose his numerous medical aliments (*see e.g.,* Pet'r's Mot. at 1-3), subjected him to a brutal force-feeding regimen and other painful practices (*see e.g., id.* at 2-3), and violated professional ethics and standards (*see e.g., id.* at 3), supposedly as punishment for and to convince him to end participation in a three-year hunger strike. The motion describes petitioner's health as

-19-

"precarious" to the point that his ability to participate in his habeas proceedings and interact with counsel is threatened. *Id.* at 4, 6. Despite the emotionally-charged language, petitioner's allegations that he has received harmful medical care are without merit. Nor has the Guantanamo medical staff deliberately and repeatedly endangered petitioner's health. Rather, petitioner has been provided extensive medical care, including examinations, diagnoses, and treatments for numerous physical ailments.

For over three years, petitioner has participated in a hunger strike. The Guantanamo medical staff has taken and continues to provide appropriate medical care to preserve petitioner's life and health. As detailed by Captain Meneley, petitioner is fed enterally twice a day for approximately a total of 70 to 110 minutes. Meneley Decl. ¶ 16. Petitioner's feeding tube, per his request, is lubricated with olive oil and, due to his cooperation during his current feedings, he is not constrained by all of the restraints on the restraining chair. *Id.* ¶¶ 16, 18. Petitioner has not expressed any discomfort to the staff with the procedure and he apparently has not complained to the staff of blocked nasal passages. *Id.* ¶ 18. Contrary to petitioner's allegations, enteral feeding was implemented and continues to be imposed not to punish or persuade petitioner from participating in the hunger strike, but to maintain his life and health.

Since being detained, petitioner also has been diagnosed and offered treatment for a number of physical ailments and complaints. These include painful urination, blood in his urine, kidney pain, low back pain, bilateral knee and ankle swelling and pain, and hemorrhoids and anal fissure. *Id.* ¶ 20-34. Petitioner has received extensive testing and laboratory work, including 61 radiologic imaging studies and 370 laboratory studies. *Id.* ¶ 9. He also has declined medical care on a number of occasions, including prescribed medications and recommendations by consulting

specialists.  *Id.* ¶ 37-47.

As illustrated above, the story petitioner has conveyed to his counsel is refuted by the detailed declaration provided by Captain Meneley.  Far from deliberately and repeatedly endangering petitioner's health, Guantanamo medical personnel have provided and continue to provide petitioner with comprehensive and attentive medical care. [7]  In addition, petitioner's generalized and speculative allegations of potential harm to his case or interaction with his counsel – based solely on refuted allegations of abusive medical care – are specious.  It is telling that petitioner and his counsel do not actually explain how his current medical condition has impeded the Court's ability to conduct these proceedings or his ability to interact with his counsel, except to the extent they imply that his alleged "precarious" health may further deteriorate.  But as detailed above, petitioner is currently in good health with no significant medical problems.  Meneley Decl. ¶ 48.  Consequently, petitioner has not carried his burden of establishing an imminent threat of irreparable harm related to Guantanamo's provision of medical care to him.

**B.    Petitioner Has Little Chance of Success on the Merits.**

This Court should also deny petitioner's motion for a preliminary injunction because he

_____

[7]  Petitioner cites to *Al-Joudi v. Bush*, 406 F.Supp.2d 13 (D.D.C. 2005) (Kessler, J.), as support for a couple of the preliminary injunction factors, including irreparable injury.  In *Al-Joudi*, counsel for detainees participating in a hunger strike asked for updates on detainees' health status and access to their hospitalization records.  *Id.* at 15.  Recognizing that "courts often find a showing of irreparable harm where the movant's health is in imminent danger," and that "[p]etitioners have provided sufficient facts . . . to establish that the threat of death or serious physical deterioration is real and imminent," the Court granted relief.  *Id.* at 20.  But Captain Meneley's declaration directly refutes that petitioner's health is in imminent danger or that he faces a threat of real and imminent physical deterioration.

has not demonstrated a substantial likelihood of success on the merits. Petitioner specifically states that "[T]he relief sought herein is needed to ensure that Petitioner is receiving appropriate and humane medical treatment, that undersigned counsel can discharge their obligations, and that this Court can proceed apace with its adjudication of this matter." Pet'r's Mot. at 4. Such relief in essence asks the Court to significantly to intrude upon, and micro-manage the operations of, the Guantanamo Bay medical facility and staff, not to mention second guessing the medical staff's judgment.

As discussed in Part I above, this Court lacks jurisdiction to hear or consider a motion to alter petitioner's conditions of confinement. Moreover, as also discussed in Part I, the core habeas right recognized in *Boumediene* does not include, and has never included, the right to challenge the conditions under which a detainee is confined. On that basis alone, petitioner's claim cannot succeed.

But even assuming both that *Boumediene* invalidated § 2241(e)(2)—a dubious proposition indeed, given that the Court expressly declined to extend its discussion to conditions-of-confinement claims—and that such claims would be cognizable in habeas in any event, and making the third assumption that petitioner is entitled to other constitutional protections under the Eighth Amendment or otherwise, he still fails to demonstrate that his conditions-of-confinement claims are likely to succeed.

At the threshold, it is worth noting that no court has definitively determined what legal standard should be applied to evaluate conditions-of-confinement claims brought by detainees in the custody of the military. *See O.K. v. Bush*, 377 F. Supp. 2d 102, 112 n.10 (D.D.C. 2005) ("No federal court has ever examined the nature of the substantive due process rights of a prisoner in a

military interrogation or prisoner of war context."); *see also* Urbina Memorandum Opinion at 4

("What is clear is that no court has ever ruled that detainees, designated as enemy combatants,

have a right to challenge the conditions of their confinement pursuant to the constitutional writ of

habeas corpus."). [8]  In settings in which courts have analyzed conditions-of-confinement claims,

the most analogous is that of detained unadmitted or excludable aliens, in which courts have

considered only whether the challenged conditions constituted a Fifth Amendment substantive

due process right under a "gross physical abuse" standard.  *See Adras v. Nelson*, 917 F.2d 1552,

1559 (11th Cir. 1990); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987).[9]  In the setting

of imprisoned criminals, courts have applied the Eighth Amendment's "deliberate indifference"

standard, *see Farmer v. Brennan,* 511 U.S. 825, 846 (1994) (requiring prisoner to establish that

prison officials were "knowingly and unreasonably disregarding an objectively intolerable risk of

harm" to the prisoners' health or safety); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

---

[8] Although in *Al-Joudi* the Court granted petitioners preliminary injunctive relief, the Court did not articulate a legal standard for conditions-of-confinement claims.  406 F.Supp.2d at 20-22.  Instead, the Court focused on whether counsel's access to petitioners was imperil, after already concluding that there were sufficient facts to establish petitioners faced a real and imminent threat of death or serious physical deterioration.  Because petitioner in this case faces no such threat and, as discussed elsewhere in this Opposition, does not adequately explain how access to his counsel is threatened, *Al-Joudi* is inapposite and, therefore, would not govern even if it were binding, which it is not.

