**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AHMED ZAID SALEM ZUHAIR<br>    Petitioner | )<br>)<br>)<br>) | |
| v. | )<br>)<br>) | CIVIL ACTION<br>NO. 08-CV-0864 (EGS) |
| GEORGE W. BUSH, ROBERT GATES,<br>REAR ADM. MARK H. BUZBY, and<br>ARMY COL. BRUCE VARGO<br>    Respondents | )<br>)<br>)<br>)<br>)<br>) | |
| ------------------------------------------------------- | ) | |

DECLARATION OF CAPTAIN BRUCE C. MENELEY, M.D.

Pursuant to 28 U.S.C. § 1746, I, Bruce C. Meneley, M.D., hereby declare:

    1.    I am a Captain in the United States Navy and with over 32 years of active and reserve service. I currently serve as the Commander, Joint Medical Group, Guantanamo Bay and Joint Task Force Surgeon, Joint Task Force – Guantanamo (JTF-GTMO), at Guantanamo Bay, Cuba. I am responsible for the medical care provided to personnel stationed at Guantanamo Bay and oversee the operation of the Joint Medical Group that provides medical care to the detainees being held at Guantanamo Bay. There are currently approximately 260 detainees being held at the detainee camp at Guantanamo Bay, Cuba. I have served in this position since July 6, 2007.

    2.    I received my medical degree from the University of Nevada, School of Medicine. I completed an Internship at Naval Hospital Bremerton and a Residency in Emergency Medicine at Naval Medical Center San Diego.

    3.    I have personal knowledge of the procedures that are in place for the operation of the Detention Hospital and I am responsible for ensuring that they are followed. Due to my

responsibilities, I have personal knowledge of, or have received information concerning the allegations made by ISN 669 (Ahmed Zaid Salem Zuhair, the petitioner in the above-captioned case) through his counsel. This declaration is based on information made available to me through my official duties and from the medical records of ISN 669.

## JOINT MEDICAL GROUP BACKGROUND

4. The Joint Medical Group staff consists of licensed, board-certified physicians of different specialties. Specifically as of August 2008, the hospital staff consisted of 116 professionally trained individuals. This staff included an anesthesiologist, a general surgeon, an orthopedic surgeon, family physicians, internal medicine physicians, a psychiatrist, a psychologist, a physician's assistant, a licensed dietician, dentists, and a physical therapist. In addition, the staff included licensed medical/surgical nurses, corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians (lab, radiology, pharmacy, operating room, respiratory, physical therapy, information technology and biomedical repair), and administrative staff. We have routinely brought down specialists in Dermatology, Cardiology, ENT, Gastroenterology, Neurosurgery, Urology, and Audiology to name a few. Any specialty required is available. Other specialists specifically involved in the care of the detainees on hunger strike include nutritionists, internal medicine and behavioral health professionals, all of whom assisted in monitoring and providing specialized care, as needed.

5. All detainees, upon arrival at Guantanamo Bay, are given a complete physical examination. Medical issues identified during the examination, or identified during subsequent examinations, are followed by the medical staff. Detainees may request medical care at any time by making a request to guard personnel in the cell blocks or to the medical personnel who make daily rounds on each cellblock. In addition to responding to such detainee requests, the medical

staff will investigate any medical issues observed by JTF-GTMO guards or staff. The availability of this care has resulted in thousands of outpatient contacts between detainees and the medical staff, followed by inpatient care as needed.

6. Outpatient healthcare provided to the detainees is done at the medical facility in the detention camps as well as the Detention Hospital. Inpatient medical care is performed primarily in the Detention Hospital. The Detention Hospital is a 20-bed facility that is comparable to a small community hospital in the United States. For medical procedures beyond the capability of the Detention Hospital, the detainees are transferred to the Naval Base Hospital at Guantanamo Bay. As noted above, we can and have requested that specialists be flown in to provide care to detainees when the medical need warrants it.

