**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

AHMED ZAID SALEM ZUHAIR, *et al.*

         Petitioners,

         v.

GEORGE W. BUSH, President of
the United States, *et al.*,

         Respondents.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 08-CV-0864 (EGS)

## RESPONDENTS' OPPOSITION TO PETITIONER'S "EMERGENCY MOTION TO COMPEL COMPLIANCE WITH THE PROTECTIVE ORDER AND ATTORNEY-CLIENT PRIVILEGE; FOR TELEPHONIC ACCESS; FOR A HEARING; AND FOR A WRIT OF HABEAS CORPUS AD TESTIFICANDUM"

Respondents hereby oppose Petitioner's "Emergency Motion To Compel Compliance With the Protective Order And Attorney-Client Privilege; For Telephonic Access; For A Hearing; And For A Writ of Habeas Corpus Ad Testificandum." (dkt. No. 35).

### I. INTRODUCTION

Petitioner's "Emergency Motion" for various forms of injunctive relief should be denied for two independent reasons. First, Petitioner's Motion should be denied because – contrary to Petitioner's allegations in his letter to his counsel – the Guantanamo guards did not threaten him or read or confiscate his legal papers. Rather, the guards responded appropriately and in accordance with applicable procedures when Petitioner became disruptive.

-1-

But the Court need not resolve any factual dispute that may exist. Petitioner's Motion should also be denied because injunctive relief is inappropriate, regardless of what occurred between Petitioner and the guards. An injunction ordering the return of Petitioner's legal materials and a cessation of threats is inappropriate because there is no cognizable danger – Respondents are not in possession of any of Petitioner's legal materials and are not threatening Petitioner. Similarly, an injunction granting Petitioner "regular telephonic access to his counsel" is inappropriate because it has no jurisdictional basis, does not meet the applicable test for injunctive relief, and goes far beyond remedying any alleged harm.

For the foregoing reasons, an evidentiary hearing is not necessary for resolution of the Motion. Thus, Petitioner's request for an evidentiary hearing should also be denied.

## II.  FACTUAL BACKGROUND

Petitioner, a detainee held as an enemy combatant at Guantanamo Bay, Cuba, is subject to a set of rules designed to achieve good order and discipline and to protect the safety and security of the detainee population and the guard staff. As described in the declaration of Colonel Bruce E. Vargo, the Commander of the Joint Detention Group (JDG) for the Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO), Petitioner's actions have not always comported with these  rules.

On July 17, 2008, Petitioner became noncompliant with the instructions given to him by members of the Guantanamo guard force who were in the process of moving him back to his cell. *See* Declaration of Colonel Bruce E. Vargo ("Vargo Decl."), ¶ 6 (attached hereto as Exhibit 1). Petitioner resisted efforts to secure him and did not comply with an order to stop his resistance. *Id.* Consequently, the guard force used the minimal force necessary to place Petitioner in shackles for movement back to his cell by using their hands to guide Petitioner's hands to his

belly so he could be shackled.  *Id.*  During this time, Petitioner directed profanity at the guard

force.  *Id.*  The guard force timely notified the guard force supervisor and the events were

documented according to established procedures.  *Id.*

Petitioner continued to direct profanity at the guard force after he was returned to his cell,

and also made violent threats, including threatening to "cut off [the] head[s]" of the guards.  *Id.*

¶ 7.  Petitioner continued to make the threats even after he was told to stop.  *Id.*  The guards are

routinely trained on procedures for intervening with an uncooperative or agitated detainee as well

as proper movement procedures.  *Id.*  The guard force followed standard procedure and locked

Petitioner in his cell.  *Id.*  Petitioner's threats were observed by the guard force supervisor and

timely documented according to established procedure.  *Id.* ¶ 8.  The guard force never directed

any threats at Petitioner.  *Id.* ¶ 9.

Furthermore, the guard force did not read or remove any of Petitioner's legal mail.[1]  *Id.* ¶

4.  There is no record that any search was done of Petitioner's cell or that any mail or paperwork

was read or even handled during the time in question or any time around that date.  *Id.*  In

addition, there is no record of any improper handling of Petitioner's legal mail at any time during

his detention.  *Id.*  There is no indication that any search of Petitioner's mail was conducted nor

that any written materials were confiscated from the detainee during the time frame surrounding

the incident nor that any guard acted outside of the authorized procedures.[2]  *Id.*

---

[1]Legal mail is described as letters between counsel and a detainee that are related to the
counsel's representation of the detainee, as well as privileged documents and publicly-filed legal
documents relating to that representation.  *Id.* ¶ 2; *see In re Guantanamo Cases*, Amended
Protective Order and Procedures for Counsel Access to Detainees, 344 F. Supp. 2d 174, 184
(2004), adopted in this case by Minute Order dated June 25, 2008.

