CLEARED FOR PUBLIC FILING BY THE CSO

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | |
| *Petitioner*, | |
| v. | Civil Action No. 08-864 (EGS) |
| GEORGE W. BUSH, ROBERT GATES, REAR ADM. MARK H. BUZBY, and ARMY COL. BRUCE VARGO, | |
| *Respondents*. | |

## PETITIONER'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF MEDICAL RECORDS AND FOR ORDER PERMITTING INDEPENDENT MEDICAL EXAMINATION

Petitioner Ahmed Zaid Salem Zuhair, through undersigned counsel, submits the following reply in further support of his Motion to Compel Production of Medical Records and for Order Permitting Independent Medical Examination (dkt. no. 50).

Mr. Zuhair seeks two very specific, narrow, forms of relief here. First, he asks that Respondents provide a copy of the very medical records they have already consulted in preparing their response to Mr. Zuhair's Motion. Second, he requests that Respondents allow a physician to accompany his counsel so as to perform an independent medical examination. Such relief is necessary and appropriate to protect the Court's jurisdiction in this case. The relief is necessary to the proper functioning of this habeas proceeding because a detainee's health is inextricably linked to his ability to participate meaningfully in his habeas proceedings and to consult with counsel, especially if he has been subjected to brutal force-feeding and denials of medical treatment for years. It is also appropriate because, contrary to the Government's caricature of it

as a form of "micro-management" of Mr. Zuhair's health care, Gov't Opp. at 2, the relief sought is narrowly tailored and less taxing than others provided by district and circuit courts in Guantánamo cases. These measures would also be warranted as a form of preliminary injunctive relief to prevent serious and irreparable harm to Mr. Zuhair.

In order to obscure the straightforward form of relief at issue here, the Government ignores clear language in the Supreme Court's decision in *Boumediene v. Bush*, 128 S.Ct. 2229 (2008), in an attempt to launch this Court on a jurisdictional wild goose chase. It also selectively draws on the very medical records it seeks to withhold in order to claim that Mr. Zuhair's complaints are "without merit." Gov't Opp. at 20. Respondents invite this Court to abuse its discretion by presumptively favoring its *selective* citation of *written* records available *only* to the Government over Mr. Zuhair's statements, made consistently over the course of several years and generally corroborated by independent accounts. Instead of refuting Mr. Zuhair's detailed account, the Government has either inadequately responded to them or done no more than demonstrate the existence of a material dispute of fact, whose resolution requires an evidentiary hearing and, indeed, the type of independent assessment that Mr. Zuhair seeks.

## BACKGROUND

Since Mr. Zuhair filed his Motion, additional information about his health from meetings with counsel on August 5th and 6th has just been unclassified, further underscoring the necessity of an independent assessment of his health. While his ongoing health problems – including kidney and urinary pain and severe pain in his ankles and other joints – remain unabated, Mr. Zuhair also developed a serious stomach infection in mid-June. *See* September 4, 2008 Declaration by Ramzi Kassem ("Kassem Decl."), attached as Ex. 1 at ¶ 65. During his twice-daily force-feeding sessions, Mr. Zuhair now experiences an intense spreading pain, "like a fire

lighting up" in his stomach as soon as the nutrient mixture flows out of the feeding tube. Mr. Zuhair was not permitted to see a physician about this problem until August 4, some six weeks later, when he was told that he has a stomach infection. *Id.* at ¶ 66. Mr. Zuhair believes the infection is caused by unsanitary procedures in his force-feeding process. Mr. Zuhair told another physician in Guantánamo that staff wash feeding tubes for all the hunger strikers simultaneously in the same bucket prior to reuse and only replace them with new tubes at detainees' request, prompting surprise on the doctor's part, who told him that staff "are supposed to remove fresh tubes from the packaging before detainees' eyes at every feeding session." *Id.* at ¶¶ 67-8. Further, Mr. Zuhair has observed Guantánamo personnel playing with feeding tubes with their bare hands before replacing them—without cleansing or purification—in open boxes that remain exposed to dust, iguanas, and various rodents (the clinic has doors and windows open at all times). *Id.* at ¶ 69.

Mr. Zuhair also believes that he and other hunger-strikers are being surreptitiously drugged to render them more compliant. The Department of Defense Inspector General is currently investigating improper drugging of detainees by medical personnel at Guantánamo. *See* Letter from the Department of Defense Inspector General to the Center for Constitutional Rights, attached as Ex. 3 to Pet'r's Mot'n to Compel. Mr. Zuhair has indicated his willingness to cooperate with such an investigation by submitting to an interview on the topic in the presence of counsel. *Id.* at ¶ 71.

## ARGUMENT

For the reasons discussed below, this Court has jurisdiction under *Boumediene* to consider Mr. Zuhair's claim and to order the relief he seeks. In the context of his prolonged hunger strike and the denials of medical care that he has experienced, an independent assessment

of Mr. Zuhair's health is crucial to his ability to participate in his habeas proceedings. The Government seeks denial of this motion simply by rejecting Mr. Zuhair's detailed account, thought they fit with a well-documented pattern of misconduct at Guantánamo. Moreover, the Government's factual denials chiefly and selectively rely on the very medical records it seeks to withhold, further demonstrating that the production of such records would not be unduly burdensome.

## I.    This Court Has Jurisdiction Over Mr. Zuhair's Claim

This Court's jurisdiction over Mr. Zuhair's habeas petition is governed by the habeas corpus statute, 28 U.S.C. § 2241, and it has the power to take all measures "necessary and appropriate" to aid that jurisdiction under the All Writs Act, 28 U.S.C. § 1641, including the power to grant the limited relief sought here.

### A. *Boumediene* Fully Restored This Court's Habeas Jurisdiction Over This Claim

This Court's jurisdiction pursuant to 28 U.S.C. § 2241 was fully restored by the Supreme Court in its landmark ruling in *Boumediene v. Bush*, 128 S.Ct. 2229 (2008). Previously, 28 U.S.C. § 2241(e) purported to divest federal courts of jurisdiction over habeas and all other legal claims brought by detainees at Guantánamo. This provision had been added to the habeas statute by Section 7 of the Military Commissions Act of 2006 (labeled "Habeas Corpus Matters"), which superseded similar amendments in the 2005 Detainee Treatment Act. The Supreme Court invalidated this amendment, holding that "the law we identify as unconstitutional is MCA § 7, 28 U.S.C.A. §2241(e)." *Boumediene*, 128 S.Ct. 2229 at 2275. Hence, the Court restored § 2241 to its previous state, observing that the statute "would govern in MCA § 7's absence." *Id.* at 2239.

