CLEARED FOR PUBLIC FILING BY CSO

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | |
| *Petitioner*, | |
| v. | Civil Action No. 08-864 (EGS) |
| GEORGE W. BUSH, ROBERT GATES, REAR ADM. MARK H. BUZBY, and ARMY COL. BRUCE VARGO, | |
| *Respondents*. | |

## PETITIONER'S REPLY IN FURTHER SUPPORT OF HIS EMERGENCY MOTION TO COMPEL COMPLIANCE WITH THE PROTECTIVE ORDER AND ATTORNEY-CLIENT PRIVILEGE; FOR TELEPHONIC ACCESS; FOR A HEARING; AND FOR A WRIT OF HABEAS CORPUS AD TESTIFICANDUM

Petitioner Ahmed Zaid Salem Zuhair respectfully submits this Reply in Further Support of His Emergency Motion to Compel Compliance With the Protective Order and Attorney-Client Privilege; For Telephonic Access; For a Hearing; and for a Writ of Habeas Corpus Ad Testificandum (dkt. no. 51).

## INTRODUCTION

Mr. Zuhair identified two guards – including in his letter to counsel the guards' identifying serial numbers – who threatened his life, and read and confiscated his legal papers on the night of July 17, 2008. He requests that this Court order his custodians to return his papers, to cease all threats and interference with the attorney-client relationship, to allow him telephonic access to his Counsel, and – should further fact finding be required – the Court should hold a hearing into the matter

and issue a writ of habeas corpus ad testificandum allowing Petitioner to testify via videoconference.

Respondents urge this Court to do nothing about their grave misconduct. Respondents state that *no* hearing is necessary, and *no* relief is possible. They argue, first, that the incident never occurred; and, second, that even if the incident occurred, this Court lacks the power to ordering the limited relief sought by Mr. Zuhair and counsel. Respondents are mistaken on both counts.

Respondents seek to discredit Mr. Zuhair's account by relying on a single declaration, which is based on a review of unspecified "detention records" by the Commanding Officer of Guantánamo and a rote recitation of facility regulations. The Declaration of Commander Bruce Vargo, attached as Ex. 2 to Respondents' Opposition (hereinafter, "Vargo Declaration"), cannot shoulder the burden the Government would have it bear: it does not conclusively refute Mr. Zuhair's account nor does it preclude the Court from ordering injunctive relief. The Vargo Declaration is based upon a review of records that were created by the very individuals whom Mr. Zuhair identified, the same men who threatened his life and read and confiscated his legal papers.

At most, the Vargo Declaration raises questions of material fact, requiring the Court to hold a hearing into the events of July 17, 2008, their effect on Mr. Zuhair's right to access the Court and on the Court's ability to exercise its jurisdiction over this matter. A hearing would help the Court determine, first, the extent of the harm suffered by Mr. Zuhair and by this Court in its ability to carry out its responsibility as a result of the guards' actions and, second, the proper scope of relief.

The need for inquest is further underscored by information recently received by Petitioner's Counsel – information unavailable at the time Petitioner's Emergency Motion was filed. Counsel met with Mr. Zuhair at Guantánamo on the 5th and 6th of August, 2008. The Privilege Review Team unclassified Counsel's meeting notes on August 26, 2008. The notes provide further details not included in Mr. Zuhair's panicked letter of July 18, 2008, the day after the incident.

This new information undermines the reliability of the Vargo Affidavit, provides the identities of several additional individuals who were likely witnesses to the incident, and provides background that demonstrates that the incident with the two guards was not an isolated event but the most egregious example of a practice of retaliation against Mr. Zuhair by his guards. This retaliatory behavior violates the very policies cited by the Vargo Declaration. It is abetted by a failure of the command structure at Guantánamo Bay to supervise and discipline guards who engage in gross violations of internal policies by routinely humiliating the detainees in their charge.

The accompanying declaration makes clear that this Emergency Motion for Relief is not the first time Mr. Zuhair has brought these allegations to the attention of Guantánamo staff. A willful official silence has met each of Mr. Zuhair's complaints. This silence is reflected in the Vargo Declaration itself. Colonel Vargo betrays no interest in investigating the allegations further. Respondents have not even taken the simple, but necessary step, of providing declarations, submitted under oath and threat of perjury, from the men identified by Mr. Zuhair.

For these reasons, this Court should hold order a hearing into this matter to take testimony from Mr. Zuhair and any other individuals under the care and control of

Respondents whom the Court believes have relevant, direct information about the incidents at issue.

## SUPPLEMENTAL FACTUAL BACKGROUND

Petitioner's counsel met with Mr. Zuhair in Guantánamo on August 5 and 6, 2008. *See* September 4, 2008 Declaration of Ramzi Kassem ("Kassem Decl."), attached as Ex. 1 at ¶ 3. The Privilege Review Team unclassified and faxed the notes from that meeting on August 26, 2008 – after the Emergency Motion was filed, on August 12, 2008, so as to meet the deadline set by the Court in its scheduling order of June 31, 2008. *Id.* at ¶ 4. The contents of counsel's notes of his conversation with Mr. Zuhair provide further details and background to the allegations made in Mr. Zuhair's letter of July 18, 2008. This information is material to the controversy before the court.

On or about May 11, 2008, Mr. Zuhair was transferred to Camp 6. *Id.* at ¶ 5. Camp 6 is the worst of all Guantánamo prison camps, featuring permanent lockdown, little to no natural light, extreme temperatures, and constant surveillance.

Mr. Zuhair is held in Block H in Camp 6. *Id.* at ¶ 6. With him in Block H in Camp 6 are 7 other hunger strikers whose names and Internment Serial Numbers were provided to counsel by Mr. Zuhair and can be shared with the Court should it so wish. *Id.* The detainee cells in Block H are arranged around a central common area, which detainees are not permitted to use as they are kept in their cells almost all times. *Id.* at ¶ 8. Each detainee, therefore, has a view of activity in the common area through a window in their cell door.