[9] The constitutional standard of care owed to "pretrial detainees" in the criminal justice context – defined by the Supreme Court as "those persons who have been charged with a crime but who have not yet been tried on that charge" – is governed by the Due Process Clause of the Fifth Amendment.  *Wolfish*, 441 U.S. at 523.  "[W]here it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment, for under the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law."  *Block v. Rutherford*, 468 U.S. 576, 583 (1984) (internal quotation marks omitted); *see also Brogsdale v. Barry*, 926 F.2d 1184, 1188 n.4 (D.C. Cir. 1991).

-23-

Regardless of which standards directly applies to the Guantanamo detainees, courts have at least employed the constitutionally-based "deliberate indifference" standard as a guide to evaluate claims of deficient medical care and challenges to conditions of confinement asserted by Guantanamo detainees. *See O.K. v. Bush*, 344 F. Supp. 2d 44, 60-63 & n.23 (D.D.C. 2004) (Bates, J.) ("Without concluding that the 'deliberate indifference' doctrine" applies to challenges regarding inadequate medical care, "the Court will draw on this well-developed body of law to guide its analysis"); *Al-Ghizzawi v. Bush*, No. 05-CV-02378 (JDB), Memorandum Opinion at 7-9 (dkt. no. 47; Oct. 2, 2006) (Bates, J.) (applying deliberate indifference standard to detainee's claim of inadequate medical care). Under that standard, to justify a court intervening in the treatment of inmates in a traditional penal prison setting, petitioner must demonstrate that government officials have exhibited "deliberate indifference" to a prisoner's "serious medical needs." *See Neitzke v. Williams*, 490 U.S. 319, 321 (1989); *Chandler v. District of Columbia Dept. of Corrections*, 145 F.3d 1355, 1360 (D.C. Cir. 1998) ("To prevail in a case alleging unconstitutional conditions of confinement, a prisoner must show that the government official 'knew of and disregarded an excessive risk to inmate health or safety'") (internal citation omitted). As Judge Bates explained in a prior challenge by a Guantanamo detainee regarding medical care:

> A prisoner challenging his medical care must be prepared to show that officials were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety . . . . This standard means that courts will not intervene upon allegations of mere negligence, mistake or difference of opinion . . . . Absent a showing of misconduct that rises to the level of deliberate indifference, courts will not sit as boards of review over the medical decisions of prison officials, and they will not second-guess the adequacy of a particular course of treatment.

*O.K.*, 344 F. Supp. 2d at 61 (internal citations and quotation marks omitted).

Petitioner's allegations fall far short of this benchmark.  As detailed above, the declaration of Captain Meneley refutes petitioner's claims regarding his medical care and health.  Petitioner has not been subject to a "brutal force-feeding regimen," but instead has received appropriate medical care during his hunger strike.  And Guantanamo medical personnel have been attentive to petitioner's other medical needs, providing petitioner with extensive and comprehensive medical care.  Accordingly, even if habeas courts have the authority to consider challenges to a detainee's confinement conditions, petitioner is not likely to succeed on the merits of his challenge because he cannot demonstrate that the Guantanamo staff has been deliberately indifferent to his health or well-being.

C.    **The Relief Requested Would Impose Substantial and Undue Burdens on the Government and Injure its Interests.**

Petitioner's request relief would impose substantial and undue burdens on Guantanamo staff, as well as interfere with the appropriate operation of Guantanamo's provision of medical care.  Courts are understandably reluctant to intervene in the management of medical decisions or second-guess the adequacy of a particular course of medical treatment.  *See O.K.*, 344 F. Supp. 2d 44 at 61.  Petitioner's motion, however, seeks to do just that by asking the Court to "ensure that Petitioner is receiving appropriate and humane medical treatment," Pet'r's Mot. at 4, beginning with the appointment of an independent medical examiner and the release of petitioner's medical records.

Petitioner's argument that the relief sought on this motion would be of no significant burden to the Government is misplaced.  Petitioner attached an affidavit by Dr. Robert Cohen to his motion, in which Dr. Cohen contemplates a wide-range of tests – from non-invasive urine and

x-rays tests, among others, to potentially more evasive tests, such as an esophago-gastro-

duodenoscopy (EGD) – and evaluations from multiple medical specialists in order to evaluate

petitioner's medical condition. [10] Pet'r's Mot. Ex. 2 ¶¶ 21-33.  Accommodating this physician in

his plan to undertake this sort of activity would result in an improper intrusion on Guantanamo's

military mission and undermine the administration of medical care to detainees.

    While petitioner's request for medical records is arguably less intrusive, the purpose for

them, to have the Court micro-managed petitioner's medical care and second-guess the

Guantanamo staff's medical expertise and judgment, is not.  Petitioner's request to access his

medical records also is an inappropriate attempt at discovery, which would be unduly

burdensome. [11]  Petitioner is certainly not entitled to such discovery.  *See* Government's Brief

Regarding Procedural Framework Issues at 22-36 (dkt. no. 39, dated Aug. 12, 2008) (detailing the

appropriateness and limits on discovery in these proceedings).