7. The Joint Medical Group is committed to providing unconditional appropriate comprehensive medical care to all detainees regardless of their disciplinary status, cooperation, or participation in a hunger strike. The healthcare provided to the detainees being held at Guantanamo Bay rivals that provided in any community in the United States. Detainees receive timely, compassionate, quality healthcare and have regular access to primary care and specialist physicians. The care provided to detainees is comparable to that afforded our active duty service members. All medical procedures performed are justified and meet accepted standards of care. A detainee is provided medical care and treatment based solely on his need for such care and the level and type of treatment is dependent on the accepted medical standard of care for the condition being treated. Diagnosis of such conditions and medical care and treatment for them are not affected in any way by a detainee's cooperation, or lack thereof, during an interrogation session. Similarly, medical care is not provided or withheld based on a detainee's compliance or noncompliance with detention camp rules or on his refusal to end a hunger strike. Medical

decisions and treatment are not withheld as a form of punishment. Additionally, the medical staff have no involvement in discipline decisions made by detention personnel.

## ALLEGATIONS MADE BY ISN 669

8. Through his attorney, ISN 669 claims that he "has been subjected to an increasingly brutal force-feeding regimen." According to ISN 669, this regimen involves ISN 669 being strapped to a six-point restraint chair for four hours per day, and having a feeding tube "shoved" into his nose and down into his stomach. ISN 669 further asserts in his motion that "these force feeding procedures are unnecessarily brutal and do not serve any legitimate medical purpose." As described below, these claims are inaccurate.

9. ISN 669's motion also alleges that Guantanamo medical personnel have refused to diagnose or treat ISN 669 for a number of ailments, including severe kidney pain, a burning sensation during urination, inflammation of the nerves in the spinal cord, a swollen knee and ankle and a painful hemorrhoidal condition that leaves blood in his feces. ISN 669 asserts in his motion that Guantanamo medical personnel have predicated provision of medical treatment on ISN 669 ending his hunger strike. As described below, these allegations are untrue. In fact, his medical records document extensive and ongoing medical evaluations and follow-on treatment, including 61 radiologic imaging studies and 370 laboratory studies.

10. Contrary to ISN 669's contention in his motion that medial staff is denying him proper medical care in an effort to break his hunger strike, we do not withhold, nor do we condone the withholding of medical care as a form of punishment. The Joint Medical group has no involvement with detention or discipline issues.

## ISN 669'S MEDICAL HISTORY

11. ISN 669's date of birth is 16 October 1965. He arrived at Guantanamo Bay in June 2002. At arrival he was in good general health, weighing 149 pounds with no complaint of any chronic medical condition. No pre-existing diagnoses were listed on his inprocessing physical examination. In August 2002, soon after arrival, he was evaluated by mental health and given a diagnosis of depressive disorder with psychotic features, based on his report of auditory/visual hallucinations of his family as well as depressed mood and hopelessness in the context of his detention. Zoloft and Zyprexa were prescribed. On follow up later that month, he reported no further hallucinations; he stated to the psychiatrist that he had no mental health problems, and the psychiatrist must have made a "mistake." The diagnosis was changed to Depressive Disorder, Not Otherwise Specified. He refused the medications, and they were discontinued. By November 2002, he was not consistently demonstrating any depressive or other psychiatric symptoms, and his depressive disorder was considered resolved. He was discharged from the Behavioral Health Service.

## HUNGER STRIKE PROTOCOLS

12. It is the policy of the Department of Defense to support the preservation of life by appropriate clinical means, in a humane manner, and in accordance with all applicable standards. Medical professionals administer enteral feeding for hunger striking detainees in a humane and compassionate manner, and do so only when it becomes medically necessary to preserve a detainee's health. Detainees are designated as hunger strikers after missing nine consecutive meals. The medical staff carefully assesses each hunger-striking detainee's health by means of physical and psychological examinations, weight monitoring, personal observation and laboratory tests. When the preservation of health and life becomes necessary, a recommendation for enteral feeding is made to the Commander of the Joint Task Force, who then orders the

necessary enteral feedings. Joint Medical Group personnel provide extensive counseling and detailed warnings to the detainees concerning the risks of failure to eat or drink when they begin a hunger strike, prior to commencing involuntary feeding, and periodically thereafter, if the detainee continues to participate in the hunger strike. Medical personnel (including behavioral health professionals) continually remind detainees who persist in their hunger strike that continuation of the hunger strike could endanger their health or life.