[2]Camp guards are not permitted to read a detainee's legal mail.  *Id.* ¶ 3.  When guards
conduct routine cell searches they are authorized to search open envelopes containing any type of

### III.  ARGUMENT

**A.     Petitioner's Request For An Injunction Ordering The Return of His Legal Papers And A Cessation Of Threats Should Be Denied Because the Alleged Actions Did Not Occur And There Is No Cognizable Danger That They Will Occur In The Future.**

Petitioner first requests that the Court enter an injunction ordering the return of his legal papers and prohibiting "further threats and violations of the attorney-client privilege."  Petr's Memo. at 14.  "Under general equity principles, an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a cognizable danger of recurrent violation."  *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 n. 3 (1994) (internal citations omitted).

Here, there is no such showing that Respondent has violated or imminently will violate any such provisions, nor that there is a danger of any recurrent violations.  The guard staff did not threaten Petitioner and did not read or seize any privileged material from him.  Vargo Decl. ¶¶ 4, 9.  Respondent does not allow or condone any threatening behavior by guards.  Vargo Decl. ¶ 5. Furthermore, as part of ensuring Respondent meets its obligations to not violate attorney-client privilege (including this Court's Protective Order), the guard staff at Guantanamo are regularly trained on the proper procedures for handling attorney-client privileged material in the event a detainee's cell is searched.    Vargo Decl. ¶ 3.  Thus, Petitioner's motion should be denied

---

mail for physical contraband.  *Id.*  Also, during these searches, loose mail kept outside of an envelope can be paged through for physical contraband.  *Id.*  Similarly, when mail is stored in a detainee's covered plastic storage container and either provided to a detainee in his cell or when mail is retrieved from the detainee to be returned to the container, guards are authorized to look in open envelopes for physical contraband.  *Id.*  The guard force is routinely trained on legal mail handling procedures, search procedures, and on what constitutes physical contraband requiring confiscation during a search.  *Id.*

because there is not "a cognizable danger of recurrent violation."[3]  *Madsen*, 512 U.S. at 765 n. 3;

*see also Clarke v. U.S.*, 915 F.2d 699, 701 (D.C. Cir. 1990) ("Even where litigation poses a live

controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding

it if 'events have so transpired that the decision will neither presently affect the parties' rights nor

have a more-than-speculative chance of affecting them in the future.'"), quoting *Transwestern*

*Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990); *Reiter v. Universal Marion Corp.*,

273 F.2d 820, 824 (D.C. Cir. 1960) ("It is clear that a request for injunction becomes moot where

circumstances so change that no remedy can be granted affecting the substantial rights of the

parties.").

**B.    Petitioner's Request for An Order Granting Him "Regular Telephonic Access To His Counsel" Should Be Denied Because There Is No Jurisdictional Basis For The Relief And Petitioner Cannot Meet The Exacting Standard For Injunctive Relief.**

Petitioner also requests an Order granting him "regular phone access" to his counsel

based on a claimed need to "promptly report to the Court any future misconduct by

Respondents."  Petr's Memo. at 4.  Petitioner claims that "[t]he Court has the power to order

such relief through its authority to enforce its Protective Order, the All Writs Act, 28 U.S.C. §

1651, or by issuing a Preliminary Injunction pursuant to Fed. R. Civ. P. 65."  Petr's Memo. at 8.

First, as noted previously, Respondents did not engage in any misconduct and authorizing such a

remedy based on non-existent events would be inappropriate.  Second, none of Petitioner's

purported sources of authority authorizes this broad injunctive relief.

---

[3]For the same reasons, Petitioner cannot show irreparable injury, as required to obtain injunctive relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again-a likelihood of substantial and immediate irreparable injury." ) (internal quotations omitted).