Notwithstanding this clear holding, the Government claims that this Court is presumptively unable to exercise jurisdiction over any question other than what it calls "core

habeas" functions[1], namely the legality of detention.   The Government argues that under *Boumediene*, the first part of section 7 of the MCA, 28 U.S.C. § 2241(e)(1), is unconstitutional "only insofar as it denies habeas review to detainees . . . who raise a core habeas challenge." Gov't Opp. at 9.[2]   The government also contends that "*Boumediene*'s holding does not invalidate the second part of section 7" at all.  Gov't Opp. at 10.[3]

This attempt to parse the repeal of MCA § 7 contradicts the plain language of *Boumediene* and is unsupported by relevant precedent.   As noted above, *Boumediene* declared MCA § 7 unconstitutional without limiting its holding to only one subsection thereof or to some notion of "core" habeas, nor does the MCA itself make any distinctions between "core" and "non-core" habeas functions.  *See Boumediene*, 128 S.Ct. 2229 at 2240 ("§ 7 of the [MCA] . . . operates as an unconstitutional suspension of the writ.").  *Boumediene* thus rendered MCA § 7 void in its entirety.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void.").  This is especially so because nothing in the DTA or MCA purported to modify statutory habeas procedures in the event that the repeal proved ineffective.  Indeed, the Supreme Court in *Boumediene* expressly noted the absence of

---

[1] The Government's position that this Court should read into *Boumediene* a critical distinction between "core" and "non-core" habeas claims is perplexing.  The term "core" appears in that decision only *once,* and only when citing *Schlup v. Delo,* 513 U.S. 298, 319 (1995), for the proposition that habeas "is, at its core, an equitable remedy." There is not a single statement in *Boumediene* to support the Government's apparent position that Mr. Zuhair's claims are not "core" habeas claims or, for that matter, why it would make any difference as a matter of law if they were not.

[2] The first part of MCA § 7, codified as 28 U.S.C. 2241(e)(1) purported to strip federal courts of jurisdiction over any "application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

[3] The second part of MCA § 7, codified as U.S.C. § 2241(e)(2), purported to strip federal courts of jurisdiction over "any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

such a provision, pointing out that neither the MCA nor the DTA contain any "saving clause." 128 S. Ct. at 2266.

The Government's attempt to rewrite *Boumediene* also cuts against relevant Supreme Court precedent. The DTA was enacted in response to the Supreme Court's holding in *Rasul v. Bush*, 542 U.S. 466, 483-84 (2004), that § 2241 is available to Guantánamo detainees. Similarly, the MCA was enacted after the Court found that an earlier version of § 2241(e)(1) did not apply to pending habeas petitions. *Hamdan v. Rumsfeld*, 548 U.S. 557, 576-77 (2006). Thus, prior to enactment of MCA § 7, *Rasul* and *Hamdan* made clear that Guantánamo detainees had a right to invoke the statutory habeas corpus procedure under 28 U.S.C. § 2241. This Court must now read § 2241 without the clause added by MCA §7.[4]

As a result, lower courts must apply the statute without the unconstitutional provision. *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1871) (disregarding unconstitutional statute that divested court of jurisdiction and reinstating judgment obtained under prior statutory scheme); *accord Armstrong v. United States*, 80 U.S. (13 Wall.) 154 (1871) (same); Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1387 (1953) ("If the court finds that what is being done is invalid, its duty is simply to declare the jurisdictional limitation invalid also, and then proceed under the general grant of jurisdiction."). *See also Boumediene v. Bush*, 476 F.3d 981, 1011 (D.C. Cir. 2007) (Rogers, J., dissenting) (stating that the habeas repeal was unconstitutional, and that the proper outcome was to hold that "on remand the district courts shall follow the return and traverse procedures of 28 U.S.C. § 2241, et seq."). This Court should not accept

---

[4] The Government also cites a recent Memorandum Opinion that read *Boumediene* as only partially invalidating MCA § 7. *In re Guantanamo Bay Detainee Litigation*, No. 05-CV-01509, Mem. Op. at 6 (dkt. no. 151) (D.D.C. Aug. 7, 2008) (Urbina, J.). The jurisdictional issue, however, was never fully briefed in that case, as Judge Urbina himself recognized when he lamented having to decide the issue from "the unfortunate position of evaluating the respondents' jurisdictional arguments without the benefit of counterargument." *Id.* at 5.

Respondents' invitation to narrow or modify the Supreme Court's express holding.[5] Accordingly, this case is in the same position it would be in if the MCA had never been enacted: subject to the statutory procedures that Congress enacted, which set out "a very specific process that the court and parties must follow." *Khalid*, 355 F. Supp. 2d at 323 n.15 (Leon, J.) (citing 28 U.S.C. §§ 2241 *et seq.*).

### B.  The Relief Requested Is Necessary to Protect This Court's Jurisdiction Over Mr. Zuhair's Habeas Petition and Is Not "Ancillary" to It

Even if the Government were correct in contending that 28 U.S.C. § 2241(e) somehow survived *Boumediene*, this Court would still have jurisdiction because the relief requested by Mr. Zuhair is integral to his habeas proceedings and not a "collateral" or "ancillary" issue as the Government claims.  Gov't Opp. at 9.  Accordingly, this Court has the power under the All Writs Act to order the requested relief in order to protect its hold over this case.  *See Belbacha v. Bush* 520 F.3d 452 (D.C. Cir. 2008).

The Government misreads *Belbacha* to stand for the proposition that courts can *only* act to protect their jurisdiction pending appellate review and that this Court's ability has evaporated now that "[t]he Supreme Court already has ruled in *Boumediene*."  Gov't Opp. at 17.  Nothing in *Belbacha* supports such a narrow reading.  Instead, the Court of Appeals held that relief was available *notwithstanding* its own previous holding in *Boumediene v. Bush*, 476 F.3d 981 (2007) that the MCA divested courts of habeas jurisdiction over Guantánamo.  *See Belbacha*, 520 F.3d at 456 ("[T]he district court has the authority to grant Belbacha preliminary relief because the

---

[5] The Government's reliance on *Ayotte v. Planned Parenthood*, 546 U.S. 320 (2006) and the plurality opinion in *Regan v. Time, Inc.*, 468 U.S. 641 (1984) is similarly unavailing here.  In both cases, lower courts took sweeping steps to invalidate unconstitutional provisions through a permanent injunction against a state statute and an invalidation of a federal regulatory mechanism, respectively.  In those situations, the Supreme Court properly curbed the lower courts' actions on the basis that courts should not invalidate more of statutes than necessary.  Here, the Supreme Court has *already* acted with the requisite precision, using clear language to invalidate a subset of a statutory enactment not to block policy mechanisms but merely to *restore* previously existing federal court jurisdiction.

Suspension Clause colorably protects [his] claims."). Indeed, the Court of Appeals explicitly noted that even the second part of MCA § 7 "does not displace [courts'] remedial authority, pursuant to the All Writs Act, to issue an 'auxiliary' writ 'in aid' of a 'jurisdiction already existing.'" *Id.* at 458 (quoting *Adams v. U.S. ex rel. McCann,* 317 U.S. 269, 273 (1942)). Now that the Supreme Court has found detainees' claims under the Suspension Clause to be not only colorable but indeed compelling and valid, the remedial authority recognized in *Belbacha* becomes more, and certainly not less, relevant.