Force-feeding of the hunger strikers occurs in the common area. *Id.* at ¶ 8. Guards line the restraint chair in front of the cells and the detainees on hunger strike are

brought out for force-feeding in groups of four. *Id.* at ¶ 9. Mr. Zuhair is part of a group of four who are force-fed from 9:30 to 11:30 AM and again from 4:30 to 6:30 PM. *Id.* The other four hunger strikers are fed on alternate shifts. *Id.*

During his force-feeding ordeals, Mr. Zuhair had interacted with the two guards who threatened him and read his legal papers. Their identification numbers were noted in his letter to counsel. *See* Letter from Ahmed Zaid Zuhair, attached as Ex. 1 to Petitioner's Emergency Motion, dkt. 35. Mr. Zuhair identified the guard who confiscated his privileged papers as the cell block's Non-Commissioned Officer (NCO) (hereinafter, "Guard 1"). *See* Kassem Decl., Ex. 1, at ¶ 11. Mr. Zuhair describes Guard 1 as a six foot tall man weighing over 200 pounds, with white skin, and a shaved head. *Id.* at ¶ 12. He estimates that Guard 1 is approximately 35 years old. Mr. Zuhair recalls this guard's insignia as being three inverted "v"s, which makes him a Petty Officer First Class, at least. *Id.* Guard 1 is the commanding officer in the cell block. *Id.* Mr. Zuhair has been told that subordinates and Soldiers on Guard ("SOG's") have complained about this guard's behavior on a number of occasions. *Id.* at ¶ 13.

Mr. Zuhair stated that the second guard is a Navy "seaman." *Id.* at ¶ 14. He described his hair and eyes as dark brown, his build as "skinny," and estimates that he is approximately 22 years-old (hereinafter, "Guard 2"). *Id.* On two occasions before the July 17th incident, Guard 2 mistreated Mr. Zuhair at the end of his force-feeding session.

**First Incident—Mid-June**

In mid-June, Mr. Zuhair's wrist was swollen as a result of the guards' routine use of excessive force. *Id.* at ¶ 15. After a session in the restraint chair, Guard 2 unrestrained Mr. Zuhair's left hand from the chair in order to shackle him for transportation a few

steps back to his cell.  *Id.*  When Guard 2 applied the handcuff onto his left hand, Mr. Zuhair asked Guard 2 to loosen the cuff, as it was cutting into his swollen wrist.  *Id.* at ¶ 16.

Guard 2 asked Mr. Zuhair whether he was refusing to be cuffed.  *Id.* at ¶ 17.  Mr. Zuhair responded by repeating his request that the cuff on his wrist be loosened.  *Id.* Guard 2 took off the cuff and tied Mr. Zuhair's left hand back into the restraint on the chair.  *Id.* at ¶ 18.  Guard 2 then went to complain to the SOG and filed a report stating falsely that Mr. Zuhair had attacked him and hit him with his right hand.  *Id.*  At no time was either of Mr. Zuhair's hands free to hit the guard.  As a result of the report filed by Guard 2, Mr. Zuhair was placed on level 2 discipline status for eighteen days.[1]  *Id.* at 19.

### Second Incident—On or About the 10th or 11th of July

At the end of the eighteen day period, on or around the 10th or 11th of July, Mr. Zuhair was again strapped to the feeding chair when Guard 2 approached him and said, "Shut up! Don't speak!"  *Id* at ¶ 20.

Mr. Zuhair, who had not said anything, asked "What did I do wrong?  What did I say?"  *Id* at ¶ 21.

Guard 2 once again told him to "shut up."  *Id* at ¶ 22.

Mr. Zuhair, angered, called Guard 2 an "animal."  Guard 2 then returned the other 3 hunger strikers to their cells, leaving Mr. Zuhair strapped to the restraint chair.  *Id* at ¶¶ 23, 24.

---

[1] Level 2 discipline status is the worst status at Guantánamo.  For a long term hunger striker stripped of all "comfort items" and privileges such as Mr. Zuhair, however, it makes scant difference—he was offered night-time recreation only, meaning he had absolutely no opportunity to see natural light for that period of time.

Mr. Zuhair had a view of a clock on the wall.  Mr. Zuhair waited in his restraint chair for forty minutes.  *Id* at ¶ 26.  Mr. Zuhair then asked a nurse, "why am I still here?"  The nurse was a black female, in the Navy Command, and approximately thirty years old.  *Id* at ¶¶ 26, 27.

The nurse instructed Guard 2 to return him to the cell.  *Id* at ¶ 28.  Guard 2 ignored the nurse.  *Id* at ¶ 29.  The client then asked the NCO on duty at the time to return him to his cell.  *Id* at ¶ 29.  The NCO was a white female in her 30s.  Id at ¶ 29.  Her insignia was 2 inverted Vs.  *Id* at ¶ 29.  Guard 2 told the NCO that Mr. Zuhair was on punishment.  *Id* at ¶ 30.  The NCO then went to the Soldier on Guard, who stands outside the cell block.  *Id* at ¶ 31.  Upon her return, the NCO told Guard 2 that the SOG ordered that Mr. Zuhair should be returned to his cell.  Guard 2 refused.  The NCO found two other guards to moved Mr. Zuhair back to his cell.  *Id* at ¶ 32.  It had then been forty minutes since the other detainees had been returned to their cells, amounting to a continuous 2 hours and 40 minutes in the restraint chair for Mr. Zuhair.  *Id* at ¶¶ 32, 33.

### Third Incident—July 17, 2008

On July 17th, at 6:30 PM – the end of Mr. Zuhair's evening feeding – three guards came to release him from the restraining chair:  Guard 1 (the Non-Commissioned Officer), Guard 2, and an unidentified seaman.  *Id* at ¶ 34.  The third seaman cuffed Mr. Zuhair properly, leaving the width of one finger between the cuff and his wrist so as not to cut off circulation.  *Id* at ¶ 35.  Guard 1 told the seaman to tighten the cuff.  *Id* at ¶ 36.  The seaman refused to tighten the cuff on Mr. Zuhair left hand.  *Id* at ¶ 36.  Guard 2 immediately tightened the cuff on Mr. Zuhair's right hand.  *Id* at ¶ 37.