    Petitioner also makes the inflammatory, dubious and unsupported assertion that he

believes Guantanamo medical personnel may have doctored his medical records.  Pet'r's Mot. at

11.  Petitioner does not explain how he would like to ultimately proceed on this front, but any

factual determination by the Court as to the authenticity and accuracy of his medical records

---

[10] It is telling that several of the examinations proposed by Dr. Cohen, including urinalysis and radiological examinations, and the necessity to which he can only speculate, have been administered by Guantanamo medical personnel to petitioner in response to complaints or diagnoses of physical ailments.

[11] Petitioner's counsel raised the prospect of using petitioner's medical records in his defense in a May 29, 2008, letter to the Department of Defense seeking such records pursuant to the Freedom of Information Act.  Pet'r's Mot. Ex. 4 at 15 ("Medical records will assist in Mr. Zaid's defense . . . . Additionally, medical records will help establish whether any statements made by Mr. Zaid to interrogators or custodians were involuntary, made under physical duress, or improperly facilitated by medical personnel.").

could entail additional, burdensome discovery on Guantanamo personnel. The Court should not permit petitioner to evade limitations on discovery simply by filing a motion for preliminary injunction.

The court also cannot view petitioner's request for relief in isolation. Any order granting the forms of relief petitioner seeks would likely will prompt counsel for many detainees in other cases to demand the same type of remedy. Such a precedent would not only unduly burden the Guantanamo medical staff, it has the potential of taking resources away from providing medical care to other detainees.

Plaintiff's requests seek the Court to interfere with the competent medical judgment and expertise of the Guantanamo medical staff. Such relief is not necessary because, as described above, the Guantanamo medical staff has provided petitioner with attentive and through medical care, and has never used such care to punish or coerce petitioner for participation in a hunger strike. This Court should thus deny a preliminary injunction.

**D.    The Public Interest Would Not be Served by a Preliminary Injunction.**

The public has a strong interest in assuring that the military operations and medical care provided at Guantanamo are not interrupted, overly burdened, and second-guessed by the unnecessary or contra-factual demands of a detainee pertaining to the particulars of his medical care. As demonstrated above, the Guantanamo staff has taken and will continue to take appropriate and careful measures to address the health and medical care of petitioner. Accordingly, to avoid the unnecessary burdens imposed by petitioner's motion, the public interest would best be served if the Court denied the motion.

**CONCLUSION**

-27-

For the reasons stated above, respondents respectfully request that petitioner's motion for preliminary injunction be denied in all respects.

Dated: August 22, 2008                    Respectfully submitted,


                                          GREGORY G. KATSAS
                                          Assistant Attorney General

                                          JOHN C. O'QUINN
                                          Deputy Assistant Attorney General

                                          _____/s/ *Scott D. Levin*_____
                                          JOSEPH H. HUNT (D.C. Bar No. 431134)
                                          VINCENT M. GARVEY (D.C. Bar No. 127191)
                                          JUDRY L. SUBAR (D.C. Bar No. 347518)
                                          TERRY M. HENRY
                                          ANDREW I. WARDEN
                                          PAUL E. AHERN
                                          SCOTT D. LEVIN
                                          Attorneys
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Avenue N.W.
                                          Washington, DC  20530
                                          Tel:  (202) 514-3755
                                          Fax:  (202) 616-8470

                                          Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
AHMED ZAID SALEM ZUHAIR,                  )
                                          )
          Petitioner,                     )
                                          )
     v.                                   )          Civil Action No. 08-0864 (EGS)
                                          )
GEORGE W. BUSH, et al.,                   )
                                          )
          Respondents.                    )
_____)

**[PROPOSED] ORDER DENYING PETITIONER'S MOTION TO COMPEL
PRODUCTION OF COMPLETE MEDICAL RECORDS AND FOR ORDER
PERMITTING INDEPENDENT MEDICAL EXAMINATION**


     IT IS HEREBY ORDERED THAT

     Petitioner's "Petitioner's Motion To Compel Production Of Complete Medical Records

And For Order Permitting Independent Medical Examination," (dkt. No. 37), is DENIED.


DATE: _____, 2008


                                        _____
                                        EMMET G. SULLIVAN
                                        United States District Judge

-29-

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AHMED ZAID SALEM ZUHAIR                    )
    Petitioner                                 )
                                               )
                                               )
          v.                                )    CIVIL ACTION
                                               )    NO. 08-CV-0864 (EGS)
                                               )
GEORGE W. BUSH, ROBERT GATES,              )
REAR ADM. MARK H. BUZBY, and               )
ARMY COL. BRUCE VARGO                       )
    Respondents                                )
                                               )
-------------------------------------------------    )

## DECLARATION OF CAPTAIN BRUCE C. MENELEY, M.D.

Pursuant to 28 U.S.C. § 1746, I, Bruce C. Meneley, M.D., hereby declare:

1.    I am a Captain in the United States Navy and with over 32 years of active and reserve service. I currently serve as the Commander, Joint Medical Group, Guantanamo Bay and Joint Task Force Surgeon, Joint Task Force – Guantanamo (JTF-GTMO), at Guantanamo Bay, Cuba. I am responsible for the medical care provided to personnel stationed at Guantanamo Bay and oversee the operation of the Joint Medical Group that provides medical care to the detainees being held at Guantanamo Bay. There are currently approximately 260 detainees being held at the detainee camp at Guantanamo Bay, Cuba. I have served in this position since July 6, 2007.

2.    I received my medical degree from the University of Nevada, School of Medicine. I completed an Internship at Naval Hospital Bremerton and a Residency in Emergency Medicine at Naval Medical Center San Diego.

3.    I have personal knowledge of the procedures that are in place for the operation of the Detention Hospital and I am responsible for ensuring that they are followed. Due to my

responsibilities, I have personal knowledge of, or have received information concerning the allegations made by ISN 669 (Ahmed Zaid Salem Zuhair, the petitioner in the above-captioned case) through his counsel. This declaration is based on information made available to me through my official duties and from the medical records of ISN 669.