13.     JTF-GTMO follows the Federal Bureau of Prisons' model for managing hunger strikers. The Joint Detention Group is responsible for escorting a detainee to the feeding chair and appropriately placing them into the chair. A restraint chair is utilized to ensure the safety of the guard staff, medical staff, and the detainee. A detainee is only kept in the chair for the time required to administer a feeding and for a short, informal observation period of 10-15 minutes after the feeding is completed to prevent the detainee from purging. This process normally lasts less than an hour. Detainees are typically fed twice daily.

14.     Prior to any enteral feeding guard staff offer the detainee a meal to eat. Detainees are also offered and encouraged to use the bathroom. A lubricant is always used, typically viscous lidocaine, although we allow them to choose alternative lubricants if they desire. In all cases a topical anesthetic such as lidocaine is available, however, a patient may decline the anesthetic. An enteral feeding tube is introduced by a registered nurse by standard medical protocol to accepted medical standards. Cepacol anesthetic lozenges are available to the detainees on request. After verification of tube placement, an appropriate amount of Jevity nutritional supplement is infused by gravity into the detainee's stomach, at which time the tube is then removed. This process typically takes 30 to 40 minutes. During this time medical staff

periodically check the detainee's circulation in their arms and legs to ensure they have not been restrained too tightly.

### ISN 669'S HUNGER STRIKE

15. ISN 669 began his hunger strike on 15 August 2005 and at present continues to refuse meals. As discussed above, Detainees are designated as hunger strikers after missing nine consecutive meals. In accordance with JTF-GTMO policy discussed above, ISN 669's enteral feedings began when it becomes medically necessary to preserve his health. He has been enterally fed continuously since August 2005.

16. ISN 669 is currently being enterally fed twice per day. Guard staff provide him with bottled water and running water is available in his cell. Detainees are currently fed in a common area in front of their cells in restraint chairs. As noted above, detainees are fed using the restraint chair in accordance with JTF-GTMO standard operating procedure to ensure safe and expeditious performance of the procedure. A sampling of ISN 669's records indicates the usual duration of his feeding times to be between 35 and 55 minutes. Given two feedings per day, the ISN 669 is being enterally fed for approximately 70 to 110 minutes per day, not the four hours claimed in his motion. This time frame does not, however, include the time it might take for the guard staff to place him into and remove him from the restraint chair and medical staff to insert and remove the tube. Because of his long term cooperation with the procedure the guard staff only applies wrist, ankle, and a lap/shoulder restraint. The guard staff is not currently using the head restraint, meaning only five of the six restraint points are actually being used.

17. ISN 669's medical records indicate no history of purging after enteral feeding. As is true with all hunger striking detainees, Behavioral Health has evaluated ISN 669 since day one of his hunger strike and follows up with him on a weekly basis as his hunger strike continues. As

is true of all detainees on hunger strike, ISN 669 has been encouraged to end his hunger strike for the sake of his health. No behaviors warranting further mental health evaluation have been identified by Behavioral Health, nor has ISN 669 been diagnosed with a mental illness. His weight has remained largely stable over the past 3 years ranging from 137 pounds in 2005 to 152 pounds in 2007 to 136 pounds today. His current weight as of 13 August 2008 is 136 pounds. The enteral feeding is helping the detainee maintain his body weight. ISN 669's Ideal Body Weight is 143 pounds. As he is receiving adequate total nutrition through enterally feeding, no additional medical steps or measures to respond to his hunger strike are required.

18. By ISN 669's long standing request, olive oil is used as a lubricant rather than viscous lidocaine. This is an acceptable alternative for lubrication. This request by ISN 669 is not for religious reasons. He has never expressed any discomfort to the staff during this procedure. Several other detainees being fed at the same time and location as this detainee use the Cepacol lozenges, but ISN 669 has never requested any lozenges and has declined when offered them. Prior to inserting the enteral feeding tube, medical staff perform a general check to ensure the detainee does not have any problems with congestion or nasal passage blockage. Nasal passages are also evaluated as part of routine health check-ups. ISN 669's records do not provide any indications he has complained of blocked nasal passages to the staff.

19. Of the 370 above-mentioned laboratory studies conducted on ISN 669, 308 of those studies were conducted since he began his hunger strike.