1.     **The Protective Order does not give Petitioner an enforceable right to regular telephonic access to his counsel.**

The Protective Order states that "[r]equests for telephonic access to the detainee by counsel or other persons will not normally be approved.  Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo."  *In re Guantanamo Cases*, Amended Protective Order and Procedures for Counsel Access to Detainees At The United States Naval Base At Guantanamo Bay, Cuba, 344 F. Supp. 2d 174, 190 (Nov. 8, 2004), adopted in this case by Minute Order dated June 25, 2008. Petitioner's requested injunctive relief – regular telephonic access with his counsel for an unlimited period of time – would amend the terms of counsel access provided in the Protective Order.  Petitioner himself moved the Court for entry of the Protective Order in this case (dkt no. 3), and there is no basis for Petitioner to receive different treatment than the numerous other petitioners/detainees that are also subject to the Protective Order.  Thus, contrary to Petitioner's argument, the requested injunctive relief of regular telephonic access to counsel cannot be justified as an enforcement of the Protective Order.  Instead, the requested relief, if granted, would be an unwarranted departure from the terms of the Protective Order.[4]

---

[4]Moreover, contrary to Petitioner's argument, Respondents have not violated the Protective Order such that it needs to be "enforced" in any manner.  Respondents did not read or confiscate Petitioner's legal mail, and Section 10 of the Protective Order explicitly permits the Guantanamo guards to take reasonable security measures to ensure that detainees do not possess physical contraband.  *See In re Guantanamo Cases*, 344 F. Supp. 2d at 191; *see also Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (upholding requirement that prison officials be permitted to scan privileged documents for contraband); *Said v. Bush*, No. 05-cv-02384-RWR-AK (D.D.C. Oct. 11, 2006) ("[S]ome minimal scanning of the content of written material is inevitable in any screening for written contraband.").  *Al-Odah v. U.S.*, 346 F. Supp. 2d 1 (D.D.C. 2004), is distinguishable because the conduct at issue in that case – real-time monitoring of meetings between detainees and their attorneys – is not permitted by the Protective Order.  *Id.* at 15.

    2.       **The All Writs Act does not provide jurisdiction for an injunction granting Petitioner regular telephonic access to his counsel.**

The All Writs Act authorizes the Court to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute." *Pennsylvania Bureau of Correction v. U.S. Marshals Service*, 474 U.S. 34, 43 (1985). "[T]he express terms of the [All Writs] Act confine the power of the [Court] to issuing process 'in aid of' its existing statutory jurisdiction; the Act does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999).

The All Writs Act's limited purpose of aiding a court's existing statutory jurisdiction is particularly important here because of the narrow scope of the Court's jurisdiction over Petitioner's *habeas* petition. Section 7(a) of the Military Commissions Act of 2006 (the "MCA") divests district courts of "jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." 28 U.S.C. § 2241(e)(2); *see also Miller v. Overholser*, 206 F.2d 415, 419 (D.C. Cir. 1953) ("Except in circumstances so extreme as to transgress constitutional prohibitions, the courts will not interfere with discipline or treatment in a place of legal confinement, and so habeas corpus is not an available remedy."). While the Supreme Court held in *Boumediene v. Bush,* --- U.S. ----, 128 S. Ct. 2229, 171 L. Ed.2d 41 (2008), that the MCA was unconstitutional to the extent that it denied detainees the right to challenge their detention (*i.e.*, held 28 U.S.C. § 2241(e)(1) to be unconstitutional), it did not address "the reach of the writ with respect to claims

-7-

of unlawful conditions of treatment or confinement." *Id.* at 2274. *Boumediene* has been

judicially interpreted "to invalidate only 28 U.S.C. § 2241(e)(1)." *In re Guantanamo Bay*

*Detainee Litigation*, --- F. Supp.2d ----, 2008 WL 3155155, *3 (D.D.C. 2008).[5]

Petitioner claims that the requested injunctive relief is authorized by the All Writs Act

because the Court's jurisdiction over the *habeas* petition is under "threat." Petr's Memo. at 9.

Numerous other detainees, though, are pursuing *habeas* petitions with the standard access to

counsel provided by the Protective Order. Regular telephone calls between Petitioner and his

counsel as an avenue to report allegations regarding government misconduct are simply not

necessary for the Court to hear Petitioner's *habeas* petition, and the Court's jurisdiction will not

be threatened if the relief is not granted. *See Jones v. Lilly*, 37 F.3d 964, 967 (3rd Cir. 1994)

(holding that the All Writs Act did not authorize the district court's writ granting the petitioner-

prisoner paralegal assistance because issuance of the writ "would appear to have absolutely no

effect on the district court's jurisdiction to hear and decide the underlying civil rights claims" and

"the absence of a writ will not destroy the court's jurisdiction"); *see also O.K. v. Bush*, 344 F.