Similarly, the Government's reliance on *Munaf v. Geren*, 128 S.Ct. 2207 (2008) to restrict the scope of the Great Writ, Gov't Opp. 16, is misplaced here. The circumstances in *Munaf* are entirely distinguishable from Mr. Zuhair's. In *Munaf*, the Court declined not to block a proposed transfer of detainees from U.S. military custody to Iraqi authorities, because to do so "would interfere with Iraq's sovereign right to 'punish offenses against its laws committed within its borders,'" *id.* at 2220 (citation omitted), and because the U.S. could not "shelter . . . fugitives from the criminal justice system of the sovereign with authority to prosecute them." *Id.* at 2228. Key to the holding in *Munaf* were the facts that petitioners had traveled to Iraq voluntarily, were detained within the sovereign territory of Iraq at the behest of the Iraqi courts, and were charged with serious crimes and subject to criminal proceedings under Iraqi law. *Id.* at 2221 ("Given these facts, our cases make clear that Iraq has a sovereign right to prosecute Omar and Munaf for crimes committed on its soil."). In contrast, Mr. Zuhair was abducted from Pakistan, is being held within the exclusive jurisdiction of the United States pursuant only to the authority of the executive branch of the U.S. government, and has been charged with no crime by the United States or Cuba. Thus, Mr. Zuhair's requested relief would not implicate issues of foreign sovereignty.

Mr. Zuhair's access to his medical records and to a reliable medical assessment is not an ancillary issue or an attempt to litigate the conditions of his confinement but rather is necessary for this Court to exercise its undisputed jurisdiction over Mr. Zuhair's habeas petition.[6]    Mr. Zuhair only seeks basic information about the effects of his detention on his own body.  This is necessary to protect this Court's hold over this case for two reasons.  First and most obviously, Respondents' actions continue to weaken Mr. Zuhair's already-damaged health, threatening his ability to participate in the habeas proceedings.  The Government's claim that Mr. Zuhair is "in good health with no significant medical problems," Declaration of Captain Bruce C. Meneley in support of Respondents' Opposition to Motion to Compel ("Meneley Decl.") at ¶ 48, attempts to sweep this concern under the rug and is improperly conclusory (see *infra*, Part III).

Second, by denying Mr. Zuhair an independent and reliable assessment of his own health, Respondents are impacting his ability meaningfully to consult his attorneys.  As a judge of this Court has recognized, the right to counsel "is illusory unless counsel have sufficient access to their clients to be informed about their physical condition."  *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005).  Attorney visits to Guantánamo take place under extraordinarily restrictive

---

[6] Moreover, the general convention that conditions of confinement are not cognizable on habeas – which the Government has improperly transmogrified into an ironclad rule for all time (habeas can "challenge one thing only: the fact of detention or its duration," Gov't. Opp. at 13) – carries less force here.  This is because Guantánamo detainees have until now been denied parallel avenues for relief such as those built into the trial process itself or via constitutional tort claims under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny.  The Supreme Court has repeatedly left open the propriety of habeas in some circumstances for forms of relief other than release.  *See Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("[H]abeas corpus may … also be available to challenge such prison conditions.  When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal.") (internal citations omitted); *Bell v. Wolfish*, 441 U.S. 520, 527 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."); *see also Blair-Bey v. Quick*, 151 F.3d 1036, 1042 (D.C. Cir. 1998) ("It is possible that habeas corpus might be available to challenge prison conditions in at least some situations."); *Glaus v. Anderson*, 408 F.3d 382 (7th Cir. 2005) ("[I]n some circumstances civil rights actions and writs of habeas corpus may be coextensive.").  In each of these cases, the availability of alternative remedies allowed courts to avoid delineating the outer limits of the scope of habeas; here, no such alternative remedies are yet available.  If indeed the Government's sweeping misreading of *Boumediene* is correct and Guantánamo detainees cannot seek relief even for torture and abuse that "shock[] the conscience," *Rochin v. California*, 342 U.S. 165, 209 (1953), then the circumstances imagined by the Supreme Court in *Preiser* and *Bell* calling for such a vigorous exercise of the Great Writ will, sadly, have come to pass.

conditions, and only a few times per year. In the absence of medical records and other information – and as long as Mr. Zuhair cannot be assured of the confidentiality of his written communications with counsel (dkt. no. 35) – such meetings present the only opportunities available to counsel to gauge Mr. Zuhair's condition, taking time away from other issues requiring discussion. As Mr. Zuhair's habeas proceedings progress, Mr. Zuhair needs to consult frankly and extensively with his counsel on difficult factual and legal questions that will determine his freedom. These deliberations, however, are compromised in numerous ways as long as they continue under the cloud of palpable concern over his physical health.

## II.    The Relief Sought By Mr. Zuhair Is Narrowly Tailored and No More Burdensome Than Other Forms Of Relief Granted to Protect Jurisdiction Over Habeas Actions

The Government caricatures the relief sought by Mr. Zuhair as an attempt to "micro-manage" operations at Guantánamo, Gov't Opp. at 22, that would not only unduly burden personnel there, but would "prompt counsel for many detainees in other cases to demand the same type of remedy." *Id.* at 27. The Government accordingly argues that such burdens would, for the purposes of preliminary injunctive relief under Fed. R. Civ. P. 65, substantially injure the government's interests and harm the public interest. *Id.* at 25-7. In reality, Mr. Zuhair seeks nothing more than the provision of medical records easily accessible to Respondents and permission to bring an independent medical specialist with counsel for a visit. Courts have already ordered similar forms of relief without the proverbial sky falling in.

The Government does not argue that the provision of medical records would be unduly burdensome, only that its "purpose" would be "intrusive." *Id.* at 26. In doing so, the Government sidesteps the applicable legal standard. In assessing the propriety of preliminary injunctive relief, courts assay whether "an injunction will substantially injure the other party," *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317 (D.C. Cir. 1998), not whether the

motive imputed to the movant by the opposing party is "intrusive" or not.  The lack of any "substantial injury" is best demonstrated by the Government's selective reliance on Mr. Zuhair's medical records in its opposition, *see* Meneley Decl., confirming that Respondents have Mr. Zuhair's updated medical records at hand and that their production would not be unduly burdensome.

The Government also argues that granting Mr. Zuhair's motion would encourage a torrent of similar requests and divert resources from providing medical care to detainees.  Gov't Opp. at 27.  The Government fails to mention that courts first ordered the production of Guantánamo detainees' medical records three years ago without being inundated with such requests.  *Al-Joudi v. Bush*, 406 F.Supp.2d 13 (D.D.C. 2005).[7]  The Government also does not explain how the mere transmission of records would unduly burden the work of the medical personnel who must continuously maintain and update them anyway.  Moreover, if the availability of medical records to detainees as a matter of right in the Federal Bureau of Prisons under 28 C.F.R. § 513.42 is not unduly burdensome, it is unclear how the narrow relief requested here – production of one individual's medical records based on a particularized showing of need – could be.

Similarly, allowing a medical expert to accompany undersigned counsel to examine Mr. Zuhair would impose no significant costs or burdens on Respondents.  This Court has granted similar relief in allowing a psychologist to accompany counsel for another detainee in Guantánamo.  *See* Minute Entry Granting Pet'r's Motion to Compel to Permit Psychologist to Accompany Counsel to Client Interviews, *Batarfi v. Bush*, 05-CV-409 (D.D.C. Aug. 20, 2008).