Guard 2 then sharply tightened the buckle tying Mr. Zuhair's cuffed hands to his waist. *Id* at ¶ 37. Mr. Zuhair felt like he was going to vomit and screamed out in pain. *Id* at ¶ 38. Guard 1 yelled that Mr. Zuhair was refusing and called for an IRF team. *Id* at ¶ 39. Guard 1 then went to speak to the SOG outside. *Id* at ¶ 39. When he returned, there was no IRF team. *Id* at ¶ 40. Guard 1 ordered Guard 2 and the seaman to tighten Mr. Zuhair's cuffs again and return him to his cell. *Id* at ¶ 40.

Angered by this treatment, Mr. Zuhair addressed Guard 1 in English. *Id* at ¶ 41. He stated, "We are prisoners. Do you think you are Rambo? If you are Rambo, go to Iraq. We are prisoners. We cannot hurt you." *Id* at ¶ 42.

Guard 1 laughed. *Id* at ¶ 43. The three guards took Mr. Zuhair to his cell. *Id* at ¶ 44. Mr. Zuhair stood outside his cell with the NCO as Guard 2 and the other seaman patted him down. *Id* at ¶ 45. The seaman performed the bodysearch normally, whereas Guard 2 did it in a manner that was deliberately brutal and demeaning, leading the seaman to shake his head disapprovingly. *Id* at ¶ 46.

Guard 1 then asked Mr. Zuhair, "I should go to Iraq?" *Id* at ¶ 47.

Mr. Zuhair replied, "Yes." *Id* at ¶ 48. Guard 1 then told Mr. Zuhair that he would kill him and cut his body into pieces. Guard 2 said that they should cut off Mr. Zuhair's ears and nose instead, as detailed in Petitioner's letter to counsel and in the Motion filed with the Court. *Id* at ¶ 49.

That night, at around 11:00 PM or midnight, Guard 1 removed Mr. Zuhair's box of personal and legal papers from the vacant cell where it is kept. Detainees on hunger strike are not permitted to keep their legal papers in their cells. Guard 1 took the papers to the common area outside Mr. Zuhair's cell and read through them, as detailed in

8

Petitioner's letter to counsel and in the Emergency Motion filed with the Court. *Id* at ¶ 54.

Guard 1 went through Mr. Zuhair's papers page by page. *Id* at ¶ 54. He read everything that was in English, including legal papers marked attorney-client privileged. *Id* at ¶ 54. He then pulled all handwritten papers and notes and took them with him. *Id* at ¶ 55. He did so in full sight of Guard 2, the other guards on duty that night, and the other prisoners in the block who could have witnessed it through the windows in their cell doors. *Id* at ¶ 53.

As he read Petitioner's privileged papers, from 11:00 PM or midnight on, Guard 1 would shake and bang on Mr. Zuhair's door every 30 minutes. *Id* at ¶ 52. This lasted until dawn, approximately 4 or 5 AM the next day, July 18. Guard 1 did so in full sight of Guard 2, the other guards on duty that night, and the other prisoners in the block who could have witnessed it through the windows in their cell doors. *Id* at ¶ 53.

The next day, on July 18th, the mental health doctor toured the cell block. *Id* at ¶ 56. Mr. Zuhair told the doctor, who was a Navy physician from the camp's PHU, about the threats. *Id* at ¶ 56. Mr. Zuhair believes that the doctor noted his complaints, but does not know if he ever reported them to his superiors. *Id* at ¶ 56.

On July 18th, Mr. Zuhair asked an interpreter for the soldier on guard, a tall black man with three inverted superposed "v"'s to lodge a formal complaint. *Id* at ¶57.

## **ARGUMENT**

**I.    A Hearing Is Appropriate to Determine the Extent of the Harm Suffered by Petitioner Ahmed Zuhair**

"If there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).

> Particularly when a court must make credibility determinations to resolve key factual disputes in favor of the moving party, it is an abuse of discretion for the court to settle the question on the basis of documents alone, without an evidentiary hearing. . . .   The circumstances and interests at stake will affect whether an abbreviated or more extensive evidentiary hearing is necessary.

*Id.*

The Vargo Declaration is insufficient to rebut the allegations raised in Petitioner's Emergency Motion.   Its contents are too insubstantial to rebut Mr. Zuhair's twin allegations – first, that guards read and confiscated his legal mail and, second, that the guards threatened his life.   The Vargo Declaration is not based upon Colonel Vargo's personal knowledge of the events at issue but on Colonel Vargo's review of "detainee records."   Colonel Vargo does not define the scope or nature of the records reviewed.   To the extent that sources of the information in these records are identified, those only undermine the records' reliability.   These records were created by the very individuals Mr. Zuhair identifies as interfering with attorney-client relationship, violating the attorney-client privilege, threatening Mr. Zuhair's life and obstructing the jurisdiction of this Court.   Their reliability is highly questionable at best.   The guards had every reason to hide their perfidy from their superior officers.

Mr. Zuhair has identified, by physical description and ID number, the two guards who read and removed his legal papers.   Given the apparent reluctance of Guantánamo's commanding officers to investigate serious allegations against the guard force, greater scrutiny by this Court is required before deciding Mr. Zuhair's Motion.

Furthermore, it is clear that the Court has the power to order the relief requested by Mr. Zuhair pursuant to either its powers under the All Writs Act, 28 USC 1651, or FRCP 65. If Mr. Zuhair cannot accept legal mail from Counsel without confidence in the inviolability of attorney-client privilege, his habeas proceedings will be severely compromised.

The relief requested – the return of legal papers and telephonic access to Mr. Zuhair – is neither overbroad nor precluded by traditional notions of deference to prison administration. Mr. Zuhair is at the mercy of his jailors. He faces the same guards 24 hours a day, seven days a week. They have repeatedly acted in a threatening manner towards him. They have already demonstrated their willingness to violate his rights in clear violation of internal policy. Telephone access with his Counsel – already contemplated by the terms of the Protective Order – is one remedy that can allow this Court to ensure that Mr. Zuhair's ability to litigate his habeas proceedings is not chilled by the actions of his guards.