## JOINT MEDICAL GROUP BACKGROUND

4.    The Joint Medical Group staff consists of licensed, board-certified physicians of different specialties. Specifically as of August 2008, the hospital staff consisted of 116 professionally trained individuals. This staff included an anesthesiologist, a general surgeon, an orthopedic surgeon, family physicians, internal medicine physicians, a psychiatrist, a psychologist, a physician's assistant, a licensed dietician, dentists, and a physical therapist. In addition, the staff included licensed medical/surgical nurses, corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians (lab, radiology, pharmacy, operating room, respiratory, physical therapy, information technology and biomedical repair), and administrative staff. We have routinely brought down specialists in Dermatology, Cardiology, ENT, Gastroenterology, Neurosurgery, Urology, and Audiology to name a few. Any specialty required is available. Other specialists specifically involved in the care of the detainees on hunger strike include nutritionists, internal medicine and behavioral health professionals, all of whom assisted in monitoring and providing specialized care, as needed.

5.    All detainees, upon arrival at Guantanamo Bay, are given a complete physical examination. Medical issues identified during the examination, or identified during subsequent examinations, are followed by the medical staff. Detainees may request medical care at any time by making a request to guard personnel in the cell blocks or to the medical personnel who make daily rounds on each cellblock. In addition to responding to such detainee requests, the medical

staff will investigate any medical issues observed by JTF-GTMO guards or staff. The availability of this care has resulted in thousands of outpatient contacts between detainees and the medical staff, followed by inpatient care as needed.

6.    Outpatient healthcare provided to the detainees is done at the medical facility in the detention camps as well as the Detention Hospital. Inpatient medical care is performed primarily in the Detention Hospital. The Detention Hospital is a 20-bed facility that is comparable to a small community hospital in the United States. For medical procedures beyond the capability of the Detention Hospital, the detainees are transferred to the Naval Base Hospital at Guantanamo Bay. As noted above, we can and have requested that specialists be flown in to provide care to detainees when the medical need warrants it.

7.    The Joint Medical Group is committed to providing unconditional appropriate comprehensive medical care to all detainees regardless of their disciplinary status, cooperation, or participation in a hunger strike. The healthcare provided to the detainees being held at Guantanamo Bay rivals that provided in any community in the United States. Detainees receive timely, compassionate, quality healthcare and have regular access to primary care and specialist physicians. The care provided to detainees is comparable to that afforded our active duty service members. All medical procedures performed are justified and meet accepted standards of care. A detainee is provided medical care and treatment based solely on his need for such care and the level and type of treatment is dependent on the accepted medical standard of care for the condition being treated. Diagnosis of such conditions and medical care and treatment for them are not affected in any way by a detainee's cooperation, or lack thereof, during an interrogation session. Similarly, medical care is not provided or withheld based on a detainee's compliance or noncompliance with detention camp rules or on his refusal to end a hunger strike. Medical

3

decisions and treatment are not withheld as a form of punishment.  Additionally, the medical

staff have no involvement in discipline decisions made by detention personnel.

## ALLEGATIONS MADE BY ISN 669

8.      Through his attorney, ISN 669 claims that he "has been subjected to an

increasingly brutal force-feeding regimen."  According to ISN 669, this regimen involves ISN

669 being strapped to a six-point restraint chair for four hours per day, and having a feeding tube

"shoved" into his nose and down into his stomach.  ISN 669 further asserts in his motion that

"these force feeding procedures are unnecessarily brutal and do not serve any legitimate medical

purpose."  As described below, these claims are inaccurate.

9.      ISN 669's motion also alleges that Guantanamo medical personnel have refused

to diagnose or treat ISN 669 for a number of ailments, including severe kidney pain, a burning

sensation during urination, inflammation of the nerves in the spinal cord, a swollen knee and

ankle and a painful hemorrhoidal condition that leaves blood in his feces.  ISN 669 asserts in his

motion that Guantanamo medical personnel have predicated provision of medical treatment on

ISN 669 ending his hunger strike.  As described below, these allegations are untrue.  In fact, his

medical records document extensive and ongoing medical evaluations and follow-on treatment,

including 61 radiologic imaging studies and 370 laboratory studies.

10.     Contrary to ISN 669's contention in his motion that medial staff is denying him

proper medical care in an effort to break his hunger strike, we do not withhold, nor do we

condone the withholding of medical care as a form of punishment.  The Joint Medical group has

no involvement with detention or discipline issues.

## ISN 669'S MEDICAL HISTORY

11.    ISN 669's date of birth is 16 October 1965. He arrived at Guantanamo Bay in June 2002. At arrival he was in good general health, weighing 149 pounds with no complaint of any chronic medical condition. No pre-existing diagnoses were listed on his inprocessing physical examination. In August 2002, soon after arrival, he was evaluated by mental health and given a diagnosis of depressive disorder with psychotic features, based on his report of auditory/visual hallucinations of his family as well as depressed mood and hopelessness in the context of his detention. Zoloft and Zyprexa were prescribed. On follow up later that month, he reported no further hallucinations; he stated to the psychiatrist that he had no mental health problems, and the psychiatrist must have made a "mistake." The diagnosis was changed to Depressive Disorder, Not Otherwise Specified. He refused the medications, and they were discontinued. By November 2002, he was not consistently demonstrating any depressive or other psychiatric symptoms, and his depressive disorder was considered resolved. He was discharged from the Behavioral Health Service.

## HUNGER STRIKE PROTOCOLS

12.    It is the policy of the Department of Defense to support the preservation of life by appropriate clinical means, in a humane manner, and in accordance with all applicable standards. Medical professionals administer enteral feeding for hunger striking detainees in a humane and compassionate manner, and do so only when it becomes medically necessary to preserve a detainee's health. Detainees are designated as hunger strikers after missing nine consecutive meals. The medical staff carefully assesses each hunger-striking detainee's health by means of physical and psychological examinations, weight monitoring, personal observation and laboratory tests. When the preservation of health and life becomes necessary, a recommendation for enteral feeding is made to the Commander of the Joint Task Force, who then orders the

necessary enteral feedings. Joint Medical Group personnel provide extensive counseling and detailed warnings to the detainees concerning the risks of failure to eat or drink when they begin a hunger strike, prior to commencing involuntary feeding, and periodically thereafter, if the detainee continues to participate in the hunger strike. Medical personnel (including behavioral health professionals) continually remind detainees who persist in their hunger strike that continuation of the hunger strike could endanger their health or life.