### ALLEGATIONS OF KIDNEY PAIN

20. As noted above, ISN 669 claims in his motion that Guantanamo medical personnel have refused diagnosis and treatment, including urinalyses and ultrasounds, for his severe kidney pain and painful urination. This is untrue. JTF-GTMO medical personnel have

responded appropriately when ISN 669 has brought kidney and urination problems to their attention. ISN 669's urinary tract issues are not associated with his hunger strike. He has continued to drink water since his hunger strike began. Regardless of his status as a hunger striker, no other monitoring of his urinary tract, other than what is already being done as describe below, is necessary.

21. ISN 669 first complained to medical staff of left sided low back pain with painful urination on 11 August 2003. ISN 669 was evaluated by a physician who prescribed appropriate antibiotics and pain medications after noting blood in ISN 669's urine with an elevated white blood cell count. This is standard medical protocol when such symptoms are reported by patients and such test results are produced. After that treatment, ISN 669 made no complaints of recurring back or kidney pain until 24 September 2003 when he complained of mild pain during urination. A urinalysis on 24 September 2003 was normal with no sign of blood or infection in the urine sample collected. When a detainee has a normal urinalysis and negative urine culture, no treatment is normally prescribed.

22. On 10 November 2003, ISN 669 complained again of painful urination with blood visible in his urine. A urine sample confirmed the presence of blood and ISN 669 was diagnosed by medical staff with a left sided kidney or ureteral stone. A helical CT of the abdomen and pelvis was performed indicating no evidence of any stones within the kidneys and a small area of possible stone formation 3mm x 4 mm in diameter at the ureteralvesicular junction. Based on these findings and consistent with the standard of care for such a condition, ISN 669 was prescribed pain medications. When a second CT scan was performed, no stone was detected, indicating that the stone had passed on its own. At the time of this CT scan, ISN 669 was no longer experiencing pain. ISN 669 was seen by a urologist in December 2003 who repeated

imaging of kidneys and ureters with an X-ray and saw no evidence of any stones. A urinalysis showed no indication of any bleeding or infection in ISN 669's urine. The urologist assessed his pain level to be 0/10. At that point, medical staff assessed this medical condition to be resolved.

23.   ISN 669 had no further complaints of any painful urination or blood in his urine until April 2004 when he again complained about painful urination and a urinalysis indicated blood in the urine. Guantanamo medical staff prescribed an appropriate antibiotic regimen and a re-imaging X-ray indicated no recurring stone. ISN 669 was diagnosed with a urinary tract infection. ISN 669 refused to take his prescribed antibiotic medication after one day.

24.   In July 2004, ISN 669 complained again of painful urination. A urinalysis indicated blood and infection in his urine. An appropriate antibiotic course was restarted which resolved the symptoms. A follow up urinalysis check conducted in August 2004 was normal with a normal urine culture as well.

25.   Urinalyses were checked 5 times between August 2004 and January 2005 and all were within normal limits with normal urine cultures. During this time period, ISN 669 complained of feeling tingling or mild pain while he urinated and these tests were conducted to be sure no recurrence of renal stones had occurred. Between January 2005 and March 2007 there were no documented urinalysis checks or complaints by ISN 669 of painful urination.

26.   ISN 669 made no further complaints of painful urination or kidney pain until March 2007 when he again complained of painful urination. A urinalysis and urine culture were checked to be normal. Five urinalyses checks, all within normal limits, were recorded for ISN 669 in 2007.

27.   ISN 669 again complained of painful urination in January 2008 together with kidney pain on both sides. Urinalysis and urine culture were within normal limits with no sign of

infection. A physical examination by medical provider indicated no sign of gross infection. As noted above, when a detainee has a normal urinalysis and negative urine culture, no treatment is normally prescribed.

28. In March 2008, ISN 669 again complained of pain in his kidney (left side greater than right). He was seen by a medical provider who conducted an examination found to be normal and his urinalysis and urine culture were normal with no sign of any infection. The medical provider diagnosed ISN 669 with mechanical low back pain, meaning uncomplicated pain in the lower back caused by normal, everyday movement. Over-the-counter pain medications are typically recommended for such a diagnosis. In 2008, two urinalysis and urine cultures were performed on separate visits both normal with no sign of any infection. The date of ISN 669's most recent urinalysis was 17 March 2007.