Supp. 2d 44, 62 (D.D.C. 2004) (rejecting a "free-floating responsibility to ensure the general

welfare of petitioner pursuant to the powers under the All Writs' Act and its inherent judicial and

habeas authority" as it relates to Guantanamo detainees).

Petitioner's citation to *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008), for support is

---

[5]As detailed in another Opposition Brief filed this same day, Respondents take the
position that *Boumediene* invalidated 28 U.S.C. § 2241(e)(1) only to the extent it denies habeas
review to detainees who have available to them only the CSRT process and who raise a core
habeas challenge, that is, one that challenges the legality of their *detention*. *See Zuhair*, No. 08-
CV-00864 (EGS), Respondents' Opposition To Petitioner's Motion To Compel Production Of
Complete Medical Records And For Order Permitting Independent Medical Examination at 7-17,
(dkt. no. 50, dated Aug. 22, 2008).

unavailing.  In *Belbacha*, the Court of Appeals held that it had jurisdiction under the All Writs

Act to enjoin the *habeas* petitioner's transfer from Guantanamo to Algeria because the "transfer

would make it impossible for the district court to entertain his claim to relief that the Constitution

might guarantee." *Id.* at 458-59.  Here, on the other hand, Petitioner is not requesting an

injunction *prohibiting* an action (such as a transfer) that would destroy the Court's jurisdiction

over his *habeas* petition.  Instead, Petitioner is requesting *affirmative* relief that is not necessary

for the Court to hear his *habeas* petition and that goes beyond the access permitted to other

detainees pursuant to the Protective Order.  *Belbacha* does not provide support for such broad

remedial relief.

In sum, Petitioner's request for regular unlimited telephonic access to counsel beyond the

access specified in the Protective Order is a condition of confinement issue that lacks any

jurisdictional basis.  *See* 28 U.S.C. § 2241(e)(2).

### 3.    Petitioner does not meet the exacting standard for injunctive relief.

To prevail on a motion for a preliminary injunction, Petitioner "must demonstrate 1) a

substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the

injunction is not granted, 3) that an injunction would not substantially injure other interested

parties, and 4) that the public interest would be furthered by the injunction." *CityFed Financial

Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  "It frequently is

observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not

be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v.

Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867, 138 L. Ed.2d 162 (1997) (emphasis in

original) (citation omitted); *see also In re Guantanamo Bay Detainee Litigation*, 2008 WL

3155155, *2 (D.D.C. 2008) ("[B]ecause preliminary injunctions are extraordinary forms of relief,

courts should grant them sparingly.")

Petitioner's request for an injunction granting him "regular telephonic access to his counsel" should be denied because Petitioner has not met and cannot meet this exacting standard for injunctive relief.

### a. Petitioner has not demonstrated a likelihood of success on the merits.

Under the first prong of the preliminary injunction test, Petitioner must demonstrate a substantial likelihood of success on the merits. The jurisdictional problems with Petitioner's Motion resurface in this prong of the test because Petitioner's *habeas* petition can only challenge the legality of Petitioner's detention, not his access to counsel. *In re Guantanamo Bay Detainee Litigation*, 2008 WL 3155155 at *3 ("[T]he Supreme Court has held that jurisdiction is one gauge by which the court can measure the likelihood of success on the merits."), citing *Munaf v. Geren,* ---U.S. ----, ----, 128 S. Ct. 2207, 2219, 171 L. Ed.2d 1 (2008) (noting that difficult jurisdictional issues make "success more *unlikely* due to potential impediments to even reaching the merits") (emphasis in original).

Even if the merits of Petitioner's *habeas* petition did challenge his access to counsel and even if the Court did have jurisdiction to hear the challenge, Petitioner cannot show a substantial likelihood of success on the merits because courts accord substantial deference to the judgment of prison administrators and generally refrain from interfering in the day-to-day operations of detention facilities. *See, e.g.*, *Bell* v. *Wolfish*, , 441 U.S. 520, 548, 562 (1979) (explaining that the operation of even domestic "correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," and cautioning lower courts to avoid becoming "enmeshed in the minutiae of prison operations"). This deference is, naturally, at its height when the court is asked to second-guess decisions made by facility personnel that

concern institutional security.  *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989)

("Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal

with the difficult and delicate problems of prison management, this Court has afforded

considerable deference to the determinations of prison administrators who, in the interest of

security, regulate the relations between prisoners and the outside world."); *Inmates of Occoquan*

*v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (noting that "courts are not to be in the business of

running prisons" and that "questions of prison administration are to be left to the discretion of

prison administrators").  Thus, Respondents are well within their rights to limit access to counsel

as provided in the Protective Order.