---

[7] The Government has also produced Guantánamo medical records in the context of Freedom of Information Act litigation.  *See Oleskey v. U.S. Dep't of Defense*, 05-CV-10735 (D. Mass.).  As noted in Mr. Zuhair's Motion, months of efforts on the FOIA track have only encountered stonewalling from the Government.  Pet'r's M'tn at 9-10.

And neither form of relief is more "intrusive" or "burdensome" than the authority of district courts to enjoin transfers under *Belbacha*, which would require Respondents to continue to hold, watch over, and provide for detainees at taxpayer expense.

## III. The Government's Selective Use of Mr. Zuhair's Medical Records to Seek Denial of His Motion Is Improper

The Government attempts to sweep aside Mr. Zuhair's detailed account as "without merit," Gov't Opp. at 20, by relying on the Meneley Declaration. The Government accordingly argues that, for the purposes of a preliminary injunction under Fed. R. Civ. P. 65, Mr. Zuhair cannot demonstrate imminent irreparable injury or likelihood of success on the merits. Gov't Opp. 19-21, 25. The specific allegations in the Meneley Declaration concerning grossly inadequate or deliberately withheld medical care, however, are not based on personal knowledge; moreover, the declaration selectively cites the very records the Government is withholding. There is no reason why this Court should presumptively accord the Government's partial account of Mr. Zuhair's records such conclusive weight, especially in light of Mr. Zuhair's consistent description of the medical mistreatment and willful neglect he has experienced. The deliberate denial of medical care by Guantánamo personnel for hunger strikers and the abuse and humiliation they endure daily has been corroborated by other detainees in detail that is strikingly similar if not identical to Mr. Zuhair's account. *See* Declaration of Julia Tarver Mason dated September 4, 2008 ("Mason Decl."), attached as Ex. 2, at ¶¶ 2-5, 7-14.

To the extent there is evidence of such misconduct in Mr. Zuhair's records, it is highly unlikely to emerge if the Government is the only party that can examine them. This is especially the case with Mr. Zuhair's concerns that Guantánamo medical personnel are drugging him without his consent, Kassem Decl. at ¶ 70, a practice that is now under investigation by the Department of Defense Inspector General's Office. Other instances of medical misconduct, such

as Mr. Zuhair witnessing Guantánamo personnel playing with feeding tubes with their bare hands without cleaning or sterilizing them before reuse, Kassem Decl. ¶ at 67, are highly unlikely to be in the records at all, which is why an independent examination is also necessary. The Government's "just trust us" attitude cannot sweep away the serious harm that Mr. Zuhair faces and has already endured.

The Meneley Declaration on its face does not adequately answer some of the most serious medical concerns raised by Mr. Zuhair. For example, the declaration dismisses Mr. Zuhair's concerns about the possibility of gout for two reasons. First, it cites the results of a uric acid analysis performed *nearly five years ago*, in November 2003, Meneley Decl. at ¶ 30, prior to Mr. Zuhair's hunger strike and the implementation of Respondents' retaliatory denials of medical care. Such a dated test cannot serve as a basis for dismissing the possibility of gout today. *See* Declaration of Dr. Robert Cohen dated September 4, 2008 ( "Cohen Decl."), attached as Ex. 3, at ¶ 10. Second, Dr. Meneley's "records review identified no recurring severe joint pain syndrome." Meneley Decl. at ¶ 30. Yet on the very same page, the declaration discusses Mr. Zuhair's knee, ankle, and back pains – symptoms that are consistent with severe joint pain syndrome – and alleges that he has been prescribed with pain medication, including Ultram. *Id.* at ¶ 31-2. *See* Cohen Decl at ¶ 9. The information in the Meneley Declaration by itself does little to allay the concerns raised by Mr. Zuhair.

Similarly, the persistence of Mr. Zuhair's kidney and urinary pain since 2003 remains troubling. Although the Meneley Declaration indicates that a helical CT scan and other tests were undertaken in the early years of Mr. Zuhair's unlawful detention, the most recent use of any diagnostic imaging (an X-ray) dates back to April 2004, Meneley Decl. at ¶ 23, which, again, was prior to Mr. Zuhair's hunger strike and the institution of Respondents' practice denying

proper medical care. In the four years since, Mr. Zuhair's symptoms have clearly not been resolved or even properly diagnosed, notwithstanding occasional urinalyses. The persistence of painful symptoms that could indicate serious health conditions would normally occasion use of different and varied diagnostic techniques to identify the problem. Cohen Decl. at ¶¶ 12-3. Yet the Meneley Declaration seems to indicate the opposite – a refusal to perform anything more than a perfunctory analysis during the period of Mr. Zuhair's hunger strike.

The Government's insufficient answers to Mr. Zuhair's allegations concerning his kidney problems and potential gout fail to defeat his request for relief. As for Mr. Zuhair's other complaints, far from "directly refut[ing]" them, Gov't Br. at 6, the Government has at most created a material dispute of fact whose resolution requires a hearing. "[I]f there are genuine issues of material fact raised in opposition for a preliminary injunction, an evidentiary hearing is required." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Furthermore, "it is an abuse of discretion for the court to settle the question on the basis of documents alone, without an evidentiary hearing." *Id.* Such a dispute exists over one of the central factual claims at stake, namely that medical personnel at Guantánamo have repeatedly and explicitly told Mr. Zuhair that he would not receive certain kinds of needed medical treatment unless and until he ended his hunger strike. Pet'r's M'tn at 2-3. The Meneley Declaration, unsurprisingly, denies these statements, ostensibly on the basis of a review of Mr. Zuhair's medical records. Meneley Decl. at ¶ 10. Although such denials should occasion an evidentiary hearing in which this Court could take testimony via videoconferencing from Mr. Zuhair as well as from the Guantánamo medical personnel who have long denied him treatment, for the reasons outlined above the relief requested can also be properly dispensed without a hearing.

**CONCLUSION**

For the reasons stated above, Petitioner's Motion to Compel Production of Medical Records and for Order Permitting Independent Medical Examination should be granted, either pursuant to this Court's power under the All Writs Act or as a preliminary injunction pursuant to Fed. R. Civ. P. 65.

Dated: September 4, 2008

Respectfully submitted,
_____/s/_____
Ramzi Kassem
Michael J. Wishnie
*Supervising Attorneys*

Anand Balakrishnan
Madhuri Kumar
Darryl Li
*Law Student Interns*

Allard K. Lowenstein International Human
    Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street, New Haven, CT 06511
(203) 432-0138
ramzi.kassem@yale.edu
*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2008, I caused a true and accurate copy of Petitioner's Reply In Further Support of His Motion to Compel Production of Medical Records and For Order Permitting Independent Medical Examination to be served upon the following counsel for Respondents by electronic filing via the Court's ECF system:

Arlene Groner, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530


_____/s/_____
DARRYL LI
Allard K. Lowenstein International Human Rights
    Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138

16

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | |
| *Petitioner,* | |
| v. | Civil Action No. 08-864 (EGS) |
| GEORGE W. BUSH, ROBERT GATES, REAR ADM. MARK H. BUZBY, and ARMY COL. BRUCE VARGO, | |
| *Respondents.* | |

## SEPTEMBER 4, 2008 DECLARATION OF RAMZI KASSEM

Pursuant to 28 U.S.C. § 1746, I certify that the following is true and correct to the best of my knowledge:

1. My name is Ramzi Kassem.

2. I am a Robert M. Cover Fellow and Clinical Lecturer in Law at Yale Law School and counsel to Petitioner in the above-captioned matter, Ahmed Zaid Salem Zuhair.