### A.   The Vargo Declaration is Insufficient to Rebut Mr. Zuhair's Allegations that the Guards Read and Confiscated his Confidential Legal Papers

The Vargo Declaration is insufficient to rebut Mr. Zuhair's allegations that on the night of July 17, 2008, two guards threatened his life, read his legal papers, and confiscated several of the pages, for three reasons. First, Colonel Bruce Vargo did not bear witness to the incidents. His Declaration is not based upon his personal knowledge of the events but upon "information made available to [Colonel Vargo] through [his] official duties, including the detention records of ISN 669[.]" Vargo Decl. ¶ 1.

Second, Colonel Vargo does not provide copies of these records or identify the sources of the information. Respondents have provided this Court with absolutely no indicia to ensure that the records or information reviewed by Mr. Vargo is either reliable or exhaustive, or that his review itself was exhaustive of the universe of materials before him. The Vargo Declaration merely states that the records "do not reflect any information to support the allegations of ISN 669 that any guards read through or removed any legal mail from the detainee's cell or possessions on or about 17 July 2008." Vargo Decl. ¶ 4. No mention is made in the Vargo Declaration as to any reporting requirements that would necessitate guards indicating, in any form, that they read or confiscated a detainee's mail. *But see* Vargo Decl. ¶ 5 (detailing requirement that guards "immediately report detainee noncompliance and agitation to . . . supervisors [who], in turn, are trained to ensure the timely reporting and documentation of these incidents . . . [and] are regularly trained on these requirements).

Third, Respondents' dependence on an Affidavit limited solely to these "detainee records" is inappropriate given Mr. Zuhair's identification of the two guards who read and confiscated his legal papers. In the letter attached to his Emergency Motion as Exhibit 1, Mr. Zuhair gave the badge numbers of the two guards who entered his cell and engaged in these acts. "Camp guards are not permitted to read a detainee's legal mail." Vargo Decl. ¶ 3. A guard who engaged in these actions, in clear violation of attorney-client privilege and internal regulations, would be less than enthusiastic to report his own intransigence to a superior officer, let alone create a lasting document that would presumably lead to some sort of disciplinary action. As Counsel's meeting notes explain, Mr. Zuhair has witnessed both Guard 1 and Guard 2 be grossly insubordinate towards a

superior officer. *See* Kassem Decl. at ¶¶ 32, 61. Given the incentive these guards had to cover up their malfeasance, reliance on a written record is simply insufficient to rebut Mr. Zuhair's allegations. Only statements from individuals with direct knowledge of the event – Mr. Zuhair, Guard 1, Guard 2, and the third seaman – can suffice to settle the facts of the matter.

Recently cleared meeting notes between Counsel and Mr. Zuhair show that the guards undertook their action in sight of the other detainees held in Mr. Zuhair's cell block in Camp 6. These detainees bore witness through the windows in their cell doors. Because of the limitations Respondents have placed on Counsel's access to Mr. Zuhair, let alone any other detainee whose recollection of the night is germane to this matter, it has not been possible to collect Affidavits from these detainees. The Court, however, can require the production of their testimony in a hearing.[2]

### B.    The Vargo Declaration is Insufficient to Rebut Mr. Zuhair's Allegations that the Guards Threatened His Life

The Vargo Declaration is insufficient to rebut Mr. Zuhair's allegation that two guards threatened his life on or about the night of July 17, 2008 for the three reasons enumerated *supra* at IA. First, Colonel Vargo did not bear witness to the incidents. Second, he has provided no indicia by which to measure the comprehensiveness or reliability of either the records reviewed or the scope of his review. Third, the record is based upon the testimony of the very guards who Mr. Zuhair alleges to have threatened his life.[3]

---

[2] Should the Court so desire, Counsel can provide the names and ISN numbers of these detainees.

[3] Colonel Vargo states that Mr. Zuhair "has a very long history of disciplinary violations and noncompliant, resistant and competitive behavior." Vargo Decl. ¶ 6. Colonel Vargo provides no evidence in support of this statement, besides the single incident based on the testimony of the guards who threatened Mr.

The Vargo Declaration states that, on the night of 17 July 2008, Mr. Zuhair became "noncompliant after members of the guard force instructed him to place his hand eight inches in front of his stomach so that he could be shackled."  Vargo Decl. ¶ 6.  Mr. Zuhair then refused and began to "use profanity while the guards escorted him" to his cell.   Vargo Decl. ¶ 6.   Finally, according to the Vargo Declaration, Mr. Zuhair threatened the lives of the guards by stating "come in my cell, I will cut off your head." Vargo Decl. ¶ 6.  The Vargo Declaration attributes this record to two unidentified guards who took Mr. Zuhair to his cell, as well as the "guard force supervisor."  Vargo Decl. ¶ 6.

The recently cleared information received from Mr. Zuhair further undermines the reliability of the Vargo Declaration and the credibility of the assertions therein.  Mr. Zuhair has clarified that three men were involved in the June 17th incident:  the Non-Commissioned Officer described as the "guard force supervisor" in the Vargo Declaration, Guard 1; the "skinny seaman," Guard 2; and an unidentified seaman.[4]  The record reviewed in the Vargo Declaration was created by these three men.  Counsel believes that Guard 1 is identified in the Vargo Declaration as the "guard force supervisor."  It is simply impossible to rely on the very individuals accused of violating attorney-client privilege and internal regulations to report honestly and accurately news of their own transgressions to supervising officers.  In this instance, the reliability of the records is further diminished due to the active involvement of a "guard force supervisor."

Zuhair's life.  The existence of records reflecting an incident on the night of July 17, 2008 confirms only that an incident transpired, consistent with Petitioner's account.   These statements, unsourced, uncorroborated, and flawed as they are do not settle the precise content of the incident.  The Court must hold a hearing to shed further light.  Furthermore, Mr. Zuhair disciplinary history, whatever it may be, in no way authorized guards to violate attorney-client privilege, disrupt this Court's jurisdiction over Mr. Zuhair's habeas claim.

[4] Mr. Zuhair did not mention the latter seaman in his initial letter, as that man explicitly refused to tighten his cuff, did not issue death threats, and did not read or confiscate his mail.