13.     JTF-GTMO follows the Federal Bureau of Prisons' model for managing hunger strikers. The Joint Detention Group is responsible for escorting a detainee to the feeding chair and appropriately placing them into the chair. A restraint chair is utilized to ensure the safety of the guard staff, medical staff, and the detainee. A detainee is only kept in the chair for the time required to administer a feeding and for a short, informal observation period of 10-15 minutes after the feeding is completed to prevent the detainee from purging. This process normally lasts less than an hour. Detainees are typically fed twice daily.

14.     Prior to any enteral feeding guard staff offer the detainee a meal to eat. Detainees are also offered and encouraged to use the bathroom. A lubricant is always used, typically viscous lidocaine, although we allow them to choose alternative lubricants if they desire. In all cases a topical anesthetic such as lidocaine is available, however, a patient may decline the anesthetic. An enteral feeding tube is introduced by a registered nurse by standard medical protocol to accepted medical standards. Cepacol anesthetic lozenges are available to the detainees on request. After verification of tube placement, an appropriate amount of Jevity nutritional supplement is infused by gravity into the detainee's stomach, at which time the tube is then removed. This process typically takes 30 to 40 minutes. During this time medical staff

periodically check the detainee's circulation in their arms and legs to ensure they have not been restrained too tightly.

## ISN 669'S HUNGER STRIKE

15.     ISN 669 began his hunger strike on 15 August 2005 and at present continues to refuse meals.  As discussed above, Detainees are designated as hunger strikers after missing nine consecutive meals.  In accordance with JTF-GTMO policy discussed above, ISN 669's enteral feedings began when it becomes medically necessary to preserve his health.  He has been enterally fed continuously since August 2005.

16.     ISN 669 is currently being enterally fed twice per day.  Guard staff provide him with bottled water and running water is available in his cell.  Detainees are currently fed in a common area in front of their cells in restraint chairs.  As noted above, detainees are fed using the restraint chair in accordance with JTF-GTMO standard operating procedure to ensure safe and expeditious performance of the procedure.  A sampling of ISN 669's records indicates the usual duration of his feeding times to be between 35 and 55 minutes.  Given two feedings per day, the ISN 669 is being enterally fed for approximately 70 to 110 minutes per day, not the four hours claimed in his motion.  This time frame does not, however, include the time it might take for the guard staff to place him into and remove him from the restraint chair and medical staff to insert and remove the tube.  Because of his long term cooperation with the procedure the guard staff only applies wrist, ankle, and a lap/shoulder restraint.  The guard staff is not currently using the head restraint, meaning only five of the six restraint points are actually being used.

17.     ISN 669's medical records indicate no history of purging after enteral feeding.  As is true with all hunger striking detainees, Behavioral Health has evaluated ISN 669 since day one of his hunger strike and follows up with him on a weekly basis as his hunger strike continues.  As

is true of all detainees on hunger strike, ISN 669 has been encouraged to end his hunger strike

for the sake of his health.  No behaviors warranting further mental health evaluation have been

identified by Behavioral Health, nor has ISN 669 been diagnosed with a mental illness.  His

weight has remained largely stable over the past 3 years ranging from 137 pounds in 2005 to 152

pounds in 2007 to 136 pounds today. His current weight as of 13 August 2008 is 136 pounds.

The enteral feeding is helping the detainee maintain his body weight.  ISN 669's Ideal Body

Weight is 143 pounds.  As he is receiving adequate total nutrition through enterally feeding, no

additional medical steps or measures to respond to his hunger strike are required.

18.    By ISN 669's long standing request, olive oil is used as a lubricant rather than

viscous lidocaine.  This is an acceptable alternative for lubrication.  This request by ISN 669 is

not for religious reasons.  He has never expressed any discomfort to the staff during this

procedure.  Several other detainees being fed at the same time and location as this detainee use

the Cepacol lozenges, but ISN 669 has never requested any lozenges and has declined when

offered them.  Prior to inserting the enteral feeding tube, medical staff perform a general check to

ensure the detainee does not have any problems with congestion or nasal passage blockage.

Nasal passages are also evaluated as part of routine health check-ups.  ISN 669's records do not

provide any indications he has complained of blocked nasal passages to the staff.

19.    Of the 370 above-mentioned laboratory studies conducted on ISN 669, 308 of

those studies were conducted since he began his hunger strike.

### ALLEGATIONS OF KIDNEY PAIN

20.    As noted above, ISN 669 claims in his motion that Guantanamo medical

personnel have refused diagnosis and treatment, including urinalyses and ultrasounds, for his

severe kidney pain and painful urination.  This is untrue.  JTF-GTMO medical personnel have

8

responded appropriately when ISN 669 has brought kidney and urination problems to their

attention. ISN 669's urinary tract issues are not associated with his hunger strike. He has

continued to drink water since his hunger strike began. Regardless of his status as a hunger

striker, no other monitoring of his urinary tract, other than what is already being done as describe

below, is necessary.

     21.    ISN 669 first complained to medical staff of left sided low back pain with painful

urination on 11 August 2003. ISN 669 was evaluated by a physician who prescribed appropriate

antibiotics and pain medications after noting blood in ISN 669's urine with an elevated white

blood cell count. This is standard medical protocol when such symptoms are reported by

patients and such test results are produced. After that treatment, ISN 669 made no complaints of

recurring back or kidney pain until 24 September 2003 when he complained of mild pain during

urination. A urinalysis on 24 September 2003 was normal with no sign of blood or infection in

the urine sample collected. When a detainee has a normal urinalysis and negative urine culture,

no treatment is normally prescribed.

     22.    On 10 November 2003, ISN 669 complained again of painful urination with blood

visible in his urine. A urine sample confirmed the presence of blood and ISN 669 was diagnosed

by medical staff with a left sided kidney or ureteral stone. A helical CT of the abdomen and

pelvis was performed indicating no evidence of any stones within the kidneys and a small area of

possible stone formation 3mm x 4 mm in diameter at the ureteralvesicular junction. Based on

these findings and consistent with the standard of care for such a condition, ISN 669 was

prescribed pain medications. When a second CT scan was performed, no stone was detected,

indicating that the stone had passed on its own. At the time of this CT scan, ISN 669 was no

longer experiencing pain. ISN 669 was seen by a urologist in December 2003 who repeated

imaging of kidneys and ureters with an X-ray and saw no evidence of any stones. A urinalysis showed no indication of any bleeding or infection in ISN 669's urine. The urologist assessed his pain level to be 0/10. At that point, medical staff assessed this medical condition to be resolved.