29. Contrary to ISN 669's allegations in his motion that medical staff refused to perform urinalyses and ultrasounds, a total of twenty nine urinalyses are documented in ISN 669's medical records from June 2002 to the present. Of those, 23 urinalyses were performed with a urine culture and 6 urinalyses were performed without a urine culture. A helical CT scan of ISN 669's abdomen and pelvis was performed in November 2003. Helical CT scans have largely replaced renal ultrasound as a better imaging technique for renal stones. In addition, three documented KUB abdominal / pelvic X-rays have been performed on ISN 669 to document the presence and absence of kidney and ureteral stones. JTF-GTMO medical staff's treatment of ISN 669's urinary tract problems was medically appropriate and within the standard of care for such conditions.

**ALLEGATIONS REGARDING GOUT**

11

30. Although ISN 669's motion suggests he may be suffering from chronic gout, in reviewing ISN 669's medical records, I have found no complaints compatible with acute or chronic gout. My records review identified no recurring severe joint pain syndrome. ISN 669's uric acid levels, which, if elevated, would serve as an indicator of gout, were checked on 16 November 2003. The uric acid levels were found to be within normal ranges. This test will be repeated if medically indicated in the future.

## ALLEGATIONS REGARDING BACK PAIN

31. ISN 669 has been diagnosed uncomplicated low back pain and been evaluated for the condition on several occasions. Although ISN 669 alleges in his motion that this back pain was not treated, he has, in fact, been prescribed appropriate medications and has been consulted to Physical therapy to help with mild intermittent low back pain. He has been prescribed several pain medications to include Celebrex, Mobic, capsaicin cream topical and Ultram in addition to other NSAIDs for his back pain. He was seen by physical therapy on several occasions in 2003 to help him with exercises to relieve chronic low back pain. As a result of the prescribed medication and the therapy, ISN 669's back pain showed improvement. A CT scan of ISN 669's cervical spine in April 2003 showed a mild spinal canal narrowing at cervical spine C-7 causing the detainee no clinical symptoms. An X-ray of his cervical spine in August 2003 was normal. An X-ray of his lumbar sacral spine in August 2008 was normal as well.

32. ISN 669 has been evaluated for complaints of bilateral knee and ankle swelling and pain on multiple occasions, again contrary to the allegations contained in his motion. Orthotic shoe supports and special medical athletic shoes have been provided to him. Orthopedic surgery has consulted with him on multiple occasions each time indicating no orthopedic surgery on the joint was required. Orthopedic consultants have never concluded that

a brace is indicated for his ankle condition, which has been diagnosed as mild left ankle laxity. Instead, Orthopedics referred ISN 669 to Physical Therapy to help with ankle strengthening exercises. Physical therapy has seen him on multiple occasions beginning in March 2003 to help him with chronic joint pains in his back, ankles and feet. In October 2006, he was seen again by to help with stretching exercises to address his complaint of foot pain thought to be plantar fasciitis. He is not currently being seen by Physical Therapist and his last appointment was in November 2007. Physical therapy has resolved his symptoms somewhat. He still complains occasionally of mild recurring pain in his ankles, knees, hips and back and continues to take Ultram medication daily for chronic recurring mild joint pains. ISN 669's ankles have been X-rayed eight times between January 2004 and August 2008, with the last X-ray of the right ankle evaluated as normal August 2008. ISN 669's knees have been X-rayed six times between December 2003 and August 2008, with the last X-rays of the right knee evaluated normal August 2008.

## ALLEGATIONS REGARDING NON-USE OF ANESTHESIA

33.   ISN 669 has claimed in his motion that medics refused to use anesthesia while stitching a wound on his face. The common medical practice used at the JTF-GMTO Detention Hospital calls for numbing of wound edges prior to use of sutures. Two separate events (in April 2003 and in January 2007) are documented in the medical record which resulted in lacerations to ISN 669's face or head requiring sutures to close the wounds. Our medical records state that these lacerations occurred during scuffles with guard staff. For both events, medical records document medical staff using 3-4 ml of injectable lidocaine anesthetic agent to numb the wound edges before sutures were applied.