      In any event and at the very least, the combination of these jurisdictional and merits-based

factors foreclose any possibility that Petitioner can meet his burden of showing a substantial

likelihood of success on the merits.

> **b.**    **Petitioner has not shown he will suffer irreparable injury if the injunction is not granted.**

      Petitioner also fails to meet the irreparable injury prong of the preliminary injunction test.

Petitioner claims that the requested relief would be useful to "promptly report to the Court any

future misconduct by Respondents," Petr's Memo. at 4, but additional or swifter access to his

counsel does not mean that Petitioner is irreparably injured by his current access level.  Petitioner

can correspond with his counsel, as he successfully did in this instance.  The access to counsel

provided by the Protective Order simply does not cause Petitioner irreparable injury.

      Moreover, the fact that Petitioner is not in immediate danger of any alleged harm

precludes him from meeting his burden on this prong of the preliminary injunction test.  *See City*

*of Los Angeles*, 461 U.S. at 111 ("The equitable remedy is unavailable absent a showing of

irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again-a likelihood of substantial and immediate irreparable injury." ) (internal quotations omitted).

> c.    **The public interest and the interest of others have already been measured and weigh against the requested relief.**

Petitioner limits his analysis on the remaining two prongs of the preliminary injunction test to conclusory statements regarding the importance of the attorney-client privilege and the purported lack of burden that the requested relief would entail.  What Petitioner fails to acknowledge, though, is that these factors were already weighed by the courts in devising standard procedures regarding attorney access to detainees.  *See In re Guantanamo Cases*, 344 F. Supp. 2d at 191.  That balancing resulted in a Protective Order that limits telephonic access to counsel, but that also allows access by mail and in-person visits.  Petitioner cannot sweep away this extensive balancing of interests based on a single incident in which Respondents, in fact, acted appropriately.

> d.    **The requested injunctive relief is too broad.**

Petitioner's motion should also be denied because the scope of the requested injunction is too broad.  Courts "have long held that '[a]n injunction must be narrowly tailored to remedy the specific harm shown.'" *State of Nebraska Dept. of Health and Human Serv. v. Dept. of Health and Human Serv.*, 435 F.3d 326, 330 (D.C. Cir. 2006), quoting *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir.1976).  "The purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001) ("[Plaintiff] asks this Court to require defendant

to take affirmative steps to reverse his separation and restore him to active duty five months after his separation was finalized.  Such a ruling would alter, not preserve, the *status quo.* Accordingly, he must meet a higher standard than were the injunction he sought merely prohibitory.").

Even if Petitioner's version of his dispute with the Guantanamo guards is accepted as true for purposes of his Motion, Petitioner's proposed injunctive relief  – regular telephonic access to counsel – is improper because it goes beyond simply remedying the alleged harm to grant Petitioner additional rights not granted to other detainees and that Petitioner did not have prior to the alleged incident.  *See Lingo v. Boone*, 402 F. Supp. 768, 773 (N.D. Cal. 1975) (holding that forward-looking injunctive relief for prisoner-petitioner was inappropriate when "[t]he conduct complained of involved a single, isolated instance of mail censorship" and "[t]here was no suggestion that that event is part of a broader plan or course of conduct to censor plaintiff's mail unconstitutionally").

**C.     Because Petitioner Cannot Meet the Standard For Injunctive Relief, His Request For An Evidentiary Hearing Should Be Denied.**

Finally, Petitioner claims that an evidentiary hearing is "necessary to the adjudication of this motion." (Mot. at 13).  An evidentiary hearing is unnecessary because Petitioner has provided his account of events, and, as noted above, injunctive relief is unwarranted regardless of Petitioner's testimony about the incident.  Thus, there is no reason for the Court to order an evidentiary hearing, and Petitioner's request should be denied.

/ / /

/ / /

/ / /

-13-

## IV.  CONCLUSION

For the foregoing reasons, Respondents respectfully request that Petitioner's "Emergency Motion To Compel Compliance With The Protective Order And Attorney-Client Privilege; For Telephonic Access; For A Hearing; And For A Writ Of Habeas Corpus Ad Testificandum" (dkt. No. 35) be denied.