3. I traveled to Guantánamo and met with Mr. Zuhair on the 5th and 6th of August, 2008.

4. On August 26, 2008, the Privilege Review team faxed me my notes from those meetings after having unclassified them.

## Mr. Zuhair's Treatment by the Guards in Cell Block H in Camp 6

5. Mr. Zuhair told me that, on or about May 11, 2008, he was transferred to Camp 6, where he is held in Block H.

6. Mr. Zuhair told me that seven other hunger strikers are held with him in Camp H.

7. Mr. Zuhair told me the names and Internment Serial Numbers of these seven men.

8.  Mr. Zuhair told me that force-feeding of the hunger strikers occurs in a common area between the cells. Guards line restraint chairs in front of the cells.

9.  Mr. Zuhair told me that the hunger strikers are force-fed four at a time. Mr. Zuhair and three other strikers are brought out between 9:30 and 11:30 AM and between 4:30 and 6:30 PM. The other four hunger strikers are fed on alternate shifts.

10. Mr. Zuhair told me that the two guards who threatened his life and read and removed his legal papers are stationed in Block H in Camp 6.

11. Mr. Zuhair told me that the guard who confiscated his privileged papers was a Non-Commissioned Officer. I refer to this guard hereinafter as Guard 1.

12. Mr. Zuhair described Guard 1 as a six foot tall white man, weighing over 200 pounds, with a shaved head, who is approximately 35 years old. Mr. Zuhair recalls this guard's insignia as being three inverted "v's." Guard 1 is a commanding officer in the cell block when on duty.

13. Mr. Zuhair stated that subordinates and Soldiers on Guard ("SOGs") have complained about Guard 1's behavior on a number of occasions.

14. Mr. Zuhair stated that the second guard's rank is that of a Navy seaman. He described him as white, with dark brown eyes and hair, his build as "skinny," and estimates that he is approximately 22 years-old. I refer to this guard hereinafter as Guard 2.

### First Incident—Mid-June, 2008

15. Mr. Zuhair told me that, in mid-June, his wrist was swollen as a result of the guards' routine use of excessive force. He said that, after a session in the restraint chair, Guard 2 unrestrained Mr. Zuhair's left hand from the chair in order to shackle him for transportation a few steps back to his cell.

16. Mr. Zuhair told me that when Guard 2 shackled his left hand, Mr. Zuhair asked Guard 2 to loosen the cuff, as it was cutting into his swollen wrist.

17. Mr. Zuhair told me that Guard 2 then asked Mr. Zuhair whether he was refusing to be cuffed. Mr. Zuhair responded by repeating his request that the cuff on his wrist be loosened.

18. Mr. Zuhair told me that, in response, Guard 2 took off the cuff and tied Mr. Zuhair's left hand to the restraint on the chair. Guard 2 then went to complain to the SOG and filed a report stating falsely that Mr. Zuhair had attacked him

and hit him with his right hand. At no time were either of Mr. Zuhair's hands free to hit the guard.

19.   Mr. Zuhair stated that, as a result of the report filed by Guard 2, Mr. Zuhair was placed on level 2 discipline status for eighteen days.

**Second Incident—On or About the 10ᵗʰ or 11ᵗʰ of July, 2008**

20.   Mr. Zuhair told me that, at the end of the eighteen day period of punishment, he was again strapped to the feeding chair when Guard 2 approached him and said, "Shut up! Don't speak!"

21.   Mr. Zuhair told me that he had not said anything to the guard and that he then asked the guard "What did I do wrong? What did I say?"

22.   Mr. Zuhair told me that Guard 2 again told him to "shut up."

23.   Mr. Zuhair told me that he lost his temper, and in anger called Guard 2 an "animal."

24.   Mr. Zuhair said that Guard 2 then returned the other three hunger strikers to their cells, but left Mr. Zuhair strapped to the restraint chair.

25.   Mr. Zuhair told me that he could see a clock on the wall from where the restraint chair was placed.

26.   Mr. Zuhair stated that, after forty minutes, he asked a nurse "why am I still here?"

27.   Mr. Zuhair described the nurse was a black female, approximately thirty years old. Her insignia had two inverted "v"'s.

28.   Mr. Zuhair told me that the nurse then instructed Guard 2 to return him to his cell but Guard 2 ignored the nurse.

29.   Mr. Zuhair told me that he then asked the NCO on duty at the time to return him to his cell. He described the NCO as a white female in her 30s whose insignia was 2 inverted "v"s.

30.   Mr. Zuhair told me that Guard 2 told the NCO that Mr. Zuhair was on punishment.

31.   Mr. Zuhair told me that the NCO then went to the Soldier on Guard, who stands outside the cell block.

32.    Mr. Zuhair told me that when she returned, the NCO told Guard 2 that the
       SOG ordered that Mr. Zuhair should be returned to his cell, but that Guard 2
       refused to do so. The NCO found two other guards to move Mr. Zuhair back
       to his cell.

33.    Mr. Zuhair told me that by the time he was returned to his cell, he had been
       strapped into the restraint chair for two hours and forty minutes.

### Third Incident, July 17, 2008

34.    Mr. Zuhair told me that on July 17th, at 6:30 PM – the end of Mr. Zuhair's
       evening feeding – three guards came to release him from the restraint chair:
       Guard 1 (the Non-Commissioned Officer), Guard 2, and an unidentified
       seaman.

35.    Mr. Zuhair told me that the third seaman cuffed Mr. Zuhair properly, leaving
       the width of one finger between the cuff and his wrist so as to not cut off
       circulation.

36.    Mr. Zuhair told me that Guard 1 told the third seaman to tighten the cuff, but
       the seaman refused to tighten the cuff on his left hand.

37.    Mr. Zuhair told me that Guard 2 tightened the cuff on Mr. Zuhair's right hand
       and then tightened the buckle tying Mr. Zuhair's cuffed hands to his waist.

38.    Mr. Zuhair told me that Guard 2 made the buckle so tight that Mr. Zuhair felt
       like he was going to vomit and screamed out in pain.

39.    Mr. Zuhair told me that Guard 1 yelled that Mr. Zuhair was refusing, called
       for an Initial Reaction Force ("IRF") team, and went to speak to the SOG
       outside.

40.    Mr. Zuhair told me that no IRF team appeared, but instead Guard 1 returned
       and told Guard 2 to tighten Mr. Zuhair's cuffs and return him to his cell.

41.    Mr. Zuhair told me that he was angered by his treatment and addressed Guard
       1 in English.

42.    Mr. Zuhair told me that he stated to Guard 1, "We are prisoners. Do you think
       you are Rambo? If you are Rambo, go to Iraq. We are prisoners. We cannot
       hurt you."