Furthermore, the involvement of a commanding officer no doubt chilled any desire the second seaman had to report the violations he witnessed.

The Vargo Declaration provides the Court with two layers of unreliable hearsay evidence. The record itself is ill-defined, as is the scope of Colonel Vargo's search of the records. To the extent the record is defined, it is based *exclusively* upon statements made by the very individuals who Mr. Zuhair alleges to have threatened his life.

To the extent the Vargo Declaration does dispute any of Mr. Zuhair's allegations regarding the death threats, a hearing is necessary. Again, these acts took place in clear view of the other detainees, listed above, in Mr. Zuhair's cell block. Furthermore, Mr. Zuhair has identified – both by physical description as well as by serial number – the guards in question. No less than their testimony and the testimony of Mr. Zuhair is necessary to the resolution of this motion.

> C.    **To The Extent the Vargo Declaration Raises Genuine Issues of Material Fact in Opposition to Mr. Zuhair's Emergency Motion, A Hearing is Necessary**

This Court must hold a hearing to resolve any issues of material fact that the Vargo Declaration must raise. Ruling against Mr. Zuhair's Emergency Motion before such a hearing would be premature, and an abuse of discretion, given the Vargo Declaration's insubstantiality.

> II.    **The Court Has the Power to Grant the Relief Requested by Mr. Zuhair**

The Government argues that, even if Mr. Zuhair's allegations are true, this Court has no power to remedy the harm the guards' actions inflicted on Mr. Zuhair or the Court itself. If the Government's argument is accepted, this Court would have *no* recourse should the actions of Respondents' agents practically bar Mr. Zuhair from litigating his

habeas case.  This cannot be so.  The Supreme Court did not order that Mr. Zuhair and similarly situated detainees be allowed a "prompt habeas hearing" only to allow Respondents' agents to frustrate the habeas proceeding.  The Court has broad equitable powers under the All Writs Act, 28 USC § 1651, as well as the power to issue injunctive relief under FRCP 65.[5]

### A.    The Relief Requested is Necessary to Remedy the Harm Experienced by Mr. Zuhair and the Court

The Government argues that this Court cannot "amend" the Protective Order to grant Mr. Zuhair telephonic access to his counsel because to do so would be an "unwarranted departure from the terms of the Protective Order."  Resp. Mot'n at 6. Contrary to Respondent's position, the Court does not need to amend the Protective Order to grant Mr. Zuhair's requested injunctive relief.  Furthermore, the requested relief is a necessary remedy, given the harm Mr. Zuhair has experienced.

It is not necessary for the Court to amend the terms of the Protective Order in Mr. Zuhair's case.[6]  Section VIII(A) of the Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba states that phone calls to by counsel to the detainee are available in "special circumstances":

> Requests for telephonic access to the detainee by counsel or other persons will not normally be approved.  Such requests may be considered on a case-by-case basis due to special circumstances.[7]

---

[5] Respondents do not contest that this Court has the power to order the return to Mr. Zuhair of legal papers that have been removed from his possession.

[6] However, the Court does have the power to amend the Protective Order, should it choose to do so.  The Protective Order governing this case was enacted pursuant to the Court's power, under the All Writs Act, 28 U.S.C. § 1651, to "arrange for procedures which will allow development . . . of the facts relevant to the disposition of a habeas corpus petition."  *Al Odah v. United States*, 346 F.Supp. 2d 1, 6 (D.D.C. 2004).  It is axiomatic that a Protective Order created by the Court as an extension of its equitable powers may be amended by the Court utilizing the same.

[7] The Procedures for Counsel Access are attached to the Amended Protective Order first entered by Judge Green, *In re Guantánamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004). The Amended Protective

The Protective Order clearly contemplates situations where the telephonic access is required.  The instant case, should a hearing demonstrate the truth of Mr. Zuhair's allegations, presents precisely such a situation.

The actions of the guards left Mr. Zuhair unwilling to communicate with counsel through legal correspondence.  That Respondents so readily turn a blind eye to their subordinates' misconduct – their failure to provide testimony from the guards identified in Mr. Zuhair's motion, for example – only further erodes whatever expectation Mr. Zuhair may have had that the guards will not repeat their actions and again read and confiscate his legal materials or threaten him.  Ordering that he be allowed telephonic access to his counsel to relay and discuss confidential legal information is a remedy that will allow this Court to protect its jurisdiction over this case.

**B.    The Court has the Power to Order All Requested Relief Under the All Writs Act, 28 U.S.C. § 1651**

According to Mr. Zuhair – and there is no reason to believe his account is inaccurate – the guards have interfered with this Court's ability to hear Mr. Zuhair's habeas petition.  This Court's jurisdiction over Mr. Zuhair's habeas petition is governed by the habeas corpus statute, 28 U.S.C. § 2241, and it has the power to take all measures "necessary and appropriate" to aid that jurisdiction under the All Writs Act, 28 U.S.C. § 1641, including the power to grant the limited relief sought here.

The Court of Appeals for the District of Columbia Circuit has already held that district courts have the power under the All Writs Act to protect their jurisdiction where the actions of Respondents in the Guantánamo detainee cases may threaten proceedings.

---

Order was entered in this case by Judge Sullivan on June 25, 2008. See, Minute Order Granting Motion for Protective Order, *Zuhair v. Bush*, 08-CV-864 (D.D.C. June 25, 2008)

*Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008). Respondents seek to distinguish this case by arguing that what was at issue in *Belbacha* was the power of a District Court to *prohibit* governmental action, by preventing the transfer of detainees, whereas Petitioner is asking the Court for *affirmative* relief. Nowhere does *Belbacha* construct such a facile distinction. Furthermore, the distinction is meaningless. Petitioner can easily phrase his request of this Court in the negative by requesting relief to *prevent* Respondents from further threatening this Court's jurisdiction in the same manner that *Belbacha* allowed courts to require Respondents take affirmative steps to prevent transferring detainees.