23.    ISN 669 had no further complaints of any painful urination or blood in his urine until April 2004 when he again complained about painful urination and a urinalysis indicated blood in the urine. Guantanamo medical staff prescribed an appropriate antibiotic regimen and a re-imaging X-ray indicated no recurring stone. ISN 669 was diagnosed with a urinary tract infection. ISN 669 refused to take his prescribed antibiotic medication after one day.

24.    In July 2004, ISN 669 complained again of painful urination. A urinalysis indicated blood and infection in his urine. An appropriate antibiotic course was restarted which resolved the symptoms. A follow up urinalysis check conducted in August 2004 was normal with a normal urine culture as well.

25.    Urinalyses were checked 5 times between August 2004 and January 2005 and all were within normal limits with normal urine cultures. During this time period, ISN 669 complained of feeling tingling or mild pain while he urinated and these tests were conducted to be sure no recurrence of renal stones had occurred. Between January 2005 and March 2007 there were no documented urinalysis checks or complaints by ISN 669 of painful urination.

26.    ISN 669 made no further complaints of painful urination or kidney pain until March 2007 when he again complained of painful urination. A urinalysis and urine culture were checked to be normal. Five urinalyses checks, all within normal limits, were recorded for ISN 669 in 2007.

27.    ISN 669 again complained of painful urination in January 2008 together with kidney pain on both sides. Urinalysis and urine culture were within normal limits with no sign of

infection. A physical examination by medical provider indicated no sign of gross infection.   As noted above, when a detainee has a normal urinalysis and negative urine culture, no treatment is normally prescribed.

28.    In March 2008, ISN 669 again complained of pain in his kidney (left side greater than right).  He was seen by a medical provider who conducted an examination found to be normal and his urinalysis and urine culture were normal with no sign of any infection.  The medical provider diagnosed ISN 669 with mechanical low back pain, meaning uncomplicated pain in the lower back caused by normal, everyday movement.   Over-the-counter pain medications are typically recommended for such a diagnosis.   In 2008, two urinalysis and urine cultures were performed on separate visits both normal with no sign of any infection.  The date of ISN 669's most recent urinalysis was 17 March 2007.

29.    Contrary to ISN 669's allegations in his motion that medical staff refused to perform urinalyses and ultrasounds, a total of twenty nine urinalyses are documented in ISN 669's medical records from June 2002 to the present.  Of those, 23 urinalyses were performed with a urine culture and 6 urinalyses were performed without a urine culture.   A helical CT scan of ISN 669's abdomen and pelvis was performed in November 2003.  Helical CT scans have largely replaced renal ultrasound as a better imaging technique for renal stones.  In addition, three documented KUB abdominal / pelvic X-rays have been performed on ISN 669 to document the presence and absence of kidney and ureteral stones. JTF-GTMO medical staff's treatment of ISN 669's urinary tract problems was medically appropriate and within the standard of care for such conditions.

## ALLEGATIONS REGARDING GOUT

30.     Although ISN 669's motion suggests he may be suffering from chronic gout, in reviewing ISN 669's medical records, I have found no complaints compatible with acute or chronic gout. My records review identified no recurring severe joint pain syndrome. ISN 669's uric acid levels, which, if elevated, would serve as an indicator of gout, were checked on 16 November 2003. The uric acid levels were found to be within normal ranges. This test will be repeated if medically indicated in the future.

## ALLEGATIONS REGARDING BACK PAIN

31.     ISN 669 has been diagnosed uncomplicated low back pain and been evaluated for the condition on several occasions. Although ISN 669 alleges in his motion that this back pain was not treated, he has, in fact, been prescribed appropriate medications and has been consulted to Physical therapy to help with mild intermittent low back pain. He has been prescribed several pain medications to include Celebrex, Mobic, capsaicin cream topical and Ultram in addition to other NSAIDs for his back pain. He was seen by physical therapy on several occasions in 2003 to help him with exercises to relieve chronic low back pain.   As a result of the prescribed medication and the therapy, ISN 669's back pain showed improvement.   A CT scan of ISN 669's cervical spine in April 2003 showed a mild spinal canal narrowing at cervical spine C-7 causing the detainee no clinical symptoms. An X-ray of his cervical spine in August 2003 was normal. An X-ray of his lumbar sacral spine in August 2008 was normal as well.

32.     ISN 669 has been evaluated for complaints of bilateral knee and ankle swelling and pain on multiple occasions, again contrary to the allegations contained in his motion. Orthotic shoe supports and special medical athletic shoes have been provided to him. Orthopedic surgery has consulted with him on multiple occasions each time indicating no orthopedic surgery on the joint was required.   Orthopedic consultants have never concluded that

12

a brace is indicated for his ankle condition, which has been diagnosed as mild left ankle laxity.

Instead, Orthopedics referred ISN 669 to Physical Therapy to help with ankle strengthening

exercises. Physical therapy has seen him on multiple occasions beginning in March 2003 to help

him with chronic joint pains in his back, ankles and feet. In October 2006, he was seen again by

to help with stretching exercises to address his complaint of foot pain thought to be plantar

fasciitis. He is not currently being seen by Physical Therapist and his last appointment was in

November 2007. Physical therapy has resolved his symptoms somewhat. He still complains

occasionally of mild recurring pain in his ankles, knees, hips and back and continues to take

Ultram medication daily for chronic recurring mild joint pains. ISN 669's ankles have been X-

rayed eight times between January 2004 and August 2008, with the last X-ray of the right ankle

evaluated as normal August 2008. ISN 669's knees have been X-rayed six times between

December 2003 and August 2008, with the last X-rays of the right knee evaluated normal August

2008.