## ALLEGATIONS REGARDING HEMORRHOIDS

13

34.     Despite the claim in his motion that Guantanamo medical staff refuses to treat him for hemorrhoids, ISN 669 has been evaluated on multiple occasions for chronic external hemorrhoids and anal fissure. In January of 2007, he was evaluated by a consulting general surgeon who made a diagnosis of anal fissure. Appropriate medical therapy was prescribed for this long term chronic condition. ISN 669 had three followed up evaluations in 2007 for hemorrhoid issues, including a consultation by a general surgeon who recommended a colonoscopy to better assess ISN 669's rectal bleeding complaint. ISN 669 declined to have this procedure performed. ISN 669 was last seen by a medical provider for his hemorrhoid condition in March 2008 and was prescribed appropriate topical therapy. ISN 669 declined an offer of a follow up consultation with the general surgeon.

## ALLEGATIONS REGARDING A BROKEN FINGER

35.     Exhibit 1 to ISN 669's motion contends that guard staff in an "Initial Reaction Force" (IRF) team broke his left index finger when they pulled it all the way back. However, there is no evidence in ISN 669's medical record of a broken finger. Only two complaints from ISN 669 of pain in the digits of the hand have been recorded. In March 2004, an X-ray was performed after the detainee struck a guard with no fractures noted. In August 2008, X-rays were again performed on the right hand after a forced cell extraction with no sign of any bony fracture noted.

## ALLEGATIONS REGARDING IMPROPER IV INSERTION

36.     Upon appropriate medical indications, and on the orders of a medical officer, intravenous needles are introduced into a patient's veins by the medical staff applying standard medical procedures for infusing intravenous fluids. On occasion, they may be unable to place the needle into the vein on the first attempt and must reinsert the needle. Detainees are never

14

intentionally stabbed in a muscle as medical personnel are trying to start an IV. Nothing in ISN 669's medical records indicates that an IV was improperly inserted, as he alleges in his motion.

### ISN 669'S REFUSAL OF MEDICAL TREATMENT AND TESTING

37.  While ISN 669's motion contends that he has been continually denied treatment for various ailments, ISN 669 has, in fact, on numerous occasions, declined to take prescribed medications, declined procedures recommended by consulting specialists, declined physical therapy appointments, and declined laboratory studies. A sampling of these instances are included below.

38.  As early as October 2003, it has been documented that ISN 669 declined to take an antibiotic prescribed to him after he had complained of symptoms compatible with bacterial pharyngitis. This drug was not administered without his consent.

39.  In April of 2004, as described above, ISN 669 declined to take antibiotic prescribed for his complaint of painful urination with a urinalysis indicating a urinary tract infection. His failure to comply with therapy resulted in progression of his symptoms until he complied with antibiotic therapy in July of 2004.

40.  In August 2005, ISN 669 declined medication for gastroesophageal reflux syndrome making diagnosis of recurring abdominal complaints more difficult.

41.  In November 2007, as described above, ISN 669 declined a colonoscopy to help the general surgeon better assess the cause of recurring rectal bleeding,

42.  In April 2005, ISN 669 declined a Physical Therapy consultant appointment.

43.  In April 2007, he declined to be seen by a visiting orthopedic specialist.

44. In July of 2007, he requested a back brace for back pain from a corpsman. In response to this request, medical staff scheduled a medical appointment for him to diagnose the back pain. ISN 669 later refused to attend that scheduled appointment.

45. In November 2007, he declined an appointment with a medical officer to reassess his complaint of foot pain.

46. In April 2008, a medical officer also documented that ISN 669 refused to be seen for an annual medical review.

47. Throughout his detention, ISN 669 has on occasion declined to allow blood work to be drawn or urinalysis to be performed to confirm our diagnoses.

## ISN 669'S CURRENT HEALTH

48. ISN 669 is currently in good health with no significant medical problems. He now weighs 136 pounds and his weight has remained stable since his hunger strike began. He exercises and participates in recreation with other detainees. He routinely goes outside his cell every day for recreation. His joint aches are intermittent and mild, not limiting his ability to perform all activities of daily living.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true, accurate and correct.

Dated: 22 August 2008

*[signature]*
BRUCE C. MENELEY
Captain, Medical Corps, U.S. Navy