Dated: August 22, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

*/s/ James E. Cox, Jr.*
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
ANDREW I. WARDEN
PAUL AHERN
JAMES E. COX, JR.
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. N.W.
Washington, DC 20530
Tel: (202) 305-8629

-14-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

AHMED ZAID SALEM ZUHAIR, *et al.*

        Petitioners,

        v.

GEORGE W. BUSH, President of the United States, *et al.*,

        Respondents.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 08-CV-0864 (EGS)

**[PROPOSED] ORDER DENYING PETITIONER'S "EMERGENCY MOTION TO COMPEL COMPLIANCE WITH THE PROTECTIVE ORDER AND ATTORNEY-CLIENT PRIVILEGE; FOR TELEPHONIC ACCESS; FOR A HEARING; AND FOR A WRIT OF HABEAS CORPUS AD TESTIFICANDUM"**

**IT IS HEREBY ORDERED THAT**

Petitioner's "Emergency Motion To Compel Compliance With the Protective Order And Attorney-Client Privilege; For Telephonic Access; For A Hearing; And For A Writ of Habeas Corpus Ad Testificandum," (dkt. No. 35), is DENIED.

DATE: _____, 2008

_____
EMMET G. SULLIVAN
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )     Civil Action No. 08 CV-0864 (EGS) |
| | ) |
| GEORGE W. BUSH, President of | ) |
| the United States, *et al.*, | ) |
| | ) |
| Respondents. | ) |
| | ) |

Pursuant to 28 U.S.C. § 1746, I Colonel Bruce E. Vargo, hereby declare that to the best of my knowledge, information and belief, the following is true, accurate, and correct:

1.  I am a Colonel in the United States Army with over 23 years of active duty service. I currently serve as the Commander of the Joint Detention Group (JDG) for the Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I am responsible for all aspects of detention operations for all JTF-GTMO Detention Camps and am familiar with all areas of detention within JTF-GTMO, including the conditions and operational policies and procedures of the various detention areas. I have served in this position since 30 June 2007. This declaration is based on information made available to me through my official duties, including the detention records of ISN 669 (Ahmed Zaid Salem Zuhair, the petitioner in the above-captioned case).

### ALLEGATION REGARDING LEGAL MAIL

2.  When authorized under applicable court orders, detainees are permitted to send, receive and review legal mail. Legal mail is described as letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged

1

documents and publicly-filed legal documents relating to that representation. For purposes of habeas corpus or Detainee Treatment Act litigation, detainees are considered eligible to receive, send or review legal mail when the appropriate Protective Order is entered by the applicable court. Specially trained JTF-GTMO personnel handle all detainee legal mail.

3. Camp guards are not permitted to read a detainee's legal mail. When guards conduct routine searches of detainees' cells, they are authorized to search open envelopes containing any type of mail for physical contraband. Also, during these searches, loose mail kept outside of an envelope can be paged through in order to look for physical contraband. Similarly, when mail is stored in a detainee's covered plastic storage container and either provided to a detainee in his cell or when mail is retrieved from the detainee to be returned to the container, guards are authorized to look in open envelopes for physical contraband. The guard force is routinely trained on legal mail handling procedures and we continue to repeatedly emphasize the importance of this issue.

4. Our records do not reflect any information to support the allegations of ISN 669 that a guard read through or removed any legal mail from the detainee's cell or possession on or about 17 July 2008. There is no record that any search was done of ISN 669's cell or that any mail or paperwork was read or even handled during the time in question or any time around that date. Furthermore, there is no record of any improper handling of ISN 669's legal mail at any time during his detention. There is no indication that any search of ISN 669's mail was conducted nor that any written materials were confiscated from the detainee during the time frame surrounding 17 July 2008 nor that any guard acted outside of the authorized procedures described above.

## ALLEGATION REGARDING THREATS MADE BY GUARDS

5. Guards are required to follow established procedures during their interactions with detainees and specifically with detainees who are uncooperative or show escalating agitation. Guards are authorized to intervene to de-escalate agitated detainees within prescribed guidelines designed to protect the detainee and the guard staff from harm. Guards are not permitted to intervene in any manner which would cause further escalation of a detainee's agitation. Guards are trained to immediately report detainee noncompliance and agitation to their guard force supervisors. These supervisors, in turn, are trained to ensure the timely reporting and documentation of these incidents in accordance with established procedures. Guard personnel are regularly trained on these requirements.