43.    Mr. Zuhair told me that Guard 1 laughed in response.

44.    Mr. Zuhair told me that the three guards took Mr. Zuhair to his cell.

45.   Mr. Zuhair told me that when they arrived at the cell, Guard 1 stood outside the cell while Guard 2 and the other seaman patted Mr. Zuhair down.

46.   Mr. Zuhair told me that while the seaman performed the body search normally, Guard 2 did it in a matter that was deliberately brutal and demeaning, which made the seaman shake his head disapprovingly.

47.   Mr. Zuhair told me that at that point, Guard 1 asked Mr. Zuhair, "I should go to Iraq?"

48.   Mr. Zuhair told me that he told Guard 1, "Yes."

49.   Mr. Zuhair told me that Guard 1 then told Mr. Zuhair that he would kill him and chop his body into pieces and Guard 2 said that they should cut off Mr. Zuhair's nose and ears instead.

50.   Mr. Zuhair told me that, on that night, at around 11 PM or midnight, Guard 1 removed Mr. Zuhair's box of personal and legal papers from the separate cell where it is kept.  Hunger strikers are not permitted to keep their papers in their cells.  Mr. Zuhair told me the guard took his box of legal materials and papers to the common area outside Mr. Zuhair's cell and read through them.

51.   Mr. Zuhair told me that Guard 1 was in full sight of Guard 2, the other guards on duty that night, and the other prisoners in the block who could observe what was happening through the windows in their cell doors.

52.   Mr. Zuhair told me that, from 11 PM or midnight on, Guard 1 shook and banged on Mr. Zuhair's door every 30 minutes until dawn, at about 4 or 5 AM.

53.   Mr. Zuhair told me Guard 1 banged on his door in full sight of Guard 2, the other guards on duty that night, and the other prisoners in the block who could observe what was happening through the windows in their cell doors.

54.   Mr. Zuhair told me that he saw Guard 1 read through his papers page by page. Guard 1 read everything that was in English, including papers marked attorney-client privileged.

55.   Mr. Zuhair told me that Guard 1 pulled all handwritten papers and notes and took them with him.

56.   Mr. Zuhair told me that the next day, on July 18th, a Navy mental health doctor from the PHU toured the cell block and that he told the doctor about the threats.  Mr. Zuhair believes that the doctor noted his complaints, but does not know if he ever reported them to his superiors.

57.  Mr. Zuhair told me that on July 18th, he asked an interpreter for the SOG, a tall black man with three inverted superposed "v"'s to lodge a formal complaint. That man told Mr. Zuhair that he had complained about Guard 1 himself at a prior time and said he'd write a report about the incident. Two days later, Mr. Zuhair said he complained to another SOG, a white male of the same rank as the aforementioned SOG, and that he responded to Mr. Zuhair in the exact same manner.

58.  Mr. Zuhair told me that approximately one week after the threat, on the Wednesday of the following week, a Navy captain, who was dark-skinned and larger than Guard 1 came to tour Block H.

59.  Mr. Zuhair told me that he knocked on the window of his cell door to ask to speak with the captain but that Guard 1 tried to dissuade the captain from coming to speak to Mr. Zuhair.

60.  Mr. Zuhair told me that the captain went over to his cell anyway. Mr. Zuhair asked him for some water.

61.  Mr. Zuhair told me that the captain ordered Guard 1 to give him some water but that Guard 1 refused.

62.  Mr. Zuhair told me that he turned to the captain and pointed to his (Mr. Zuhair's) dark skin and said "it's because of this," meaning that Guard 1 was disobeying his commanding officer because Guard 1 was white and the captain was black.

63.  Mr. Zuhair told me that the captain ordered Guard 1 to get water again and that, this time, Guard 1 complied, uttering a curse word in English which Mr. Zuhair did not understand.

### Mr. Zuhair's Medical Condition

64.  During my August 5-6, 2008 meetings with Mr. Zuhair, his ongoing health problems remained unabated.

65.  Mr. Zuhair told me that he developed a serious stomach infection in mid-June and that, during his twice-daily force-feeding sessions, he experiences an intense spreading pain, "like a fire lighting up" in his stomach as soon as the nutrient mixture flows out of the feeding tube.

66.  Mr. Zuhair told me that he was not permitted to see a physician about this problem until August 4, the day before his meeting with counsel. The physician told him that he has a stomach infection.

67.    Mr. Zuhair told me that he believes the infection is caused by unsanitary procedures in his force-feeding process.  He has observed Guantánamo personnel washing feeding tubes for all the hunger strikers simultaneously in the same bucket.  He said that the same feeding tubes are used for 15 days and are only replaced at detainees' request.

68.    Mr. Zuhair told me that he described the handling of feeding tubes to another physician, and that the doctor expressed surprise and told him that staff "are supposed to remove fresh tubes from the packaging before detainees' eyes at every feeding session."

69.    Mr. Zuhair told me that has also observed Guantánamo medical personnel playing with feeding tubes with their bare hands before placing them in boxes to dust, iguanas, and various rodents without subsequently cleaning or purifying them.  He told me the clinic has doors and windows open at all times.

70.    Mr. Zuhair told me that he also believes that he and other hunger-strikers are being surreptitiously drugged to render them more compliant.

71.    Mr. Zuhair told me that he would be willing to be interviewed, in the presence of his counsel, by the Department of Defense Inspector General's office in any investigation concerning the role of medical personnel in abuses at Guantánamo.

I declare under penalty of perjury that the foregoing is true and correct.

New Haven, CT

Executed on this 4th day of September, 2008

RAMZI KASSEM

7

EXHIBIT 2

## DECLARATION BY JULIA TARVER MASON, ESQ.

I, Julia Tarver Mason, declare that the following statements are true to the best of my knowledge, information, and belief:

1.      I am a member of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss").  Paul, Weiss currently represents habeas petitioner Abdul Rahman Shalabi, ISN 042, in the habeas action captioned *Al Oshan* v. *Bush*, 05-cv-520 (RMU).

2.      Mr. Shalabi has been on a hunger strike for three years, despite persistent efforts by personnel at Guantanamo to coerce him physically and psychologically to end his non-violent protest.  In my meetings with him over the last three years, he has described to me in painful detail how he has been treated by the military since he began his hunger strike in August 2005.

3.      According to Mr. Shalabi, from the early days of the hunger strike, military personnel attempted to persuade the strikers from their protest by making the process of force-feeding excruciatingly painful.  Mr. Shalabi described to me how on one occasion in the first weeks of the strike, an unnamed military doctor, "Dr. X," forcefully inserted a large, 18 French tube into the nose of a Yemeni detainee.  According to Mr. Shalabi, Dr. X removed the tube, covered in blood, and then reinserted it again into the prisoner.  This was done repeatedly until the detainee lost consciousness.

4.      Then, in January 2006, the military stepped up its efforts to end what had become a widespread strike when it introduced a restraint chair to immobilize detainees while they were being force-fed.  Another Paul, Weiss client who was on a hunger strike prior to his recent transfer to Saudi Arabia referred to the restraint chairs as

1

"execution chairs." These chairs were used to feed each detainee without regard to a detainee's resistance to enteral feeding. Mr. Shalabi himself did not resist enteral feedings, nor at 104 pounds, could he have offered any meaningful resistance.