Finally, Respondents seem to argue that this Court is prohibited from ordering any amendments to the Protective Order by the language of 28 U.S.C. § 2241(e)(2). Respondents seek to characterize Petitioner's Emergency Motion as one that seeks changes in Mr. Zuhair's conditions of confinement. Resp. Br. At 10 at fn 5. Respondents intentionally misconstrue Mr. Zuhair's request. The relief Mr. Zuhair requests is not an ancillary issue or an attempt to litigate the conditions of his confinement but rather is necessary for this Court to exercise its undisputed jurisdiction over Mr. Zuhair's habeas petition.

    **C.**    **Mr. Zuhair Meets the Standard for a Preliminary Injunction Under FRCP 65**

    **a.**    **Mr. Zuhair has demonstrated his likely success on the merits.**

Respondents contest neither Mr. Zuhair's right to access this Court nor the inviolability of the attorney-client privilege. They state, in general terms, that courts accord "substantial deference to the judgment of prison administrators and generally refrain from interfering in the day-to-day operations of prison facilities." Resp. Br. At 10. This deference has never been held to bar judicial intervention meant to protect the

basic rights of individuals held in prison facilities, including the right to access courts of law or legal materials. Deference to prison administration is not a talisman, the simple invocation of which is sufficient to prevent a court from issuing narrow injunctions necessary to prevent officials from egregious violations of prisoners' rights.

Respondents further argue that this Court has no jurisdiction to enter an injunction in this matter, as Mr. Zuhair's habeas petition challenges the legality of his detention and *not* his conditions of confinement. Mr. Zuhair's Emergency Motion is clearly not seeking relief from general conditions of confinement. He is not asking the Court to prevent the guards from cruelly and intentionally causing him pain when force feeding him. He is simply asking that the Court intervene where the actions of prison guards burden his ability to access this Court and properly litigate his habeas petition.

**b.   Mr. Zuhair has suffered irreparable injury**

Petitioner is injured by his current level of access because the actions of the guards in reading through and confiscating his papers left him unwilling to accept legal communications from his attorneys at that time and severely undermined his belief in the confidentiality of communications with counsel. Unless active steps are made to reinstate Mr. Zuhair' faith that the guards will respect the inviolability of the attorney-client privilege, his ability to access this Court and judicial relief is in jeopardy.

The actions of the guards and the failure of their superiors to investigate their actions and discipline them accordingly has chilled Mr. Zuhair's ability to petition this Court. The Supreme Court has recognized 'chilling' effect as an adequate injury for establishing standing because the "alleged danger . . . is, in large measure, one of self-censorship." *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

Furthermore, as opposed to the plaintiff in the case cited by Respondents, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Mr. Zuhair is not a resident in a city of millions who faces little chance of coming into contact with the police who once abused him. He is the thrall of his guards twenty-four hours a day, seven days a week. There are potentially limitless opportunities for further retaliation, especially against petitioners who have exposed themselves by taking the stand and testifying against Respondents. *Cf. Goff v. Nix, 803 F.2d 358, 36*1 n.6 (8th Cir. 1986) (rejecting argument that prisoner plaintiffs lacked standing to challenge a strip search procedure because "it seems not unlikely" that plaintiffs would be subjected to strip searches in the future).

### c.    Injunctive relief will further the public interest

There is a "strong public interest in the integrity of the judicial process." *United States v. Hasting*, 461 U.S. 527 (1983). If the protective order, as it is currently applied in Mr. Zuhair's case cannot guarantee the integrity of the judicial process, changes must be made. As explained, supra in IIA, the Protective Order itself contemplates telephonic access in certain situations. Petitioner does not seek to upset the balance set in the Protective Order – only to protect it and utilize it properly given the egregious actions of Respondents' agents.

### d.    The injunctive relief requested is not overbroad

The injunctive relief requested by Mr. Zuhair is extremely narrow, given the nature of the harm inflicted. Guards threatened his life, read through his confidential legal papers, and confiscated a portion of these papers. He asks that his papers be returned and that he be allowed telephonic access to his counsel, a form of communication contemplated by the Protective Order itself. This remedy does not require the continuous

supervision of the court, nor does it require judicial interference in the running of the prison system. The relief requested addresses only the harm caused an individual detainee. It does not apply to the prison system as a whole, or even to classes of prisoners. At most, the injunction affects a few isolated decisions over the course of Mr. Zuhair's detention. In the face of egregious violation of Mr. Zuhair's rights, the narrow injunction can only be characterized as minimal and virtually non-intrusive.

## **CONCLUSION**

For the foregoing reasons, Mr. Zuhair requests that this Court hold a hearing to resolve any disputed issues of material fact and grant the relief requested in his Emergency Motion.


Dated: September 4, 2008

<div style="margin-left:50%">

Respectfully submitted,
_____/s/_____
Ramzi Kassem
Michael J. Wishnie
*Supervising Attorneys*

Anand Balakrishnan
Madhuri Kumar
Darryl Li
*Law Student Interns*

Allard K. Lowenstein International
    Human Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street, New Haven, CT 06511
(203) 432-0138
ramzi.kassem@yale.edu
*Counsel for Petitioner*

</div>

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 4, 2008, I caused a true and accurate copy of Petitioner's Reply In Further Support of His Emergency Motion to Compel Compliance With the Protective Order and Attorney-Client Privilege; For Telephonic Access; For a Hearing; and For a Writ of Habeas Corpus Ad Testificandum to be served upon the following counsel for Respondents by electronic filing via the Court's ECF system:

Arlene Groner, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530


_____/s/_____
Anand Balakrishnan
Allard K. Lowenstein International Human
    Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | |
| *Petitioner*, | |
| v. | Civil Action No. 08-864 (EGS) |
| GEORGE W. BUSH, ROBERT GATES, REAR ADM. MARK H. BUZBY, and ARMY COL. BRUCE VARGO, | |
| *Respondents*. | |

## SEPTEMBER 4, 2008 DECLARATION OF RAMZI KASSEM

Pursuant to 28 U.S.C. § 1746, I certify that the following is true and correct to the best of my knowledge:

1.  My name is Ramzi Kassem.

2.  I am a Robert M. Cover Fellow and Clinical Lecturer in Law at Yale Law School and counsel to Petitioner in the above-captioned matter, Ahmed Zaid Salem Zuhair.