### ALLEGATIONS REGARDING NON-USE OF ANESTHESIA

33.    ISN 669 has claimed in his motion that medics refused to use anesthesia while

stitching a wound on his face. The common medical practice used at the JTF-GMTO Detention

Hospital calls for numbing of wound edges prior to use of sutures. Two separate events (in

April 2003 and in January 2007) are documented in the medical record which resulted in

lacerations to ISN 669's face or head requiring sutures to close the wounds. Our medical records

state that these lacerations occurred during scuffles with guard staff. For both events, medical

records document medical staff using 3-4 ml of injectable lidocaine anesthetic agent to numb the

wound edges before sutures were applied.

### ALLEGATIONS REGARDING HEMORRHOIDS

34.     Despite the claim in his motion that Guantanamo medical staff refuses to treat

him for hemorrhoids, ISN 669 has been evaluated on multiple occasions for chronic external

hemorrhoids and anal fissure.  In January of 2007, he was evaluated by a consulting general

surgeon who made a diagnosis of anal fissure.  Appropriate medical therapy was prescribed for

this long term chronic condition.  ISN 669 had three followed up evaluations in 2007 for

hemorrhoid issues, including a consultation by a general surgeon who recommended a

colonoscopy to better assess ISN 669's rectal bleeding complaint.  ISN 669 declined to have this

procedure performed.  ISN 669 was last seen by a medical provider for his hemorrhoid condition

in March 2008 and was prescribed appropriate topical therapy.  ISN 669 declined an offer of a

follow up consultation with the general surgeon.

### ALLEGATIONS REGARDING A BROKEN FINGER

35.     Exhibit 1 to ISN 669's motion contends that guard staff in an "Initial Reaction

Force" (IRF) team broke his left index finger when they pulled it all the way back.  However,

there is no evidence in ISN 669's medical record of a broken finger.  Only two complaints from

ISN 669 of pain in the digits of the hand have been recorded. In March 2004, an X-ray was

performed after the detainee struck a guard with no fractures noted.  In August 2008, X-rays were

again performed on the right hand after a forced cell extraction with no sign of any bony fracture

noted.

### ALLEGATIONS REGARDING IMPROPER IV INSERTION

36.     Upon appropriate medical indications, and on the orders of a medical officer,

intravenous needles are introduced into a patient's veins by the medical staff applying standard

medical procedures for infusing intravenous fluids.  On occasion, they may be unable to place

the needle into the vein on the first attempt and must reinsert the needle.  Detainees are never

intentionally stabbed in a muscle as medical personnel are trying to start an IV.  Nothing in ISN

669's medical records indicates that an IV was improperly inserted, as he alleges in his motion.

### ISN 669'S REFUSAL OF MEDICAL TREATMENT AND TESTING

37.     While ISN 669's motion contends that he has been continually denied treatment

for various ailments, ISN 669 has, in fact, on numerous occasions, declined to take prescribed

medications, declined procedures recommended by consulting specialists, declined physical

therapy appointments, and declined laboratory studies.  A sampling of these instances are

included below.

38.     As early as October 2003, it has been documented that ISN 669 declined to take

an antibiotic prescribed to him after he had complained of symptoms compatible with bacterial

pharyngitis.  This drug was not administered without his consent.

39.     In April of 2004, as described above, ISN 669 declined to take antibiotic

prescribed for his complaint of painful urination with a urinalysis indicating a urinary tract

infection.  His failure to comply with therapy resulted in progression of his symptoms until he

complied with antibiotic therapy in July of 2004.

40.     In August 2005, ISN 669 declined medication for gastroesophageal reflux

syndrome making diagnosis of recurring abdominal complaints more difficult.

41.     In November 2007, as described above, ISN 669 declined a colonoscopy to help

the general surgeon better assess the cause of recurring rectal bleeding,

42.     In April 2005, ISN 669 declined a Physical Therapy consultant appointment.

43.     In April 2007, he declined to be seen by a visiting orthopedic specialist.

44.    In July of 2007, he requested a back brace for back pain from a corpsman.  In response to this request, medical staff scheduled a medical appointment for him to diagnose the back pain.  ISN 669 later refused to attend that scheduled appointment.

45.    In November 2007, he declined an appointment with a medical officer to reassess his complaint of foot pain.

46.    In April 2008, a medical officer also documented that ISN 669 refused to be seen for an annual medical review.

47.    Throughout his detention, ISN 669 has on occasion declined to allow blood work to be drawn or urinalysis to be performed to confirm our diagnoses.

### ISN 669'S CURRENT HEALTH

48.    ISN 669 is currently in good health with no significant medical problems. He now weighs 136 pounds and his weight has remained stable since his hunger strike began. He exercises and participates in recreation with other detainees.  He routinely goes outside his cell every day for recreation. His joint aches are intermittent and mild, not limiting his ability to perform all activities of daily living.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true, accurate and correct.


Dated: 22 August 2008

BRUCE C. MENELEY
Captain, Medical Corps, U.S. Navy

**EXHIBIT 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ───────────────────── | ) | |
| AHMED ZAID SALEM ZUHAIR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08 CV-0864 (EGS) |
| | ) | |
| GEORGE W. BUSH, President of | ) | |
| the United States, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| ───────────────────── | ) | |

Pursuant to 28 U.S.C. § 1746, I Colonel Bruce E. Vargo, hereby declare that to the best of my knowledge, information and belief, the following is true, accurate, and correct:

1. I am a Colonel in the United States Army with over 23 years of active duty service. I currently serve as the Commander of the Joint Detention Group (JDG) for the Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I am responsible for all aspects of detention operations for all JTF-GTMO Detention Camps and am familiar with all areas of detention within JTF-GTMO, including the conditions and operational policies and procedures of the various detention areas. I have served in this position since 30 June 2007. This declaration is based on information made available to me through my official duties, including the detention records of ISN 669 (Ahmed Zaid Salem Zuhair, the petitioner in the above-captioned case).

### ALLEGATION REGARDING LEGAL MAIL

2. When authorized under applicable court orders, detainees are permitted to send, receive and review legal mail. Legal mail is described as letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged

1

documents and publicly-filed legal documents relating to that representation. For purposes of habeas corpus or Detainee Treatment Act litigation, detainees are considered eligible to receive, send or review legal mail when the appropriate Protective Order is entered by the applicable court. Specially trained JTF-GTMO personnel handle all detainee legal mail.