6. ISN 669 has a very long history of disciplinary violations and noncompliant, resistant and combative behavior. Our detention records reflect that on the night of 17 July 2008, after his enteral feeding was completed, the detainee became noncompliant after members of the guard force instructed him to place his hand eight inches in front of his stomach so that he could be shackled as part of the process of securing the detainee for movement back to his cell. Specifically, instead of complying with the guards' instructions, the detainee resisted efforts to secure him and then did not comply with an order to stop resisting. Consequently, the guard force used the minimal force necessary to place the detainee in shackles for movement back to his cell by using their hands to guide ISN 669's hands to his belly so he could be shackled. The detainee used profanity towards the guard force during the shackling process. Consistent with standard procedures, the guard force notified the guard force supervisor.

7. As he was being moved towards his cell, ISN 669 continued to use profanity while the guards escorted him. Upon reaching the cell, detainee's profanity changed to violent threats, to include "come in my cell, I will cut off your head." The guard force told the detainee to stop

making threats but the detainee continued stating "you are scared…I can tell…come in my cell…I will cut off your head." The guards, routinely trained in procedures on how to effectuate the de-escalation of agitated detainees, followed standard procedure and locked the detainee in his cell.

8. In addition to being witnessed by two guards, the detainee's combative activity and threats were observed by the guard force supervisor and were documented according to established procedure.

9. There is no record of any threats being made by members of the guard force toward ISN 669 on 17 July 2008. Such behavior would be inappropriate and contrary to our policy and procedures. Any guard personnel or supervisors who witnessed such conduct by another member of the guard staff are required to promptly report that misconduct to the chain of command for appropriate action. No such report was made regarding this interaction with ISN 669.

### ALLEGATIONS REGARDING SEIZURE OF ANKLE BRACE

10. Guards are required to conduct all searches according to established procedures and are trained and supervised regarding when to search a detainee and how to search a detainee. Procedure requires that detainees be searched every time they are moved from one area to another, to include from a cell to the shower area. A search is done every time regardless of circumstances or reason for the move. One of the primary purposes of the search is to look for contraband items. JDG procedures state that detainees will not possess or be given any contraband from any source, including other detainees. Contraband is considered any item, article, or substance not issued to detainees, not authorized for their use, and any item altered by the detainee.

4

11. Our detention records reflect that on 8 April 2007, a routine search was conducted of ISN 669 upon returning to his cell from the shower. Guards conducting that search discovered an ankle brace on ISN 669's ankle that had not been issued or given to the detainee from any authorized source, such as staff or medical personnel. The ankle brace was therefore seized as contraband by the guards. The guard force is routinely trained on search procedures and we continue to emphasize the importance of what constitutes contraband requiring seizure. This search and seizure of contraband followed established procedure and was documented accordingly.

### ALLEGATIONS REGARDING USE OF OLEORESIN CAPSICUM SPRAY

12. Guards are required to follow established procedures regarding the use of Oleoresin Capsicum (OC) spray. Guards are required to have training on the use of OC spray and to be certified within prescribed standards prior to being authorized to carry or use authorized spray in the detainee environment. Only guards ranked E-4 and above are authorized to carry OC spray in the camps. OC spray may be used in the priorities of force when other minimal amounts of force have failed to obtain necessary control or compliance of a detainee. OC spray is not authorized to be used in any situation in which control is obtained, such as situations where a detainee is restrained and not a harm to himself or others. Any use of OC spray in the camp by any guard is required to be immediately reported to supervising guards. These supervisors, in turn, are trained to ensure the timely reporting and documentation of any use of OC spray in accordance with established procedures. Guard personnel are regularly trained on these requirements.

13. Our records do not reflect any information to support the allegations of ISN 669 that a he was sprayed by OC Spray while restrained to a chair. Being restrained in a chair would

5

preclude the need for the use of OC spray and such behavior would be inappropriate and contrary to our policy and procedures. Any guard personnel or supervisors who witnessed such conduct by another member of the guard staff are required to promptly report that misconduct to the chain of command for appropriate action. No such report was made regarding this interaction with ISN 669.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Dated _22 AUG_____ 2008

BRUCE E. VARGO
Colonel, U.S. Army
Commander, Joint Detention Group

6