5.      Nonetheless, Mr. Shalabi and others were placed in the chair and forced to ingest an excessive volume of liquid nutrients and water. Mr. Shalabi explained this unusual form of coercion whereby he was continually -- and dangerously -- fed excessive amounts of Ensure until he vomited repeatedly and ultimately defecated on himself while restrained in the chair. He was left in the chair, in this humiliating and degrading position, sitting in his own excrement, for hours.

6.      Mr. Shalabi also has complained that prisoners have been taken to the chair to be fed during prayer time and were told that if they wanted to pray, they had to end their hunger strike.

7.      They were also subjected to harsh conditions of confinement as a form of punishment for refusing to eat. Many of the hunger strikers – with fragile mental health to begin with – have been placed in solitary confinement for extended periods of time. They have been housed in cells set to such low thermostat temperatures that they are literally freezing in their cells – with guards refusing their pleas for adequate blankets or other cover to keep them warm.

8.      The hunger strikers have been forbidden to possess "comfort items" such as soap or toothpaste.

9.      They have also been deprived the opportunity to send or receive non-legal mail.

2

10.     I met with Mr. Shalabi again on June 14, 2007, with my colleague Sarah Jackel and an interpreter. We had scheduled a special trip to meet with him after learning that Mr. Shalabi was in poor health and anxious to talk to counsel about his health and well being. When we arrived, Mr. Shalabi reported that guards injured his wrist, slamming it against a wall while he was wearing shackles. Although the injury caused Shalabi such serious pain that he believed his wrist was broken, Mr. Shalabi was not given any medication. He was told that in order to receive such medication, he would have to end his hunger strike.

11.     And although Mr. Shalabi acknowledged in June 2007 that there had been some positive changes in the way that hunger strikers have been treated – reporting that he is no longer fed an excessive volume of food and no longer vomits blood during his daily feedings – he believes that hunger strikers continue to be punished for participating in the strike. He explained that they are still being denied privileges belonging to other detainees, including receipt of family mail and access to the detainee library.

12.     I met with Mr. Shalabi again on May 1, 2008 with my colleague Martin Flumenbaum and a translator. Mr. Shalabi was still on a hunger strike and was suffering from a painful sinus inflammation as a result of the continuous insertion and removal of the feeding tube, several times each day for the last three years.

13.     Mr. Shalabi said that he was still not allowed to receive books and was only given limited time to use writing materials and to review his legal materials.

14.     Mr. Shalabi also reported that some time ago his head was swollen and he was in pain. He asked for medication but was once again told that he would only

3

be given medication if he spoke to the interrogators.    He did not speak to the

interrogators, and ultimately had to be taken to the hospital.

      15.    I declare, under penalty of perjury under the laws of the United

States that the foregoing is true and correct.

Executed this 4th day of September 2008
Washington, D.C.

_____
Julia Tarver Mason

4

EXHIBIT 3

## DECLARATION OF DR. ROBERT COHEN

1. I am a Board-certified physician and have over two decades of experience monitoring health care delivery in federal correctional facilities as a court-appointed expert. My curriculum vitae is attached.

2. I was contacted by Attorney Ramzi Kassem in April 2008 to provide an independent medical assessment of Ahmed Zaid Zuhair's (hereinafter "Mr. Zuhair") health, medical treatment, and the propriety of the force-feeding regimen on which he has been placed.

3. I am providing these services on a *pro bono* basis.

4. Attorney Kassem has provided me with his unclassified observations and his declassified meeting notes from his five meetings with Mr. Zuhair. In addition, I have read the Affidavit of Navy Captain Dr. Bruce Meneley, M.D.

5. As I understand it, the government has repeatedly refused to release Mr. Zuhair's medical records, making a conclusive evaluation of his health impossible.

6. In my experience as a physician practicing, supervising, administering, and monitoring correctional medical care for over thirty years, it is standard practice for prisoners and their counsel to have access to prisoners' medical files as a matter of right.

7. Nevertheless, from my review of the available materials, I can make the following preliminary conclusions:

8. The Meneley Declaration at ¶ 30 dismisses the possibility that Mr. Zuhair may be suffering from gout. This conclusion appears hasty and medically improper, for two reasons.

9. First, the Meneley Declaration claims that "records review identified no recurring severe joint pain syndrome." Meneley Decl. at ¶ 30. Yet on the very same page, the declaration discusses Mr. Zuhair's knee, ankle, and back pains and alleges that he has been prescribed with pain medication, including tramadol (ultram), a medication usually reserved for treatment of severe pain. *Id.* at ¶ 31-2. Mr. Zuhair's repeated complaints of joint pain are consistent with a severe joint pain syndrome and may be a symptom of gout or other treatable rheumatologic condition.

10. Second the Meneley Declaration claims that Mr. Zuhair's uric acid levels are normal. *Id.* at ¶ 30. It cites the results of a uric acid analysis performed nearly five years ago, in November 2003. Such dated test results cannot serve as a basis for dismissing the possibility of gout today. This is particularly true in Mr. Zuhair's case because he has been receiving prepared enteral nutritional substitute for the past three years which may have different concentrations of purines from the diet he had been eating when he was not on a hunger strike. Diets low in purine are prescribed to prevent attacks of gout. Normal or high purine diets can cause elevated levels of uric acid and precipitate gout in susceptible individuals. A uric acid level from five years ago does not provide any information about his current uric acid level since he is receiving artificially prepared nutrition.

11. The persistence of Mr. Zuhair's kidney and urinary pain since 2003 remains troubling. Although the Meneley declaration indicates that a helical CT scan and other advanced techniques were undertaken in the early years of Mr. Zuhair's unlawful detention, the most recent use of any diagnostic imaging (an X-ray)

mentioned was from April 2004. *Id.* at ¶ 23. Yet in the four years since, Mr. Zuhair's symptoms have clearly not been resolved. He continues to have burning on urination and pain in the region of his kidneys.

12. Since he has documented and treated urinary tract infections in the past, and since he has had CT scan documentation of a probably kidney stone, the minimal urological evaluation provided, consisting only of urinalysis, is completely inadequate. The failure of Mr. Zuhair's physicians at Guantanamo to diagnose the cause of his dysuria and renal pain should prompt additional diagnostic and radiologic testing under the direction of a consultant urologist.

13. The persistence of painful symptoms over the course of years that could indicate serious health conditions would normally occasion use of different and varied diagnostic techniques to identify the problem. Instead, the Meneley Declaration suggests that since 2004 Guantánamo personnel have only used urinalysis, the most basic form of diagnosis, without making any progress in identifying the problem. This is contrary to standard medical practice.

   I declare upon penalty of perjury that under the laws of the United States of America that the foregoing is true, accurate, and correct.