3.  I traveled to Guantánamo and met with Mr. Zuhair on the 5th and 6th of August, 2008.

4.  On August 26, 2008, the Privilege Review team faxed me my notes from those meetings after having unclassified them.

### Mr. Zuhair's Treatment by the Guards in Cell Block H in Camp 6

5.  Mr. Zuhair told me that, on or about May 11, 2008, he was transferred to Camp 6, where he is held in Block H.

6.  Mr. Zuhair told me that seven other hunger strikers are held with him in Camp H.

7.  Mr. Zuhair told me the names and Internment Serial Numbers of these seven men.

8.  Mr. Zuhair told me that force-feeding of the hunger strikers occurs in a common area between the cells.  Guards line restraint chairs in front of the cells.

9.  Mr. Zuhair told me that the hunger strikers are force-fed four at a time.  Mr. Zuhair and three other strikers are brought out between 9:30 and 11:30 AM and between 4:30 and 6:30 PM.  The other four hunger strikers are fed on alternate shifts.

10.  Mr. Zuhair told me that the two guards who threatened his life and read and removed his legal papers are stationed in Block H in Camp 6.

11.  Mr. Zuhair told me that the guard who confiscated his privileged papers was a Non-Commissioned Officer.  I refer to this guard hereinafter as Guard 1.

12.  Mr. Zuhair described Guard 1 as a six foot tall white man, weighing over 200 pounds, with a shaved head, who is approximately 35 years old.  Mr. Zuhair recalls this guard's insignia as being three inverted "v's."  Guard 1 is a commanding officer in the cell block when on duty.

13.  Mr. Zuhair stated that subordinates and Soldiers on Guard ("SOGs") have complained about Guard 1's behavior on a number of occasions.

14.  Mr. Zuhair stated that the second guard's rank is that of a Navy seaman.  He described him as white, with dark brown eyes and hair, his build as "skinny," and estimates that he is approximately 22 years-old.  I refer to this guard hereinafter as Guard 2.

### First Incident—Mid-June, 2008

15.  Mr. Zuhair told me that, in mid-June, his wrist was swollen as a result of the guards' routine use of excessive force.  He said that, after a session in the restraint chair, Guard 2 unrestrained Mr. Zuhair's left hand from the chair in order to shackle him for transportation a few steps back to his cell.

16.  Mr. Zuhair told me that when Guard 2 shackled his left hand, Mr. Zuhair asked Guard 2 to loosen the cuff, as it was cutting into his swollen wrist.

17.  Mr. Zuhair told me that Guard 2 then asked Mr. Zuhair whether he was refusing to be cuffed.  Mr. Zuhair responded by repeating his request that the cuff on his wrist be loosened.

18.  Mr. Zuhair told me that, in response, Guard 2 took off the cuff and tied Mr. Zuhair's left hand to the restraint on the chair.  Guard 2 then went to complain to the SOG and filed a report stating falsely that Mr. Zuhair had attacked him

and hit him with his right hand. At no time were either of Mr. Zuhair's hands free to hit the guard.

19.     Mr. Zuhair stated that, as a result of the report filed by Guard 2, Mr. Zuhair was placed on level 2 discipline status for eighteen days.

**Second Incident—On or About the 10th or 11th of July, 2008**

20.     Mr. Zuhair told me that, at the end of the eighteen day period of punishment, he was again strapped to the feeding chair when Guard 2 approached him and said, "Shut up! Don't speak!"

21.     Mr. Zuhair told me that he had not said anything to the guard and that he then asked the guard "What did I do wrong? What did I say?"

22.     Mr. Zuhair told me that Guard 2 again told him to "shut up."

23.     Mr. Zuhair told me that he lost his temper, and in anger called Guard 2 an "animal."

24.     Mr. Zuhair said that Guard 2 then returned the other three hunger strikers to their cells, but left Mr. Zuhair strapped to the restraint chair.

25.     Mr. Zuhair told me that he could see a clock on the wall from where the restraint chair was placed.

26.     Mr. Zuhair stated that, after forty minutes, he asked a nurse "why am I still here?"

27.     Mr. Zuhair described the nurse was a black female, approximately thirty years old. Her insignia had two inverted "v"'s.

28.     Mr. Zuhair told me that the nurse then instructed Guard 2 to return him to his cell but Guard 2 ignored the nurse.

29.     Mr. Zuhair told me that he then asked the NCO on duty at the time to return him to his cell. He described the NCO as a white female in her 30s whose insignia was 2 inverted "v"s.

30.     Mr. Zuhair told me that Guard 2 told the NCO that Mr. Zuhair was on punishment.

31.     Mr. Zuhair told me that the NCO then went to the Soldier on Guard, who stands outside the cell block.

32.    Mr. Zuhair told me that when she returned, the NCO told Guard 2 that the SOG ordered that Mr. Zuhair should be returned to his cell, but that Guard 2 refused to do so.  The NCO found two other guards to move Mr. Zuhair back to his cell.

33.    Mr. Zuhair told me that by the time he was returned to his cell, he had been strapped into the restraint chair for two hours and forty minutes.

### Third Incident, July 17, 2008

34.    Mr. Zuhair told me that on July 17th, at 6:30 PM – the end of Mr. Zuhair's evening feeding – three guards came to release him from the restraint chair: Guard 1 (the Non-Commissioned Officer), Guard 2, and an unidentified seaman.

35.    Mr. Zuhair told me that the third seaman cuffed Mr. Zuhair properly, leaving the width of one finger between the cuff and his wrist so as to not cut off circulation.

36.    Mr. Zuhair told me that Guard 1 told the third seaman to tighten the cuff, but the seaman refused to tighten the cuff on his left hand.

37.    Mr. Zuhair told me that Guard 2 tightened the cuff on Mr. Zuhair's right hand and then tightened the buckle tying Mr. Zuhair's cuffed hands to his waist.

38.    Mr. Zuhair told me that Guard 2 made the buckle so tight that Mr. Zuhair felt like he was going to vomit and screamed out in pain.

39.    Mr. Zuhair told me that Guard 1 yelled that Mr. Zuhair was refusing, called for an Initial Reaction Force ("IRF") team, and went to speak to the SOG outside.