3. Camp guards are not permitted to read a detainee's legal mail. When guards conduct routine searches of detainees' cells, they are authorized to search open envelopes containing any type of mail for physical contraband. Also, during these searches, loose mail kept outside of an envelope can be paged through in order to look for physical contraband. Similarly, when mail is stored in a detainee's covered plastic storage container and either provided to a detainee in his cell or when mail is retrieved from the detainee to be returned to the container, guards are authorized to look in open envelopes for physical contraband. The guard force is routinely trained on legal mail handling procedures and we continue to repeatedly emphasize the importance of this issue.

4. Our records do not reflect any information to support the allegations of ISN 669 that a guard read through or removed any legal mail from the detainee's cell or possession on or about 17 July 2008. There is no record that any search was done of ISN 669's cell or that any mail or paperwork was read or even handled during the time in question or any time around that date. Furthermore, there is no record of any improper handling of ISN 669's legal mail at any time during his detention. There is no indication that any search of ISN 669's mail was conducted nor that any written materials were confiscated from the detainee during the time frame surrounding 17 July 2008 nor that any guard acted outside of the authorized procedures described above.

**ALLEGATION REGARDING THREATS MADE BY GUARDS**

5. Guards are required to follow established procedures during their interactions with detainees and specifically with detainees who are uncooperative or show escalating agitation. Guards are authorized to intervene to de-escalate agitated detainees within prescribed guidelines designed to protect the detainee and the guard staff from harm. Guards are not permitted to intervene in any manner which would cause further escalation of a detainee's agitation. Guards are trained to immediately report detainee noncompliance and agitation to their guard force supervisors. These supervisors, in turn, are trained to ensure the timely reporting and documentation of these incidents in accordance with established procedures. Guard personnel are regularly trained on these requirements.

6. ISN 669 has a very long history of disciplinary violations and noncompliant, resistant and combative behavior. Our detention records reflect that on the night of 17 July 2008, after his enteral feeding was completed, the detainee became noncompliant after members of the guard force instructed him to place his hand eight inches in front of his stomach so that he could be shackled as part of the process of securing the detainee for movement back to his cell. Specifically, instead of complying with the guards' instructions, the detainee resisted efforts to secure him and then did not comply with an order to stop resisting. Consequently, the guard force used the minimal force necessary to place the detainee in shackles for movement back to his cell by using their hands to guide ISN 669's hands to his belly so he could be shackled. The detainee used profanity towards the guard force during the shackling process. Consistent with standard procedures, the guard force notified the guard force supervisor.

7. As he was being moved towards his cell, ISN 669 continued to use profanity while the guards escorted him. Upon reaching the cell, detainee's profanity changed to violent threats, to include "come in my cell, I will cut off your head." The guard force told the detainee to stop

making threats but the detainee continued stating "you are scared...I can tell...come in my cell...I will cut off your head." The guards, routinely trained in procedures on how to effectuate the de-escalation of agitated detainees, followed standard procedure and locked the detainee in his cell.

8. In addition to being witnessed by two guards, the detainee's combative activity and threats were observed by the guard force supervisor and were documented according to established procedure.

9. There is no record of any threats being made by members of the guard force toward ISN 669 on 17 July 2008. Such behavior would be inappropriate and contrary to our policy and procedures. Any guard personnel or supervisors who witnessed such conduct by another member of the guard staff are required to promptly report that misconduct to the chain of command for appropriate action. No such report was made regarding this interaction with ISN 669.

## ALLEGATIONS REGARDING SEIZURE OF ANKLE BRACE

10. Guards are required to conduct all searches according to established procedures and are trained and supervised regarding when to search a detainee and how to search a detainee. Procedure requires that detainees be searched every time they are moved from one area to another, to include from a cell to the shower area. A search is done every time regardless of circumstances or reason for the move. One of the primary purposes of the search is to look for contraband items. JDG procedures state that detainees will not possess or be given any contraband from any source, including other detainees. Contraband is considered any item, article, or substance not issued to detainees, not authorized for their use, and any item altered by the detainee.

4

11.  Our detention records reflect that on 8 April 2007, a routine search was conducted of ISN 669 upon returning to his cell from the shower.  Guards conducting that search discovered an ankle brace on ISN 669's ankle that had not been issued or given to the detainee from any authorized source, such as staff or medical personnel.  The ankle brace was therefore seized as contraband by the guards.  The guard force is routinely trained on search procedures and we continue to emphasize the importance of what constitutes contraband requiring seizure. This search and seizure of contraband followed established procedure and was documented accordingly.

## ALLEGATIONS REGARDING USE OF OLEORESIN CAPSICUM SPRAY

12.  Guards are required to follow established procedures regarding the use of Oleoresin Capsicum (OC) spray.  Guards are required to have training on the use of OC spray and to be certified within prescribed standards prior to being authorized to carry or use authorized spray in the detainee environment.  Only guards ranked E-4 and above are authorized to carry OC spray in the camps.   OC spray may be used in the priorities of force when other minimal amounts of force have failed to obtain necessary control or compliance of a detainee.  OC spray is not authorized to be used in any situation in which control is obtained, such as situations where a detainee is restrained and not a harm to himself or others.  Any use of OC spray in the camp by any guard is required to be immediately reported to supervising guards.  These supervisors, in turn, are trained to ensure the timely reporting and documentation of any use of OC spray in accordance with established procedures.  Guard personnel are regularly trained on these requirements.

13.  Our records do not reflect any information to support the allegations of ISN 669 that a he was sprayed by OC Spray while restrained to a chair.  Being restrained in a chair would

preclude the need for the use of OC spray and such behavior would be inappropriate and contrary

to our policy and procedures.  Any guard personnel or supervisors who witnessed such conduct

by another member of the guard staff are required to promptly report that misconduct to the

chain of command for appropriate action.  No such report was made regarding this interaction

with ISN 669.


   I declare under penalty of perjury pursuant to the laws of the United States that the

foregoing is true and correct.


       Dated _22 AUG_____ 2008


                                        BRUCE E. VARGO
                                        Colonel, U.S. Army
                                        Commander, Joint Detention Group