Dated: 4 September 2008

DR. ROBERT L. COHEN, MD

Robert L. Cohen, MD

Page #1

## ROBERT L. COHEN, M.D.

130 Barrow Street, Apt. 102     (H) 212-242-5062
New York, NY  10014

314 West 14th Street            (W) 212-620-0144
New York, NY  10014             (F) 212-691-8588

**EDUCATION**

A.B., Princeton University, 1970
M.D., Rush Medical College, 1975

**POSTGRADUATE TRAINING**

Residency, Medicine, Cook County Hospital, 1978
Chief Residency, Cook County Hospital, 1979

**BOARD CERTIFICATION**

Internal Medicine - 1978

**PROFESSIONAL EMPLOYMENT**

Clinical Practice in General Internal Medicine
New York City
1988 -

Attending Physician
AIDS Center
St. Vincent's Hospital and Medical Center
October, 1990 - 2000

Medical Director
AIDS Center
St. Vincent's Hospital and Medical Center, NYC
January 1989 - October 1990.

Vice President for Medical Operations
New York City Health and Hospitals Corporation

Robert L. Cohen, MD
Page #2

1986-1988

Director
Montefiore Medical Center
Rikers Island Health Services
1982 - 1986

Associate Medical Director
Montefiore Medical Center
Rikers Island Health Services
1981 - 1982

Attending Physician
Department of Medicine
Cook County Hospital
1979 - 1981

**FACULTY APPOINTMENTS**

Clinical Assistant Professor
Department of Clinical Epidemiology and Population Health
Albert Einstein College of Medicine
1985 -

**FACULTY COMMITTEES**

Vice Chairman
Institutional Review Board
Montefiore Medical Center
1984 - 1986

Member
Institutional Review Board
Hunter College, City University of New York
2000 B present

Chair
St. Vincent's Hospital
AIDS Surveillance Committee
1989 -1997

Robert L. Cohen, MD

Page #3

**MEDICAL EXPERT -- PRISON HEALTH**

**Federal Court Appointed Monitoring of Health Care in Prisons and Jails**

Michigan, *Hadix v. Johnson*, 2003 B present
Court Appointed monitor for oversight of medical care of 4 prisons in Michigan

Ohio, *Austin v. Wilkinson*, 2002 - 2006
Member of two person Medical Monitoring Team to monitor compliance with settlement
agreement regarding medical care in Ohio State Penitentiary

New York State, *Milburn v. Coughlin*, 1989 -- present
Continuing review of compliance with health care consent agreement
.
Connecticut, *Doe v. Meachum*, 1990 -- present
Medical expert at trial and court appointed monitor of compliance with settlement
agreement covering care of all HIV infected prisoners in Connecticut.

Florida, *Costello v. Wainwright*, 1983 through 1988
Review of compliance with settlement agreement in all Florida Prisons.

Washington, D.C.  1986 - 2000
Court appointed medical expert involved in monitoring compliance with several consent
agreements regarding medical care at the DC Jail as well as DC prisons at Lorton (VA).

**State Court Appointed Monitor**

Philadelphia, PA, *Jackson v. Hendricks*, 1991 -- 1999
Review of compliance with consent agreement on medical care within Philadelphia jails.


**Department of Justice Appointed Medical Expert**

Cook County Jail, 1982 (Chicago, IL)
Essex County Youth House (Newark, NJ), 1995 to 1999

Robert L. Cohen, MD

Page #4

**RECENT PRESENTATIONS**

American Exceptionalism: The Health Consequences of Mass Incarceration
2nd Annual Conference of the International Journal of Prison Health Care
Varna, Bulgaria,
October 21, 2007

Quality of Care for Prisoners with HIV infection
Association of the Bar of the City of New York,
 January 10, 2007

Prison Health Care в Does Court Intervention Improve Quality of Care?
New York University Law School, Health Law Forum,
February 15, 2006

The Commission on Safety and Abuse in America's Prisons
Expert Testimony on the Quality of Medical Care, Newark, NJ,
July 20, 2005
http://www.prisoncommission.org/statements/cohen_robert.pdf

Lessons Learned from Rights Based Approaches to Health
Emory University Conference Center, Atlanta, Georgia, USA,
April 16, 2005

**BOARD AND COMMITTEE MEMBERSHIPS**

Housing Works
Board Member, AIDS Day Treatment Centers and Housing Programs
1994 - present

Fortune Society
Board Member
1991 - present

National Commission on Correctional Health Care
Representative, American Public Health Association
1994 в present

World Health Organization в European Region
Health in Prison Project

Robert L. Cohen, MD

Page #5

APHA Invited Observer
2003 в present
**PUBLICATIONS**.

Cohen-R., Health and Public Health Advocacy for Prisoners, in Puisis-M, et.al, *Clinical Practice in Correctional Medicine*, Elsevier, 2006.

deLone-M, Cohen-R, et.al, Standards for Health Services in Correctional Institutions, 3rd Edition, American Public Health Association  2003

Cohen-R, Mass Incarceration: A Public Health Failure, in May, J, *Building Violence*, Sage Publications, 1999

Cohen-R., The Medical Intake Examination, in Puisis-M, Cohen-R, et al, *Textbook of Correctional Medicine, Mosby, St. Louis, 1998.*

Frickhofen-N, Abkowitz-JL, Safford-M, Berry-M, Antunez-De-Mayolo-J., Astrow-A, Cohen-RL, King-LN,et.al., Persistent B19 Parvovirus Infection in Patients Infected with HIV-1: A treatable cause of anemia in AIDS., Annals of Int. Med.113, 12,  926-933, Dec. 15, 1990.

Laudicina, S., Goldfield, N., Cohen, R., Financing  for AIDS Care, The Journal of Ambulatory Care Management,Vol. II, No. 2, 55-66, May 1988.

Selwyn, Peter A., Feiner, Cheryl, Cox, Charles P., Lipshutz, Carl & Cohen, Robert L., Knowledge about AIDS  and High-Risk Behavior Among Intravenous Drug Users in New York City, AIDS, Vol. 1, No. 4, 247-254, 1987.

Cohen, Robert L., Case Studies: A Prisoner in Need of a Bone Marrow Transplant, Hastings Center Report, Vol. 17, No. 5, 26-27, 1987.

Bayer, Ronald, Carol Levine, Susan M. Wolf et. al. 1986. HIV Anti-body Screening: An Ethical Framework for Evaluating Proposed Programs. JAMA 256(3): 1768-1774, 1986.

Cohen, Robert L., Oliver Dennis, Pollard-Sigwanz, Cathy, Leukopenia and Anergy as Predictors of AIDS, JAMA, Vol. 255, No. 10, 1289, 1986.

Whitman S, King L, and Cohen R., Epilepsy and Violence: A Scientific and Social Analysis.  In: Whitman S, and Hermann B, ed. The Social Dimensions of Psycho pathology.  Oxford University Press, 1986.

Cohen, R., AIDS: The Impending Quarantine, Bulletin of   the Health Policy Advisory Committee, Vol. 17, No. 3,    9-14, 1985.

Whitman S, Coleman T, Patron C, 6.0

Robert L. Cohen, MD

Page #6

Desi B, Cohen R, King L, Epilepsy in Prison: Elevated Prevalence and No Relationship to Violence. Neurology, Vol. 34, No. 6, June, 1984.

Cohen, Robert L., Imprisoned Plasma Donors: A Medical-Ethical Case and Comment, Journal of Prison & Jail Health, Vol. 2, No. 1, 41-46, 1982.