40.    Mr. Zuhair told me that no IRF team appeared, but instead Guard 1 returned and told Guard 2 to tighten Mr. Zuhair's cuffs and return him to his cell.

41.    Mr. Zuhair told me that he was angered by his treatment and addressed Guard 1 in English.

42.    Mr. Zuhair told me that he stated to Guard 1, "We are prisoners.  Do you think you are Rambo?  If you are Rambo, go to Iraq.  We are prisoners.  We cannot hurt you."

43.    Mr. Zuhair told me that Guard 1 laughed in response.

44.    Mr. Zuhair told me that the three guards took Mr. Zuhair to his cell.

45.   Mr. Zuhair told me that when they arrived at the cell, Guard 1 stood outside the cell while Guard 2 and the other seaman patted Mr. Zuhair down.

46.   Mr. Zuhair told me that while the seaman performed the body search normally, Guard 2 did it in a matter that was deliberately brutal and demeaning, which made the seaman shake his head disapprovingly.

47.   Mr. Zuhair told me that at that point, Guard 1 asked Mr. Zuhair, "I should go to Iraq?"

48.   Mr. Zuhair told me that he told Guard 1, "Yes."

49.   Mr. Zuhair told me that Guard 1 then told Mr. Zuhair that he would kill him and chop his body into pieces and Guard 2 said that they should cut off Mr. Zuhair's nose and ears instead.

50.   Mr. Zuhair told me that, on that night, at around 11 PM or midnight, Guard 1 removed Mr. Zuhair's box of personal and legal papers from the separate cell where it is kept.  Hunger strikers are not permitted to keep their papers in their cells.  Mr. Zuhair told me the guard took his box of legal materials and papers to the common area outside Mr. Zuhair's cell and read through them.

51.   Mr. Zuhair told me that Guard 1 was in full sight of Guard 2, the other guards on duty that night, and the other prisoners in the block who could observe what was happening through the windows in their cell doors.

52.   Mr. Zuhair told me that, from 11 PM or midnight on, Guard 1 shook and banged on Mr. Zuhair's door every 30 minutes until dawn, at about 4 or 5 AM.

53.   Mr. Zuhair told me Guard 1 banged on his door in full sight of Guard 2, the other guards on duty that night, and the other prisoners in the block who could observe what was happening through the windows in their cell doors.

54.   Mr. Zuhair told me that he saw Guard 1 read through his papers page by page. Guard 1 read everything that was in English, including papers marked attorney-client privileged.

55.   Mr. Zuhair told me that Guard 1 pulled all handwritten papers and notes and took them with him.

56.   Mr. Zuhair told me that the next day, on July 18th, a Navy mental health doctor from the PHU toured the cell block and that he told the doctor about the threats. Mr. Zuhair believes that the doctor noted his complaints, but does not know if he ever reported them to his superiors.

57.    Mr. Zuhair told me that on July 18th, he asked an interpreter for the SOG, a tall black man with three inverted superposed "v"'s to lodge a formal complaint.  That man told Mr. Zuhair that he had complained about Guard 1 himself at a prior time and said he'd write a report about the incident.  Two days later, Mr. Zuhair said he complained to another SOG, a white male of the same rank as the aforementioned SOG, and that he responded to Mr. Zuhair in the exact same manner.

58.    Mr. Zuhair told me that approximately one week after the threat, on the Wednesday of the following week, a Navy captain, who was dark-skinned and larger than Guard 1 came to tour Block H.

59.    Mr. Zuhair told me that he knocked on the window of his cell door to ask to speak with the captain but that Guard 1 tried to dissuade the captain from coming to speak to Mr. Zuhair.

60.    Mr. Zuhair told me that the captain went over to his cell anyway.  Mr. Zuhair asked him for some water.

61.    Mr. Zuhair told me that the captain ordered Guard 1 to give him some water but that Guard 1 refused.

62.    Mr. Zuhair told me that he turned to the captain and pointed to his (Mr. Zuhair's) dark skin and said "it's because of this," meaning that Guard 1 was disobeying his commanding officer because Guard 1 was white and the captain was black.

63.    Mr. Zuhair told me that the captain ordered Guard 1 to get water again and that, this time, Guard 1 complied, uttering a curse word in English which Mr. Zuhair did not understand.

### Mr. Zuhair's Medical Condition

64.    During my August 5-6, 2008 meetings with Mr. Zuhair, his ongoing health problems remained unabated.

65.    Mr. Zuhair told me that he developed a serious stomach infection in mid-June and that, during his twice-daily force-feeding sessions, he experiences an intense spreading pain, "like a fire lighting up" in his stomach as soon as the nutrient mixture flows out of the feeding tube.

66.    Mr. Zuhair told me that he was not permitted to see a physician about this problem until August 4, the day before his meeting with counsel.  The physician told him that he has a stomach infection.

67.    Mr. Zuhair told me that he believes the infection is caused by unsanitary procedures in his force-feeding process.   He has observed Guantánamo personnel washing feeding tubes for all the hunger strikers simultaneously in the same bucket. He said that the same feeding tubes are used for 15 days and are only replaced at detainees' request.

68.    Mr. Zuhair told me that he described the handling of feeding tubes to another physician, and that the doctor expressed surprise and told him that staff "are supposed to remove fresh tubes from the packaging before detainees' eyes at every feeding session."

69.    Mr. Zuhair told me that has also observed Guantánamo medical personnel playing with feeding tubes with their bare hands before placing them in boxes to dust, iguanas, and various rodents without subsequently cleaning or purifying them.   He told me the clinic has doors and windows open at all times.

70.    Mr. Zuhair told me that he also believes that he and other hunger-strikers are being surreptitiously drugged to render them more compliant.

71.    Mr. Zuhair told me that he would be willing to be interviewed, in the presence of his counsel, by the Department of Defense Inspector General's office in any investigation concerning the role of medical personnel in abuses at Guantánamo.

I declare under penalty of perjury that the foregoing is true and correct.

New Haven, CT

Executed on this 4th day of September, 2008

RAMZI KASSEM

7